## Stern, Kevin (Shld-DC-LT)

**From:** Sinoski, Allison N. [ASINOSKI@thompsoncoburn.com]
**Sent:** Wednesday, February 08, 2006 11:56 AM
**To:** Stern, Kevin (Shld-DC-LT)
**Cc:** Schwartz, Matthew D. (Thompson Coburn LLP); Hallas, Maria (OfCnl-DC-Emp/LT)
**Subject:** RE: Ironbound Partners, LLC v. Source Interlink Companies, Inc.

Kevin,

We cannot agree to your offer of allowing discovery only with respect to business opportunities presented to Source by Endeavor or Emanuel "that have been fulfilled." We believe that Ironbound is entitled to discovery regarding all business opportunities presented to Source by Endeavor or Emanuel, including business opportunities that have resulted from the Alliance merger, as these opportunities are relevant both to Ironbound's contract claims and its equitable claims. Particularly, they are relevant to the value of Ledecky's introduction and the benefit Source has received therefrom, and we believe that Source's refusal to produce documents relating to this issue is inconsistent with Rule 26(b)(1), which permits discovery that is reasonably calculated to lead to admissible evidence relevant to Ironbound's claims.

With regards to the potential dismissal of the equitable claims, we discussed this matter during our meet and confer and agreed to take this issue under advisement and discuss it with our client. Upon further review, we realized that the client will require additional stipulations in light of the current posture of the case in order to agree to a dismissal of the equitable claims. With those stipulations, the offer remains open.

You state that it requires 10-24 hours per backup tape to reload the backup tapes onto a server. Are those 10-24 labor hours or is that simply how long the computer takes to reload the tapes?

On a related note, we are troubled that Source apparently continued to destroy or delete backup tapes after the complaint in this case was filed. Inasmuch as monthly backup tapes are retained for 16 months, Source should have had backup tapes dating back to at least January of 2004 at the time this case was filed in May of 2005. While Ironbound has not yet determined what relief, if any, it will seek as a result of Source's failure to preserve the tapes, it asks that Source refrain from deleting or destroying any additional tapes or documents pending the conclusion of this litigation.

Allison

*********************

Allison Sinoski
Thompson Coburn LLP
Suite 600
1909 K Street, N.W.
Washington D.C. 20006-1167
(202) 585-6907
Fax: (202) 508-1034
asinoski@thompsoncoburn.com

---

> **From:** sternk@gtlaw.com [mailto:sternk@gtlaw.com]
> **Sent:** Monday, February 06, 2006 4:54 PM
> **To:** Sinoski, Allison N.
> **Cc:** Schwartz, Matthew D.; HallasM@gtlaw.com
> **Subject:** RE: Ironbound Partners, LLC v. Source Interlink Companies, Inc.



DEFENDANT'S EXHIBIT G

Allison,

I am writing in response to your February 2, 2006 email below.

You have asked whether we intend to instruct Source witnesses not to answer questions during their depositions regarding unfulfilled or potential business opportunities presented by Endeavor or Emanuel to Source. As stated in my January 27, 2006 letter (from which you quote), it is our intention to seek a protective order from the Court if you insist on going forward with questions concerning this subject.

However, as a compromise, we are willing to allow discovery relating to any business opportunities presented to Source by Endeavor or Emanuel that have been fulfilled, i.e., have resulted in actual business to Source or a consummated agreement.

You have asked several detailed questions regarding Source's document search efforts. Our responses are as follows:

### (1) Generally, what was done to collect responsive documents?

Douglas J. Bates supervised a physical search of all tangible media held in the offices of those individuals that had contact with Ironbound, Jon Ledecky, Endeavor, and/or Ari Emanuel. He also supervised a search of the hard drives of the computers used by those individuals. The email server of Source Interlink was also searched.

### (2) How did Source determine whose offices, files, computers, etc. to include in the search?

A preliminary search was conducted based on Mr. Bates's knowledge of those having contact with Ironbound, Jon Ledecky, Endeavor, and/or Ari Emanuel. The resulting documents and emails were then reviewed to determine if other Source employees were named in the documents and emails and thereby may have responsive materials.

