UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JONATHAN LEDECKY d/b/a IRONBOUND PARTNERS,<br>1400 34th Street NW<br>Washington, DC  20007<br><br>*Plaintiff,*<br><br>v.<br><br>SOURCE INTERLINK COMPANIES, INC.<br>27500 Riverview Center Blvd., Suite 400<br>Bonita Springs, FL  34134<br><br>*Defendant.* | Civil Action No.  1:05CV01039 (JGP)<br><br>**JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT**

1. This case arises out of defendant Source Interlink Companies, Inc.'s (the "Company" or "Source") breach of a Referral Agreement (the "Agreement") by and between Source and plaintiff Jonathan Ledecky d/b/a Ironbound Partners, LLC.  By this complaint, Ironbound seeks a declaration of the parties' rights and liabilities under the Agreement, an order directing Source to produce its books and records for an annual accounting to determine amounts owed to Ironbound under the Agreement, reformation of the Agreement to change the name "Ironbound Partners, LLC" to "Ironbound Partners," and damages in an amount to be proven at trial.

**Jurisdiction and Venue**

2.     This Court has jurisdiction under 28 U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

3.     Venue is proper under 28 U.S.C. § 1391.

**Parties**

4.     Jonathan Ledecky ("Ledecky") is a resident of the District of Columbia.

5.     Ironbound Partners ("Ironbound") is a trade name or fictitious name, duly registered under the laws of the District of Columbia, through which Ledecky conducted business as a sole proprietorship at the times relevant to this Complaint.

6.     Source, a Delaware corporation with its principal place of business in Bonita Springs, Florida, is engaged in the distribution and fulfillment of magazines, confections and other non-perishable merchandise to grocers, specialty retailers and mass merchandisers.

**The Agreement**

7.     Ledecky, acting under the name Ironbound Partners, LLC, and Source entered into the Agreement on or about April 26, 2004. Under the terms of the Agreement, Ironbound agreed to introduce Source to The Endeavor Agency, LLC, a California-based talent agency that Mr. Ariel Emanuel founded in 1995, and Source agreed to pay Ironbound "compensation equal to 5% of the net income recorded by Source as a result of its relationship with [Endeavor]" during the five-year period following the date on which a "business relationship" was established between Source and Endeavor. A true and correct copy of the Agreement is attached hereto as Exhibit A.

8. Ironbound's entitlement to compensation under the Agreement includes income earned from any and all business dealings and transactions including, without limitation, business combinations, strategic alliances, distribution agreements, sales agreements and fulfillment agreements, and is not limited to income earned by Source from particular types of transactions. Under the compensation structure drafted by Source, once Ledecky introduced Endeavor to Source, the only condition to Ironbound's right to compensation is that Source record "net income" as a result of its relationship with Endeavor. As indicated by the restriction on Ironbound's right to assign the Agreement, the introduction provided by Ledecky was essentially a personal services contract.

9. In reliance upon the Agreement, Ledecky introduced Endeavor's Emanuel to Source, and Source has recorded and is expected to continue to record substantial net income as a result of its relationship with Endeavor.

10. At all times relevant to the Complaint, Source dealt exclusively with Ledecky. At no time did Ledecky represent that Ironbound had any members other than Ledecky.

**Ironbound's Introduction of Endeavor to Source**

11. At the time the Agreement was entered, Source, which was the largest direct-to-retail magazine distribution and fulfillment company in North America, was pursing a multi-faceted growth strategy that included strategic alliances with, or acquisitions of, businesses engaged in the fulfillment of products other than magazines.

12. Ironbound's Jonathan Ledecky, who was also a shareholder of Source, believed that Source's extensive direct-to-retail distribution network made the Company ideally suited to expand into the distribution and fulfillment of audio and video products (the "home entertainment content market"). In Ledecky's view, expansion into this market would be

synergistic with Source's existing business and consistent with the Company's stated growth strategy.

13. Although Endeavor was not in the distribution and fulfillment business, Emanuel had extensive relationships with movie studios and other key participants in the entertainment industry, which Ledecky believed could be leveraged to introduce Source to potential business opportunities relating to the distribution and fulfillment of audio and video products such as CDs and DVDs.

14. Although Ledecky had previously provided business assistance to the Company without entering into a formal contractual relationship, he believed that, in this instance, he should be compensated and advised the Company that he would not disclose his idea or make introductions to permit the Company to execute on that idea without a formal agreement.

15. After confirming Source's willingness to compensate Ironbound for introducing new growth opportunities, Ironbound and Source entered into the Agreement, and Ironbound's Ledecky introduced Source to Endeavor's Emanuel.

16. Contemporaneous with his negotiation of the Agreement, Ledecky also worked with Source and Endeavor to negotiate a non-disclosure agreement to be entered into between Source and Endeavor in the event that Source chose to accept the introduction and enter into discussions with Endeavor. So as not to reveal the "Client's" identity prior to the execution of the Agreement, the non-disclosure agreement contained a blank for Endeavor's name, which was to be inserted after the Agreement was signed.

