### Stern, Kevin (Shld-DC-LT)

**From:** Stern, Kevin (Shld-DC-LT)
**Sent:** Thursday, February 02, 2006 6:16 PM
**To:** 'Sinoski, Allison N.'
**Cc:** Schwartz, Matthew D.; Hallas, Maria (OfCnl-DC-Emp/LT)
**Subject:** RE: Ironbound Partners, LLC v. Source Interlink Companies, Inc.

Allison,

We will get back to you on your letter below. In the meantime, please advise promptly as to whether you intend to maintain your objections and will continue to refuse to produce any documents in response to Source Request Nos. 7, 12-16, 19-22 and 23 (as modified in my 1/18/06 letter).

In addition, so we can be assured that Ledecky/Ironbound has undertaken a full and complete search for responsive documents, we would request answers from you to the same twelve questions you have posed below with regard to Source's document search efforts. Specifically:

(1) Generally, what was done to collect responsive documents?
(2) How did Ledecky/Ironbound determine whose offices, files, computers, etc. to include in the search?
(3) What files were searched and where are those files located?
(4) Which computers were searched?
(5) Who was involved in the search? Anyone other than Ledecky?
(6) Whose offices and files were searched and a description of the files maintained by each (i.e., incoming and outgoing chron files, appointment calendars, matter-specific file, personal files, Microsoft Outlook files, etc.).

(7) Did Ledecky/Ironbound search faxes, correspondence, e-mails, chron files, calendar entries, notes, journals, diaries, phone records, and fax records?

(8) Describe Ledecky/Ironbound's backup system for electronic files. What kind of machine is used? Are there just backup tapes, or are there also backup servers? Are they located on Ledecky/Ironbound's premises or off-site?

(9) What does it take to search backup tapes for responsive documents, particularly e-mails?
(10) What are the oldest backup tapes still in Ledecky/Ironbound's possession?
(11) Are different employees' computers found on different backup tapes or is there one tape for the whole company for each time period?

(12) Were individual computers and hard drives searched using appropriate search terms?

Sincerely,

### *Kevin E. Stern*
**Greenberg Traurig LLP**
*800 Connecticut Ave., NW*
*Suite 500*
*Washington, DC 20006*
*(202) 452-4878*
*(202) 261-0107 (fax)*
*sternk@gtlaw.com*

-----Original Message-----


DEFENDANT'S EXHIBIT F

2/23/2006

**From:** Sinoski, Allison N. [mailto:ASINOSKI@thompsoncoburn.com]
**Sent:** Thursday, February 02, 2006 4:24 PM
**To:** Stern, Kevin (Shld-DC-LT)
**Cc:** Schwartz, Matthew D. (Thompson Coburn LLP)
**Subject:** Ironbound Partners, LLC v. Source Interlink Companies, Inc.

Kevin,

We are in receipt of your letter of Jan. 27, 2006. Tentatively, the dates for the depositions appear acceptable. We are waiting to hear back from our client, as he will probably attend.

In your letter, you state that "unfulfilled or potential business opportunities presented by Endeavor or Emanuel are not a relevant line of inquiry even under your theory of case, and we will have no choice but to seek a protective order if you insist on going forward with questions concerning this subject." As we have advised, Ironbound disagrees with this assertion. Such opportunities are not only reasonably calculated to lead to the discovery of admissible evidence, but, for the reasons we have discussed, are directly relevant to Ironbound's claims. Please advise if you intend to instruct Source's witnesses not to answer questions on these topics during their depositions. Also, we note that Source's objection in this regard appears to be limited only to "unfulfilled or potential business opportunities." Please confirm whether this means that Source has no objection to discovery relating to actual business or business opportunities provided to Source by Endeavor or Emanuel or as a result of the Alliance merger.

As you know, we have significant concerns about the adequacy of Source's document production. As we discussed during our meet and confer session, in an effort to better understand the steps Source has taken to comply with its discovery obligations, it would be useful if Source would explain its efforts to identify and produce documents responsive to Ironbound's document requests. Specifically, we would appreciate answers to the following questions:

(1) Generally, what was done to collect responsive documents?
(2) How did Source determine whose offices, files, computers, etc. to include in the search?
(3) What files were searched and where are those files located?
(4) Which computers were searched?
(5) Who was involved in the search? Anyone other than Doug Bates?
(6) Whose offices and files were searched and a description of the files maintained by each (i.e., incoming and outgoing chron files, appointment calendars, matter-specific file, personal files, Microsoft Outlook files, etc.).

(7) Did Source search faxes, correspondence, e-mails, chron files, calendar entries, notes, journals, diaries, phone records, and fax records?

(8) Describe Source's backup system for electronic files. What kind of machine is used? Are there just backup tapes, or are there also backup servers? Are they located on Source's premises or off-site?

(9) What does it take to search backup tapes for responsive documents, particularly e-mails?
(10) What are the oldest backup tapes still in Source's possession?
(11) Are different employees' computers found on different backup tapes or is there one tape for the whole company for each time period?

(12) Were individual computers and hard drives searched using appropriate search terms?

On a related note, during our meeting, you indicated that certain electronic records may have been destroyed. Please provide a copy of Source's document retention policy so that we may better understand the manner in which documents were disposed and evaluate Source's compliance therewith. Also, please confirm that back up tapes have been searched and all responsive documents on those tapes have been produced.

On a separate note, Source has raised concern about discovery related to Ironbound's equitable claims. Ironbound will agree to withdraw its equitable claims if Source stipulates to the following:

(1) The term "Client," as that term is used in the Referral Agreement, means Endeavor, which includes its principal and founder, Emanuel.

(2) The Referral Agreement covers mergers and acquisitions resulting from Source's relationship with Endeavor, including, without limitation, the Alliance merger.

(3) The status of Ironbound Partners as a trade name, rather than an LLC, does not affect the validity or enforceability of the Referral Agreement.

(4) Source accepted the introduction to Endeavor.

Allison

********************

Allison Sinoski
Thompson Coburn LLP
Suite 600
1909 K Street, N.W.
Washington D.C. 20006-1167
(202) 585-6907
Fax: (202) 508-1034
asinoski@thompsoncoburn.com