IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IRONBOUND PARTNERS, LLC, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:05CV01039 (JGP) |
| | ) | |
| SOURCE INTERLINK COMPANIES, INC., | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

PLAINTIFF'S MOTION TO
COMPEL PRODUCTION OF DOCUMENTS

Pursuant to Rules 26 and 37(a) of the Federal Rules of Civil Procedure and for the reasons set forth in the attached Memorandum, Plaintiff moves to compel Defendant to (1) search and produce information from its computer backup tapes and other devices for storing electronic information that is responsive to Plaintiff's First Request for Production of Documents, (2) use reasonable forensic methods to recover and restore lost, deleted, or destroyed information from computer servers and hard drives and to produce such information that is responsive to Plaintiff's document requests, and (3) produce all documents responsive to Request Nos. 10, 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 32 of Plaintiff's First Request for Production of Documents.

Pursuant to Local Rule 7(m), Ironbound certifies that it has discussed this motion with Source's counsel in a good faith effort to resolve this dispute, and Source has indicated that it opposes this motion.

Respectfully submitted,


_/s/   Matthew D. Schwartz_____

Matthew D. Schwartz (D.C. Bar No. 436619)
Allison Sinoski (D.C. Bar No. 482593)
 THOMPSON COBURN LLP
 1909 K. Street, N.W. Ste. 600
 Washington, D.C.  20006-1167
 (202) 585-6900 (telephone)
 (202) 585-6969 (facsimile)

*Attorneys for Plaintiff Ironbound Partners, LLC*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IRONBOUND PARTNERS, LLC,       ) | |
|          ) | |
|    *Plaintiff,*      ) | |
|          ) | |
| v.         ) | Civil Action No. 1:05CV01039 (JGP) |
|          ) | |
| SOURCE INTERLINK COMPANIES, INC.,  ) | |
|          ) | |
|    *Defendant.*     ) | |
|          ) | |

MEMORANDUM IN SUPPORT OF PLAINTIFF'S
<u>MOTION TO COMPEL PRODUCTION OF DOCUMENTS</u>

     Plaintiff Ironbound Partners seeks to compel the production of information stored on computer backup tapes that Source has deleted, destroyed or otherwise failed to preserve in its original form and information relating to Defendant Source's liability on Ironbound's contract and equity claims.

<u>Background</u>

     This case involves the breach of a Referral Agreement (the "Agreement") entered into by and between Plaintiff, Ironbound Partners ("Ironbound"), and Defendant, Source Interlink Companies, Inc. ("Source"), on or about April 26, 2004.  Under the terms of the Agreement, which is attached hereto as Exhibit A, Ironbound agreed to introduce Source to Ironbound's "Client," The Endeavor Agency, LLC ("Endeavor"), and Source agreed to pay Ironbound "compensation equal to 5% of the net income recorded by Source <u>as a result of its relationship with Client</u>" for a five-year period. *Id.* (emphasis added).

     As alleged more fully in the Complaint, Ironbound performed its obligations under the Agreement by introducing Source to Endeavor, and Source entered into a business relationship

with Endeavor, which has resulted in substantial net income and increased shareholder value to

Source; among other things, Endeavor introduced and facilitated Source's merger with Alliance

Entertainment Corp. (the "Alliance merger"), for which Source paid Endeavor $1.5 million.

Endeavor has also worked with Source to expand Source's new business opportunities. After

accepting the benefit of the bargain, Source repudiated its obligations to Ironbound, which in

turn filed this lawsuit seeking, among other things, damages for breach of contract, quantum

meruit, and unjust enrichment.[1]

   At Source's request, Ironbound agreed to bifurcate this lawsuit into damages and liability

phases, the latter of which is currently the focus of the parties' discovery efforts. This motion

involves Source's refusal to make discovery in response to document requests propounded by

Ironbound to establish liability on its contract and equity claims. As discussed more fully below,

Ironbound seeks to compel the production of (1) responsive information stored on computer back

up tapes and other electronic storage systems, and (2) documents relating to business

opportunities, including the Alliance merger, that have that have resulted from its relationship

with Endeavor.

