| | |
|---|---|
| Subj: | **RE: Conversation with Leslie from Greece on Sunday at noon EST.** |
| Date: | 4/26/2004 11:30:18 AM Eastern Daylight Time |
| From: | DBates@sourceinterlink.com |
| To: | Jledecky@aol.com |

*Sent from the Internet (Details)*

Jon,

I spoke to Leslie this morning and he outlined your discussion with me.

Leslie informed me that Source could not compensate you on the basis described in you message to me. Leslie would propose that you receive an annual payment equal to 5% of the net income derived by Source from the business relationship, as determined in accordance with GAAP applied on a basis consistent with Source's financial statements and assuming full allocation of all costs and expenses.

Furthermore, Leslie wished me to inform you that our interest assumes that the "potential business partner" is not party with whom we have had contact.

Assuming that you agree to the compensation structure, I will review and revise the agreement between you and Source, and the NDA.

I look forward to hearing from you.

Doug

-----Original Message-----
**From:** Jledecky@aol.com [mailto:Jledecky@aol.com]
**Sent:** Sunday, April 25, 2004 2:03 PM
**To:** Doug Bates
**Cc:** Leslie Flegel; Jim Gillis; Leslie Flegel; Gillis1@aol.com
**Subject:** Conversation with Leslie from Greece on Sunday at noon EST.

Hi Doug, I hope you are well

I talked with Leslie today from Greece about the attached document.

A leading company on the west coast wants to enter into an exciting business relationship with Source Interlink but is unwilling to disclose certain information about the potential relationship without the protection of the enclosed agreement. Leslie needs you to review this and ultimately execute it on behalf of the company.

Leslie also indicated that he was willing to compensate me for making a deal happen between Source and this company. He left that potential compensation vague and I am not comfortable with that so I am attaching a second document for your review that memorializes an understanding. You will need to run this by Leslie obviously.

Obviously, once we have agreement on these documents, I will disclose the name of the potential business partner in Appendix A and on the non disclosure document and we can move forward.

Our goal is to have a conference call with Leslie and Jim from Greece with the Company's principals either on Monday or Tuesday once these documents have been approved by Source.

NOTICE: The contents of this email and any attachments to it may contain privileged and confidential information from Source Interlink Companies, Inc. This information is only for the viewing or use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of, or the taking of any action in the reliance upon, the information contained in this email, or any of the attachments to this email, is strictly prohibited and that this email and all of the attachments to this email, if any, must be immediately returned to Source Interlink Companies, Inc. or destroyed and, in either case, this email and all attachments to this email must be immediately deleted from your computer without making any copies thereof. If you have received this email in error, please notify Source Interlink Companies, Inc. by email immediately.

IB 00504

Thursday, May 20, 2004 America Online: Jledecky

Bates Decl. - Exhibit 1

| | |
|---|---|
| Subj: | **proposed engagment agreement** |
| Date: | **4/26/2004 1:18:01 PM Eastern Daylight Time** |
| From: | DBates@sourceinterlink.com |
| To: | JLEDECKY@aol.com |
| File: | **Ledecky.DOC (43008 bytes) DL Time (TCP/IP): < 1 minute** |
| *Sent from the Internet (Details)* | |

John,

Attached is redraft of the engagement letter. On the NDA, is that their form or can we use ours?

NOTICE: The contents of this email and any attachments to it may contain privileged and confidential information from Source Interlink Companies, Inc. This information is only for the viewing or use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of, or the taking of any action in the reliance upon, the information contained in this email, or any of the attachments to this email, is strictly prohibited and that this email and all of the attachments to this email, if any, must be immediately returned to Source Interlink Companies, Inc. or destroyed and, in either case, this email and all attachments to this email must be immediately deleted from your computer without making any copies thereof. If you have received this email in error, please notify Source Interlink Companies, Inc. by email immediately.

IB 00505

Thursday, May 20, 2004 America Online: Jledecky

## REFERRAL AGREEMENT

This **Referral Agreement** is made and entered into as of April ___, 2004 by and between Source Interlink Companies, Inc., a Missouri corporation ("Source") and Ironbound Partners, LLC, a _____ limited liability company ("Ironbound").

**WHEREAS,** Source is engaged in, among other things, the distribution and fulfillment of magazines, confections and other non-perishable merchandise to grocers, specialty retailers and mass merchandisers (collectively, the "Retailers"); and

**WHEREAS,** Ironbound has a pre-existing relationship with an entity (the "Client") that desires to establish a business relationship with Source, the name of which shall be disclosed to Source in writing immediately following execution of this Agreement; and

**WHEREAS,** Source desires to arrange for Ironbound to introduce it to the Client and to assist Source in evaluating and negotiating any proposed business relationship with the Client, and Ironbound is willing to so introduce and assist Source, upon the terms and conditions set forth in this Agreement.

**NOW THEREFORE,** in consideration of the payments to be made by Source to Ironbound hereunder and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    **Introduction by Ironbound.**    Promptly after execution of this Agreement, Ironbound shall arrange a preliminary telephone conference between Source and representatives of the Client.  Thereafter, upon the reasonable request of Source, Ironbound shall assist Source with its evaluation and negotiation of any proposed business venture between Client and Source.  Ironbound shall not make any representations or warranties to the Client regarding Source or its business.  Source shall have the unfettered discretion to accept or reject any proposed business relationship with Client without liability to Ironbound.  Acceptance shall be manifest only by execution of a written agreement between Source and the Client.  Ironbound shall use its best efforts to furnish to Source any information in its possession or control that a reasonable person would consider important in reaching a decision to establish a business relationship with Client.

2.    **Compensation.**    As compensation for Ironbound's services hereunder, Source shall pay to Ironbound, and Ironbound shall accept, compensation equal to 5% of the net income recorded by Source as a result of its relationship with Client during the five—year period following the date (the "Establishment Date") on which the business relationship is established between Source and Client, or if shorter the period commencing on the Establishment Date and ending on the effective date of sale involving Source.  As used herein, "net income" shall be calculated in accordance with generally accepted accounting principles on a basis consistent with the financial statements of Source and after full allocation of all costs and expenses in accordance with Source's then current policy; and "sale" means (a) any sale of all or substantially all of the assets of

IB 00506

Source, or (b) any merger, consolidation or other business combination in which Source is not the surviving corporate entity or the directors of Source immediately prior to such transaction do not constitute at least 80% of the directors of Source immediately after such transaction.

Compensation due to Ironbound under this Section 2 shall be payable to Ironbound on or before the last day of April of each fiscal year with respect to which any Compensation is payable.

4.    **Reporting by Source.**    Not later than April 30 of each year, Source shall provide Ironbound with an accounting of the net income earned by it during the then immediately proceeding fiscal year attributable to its business relationship with Client.

5.    **General Provisions**

(a)    The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach hereof.

(b)    Should any one or more sections of this Agreement be found to be invalid, illegal, or unenforceable in any respect, the validity, legality and enforceability of the remaining sections contained herein shall not in any way be affected or impaired thereby. In addition, if any section hereof is found to be partially enforceable, then it shall be enforced to that extent.

(c)    Any and all notices required or permitted to be given under this Agreement shall be sufficient if furnished in writing and personally delivered or sent by registered or certified mail to Ironbound at _____ and to Source, c/o General Counsel, Source Interlink Companies, Inc. 27500 Riverview Center Blvd., Suite 400, Bonita Springs, Florida 34134 or such other place as it may subsequently designate in writing.

