IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JONATHAN LEDECKY d/b/a IRONBOUND  )
PARTNERS,                          )
                                   )
          Plaintiff,               )
                                   )      Case No. 1:05CV01039 (JGP)
     v.                            )
                                   )
SOURCE INTERLINK COMPANIES, INC.,  )
                                   )
          Defendant.               )
_____)

## DEFENDANT SOURCE INTERLINK COMPANIES, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Defendant Source Interlink Companies, Inc. ("Source") respectfully submits its

memorandum in opposition to Plaintiff's Motion to Compel Production of Documents.

## INTRODUCTION

Plaintiff has moved to compel Source to restore all of its 526 existing backup tapes and

use "reasonable forensic means" to recover documents that do not otherwise exist elsewhere,

alleging that Source has intentionally deleted and destroyed potentially responsive documents.[1]

Plaintiff's accusations are unfounded. The true facts are that, upon receiving notice of this

lawsuit, Source complied with its duty to preserve potentially responsive documents by

instituting a litigation hold upon the relevant Source employees and preserving all existing

backup tapes covering the relevant time period of this lawsuit. To the extent any potentially

---

[1] Although Plaintiff's motion focuses almost entirely upon e-mails that are missing from Source's document production, Plaintiff's motion makes no distinction between restoration of e-mail server backup tapes and other file server backup tapes (which contain other forms of electronic documents such as Word documents, spreadsheets, Power Point presentations, financial data and imaged documents), so Source presumes that Plaintiff is seeking to compel Source to restore and search all of its existing tapes.



responsive documents were deleted or destroyed or relevant backup tapes were not preserved, this occurred prior to the commencement of this action and, therefore, before any duty to preserve arose.

Moreover, as discussed more fully below, there exists no basis to believe that restoration and search of Source's existing backup tapes will uncover any additional documents that are reasonably calculated to lead to the discovery of admissible evidence. However, should Source be required to do so, Plaintiff should bear this cost in accordance with the relevant cost-shifting factors.

Plaintiff has also moved to compel discovery on documents relating to potential, unfulfilled or unrealized business opportunities that have been presented or referred to Source by The Endeavor Agency, LLC ("Endeavor"). Plaintiff's request should be denied because it is not reasonably calculated to lead to the discovery of admissible evidence, as Source could not possibly have any liability to Plaintiff for an unfulfilled or unrealized business opportunity which, by definition, has generated no income to Source and has no tangible economic value.

For similar reasons, Plaintiff's motion to compel discovery on his requests relating to his equitable claims of quantum meruit and unjust enrichment should be denied. While Plaintiff claims that these requests are relevant to determining the alleged "value" of the Alliance merger to Source, in reality all of these requests seek, at most, documents related to the merger's *anticipated or expected* value, not its actual value. Like an unfulfilled or unrealized business opportunity, Source cannot be liable to Plaintiff under his quantum meruit or unjust enrichment claims for merely the expected or anticipated value of something. Accordingly, none of Plaintiff's requests relating to these claims are reasonably calculated to lead to the discovery of admissible evidence, and Plaintiff's motion to compel should be denied.

2

## BACKGROUND

### A.    The Referral Agreement

This case concerns the parties' rights and obligations under a three-page written "Referral Agreement," dated as of April 26, 2004 (the "Agreement"), between Ironbound Partners, LLC and Source (Exhibit A to Plaintiff's Motion).[2]  The Agreement was negotiated between Plaintiff Jonathan Ledecky ("Plaintiff") and Source's general counsel, Douglas Bates, over a period of one day, on April 26, 2004.  Declaration of Douglas Bates ("Bates Decl.") ¶ 3; *see also* Exhibit C to Plaintiff's Motion ("Pl. Mot.") (copies of e-mails between Ledecky and Bates).

Under the terms of the Agreement, Plaintiff agreed to introduce Source to a "Client" of Plaintiff and to assist Source in evaluating and negotiating any proposed "business relationship" with the Client.  Agmt. ¶ 1 (Exhibit A to Pl. Mot.).  Source had the unfettered discretion to accept or reject any proposed business relationship with the Client, and Source's acceptance of a business relationship could only be manifest by *execution of a written agreement* between Source and the Client.  *Id.*  In the event Source and the Client entered into a business relationship *and* that relationship is documented by an executed written agreement between the parties, the Referral Agreement provides that:

> Source shall pay to Ironbound, and Ironbound shall accept, compensation equal to 5% of the net income recorded by Source as a result of its relationship with Client during the five-year period following the date (the "Establishment Date") on which the business relationship is established between Source and Client.[3]

---

[2]  Although Ironbound Partners, LLC is the named party to the Agreement, Plaintiff Jonathan Ledecky has recently disclosed that Ironbound Partners, LLC, did not exist as a legal entity at the time the Agreement was executed, and in fact, has not existed since 1999, when it was merged out of existence.  *See* Plaintiff's Motion for Leave to Amend Complaint [Doc. # 20].  In his Amended Complaint, Plaintiff is seeking to reform the Agreement to change the contracting party's name from "Ironbound Partners, LLC" to "Ironbound Partners," which Plaintiff now claims is his "trade or fictitious name."  *See* Am. Compl. ¶¶ 66-70.

[3]  In her supporting memorandum, Plaintiff inaccurately asserts that he is entitled to compensation under the Agreement by mere virtue of the fact that he introduced Endeavor to Source and "Source [has] earned net income *as a result of the introduction.*"  Plaintiff's Memorandum ("Pl. Mem.") at 13 n.8 (emphasis added).  Plaintiff's "interpretation" of the Agreement is not supported by its express language, as it conveniently ignores the

*Id.* ¶ 2.

**B.    Plaintiff's Allegations**

Plaintiff contends that it performed its obligations under the Referral Agreement and is entitled to compensation. Specifically, Plaintiff claims that, (i) pursuant to the Referral Agreement, he introduced Source to Mr. Ariel Emanuel ("Emanuel"), a founder and member of The Endeavor Agency, LLC ("Endeavor"), a California-based talent agency; (ii) Emanuel allegedly became a consultant or adviser to Source; and (iii) that, as a result of Endeavor's alleged "business relationship" with Source, Source has and will continue to earn substantial net income. Plaintiff alleges that this includes net income earned by Source as a result of its February 2005 merger with Alliance Entertainment Corporation ("Alliance"), which Plaintiff alleges was facilitated by Endeavor.

