IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JONATHAN LEDECKY d/b/a IRONBOUND PARTNERS, | ) ) ) ) | |
| *Plaintiff*, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 1:05CV01039 (JGP) |
| SOURCE INTERLINK COMPANIES, INC., | ) ) ) | |
| *Defendant*. | ) ) | |

PLAINTIFF'S REPLY TO DEFENDANT'S
OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

In its opposition, Source does not dispute that relevant documents have been lost or destroyed. It does not dispute that backup tapes containing potentially relevant documents have been lost or destroyed. It does not, and cannot, dispute that its backup tapes may contain information responsive to Ironbound's document requests that have not otherwise been preserved. In fact, a search of one of those tapes has indeed revealed documents that are responsive to Ironbound's requests. In these respects, Source's opposition provides further support for Ironbound's motion to compel.

With respect to that portion of Ironbound's motion seeking to compel the production of documents relating to business opportunities resulting from Source's relationship with Endeavor and the value of the Alliance merger, Source's opposition raises no material arguments that have not been addressed in Ironbound's opening brief or in its opposition to Source's Motion for Protective Order, which covers the same subject matter. At its core, Source seeks to unilaterally determine as a threshold matter which transactions are subject to the Agreement (or Ironbound's implied contract claims) and which are not, thereby preventing litigation of such matters in the

first instance. It also seeks to argue damages, which have been bifurcated from liability. Of course, the standard of production is not whether the producing party believes the documents to be relevant, but, rather, whether the requested information is reasonably calculated to lead to the discovery of admissible evidence, which is the case here. For the reasons stated in Ironbound's Memorandum in Support of its Motion to Compel and its Opposition to Source's Motion for Protective Order, the requested documents meet this standard and should be produced.

Argument

I.     Production of Information Stored Electronically and on Magnetic Media

Source does not dispute that documents have been lost or destroyed. Source does not dispute that Jonathan Ledecky sent a letter to Source making a formal demand for payment under the Agreement on March 29, 2005. In fact, the parties had been negotiating regarding Mr. Ledecky's claim to compensation under the Agreement for more than a month leading up to that demand letter. Even though Source was first put on notice of a claim in February of 2005 and the Complaint in this case was filed on May 24, 2005, a litigation hold on relevant documents was not issued until June 1, 2005. (*See* Opp'n at 5 n.5; Bates Decl. at ¶ 5.) Although Source claims its delay in issuing the litigation hold was due to its belief that Mr. Ledecky's demand for payment would not result in litigation (Opp'n at 5 n.5), this is belied by the fact that Source refused Mr. Ledecky's demand, refused to consider settlement offers, and refused to submit the issue to mediation.

A litigation hold was finally issued a week after this lawsuit was filed, at which time Source's Senior Director of Network Services, Ms. Becky Austin, was informed by Source's general counsel, Mr. Douglas Bates, that all backup tapes for the time period between April and November of 2004 should be preserved. (Austin Decl. at ¶ 3.) At that point, based on Source's

own document retention policy, which requires the retention of monthly backup tapes for 15 months (Opp'n at 7), all monthly backup tapes for April through November of 2004 should have been in existence and preserved (as well as all tapes subsequent to November of 2004). Mysteriously, those tapes are missing, apparently having been destroyed, and Source claims it cannot account for what happened to them. Moreover, not only were tapes from April through November of 2004 destroyed, but also tapes from December 2004 through March 2005. (Austin Decl. at ¶ 5.) This time frame of the missing tapes (April 2004 through March 2005) coincides with the subject matter of this litigation.

Source has no explanation for these missing tapes other than to speculate that one of its former employees did not do her job. (Austin Decl. at ¶¶ 4-5.) Acknowledging that a year's worth of backup tapes containing information relevant to this case were destroyed, not only in violation of its duty to preserve evidence but also in violation of its own document retention policy, Source seeks to place the blame for this deficiency on an unidentified former employee. Tellingly, there is no one at Source who can explain when the destruction of these tapes occurred, how it occurred, or why it occurred, nor is there anyone willing to take responsibility for this failure. Nor, apparently, has Source undertaken any meaningful investigation to resolve these questions.

Nevertheless, apparently one backup tape, from November of 2004, managed to survive this fortuitous purge of information. In its opposition, Source says that it has restored and searched that tape and concedes that it found additional documents responsive to Ironbound's requests. (Opp'n at 14.) Those documents have since been produced to Ironbound, and they include a number of documents responsive to Ironbound's requests and relevant to this litigation that have not been previously produced. For example, Source's test search of the November

2004 backup tape revealed an e-mail from Mr. Steven Liu to Mr. Douglas Bates regarding the Alliance merger that indicates that Yucaipa (the controlling shareholder of Alliance) wanted Mr. Emanuel to be placed on Source's board of directors.  Such a document is directly related to Endeavor's role in the Alliance merger, which is relevant to whether Ironbound is entitled to compensation under the Agreement for net income earned as a result of that merger.  Had Ironbound not brought this motion, it would never have discovered the existence of this information, must less obtained production of the documents.  Source seeks to trivialize this fact by incorrectly saying that the documents are not relevant.

