IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JONATHAN LEDECKY d/b/a IRONBOUND PARTNERS, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:05CV01039 (JGP) |
| v. | ) ) ) | |
| SOURCE INTERLINK COMPANIES, INC., | ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT SOURCE INTERLINK COMPANIES, INC.'S
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, as supported by the accompanying Statement of

Material Undisputed Facts and Points and Authorities, Defendant Source Interlink

Companies, Inc. ("Source") respectfully moves the Court for summary judgment on

Plaintiff Jonathan Ledecky's claims.

Respectfully submitted,

/s/ Kevin E. Stern          .
C. Allen Foster (Bar No. 411662)
Kevin E. Stern (Bar No. 459214)
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, DC 20006
Tel: (202) 331-3100
Fax: (202) 331-3101
*Counsel for Defendant Source Interlink Companies, Inc.*

Dated: June 26, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JONATHAN LEDECKY d/b/a IRONBOUND PARTNERS, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 1:05CV01039 (JGP) |
| v. | ) ) | |
| SOURCE INTERLINK COMPANIES, INC., | ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANT SOURCE INTERLINK COMPANIES, INC.'S STATEMENT OF MATERIAL UNDISPUTED FACTS AND POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Source Interlink Companies, Inc. ("Source"), by and through counsel, respectfully submits its Statement of Material Undisputed Facts and Points and Authorities in support of its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

**INTRODUCTION**

This case concerns the parties' rights and obligations under a written "Referral Agreement," dated as of April 26, 2004 **(Exhibit A)**, between Ironbound Partners, LLC and Source.[1]  Plaintiff Jonathan Ledecky ("Plaintiff") is suing Source for breach of this contract, alleging that he is entitled to a commission or finder's fee under the Referral Agreement for introducing The Endeavor Agency, LLC ("Endeavor") to Source.

---

[1]  Although Ironbound Partners, LLC is the named party to the Referral Agreement, Plaintiff Jonathan Ledecky has disclosed that Ironbound Partners, LLC, did not exist as a legal entity at the time the Referral Agreement was executed, and in fact, has not existed since 1999, when it was merged out of existence. *See* Plaintiff's Motion for Leave to Amend Complaint [Doc. # 20].  In his Amended Complaint, Plaintiff is seeking to reform the Referral Agreement to change the contracting party's name from "Ironbound Partners, LLC" to "Ironbound Partners," which Plaintiff now claims is his "trade  or fictitious name." *See* Amended Complaint ("Compl.") ¶¶ 66-70.

Plaintiff's breach of contract claim is deficient as a matter of law because an express condition precedent for Plaintiff to be entitled to compensation under the Referral Agreement was never fulfilled. Under the terms of the Referral Agreement, for Plaintiff to receive his commission for introducing Endeavor to Source, Source and Endeavor had to agree to enter into a "business relationship" after Plaintiff's introduction, and Source's acceptance of this business relationship could be manifest "only by execution of a written agreement between Source and [Endeavor]." It is undisputed that no such written agreement between Source and Endeavor exists or has ever existed, the reason being that Source and Endeavor never agreed to enter into any kind of business relationship. In addition, Plaintiff is barred as a matter of law from enforcing the Referral Agreement because he was not licensed as a business broker under Chapter 475, Florida Statutes, at the time he performed his services under the Referral Agreement. Finally, Plaintiff's alternative quasi-contract claims of quantum meruit and unjust enrichment must also be dismissed. As a matter of law, there can be no recovery under an implied contract theory where, as is the case here, an express contract exists between the parties that covers the same subject matter. Furthermore, an unlicensed broker cannot circumvent Florida's strong public policy underlying Chapter 475 by alleging claims for quantum meruit or unjust enrichment.

**STATEMENT OF MATERIAL UNDISPUTED FACTS**

Source is a company headquartered in Bonita Springs, Florida. *See* Form S-4 Proxy Statement/Prospectus dated Jan. 19, 2005 ("S-4") at 100 **(Exhibit B).** Its business is primarily geared towards the management of magazine sales at front-end retail checkouts and distribution of magazines, DVDs and CDs to specialty retailers. S. Leslie

2

Flegel Dep. at 14(13)-(19) (**Exhibit C**); **Exhibit B** at 94. Pursuant to the Referral Agreement, Plaintiff agreed to introduce Source to a "Client" of Plaintiff and to assist Source in evaluating and negotiating any proposed "business relationship" with the Client. *See* **Exhibit A** at ¶ 1. Under the terms of the Referral Agreement, Source had the unfettered discretion to accept or reject any proposed business relationship with the Client, and Source's acceptance of a business relationship with the Client could be manifest "*only by execution of a written agreement* between Source and the Client." *Id.* (emphasis added). In the event Source and the Client entered into a business relationship and that relationship was documented by an executed written agreement between the parties, the Referral Agreement provides that:

> Source shall pay to Ironbound, and Ironbound shall accept, compensation equal to 5% of the net income recorded by Source as a result of its relationship with Client during the five-year period following the date (the "Establishment Date") on which the business relationship is established between Source and Client.