### (3) What files were searched and where are those files located?

All physical and electronic files were searched. These files were located in the offices and on the hard drives of those having contact with Ironbound, Jon Ledecky, Endeavor and/or Ari Emanuel. The email server was also searched. It is located on-site at Source's headquarters in Bonita Springs, Florida.

### (4) Which computers were searched?

Computers located in company offices in Bonita Springs, Florida and New York, New York.

### (5) Who was involved in the search? Anyone other than Douglas J Bates?

Other than Mr. Bates, Mark Humphrey, the executive assistants to S. Leslie Flegel, James R. Gillis, Jason S Flegel, the executive assistant to the company's Chief Financial Officer and certain members of the company's IT support team.

### (6) Whose offices and files were searched and a description of the files maintained by each (i.e., incoming and outgoing chron files, appointment calendars, matter-specific file, personal files, Microsoft Outlook files, etc.).

Each individual who was determined to have had contact with Ironbound, Jon Ledecky, Endeavor, and/or

Ari Emanuel or who may otherwisebe in possession of responsive materials, namely, Doug Bates, Leslie Flegel, Jim Gillis and Jason Flegel. Each individual maintains different types of files. In general, however, the individuals maintain matter specific files and personal files as well as electronic files in MS Outlook, MS Word and MS Excel.

**(7) Did Source search faxes, correspondence, e-mails, chron files, calendar entries, notes, journals, diaries, phone records, and fax records?**

To the extent that such files existed, all were searched.

**(8) Describe Source's backup system for electronic files. What kind of machine is used? Are there just backup tapes, or are there also backup servers? Are they located on Source's premises or off-site?**

Source backs up all servers after the end of each business day to magnetic tape. Source has a total of 60 file and email servers combined and uses approximately 10 tape drives to back up the servers. There are test and disaster recovery servers onto which Source irregularly restores backup tapes for testing and disaster preparation purposes. Backup tapes are generally stored off-site. Test and disaster recovery servers are housed within Source facilities.

### (9) What does it take to search backup tapes for responsive documents, particularly e-mails?

For each server backup tape, the tape must first be reloaded onto a separate server. This requires 10-24 hours per backup tape to accomplish. Once reloaded, the only search tool that Source has is the MS Windows environment search engine.

### (10) What are the oldest backup tapes still in Source's possession?

The oldest backup tapes currently in Source's possession, custody or control are backup tapes of the file servers and email servers as of November 26, 2004. [There are some older tapes on different media, but older ones are sporadic and may not be readable.]

### (11) Are different employees' computers found on different backup tapes or is there one tape for the whole company for each time period?

No hard drive on any employee's computer is backed up.

### (12) Were individual computers and hard drives searched using appropriate search terms?

Yes.

\* \* \* \*

You have asked for a copy of Source's document retention policy. Source does not have a retention policy or practice with regard to paper documents. Source does have a retention practice with regard to electronic records, including emails, but that practice has never been put into writing. The practice in the normal course of business has been as follows:

- All daily backups of servers are retained for 6 weeks;

- All weekly backups, i.e., the backup made at the end of each week, are retained for 15 weeks; and

- All monthly backups, i.e., the backup made on the last Friday of each month, are retained for 16 months.

We have not searched any backup tapes in connection with Ironbound's document requests. We object to such undertaking, as it is unduly burdensome and unduly expensive (as mentioned above, it takes on average 10-24 hours just to restore an individual backup tape), particularly when weighed against the marginal value of the sought-after information. Therefore, if you wish to have such a search conducted, Ledecky will have to agree to pay the costs incurred in connection with this effort.

Finally, you have asked that we agree to four proposed stipulations in exchange for your agreement to withdraw Ironbound's equitable claims. Your proposal is inconsistent with the proposal you made at our January 20 meeting, where you offered, with no strings attached, to dismiss your equitable claims in exchange for Source's stipulation that the term "Client" as that term is used in the Referral Agreement, means Endeavor. We are disappointed that you have chosen to renege on your offer, as we would have been willing to enter into such a stipulation and thereby conserve valuable party resources by removing your equitable claims from this suit.

As I am sure you expected, we cannot and will not agree to all of your proposed stipulations, some of which have nothing to do with the issues presented by your equitable claims.