17. Following Source's execution of the Agreement (in which it agreed to compensate Ironbound for the introduction), Ledecky disclosed the name of the "Client" (Endeavor), which was then inserted into the non-disclosure agreement and presented to Source

and Endeavor for signature. Source then accepted the introduction by entering into the non-disclosure agreement with Endeavor (a true and correct copy of which is attached as Exhibit B) and asking Ledecky to arrange a telephone conference between Source and a representative of Endeavor (*i.e.*, Emanuel) as provided in paragraph one of the Agreement, which Ledecky did.

18.    Notwithstanding this fact, Source claims that it has not entered into a written agreement with Endeavor and, therefore, has not accepted the introduction for the purposes of the Agreement; the Agreement provides that Source's acceptance of the introduction was to be manifest by "the execution of a written agreement between Source and Client."

19.    Upon information and belief, Source has declined to enter into further written agreements memorializing its ongoing business relationship with Endeavor (which has included a $1.5 million payment to Endeavor) for the sole purpose of avoiding liability under the Agreement. Such an argument not only ignores the existence of the non-disclosure agreement, a written agreement which by its own terms governs Source's and Endeavor's ongoing relationship, but also the fact that, after Ledecky revealed the identity of the Client, Source requested and received an introduction under the Agreement and entered into a business relationship with Endeavor that continues to this day.

20.    On or about April 28, 2004, the day after Source and Endeavor entered into the non-disclosure agreement, Ledecky, Emanuel and Source's Chairman and CEO, S. Leslie Flegel ("Flegel"), had a telephone conference to discuss possible business opportunities involving the retail distribution of audio and video products (*e.g.,* CDs and DVDs) to grocery stores and other retail outlets, which was followed by a meeting in New York City in or about May 2004 (the "New York meeting").

21.     During the New York meeting, Flegel told Emanuel about Source's business and the parties discussed opportunities involving the distribution of audio and video products.

22.     Following the New York meeting, Flegel called Ledecky and expressed frustration that Emanuel would not return his calls. Flegel also stated that he was no longer interested in doing business with someone like Emanuel, suggesting to Ledecky that he had taken Emanuel's failure to return his calls as a slight.

23.     Convinced that Endeavor could assist Source in identifying viable business opportunities in the home entertainment content market, Ledecky called Emanuel in order to salvage the relationship between Endeavor and Source. During their discussion, Ledecky related Flegel's frustration and advised Emanuel that he, Emanuel, would be passing up a significant business opportunity if he did not return Flegel's calls and establish a relationship with Source.

24.     Shortly after speaking with Ledecky, Emanuel called Flegel to discuss a business relationship with Source, and Source subsequently retained Endeavor as an advisor and consultant to the Company.

**The Alliance Merger**

25.     Upon becoming an advisor to the Company, Emanuel arranged to introduce Source to Alliance Entertainment Corp. ("Alliance"), which was a leading provider of distribution and fulfillment services to retailers of home entertainment content products such as DVDs, CDs, video games and related merchandize (collectively "audio and video products"). As a distribution and fulfillment company servicing over 30,000 stores and over two million individual customers, a business combination or relationship with Alliance would advance Source's strategy of pursing strategic alliances with, or acquisitions of, businesses engaged in the distribution and fulfillment of products other than magazines. In addition to gaining access to

Alliance's blue chip customers, such a relationship would enable Source to expand its existing product offerings beyond magazine fulfillment to include audio and video products. As Ledecky had already discovered, expanding the Company's business into this market presented a particularly attractive and profitable opportunity inasmuch as the retail market for DVDs, prerecorded music and single-copy magazines was a rapidly growing multi-billion dollar market.

26.     On or about June 22, 2004, Emanuel introduced Source's Flegel and James Gillis, Source's president, to representatives of Alliance. After a general discussion concerning Source's and Alliance's respective businesses, the parties agreed that they should meet again to discuss their mutual business interests. On or about July 7, 2004, the parties had a second meeting at which they discussed, among other things, the possibility of a merger between Source and Alliance.

27.     Over the next several months, representatives of Source and Alliance (collectively the "companies") conducted site visits, exchanged certain business and financial information, discussed the basic terms and structure of a transaction, and retained legal counsel and accountants to conduct due diligence.

28.     After several months of negotiations and due diligence, however, the parties reached an impasse in their negotiations, and Source formally discontinued the merger discussions. Upon information and belief, Emanuel, who was still advising Source, was instrumental in resolving this impasse. Indeed, according to Flegel, the merger would not have been consummated but for Emanuel's efforts.