<u>Argument</u>

   On November 7, 2005, Ironbound propounded 36 document requests, a copy of which is

attached hereto as Exhibit B, covering multiple categories of documents relevant to establishing

Source's liability on Ironbound's contract and equity claims.   In response to these requests,

which included requests for documents relating to the Agreement, the Alliance merger (the

---

[1] Ironbound has asserted its equitable claims as an alternative justification for recovery due to the fact that Source has represented that it will contest that the Agreement applies to net income resulting from a merger or other business combination.

largest transaction in Source's history), and Source's relationship with Endeavor (which was paid $1.5 million by Source for its role in the Alliance merger alone), Source produced a stack of documents less than a half inch thick. Additionally, Source failed to produce known responsive documents (*i.e.,* emails) relating to the Agreement, which are especially important in light of Source's defense that the Agreement is ambiguous and should be interpreted through parole evidence. Copies of responsive emails not produced by Source are attached hereto as Exhibit C.[2]

By letter dated January 13, 2006, a copy of which is attached hereto as Exhibit D, Ironbound notified Source of its concerns with the adequacy of Source's production, and requested that the parties meet to discuss whether this dispute could be resolved without the Court's intervention. Thereafter, on January 20, a discovery conference was held at the offices of Source's counsel, during which Source advised that (1) known responsive documents could not be located (*i.e.,* had been lost, deleted or destroyed), (2) it was unable to locate entire categories of responsive documents relating to the Agreement and communications among the key parties, (3) it would not produce documents relating to business opportunities that have resulted from its relationship with Endeavor, and (4) it would not produce documents relating to the value of the Alliance Merger.[3] Following the conference, Source further advised that it would not seek to recover lost or destroyed documents by searching and producing information from its computer back up tapes.

---

[2] These emails are responsive to Request Nos. 1, 2, 3, 6, and 11 of Plaintiff's First Request for Production of Documents. (Exhibit B.)

[3] Ironbound has pleaded alternative claims sounding in contract and equity because Source has denied, and continues to deny, that, among other things, the Agreement covers the Alliance merger. If Source is correct, and the Agreement does not cover this or other issues in this litigation, Ironbound is entitled to proceed on these claims in equity. Fed. R. Civ. P. 8(e)(2) ("[a] party may . . . state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds").

By this motion, Ironbound seeks to compel Source to (1) search its backup tapes and other electronic storage systems and produce information responsive to Ironbound's requests that has been lost, destroyed, or deleted, especially e-mails and communications between Source and Endeavor, (2) use reasonable forensic means to recover documents that would have otherwise been preserved on Source's computer backup tapes had it not failed to preserve evidence after receiving notice of Ironbound's claim, (3) produce all documents relating to business opportunities that have resulted from its relationship with Endeavor, and (4) produce documents relating to the value realized by Source as a result of the Alliance merger. As discussed below, Ironbound's requests for these documents are reasonably calculated to lead to the discovery of admissible evidence relating to both its contractual and equitable claims. As such, Source's objections to their production should be overruled and the production of responsive documents compelled.

I.    Production of Information Stored Electronically and on Magnetic Media

In connection with this discovery dispute, Source confirmed that it maintains computer backup tapes of its email and file servers, which are created and maintained in the ordinary course of its business. Thus, after discovering that Source deleted or destroyed electronic documents, and could not locate documents responsive to multiple requests, Ironbound asked Source to search its computer backup tapes and produce responsive information contained thereon for the period April 2004 to the present. Notwithstanding its admitted deletion or destruction of known responsive documents, however, Source refuses to search its computer backup tapes on the grounds that the information contained on such tapes would be of "marginal value" and that such an effort would be "unduly burdensome." (E-mail from Kevin Stern to

Allison Sinoski (Feb. 6, 2006), attached hereto as Exhibit E.)  As discussed more fully below, these claims are without merit.