(d)    The rights and obligations of each of the parties to this Agreement shall be governed by and interpreted and determined in accordance with the internal laws of the State of Florida excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of Florida.

(e)    The section headings contained in this Agreement are for convenience only and shall in no manner be construed to limit or define the terms of this Agreement.

(f)    This Agreement shall be executed in two or more counterparts, each of which shall be deemed an original and together they shall constitute one and the same Agreement, with at least one counterpart being delivered to each party hereto.

IB 00507

(g)    Source shall have the right to assign this Agreement to a third party which purchases substantially all of the stock, or substantially all of the assets of Source, a subsidiary or affiliated entity of Source, or the surviving entity in a merger or similar corporate event. The Agreement may not be assigned by Ironbound without the prior written consent of Source. Whenever the consent of a party is needed it shall not be unreasonably withheld or delayed.

(h)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns.

(i)    This is the entire and only Agreement between the parties respecting the subject matter hereof, and supercedes all prior agreements. This Agreement may be modified only by a written instrument executed by all parties hereto.

(j)    Source shall have the right to control and direct Ironbound only as to the result of the services to be performed for Source under this Agreement. Ironbound may perform its services at such places and in such manner as it determines are reasonably necessary for the performance of its obligations under this Agreement.

(k)    Source and Ironbound intend and agree that the relationship between the Source and Ironbound created by this Agreement is that of an independent contractor. Ironbound is not and shall not be deemed to be an employee of Source for any purpose and Source is not an agent, servant or employee of Ironbound, and Source has no authority to bind Ironbound to any agreement, or liability or obligation. Nothing contained in this Agreement shall be construed to constitute Source or Ironbound as a partner or joint venturer of the other, it being intended that Ironbound and Source shall each remain an independent contractor and each shall be responsible for its actions and those of its respective agents, employees, and servants. Source may engage others to perform services similar to those which Ironbound is to perform under this Agreement.

(l)    Ironbound agrees that it shall be responsible for and pay all of its own (i) taxes of all kinds (including, without limitation, employment and unemployment taxes), and (ii) expenses incurred by it in connection with the services it is to perform under this Agreement (including, without limitation, business travel and entertainment expenses). Ironbound shall indemnify and hold Source, and each of its affiliates, harmless from and against any claim, loss, damage, liability, cost or expense, including, without limitation, reasonable attorney's fees, by reason of Source alleged breach or violation of this subsection.

**IN WITNESS WHEREOF,** Source and Ironbound have caused this Agreement to be executed by their respective duly authorized officers as of the date first written above.

IB 00508

SOURCE INTERLINK COMPANIES, INC.


By:_____
    Name:_____
    Its:_____

IRONBOUND PARTNERS, LLC


By:_____
    Name:_____
    Its:_____

IB 00509

| Subj: | **RE: proposed engagment agreement** |
|---|---|
| Date: | 4/26/2004 2:03:41 PM Eastern Daylight Time |
| From: | DBates@sourceinterlink.com |
| To: | Jledecky@aol.com |
| Sent from the Internet (Details) | |

I think that you should talk directly to Leslie about this issue. Leslie' believes that we should not establish any impediment to a sale of the company. If the business relationship that you are introducing is successful, the value of your interest as a shareholder would increase and compensate you through the sale of your interest in the sale of the Company.

Anyway, each of you and Leslie make reasonable points so I think you should discuss it directly. Please call Delia (239-949-7687) within the next two hours and she will connect you to Leslie.

Doug

    -----Original Message-----
    **From:** Jledecky@aol.com [mailto:Jledecky@aol.com]
    **Sent:** Monday, April 26, 2004 1:44 PM
    **To:** Doug Bates
    **Subject:** Re: proposed engagment agreement

    Hi Doug...my comments on this letter...

    Just strike the provision having to do with the sale of Source. My concern is that the new business arrangement is so lucrative that Source does get bought by another company which would end my compensation. Seems counter-intuitive. If it is NOT successful, I get nothing. If it is successful and Source is sold, I get nothing. Do you see what I mean?

    Everything else is fine...5 year term okay.

    Ironbound is a Delaware corporation with offices at 1400 34th Street NW Washington DC 20007. That will allow you to fill in the blanks.

    Let me know about the NDA.

NOTICE: The contents of this email and any attachments to it may contain privileged and confidential information from Source Interlink Companies, Inc. This information is only for the viewing or use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of, or the taking of any action in the reliance upon, the information contained in this email, or any of the attachments to this email, is strictly prohibited and that this email and all of the attachments to this email, if any, must be immediately returned to Source Interlink Companies, Inc. or destroyed and, in either case, this email and all attachments to this email must be immediately deleted from your computer without making any copies thereof. If you have received this email in error, please notify Source Interlink Companies, Inc. by email immediately.

IB 00510

Thursday, May 20, 2004 America Online: Jledecky

Message

| | |
|---|---|
| Subj: | **sourcenondisclosure1.doc** |
| Date: | 4/26/2004 2:28:52 PM Eastern Daylight Time |
| From: | DBates@sourceinterlink.com |
| To: | JLEDECKY@aol.com |
| File: | **sourcenondisclosure1.doc** (38400 bytes) DL Time (TCP/IP): < 1 minute |
| *Sent from the Internet (Details)* | |

Here are a couple of suggested changes

NOTICE: The contents of this email and any attachments to it may contain privileged and confidential information from Source Interlink Companies, Inc. This information is only for the viewing or use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of, or the taking of any action in the reliance upon, the information contained in this email, or any of the attachments to this email, is strictly prohibited and that this email and all of the attachments to this email, if any, must be immediately returned to Source Interlink Companies, Inc. or destroyed and, in either case, this email and all attachments to this email must be immediately deleted from your computer without making any copies thereof. If you have received this email in error, please notify Source Interlink Companies, Inc. by email immediately.

**Mutual Non-Disclosure Agreement**

This agreement ("Agreement") is made effective as of <u>April 26, 2004</u> (the "Effective Date") by and between _____ with offices at _____ and Source Interlink <u>Companies, Inc.</u> with offices at <u>27500 Riverview Center Blvd., Suite 400, Bonita Springs, Florida 34134</u> (each individually a "Party" and collectively the "Parties").

## WITNESSETH:

Whereas, in connection with exploring and evaluating a possible business relationship (the "Relationship") and for the purposes of the ongoing Relationship, the Parties recognize the need to disclose to one another certain of their Confidential Information (as defined below); and

Whereas, the Parties wish to provide the terms and conditions upon which such Confidential Information will be disclosed by one Party to the other Party hereunder;

Now, therefore, the Parties agree as follows:

1. "Confidential Information" means information in whatever form disclosed by one Party (the "Disclosing Party") to the other Party (the "Receiving Party") before, on or after the Effective Date hereof which relates to a Disclosing Party's business or the Relationship including without limitation business, financial and technical materials, information and data, or which although not directly related to the Relationship, is nevertheless disclosed as a result of or in connection with the Parties' discussions of the Relationship.

2. The Receiving Party shall use the Disclosing Party's Confidential Information only for the purpose of evaluating the Relationship and for the purposes of the ongoing Relationship, and shall protect such Confidential Information from disclosure to third parties, using the same degree of care used to protect its own proprietary information of like importance, but in any case using no less than a reasonable degree of care. The Receiving Party may disclose the Disclosing Party's Confidential Information to its officers, directors, employees, agents, advisors and consultants ("Representatives") in each case if such Representatives have a need to know, provided such Representatives limit the use of the Confidential Information as required hereunder. Each Party, for itself, shall be responsible for any breach of the terms of this Agreement by such Party or its Representatives. Each Party agrees, for itself at its sole expense, to take all reasonable measures (including but not limited to court proceedings) to restrain its Representatives from prohibited or unauthorized disclosure or use of the Confidential Information.