While Source does not dispute that the parties entered into the Referral Agreement and that Plaintiff introduced Emanuel and Endeavor to Source, it denies that Plaintiff is entitled to any compensation under the Referral Agreement for several reasons. These reasons include: (i) Plaintiff's failure to fully perform his obligations under the Referral Agreement; (ii) there exists no "business relationship" between Source and Endeavor as that term is used in the Agreement; (iii) there has never existed an executed written agreement that establishes any business relationship between Source and Endeavor; and (iv) even if there exists a "business relationship" between Source and Endeavor, Endeavor (or Emanuel) never did anything on Source's behalf to

---

Agreement's requirements that, in order for Plaintiff to be compensated under the Agreement, Source and Endeavor had to enter into a "business relationship" *after Plaintiff's introduction,* and that this business relationship could only be manifest by "*execution of a written agreement* between Source and [Endeavor]." (emphasis added) As Plaintiff well knows, no such written agreement between Source and Endeavor exists or has ever existed. This failure of an express condition precedent in the Agreement is dispositive of Plaintiff's claim as a matter of law.

facilitate or cause the merger between Source and Alliance, or any other business transaction for that matter.[4]

In addition to his breach of contract claim, Plaintiff has also brought alternative implied contract claims for unjust enrichment and quantum meruit, claiming that, even if he is not entitled to recover under the Referral Agreement, he should be entitled to recover for the "value" of the services he provided to or the "benefits conferred" upon Source. Source has filed a motion to dismiss these equitable claims pursuant to Fed. R. Civ. P. 12(b)(6) [Doc. # 28], on grounds that Plaintiff is barred as a matter of law from recovering under an implied contract claim where it is undisputed that an express contract between the parties exists.

Pursuant to the Scheduling Order entered on October 19, 2005, discovery and trial in this case has been bifurcated into liability and damages phases. Accordingly, Plaintiff is not entitled in this phase of the case – the liability phase – to seek or obtain discovery relating to what, if any, damages he may be entitled to as a result of Source's actions.

### C.    Litigation Hold

Source was served with the original complaint in this action on May 24, 2005. Bates Decl. ¶ 5. On or around June 1, 2005, Source's general counsel, Douglas Bates, issued a "litigation hold" in this case with regard to potentially relevant documents.[5] Declaration of Bates

---

[4]  Plaintiff contends that Source denies that Plaintiff is entitled to compensation under the Agreement because it takes the position that the Agreement does not cover "mergers" or "acquisitions." *See* Pl. Mem. at 7 n.4. That is not accurate. Source does not deny that Plaintiff would be entitled to compensation under the Agreement had Source merged with, acquired or entered into a joint business venture or similar business relationship with *Endeavor*. Source, however, does deny that the Agreement covers mergers with or acquisitions of other entities, including the Alliance merger, no matter how much involvement Endeavor may or may not have had in such a transaction.

[5]  Plaintiff argues that Source's duty to preserve arose earlier than the late May 2005 filing date of this suit because his counsel sent a demand letter to Source in March 2005 (actually March 29, 2005). *See* Pl. Mem. at 8. However, from March 2005 to May 2005, the parties were attempting to reach a negotiated resolution of this dispute and, therefore, had good reason to believe that this case would be resolved without litigation. Bates Decl. ¶ 4. Moreover, there are no records at Source that show or indicate that any relevant backup tapes were destroyed during this time period. *Id.*

*Id.* The litigation hold encompassed both (i) paper and accessible electronic files of relevant Source employees and, (ii) to the extent they still existed, relevant e-mail backup tapes.

With regard to paper and accessible electronic files, Mr. Bates reasonably determined, based upon his review of the original complaint, that the only persons at Source who could possibly have documents in their possession that are relevant to this action were (1) S. Leslie Flegel, Source's Chairman and Chief Executive Office; (2) James R. Gillis, Source's President and Chief Operating Officer; (3) Jason S. Flegel, an Executive Vice President; and (4) himself. *Id.* ¶ 6. Mr. Bates made this determination based upon his personal knowledge that these were the only individuals at Source who had any involvement with or knowledge of the Agreement or has had any contact with Ledecky, Endeavor or Emanuel. *Id.* Accordingly, Mr. Bates informed these individuals of the lawsuit and instructed their respective executive assistants to search for and maintain all paper and active electronic documents (including e-mails) in their possession that had anything to do with (i) the Agreement, (ii) Jonathan Ledecky, (iii) Endeavor or (iv) Emanuel. *Id.*

With regard to inaccessible server backup tapes,[6] Mr. Bates reasonably determined, based upon his review of the original complaint, that the relevant time period of Plaintiff's allegations was from April 2004, which was when the Agreement was negotiated and executed, through November 2004, which was the month Source's merger with Alliance was announced. *Id.* ¶ 7. He contacted Becky Austin, the Senior Director of Network Services at Source, and instructed her that, because of this lawsuit, all e-mail backup tapes in existence from April 2004 through

---

[6]  Backup tapes contain "inaccessible" data, *i.e.*, data that is not readily usable or readable. *Zubulake v. UBS Warburg LLC,* 217 F.R.D. 309, 319-20 (S.D.N.Y. 2003) ("*Zubulake I*"). In order to access backup tape data, the tape must be restored to decompress the data. *Id.* This is typically a time consuming and expensive process given the lack of uniform standards governing data compression. *Id.* at 319. Once a backup tape's data is restored, a software search tool must be employed using keywords to identify potentially responsive documents.

November 2004 had to be inventoried and preserved.  *Id.*; Declaration of Becky Austin ("Austin Decl.") ¶ 3.

Following Mr. Bates's instruction, Ms. Austin proceeded to inventory Source's backup tapes from the April 2004 through November 2004 time period.  Austin Decl. ¶ 4.  Under Source's retention practice with regard to electronic records, including e-mails, all monthly server backup tapes, *i.e.*, the backup tapes made on the last Friday of each month, are supposed to be retained for 15 months.[7]  *Id.* ¶ 2.  However, after conducting an extensive search, Ms. Austin was only able to identify and locate one backup tape (either monthly, daily or weekly) from the April 2004-November 2004 period, namely, the November 2004 monthly e-mail backup tape.[8]  *Id.* ¶ 4.  To date, Source has been unable to determine definitively how or why other monthly backup tapes from this time period were missing or not in existence as of the time this lawsuit was filed.[9]  *Id.*

**D.    Current Backup Tape Inventory And Costs Associated With Restoration**

In addition to the November 2004 monthly e-mail backup tape, Source currently has 134 e-mail backup tapes and 392 file server backup tapes in its inventory.  Declaration of Linwood

---

[7]  Plaintiff's counsel was previously mistakenly informed by Source that monthly backup tapes are supposed to be retained by Source for 16 months, not 15 months.  Also under Source's retention practice, daily backup tapes are supposed to be retained for 6 weeks, and weekly backup tapes are supposed to be retained for 15 weeks (except the weekly backup made on the last Friday of the month, which, as discussed above, is retained for 15 months).  Austin Decl. ¶ 2.