The fact that this single test run resulted in the identification of responsive documents is further support for Ironbound's motion, as it shows that the remaining backup tapes in Source's possession contain information that may lead to the discovery of admissible evidence relevant to this litigation.  When combined with the fact that, as discussed in Ironbound's motion, Ironbound was in possession of responsive documents that Source failed to produce, these new documents discovered on the November 2004 backup tape support the need for a broader search, which is likely to uncover additional responsive information.  Moreover, although Source maintains that the documents it found on the November 2004 backup tape are not relevant (even while admitting that they are responsive to Ironbound's requests), an assertion with which Ironbound unequivocally disagrees, the question of the relevance of these documents is not for Source to judge.  As long as they are responsive to Ironbound's requests and reasonably calculated to lead to the discovery of admissible evidence, they must be produced, and this is true not only of documents on the November 2004 backup tape, but on all backup tapes containing the files and e-mails of individuals having information relating to this case during the relevant time period.

Apart from its bald assertion that the documents responsive to Ironbound's requests are not relevant, Source also says that (1) Ironbound obtained all communications that took place regarding the Agreement prior to this litigation (and thus Source need not undertake a search), and (2) communications regarding the negotiation and drafting of the Agreement are the only communications relevant to this case. As an initial matter, Source's assertion about Ironbound's possession of documents is flatly contradicted by the fact that Source's test search of a single tape in response to Ironbound's motion revealed relevant responsive documents that Ironbound was *not* previously in possession of and Source had *not* previously produced, a fact Source simply ignores. Moreover, Source's bald assertion that no other responsive documents exist has no support in fact and, on the contrary, as the test tape illustrates, is contrary to the single limited search that Source actually conducted.

In support of its position, Source is relying solely on the memory of its general counsel, Mr. Douglas Bates, the person who drafted the Agreement and has a vested interest in defeating liability. In his declaration, Mr. Bates states that, with respect to *internal communications* at Source regarding the negotiation and drafting of the Agreement, he does not *recall* any such communications between himself and others. (Bates Decl. at ¶ 10.) Not only is Source asking Ironbound to rely solely on Mr. Bates's memory concerning e-mail communications that occurred nearly two years ago, but it is also conveniently ignoring the fact that others at Source (such as Messrs. Gillis and Flegel, for example) likely communicated with one another or with third parties (such as Mr. Emanuel) without Mr. Bates's knowledge.

Moreover, Source's claim that no communications exist relating to the negotiation and drafting of the Agreement other than those Ironbound obtained prior to this lawsuit is belied by Source's own search of its November 2004 backup tape, which revealed a number of

communications related to the negotiation of the Agreement itself and to Ironbound's right to compensation thereunder. Of course, even if Mr. Bates had perfect recall of all e-mails sent in 2004 and was correct in his assertion that there were no communications regarding the Agreement other than those obtained by Ironbound prior to this litigation, this is not the limit of Source's discovery obligations, which also extend to communications with third parties.

Not only should Source be required to produce communications and other responsive documents contained on its backup tapes (especially as its test search revealed relevant information), but it should be required to do so at its own expense. In its opposition, Source relies on *Zubulake v. UBS Warburg LLC,* 217 F.R.D. 309 (S.D.N.Y. 2003) for the proposition that Ironbound should be required to bear the cost of producing documents from Source's backup tapes. What Source neglects to mention is that the court in *Zubulake* required the producing party (the defendant) to bear the bulk of the expense of restoring documents from its backup tapes because a test search revealed documents relevant to the plaintiff's claims that were not available from other sources. *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 284-287, 289 (S.D.N.Y. 2003). Here, like in *Zubulake*, Source's search of its November 2004 backup tape has revealed documents relevant to Ironbound's claims that are not available from other sources. Additionally, as in *Zubulake*, this case involves the potential for a multi-million dollar recovery on the part of Plaintiff and, as such, the costs of restoring the backup tapes is not disproportionate to the value of the case. *Zubulake*, 216 F.R.D. at 287-88. Based on these factors, Source should be required to bear the burden of restoring its own backup tapes and searching them for responsive documents.

The question of which electronic records a party to litigation should be required to produce, and at whose cost, is an evolving area of the law, and there is no controlling authority in

this jurisdiction. In today's age of electronic commerce, a defendant such as Source should not be permitted to escape its discovery obligations by deleting relevant information from computer servers or hard drives and then refusing to produce that information from backup tapes or other systems for preserving electronic information on the basis of burden. To allow companies to withhold evidence on such grounds (especially a logistics company such as Source) would create a gaping loophole in the discovery rules giving companies the ability to secret relevant materials on their backup systems.