*Id.* at ¶ 2. The rights and obligations of each of the parties to the Referral Agreement are to be governed by and interpreted and determined in accordance with Florida law. *Id.* at ¶ 5(d). The Referral Agreement also contains an integration clause which provides that "[t]his is the entire and only Agreement between the parties respecting the subject matter hereof, and supercedes all prior agreements." *Id.* at ¶ 5(h).

From Plaintiff's perspective, the intention behind the Referral Agreement was for him to be compensated by Source if he made a "marriage of business opportunities and situations where . . . Source and Endeavor could do business together." Jonathan Ledecky Dep. at 54(15)-55(2) (**Exhibit D**). In other words, he was to "put the two

parties on the playing field and see what would happen together. And if something came out of that relationship, I wanted to be compensated for it." *Id.* at 77(21)-78(2).

The Referral Agreement was executed by both parties on April 27, 2004. *Id.* at 131(20)-133(9). Also on April 27, 2004 and before he introduced Source to the Client, Plaintiff arranged for Source and the Client to enter into a Mutual Non-Disclosure Agreement ("NDA") (**Exhibit E**) so the parties could exchange confidential information "in connection with exploring and evaluating a *possible* business relationship (the "Relationship")." *Id.* (emphasis added); Ledecky Dep. at 134(6)-136(7) (**Exhibit D**). In the NDA, the parties expressly acknowledged and agreed that they had not entered into a business relationship by virtue of entering into the NDA:

> Both parties understand and agree that no contract or agreement with respect to the Relationship (or any other transaction) shall be deemed to exist between them or their respective stockholders or other owners, unless and until a definitive agreement has been executed and delivered by the Parties. None of the Parties or their respective stockholders, or any other person will have any rights or obligations of any kind whatsoever with respect to any transaction by virtue of this Confidentiality Agreement or any other written or oral expression by either Party or their respective Representatives unless and until a definitive agreement between the Parties is executed and delivered, other than with respect to the matters specifically agreed to herein. For purposes of this Confidentiality Agreement, the term "definitive agreement" does not include an executed letter of intent or any other preliminary written agreement. The Parties acknowledge and agree that any Relationship is subject to the approval of their respective senior management and/or their Board of Directors, which approval may be denied, granted or conditionally granted in such management's or board's complete discretion. *It is expressly understood and agreed that neither Party is bound by this Confidentiality Agreement to establish a Relationship (or any other transaction).* Each Party preserves the right, in its sole and absolute discretion, at any time, to reject any and all proposals from, and to terminate all discussions with, the other Party.

**Exhibit E** at ¶ 6 (emphasis added).

In connection with the execution of the NDA, Plaintiff disclosed to Source for the

first time that "the Client" in the Referral Agreement was The Endeavor Agency, LLC

("Endeavor"), a California-based talent agency.  Plaintiff's Response to Source

Interrogatory No. 3 (**Exhibit F**).  After the NDA and Referral Agreement were executed,

Plaintiff arranged for an introductory phone call between Ari Emanuel ("Emanuel"), a

member of Endeavor, and Source's Chairman and CEO, Leslie Flegel, on April 27, 2004.

Ledecky Dep. at 135(17)-137(22) (**Exhibit D**).  Plaintiff subsequently helped arrange an

introductory face-to-face meeting between Source and Endeavor representatives on May

12, 2004 in New York, where potential business opportunities between the parties

involving the supply and distribution of DVDs at retail checkouts were discussed.  *Id.* at

219(14)-220(17); 234(6)-235(14); Flegel Dep. at 84(11)-(25) (**Exhibit C**); Jim Gillis

Dep. at 108(21)-109(14) (**Exhibit G**); Plaintiff's Response to Source Interrogatory No. 5

(**Exhibit F**).  At the time Plaintiff made these introductions, he was not licensed as a

broker in the State of Florida pursuant to Chapter 475, Florida Statutes.  *See* Plaintiff's

Response to Defendant's First Requests for Admission (**Exhibit H**).

On June 22, 2004, Ari Emanuel introduced Source representatives to Erika

Paulson, a director of Alliance Entertainment Corp. ("Alliance") and a partner with The

Yucaipa Companies, LLC, an entity affiliated with Alliance's controlling stockholder,

AEC Associates, L.L.C.  **Exhibit B** at 36.  Alliance, a company headquartered in Coral

Springs, Florida, was a major distributor of DVDs, CDs and other home entertainment

product to specialty retailers, mass merchandisers, supermarkets and e-commerce

retailers.  *Id.* at 124, 132.  A few weeks after this introduction, Source and Alliance

entered into merger discussions.  *Id.* at 37.  On November 18, 2004, Source and Alliance

5

entered into a merger agreement and announced that Emanuel had been appointed to Source's Board of Directors. *See* **Exhibit A** at 39; **Exhibit I**. The Alliance merger closed on February 28, 2005. Douglas J. Bates Dep. at 84(3)-(12) (**Exhibit J**).