Sincerely,

*Kevin E. Stern*
**Greenberg Traurig LLP**
*800 Connecticut Ave., NW*
*Suite 500*
*Washington, DC 20006*
*(202) 452-4878*
*(202) 261-0107 (fax)*
*sternk@gtlaw.com*

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, please send an email to postmaster@gtlaw.com.

-----Original Message-----
**From:** Sinoski, Allison N. [mailto:ASINOSKI@thompsoncoburn.com]
**Sent:** Thursday, February 02, 2006 4:24 PM
**To:** Stern, Kevin (Shld-DC-LT)
**Cc:** Schwartz, Matthew D. (Thompson Coburn LLP)
**Subject:** Ironbound Partners, LLC v. Source Interlink Companies, Inc.

2/21/2006

Kevin,

We are in receipt of your letter of Jan. 27, 2006. Tentatively, the dates for the depositions appear acceptable. We are waiting to hear back from our client, as he will probably attend.

In your letter, you state that "unfulfilled or potential business opportunities presented by Endeavor or Emanuel are not a relevant line of inquiry even under your theory of case, and we will have no choice but to seek a protective order if you insist on going forward with questions concerning this subject." As we have advised, Ironbound disagrees with this assertion. Such opportunities are not only reasonably calculated to lead to the discovery of admissible evidence, but, for the reasons we have discussed, are directly relevant to Ironbound's claims. Please advise if you intend to instruct Source's witnesses not to answer questions on these topics during their depositions. Also, we note that Source's objection in this regard appears to be limited only to "unfulfilled or potential business opportunities." Please confirm whether this means that Source has no objection to discovery relating to actual business or business opportunities provided to Source by Endeavor or Emanuel or as a result of the Alliance merger.

As you know, we have significant concerns about the adequacy of Source's document production. As we discussed during our meet and confer session, in an effort to better understand the steps Source has taken to comply with its discovery obligations, it would be useful if Source would explain its efforts to identify and produce documents responsive to Ironbound's document requests. Specifically, we would appreciate answers to the following questions:

(1) Generally, what was done to collect responsive documents?
(2) How did Source determine whose offices, files, computers, etc. to include in the search?
(3) What files were searched and where are those files located?
(4) Which computers were searched?
(5) Who was involved in the search? Anyone other than Doug Bates?
(6) Whose offices and files were searched and a description of the files maintained by each (i.e., incoming and outgoing chron files, appointment calendars, matter-specific file, personal files, Microsoft Outlook files, etc.).

(7) Did Source search faxes, correspondence, e-mails, chron files, calendar entries, notes, journals, diaries, phone records, and fax records?

(8) Describe Source's backup system for electronic files. What kind of machine is used? Are there just backup tapes, or are there also backup servers? Are they located on Source's premises or off-site?

(9) What does it take to search backup tapes for responsive documents, particularly e-mails?
(10) What are the oldest backup tapes still in Source's possession?
(11) Are different employees' computers found on different backup tapes or is there one tape for the whole company for each time period?

(12) Were individual computers and hard drives searched using appropriate search terms?

On a related note, during our meeting, you indicated that certain electronic records may have been destroyed. Please provide a copy of Source's document retention policy so that we may better understand the manner in which documents were disposed and evaluate Source's compliance therewith. Also, please confirm that back up tapes have been searched and all responsive documents on those tapes have been produced.

On a separate note, Source has raised concern about discovery related to Ironbound's equitable claims. Ironbound will agree to withdraw its equitable claims if Source stipulates to the following:

2/21/2006

(1) The term "Client," as that term is used in the Referral Agreement, means Endeavor, which includes its principal and founder, Emanuel.

(2) The Referral Agreement covers mergers and acquisitions resulting from Source's relationship with Endeavor, including, without limitation, the Alliance merger.

(3) The status of Ironbound Partners as a trade name, rather than an LLC, does not affect the validity or enforceability of the Referral Agreement.

(4) Source accepted the introduction to Endeavor.

Allison

********************

Allison Sinoski
Thompson Coburn LLP
Suite 600
1909 K Street, N.W.
Washington D.C. 20006-1167
(202) 585-6907
Fax: (202) 508-1034
asinoski@thompsoncoburn.com