29.     On or about November 18, 2004, approximately one month after the merger discussions resumed, Source publicly announced that it had reached a merger agreement with Alliance.

30. According to Source's Chairman and CEO, Source expects that the Alliance merger will, among other things, (i) substantially expand its direct-to-retail distribution and fulfillment services beyond its existing magazine and periodicals business, (ii) strengthen its role in the multi-billion dollar mainstream distribution market for magazines by utilizing Alliance's in-store merchandizing capabilities, and (iii) provide significant economies of scale through the consolidation of operations and the reduction of redundancies.

31. For Emanuel's role in introducing Source to Alliance and facilitating the merger, Endeavor was paid $1.5 million and Emanuel was appointed as a director of the Company. Upon information and belief, Endeavor, Emanuel and Source also entered into a "finder's fee" or similar type of agreement (the "Endeavor Agreement") under which Endeavor will receive compensation for future Transactions (as defined below) that he facilitates or introduces to the Company.

**Source's Repudiation of Its Obligations Under the Agreement**

32. Following Ledecky's recommendation and introduction of Endeavor to Source, the audio and video distribution and fulfillment business became the central focus of the Company's growth strategy, which most recently culminated in the consummation of the Alliance merger.

33. Understanding the substantial economic benefits that Source is expected to realize from the merger, Ironbound contacted Source to implement mutually acceptable procedures to track the compensation owed to Ironbound under the Agreement, which, as discussed above, provides that Source will pay Ironbound "compensation equal to 5% of the net income recorded by Source as a result of its relationship with [Endeavor]" for a period of five years.

34.     Notwithstanding the facts that (i) Ironbound's Ledecky introduced Source to Endeavor, (ii) the merger was a direct result of Source's relationship with Endeavor, and (iii) Source has recorded and will continue to record substantial net income as a result of the merger, Source repudiated its obligation to compensate Ironbound under the Agreement.

35.     In response to Ironbound's demands for payment, and notwithstanding the absence of support for its position in the Agreement, Source has asserted that it never intended the Agreement to cover mergers or acquisitions.  Such an artificial limitation, however, is belied by the plain language of the Agreement.  It is also belied by Source's stated intention of pursuing acquisitions as a key part of its growth strategy.  If the parties had intended to limit the Agreement to particular types of transactions, or specifically exclude mergers and acquisitions, they could have easily done so.

36.     Inasmuch as Source received and accepted the benefit of the bargain, Ironbound is entitled to compensation for the Alliance merger and any other Transaction (as defined below) facilitated or introduced by Endeavor for a period of five years from the Establishment Date, as defined in the Agreement.

37.     Despite Ironbound's demands and Source's obligations under the Agreement, Source has refused and continues to refuse to make payment.

## COUNT ONE
### (Breach of Contract)

38.     Paragraphs 1-37 are incorporated by reference as if fully set forth herein.

39.     Source and Ironbound entered into a contract under which Ironbound agreed to introduce Source to Endeavor and Source agreed to pay Ironbound five percent of the net income recorded by Source as a result of its relationship with Endeavor over a five-year period.

40.     Ironbound has complied fully with its obligations under the Agreement.

41.     Pursuant to the Agreement, Ironbound introduced Source to Endeavor's Emanuel.

42.     As a result of its relationship with Endeavor, Source merged with Alliance and has recorded and is expected to continue to record substantial net income as a result of that merger

43.     Source has breached the Agreement by repudiating its obligations thereunder and refusing to pay Ironbound the agreed-upon compensation for its services.

44.     By reason of Source's breach of contract, Ironbound has been damaged in an amount to be proven at trial.

### COUNT TWO
### (Quantum Meruit)

45.     Paragraphs 1-44 are incorporated by reference as if set forth here in full.

46.     Ironbound rendered a valuable service to Source when it introduced Source to Endeavor.

47.     Source accepted Ironbound's services.

48.     When Source accepted Ironbound's services, it was aware that Ironbound expected to be paid for those services.

49.     By reason of Source's refusal to pay Ironbound for its services, Ironbound has been damaged in an amount to be proven at trial.

### COUNT THREE
### (Unjust Enrichment)

50.     Paragraphs 1-49 are incorporated herein by reference.

51.     Source was unjustly enriched at Ironbound's expense when it received Ironbound's introduction to Endeavor's Emanuel. That introduction led to Source's enrichment as a consequence of the Alliance merger, which was facilitated by Emanuel.

52. Under these circumstances in good conscience, Source should make restitution to Ironbound for the value of its services.

53. By reason of Source's unjust enrichment, Ironbound has been damaged in an amount to be proven at trial.

**COUNT FOUR**
**(Declaratory Relief)**

54. Paragraphs 1-53 are incorporated by reference as if fully set forth herein.

55. A real, present, actual and justiciable controversy exists between the parties concerning their respective rights and obligations under the Agreement with respect to Ironbound's claim for payment.