A.     Value of the Backup Tapes

Inasmuch as Source admits that it has not "not searched any backup tapes in connection with Ironbound's document requests" (Exhibit E), it is difficult to understand the basis for its assertion that the information contained on such tapes would be of "marginal value."  On the contrary, and while Source may not agree with its import, at least one of the responsive emails in Ironbound's possession that Source deleted or destroyed, and thus did not produce, contains information relating to the meaning of a disputed term in the Agreement, which Source now contends is ambiguous and, hence, must be interpreted through parole evidence.[4]  Accordingly, this email, and other documents that Source claims would be of marginal value, will be relevant to interpreting the Agreement should the Court grant Source's motion to introduce parole evidence.  Thus, notwithstanding Source's efforts to minimize the import of this and other yet to be produced documents, the weight accorded to such evidence (and thus its "value") is a matter to be determined by the finder of fact, which in this case will be a jury, and not Source.

---

[4] This email relates to the issue of whether the Agreement covers business combinations, as Ironbound contends, or excludes such transactions, as Source asserts.  While Ironbound does not believe that the Agreement, which is broadly worded, is ambiguous, should parole evidence be admitted, this email (which was not produced by Source) would be directly relevant to the Court's and the jury's consideration of this issue.  Specifically, on April 26, 2004 Ironbound's Ledecky and Source's general counsel, Mr. Doug Bates, exchanged emails in which Ledecky objected to Source's effort to include in the contract language that would result in the termination of the Agreement in the event Source was sold (*e.g.,* in the event of a merger or acquisition).  In that email, which was not produced by Source, Ledecky states "[m]y concern is that the new business arrangement is so lucrative that Source does get bought by another company which would end my compensation.  Seems counter-intuitive.  If it is NOT successful, I get nothing.  If it is successful and Source is sold, I get nothing.  Do you see what I mean?" (Exhibit F) (emphasis in original).  Ultimately, the objectionable language was removed and the scope of the Agreement was not so limited.  If Source prevails in its effort to introduce parole evidence about the meaning of the Agreement's terms, Ironbound should be able to present documents such as this to the factfinder, who is ultimately responsible for interpreting the meaning of the Agreement (*e.g.,* whether it was intended to exclude compensation for mergers or acquisitions introduced or facilitated by Endeavor).

Inasmuch as Source has not, by its own admission, searched its backup tapes, Ironbound presumes that its assertion concerning their "marginal value" is based on the fact that the tapes are incomplete because they were erased or destroyed by Source in violation of its duty to preserve evidence after this lawsuit was filed. According to Source, it is the company's policy to preserve monthly backup tapes for 16 months. (Exhibit E.) Thus, at the time this lawsuit was filed in May 2005, Source would have been in possession of backup tapes dating to January 2004, which covers the entire period relevant to this action, March 2004 to the present. Notwithstanding this fact, Source now says it only has complete back up tapes dating back to November 2004 and sporadic tapes pre-dating that time. (Exhibit E.) This means that if Source adhered to its policy of preserving tapes for 16 months, the backup tapes covering the period January 2004 through October 2004, which includes a significant portion of the period directly relevant to this litigation, were erased or destroyed after this lawsuit was filed in violation of Source's duty to preserve evidence.

Once Source had notice that litigation was pending or anticipated (much less filed), it had a duty to preserve relevant evidence, including electronic evidence. *Proctor & Gamble Co. v. Haugen*, 179 F.R.D. 622, 632 (D. Utah 1998), *rev'd on other grounds*, 222 F.3d 1262 (10th Cir. 2000); *Computer Assocs., Inc. v. Am. Fundware, Inc.*, 133 F.R.D. 166, 169 (D. Colo. 1990); *William T. Thompson Co. v. Gen. Nutrition Corp.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984). In this case, Ironbound formally notified Source of its claim by sending a demand letter to its general counsel in March of 2005 and filed this lawsuit in May; Source's Chairman and CEO was informally notified of Ironbound's claim by Ironbound's Jonathan Ledecky prior to this time. Notwithstanding Source's duty to preserve evidence upon receiving Ironbound's notice

and the filing of this lawsuit, Source apparently continued to erase or destroy backup tapes covering the time periods relevant to this litigation.