3. The restrictions of this Agreement on use and disclosure of Confidential Information shall not apply to information that:

IB 00512

(a) the Receiving Party can demonstrate was in its possession or control at the time of its disclosure hereunder;

(b) is or becomes publicly known, through no wrongful act of the Receiving Party;

(c) the Receiving Party can demonstrate was received by such Party from a third party which the Receiving Party had no reason to believe was under any obligation (whether contractual, legal, fiduciary or otherwise) to maintain the confidentiality thereof~~free to disclose it without obligation (whether contractual, legal, fiduciary or otherwise) to the Disclosing Party~~;

(d) the Receiving Party can demonstrate the information was developed independently by such Party without reference to the Confidential Information, or

(e) is lawfully required to be disclosed to any governmental agency or is otherwise required to be disclosed by law; provided, however, that before making such disclosure, the Receiving Party shall give the Disclosing Party an adequate opportunity to interpose an objection an/or take action to assure confidential handling of such information.

4. Confidential Information disclosed under this Agreement (including information in computer software or held in electronic storage media) shall be and remain the property of the Disclosing Party. The Receiving Party shall keep a record of the location of all tangible Confidential Information of the Disclosing Party in its possession, and, upon the written request of the Disclosing Party at any time, shall promptly return or destroy all such tangible Confidential Information of the Disclosing Party in its possession, and no such Confidential Information shall thereafter be retained in any form by the Receiving Party. The Receiving Party shall be fully responsible for the return or destruction of all Confidential Information disclosed to its Representatives. Any destruction of Confidential Information shall be certified in writing by the Receiving Party.

5. Without the prior written consent of the other Party, a Party will not disclose to any third party any information (including Confidential Information) regarding the Relationship, including without limitation, the fact that discussions are occurring concerning the Relationship, any of the terms or conditions relating to the Relationship being discussed by the Parties, or the existence of this Agreement.

6.- Both parties understand and agree that no contract or agreement with respect to the Relationship (or any other transaction) shall be deemed to exist between them or their respective stockholders or other owners, unless and until a definitive agreement has been executed and delivered by the Parties. None of the Parties or their respective stockholders, or any other person will have any rights or obligations of any kind whatsoever with respect to any such transaction by virtue of this Confidentiality Agreement or any other written or oral expression by either Party or their respective

IB 00513

Representatives unless and until a definitive agreement between the Parties is executed and delivered, other than with respect to the matters specifically agreed to herein. For purposes of this Confidentiality Agreement, the term "definitive agreement" does not include an executed letter of intent or any other preliminary written agreement. The Parties acknowledge that any Relationship is subject to the approval of their respective senior management and/or the Board of Directors, which approval may be denied, granted or conditionally granted in such management's or board's complete discretion. It is expressly understood and agreed that neither Party is bound by this Confidentiality Agreement to establish a Relationship (or any other transaction). Each Party reserves the right, in its sole and absolute discretion, at any time, to reject any and all proposals from, and to terminate all discussions with, the other Party.

7. For a period of two years from the date of this Agreement, neither Party (including its directly or indirectly owned subsidiaries and controlled affiliates) will, directly or indirectly, contact for the purposes of hiring, solicit for employment or hire any employee, officer or director of the other Party (including its directly or indirectly owned subsidiaries); provided, however, that the foregoing shall not preclude either Party from hiring any person who (i) initiates discussions regarding employment without any direct solicitation by the Party, (ii) responds to any general public advertisement by the Party that is not directed towards any such employee or group of employees, or (iii) has been terminated by by the employing Party.

8. This Agreement shall become effective on the date first set forth above and shall continue for the longer of (i) one year from the Effective Date or (ii) the period of the Relationship.

9~~7~~. This Agreement: (a) is the complete Agreement of the Parties concerning the subject matter hereof and supercedes any and all prior agreements, understanding or discussions with respect to the subject matter hereof; (b) shall not be construed to create any obligation on the part of either Party to retain the services or to compensate the other Party in any manner, except as may be set forth by a separate written Agreement duly executed and delivered by the parties; (c) may not be amended or in any manner modified except in a writing signed by the Parties; and (d) shall be governed and construed in accordance with the laws of the State of California without regard to its conflicts of law principles. If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit enforcement of the terms of this Agreement in a manner most closely representing the intention of the Parties as expressed herein. Without prejudice to the rights and remedies otherwise available to the Parties, the Parties agree that money damages may not be a sufficient remedy for any breach of this Agreement by either Party or their respective Representatives and, accordingly, that either Party shall be entitled to equitable relief, including injunctive and specific performance, if either Party or any of their respective Representatives breaches or threatens to breach any of the provisions of this Agreement. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and all of which shall constitute the same Agreement. The Parties hereto agree that the prevailing

Party in any dispute arising under or related to this Agreement shall be entitled to attorneys fees in addition to any other relief ordered by the trier of fact.

In witness whereof, each of the Parties hereto has caused the Agreement to be executed by its duly authorized representative.

ACCEPTED AND AGREED:

By:_____

ACCEPTED AND AGREED

By:_____

IB 00515

Message                                                                                    Page 1 of 1

| | |
|---|---|
| Subj: | **Ledecky.DOC** |
| Date: | **4/26/2004 4:04:47 PM Eastern Daylight Time** |
| From: | DBates@sourceinterlink.com |
| To: | JLEDECKY@aol.com |
| File: | **Ledecky.DOC (38912 bytes) DL Time (TCP/IP): < 1 minute** |

*Sent from the Internet (Details)*

We have removed the termination on sale language. If all else is acceptable please sign the space indicated and fax to 239-949-7689. Upon my receipt I will countersign and send back to you.

NOTICE: The contents of this email and any attachments to it may contain privileged and confidential information from Source Interlink Companies, Inc. This information is only for the viewing or use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of, or the taking of any action in the reliance upon, the information contained in this email, or any of the attachments to this email, is strictly prohibited and that this email and all of the attachments to this email, if any, must be immediately returned to Source Interlink Companies, Inc. or destroyed and, in either case, this email and all attachments to this email must be immediately deleted from your computer without making any copies thereof. If you have received this email in error, please notify Source Interlink Companies, Inc. by email immediately.

IB 00516

Thursday, May 20, 2004 America Online: Jledecky

| | |
|---|---|
| Subj: | **RE: Revisions to Agreement** |
| Date: | 4/26/2004 7:52:31 PM Eastern Daylight Time |
| From: | tmcguire@endeavorla.com |
| To: | Jledecky@aol.com |
| Sent from the Internet (Details) | |

Document changes are fine. I will add Endeavor's information to the introduction and signature lines, sign, and fax back to you.

-----Original Message-----
**From:** Jledecky@aol.com [mailto:Jledecky@aol.com]
**Sent:** Monday, April 26, 2004 3:27 PM
**To:** Tom McGuire
**Subject:** Revisions to Agreement

Here are changes to proposed NDA...we are trying to arrange for a call on Tuesday. Let me know so we can wrap this up and get it signed by the parties. Thanks.

IB 00517

Subj:    **RE: Confirming Conference Call**
Date:    4/27/2004 9:06:34 AM Eastern Standard Time
From:   DBates@sourceinterlink.com
To:     Jledecky@aol.com

I do not as of the written of this have Appendix A
    -----Original Message-----
**From:** Jledecky@aol.com [mailto:Jledecky@aol.com]
**Sent:** Monday, April 26, 2004 11:32 PM
**To:** Della Everett
**Cc:** Doug Bates
**Subject:** Confirming Conference Call

Pending return of various legal documents, we are going to put the conference call together with Leslie and Jim for 10AM Pacific Daylight Savings Time.