[8]  Source initially believed that it had some additional backup tapes covering portions of the April 2004 - November 2004 period, but further investigation revealed that these additional tapes do not exist.

[9]  The most likely explanations are that a former Source employee who was responsible for making and maintaining e-mail backup tapes at this time apparently did not make them in the first instance and/or he did not retain them in accordance with Source's retention practice for electronic records.  *Id.*

Ferguson ("Ferguson Decl.") ¶ 2. The e-mail backup tapes date from April 2005 to the present and the file server backups date from October 2003 to the present.[10] *Id.*

Source's capacity to restore tapes in its production facility in Bonita Springs, FL, is severely limited by a need to maintain ongoing business operations. *Id.* ¶ 3. The type of extended restoration and search effort requested by Plaintiff will require tapes to be retrieved from off-site storage in Bonita Springs (one day turnaround) and shipped to Source's Disaster Recovery facilities in Shepardsville, KY (an additional day minimum). *Id.* This facility has equipment available to restore and search only one backup tape at a time. *Id.* However, it is not normally staffed, so multiple tape restorations and searches will require sending a technician there to be dedicated to the project, removing that technician from normal duties, and incurring housing and living expenses while on site. *Id.* Thus, while nominally a restore and search of an individual tape may require only limited man-hours in comparison to elapsed time, doing extended searches off site will essentially turn the elapsed time into paid man-hours and place a significant burden on Source's ongoing business operations. *Id.*

Assuming no unforeseen problems, it typically takes Source at least two business days, including four (4) man-hours, to restore and conduct a keyword search of an individual e-mail backup tape if the search is limited to the user mailboxes of Leslie Flegel, James Gillis, Jason Flegel and Doug Bates. *Id.* ¶ 4. Additional search criteria will increase this time substantially. *Id.* For file server backup tapes, assuming no unforeseen problems, and limited to the user directories of the aforementioned four individuals, it will take an average of four (4) hours, including three (3) man-hours, to restore and conduct a keyword search of an individual tape. *Id.*

---

[10] Although monthly backup tapes from December 2004-March 2005 should currently exist under Source's normal retention practice, they do not because a former Source employee who was responsible for making and maintaining e-mail backup tapes at this time apparently did not make them in the first instance and/or he did not properly retain them in accordance with Source's retention practice for electronic records. Austin Decl. ¶ 5.

¶ 5. Additional search criteria will dramatically increase this time, potentially to several days. *Id.* Finally, after the search results of a restored backup tape are electronically generated, Source's counsel must review the documents identified by the search to determine whether any of them are responsive to Plaintiff's requests.

### E.    Plaintiff's Document Requests

Plaintiff's First Request for Production of Documents was served on Source on November 7, 2005. In response, Source agreed to search for and produce documents in response to 24 of Plaintiff's 36 requests. The only requests where Source objected and did not agree to produce responsive documents were requests that it considered to be not only vague, overbroad and unduly burdensome, but also wholly irrelevant to the issues in the liability phase of this case.

In connection with its response to Plaintiff's document requests, Source conducted a physical search of all tangible media held in the offices of those individuals that have had contact with Plaintiff, Endeavor and/or Ari Emanuel, *viz.*, Leslie Flegel, Jim Gillis, Jason Flegel and Doug Bates. Bates Decl. ¶ 9. A search of Source's e-mail server and the hard drives of the computers used by these individuals was also conducted. *Id.* Source, however, did not restore and search its existing e-mail and file server backup tapes. Plaintiff first raised the issue of Source restoring and searching its backup tapes for responsive documents on or around February 2, 2006. Source informed Plaintiff that it would be willing to restore and search its backup tapes if Plaintiff agreed to bear the cost of this effort. In response, Plaintiff refused to pay any such costs and has instead brought the instant Motion to Compel.

## ARGUMENT

I. **THERE HAS BEEN NO INTENTIONAL OR WILLFUL DESTRUCTION OF RELEVANT DOCUMENTS**

    A. **Source Had No Duty To Preserve Or Maintain Any Potentially Responsive Documents Prior To The Filing Of This Suit**

It is well-recognized that production of electronic discovery is much more complicated, burdensome and expensive than the production of traditional "paper" documents, particularly where the sought-after electronic discovery involves, as it does here, server backup tapes. As one court has observed:

> Producing electronic data requires, at a minimum, several steps: (1) designing and applying a search program to identify potentially relevant electronic files, (2) reviewing the resulting documents for relevance, (3) reviewing the resulting documents for privilege, (4) deciding whether the documents should be produced in electronic or printed form, and (5) actual production. If, however, the allegedly discoverable information is contained on backup tapes, a preliminary step must first be performed. All data on each backup tape must be restored from the backup tape format to a format that the standard computer can read. In a case of large data volume on multiple tapes . . . the restored files from each tape must be compared to the restored files from every other tape and duplicate files eliminated. The restored data files that are not duplicates must be converted to a common format so that a search program may seek information within them.

*Medtronic Sofamor Danek, Inc. v. Michelson*, 229 F.R.D. 550, 552 (W.D. Tenn. 2003).

Plaintiff is seeking in the present motion to compel Source to undertake the extraordinary steps of restoring and searching all of its existing server backup tapes and use "reasonable forensic means" to recover responsive documents that do not otherwise exist elsewhere. Plaintiff's motion should be denied because it rests upon a false premise: that Source purposefully deleted or destroyed responsive documents *after* receiving notice of Plaintiff's suit. To the contrary, the facts here are that, to the extent any deletion or destruction of responsive documents or potentially relevant backup tapes may have occurred at Source, this occurred *prior to* Plaintiff's suit and, therefore, before Source had any duty to preserve documents. *See*

10

*Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("*Zubulake IV*") (duty to preserve potentially relevant documentation arises once a party reasonably anticipates litigation). Thus, as Source has previously informed Plaintiff, the reason that Source has not produced certain e-mails that are known to have existed (*e.g.*, e-mail communications between Plaintiff and Source, *see* Exhibit C to Plaintiff's Motion) or may have existed at one point (*e.g.,* e-mail communications between Source and Emanuel) is because they were deleted by the sender or recipient from his Source e-mail account in the normal course of business, before this suit was known.