In this case, Source, a billion-dollar global distribution company specializing in logistics and electronic inventory control, has the means and resources to recover information responsive to Ironbound's requests from its backup tapes—a fact demonstrated by its ability to search the test tape. In its opposition, Source drastically overstates the time and manpower required to search for responsive information by claiming it would be required to search over 500 tapes. Contrary to Source's contention, however, Ironbound is not asking for a search of *all* backup tapes retained by Source, but, rather, specific tapes containing the files and e-mails of relevant individuals (namely, Leslie Flegel, Doug Bates, and James Gillis). Further, Ironbound's requests were limited to the time period beginning on January 1, 2004 to the present. Ironbound is willing to limit its requests further to documents contained on tapes dating from the time period beginning in April 2004, when the Agreement was signed, through May 24, 2005, the date the Complaint was filed. Under the circumstances, the imposition of such a task is not unreasonable.

Additionally, Ironbound has requested that Source be compelled to use reasonable forensic means to recover lost or deleted information from its computer hard drives. By this request, Ironbound is simply asking that Source be required to use the IT personnel already on its staff to restore such information using commonly accepted means, such as "ghosting" the hard

drives of the relevant individuals and servers, in an attempt to recover materials, especially e-mails, that have been deleted. Such a request is not unreasonable in light of the fact that this step is necessitated because, as Source admits, the backup tapes which may have contained such information have been lost or destroyed in violation of Source's duty to preserve evidence and its own document retention policy.

II.     Documents Relating to the Value of the Alliance Merger

Source argues that the measure of Ironbound's recovery under its equitable claims is the measure of the value of Ironbound's introduction of Endeavor to Source, not the value of the Alliance merger. As an initial matter, Ironbound notes that the value of the Alliance merger, which resulted from Ironbound's introduction of Endeavor, is part of the value of the introduction. Source's position in its public filings with the SEC is that the Alliance merger increased shareholder value (*i.e.*, the value of the company). The measure of that value is a matter to be determined during the damages phase. It is sufficient for the liability phase of this lawsuit that value was (as Source admits in its SEC filings) received.

Even though it is Source who requested bifurcation, it insists on injecting questions of damages into the liability phase of this case. For example, Source repeatedly argues that its belief or expectation regarding the value of the Alliance merger does not demonstrate the actual value of that transaction to Source. Arguments regarding the proper measurement of the value of Ironbound's services are arguments for the damages phase of this case, not the liability phase. The question at this juncture is whether value was provided. Ironbound is not seeking information regarding quantum (Ironbound's position is that the value of its services is equal to the value that Source has realized from those services, and Ironbound intends to offer expert testimony to that effect during the damages phase). At this point, Ironbound is merely seeking

documents relevant to the issue of *whether* value has been conferred (as opposed to the amount thereof), which is directly relevant to Source's liability on Ironbound's equitable claims. Source's reasons for the Alliance merger, including its beliefs and expectations regarding the value of the Alliance merger, are matters the factfinder should be permitted to consider in determining liability on Ironbound's equitable claims.

Source also incorrectly says that Ironbound's request for documents relating to the percentage of Source's revenues attributable to DVD and CD sales before and after the Alliance merger is a request for documents relating to Ironbound's damages. Contrary to Source's argument, however, Ironbound is not seeking to quantify that increase in revenue, which is a matter its experts will address during the damages phase. Rather, it is merely seeking information that will show that the Alliance merger, which resulted from Ironbound's introduction of Source to Endeavor, conferred a benefit upon Source by allowing it to increase sales of the very product that was the focus of the parties' Agreement.

Source also incorrectly argues that documents relating to the expected and actual benefits to Source from the Alliance merger do not establish that Ironbound conferred a tangible benefit on Source and that any benefits Source has received from synergies resulting from that merger are "intangible." This argument is contradicted by Source's own SEC filings, which claim that Source will realize tangible benefits from the merger, and that the synergies between the companies will result in efficiencies and cost savings to Source (a tangible benefit). Amendment No. 1 to Form S-4 Registration Statement Under the Securities Act of 1933 by Source Interlink Companies, Inc., 2 (Jan. 18, 2005) ("We expect to benefit from substantial cost savings in the areas of procurement, marketing, information technology and administration and from other operational efficiencies, particularly in the distribution and fulfillment functions, where we plan

to consolidate some distribution operations, reorganize others and leverage our best practices across all of our distribution operations"). Additionally, Source claims that Source's entry into home entertainment content contracts since the Alliance merger does not show that the merger has enhanced its ability to do so. This argument strains credibility, as Source had no presence in the home entertainment content market prior to the Alliance merger, and its SEC filings tout the fact that the merger would permit Source to enter into this market. In making this argument, Source demonstrates why it should not be given the unilateral right to determine which documents are relevant to Ironbound's claims and which should be withheld. An example of this, discussed below, is Source's argument that it should be able to first produce documents in support of existing discovery if and when Source believes it is appropriate.