Throughout 2004, Source and Endeavor engaged in sporadic discussions and negotiations regarding entering into a proposed business venture involving the supply and distribution of DVDs and other home entertainment media at retail checkouts. *See* Gillis Dep. at 116(2)-(20); 120(4)-(15); 123(12)-124(2) (**Exhibit G**). In February and March 2005, the parties exchanged draft agreements. *See* **Exhibit K**. No written or oral agreement, however, was ever reached between the parties due to unresolved financial terms and potential conflict of interest issues arising from Emanuel's membership on Source's Board of Directors. *See* Bates Dep. at 122(25)-129(3) (**Exhibit J**); Flegel Dep. at 146(24)-148(10) (**Exhibit C**); Gillis Dep. at 165(8)-166(14) (**Exhibit G**); Ariel Emanuel Dep. at 118(25)-120(7) (**Exhibit L**).

As set forth in the Amended Complaint, Plaintiff contends that he performed his obligations under the Referral Agreement by introducing Endeavor to Source and is entitled to a commission under its terms. Specifically, Plaintiff alleges that, pursuant to the Referral Agreement, (i) he introduced Source to Endeavor's Emanuel; (ii) Emanuel allegedly became a consultant to Source; (iii) Emanuel subsequently introduced Source to representatives of Alliance and helped "facilitate" the Alliance merger; and (iv) Alliance eventually merged with Source.[2] Plaintiff alleges that as a result of Endeavor's alleged "business relationship" with Source, Source has and will continue to earn substantial net

---

[2]  Although irrelevant for the purposes of this summary judgment motion, all of the knowledgeable witnesses who have testified in this case have stated, contrary to Plaintiff's allegations, that Emanuel was never retained as a consultant to Source and that he did not do anything to facilitate the merger between Source and Alliance. *See* Flegel Dep. at 125(1)-127(7); 139(6)-140(4) (**Exhibit C**); Erika Paulson Dep. at 113(17)-115(7) (**Exhibit M**); Emanuel Dep. at 95(3)-(19); 97(13)-98(8) (**Exhibit L**).

6

income from the Alliance merger and other transactions and that Source has breached the Referral Agreement by refusing to compensate Plaintiff. *See* Compl. ¶¶ 15, 20, 24, 26, 28, 31, 34, 42, 43; *see also* Ledecky Dep. at 196(20)-197(18) (**Exhibit D**). Plaintiff further alleges in Count Five that Source breached its implied duty of good faith and fair dealing under the Referral Agreement by allegedly refusing to enter into written agreements with Endeavor "for the sole purpose of avoiding liability under the Agreement." Compl. ¶¶ 19, 58-60. In addition to his contract claims, Plaintiff has brought implied contract claims of quantum meruit (Count Two) and unjust enrichment (Count Three), alleging that, even if he is not entitled to receive a commission under the Referral Agreement, he should still be compensated for introducing Endeavor to Source in the form of restitution equal to the "value" of his services rendered or the "benefit" he conferred upon Source by this introduction. Compl. ¶¶ 45-49, 50-53.

## ARGUMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The party opposing a motion for summary judgment has the burden of showing that a genuine dispute of material fact exists and must do more than simply "show that there is some metaphysical doubt as to the material facts." *Id.*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986).

I.    **PLAINTIFF IS NOT ENTITLED TO COMPENSATION UNDER THE REFERRAL AGREEMENT BECAUSE NO WRITTEN AGREEMENT EXISTS BETWEEN SOURCE AND ENDEAVOR**

Plaintiff's contract claims must be dismissed because an express condition precedent for Plaintiff to be entitled to compensation under the Referral Agreement was never fulfilled. In order for Plaintiff receive a commission or finder's fee under the Referral Agreement, Source and Endeavor had to agree to enter into a "business relationship" after Plaintiff's introduction. **Exhibit A** at ¶ 1. Most importantly, Source's acceptance of this business relationship could be manifest "*only* by execution of a written agreement between Source and [Endeavor]." *Id.* (emphasis added). In other words, a business relationship between Source and Endeavor can be deemed to exist under the terms of the Referral Agreement if and only if the parties entered into a signed written agreement establishing such a relationship.[3]

A.    **The Mutual Non-Disclosure Agreement Did Not Establish a "Business Relationship" Between Source and Endeavor**

Plaintiff's breach of contract claim fails as a matter of law because there does not exist, nor has there ever existed, a business relationship between Source and Endeavor, much less an executed written agreement establishing a business relationship. The

---

[3]   This written agreement requirement is by no means an immaterial technicality. Under the terms of the Referral Agreement, the executed written agreement between Source and Endeavor is the document Source and Plaintiff were to use to determine the date the business relationship between the parties was established (the "Establishment Date") and, hence, the starting date of the five-year period for which Plaintiff would be entitled to compensation:

> As compensation for Ironbound's services hereunder, Source shall pay to Ironbound, and Ironbound shall accept, compensation equal to 5% of the net income recorded by Source as a result of its relationship with [Endeavor] during the five-year period following the date (the "Establishment Date") on which the business relationship is established between Source and [Endeavor].