56. Ironbound requests a declaration from the Court that:

   a. Ironbound's compensation under the Agreement is not limited to specific types of transactions;

   b. the Agreement covers all types of business transactions including, without limitation, mergers, acquisitions, joint ventures, strategic alliances, distribution agreements, reseller agreements, sales agreements, finder's agreements, or any other type of transaction or business dealing, regardless of the form or structure of the transaction (collectively "Transactions");

   c. Ironbound is entitled to five percent of the net income recorded by Source as a result of its merger with Alliance for a period of five years following the Establishment Date, as that term is defined in the Agreement.

   d. Ironbound is entitled to five percent of the net income earned by Source from any and all Transactions resulting from Source's relationship with Endeavor for a period of five years following the Establishment Date including, without limitation, net

income recorded from Transactions with third parties that are facilitated, or introduced to Source, by Endeavor.

## COUNT FIVE
### (Breach of Duty of Good Faith and Fair Dealing)

57. Paragraphs 1-56 are incorporated by reference as if fully set forth herein.

58. Under the Agreement, Source had an implied duty of good faith and fair dealing.

59. Source has breached that duty by, among other things, attempting to prevent fulfillment of alleged contractual conditions.

60. Source has also breached its duty by disregarding the fulfillment of alleged contractual conditions and seeking to impose limitations on its obligations that are not supported by the Agreement.

61. As a result of Source's breach of its duty of good faith and fair dealing, Ironbound has been damaged by an amount to be proven at trial.

## COUNT SIX
### (Estoppel)

62. Paragraphs 1-61 are incorporated by reference as if fully set forth herein.

63. Source has accepted Ironbound's introduction to Endeavor, as evidenced by the fact that it retained Endeavor as a consultant, accepted Endeavor's services in connection with the Alliance merger, and paid Endeavor $1.5 million.

64. Having accepted the introduction to Endeavor and entered into an ongoing business relationship that has resulted, and will continue to result, in net income to Source, Source is estopped from claiming that Ironbound is not entitled to compensation under the Agreement.

## COUNT SEVEN
### (Reformation of Contract)

65. Paragraphs 1-64 are incorporated by reference as if fully set forth herein.

66. At the time the Agreement was entered into, the parties intended that Ledecky would be compensated for his introduction of Endeavor if Source earned net income as a result of that relationship. That intention was memorialized in the Agreement between Ledecky, acting through Ironbound Partners, LLC, and Source.

67. The name Ironbound Partners, LLC was used in the Agreement in the mistaken belief that it was a validly registered Delaware limited liability company, when in fact it had been merged out of existence several years earlier. Accordingly, Ledecky was actually operating under a trade or fictitious name, as permitted under the laws of the District of Columbia.

68. Ledecky has performed all of Ironbound's obligations under the Agreement and Source has received the benefit of its bargain, namely, an introduction to and business relationship with Endeavor. The error in the name through which Ledecky contracted has had no effect on Source. Rather, its sole effect is to deprive Ledecky of the limited liability protections he would otherwise have been afforded by entering into the Agreement through a valid LLC rather than under a trade name.

69. Plaintiff does not seek to alter, modify or otherwise amend the terms or conditions of the Agreement, but simply to correct a mistake in the name by reforming the Agreement to read "Ironbound Partners" rather than "Ironbound Partners, LLC" and deleting the related reference to Ironbound's status as a Delaware limited liability company.

70. It would be inequitable for Source to retain the benefit of the bargain while avoiding its obligations under the Agreement due to an error regarding the name used by Ledecky.

**WHEREFORE**, Ironbound respectfully prays for the following relief:

a.  a declaration concerning the parties' rights and obligations under the Agreement as set forth in Count Three;

b.  reformation of the Agreement to replace the term "Ironbound Partners, LLC" with "Ironbound Partners" and to remove the reference to Ironbound as a Delaware limited liability company;

c.  an order directing Source to establish an accounting system to track all net income recorded as a result of the Alliance merger or other Transactions resulting from Source's relationship with Endeavor for a period of five years from the Establishment Date, as defined in the Agreement;

d.  an order directing Source to produce its books and records for an annual accounting by an independent expert to determine amounts owed to Ironbound under the Agreement for a period of five years from the Establishment Date;

e.  actual damages in an amount to be proven at trial;

f.  costs and attorneys' fees; and

g.  such further relief as the Court deems just and proper.

Respectfully submitted,

THOMPSON COBURN LLP


By: /s/   Matthew D. Schwartz
Matthew D. Schwartz (D.C. Bar No. 436619)
THOMPSON COBURN LLP
1909 K. Street, N.W. Ste. 600
Washington, D.C.  20006-1167

(202) 585-6900 (telephone)
(202) 585-6969 (facsimile)

*Attorney for Plaintiff Ironbound Partners, LLC*

- 15 -