Having erased or destroyed evidence in violation of its duty, Source now seeks to use its dereliction to justify its refusal to make discovery by presumably arguing that the value of the tapes is "marginal" because they are incomplete.  Of course, Source's failure to preserve this information as required does not excuse it from its discovery obligations, but rather, justifies the imposition of additional burden to recover information that should have been preserved.  Nor does it excuse Source from searching the tapes that still exist and producing responsive information contained thereon.

B.    Burden on Source

Source's claim of undue burden is equally meritless.  In support of its claim, Source says that it "requires 10-24 hours per backup tape" to load the tapes onto a server so that they can be searched.  (Exhibit E.)  As Source has since confirmed, however, this process is automated and is not performed manually.  That is, the 10-24 hours that Source points to in support of its claim of undue burden is not the amount of time it would take a person to perform this task, but rather, the time required for the computer to perform it.  (E-mail from Kevin Stern to Allison Sinoski (Feb. 10, 2006), attached hereto as Exhibit G.)

Source also says that searching its backup tapes would be burdensome because it only has an "MS Windows environment search engine."  (Exhibit E.)  This does not mean, and Source is careful not to claim, however, that Source is unable to search its backup tapes.  Axiomatically, the very purpose of a backup tape is to preserve the company's ability to search for and retrieve information removed from its servers at a future date.  Thus, what Source is really saying is not that it is unable to search its tapes, but rather, that it does not consider Ironbound's request in this

litigation sufficiently important to justify the effort it is willing and able to undertake in other circumstances. Not surprisingly, there are multiple tools that can be used to perform "key word" and other searches of backup tapes in the "Windows environment" to which Source refers. Indeed, in addition to the search tools that Source already has, there are a number of sophisticated search tools that can be downloaded free of charge from the internet or purchased at a reasonable price.[5]

Of course, the question is not whether searching the backup tapes entails a burden; all discovery involves some amount of burden. Rather, as Source properly notes, the question is whether such burden, when weighed against the need for the information, is undue. Fed. R. Civ. P. 26(b)(2)(iii); *Marker v. Union Fid. Life Ins. Co.*, 125 F.R.D. 121, 124 (M.D.N.C. 1989); *Dunn v. Midwestern Indem.*, 88 F.R.D. 191, 197 (S.D. Ohio 1980). Inasmuch as the backup tapes and computer hard drives are the sole repository of potentially relevant information, the burden imposed on Source (*i.e.,* the automated loading of the tapes and key word searching) is out weighed by the need for the information.

Under the circumstances, Source should search for and produce relevant information contained on all backup tapes that have not been erased. Additionally, Source should be required to use reasonable forensic means to recover and restore information contained on its computer servers and the personal computer hard drives of key witnesses for the period it destroyed backup tapes in violation of its duty to preserve, March 2004 through October 2004. Finally, because Source has admitted that known relevant documents and back up tapes have been lost or

---

[5] In fact, Source could likely purchase a state of the art search program for significantly less than the legal fees it will incur to oppose this motion. In this respect, Source's opposition to this motion likely imposes a greater burden than the cost and effort required to identify and produce responsive information, which, like this motion, is work that can be performed by an outside vendor.

Case 1:05-cv-01039-JGP    Document 25    Filed 02/22/2006    Page 11 of 21

destroyed, the cost of recovering the lost information from Source's computers and backup tapes should be borne by Source.

## II.    Discovery of Transactions for Which Source has Liability Under the Agreement

By Request No. 10 (Exhibit B), Ironbound sought documents relating to "actual or potential business opportunities for Source that have been discussed by Emanuel and Source or Endeavor and Source."[6] Source objected to this request on the grounds that, among other things, "the term 'actual or potential business opportunities' is vague and ambiguous; and . . . it is not reasonably calculated to lead to the discovery of admissible evidence in that it seeks documents that do not relate to any claim, defense or issue in the liability phase of this bifurcated case." Source's objections are attached hereto as Exhibit H.  Contrary to Source's objection, the documents sought by this request go directly to the heart of Ironbound's claims and do not seek information concerning damages.