Doug, the other side approved the proposed non-disclosure document changes and will fax it back to me hopefully in time for the call.

In the meantime, you should fax back to 202-342-9090 our agreement signed. I will then email you Appendix A, you can take the company name, add it to the non-disclosure, and fax that back to me and we should be covered on all sides. So it's important that you get to this in the morning.

Ms. D. Everett, once that happens we will figure out the logistics of a conference call. Can you put together technology wise a three-way call between Leslie/Jim, me, and the other company so that everyone can hear everyone else? Let me know if you can arrange this.

Thanks everyone.

NOTICE: The contents of this email and any attachments to it may contain privileged and confidential information from Source Interlink Companies, Inc. This information is only for the viewing or use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of, or the taking of any action in the reliance upon, the information contained in this email, or any of the attachments to this email, is strictly prohibited and that this email and all of the attachments to this email, if any, must be immediately returned to Source Interlink Companies, Inc. or destroyed and, in either case, this email and all attachments to this email must be immediately deleted from your computer without making any copies thereof. If you have received this email in error, please notify Source Interlink Companies, Inc. by email immediately.

IB 00574

Sunday, December 12, 2004 America Online: Jledecky

To: Doug Bates

4 Pages Total

Fax back to

202 342 9090

Thanks!
JL

IB 00518

## REFERRAL AGREEMENT

This Referral Agreement is made and entered into as of April 26, 2004 by and between Source Interlink Companies, Inc., a Missouri corporation ("Source") and Ironbound Partners, LLC, a Delaware limited liability company ("Ironbound").

**WHEREAS,** Source is engaged in, among other things, the distribution and fulfillment of magazines, confections and other non-perishable merchandise to grocers, specialty retailers and mass merchandisers (collectively, the "Retailers"); and

**WHEREAS,** Ironbound has a pre-existing relationship with an entity (the "Client") that desires to establish a business relationship with Source, the name of which shall be disclosed to Source in writing immediately following execution of this Agreement; and

**WHEREAS,** Source desires to arrange for Ironbound to introduce it to the Client and to assist Source in evaluating and negotiating any proposed business relationship with the Client, and Ironbound is willing to so introduce and assist Source, upon the terms and conditions set forth in this Agreement.

**NOW THEREFORE,** in consideration of the payments to be made by Source to Ironbound hereunder and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    _Introduction by Ironbound._        Promptly after execution of this Agreement, Ironbound shall arrange a preliminary telephone conference between Source and representatives of the Client. Thereafter, upon the reasonable request of Source, Ironbound shall assist Source with its evaluation and negotiation of any proposed business venture between Client and Source. Ironbound shall not make any representations or warranties to the Client regarding Source or its business. Source shall have the unfettered discretion to accept or reject any proposed business relationship with Client without liability to Ironbound. Acceptance shall be manifest only by execution of a written agreement between Source and the Client. Ironbound shall use its best efforts to furnish to Source any information in its possession or control that a reasonable person would consider important in reaching a decision to establish a business relationship with Client.

2.    _Compensation._ As compensation for Ironbound's services hereunder, Source shall pay to Ironbound, and Ironbound shall accept, compensation equal to 5% of the net income recorded by Source as a result of its relationship with Client during the five—year period following the date (the "Establishment Date") on which the business relationship is established between Source and Client. As used herein, "net income" shall be calculated in accordance with generally accepted accounting principles on a basis consistent with the financial statements of Source and after full allocation of all costs and expenses in accordance with Source's then current policy.

Compensation due to Ironbound under this Section 2 shall be payable to Ironbound on or before the last day of April of each fiscal year with respect to which any Compensation is payable.

IB 00519

4.     **Reporting by Source.** Not later than April 30 of each year, Source shall provide Ironbound with an accounting of the net income earned by it during the then immediately proceeding fiscal year attributable to its business relationship with Client.

5.     **General Provisions**

(a)     The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach hereof.

(b)     Should any one or more sections of this Agreement be found to be invalid, illegal, or unenforceable in any respect, the validity, legality and enforceability of the remaining sections contained herein shall not in any way be affected or impaired thereby. In addition, if any section hereof is found to be partially enforceable, then it shall be enforced to that extent.

(c)     Any and all notices required or permitted to be given under this Agreement shall be sufficient if furnished in writing and personally delivered or sent by registered or certified mail to Ironbound at 1400 34th Street NW Washington DC 20007 and to Source, c/o General Counsel, Source Interlink Companies, Inc. 27500 Riverview Center Blvd., Suite 400, Bonita Springs, Florida 34134 or such other place as it may subsequently designate in writing.

(d)     The rights and obligations of each of the parties to this Agreement shall be governed by and interpreted and determined in accordance with the internal laws of the State of Florida excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of Florida.

(e)     The section headings contained in this Agreement are for convenience only and shall in no manner be construed to limit or define the terms of this Agreement.

(f)     This Agreement shall be executed in two or more counterparts, each of which shall be deemed an original and together they shall constitute one and the same Agreement, with at least one counterpart being delivered to each party hereto.

(g)     Source shall have the right to assign this Agreement to a third party which purchases substantially all of the stock, or substantially all of the assets of Source, a subsidiary or affiliated entity of Source, or the surviving entity in a merger or similar corporate event. The Agreement may not be assigned by Ironbound without the prior written consent of Source. Whenever the consent of a party is needed it shall not be unreasonably withheld or delayed.

(h)     This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns.

(i)     This is the entire and only Agreement between the parties respecting the subject matter hereof, and supercedes all prior agreements. This Agreement may be modified only by a written instrument executed by all parties hereto.

IB 00520

To. Doug Bates

4 Pages Total

Fax back to

202. 342 9090

Thanks!

JL

IB 00521

## REFERRAL AGREEMENT

This **Referral Agreement** is made and entered into as of April 26, 2004 by and between Source Interlink Companies, Inc., a Missouri corporation ("Source") and Ironbound Partners, LLC, a Delaware limited liability company ("Ironbound").

**WHEREAS,** Source is engaged in, among other things, the distribution and fulfillment of magazines, confections and other non-perishable merchandise to grocers, specialty retailers and mass merchandisers (collectively, the "Retailers"); and

**WHEREAS,** Ironbound has a pre-existing relationship with an entity (the "Client") that desires to establish a business relationship with Source, the name of which shall be disclosed to Source in writing immediately following execution of this Agreement; and

**WHEREAS,** Source desires to arrange for Ironbound to introduce it to the Client and to assist Source in evaluating and negotiating any proposed business relationship with the Client, and Ironbound is willing to so introduce and assist Source, upon the terms and conditions set forth in this Agreement.

**NOW THEREFORE,** in consideration of the payments to be made by Source to Ironbound hereunder and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    **Introduction by Ironbound.**    Promptly after execution of this Agreement, Ironbound shall arrange a preliminary telephone conference between Source and representatives of the Client.  Thereafter, upon the reasonable request of Source, Ironbound shall assist Source with its evaluation and negotiation of any proposed business venture between Client and Source.  Ironbound shall not make any representations or warranties to the Client regarding Source or its business.  Source shall have the unfettered discretion to accept or reject any proposed business relationship with Client without liability to Ironbound.  Acceptance shall be manifest only by execution of a written agreement between Source and the Client.  Ironbound shall use its best efforts to furnish to Source any information in its possession or control that a reasonable person would consider important in reaching a decision to establish a business relationship with Client.