Moreover, upon receiving notice of this suit, Source complied with its duty to preserve by putting in place a "litigation hold" in early June 2005, whereby the key players at Source (Leslie Flegel, James Gillis, Jason Flegel and Doug Bates) were instructed to preserve and maintain all potentially responsive documents in their possession, and an inventory was taken of all backup tapes that Source reasonably believed could potentially contain discoverable documents. *See Zubulake IV,* 220 F.R.D. at 218 ("Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents."). All paper and active electronic files of the key players (including their respective computer hard drives) and Source's e-mail server have been searched, and all responsive paper and electronic documents in their possession have been produced, except those documents that are responsive to document requests that Source has objected to (and are the current subject of the present motion).

Furthermore, Source has not, as Plaintiff asserts, destroyed any potentially relevant documents or backup tapes subsequent to the filing of this suit. At the time the litigation hold was put in place, no backup tapes from the April 2004-November 2004 time period could be

located except for the November 2004 monthly e-mail backup tape. Thus, to the extent any
backup tapes were lost, destroyed, or never made in the first place, this occurred prior to the
filing of Plaintiff's suit and, therefore, prior to the time that Source's duty to preserve arose.[11]

### B.    No Key Documents Are Missing or Have Been Destroyed

Plaintiff argues that Source should be compelled to restore and search its existing backup
tapes or use other forensic means to recover and search for inaccessible electronic documents
because such an effort has the potential to uncover a treasure trove of relevant documents.
However, the mere possibility that inaccessible backup tapes *may* contain some responsive
documents does not necessarily mandate that they be restored and searched. This is because "[i]f
the likelihood of finding something was the only criterion, there is a risk that someone will have
to spend hundreds of thousands of dollars to produce a single e-mail. That is an awfully
expensive needle to justify searching a haystack." *McPeek,* 202 F.R.D. at 34.

Here, the only category of potentially relevant documents that Plaintiff actually identifies
might be discovered from Source's backup tapes are documents that could shed light on the
meaning of disputed terms or provisions in the parties' Agreement. *See* Pl. Mem. at 7. While
Plaintiff is certainly correct that one of the central disputes in the liability phase of the case is
over the meaning and interpretation of the Agreement (*e.g.,* what the term "business
relationship" means), there exist several compelling reasons to believe that a search of Source's
extant backup tapes will not uncover any additional documents or extrinsic evidence on these
issues.[12] First of all, as discussed above, with the exception of the November 2004 tape, the

---

[11]  This is so regardless of whether Source was acting in compliance with its stated document retention practice
prior to the filing of this action.

[12]  Needless to say, Source strongly disagrees with Plaintiff's argument regarding the particular relevance of the e-
mail exchange between Plaintiff and Source's general counsel described on page 7, note 4 of Plaintiff's
Memorandum (and attached as Exhibit F to Plaintiff's Motion). In this e-mail exchange, the parties were
negotiating over whether the Agreement (and, by extension, Plaintiff's compensation under the Agreement) would

backup tapes that cover the relevant time period of this litigation *do not exist.* Moreover, even if these backup tapes existed, there would be no compelling need to restore and search them, because all of the written communications between the parties relating to the negotiation of the Agreement and the Agreement itself (*i.e.*, all e-mails, faxes and drafts of the Agreement) have already been produced in this case *by Plaintiff.*[13] Bates Decl. ¶ 10. In addition, there is no need to search Source's existing backup tapes because a litigation hold was put in place on June 1, 2005, and there exists no reason to believe that any responsive documents were deleted from any active electronic files subsequent to this date. Finally, Source's general counsel, who drafted and negotiated the Agreement on Source's behalf, does not recall there ever being any written communications between him and anyone else at Source regarding the negotiation or terms of the Agreement, nor does he recall ever discussing the Agreement or any of its terms with anyone from Endeavor (including Emanuel), either orally or in writing. *Id.* ¶ 11. In sum, there exists no basis to believe that restoration and search of Source's *existing* backup tapes, which, other than the November 2004 tape, are dated no earlier than April 2005, will uncover any additional documents that will assist the trier in fact in interpreting or understanding the Agreement or in determining the meaning of any of its disputed terms, or is even reasonably calculated to lead to the discovery of admissible evidence that is relevant to any of Plaintiff's claims.[14]

---

be terminated in the event Source was acquired by or merged into another entity. The fact that this language was removed from the final Agreement at Plaintiff's request does nothing to show that Plaintiff is entitled to compensation under the Agreement if a merger or acquisition by Source was facilitated by Endeavor.

[13] All of these communications took place over a three-day period, from April 25-27, 2004.

[14] Plaintiff is also requesting that Source also be compelled to "use reasonable forensic means" to recover and restore lost, deleted, or destroyed information from computer servers and hard drives of key witnesses. *See* Pl. Mem. at 10. However, other than restoring and searching backup tapes, Plaintiff does not identify how any allegedly deleted or destroyed information can be recovered or why there is any reason to believe that such information still exists on Source's computer servers or hard drives. Source certainly has no basis to believe that any data that has been deleted from a user's computer that does not exist on a backup tape can be recovered or restored elsewhere using "reasonable forensic methods."

Nevertheless, to test Plaintiff's assertion that Source's backup tapes likely contain relevant responsive documents, Source has restored and searched the November 2004 monthly e-mail backup tape. The search terms "Ledecky," "Ironbound," "Referral Agreement," "Endeavor," "Emanuel," "Ari" and "Ariel," and the e-mail addresses Jledecky@aol.com, aemanuel@endeavorla.com and tmcguire@endeavorla.com were used to conduct the search. As a result of the search, additional documents responsive to Plaintiff's requests were identified and are in the process of being produced. However, while these documents were determined to be technically responsive to Plaintiff's requests, none of them are directly relevant to any of Plaintiff's claims. For example, there were no substantive communications between Source and Emmanuel found (Request No. 5), and there were no documents found that had anything to do with the negotiation or the terms of the Referral Agreement (Request No. 1), any agreements or "consulting arrangement" between Source and Emanuel or Endeavor (Request Nos. 7, 8, 11) or any consulting services provided to Source by Emanuel in connection with the Alliance merger (Request No. 9).