Source also complains that it would be "impossible" for it to search for and identify each document responsive to Ironbound's requests for documents relating to Source's decision to enter into business discussions with Alliance, and, ultimately, to merge with Alliance. The documents Ironbound is requesting, which would include internal memoranda, e-mails, and other correspondence, are easily producible. Indeed, when it has been in Source's interest to locate and produce documents relating to this issue, it has shown no difficulty in doing so, and has even been able to find an internal memorandum from Yucaipa (the controlling shareholder of Alliance) dating several months before the merger that discusses the potential for a business relationship with Source. Source is a billion dollar company, and it is surely able to review, understand, and produce documents relating to its decision to enter into a business relationship, and, ultimately, a merger with Alliance. For it to respond otherwise is incredible.

III.    Discovery of Transactions for Which Source has Liability Under
        <u>The Agreement or, Alternatively, Under Ironbound's Equitable Claims</u>

As stated above, the arguments relating to the propriety of Ironbound's request for documents relating to actual or potential business opportunities for Source that have resulted from its relationship with Endeavor have been fully briefed in Ironbound's opening memorandum, as well as in its Opposition to Source's Motion for Protective Order, and are not repeated here. However, Ironbound believes it appropriate to more fully address select arguments Source raises in its opposition. First, Source claims that Ironbound is not entitled to discovery of documents relating to business opportunities that may mature during the course of this litigation because Source will supplement its production should those opportunities mature. As discussed above and in Ironbound's opening brief, however, there is a fundamental disagreement between the parties regarding the transactions and dealings for which Source is liable under the Agreement, and such an arrangement effectively puts Source in the position of gatekeeper, unilaterally determining whether information should be disclosed in the first instance. Of course, as discussed above, the standard for discovery is not whether the producing party believes the documents to be relevant, but, rather, whether the request is reasonably calculated to lead to the discovery of admissible evidence.

Second, Source incorrectly asserts that Ironbound cannot recover in equity for something that has not resulted in any income to Source. In this respect, Source equates value with income. As discussed in Ironbound's opening memorandum, value is not so limited, but may include benefits that do not directly result in net income, such as marketing and branding, efforts to which companies routinely devote substantial resources. Thus, and as discussed more fully in Ironbound's opening brief, the nature and scope of Endeavor's efforts, especially when considered together with the Alliance merger, are relevant to the question of the value that

- 11 -

Ironbound has conferred upon Source, which is relevant to Ironbound's equitable claims.  Of course, the amount of such value is an issue reserved for the damages phase of this litigation.

IV.     Written Agreement Between Source and Endeavor

Finally, and even though wholly unrelated to this discovery dispute, Source inexplicably seeks to argue the merits of this case by saying that it never entered into a written agreement with Endeavor, which Source says is required to show its acceptance of Ironbound's introduction to Endeavor under the Agreement.  In so arguing, Source ignores the fact that Source and Endeavor entered into a written non-disclosure agreement governing the terms of their discussions and continuing business relationship as part of Mr. Ledecky's introduction.  A true and correct copy of the non-disclosure agreement is attached hereto as Exhibit A.  In light of this, it is unclear why Source would represent that it did not enter into a written agreement with Endeavor, which is simply untrue.

### Conclusion

For the foregoing reasons, and for the reasons set forth in its Motion to Compel Production of Documents and accompanying Memorandum In Support, Ironbound respectfully requests that its motion be granted, and that Ironbound be awarded its costs and attorneys' fees incurred in connection with this motion, pursuant to Rule 37(a)(4)(A).

Respectfully submitted,

   /s/   Matthew D. Schwartz
Matthew D. Schwartz (D.C. Bar No. 436619)
Allison Sinoski (D.C. Bar No. 482593)
 THOMPSON COBURN LLP
 1909 K. Street, N.W. Ste. 600
 Washington, D.C.  20006-1167
 (202) 585-6900 (telephone)

(202) 585-6969 (facsimile)

*Attorneys for Plaintiff Jonathan Ledecky d/b/a Ironbound Partners*

- 14 -

CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of March, 2006, a true and correct copy of the foregoing Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion to Compel, along with attachments, was mailed electronically through CM/ECF to:

>Kevin E. Stern
>C. Allen Foster
>Maria Hallas
>GREENBERG TRAURIG, LLP
>800 Connecticut Ave., N.W.
>Suite 500
>Washington, D.C.  20006

                      /s/    Allison Sinoski