**Exhibit A** at ¶ 2.

Florida Supreme Court has set forth what constitutes a legally-recognized "business relationship" under Florida law:

> A protected business relationship need not be evidenced by an enforceable contract. However, the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights.

*Ethan Allen, Inc. v. Georgetown Manor, Inc.,* 647 So.2d 812, 814 (Fla. 1995) (internal citations and quotations omitted); *see also St. Johns Water Management Dist. v. Fernberg Geological Servs., Inc.,* 784 So.2d 500, 505 (Fla. Dist. Ct. App. 2001) ("speculative hope of future business" is not sufficient to establish the existence of a business relationship); *Thunderwave Inc. v. Carnival Corp.,* 954 F. Supp. 1562, 1566-67 (S.D. Fla. 1997).

Here, it cannot be said that Source and Endeavor ever entered into a business relationship under Florida law because neither party has ever had any existing or prospective legal or contractual rights against the other. It is undisputed that the only executed written agreement that has ever existed between Source and Endeavor is the Mutual Non-Disclosure Agreement, or NDA, dated as of April 26, 2004 (**Exhibit E**). However, contrary to Plaintiff's contention (*see* Compl. ¶¶ 17-18), that agreement did not establish or even suggest acceptance of a "business relationship" between the parties. The NDA was executed by Source and Endeavor *before they were even introduced to each other* by Plaintiff in a preliminary telephone conference on April 27, 2004 and, hence, before Source could even evaluate or even attempt to negotiate any proposed business relationship with Endeavor as contemplated by the Referral Agreement.[4]

---

[4]  Because Plaintiff did not want to disclose the identity of Endeavor to Source before the Referral Agreement was finalized and executed, Plaintiff acted as an intermediary and obtained Source's revisions to Endeavor's proposed NDA and both of the parties' signatures on the NDA without Source and Endeavor

Ledecky Dep. at 134(6)-136(7) (**Exhibit D**); **Exhibit E** at ¶ 1.  Consistent with this fact,

the NDA itself states that it is being executed "in connection with [the parties] exploring

and evaluating a *possible* business relationship (the "Relationship")."  **Exhibit E**

(emphasis added).  Most importantly, in the NDA, Source and Endeavor expressly

acknowledged and agreed that they had no enforceable rights against each other unless

and until a definitive written agreement between the parties was executed, and that they

had *not* entered into a business relationship by virtue of entering into the NDA:

> *None of the Parties or their respective stockholders, or any other person*
> *will have any rights or obligations of any kind whatsoever with respect to*
> *any transaction by virtue of this Confidentiality Agreement or any other*
> *written or oral expression by either Party or their respective*
> *Representatives unless and until a definitive agreement between the*
> *Parties is executed and delivered*, other than with respect to the matters
> specifically agreed to herein.  For purposes of this Confidentiality
> Agreement, the term "definitive agreement" does not include an executed
> letter of intent or any other preliminary written agreement.  The Parties
> acknowledge and agree that any Relationship is subject to the approval of
> their respective senior management and/or their Board of Directors, which
> approval may be denied, granted or conditionally granted in such
> management's or board's complete discretion.  *It is expressly understood*
> *and agreed that neither Party is bound by this Confidentiality Agreement*
> *to establish a Relationship (or any other transaction).*  Each Party
> preserves the right, in its sole and absolute discretion, at any time, to reject
> any and all proposals from, and to terminate all discussions with, the other
> Party.[5]

*Id.* at ¶ 6 (emphasis added).  Thus, the NDA, by its very own terms, does not satisfy the

Referral Agreement's unambiguous conditions precedent that, in order for Plaintiff to be

entitled to compensation, there must exist a business relationship between Source and

---

ever directly communicating with each other.  *See* Plaintiff's Response to Source Interrogatory No. 3
(**Exhibit F**).