### A.    Source's Professed Inability to Understand the Meaning of Ordinary Terms

Source's objection that it does not understand the term "business opportunities," especially in the context of this case, is not credible.  As alleged more fully in the Complaint, one of the primary purposes of Ironbound's introduction of Endeavor to Source was for Endeavor to assist Source in expanding its distribution business into the home entertainment content market (*i.e.,* CDs, DVDs, video games, etc).  Endeavor has worked to do this by, among other things, assisting Source in expanding its business into the distribution of CDs and DVDs.  Endeavor has done this not only through the Alliance merger, which (as Source's own SEC filings discuss) provided Source with instant access to new distribution channels in this market, but by using its relationships in the entertainment industry to enable Source to expand its product offerings

---

[6] Mr. Ariel Emanuel is a founder and principal of Endeavor.

Case 1:05-cv-01039-JGP    Document 25    Filed 02/22/2006    Page 12 of 21

through both new and existing distribution channels. Before expending effort to assist in the expansion of Source's business, it would be necessary for Source and Endeavor to discuss potential and actual opportunities, if for no other reason than to determine whether such opportunities are of interest to Source or if Source has already taken steps independent of Endeavor to pursue them.[7] For example, Ironbound is informed that one opportunity discussed by Source and Endeavor involves the distribution of CDs and DVDs at check-out counters in supermarkets and other retail outlets. Documents related to such an opportunity would include, without limitation, business plans, analyses, proposals, letters of intent, customer contracts, and evidence of sales, all of which are relevant to establishing liability under the Agreement. For Source to pretend that it does not understand the term "actual or potential business opportunities" such that it cannot undertake a meaningful search for responsive documents, especially in the context of the Agreement—which covers income earned by Source as a result of its continuing relationship with Endeavor over a five-year period—is not credible.

B.    Reasonably Calculated to Lead to the Discovery of Admissible Evidence

It is equally incredible for Source to claim that Request No. 10 is not reasonably calculated to lead to the discovery of admissible evidence. As Ironbound has explained, Request No. 10 is intended to identify transactions or dealings between Endeavor and Source for which Source is liable to compensate Ironbound under the Agreement. While the *amount* of compensation due Ironbound is a matter reserved for the damages phase of the litigation, Ironbound is entitled to obtain documents relating to the *existence* of opportunities that have

---

[7] Source apparently takes issue with the terms actual and potential. By way of illustration, an actual opportunity might be an existing customer who has stated that it will purchase CDs and DVDs if Source can provide them at a competitive price. A potential opportunity might be the identification of customers that, if approached, might be interested in purchasing such products based on the type of business it has. The former is an actual opportunity in that it is available if Source can supply the desired product at on acceptable terms, while the latter is potential, in that the customer may or may not be interested in purchasing such product, but is a likely candidate.

resulted from Source's relationship with Endeavor, such as proposals, memoranda,

correspondence and any resulting contracts.[8] As a "compromise," Source has stated that it is

"willing to allow discovery relating to any business opportunities presented to Source by

Endeavor or Emanuel that have been fulfilled, i.e., have resulted in actual business to Source or a

consummated agreement." (Exhibit E.) This compromise, however, which offers discovery that

Ironbound is already entitled to obtain under the rules, circumscribes the scope of the request and

prevents Ironbound from discovering transactions or dealings between Source and Endeavor that

are covered by the Agreement and for which Source has liability.