2.    **Compensation.** As compensation for Ironbound's services hereunder, Source shall pay to Ironbound, and Ironbound shall accept, compensation equal to 5% of the net income recorded by Source as a result of its relationship with Client during the five—year period following the date (the "Establishment Date") on which the business relationship is established between Source and Client.  As used herein, "net income" shall be calculated in accordance with generally accepted accounting principles on a basis consistent with the financial statements of Source and after full allocation of all costs and expenses in accordance with Source's then current policy.

Compensation due to Ironbound under this Section 2 shall be payable to Ironbound on or before the last day of April of each fiscal year with respect to which any Compensation is payable.

IB 00522

4.    **Reporting by Source.** Not later than April 30 of each year, Source shall provide Ironbound with an accounting of the net income earned by it during the then immediately proceeding fiscal year attributable to its business relationship with Client.

5.    **General Provisions**

(a)    The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach hereof.

(b)    Should any one or more sections of this Agreement be found to be invalid, illegal, or unenforceable in any respect, the validity, legality and enforceability of the remaining sections contained herein shall not in any way be affected or impaired thereby. In addition, if any section hereof is found to be partially enforceable, then it shall be enforced to that extent.

(c)    Any and all notices required or permitted to be given under this Agreement shall be sufficient if furnished in writing and personally delivered or sent by registered or certified mail to Ironbound at 1400 34th Street NW Washington DC 20007 and to Source, c/o General Counsel, Source Interlink Companies, Inc. 27500 Riverview Center Blvd., Suite 400, Bonita Springs, Florida 34134 or such other place as it may subsequently designate in writing.

(d)    The rights and obligations of each of the parties to this Agreement shall be governed by and interpreted and determined in accordance with the internal laws of the State of Florida excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of Florida.

(e)    The section headings contained in this Agreement are for convenience only and shall in no manner be construed to limit or define the terms of this Agreement.

(f)    This Agreement shall be executed in two or more counterparts, each of which shall be deemed an original and together they shall constitute one and the same Agreement, with at least one counterpart being delivered to each party hereto.

(g)    Source shall have the right to assign this Agreement to a third party which purchases substantially all of the stock, or substantially all of the assets of Source, a subsidiary or affiliated entity of Source, or the surviving entity in a merger or similar corporate event. The Agreement may not be assigned by Ironbound without the prior written consent of Source. Whenever the consent of a party is needed it shall not be unreasonably withheld or delayed.

(h)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns.

(i)    This is the entire and only Agreement between the parties respecting the subject matter hereof, and supercedes all prior agreements. This Agreement may be modified only by a written instrument executed by all parties hereto.

IB 00523

(j)    Source shall have the right to control and direct Ironbound only as to the result of the services to be performed for Source under this Agreement. Ironbound may perform its services at such places and in such manner as it determines are reasonably necessary for the performance of its obligations under this Agreement.

(k)    Source and Ironbound intend and agree that the relationship between the Source and Ironbound created by this Agreement is that of an independent contractor. Ironbound is not and shall not be deemed to be an employee of Source for any purpose and Source is not an agent, servant or employee of Ironbound, and Source has no authority to bind Ironbound to any agreement, or liability or obligation. Nothing contained in this Agreement shall be construed to constitute Source or Ironbound as a partner or joint venturer of the other, it being intended that Ironbound and Source shall each remain an independent contractor and each shall be responsible for its actions and those of its respective agents, employees, and servants. Source may engage others to perform services similar to those which Ironbound is to perform under this Agreement.

(l)    Ironbound agrees that it shall be responsible for and pay all of its own (i) taxes of all kinds (including, without limitation, employment and unemployment taxes), and (ii) expenses incurred by it in connection with the services it is to perform under this Agreement (including, without limitation, business travel and entertainment expenses). Ironbound shall indemnify and hold Source, and each of its affiliates, harmless from and against any claim, loss, damage, liability, cost or expense, including, without limitation, reasonable attorney's fees, by reason of Source alleged breach or violation of this subsection.

**IN WITNESS WHEREOF,** Source and Ironbound have caused this Agreement to be executed by their respective duly authorized officers as of the date first written above.

SOURCE INTERLINK COMPANIES, INC.


By: _____
    Name: Douglas J. Bates
    Its: Assistant Secretary

IRONBOUND PARTNERS, LLC

By: _____
    Name: JONATHAN J. LEDECKY
    Its: MANAGING DIRECTOR


IB 00524

To. Doug Bates

4 Pages Total

Fax back to

202 342 9090

Thanks!
JL

IB 00525

## REFERRAL AGREEMENT

This Referral Agreement is made and entered into as of April 26, 2004 by and between Source Interlink Companies, Inc., a Missouri corporation ("Source") and Ironbound Partners, LLC, a Delaware limited liability company ("Ironbound").

**WHEREAS,** Source is engaged in, among other things, the distribution and fulfillment of magazines, confections and other non-perishable merchandise to grocers, specialty retailers and mass merchandisers (collectively, the "Retailers"); and

**WHEREAS,** Ironbound has a pre-existing relationship with an entity (the "Client") that desires to establish a business relationship with Source, the name of which shall be disclosed to Source in writing immediately following execution of this Agreement; and

**WHEREAS,** Source desires to arrange for Ironbound to introduce it to the Client and to assist Source in evaluating and negotiating any proposed business relationship with the Client, and Ironbound is willing to so introduce and assist Source, upon the terms and conditions set forth in this Agreement.

**NOW THEREFORE,** in consideration of the payments to be made by Source to Ironbound hereunder and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    **Introduction by Ironbound.**        Promptly after execution of this Agreement, Ironbound shall arrange a preliminary telephone conference between Source and representatives of the Client. Thereafter, upon the reasonable request of Source, Ironbound shall assist Source with its evaluation and negotiation of any proposed business venture between Client and Source. Ironbound shall not make any representations or warranties to the Client regarding Source or its business. Source shall have the unfettered discretion to accept or reject any proposed business relationship with Client without liability to Ironbound. Acceptance shall be manifest only by execution of a written agreement between Source and the Client. Ironbound shall use its best efforts to furnish to Source any information in its possession or control that a reasonable person would consider important in reaching a decision to establish a business relationship with Client.

2.    **Compensation.** As compensation for Ironbound's services hereunder, Source shall pay to Ironbound, and Ironbound shall accept, compensation equal to 5% of the net income recorded by Source as a result of its relationship with Client during the five-year period following the date (the "Establishment Date") on which the business relationship is established between Source and Client. As used herein, "net income" shall be calculated in accordance with generally accepted accounting principles on a basis consistent with the financial statements of Source and after full allocation of all costs and expenses in accordance with Source's then current policy.

        Compensation due to Ironbound under this Section 2 shall be payable to Ironbound on or before the last day of April of each fiscal year with respect to which any Compensation is payable.

IB 00526

04/27/2004  10:19    2399497689    SOURCE INTERLINK    PAGE 03

4.    **Reporting by Source**.  Not later than April 30 of each year, Source shall provide Ironbound with an accounting of the net income earned by it during the then immediately proceeding fiscal year attributable to its business relationship with Client.

5.    **General Provisions**

(a)    The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach hereof.

(b)    Should any one or more sections of this Agreement be found to be invalid, illegal, or unenforceable in any respect, the validity, legality and enforceability of the remaining sections contained herein shall not in any way be affected or impaired thereby.  In addition, if any section hereof is found to be partially enforceable, then it shall be enforced to that extent.