## II. ALTERNATIVELY, SOURCE SHOULD NOT BE REQUIRED TO BEAR THE BURDEN AND EXPENSE OF RESTORING AND SEARCHING ITS EXISTING BACKUP TAPES

As discussed above, Source believes there exists no basis to require it to restore and search any of its existing backup tapes. However, should Source be ordered to do so, the cost of such an effort should be borne entirely by Plaintiff. Cost-shifting is appropriate for discovery of electronic data when such discovery imposes an undue burden or expense upon the responding party. *Zubulake v. UBS Warburg LLC,* 217 F.R.D. 309, 318 (S.D.N.Y. 2003) ("*Zubulake I*"); *see also McPeek v. Ashcroft,* 202 F.R.D. 31, 34 (D.D.C. 2001). A burden or expense is "undue"

_____

any data that has been deleted from a user's computer that does not exist on a backup tape can be recovered or restored elsewhere using "reasonable forensic methods."

when it "outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." *Zubulake I*, 217 F.R.D. at 318 (quoting Fed. R. Civ. P. 26(b)(2)(iii)). "Put another way, how important is the sought-after evidence in comparison to the cost of production?" *Id.* at 322-23 (internal quotations omitted).

In the leading case on electronic discovery, *Zubulake*,[15] the court set forth a seven-factor test to determine cost-shifting in the electronic discovery context:

1. The extent to which the request is specifically tailored to discover relevant information;
2. The availability of such information from other sources;
3. The total cost of production, compared to the amount in controversy;
4. The total cost of production, compared to the resources available to each party;
5. The relative ability of each party to control costs and its incentive to do so;
6. The importance of the issues at stake in the litigation; and
7. The relative benefits to the parties of obtaining the information.

*Id.* at 322; *see also Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 284-289 (S.D.N.Y. 2003) ("*Zubulake III*") (applying the seven-factor test); *Rowe Entertainment, Inc. v. The William Morris Agency, Inc.*, 205 F.R.D. 421 (S.D.N.Y. 2002) (setting forth and applying a very similar eight-factor test for cost-shifting).

The first two factors, sometimes referred to collectively as the "marginal utility" test, are the most important factors. *Id.* at 323. Under the marginal utility test

> The more likely it is that the backup tape contains information that is relevant to a claim or defense, the fairer is that the [responding party] search at its own expense. The less likely it is, the more unjust it would be to make the [responding party] search at its own expense. The difference is "at the margin."

---

[15] Although Plaintiff argues that Source should bear the entire cost of restoring its backup tapes, Plaintiff does not discuss *Zubulake* or even mention in her supporting memorandum the appropriate factors that should be considered in deciding which party should bear the cost of electronic discovery.

*Id.* (quoting *McPeek*, 202 F.R.D. at 34). Factors three through five address cost issues, *i.e.*, "How expensive will this production be?" and, "Who can handle that expense?" *Id.* Factor six -- the importance of the issues at stake in the litigation -- stands alone but comes into play only where a case has the potential for broad public impact, *e.g.*, toxic tort class actions, environmental litigation, social reform litigation, or cases implicating important legal or constitutional questions. *Id.* at 321, 323. Finally, factor seven -- the relative benefits of production as between the requesting and producing parties -- is the least important because it is fair to presume that the response to a discovery request generally benefits a requesting party. *Id.* at 323.

### A.    *Zubulake* Factors One and Two

Based upon the foregoing seven-factor analysis, cost-shifting is undoubtedly appropriate in the present case should the Court order Source to search its existing backup tapes or use other forensic means to recover inaccessible electronic data. First, the most important factors, factors one and two, tip strongly in Source's favor. As discussed above, there does not exist any basis to believe that any of these tapes will contain discoverable information, much less indispensable information, that is directly relevant to any of Plaintiff's claims. This is due to the fact that (i) with one exception, Source's existing backup tapes do not cover the key relevant time period of this phase of the litigation; (ii) much of the requested discovery is available elsewhere in that Plaintiff has produced all known communications that took place between the parties relating to the negotiation or terms of the Agreement, and responsive documents from the November 2004 backup tape are in the process of being produced; (iii) there exists no reason to believe that any responsive documents were deleted from active electronic files subsequent to June 1, 2005, when the litigation hold was put in place; and (iv) Source does not believe there have ever been any

written internal communications or communications with anyone from Endeavor (including Emanuel) regarding the Agreement.

In addition, several of Plaintiff's document requests are not specifically tailored to discover relevant information, particularly the ones that are the subject of the present motion to compel. For example, Source does not know how to conduct a specific targeted search of restored electronic data for "[a]ll documents relating to the expected and actual benefits to Source from its merger with Alliance" (Request No. 24), "[a]ll documents relating to the manner in which Source expects its in-store merchandizing capabilities to be strengthened by the Alliance merger" (Request No. 28), or "[a]ll documents relating to how the Alliance merger is expected to further Source's objective of creating the premier provider of information, supply chain management, and logistics services to retailers and producers of home entertainment content products" (Request No. 29). *See also* Request No. 27 (requesting documents relating to "market opportunities Source's management believes has been or will be presented by the Alliance merger"); Request No. 30 (requesting documents relating to Source's alleged belief that the Alliance merger will position Source as "the distribution channel of choice" for producers of home entertainment content); Request No. 32 (requesting documents relating to how the Alliance merger is expected to "increase Source's financial strength"). Assuming *arguendo* Plaintiff's motion to compel discovery on these requests is granted, it would be literally impossible for Source to come up with appropriate specific search terms to locate documents on restored tapes that may be responsive to these overbroad, vague and ambiguous requests.

Thus, the potential marginal utility of this additional discovery is minimal to non-existent, and the most important cost-shifting factors tip strongly in Source's favor.

## B.    *Zubulake* Factors Three Through Five

The second group of cost-shifting factors address the potential cost of the electronic

discovery and who can best handle and control that expense.  Here, Source presently estimates

that it will take a total of 464 business days and 1,712 man-hours (plus transportation and

lodging expenses) to restore and search all of its existing backup tapes, of which 134 are e-mail

tapes and 392 are file server tapes.[16]  Ferguson Decl. ¶¶ 2, 7.  While factor three, the total cost of

production compared to the amount in controversy, probably weighs against cost shifting, the

other two cost of production factors favor cost-shifting.  Factor four, the total cost of production

compared to the resources available to each party, favors cost-shifting.  Plaintiff is a multi-

millionaire entrepreneur who clearly has the financial wherewithal to cover the estimated cost of

restoration.  *See* **Exhibit 1**, attached hereto.  Furthermore, factor five -- the relative ability of

each party to control costs and its incentive to do so -- also favors cost-shifting, in that Source

has no ability to control or limit its costs of restoration and search, while Plaintiff could

substantially limit these costs by narrowing the scope of his discovery requests and narrowing

the number and type of tapes that need to be restored.[17]

## C.    Factors Six and Seven

Finally, the last two and least important cost-shifting factors are neutral in this case.