[5]  This paragraph was added by Source's General Counsel, Doug Bates, to a draft version of the NDA that
was initially proposed by Endeavor.  *See* **Exhibit N.**

Endeavor, and that business relationship can be deemed to exist only by virtue of an executed written agreement between Source and Endeavor.[6]

Furthermore, the language of both the Referral Agreement and the NDA show that Plaintiff, Source and Endeavor all acknowledged and agreed that a business relationship between Source and Endeavor could not exist unless and until a relevant written agreement was executed by them. In this sense, the parties implicitly agreed to modify or limit the Florida common law definition of a "business relationship" only to circumstances where a definitive written agreement between Source and Endeavor was executed subsequent to Plaintiff's introduction, a circumstance which never occurred. Thus, assuming *arguendo* that any subsequent dealings occurred between Source and Endeavor that could be construed as creating "existing or prospective legal or contractual rights" between the parties (*see Ethan Allen, supra*), these still cannot qualify as a business relationship for the purposes of the Referral

---

[6] Indeed, Endeavor's Emanuel testified that he did not believe that he had a business relationship with Source by virtue of the fact that he had been introduced to representatives of the company:

> Q. Okay, And you had a business relationship in this case with both [Source and Yucaipa]?
> A. No.
> * * *
> Q. Why not?
> A. I had a business relationship with [Yucaipa's principal and Alliance's controlling shareholder] Ron [Burkle]. I had a relationship with Ron.
> Q. Okay.
> A. I didn't have a -- I hadn't -- I didn't have a -- *I had an understanding of Source.*
> * * *
> Q. Understanding?
> A. An understanding of what the company was.
> Q. Okay.
> A. *And I was trying to potentially grow -- I didn't know if it was going to work -- a business relationship,* but I definitely had a business relationship with Ron.

Emanuel Dep. at 59(2)-(4), 59(7)-(12), 59(24)-60(6) **(Exhibit L)** (emphasis added).

Agreement (or the NDA) because there does not exist an executed written agreement
between the parties with regard to such dealings.[7]

**B.    There is No Evidence of Bad Faith Refusal on Source's Part to Enter
       Into Any Business Relationship or Written Agreements With
       Endeavor**

In an attempt to avoid the obvious consequence of the fact that there exists no

executed written business relationship agreement between Source and Endeavor, Plaintiff

has alleged -- upon information and belief -- that Source has declined to enter into any

written agreements that memorialize its alleged business relationship with Endeavor "for

the sole purpose of avoiding liability under the [Referral] Agreement." Compl. ¶ 19.

This allegation of breach of the duty of good faith and fair dealing on Source's part,

however, lacks any basis in fact. The actual uncontroverted facts are that, after first being

introduced by Plaintiff in 2004, Source and Endeavor engaged in sporadic discussions

and negotiations regarding a proposed business venture involving the supply and

distribution of DVDs and other home entertainment media at retail checkouts. *See* Gillis

Dep. at 116(2)-(20); 120(4)-(15); 123(12)-124(2) (**Exhibit G**). In February and March

2005, the parties exchanged draft engagement agreements. *See* **Exhibit K**. The parties,

however, were ultimately unable to reach an agreement (either written or oral) due to

unresolved financial terms and potential conflict of interest issues arising from Ari

---

[7]  For example, Plaintiff has suggested that Source's payment of $1.5 million to Endeavor in connection
with the Alliance transaction demonstrates the existence of a business relationship between the parties. *See*
Compl. ¶ 31. Putting aside the fact that this payment does not reflect the existence of a Source-Endeavor
business relationship because it was made by Source in fulfillment of an *Alliance obligation* to Endeavor
that Alliance's controlling shareholder, Ron Burkle, exclusively negotiated with Endeavor's Emanuel and it
had been inherited from Alliance upon consummation of the merger (*see* Flegel Dep. at 16(7)-18(16)
(**Exhibit C**); Emanuel Dep. at 72(14)-(19); 83(9)-84(15) (**Exhibit L**); Paulson Dep. at 107(10)-110(16)
(**Exhibit M**), there still does not exist any executed written agreement between the parties for this
transaction. Accordingly, even if this payment could arguably be construed as demonstrating that
Endeavor possessed legal or contractual rights against Source (it didn't), it still does not demonstrate the
existence of a "business relationship" between the parties under the specific unambiguous terms of the
Referral Agreement.

Emanuel's membership on Source's Board of Directors. Bates Dep. at 122(25)-129(3) (**Exhibit J**); Flegel Dep. at 146(24)-148(10) (**Exhibit C**); Gillis Dep. at 165(8)-166(14) (**Exhibit G**); Emanuel Dep. at 118(25)-120(7) (**Exhibit L**).

In sum, the fact that there exists no written agreement establishing a business relationship between Endeavor and Source has nothing to do with Source seeking to avoid liability to Plaintiff under the Referral Agreement, and everything to do with legitimate business issues between the parties that could not be and have never been resolved. There is no evidence to support Plaintiff's claim that Source breached its duty of good faith and fair dealing owed to Plaintiff and there exists no basis to excuse or disregard the Referral Agreement's unambiguous requirement that there must exist an applicable executed written agreement between Source and Endeavor. The lack of an applicable written agreement mandates that summary judgment be entered in Source's favor on Plaintiff's contract claims.