     *i.*     *Unilateral Determination of Liability*

     Source's proposed compromise grants Source the unilateral right to determine which

transactions or dealings are covered by the Agreement and, thus, which business opportunities

must be disclosed. As discussed above, Source's liability to Ironbound under the Agreement is

not static, but rather, arises each time it earns net income as a result of its relationship with

Endeavor over a five-year period. In this respect, each new transaction or dealing between

Source and Endeavor over this period could subject Source to liability to Ironbound under the

Agreement. The problem is that, without a full accounting from Source, Ironbound would have

no way of knowing whether and when a dealing or transaction giving rise to liability has

occurred. For example, while Source's senior management has previously informed Ironbound

and its counsel that Endeavor has been working to assist Source in the distribution of CDs and

---

[8] In determining whether Source has liability under the Agreement, Ironbound must show that (1) the introduction was made, (2) Source accepted the introduction, and (3) Source earned net income as a result of the introduction. In this respect, the fact of whether Source earned net income (as opposed to the amount of such net income) is an element of liability. As such, there is some minimal overlap between the two phases of this litigation. While some of Ironbound's requests may capture the fact of whether net income (or for that matter, revenue) was earned, they do not seek to determine the amount of net income, which would then be used to determine the compensation due Ironbound under the Agreement; in determining damages, Ironbound will use a cost accounting expert who will undertake an extensive analysis of Source's books of account. None of this information has been requested in this phase of the litigation.

Case 1:05-cv-01039-JGP     Document 25     Filed 02/22/2006     Page 14 of 21

DVDs, neither Source nor Endeavor have disclosed, and Ironbound has no way of knowing, how many, if any, deals, transactions or other business arrangements have been facilitated by Endeavor.

As illustrated by this litigation, Source and Ironbound have a fundamental disagreement about the dealings and transactions covered by the Agreement. For example, even though Endeavor introduced Source to Alliance and Source paid Endeavor $1.5 million for its role in facilitating the Alliance merger, Source disputes that this transaction is covered by the Agreement or that it has liability to Ironbound for income earned as a result thereof. Had Ironbound not known about this transaction, given Source's position that it is not covered by the Agreement, it is questionable whether this transaction would even be disclosed under Source's proposed compromise, thereby preventing Ironbound from arguing liability in the first place; stated differently, Source's proposed "compromise" effectively grants Source the power to unilaterally make a threshold determination of whether the transaction is covered by the Agreement in the first instance, thus preventing Ironbound from even arguing the issue of liability. Accordingly, Ironbound seeks unfiltered information about all opportunities that Source and Endeavor have discussed so that it can determine whether such discussions relate to a transaction or dealing for which Source is liable under the Agreement and present the issue to the jury to determine liability. In this respect, Request No. 10 is reasonably calculated to lead to the discovery of admissible evidence. The information produced by Source in response to this request may also serve as the basis of additional questions during depositions and written discovery that will similarly lead to the discovery of admissible evidence.

Case 1:05-cv-01039-JGP    Document 25    Filed 02/22/2006    Page 15 of 21

    *ii.*     *Source's "Compromise" Limits Otherwise Proper Discovery*

Similarly, Source's proposed compromise unnecessarily limits discovery to "business opportunities **presented** to Source by Endeavor or Emanuel." (Exhibit E) (emphasis added). As discussed above, however, the Agreement does not limit Source's liability to opportunities presented by Endeavor, but rather, is broadly worded to impose liability on Source for income earned "as a result of its relationship with [Endeavor]." (Exhibit A.) While it is true, therefore, that Source is liable to compensate Ironbound for opportunities "presented" by Endeavor, it is equally true that Source is also liable for income earned as a result of opportunities that, while not "presented" by Endeavor, were nevertheless facilitated by Endeavor, or otherwise attributable to, its relationship with Endeavor. Indeed, there may well be situations in which Source identifies an opportunity (or in fact is presented with an opportunity by an existing customer), but is only able to convert or realize that opportunity as a result of its relationship with Endeavor. For example, if Source identified an opportunity to distribute CDs and DVDs to its existing customers, but relied upon Endeavor's relationships in the entertainment industry to secure the rights to distribute such products on commercially reasonable terms, its ability to distribute such products, and thus the income it earned as a result of such transactions, would be a "result of its relationship" with Endeavor, and thus give rise to liability under the Agreement.