(c)    Any and all notices required or permitted to be given under this Agreement shall be sufficient if furnished in writing and personally delivered or sent by registered or certified mail to Ironbound at 1400 34th Street NW Washington DC 20007 and to Source, c/o General Counsel, Source Interlink Companies, Inc. 27500 Riverview Center Blvd., Suite 400, Bonita Springs, Florida 34134 or such other place as it may subsequently designate in writing.

(d)    The rights and obligations of each of the parties to this Agreement shall be governed by and interpreted and determined in accordance with the internal laws of the State of Florida excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of Florida.

(e)    The section headings contained in this Agreement are for convenience only and shall in no manner be construed to limit or define the terms of this Agreement.

(f)    This Agreement shall be executed in two or more counterparts, each of which shall be deemed an original and together they shall constitute one and the same Agreement, with at least one counterpart being delivered to each party hereto.

(g)    Source shall have the right to assign this Agreement to a third party which purchases substantially all of the stock, or substantially all of the assets of Source, a subsidiary or affiliated entity of Source, or the surviving entity in a merger or similar corporate event.  The Agreement may not be assigned by Ironbound without the prior written consent of Source. Whenever the consent of a party is needed it shall not be unreasonably withheld or delayed.

(h)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns.

(i)    This is the entire and only Agreement between the parties respecting the subject matter hereof, and supercedes all prior agreements.  This Agreement may be modified only by a written instrument executed by all parties hereto.

IB 00527

(j)    Source shall have the right to control and direct Ironbound only as to the result of the services to be performed for Source under this Agreement. Ironbound may perform its services at such places and in such manner as it determines are reasonably necessary for the performance of its obligations under this Agreement.

(k)    Source and Ironbound intend and agree that the relationship between the Source and Ironbound created by this Agreement is that of an independent contractor. Ironbound is not and shall not be deemed to be an employee of Source for any purpose and Source is not an agent, servant or employee of Ironbound, and Source has no authority to bind Ironbound to any agreement, or liability or obligation. Nothing contained in this Agreement shall be construed to constitute Source or Ironbound as a partner or joint venturer of the other, it being intended that Ironbound and Source shall each remain an independent contractor and each shall be responsible for its actions and those of its respective agents, employees, and servants. Source may engage others to perform services similar to those which Ironbound is to perform under this Agreement.

(l)    Ironbound agrees that it shall be responsible for and pay all of its own (i) taxes of all kinds (including, without limitation, employment and unemployment taxes), and (ii) expenses incurred by it in connection with the services it is to perform under this Agreement (including, without limitation, business travel and entertainment expenses). Ironbound shall indemnify and hold Source, and each of its affiliates, harmless from and against any claim, loss, damage, liability, cost or expense, including, without limitation, reasonable attorney's fees, by reason of Source alleged breach or violation of this subsection.

**IN WITNESS WHEREOF**, Source and Ironbound have caused this Agreement to be executed by their respective duly authorized officers as of the date first written above.

**SOURCE INTERLINK COMPANIES, INC.**

By: _____
Name: Douglas J. Bates
Its: Assistant Secretary

**IRONBOUND PARTNERS, LLC**

By: _____
Name: JONATHAN J. LEDECKY
Its: MANAGING DIRECTOR

IB 00528

To. Doug Bates

2 X Pages Total

Fax back to

202 342 9090

Thanks!

JL

IB 00529

04/27/2004  10:49    2399497689                    SOURCE INTERLINK                    PAGE  02

## Mutual Non-Disclosure Agreement

This agreement ("Agreement") is made effective as of April 26, 2004  (the "Effective Date") by and between The Endeavor Agency, LLC with offices at 9701 Wilshire Blvd., 10th Floor, Beverly Hills, California 90212 and Source Interlink Companies, Inc. with offices at 27500 Riverview Center Blvd., Suite 400, Bonita Springs, Florida 34134 (each individually a "Party" and collectively the "Parties").

## W I T N E S S E T H :

Whereas, in connection with exploring and evaluating a possible business relationship (the "Relationship") and for the purposes of the ongoing Relationship, the Parties recognize the need to disclose to one another certain of their Confidential Information (as defined below); and

Whereas, the Parties wish to provide the terms and conditions upon which such Confidential Information will be disclosed by one Party to the other Party hereunder;

Now, therefore, the Parties agree as follows:

1. "Confidential Information" means information in whatever form disclosed by one Party (the "Disclosing Party") to the other Party (the "Receiving Party") before, on or after the Effective Date hereof which relates to a Disclosing Party's business or the Relationship including without limitation business, financial and technical materials, information and data, or which although not directly related to the Relationship, is nevertheless disclosed as a result of or in connection with the Parties' discussions of the Relationship.

2. The Receiving Party shall use the Disclosing Party's Confidential Information only for the purpose of evaluating the Relationship and for the purposes of the ongoing Relationship, and shall protect such Confidential Information from disclosure to third parties, using the same degree of care used to protect its own proprietary information of like importance, but in any case using no less than a reasonable degree of care. The Receiving Party may disclose the Disclosing Party's Confidential Information to its officers, directors, employees, agents, advisors and consultants ("Representatives") in each case if such Representatives have a need to know, provided such Representatives limit the use of the Confidential Information as required hereunder. Each Party, for itself, shall be responsible for any breach of the terms of this Agreement by such Party or its Representatives. Each Party agrees, for itself at its sole expense, to take all reasonable measures (including but not limited to court proceedings) to restrain its Representatives from prohibited or unauthorized disclosure or use of the Confidential Information.

3. The restrictions of this Agreement on use and disclosure of Confidential Information shall not apply to information that:

(a) the Receiving Party can demonstrate was in its possession or control at the time of its disclosure hereunder;

(b) is or becomes publicly known, through no wrongful act of the Receiving Party;

IB 00530

(c) the Receiving Party can demonstrate was received by such Party from a third party which the Receiving Party had no reason to believe was under any obligation (whether contractual, legal, fiduciary or otherwise) to maintain the confidentiality thereof;

(d) the Receiving Party can demonstrate the information was developed independently by such Party without reference to the Confidential Information, or

(e) is lawfully required to be disclosed to any governmental agency or is otherwise required to be disclosed by law; provided, however, that before making such disclosure, the Receiving Party shall give the Disclosing Party an adequate opportunity to interpose an objection an/or take action to assure confidential handling of such information.

4. Confidential Information disclosed under this Agreement (including information in computer software or held in electronic storage media) shall be and remain the property of the Disclosing Party. The Receiving Party shall keep a record of the location of all tangible Confidential Information of the Disclosing Party in its possession, and, upon the written request of the Disclosing Party at any time, shall promptly return or destroy all such tangible Confidential Information of the Disclosing Party in its possession, and no such Confidential Information shall thereafter be retained in any form by the Receiving Party. The Receiving Party shall be fully responsible for the return or destruction of all Confidential Information disclosed to its Representatives. Any destruction of Confidential Information shall be certified in writing by the Receiving Party.

5. Without the prior written consent of the other Party, a Party will not disclose to any third party any information (including Confidential Information) regarding the Relationship, including without limitation, the fact that discussions are occurring concerning the Relationship, any of the terms or conditions relating to the Relationship being discussed by the Parties, or the existence of this Agreement.