Factor six -- the importance of the issues at stake in the litigation -- is neutral because this case

involves nothing more than a contract dispute involving private parties.  Factor seven is also

neutral because there exists no reason to believe that there will be any greater evidentiary benefit

---

[16]  These projected costs will be even substantially higher if Source retained a third party to perform the restoration and search.  *See* Ferguson Decl. ¶ 8.  In addition, these projected costs do not include the substantial time and cost for Source's outside attorneys to review the results of each backup tape search to determine whether a document is responsive or may need to be redacted or withheld on privilege grounds.

[17]  For example, Plaintiff could easily limit or reduce the cost of production by requiring that only e-mail backup tapes be restored, that only tapes from a limited time period be restored, and/or that only certain keyword searches be performed.

to Plaintiff or Source from restoration of the backup tapes. Indeed, to the extent these tapes contain any discoverable information, it is quite probable that they will contain information that will help Source and not Plaintiff.

### D.    Summary and Conclusion

Application of the *Zubulake* seven-factor test demonstrates that requiring Source to bear the entire burden and cost of restoring and searching its existing backup tapes would constitute an undue burden and expense upon Source.[18] Four of the seven factors, including the most important factors, favor cost-shifting, while only one factor tips against cost shifting and two factors are neutral. Accordingly, the cost of the requested discovery substantially outweighs its potential benefit. Should Plaintiff's Motion to Compel be granted, Plaintiff should be required to bear the entire cost of restoring and searching Source's backup tapes or any forensic means used to recover inaccessible electronic data.

## III.    SOURCE'S SPECIFIC REQUESTS ARE NOT REASONABLY CALCULATED TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE

### A.    Potential, Unfulfilled or Unrealized Business Opportunities Have no Relevance Whatsoever to Plaintiff's Claims (Request No. 10)

Plaintiff has moved to compel production on Request No. 10, wherein Plaintiff has requested all documents relating to "actual or potential business opportunities for Source that have been discussed by Emanuel and Source or Endeavor and Source." Source objects to this request because it is not reasonably calculated to lead to the discovery of admissible evidence.[19] According to Plaintiff, he is only entitled to compensation under the Agreement when Source

---

[18]    Obviously, if the burden and expense upon Source to restore and search its existing backup tapes is undue, so too would be the burden and expense upon Source to pay an outside vendor to use unspecified "forensic means" to attempt to recover and restore such data.

[19]    Source has filed a motion for a protective order on this very issue [Doc. # 23], wherein it has requested that Plaintiff be prohibited from seeking or obtaining discovery in this case from Source regarding any potential, unfulfilled or unrealized business opportunities that have been presented to Source by Emanuel or Endeavor, or that have resulted from Source's merger with Alliance.

earns net income as a result of its relationship with Endeavor over a five-year period. *See* Pl. Mem. at 13. Yet, by Plaintiff's own admission, Request No. 10 seeks much more than that. It seeks not only documents relating to "deals, transactions or other business arrangements" (Pl. Mem. at 14) that have resulted from Source's alleged business relationship with Endeavor and from which Source has earned net income, but also documents relating to potential, unfulfilled and unrealized business opportunities for which Source could have no liability to Plaintiff under any circumstance and have nothing whatsoever to do with any of Plaintiff's claims, even under Plaintiff's theory of the case.

Under Paragraph 2 of the Referral Agreement, Plaintiff is entitled to "compensation equal to 5% of the *net income* recorded by Source as a result of its relationship with Client during the five-year period following the date. . . on which the business relationship is established between Source and Client." (Exhibit A to Pl. Mot.) (emphasis added). Thus, assuming *arguendo* that Source did enter into a qualifying "business relationship" with Endeavor (it didn't), it goes without that saying that, if a purported business opportunity referred to or presented to Source by Endeavor has gone *unfulfilled* or remains *unrealized,* by definition, the opportunity has not resulted in Source earning any income, much less net income, to which Plaintiff would be entitled under the Referral Agreement. Put another way, assuming Endeavor has referred hundreds of business opportunities to Source (it hasn't) that fact, without more, means nothing, even under Plaintiff's interpretation of the Agreement. If none of these opportunities have been fulfilled or realized, *i.e.*, have resulted in Source earning any *money,* they are not reasonably calculated to lead to the discovery of admissible evidence with regard to its breach of contract claim.

For similar reasons, unfulfilled and unrealized business opportunities that have been presented or referred to Source have no relevance to Plaintiff's implied contract claims of quantum meruit and unjust enrichment (assuming they are not dismissed from this case). Plaintiff argues that unfulfilled or unrealized business opportunities are relevant to his equitable claims because they may be "valuable" and "confer a benefit" upon Source *even though they have not yet resulted in income.*" See Pl. Mem. at 16 (emphasis added). In other words, Plaintiff apparently believes that he can somehow recover in equity for something that he concedes has resulted in no income (*i.e.,* no value or benefit) to Source and that he is otherwise not entitled to be compensated for under the terms of the Agreement (because no income has been earned). No authority exists anywhere to support such a ludicrous proposition.[20] That is because, in order to recover under an implied contract claim, Plaintiff has to have conferred a *tangible* benefit upon Source, not a theoretical or potential benefit, which is all that an unfulfilled or unrealized business opportunity is. *See Gary v. D. Agustini & Asociados, S.A.,* 865 F. Supp. 818, 827 (S.D. Fla. 1994); *Akin v. Office of Thrift Supervision Dept. of Treasury,* 950 F.2d 1180, 1194 (5th Cir. 1992) ("Unjust enrichment, in the customary contract context, anticipates restitutionary action where a tangible benefit has been transferred.") *Tribune Co. v. Purcigliotti,* 869 F. Supp. 1076, 1102 (S.D.N.Y. 1994) ("In order to state a claim for unjust enrichment . . . it must be alleged that plaintiff conferred a tangible benefit upon the defendant."). Obviously, an unfulfilled or unrealized business opportunity that has resulted in no additional income or business to Source has no measurable or quantifiable economic "value" and cannot constitute a tangible "conferred benefit" for which restitution would be available under Plaintiff's implied contract claims.