## II.    PLAINTIFF CANNOT ENFORCE THE REFERRAL AGREEMENT BECAUSE HE WAS NOT LICENSED AS A BROKER UNDER CHAPTER 475, FLORIDA STATUTES

Assuming *arguendo* that Plaintiff can somehow demonstrate that he is entitled to compensation under the terms of the Referral Agreement for introducing Endeavor to Source, he would still be barred under Florida law from enforcing such agreement because he was not a Florida licensed broker under Florida Statutes Chapter 475 at the time he made the introduction.[8] Pursuant to Fla. Stat. section 475.41 (2004), "[n]o

---

[8]    Although Chapter 475 is entitled "Real Estate Brokers, Sales Associates, Schools, and Appraisers" and declares that its public purpose is to "regulate real estate brokers, sales associates, and schools in this state," a closer reading of the actual statute demonstrates that it regulates business brokers without any connection to real estate. *Meteor Motors, Inc. v. Thompson Halbach & Assocs.,* 914 So.2d 479, 482 (Fla. Dist. Ct. App. 2005).

contract for a commission or compensation for any act or service enumerated in section

475.01(3) is valid unless the broker or salesperson has complied with this Chapter [475]

in regard to issuance and renewal of the license at the time the act or service was

performed." In turn, Fla. Stat. section 475.01(3) (2004) states that any person who

commits at least one act which defines a "broker" is subject to the licensing obligations

of Chapter 475 and each act, if prohibited, constitutes a separate offense. A "broker"

includes a person who, with an intent to collect or receive a compensation or valuable

consideration, brings the parties together to a business opportunity. Specifically, Fla.

Stat. section 475.01(1)(a) (2004) defines a "broker" as including:

> a person who, for another, and for a compensation or valuable
> consideration directly or indirectly paid or promised, expressly or
> impliedly, or with an intent to collect or receive a compensation or
> valuable consideration therefor . . . attempts or agrees . . . to negotiate the
> sale, exchange [or] purchase . . . of business enterprises or business
> opportunities or any real property[9] or any interest in or concerning the
> same . . . or who takes any part in the procuring of sellers, purchasers,
> lessors, or lessees of business enterprises or business opportunities or the
> real property or another, . . . or who directs or assists in the procuring of
> prospects in the negotiation or closing of any transaction which does, or is
> calculated to, result in a sale, exchange, or leasing thereof. . . .

A party who provides business brokerage services, *i.e.*, a party who introduces

one party to another party and a business transaction or fulfilled business opportunity

results from such introduction, cannot recover a commission or finder's fee for such

transaction or opportunity unless the party was licensed under Chapter 475 at the time the

brokerage services were performed. *See Meteor Motors,* 914 So.2d 479.

In *Meteor Motors*, an Arizona corporate business broker, Thompson, entered into

an agreement with a Florida automobile dealership, Meteor Motors, in which the

---

[9] Section 475.01(1)(i) defines "real property" to include "any interest in business enterprises or business opportunities."

dealership agreed to pay the broker a commission of 5% of the closing price if it found a buyer for the dealership. *Id.* at 481. The contract contemplated only a sale of stock and not any transfer of real estate. *Id.* Neither the corporate business broker nor any of its principals was a licensed broker in Florida at any relevant time. *Id.*

After the contract was signed, Thompson's principal, Halbach, contacted various entities that he thought might be interested in purchasing the dealership. *Id.* Among those contacted was the Craig Zinn Automotive Group, a Florida-based car dealership. *Id.* Halbach transmitted information obtained from Meteor to Zinn so that Zinn could evaluate the feasibility of purchasing the dealership. *Id.* Halbach, however, did not participate in any negotiations between Meteor and Zinn, and Halbach characterized his role in the transaction as bringing the seller and buyer together. *Id.*

Meteor and Zinn eventually entered into an agreement whereby Zinn purchased the stock of Meteor for $5 million. *Id.* After Meteor refused to pay Thompson its commission, Thompson brought a breach of contract action.

The trial court found that Meteor had breached its contract with Thompson and that Thompson was entitled to recover its 5% commission. On appeal, the Florida District Court of Appeal reversed, holding that Chapter 475 prevented Thompson from enforcing its commission contract. The court found that Thompson's actions fell within the broad statutory definition of "broker" under Chapter 475, holding that the statute applies even if the transaction in question does not involve real estate and the services rendered were limited to locating and introducing the party with whom the transaction was made. *Id.* at 482-83; *see also First Equity Corp. of Fla. v. Riverside Real Estate Investment Trust,* 307 So.2d 866, 867 (Fla. Dist. Ct. App. 1975). In so holding, the court

15

rejected Thompson's argument that Chapter 475 did not apply because it performed the contract exclusively from Arizona, using telephone and e-mail to contact potential buyers. The court found that Thompson had engaged in brokerage activities within the purview of Chapter 475 by soliciting potential Florida purchasers for a Florida business. *Meteor Motors,* 914 So.2d at 483.