Finally, by its compromise, Source seeks to limit discovery only to opportunities "that have resulted in actual business to Source or a consummated agreement." (Exhibit E) (emphasis added). As it relates to Ironbound's contract claim, this limitation would prevent Ironbound from obtaining discovery of opportunities that could well mature prior to the damages phase of the litigation, and thus give rise to liability under the Agreement. For example, under Source's compromise, the existence of a transaction that is currently under negotiation or the subject of

marketing efforts, that results in a contract and revenue to Source in August (trial of the liability phase is scheduled to commence in September), would not be disclosed to Ironbound, and thus never considered in the liability phase of this lawsuit, even though Source might have liability to Ironbound for such a transaction under the Agreement. Similarly, information about pending transactions and business dealings, even if they have not yet matured, could not be considered by the Court in making the declaration prayed for by Ironbound concerning the parties' rights and liabilities under the Agreement.

Such information is also relevant to Ironbound's equitable claims for quantum meruit and unjust enrichment. To establish liability on those claims, Ironbound must show that it provided a valuable service to Source and that Source was enriched thereby. In determining liability (as opposed to damages) under Ironbound's equitable claims, the factfinder is entitled to hear evidence concerning both the quantity and quality of business opportunities that have been provided to Source as a result its relationship with Endeavor. For example, for the purposes of determining Source's liability, a jury could conclude that Endeavor's introduction or facilitation of one or more significant business opportunities that have a high likelihood of resulting in new business, especially when considered together with the value provided by Endeavor on in connection with the Alliance merger, are valuable and confer a benefit upon Source, even though they have not yet resulted in income. This is especially true with respect to opportunities that are likely to result in contracts or income to Source in the near future and which would otherwise be withheld from discovery and unknown to the fact finder. In this respect, such evidence would be both relevant and admissible to a jury's consideration of whether Ironbound rendered a valuable service by introducing Source to Endeavor, and whether Source accepted the benefit of that service, for the purpose of establishing liability on Ironbound's equity claims.

That an opportunity has not yet resulted in revenue does not mean it is not relevant in the liability phase of this case for the purpose of determining whether Ironbound provided a valuable service to Source. Given that corporations routinely devote significant resources to the development and facilitation of new business opportunities, which is essentially a function Endeavor is performing, the nature and scope of Endeavor's efforts, especially when considered together with the Alliance merger, are relevant to the question of value. Endeavor's efforts to develop, facilitate and promote new business are services to which corporations attach value and routinely expend significant resources. While the dollar value of such services is a matter reserved for the damages phase of the litigation, the fact that such services have value (especially when considered together with Endeavor's facilitation of the Alliance merger) is relevant to Ironbound's liability claims.

III.    Documents Relating to the Value of the Alliance Transaction

The third category of documents for which Ironbound seeks production comprise documents relating to the value Source has received as a result of its merger with Alliance. Ironbound has sought documents relating to this topic through Request Nos. 19, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 32 of its First Request for Production of Documents. (Exhibit B.) These requests are calculated to lead to the discovery of evidence relating to Ironbound's equity claims. Documents relating to the value Source attaches to, and has actually received from, the Alliance merger are relevant to show that Source has received value from Ironbound's introduction to Endeavor and has been enriched thereby, which is necessary to establish liability on Ironbound's equitable claims. While Source has admitted the value of the merger in generic terms in its public filings with the SEC, the factfinder should have the opportunity to review Source's own internal documents and evaluation to assess Source's unvarnished opinion

Case 1:05-cv-01039-JGP     Document 25     Filed 02/22/2006     Page 18 of 21

regarding the value and benefits of that transaction. Indeed, given the concerns about liability under the security laws, companies often temper the language used in public securities filings out of concern for potential liability.