6. Both parties understand and agree that no contract or agreement with respect to the Relationship (or any other transaction) shall be deemed to exist between them or their respective stockholders or other owners, unless and until a definitive agreement has been executed and delivered by the Parties. None of the Parties or their respective stockholders, or any other person will have any rights or obligations of any kind whatsoever with respect to any such transaction by virtue of this Confidentiality Agreement or any other written or oral expression by either Party or their respective Representatives unless and until a definitive agreement between the Parties is executed and delivered, other than with respect to the matters specifically agreed to herein.  For purposes of this Confidentiality Agreement, the term "definitive agreement" does not include an executed letter of intent or any other preliminary written agreement.  The Parties acknowledge that any Relationship is subject to the approval of their respective senior management and/or the Board of Directors, which approval may be denied, granted or conditionally granted in such management's or board's complete discretion. It is expressly understood and agreed that neither Party is bound by this Confidentiality Agreement to establish a Relationship (or any other transaction). Each Party reserves the right, in its sole and absolute discretion, at any time, to reject any and all proposals from, and to terminate all discussions with, the other Party.

7. For a period of two years from the date of this Agreement, neither Party (including its directly or indirectly owned subsidiaries and controlled affiliates) will, directly or indirectly,

IB 00531

contact for the purposes of hiring, solicit for employment or hire any employee, officer or director of the other Party (including its directly or indirectly owned subsidiaries); provided, however, that the foregoing shall not preclude either Party from hiring any person who (i) initiates discussions regarding employment without any direct solicitation by the Party, (ii) responds to any general public advertisement by the Party that is not directed towards any such employee or group of employees, or (iii) has been terminated by the employing Party.

8.  This Agreement shall become effective on the date first set forth above and shall continue for the longer of (i) one year from the Effective Date or (ii) the period of the Relationship.

9. This Agreement: (a) is the complete Agreement of the Parties concerning the subject matter hereof and supercedes any and all prior agreements, understanding or discussions with respect to the subject matter hereof; (b) shall not be construed to create any obligation on the part of either Party to retain the services or to compensate the other Party in any manner, except as may be set forth by a separate written Agreement duly executed and delivered by the parties; (c) may not be amended or in any manner modified except in a writing signed by the Parties; and (d) shall be governed and construed in accordance with the laws of the State of California without regard to its conflicts of law principles. If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit enforcement of the terms of this Agreement in a manner most closely representing the intention of the Parties as expressed herein. Without prejudice to the rights and remedies otherwise available to the Parties, the Parties agree that money damages may not be a sufficient remedy for any breach of this Agreement by either Party or their respective Representatives and, accordingly, that either Party shall be entitled to equitable relief, including injunctive and specific performance, if either Party or any of their respective Representatives breaches or threatens to breach any of the provisions of this Agreement. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and all of which shall constitute the same Agreement. The Parties hereto agree that the prevailing Party in any dispute arising under or related to this Agreement shall be entitled to attorneys fees in addition to any other relief ordered by the trier of fact.

In witness whereof, each of the Parties hereto has caused the Agreement to be executed by its duly authorized representative.

SOURCE INTERLINK COMPANIES, INC.

By: _____

Douglas J. Bates, General Counsel and Assistant Secretary

THE ENDEAVOR AGENCY, LLC

By: _____

Tom McGuire, General Counsel

IB 00532

To: Tom McGuire

Tom:

Please sign and fax back to

202 342 9090!

ASAP

4 Pages Total

IB 00533



*endeavor*

Fax Transmission To _____

**John Ledecky**

202.342.9090

Fax From

**Tom McGuire**

Endeavor Agency
9701 Wilshire Boulevard
10th Floor
Beverly Hills, CA  90212

Phone:  310.248.2000
Fax:    310.248.2020

Regarding _____

Number of Pages: 5

Tuesday, April 27, 2004

Talent Agency  9701 Wilshire Boulevard  10th Floor  Beverly Hills  CA  90212  310 248 2000  Fax 310 248 2020

IB 00534

T-015  P.002/005  F-070

Apr-27-2004  08:22am  From-

RECEIVED
APR 27 2004
Tom McGuire

To: Tom McGuire

Tom:

Please Sign and fax back to

202 342 9090 !

ASAP

4 Pages Total

JON — Here it is

Tom

IB 00535

Apr-27-2004 08:23am    From-
04/27/2004  10:49    2399497689        SOURCE INTERLINK        PAGE 02

T-015  P.003/005  F-070

### Mutual Non-Disclosure Agreement

This agreement ("Agreement") is made effective as of April 26, 2004 (the "Effective Date") by and between The Endeavor Agency, LLC with offices at 9701 Wilshire Blvd., 10th Floor, Beverly Hills, California 90212 and Source Interlink Companies, Inc. with offices at 27500 Riverview Center Blvd., Suite 400, Bonita Springs, Florida 34134 (each individually a "Party" and collectively the "Parties").

## WITNESSETH:

Whereas, in connection with exploring and evaluating a possible business relationship (the "Relationship") and for the purpose of the ongoing Relationship, the Parties recognize the need to disclose to one another certain of their Confidential Information (as defined below); and

Whereas, the Parties wish to provide the terms and conditions upon which such Confidential Information will be disclosed by one Party to the other Party hereunder;

Now, therefore, the Parties agree as follows:

1. "Confidential Information" means information in whatever form disclosed by one Party (the "Disclosing Party") to the other Party (the "Receiving Party") before, on or after the Effective Date hereof which relates to a Disclosing Party's business or the Relationship including without limitation business, financial and technical materials, information and data, or which although not directly related to the Relationship, is nevertheless disclosed as a result of or in connection with the Parties' discussions of the Relationship.

2. The Receiving Party shall use the Disclosing Party's Confidential Information only for the purpose of evaluating the Relationship and for the purposes of the ongoing Relationship, and shall protect such Confidential Information from disclosure to third parties, using the same degree of care used to protect its own proprietary information of like importance, but in any case using no less than a reasonable degree of care. The Receiving Party may disclose the Disclosing Party's Confidential Information to its officers, directors, employees, agents, advisors and consultants ("Representatives") in each case if such Representatives have a need to know, provided such Representatives limit the use of the Confidential Information as required hereunder. Each Party, for itself, shall be responsible for any breach of the terms of this Agreement by such Party or its Representatives. Each Party agrees, for itself at its sole expense, to take all reasonable measures (including but not limited to court proceedings) to restrain its Representatives from prohibited or unauthorized disclosure or use of the Confidential Information.

3. The restrictions of this Agreement on use and disclosure of Confidential Information shall not apply to information that:

(a) the Receiving Party can demonstrate was in its possession or control at the time of its disclosure hereunder;

(b) is or becomes publicly known, through no wrongful act of the Receiving Party;

IB 00536

(c) the Receiving Party can demonstrate was received by such Party from a third party which the Receiving Party had no reason to believe was under any obligation (whether contractual, legal, fiduciary or otherwise) to maintain the confidentiality thereof;

(d) the Receiving Party can demonstrate the information was developed independently by such Party without reference to the Confidential Information, or

(e) is lawfully required to be disclosed to any governmental agency or is otherwise required to be disclosed by law; provided, however, that before making such disclosure, the Receiving Party shall give the Disclosing Party an adequate opportunity to interpose an objection an/or take action to assure confidential handling of such information.

4. Confidential Information disclosed under this Agreement (including information in computer software or held in electronic storage media) shall be and remain the property of the Disclosing Party. The Receiving Party shall keep a record of the location of all tangible Confidential Information of the Disclosing Party in its possession, and, upon the written request of the Disclosing Party at any time, shall promptly return or destroy all such tangible Confidential Information of the Disclosing Party in its possession, and no such Confidential Information shall thereafter be retained in any form by the Receiving Party. The Receiving Party shall be fully responsible for the return or destruction of all Confidential Information disclosed to its Representatives. Any destruction of Confidential Information shall be certified in writing by the Receiving Party.