---

[20] Plaintiff's argument that he should be entitled to recover in equity for something that has not resulted in any income or tangible benefit to Source is akin to a salesman who is not entitled to any sales commission under his employment contract because he has not made any sales claiming that his employer must nonetheless pay him the equivalent of a commission for the "value" of his failed attempts to make sales.

Plaintiff offers several additional arguments as to why discovery of unfulfilled or unrealized business opportunities are relevant to this case, none of which are availing. Plaintiff contends that Source's offer to allow discovery relating to business opportunities that have been presented or referred to Source by Endeavor or Emanuel that have been fulfilled or realized, *i.e.*, that have resulted in actual income or business to Source, is insufficient because it excludes opportunities that were "facilitated by Endeavor" or are "otherwise attributable to [Source's] relationship with Endeavor." *See* Pl. Mem. at 15. However, other than the Alliance merger, the simple fact of the matter is that, to date, *not a single business opportunity* that Endeavor has had any involvement in any way whatsoever has been fulfilled or realized by Source.[21] Thus, while Source reiterates its willingness to produce such documents, at present there exist no documents relating to any fulfilled or realized business opportunities that were presented, referred or facilitated by Endeavor.

Plaintiff also complains that Source's proposed compromise "effectively grants Source the power to unilaterally make a threshold determination of whether the transaction is covered by the Agreement in the first instance." *See* Pl. Mem. at 14. But, as Plaintiff well knows, Source has consistently taken the position that, even though it strongly disagrees with Plaintiff's theory of the case and interpretation of the Agreement, it is prepared and willing to respond Plaintiff's discovery requests based on the assumption that Plaintiff's theory is correct. Accordingly, Source's objection to Plaintiff's request that it produce documents relating to potential, unfulfilled or unrealized business opportunities has never been based upon the fact that Source disagrees with Plaintiff's theory of the case. Rather, it is based upon the fact that, even under

---

[21]  Source, of course, disagrees with Plaintiff's contention that the Alliance merger was facilitated by Endeavor or that Endeavor provided consulting services on Source's behalf in connection with the merger.

Plaintiff's flawed theory of the case, this request is not reasonably calculated to lead to the discovery of admissible evidence.

Finally, Plaintiff argues that he should be entitled to discovery of unfulfilled and unrealized business opportunities because he needs to obtain discovery of opportunities that "could well mature prior to the damages phase of the litigation, and thus give rise to liability under the Agreement." *See* Pl. Mem. at 15. Plaintiff's purported concern is meritless. Source has a duty under the Rule 26(e) of the Federal Rules of Civil Procedure to seasonably update its discovery responses. Therefore, in the event a relevant business opportunity matures into actual income or business to Source down the road during the course of this litigation, Source must and will comply with its discovery obligations under the Rules in a prompt and timely manner.

**B.    Plaintiff's Document Requests Relating to His Equitable Claims Are Not Reasonably Calculated to Lead to the Discovery of Admissible Evidence And Are Inherently Vague and Overbroad**

The third category of documents that Plaintiff has moved to compel on are documents responsive to Request Nos. 19, 20, and 22 through 32, which Plaintiff contends seek documents that are relevant to his equitable claims of quantum meruit and unjust enrichment. As an initial matter, in order to conserve party and judicial resources, Source believes that it would make most sense to defer any decision on these requests until after the Court rules on Source's pending motion to dismiss these claims. There is no point in determining whether Source should have to produce any documents relating to Plaintiff's implied contract claims if those claims are not even going to be in the case. However, should the Court decide to rule on the propriety of these requests before Source's motion to dismiss is decided, and even if Source's motion to dismiss is denied, Plaintiff's motion to compel with regard to these requests should still be denied, because

none of these requests are reasonably calculated to lead to the discovery of admissible evidence relating to Plaintiff's equitable claims, particularly in the liability phase of the case.

Although Plaintiff argues that each of these requests relate to the alleged "value Source has received as a result of its merger with Alliance," the measure of Plaintiff's recovery under an quantum meruit or unjust enrichment claim is not the value of the Alliance merger to Source, but the value of Plaintiff's introduction of Endeavor to Source. *See Soultec Corp v. Young & Lawrence Assocs., Inc.*, 243 So.2d 605, 606 (Fla. Dist. Ct. App. 1971) ("[t]he measure of recovery [for quantum meruit] is the reasonable value of the labor performed . . . and not the value to the defendant that the completed project represents"). More fundamentally, a review of each of these requests demonstrates that what Plaintiff is really seeking here are documents that relate solely to the *expected or anticipated* value of the Alliance merger, not its actual or true value. Finally, even if these requests are somehow relevant to Plaintiff's implied contract claims, they are so vague and overbroad that it would be unduly burdensome to require Source to search for and identify responsive documents.[22]

### A. Request Nos. 19 and 20

Request No. 19 does not even ostensibly concern anything that has to do with the expected or actual value of the Alliance merger to Source. It seeks documents "relating to the decision of Source's to enter into discussions with Alliance about a *potential* business relationship" (emphasis added). Of course, the fact that Source ultimately decided to enter into merger discussions with Alliance is known and undisputed. Plaintiff offers no explanation as to why documents relating to Source's reaching of its decision to negotiate (to the extent they even

---

[22]  Plaintiff does not even address Source's vagueness, overbreadth and burden objections to these requests in his Motion to Compel.

exist) are reasonably calculated to lead to the discovery of admissible evidence relating to his equitable claims, or any other claim for that matter.

Request No. 20 seeks documents "relating to the decision of Source's management to enter into a business relationship with Alliance." Plaintiff offers no explanation as to how documents relating to Source's decision to merge with Alliance -- which, again, is an undisputed fact -- could possibly show the actual value of such a transaction to Source. At most, such documents might show Source's *belief* that the Alliance merger will bring benefits and shareholder value to Source. But that is the case for any transaction of this kind, as no rational company would agree to a merger if it didn't *believe or expect* that the transaction would bring some sort of value or benefit to the company and its shareholders.

In any event, contrary to Plaintiff's suggestion, Source has already produced a document that is directly responsive to Request No. 20. It is the minutes of a November 18, 2004 meeting of Source's Board of Directors approving the merger between Source and Alliance. (attached hereto as **Exhibit 2**). This non-public document sets forth no less than 30 distinct factors and reasons that Source's Board considered and weighed in its decision to approve the Alliance merger. Accordingly, Plaintiff already has in his possession sufficient documentation responsive to Request No. 20.