The present case is on practically all fours with the facts and circumstances of *Meteor Motors* and, therefore, the result should be the same. Plaintiff here has admitted that he was not licensed as a broker in Florida pursuant to Chapter 475 at the time he introduced Endeavor to Source. *See* **Exhibit H**. Like Thompson in *Meteor Motors,* Plaintiff's role here was to "put the parties on the playing field and see what would happen together." He therefore acted as a business broker within the meaning of Chapter 475 because a "broker" is broadly defined under the statute to include, among others, anyone who takes "*any* part in the procuring of sellers, purchasers, lessors, or lessees of business enterprises or business opportunities," and regardless of whether Plaintiff participated in any subsequent negotiations between Endeavor and Source.[10] *See id.* (citing Fla. Stat. § 475.01(1)(a)) (emphasis in original and internal quotations omitted). And like the broker in *Meteor Motors,* Plaintiff is seeking to recover a commission or finder's fee under the Referral Agreement for the fulfilled business opportunities that allegedly have resulted from his introduction, namely, the merger between Source and Alliance. *See* Ledecky Dep. at 54(15)-55(2); 77(21)-78(2); 196(20)-197(18) (**Exhibit D**); Compl. ¶¶ 41-43.

---

[10]   Plaintiff's conduct also qualifies as broker activity under Chapter 475 because, by introducing Endeavor to Source, he claims he "assist[ed] in the procuring of prospects in the negotiation or closing of any transaction which does, or is calculated to, result in a sale, exchange, or leasing thereof. . . ."

Moreover, although Plaintiff is not a Florida resident, there can be no dispute that his brokerage activities are subject to the licensing requirements of Chapter 475. The Referral Agreement pursuant to which Plaintiff made his introduction and is seeking to recover a commission under provides that the rights and obligations of the parties "shall be governed by and interpreted and determined in accordance with the internal laws of the State of Florida. . . ." **Exhibit A** at ¶ 5(d). Accordingly, Plaintiff's activities pursuant to the Referral Agreement were at all times subject to Florida law, including Chapter 475. In addition, Plaintiff's brokerage activities were directed towards Florida residents in that both Source and Alliance are businesses that are headquartered in Florida. Thus, Plaintiff here is seeking to recover, pursuant to an agreement governed by Florida law, a commission against a Florida corporation for a merger transaction between two Florida corporations that he alleges resulted from his introduction.

Accordingly, Plaintiff is barred as a matter of law under section 475.41, Florida Statutes, from enforcing the Referral Agreement and recovering a commission or finder's fee for performing unlicensed business brokerage services in Florida.

## III.    PLAINTIFF CANNOT RECOVER UNDER HIS QUANTUM MERUIT OR UNJUST ENRICHMENT CLAIM IF HIS CONTRACT CLAIMS FAIL

Summary judgment in Source's favor on Plaintiff's implied or quasi-contract claims of quantum meruit and unjust enrichment is also warranted. On February 27, 2006, Source filed a Motion to Dismiss Plaintiff's Implied Contract Claims ("Mot. Dismiss") [Doc. # 28]. That Motion to Dismiss still remains pending as of the filing of this Summary Judgment Motion. Rather than repeat all of the arguments raised in our Motion to Dismiss and Reply Memorandum in Further Support of Motion to Dismiss

("Reply Mem.") [Doc. # 48], Source provides a short summary here and respectfully refers the Court to those pleadings for further detail and authorities.

It is black letter law in Florida that a plaintiff cannot seek to enforce an express contract and at the same time seek recovery under a quasi-contract theory of quantum meruit or unjust enrichment if the recovery sought in quasi-contract is the same as the subject matter of the express contract. *In re Managed Care Litigation,* 185 F. Supp. 2d 1310, 1337 (S.D. Fla. 2002) ("An unjust enrichment claim can exist only if the subject matter of that claim is not covered by a valid and enforceable contract."). The question to be answered is did the plaintiff perform extra work or services beyond what he was obligated to do or what was contemplated under the express contract? If the answer is no, then the quasi-contract claims cannot stand, even if the plaintiff is ultimately denied recovery under the express contract.