In evaluating liability on Ironbound's equity claims, the jury should have the opportunity to review Source's internal documents, which Ironbound will also use to question Source's witnesses, to obtain an unvarnished view of the manner in which the company valued the Alliance merger. In this respect, documents relating to the business reasons for the merger (Request No. 23), the expected benefits from the merger (Request No. 24), the market opportunities actually presented by the merger (Request Nos. 22 & 27), Source's ability to obtain new distribution contracts (Request Nos. 25, 26, and 31), and how the merger was expected to increase Source's financial strength (Request No. 32) are relevant to the value provided by Ironbound and thus, the question of Source's liability on Ironbound's equitable claims.

For example, Request No. 22 seeks "[a]ll documents submitted to the Federal Trade Commission or the Antitrust Division of the United States Department of Justice by Source and Alliance pursuant to Item 4(c) of the Antitrust Improvement Act Notification and Report Form for Certain Mergers and Acquisitions in connection with Source's merger with Alliance." (Exhibit B.) These documents, which are submitted to the Federal Trade Commission (FTC) as part of the pre-merger notification process, include studies, surveys, analyses and reports prepared for the purpose of evaluating or analyzing a merger with respect to market shares, competition, competitors, markets, and potential for sales growth or expansion into product or geographic markets. Such documents typically discuss how a transaction is expected to facilitate entry into new markets, expand existing market share, and affect a company's competitive position in specific markets. Such forecasts, projections and analyses show in detail how the

Case 1:05-cv-01039-JGP     Document 25     Filed 02/22/2006     Page 19 of 21

company values the transaction and why it attaches the particular value it does.   Rather than rely

exclusively on public filings, the FTC requires the submission of such internal analysis and

reports to gain a first hand understanding of how the parties (who are often in the best position to

know) believe that the transaction will affect their competitive position in the marketplace and

the markets within which they compete.  By the same token, in discussing how the transaction

will facilitate expansion, market share, and competitive position, such information provides a

detailed discussion of the value that the parties expect to achieve through the transaction, which

in this case is relevant to the jury's consideration of Source's liability on Ironbound's equity

claims.

     While the dollar value associated with such a transaction is a matter for the damages

phase of this lawsuit, the fact that the transaction has value (and the basis for the value attached

by Source) are relevant to determining liability on Ironbound's equity claims.  The information

sought by these requests will provide the factfinder with a far more detailed picture of the value

Source has derived and expects to derive from the Alliance merger than the cautious forecasts in

Source's public securities filings that have, of necessity, been sanitized for public consumption.

Such information may be used by the factfinder in determining whether Source has, in fact,

received value and benefited from Ironbound's introduction to Endeavor.  And, since much of

this information would have been submitted to the FTC in connection with the pre-merger

notification process or otherwise reviewed in support of Source's public statements in its SEC

filings, the search and production of these documents should not be overly burdensome.  Thus,

because documents relating to the value of the Alliance merger to Source are directly relevant to

Ironbound's equitable claims, and the production of such documents does not impose an undue

burden on Source, Source should be ordered to produce all documents responsive to Ironbound's requests relating to this category of documents.

Conclusion

For the foregoing reasons, Ironbound respectfully requests that its Motion to Compel Production of Documents be granted, and that Ironbound be awarded its costs and attorneys' fees incurred in connection with this motion, pursuant to Rule 37(a)(4)(A).

Respectfully submitted,

_/s/   Matthew D. Schwartz_
Matthew D. Schwartz (D.C. Bar No. 436619)
Allison Sinoski (D.C. Bar No. 482593)
THOMPSON COBURN LLP
1909 K. Street, N.W. Ste. 600
Washington, D.C.  20006-1167
(202) 585-6900 (telephone)
(202) 585-6969 (facsimile)

*Attorneys for Plaintiff Ironbound Partners, LLC*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of February, 2006, a true and correct copy of the

foregoing Motion to Compel Production of Documents and Memorandum in Support of

Plaintiff's Motion to Compel Production of Documents, along with attachments, was mailed

electronically through CM/ECF to:

> Kevin E. Stern
> C. Allen Foster
> Maria Hallas
> GREENBERG TRAURIG, LLP
> 800 Connecticut Ave., N.W.
> Suite 500
> Washington, D.C.  20006

                          /s/    Allison Sinoski