5. Without the prior written consent of the other Party, a Party will not disclose to any third party any information (including Confidential Information) regarding the Relationship, including without limitation, the fact that discussions are occurring concerning the Relationship, any of the terms or conditions relating to the Relationship being discussed by the Parties, or the existence of this Agreement.

6. Both parties understand and agree that no contract or agreement with respect to the Relationship (or any other transaction) shall be deemed to exist between them or their respective stockholders or other owners, unless and until a definitive agreement has been executed and delivered by the Parties. None of the Parties or their respective stockholders, or any other person will have any rights or obligations of any kind whatsoever with respect to any such transaction by virtue of this Confidentiality Agreement or any other written or oral expression by either Party or their respective Representatives unless and until a definitive agreement between the Parties is executed and delivered, other than with respect to the matters specifically agreed to herein. For purposes of this Confidentiality Agreement, the term "definitive agreement" does not include an executed letter of intent or any other preliminary written agreement. The Parties acknowledge that any Relationship is subject to the approval of their respective senior management and/or the Board of Directors, which approval may be denied, granted or conditionally granted in such management's or board's complete discretion. It is expressly understood and agreed that neither Party is bound by this Confidentiality Agreement to establish a Relationship (or any other transaction). Each Party reserves the right, in its sole and absolute discretion, at any time, to reject any and all proposals from, and to terminate all discussions with, the other Party.

7. For a period of two years from the date of this Agreement, neither Party (including its directly or indirectly owned subsidiaries and controlled affiliates) will, directly or indirectly,

IB 00537

contact for the purposes of hiring, solicit for employment or hire any employee, officer or director of the other Party (including its directly or indirectly owned subsidiaries); provided, however, that the foregoing shall not preclude either Party from hiring any person who (i) initiates discussions regarding employment without any direct solicitation by the Party, (ii) responds to any general public advertisement by the Party that is not directed towards any such employee or group of employees, or (iii) has been terminated by the employing Party.

8.  This Agreement shall become effective on the date first set forth above and shall continue for the longer of (i) one year from the Effective Date or (ii) the period of the Relationship.

9. This Agreement: (a) is the complete Agreement of the Parties concerning the subject matter hereof and supersedes any and all prior agreements, understanding or discussions with respect to the subject matter hereof; (b) shall not be construed to create any obligation on the part of either Party to retain the services or to compensate the other Party in any manner, except as may be set forth by a separate written Agreement duly executed and delivered by the parties; (c) may not be amended or in any manner modified except in a writing signed by the Parties; and (d) shall be governed and construed in accordance with the laws of the State of California without regard to its conflicts of law principles. If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provisions shall be deemed modified to the limited extent required to permit enforcement of the terms of this Agreement in a manner most closely representing the intentions of the Parties as expressed herein. Without prejudice to the rights and remedies otherwise available to the Parties, the Parties agree that money damages may not be a sufficient remedy for any breach of this Agreement by either Party or their respective Representatives and, accordingly, that either Party shall be entitled to equitable relief, including injunctive and specific performance, if either Party or any of their respective Representatives breaches or threatens to breach any of the provisions of this Agreement. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and all of which shall constitute the same Agreement. The Parties hereto agree that the prevailing Party in any dispute arising under or related to this Agreement shall be entitled to attorneys fees in addition to any other relief ordered by the trier of fact.

In witness whereof, each of the Parties hereto has caused the Agreement to be executed by its duly authorized representative.

SOURCE INTERLINK COMPANIES, INC.

By: _____
Douglas J. Bates, General Counsel and Assistant Secretary

THE ENDEAVOR AGENCY, LLC

By: _____
Tom McGuire, General Counsel

IB 00538

| | |
|---|---|
| Subj: | **DVD Proposal/Source Business plan** |
| Date: | 4/28/2004 3:55:09 PM Eastern Daylight Time |
| From: | tmcguire@endeavorla.com |
| To: | Jledecky@aol.com |
| CC: | aemanuel@endeavorla.com, pwhitesell@endeavorla.com, mwiczyk@endeavorla.com, rrosen@endeavorla.com, avenit@endeavorla.com |

*Sent from the Internet (Details)*

Jon:

To help me and my colleague Modi Wiczyk fully prepare Ari and Patrick for conversations in the next few weeks with your colleagues at Source, it would be really helpful to have the following information. Obviously, if there is someone else to whom this request for information should be sent, let me know and I will pursue the information in that way.

Information request:

1. What retail outlets/chains does Source service?

2. Generally, how long are the contracts for such service? I think I heard 3 years, are their material exceptions to that?

3. Is there any kind of limit on what types of merchandise that can appear in the contracted space?

4. Has Source had any prior experience with any other home entertainment products in this space?

5. Who makes the local or regional decisions on the use of the space?

6. What is the current range of products offered in this space?

I am sure that I am missing important issues. However, this information will allow us to focus our internal discussion on how best to exploit this opportunity.

Call if you have any questions.

Tom

IB 00539

Friday, May 21, 2004 America Online: Jledecky

| Subj: | **Re: Source Interlink--YOU NEED TO COME TO NYC AFTERALL** |
| --- | --- |
| Date: | 5/11/2004 10:36:36 AM Eastern Daylight Time |
| From: | aemanuel@endeavorla.com |
| To: | Jledecky@aol.com |
| Sent from the Internet (Details) | |

One or both of us will come in.

————————————
Ariel Z. Emanuel
Endeavor Agency
Sent from my BlackBerry Wireless Handheld

————Original Message————
From: Jledecky@aol.com <Jledecky@aol.com>
To: Ariel Emanuel <aemanuel@endeavorla.com>
CC: Patrick Whitesell <pwhitesell@endeavorla.com>; Modi Wiczyk <mwiczyk@endeavorla.com>
Sent: Tue May 11 06:43:59 2004
Subject: Source Interlink--YOU NEED TO COME TO NYC AFTERALL

I talked to the CEO of Source Interlink this morning, Leslie Flegel. He is extremely unhappy about the cancellation of the meeting, was bringing in people from around the country, etc.

I gave you bad advice on the conference call yesterday. I think you are going to have send a partner or two to NYC for the meeting Wednesday or there won't be any deal downstream.

He also told me Source is on the verge of a large deal in the DVD space. They can acquire a public company they mentioned to you on the first call that puts them in that space and gives them a massive deal at check out on backlist DVD's under $10.00. There is competition for that public company deal so they don't have the luxury of waiting for the Endeavor JV possibility to crystalize.

Because of my relationship with Source, he will hold off making that deal until we meet and intuitively understands that what Endeavor can bring to the situation is superior, avoids having to buy a company in the space, etc. They have checked with the chains and there is great feedback on taking DVD's at the checkout. This is going at hyper-speed.

SOURCE DOES NOT HAVE THE LUXURY OF WAITING for the meeting. They need to touch and feel the deal makers and figure out what you guys can deliver, in what time frame, etc.

I will call you guys later when you get in but the bottom line is I need Ari or Patrick to show up and talk turkey or there won't be any bird to carve up! It's all about the smooze with this guy Flegel. Meeting would still happen at 2pm. If you make the effort, the question is whether you still want to take the other meeting at 10am, I can probably revive that one as well.

Call me anytime at 202-255-7600 when you get this on your blackberries.

IB 00004