Finally, even if Request Nos. 19 and 20 were relevant, they are inherently vague, overbroad and unduly burdensome. Like all significant corporate transactions, the decision by Source to enter into discussions with and ultimately merge with Alliance was based upon the input and involvement of many persons and invariably influenced by host of economic and non-economic factors. It would be simply impossible for Source to search for and identify each and

every document that went into such a complicated and fluid decision-making process that took place over several months and involved several persons.

## B.    Request No. 22

In Request No. 22, Plaintiff seeks all documents "submitted to the Federal Trade Commission or the Antitrust Division of the United States Department of Justice by Source and Alliance pursuant to Item 4(c) of the Antitrust Improvement Act Notification and Report Form for Certain Mergers and Acquisitions in connection with Source's merger with Alliance." Plaintiff speculates that these documents, which the government uses to determine the potential competitive impact of a merger, are relevant to his implied contract claims because they allegedly will provide "a detailed discussion of the value the parties *expect* to achieve through the transaction." Pl. Mem. at 19 (emphasis added). But, even if this is true, any information in these documents that arguably relates to the *expected* value the parties placed on the merger does nothing to demonstrate the *actual* value of Plaintiff's introduction of Endeavor to Source or the actual value of the Alliance merger. Again, the mere fact that Source expected (and currently does expect) that the Alliance merger will generate additional value and benefits to the company does nothing to prove that the merger has in fact generated any additional value or benefits, which is the only fact that is even arguably relevant to Plaintiff's equitable claims.

Furthermore, even if some of the documents submitted by Source to the FTC or Antitrust Division actually show the value of the Alliance merger, that does not mean that *all* documents that were submitted are relevant. In this sense, Request No. 22 is clearly overbroad. Moreover, to the extent documents submitted to the FTC or Antitrust Division include analyses that attempt

26

to quantify the potential market impact of the proposed merger, these documents are inherently damages-related and are barred from discovery in the liability phase of this case.

### C.    Request No. 23

Request No. 23 seeks all documents "relating to the business reasons and justifications for Source's merger with Alliance." As discussed above, while Source's "business reasons" for its merger with Alliance have nothing to do with the value of Plaintiff's introduction of Endeavor, Source has already produced the company's November 18, 2004 board minutes which set forth in comprehensive fashion its reasons and justifications for its merger with Alliance. *See* **Exhibit 2.**

### D.    Request No. 24

Request No. 24 seeks all documents "relating to the expected and actual benefits to Source from its merger with Alliance." Again, the fact that Source expects benefits from the Alliance merger does nothing to establish that Plaintiff actually conferred a *tangible* benefit upon Source, which is what Plaintiff must prove, among other things, to recover under an unjust enrichment claim. Furthermore, this request is vague, overbroad and unduly burdensome, as the term "benefits" could theoretically apply to anything from tangible benefits such as increased revenues and shareholder value to intangible benefits such as "synergy" and improved employee morale.

### E.    Request Nos. 25 and 26

Request No. 25 seeks documents relating to any Alliance agreements related to the distribution or sale of home entertainment content that were effective as of February 27, 2005. Request No. 26 seeks copies of documents relating to actual or potential agreements between Source and any third party relating to the distribution or sale of home entertainment content

subsequent to the Alliance merger, *i.e.,* from February 28, 2005 to the present. Plaintiff contends that these requests are relevant to his implied contract claims because they show how the Alliance merger has enhanced "Source's ability to obtain new distribution contracts." *See* Pl. Mem. at 18. However, like an unfulfilled business opportunity, a *potential* agreement does nothing to show how the Alliance merger has provided any value to Source. Moreover, whether Source has actually entered into any home entertainment content contracts since the Alliance merger does nothing to show that the Alliance merger has enhanced its ability to do so.

F.     **Request No. 27**

Request No. 27 seeks all documents "relating to the market opportunities Source's management believes have been or will be presented by the Alliance merger." As discussed above, potential, unfulfilled or unrealized market opportunities and Source's belief or expectation regarding the same, have no tangible or measurable value, and therefore cannot possibly be reasonably calculated to lead to the discovery of admissible evidence under Plaintiff's implied contract claims.

G.     **Request Nos. 28, 29, 30 and 32**

These requests are objectionable for essentially the same reasons discussed above, namely, they seek documents that, at most, relate entirely to Source's *expectations and beliefs* regarding the potential value and benefit of the Alliance merger, not its actual value or benefit. *See* Request Nos. 28 ("the manner in which Source *expects* its in-store merchandizing capabilities to be strengthened by the Alliance merger); 29 ("how the Alliance merger is *expected* to further Source's objective of creating the premier provider of information . . . and services to retailers and producers of home entertainment content products"); 30 ("[Source's] *belief* that the Alliance merger will position Source as the distribution channel of choice for . . .

Furthermore, each of these requests are inherently vague, overbroad and unduly burdensome. Broad requests that employ undefined, imprecise terms and phrases such as "in-store merchandizing capabilities," "premier provider," "distribution channel of choice," and "financial strength," could mean several different things to different persons and, if interpreted literally, could potentially cover thousands of documents concerning every aspect of Source's business. As currently drafted, Source has no idea how or where to specifically search for documents responsive to these requests.

**H.    Request No. 31**

Finally, Request No. 31, "[a]ll documents relating to the percentage of Source's revenues attributable to DVD and CD sales before and after the Alliance merger including, without limitation, sales and sales projections made between February 28, 2005 and the present," is objectionable on its face because it clearly seeks documentation relating to the quantification of Source's revenues. As Plaintiff concedes in his Memorandum (at 13 n. 8), discovery relating to the amount of net income or revenue earned by Source is inherently damages-related discovery which Plaintiff is prohibited from obtaining during the liability phase of this case.

## CONCLUSION

For the foregoing reasons, Source respectfully requests that Plaintiff's Motion to Compel Production of Documents be denied.

Respectfully submitted,


/s/ Kevin E. Stern                    .
C. Allen Foster (Bar No. 411662)
Kevin E. Stern (Bar No. 459214)
Maria Hallas (Bar No. 436529)
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, DC  20006
Tel:  (202) 331-3100
Fax:  (202) 331-3101

*Counsel for Defendant Source Interlink Companies, Inc.*


Dated:  March 15, 2006

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of March, 2006, I caused a true and correct copy of the foregoing to be served by electronic mail through CM/ECF on the following persons:

Matthew D. Schwartz, Esq.
Allison Sinoski, Esq.
THOMPSON COBURN, LLP
1909 K. Street, NW
Suite 600
Washington, DC 20006


/s/ Julie Lee            .
Julie Lee

31