Here, the performance underlying Plaintiff's quasi-contract claims is identical to the performance he was obligated to render under the Referral Agreement, namely, introducing Endeavor to Source. *Compare* Compl. ¶ 41 (breach of contract) ("Pursuant to the Agreement, Ironbound introduced Source to Endeavor's Emanuel.") *with* Compl. ¶ 46 (quantum meruit) ("Ironbound rendered a valuable service to Source when it introduced Source to Endeavor.") and ¶ 51 (unjust enrichment) ("Source was unjustly enriched at Ironbound's expense when it received Ironbound's introduction to Endeavor's Emanuel."). Plaintiff does not contend, nor is there any evidence showing, that he performed any work or service, or provided any benefit to Source beyond what he was obligated to do under the Referral Agreement. The subject matter of his contract and

18

quasi-contract claims is identical, and therefore his quasi-contract claims are barred as a matter of law.[11]

In response to these unassailable points, Plaintiff has argued that he should still be allowed to maintain and pursue his quantum meruit and unjust enrichment claims to the extent Source "is planning to mount a defense based on the theory that there is no enforceable contract between Ledecky and Source." *See* Plaintiff's Surreply in Opposition to Defendant's Motion to Dismiss Implied Contract Claims [Doc. # 51] at 3. In particular, Plaintiff has argued that he should be allowed to seek recovery in quasi-contract to the extent that Source contends that the Referral Agreement is invalid or unenforceable due to the fact that Plaintiff is not an actual party to the Agreement. *See id.* at 1-3. Plaintiff's argument is meritless because Source has never taken such a position and has no intention of doing so. Source has never asserted -- and does not intend to assert -- that the Referral Agreement is invalid or unenforceable due to the fact that Ironbound Partners, LLC, did not exist as a legal entity at the time the Referral Agreement was executed. Nor is Source challenging or intending to challenge Plaintiff's claim that the Referral Agreement (Count Seven) should be "reformed" to change the contracting party's name from "Ironbound Partners, LLC" to "Ironbound Partners," which Plaintiff now claims is his trade or fictitious name.

Furthermore, while Plaintiff is correct as a general matter that quasi-contract recovery may be allowed upon a showing that there exists no enforceable contract

---

[11]    Moreover, to the extent there exists any doubt on this question, it must be resolved in Source's favor due to the presence of an integration clause in the Referral Agreement (¶ 5(i)), wherein the parties acknowledged and agreed that the Referral Agreement occupies the entire field of the potential universe of claims between Plaintiff and Source regarding Plaintiff's introduction of Endeavor to Source. *See* Reply Mem. at 6-8 (citing cases).

between the parties, there are recognized exceptions to this general rule. One of those

exceptions under Florida law is where the contract is rendered unenforceable due to the

plaintiff's failure to comply with the broker licensing requirements of Chapter 475,

Florida Statutes. In *Paris v. Hilton,* 352 So.2d 534 (Fla. Dist. Ct. App. 1977), the court

held:

> To this end, the Legislature of this State has decreed that contracts to pay
> the commissions of real estate brokers or salesmen, who are not registered
> as such in the State of Florida at the time such services are rendered, are
> entirely void as a matter of public policy, and the courts have ruled that
> recovery may not be had either under the contract or under the theory of
> quantum meruit.

*Id.* at 535; *see also Bradley v. Banks,* 260 So.2d 256, 257 (Fla. Dist. Ct. App. 1972).

Thus, even though Plaintiff cannot enforce the Referral Agreement by virtue of his

performance of unlicensed brokerage services within the meaning of Chapter 475,

Plaintiff is still barred as a matter of Florida public policy from obtaining any recovery

for such services under a quantum meruit or unjust enrichment theory.

## CONCLUSION

For the foregoing reasons, Source respectfully requests that the Court grant its

Motion for Summary Judgment.

Respectfully submitted,

/s/ Kevin E. Stern                    .
C. Allen Foster (Bar No. 411662)
Kevin E. Stern (Bar No. 459214)
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, DC 20006
Tel: (202) 331-3100
Fax: (202) 331-3101
*Counsel for Defendant Source Interlink Companies,
Inc.*

Dated:  June 26, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JONATHAN LEDECKY d/b/a IRONBOUND          )
PARTNERS,                                                          )
                                                                         )
                    Plaintiff,                                       )
                                                                         )          Case No. 1:05CV01039 (JGP)
          v.                                                          )
                                                                         )
SOURCE INTERLINK COMPANIES, INC.,          )
                                                                         )
                    Defendant.                                     )
_____)

## ORDER

Upon consideration of Defendant's Motion for Summary Judgment and the

memorandum filed in support thereof, Plaintiff's Opposition thereto, Defendant's Reply

and the applicable law, and for the reasons stated in the accompanying Memorandum

Opinion, it is hereby ORDERED that Defendant's Motion is GRANTED and Plaintiff's

claims are hereby dismissed with prejudice.


                                             _____
                                             HON. JOHN GARRETT PENN
                                             United States District Judge


Date: _____

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of June, 2006, I caused a true and correct copy of the foregoing to be served by electronic mail through CM/ECF on the following persons:

Jan Paul Miller, Esq.
Allison N. Sinoski, Esq.
THOMPSON COBURN, LLP
1909 K. Street, NW
Suite 600
Washington, DC 20006

/s/ Julie Lee            .
Julie Lee