## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

PLAINTIFF'S EXH. NO. 13
For Identification (IB00005 - IB00204)
Witness: A. EMANUEL
Date: 5/18/2006
Carmen R. Sanchez, CSR No. 5060

Amendment No. 1
to

# Form S-4
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

# Source Interlink Companies, Inc.

*(Exact name of registrant as specified in its charter)*

| Missouri | 5192 | 43-1710906 |
|---|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification Number)* |

27500 Riverview Center Boulevard, Suite 400
Bonita Springs, Florida 34134
(239) 949-4450
*(Address, Including Zip Code, and Telephone Number,
Including Area Code, of Registrant's Principal Executive Offices)*

Douglas J. Bates, Esq.
General Counsel
Source Interlink Companies, Inc.
27500 Riverview Center Boulevard, Suite 400
Bonita Springs, Florida 34134
(239) 949-4450
*(Name, Address, Including Zip Code, and Telephone Number,
Including Area Code, of Agent for Service)*

IB 00005

*Copies to:*

| Charles C. Cohen, Esq. | Steven V. Bernard, Esq. | Robert B. Knauss, Esq. |
|---|---|---|
| Marc P. Taxay, Esq. | Steve L. Camahort, Esq. | Sandra Seville-Jones, Esq. |
| Cohen & Grigsby, P.C. | Steven Liu, Esq. | Munger, Tolles & Olson LLP |
| 11 Stanwix Street, 15th Floor | Wilson Sonsini Goodrich & Rosati, P.C. | 355 South Grand Avenue |
| Pittsburgh, PA 15222-1319 | 650 Page Mill Road | 35th Floor |
| (412) 297-4900 | Palo Alto, CA 94304-1050 | Los Angeles, CA 90071-1560 |
| | (650) 493-9300 | (213) 683-9100 |


DEFENDANT'S EXHIBIT
13

IB 00006

the proxy statement/prospectus forming a part of this Registration Statement.

If the securities being registered on this form are being offered in connection with the formation of a holding company and are in compliance with General Instruction G, check the following box.  ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration for the same offering.  ☐

IB 00007



**SOURCE INTERLINK COMPANIES**

To the shareholders of Source Interlink Companies, Inc.:

After careful consideration, our board has approved a merger between Source Interlink Companies, Inc. and Alliance Entertainment Corp. by a unanimous vote of those directors present at a special meeting of our board held to consider the merger. Management proposed this merge to further our objective of creating the premier provider of information, supply chain management and logistics services to retailers and producers of home entertainment content products. We believe the combined company will create more shareholder value than could be achieved by our company individually. We ask for your support in voting in favor of the proposals related to the merger to be presented at our special meeting.

Under the terms of the merger agreement, Alliance will merge with and into our wholly owned subsidiary, Alligator Acquisition, LLC. In the merger, we will issue and reserve for issuance to Alliance equityholders a number of shares of our common stock equal to our common stock outstanding immediately prior to the consummation of the merger and shares issuable upon the exercise of outstanding options, warrants and other rights to acquire our common stock. In addition, we will assume all outstanding Alliance stock options, warrants and other rights to acquire Alliance common stock. As a result of the merger, the equityholders of Alliance and Source Interlink immediately prior to the merger will each hold 50% of the fully diluted capitalization of the combined company immediately following the merger.

Our common stock is traded on the Nasdaq National Market under the trading symbol "SORC," and on January 14, 2005 the closing price of Source Interlink common stock was $12.46.

*After careful consideration, our board has determined by a unanimous vote of those directors present at a special meeting of the board held to consider the merger that the merger and the transactions associated with it, including the stock issuance, are advisable, fair to, and in the best interests of, our shareholders. Our board has approved the merger agreement and each of the proposals related thereto and recommends that the shareholders vote FOR each of the proposals.*

Our shareholders will vote at a special meeting on February 28, 2005 at 10:00 a.m., local time, at our offices located at 27500 Riverview Center Boulevard, Suite 400, Bonita Springs, Florida.

**Your vote is very important. Whether or not you plan to attend the special meeting, please take the time to vote in the manner described in this proxy statement/ prospectus.**

We encourage you to read carefully this proxy statement/ prospectus, including the section entitled "Risk Factors" beginning on page 8, before voting your shares.

                    S. LESLIE FLEGEL
                    *Chairman and Chief Executive Officer*
                    Source Interlink Companies, Inc.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the merger or the securities to be issued in the merger or determined if this proxy statement/ prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

This proxy statement/ prospectus is dated January 18, 2005 and is first being mailed to our shareholders on or about January 25, 2005.

IB 00008

http://yahoo.brand.edgar-online.com/EFX  dll/EDGARpro.dll?FetchFilingHTML1?SessionID=DbxMIg...    10/24/200:





**SOURCE
INTERLINK
COMPANIES**

### NOTICE OF SPECIAL MEETING OF SHAREHOLDERS

To our shareholders:

We will hold a special meeting of the shareholders of Source Interlink Companies, Inc., a Missouri corporation, on February 28, 2005, 10:00 a.m., local time, at our offices located at 27500 Riverview Center Boulevard, Suite 400, Bonita Springs, Florida, for the purpose of considering and voting upon the following:

1. A proposal to approve the issuance of our common stock to Alliance stockholders in connection with the merger of Alliance Entertainment Corp. with and into Alligator Acquisition, LLC, our wholly owned subsidiary, pursuant to an Agreement and Plan of Merge dated as of November 18, 2004, by and among Source Interlink, Alligator Acquisition, LLC and Alliance;

2. A proposal to amend our articles of incorporation to effect an increase in the number of authorized shares of our common stock from 40,000,000 to 100,000,000;

3. A proposal to effect our reincorporation from a Missouri corporation to a Delaware corporation;

4. A proposal to grant discretionary authority to our board to adjourn or postpone the special meeting to a later date, if necessary, to solicit additional proxies if there are not sufficient votes in favor of the foregoing proposals; and

5. Any other business as may properly come before the special meeting and any adjournment or postponement of the special meeting.

The consummation of the merger is contingent upon approval of (i) proposal one and (ii) either proposal two or proposal three. If our shareholders do not approve either proposal two or proposal three, then proposal one will not be effected, even if approved by our shareholders and the merger will not be consummated. Additionally, if our shareholders do not approve proposal one, then proposal two will not be effected even if approved by our shareholders; but proposal three will be effected if approved by our shareholders regardless of whether proposal one or proposal two is approved.

The accompanying proxy statement/ prospectus describes the proposed merger and other proposals in more detail. You are encouraged to read the entire document carefully. In particular, you should carefully consider the discussion entitled "Risk Factors" which begins on page 8.

Only shareholders of record at the close of business on January 14, 2005, the record date, are entitled to receive this notice and to vote their shares at the special meeting or any adjournment or postponement of that meeting. As of the record date, there were 23,724,940 shares of our common stock outstanding. Each share of our common stock is entitled to one vote on each matter properly brought before the special meeting. Our shareholders are not entitled to appraisal rights in connection with the merger.

By Order of the Board of Directors,

DOUGLAS J. BATES
*Secretary*

January 18, 2005
Bonita Springs, Florida

IB 00009

**Your vote is important.** Even if you plan to attend the special meeting, please vote using one of the following options:

• complete and mail the enclosed proxy card as promptly as possible in the enclosed postage-paid envelope,

• use the telephone number on the proxy card to submit your proxy by telephone, or

• visit the website designated on the proxy card to submit your proxy on the Internet.

If your shares are held in the name of a bank, broker or other fiduciary, please follow the instructions on the voting instruction card furnished by the record holder. You may revoke your proxy in the manner described in this proxy statement/ prospectus at any time before it has been voted at the special meeting. Any shareholder attending the special meeting may vote in person even if the shareholder has returned a proxy. **REMEMBER, YOUR VOTE IS IMPORTANT, SO PLEASE ACT TODAY.**

i

IB 00010

| | Page |
|---|---|
| QUESTIONS AND ANSWERS ABOUT THE MERGER | vii |
| SUMMARY | 1 |
| The Companies | 1 |
| Reasons for the Merger | 2 |
| Board of Directors and Management Following the Merger | 2 |
| Recommendations to Source Interlink Shareholders | 3 |
| Opinion of Source Interlink's Financial Advisor | 3 |
| Record Date for Voting; Shareholder Vote Required | 4 |
| Conditions to Completion of the Merger | 4 |
| Material U.S. Federal Income Tax Consequences of the Merger | 4 |
| Dissenters' or Appraisal Rights | 5 |
| Interests of Certain Persons in the Merger | 5 |
| Restrictions on Alternative Transactions | 6 |
| Anticipated Accounting Treatment of the Merger | 6 |
| Trading of Source Interlink Common Stock | 6 |
| CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS | 7 |
| RISK FACTORS | 8 |
| Risks Relating to the Merger | 8 |
| Risks Relating to the Combined Company | 12 |
| SOURCE INTERLINK SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA | 22 |
| ALLIANCE SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA | 24 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS | 26 |
| COMPARATIVE PER SHARE DATA | 28 |
| MARKET PRICE AND DIVIDEND INFORMATION | 30 |
| Source Interlink Common Stock | 30 |
| Alliance Capital Stock | 30 |
| Recent Closing Prices | 30 |
| Shareholders | 31 |
| Dividends | 31 |
| THE SOURCE INTERLINK SPECIAL MEETING | 32 |
| Date, Time and Place of the Source Interlink Special Meeting | 32 |
| Purpose of the Special Meeting | 32 |
| Record Date | 32 |
| Quorum | 32 |
| Vote Required | 33 |
| Voting of Shares | 33 |
| How to Revoke a Proxy | 34 |
| Voting Agreements | 34 |
| Solicitation of Proxies and Expenses Associated Therewith | 34 |
| Shareholder Proposals | 34 |
| Recommendation of the Source Interlink Board of Directors | 35 |

ii

IB 00011

|  | Page |
|---|---|
| **THE MERGER** | 36 |
| General | 36 |
| Background of the Merger | 36 |
| Reasons of Our Board of Directors for the Merger | 39 |
| Reasons of Alliance's Board of Directors for the Merger | 41 |
| Opinion of Jefferies & Company, Inc., Financial Advisor to Source Interlink Companies, Inc. | 42 |
| Interests of Source Interlink Directors, Officers and Affiliates in the Transaction | 50 |
| Interests of Alliance Directors, Officers and Affiliates in the Transaction | 51 |
| No Dividends | 51 |
| Material U.S. Federal Income Tax Consequences | 51 |
| Accounting Treatment for the Merger | 53 |
| Spin-Off of Certain Non-Core Assets of Alliance | 54 |
| Regulatory Filings and Approvals Required to Complete the Merger | 55 |
| Certain Securities Laws Considerations | 55 |
| No Appraisal or Dissenters' Rights | 55 |
| Listing on the Nasdaq National Market of Source Interlink Common Stock to be Issued in the Merger | 56 |
| **THE MERGER AGREEMENT** | 56 |
| Structure of the Merger | 56 |
| Effective Time of the Merger | 56 |
| Manner and Basis of Converting Shares of Alliance Preferred Stock and Alliance Common Stock | 56 |
| Directors and Officers of Source Interlink Upon Completion of the Merger | 57 |
| Increasing Authorized Source Interlink Stock After the Merger | 57 |
| Exchange of Alliance Stock Certificates | 57 |
| Assumption of Alliance Stock Options and Warrants | 58 |
| Representations and Warranties | 58 |
| Source Interlink's Conduct of Business Prior to the Completion of the Merger | 61 |
| Alliance's Conduct of Business Prior to the Completion of the Merger | 63 |
| Certain Covenants | 65 |
| Restrictions on Solicitation of Alternative Acquisition Proposals | 66 |
| Obligation of Alliance's Board of Directors to Convene Stockholder Meeting and Recommend Approval and Adoption of the Merger Agreement | 68 |
| Obligation of Source Interlink's Board of Directors to Convene Shareholder Meeting and Recommend Approval of Matters Contemplated by the Merger Agreement | 68 |
| Conditions to the Completion of the Merger | 69 |
| Termination of the Merger Agreement | 71 |
| Expenses and Termination Fees | 73 |
| Extension, Waiver and Amendment | 74 |
| Definition of Material Adverse Effect | 74 |

iii

IB 00012

| | Page |
|---|---|
| AGREEMENTS RELATED TO THE MERGER AND OTHER TRANSACTIONS | 75 |
| Source Interlink Voting Agreements | 75 |
| Alliance Voting Agreement | 75 |
| Source Interlink Affiliate Agreement | 75 |
| Stockholder's Agreement | 75 |
| Consulting Agreement | 77 |
| Agreements between Alliance and Spinco | 77 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS | 79 |
| MANAGEMENT | 87 |
| Executive Officers and Directors Post-Merger | 87 |
| Employment Contracts and Change-in-Control Arrangements Post-Merger | 89 |
| Board Committees Post-Merger | 90 |
| Executive Compensation Post-Merger | 91 |
| Source Interlink Option Grants | 92 |
| Compensation of Directors of Source Interlink | 92 |
| Compensation Committee Interlocks and Insider Participation Post-Merger | 93 |
| Related Party Transactions of Post-Merger Management | 93 |
| SOURCE INTERLINK BUSINESS | 94 |
| Overview | 94 |
| Industry Overview | 94 |
| Our Business | 95 |
| Customers | 98 |
| Marketing and Sales | 99 |
| Competition | 99 |
| Management Information Systems | 99 |
| Employees | 100 |
| Properties | 100 |
| Legal Proceedings | 100 |
| SOURCE INTERLINK MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND | |
| RESULTS OF OPERATIONS | 101 |
| SOURCE INTERLINK PRINCIPAL SHAREHOLDERS | 122 |
| ALLIANCE BUSINESS | 124 |
| Overview | 124 |
| Industry Overview | 124 |
| Seasonality And Working Capital | 125 |
| Industry Trends | 125 |
| Alliance's Services | 126 |
| Alliance's Strategy | 127 |
| Sales and Marketing | 128 |
| Technology, Information and Supply Chain Management Infrastructure | 128 |
| Customers | 130 |
| Competition | 131 |
| Additional Background Information | 131 |

iv

IB 00013

|  | Page |
|---|---|
| Employees | 13? |
| Facilities | 13? |
| ALLIANCE MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 13? |
| ALLIANCE PRINCIPAL STOCKHOLDERS | 14? |
| DESCRIPTION OF SOURCE INTERLINK CAPITAL STOCK | 14? |
| General | 14? |
| Common Stock | 14? |
| Preferred Stock | 14? |
| Warrants | 14? |
| Options | 14? |
| Anti-Takeover Effects of Provisions of Our Charter Documents and Missouri Law | 14? |
| Transfer Agent and Registrar | 14? |
| COMPARISON OF STOCKHOLDER RIGHTS AND CORPORATE GOVERNANCE MATTERS | 14? |
| PROPOSALS TO SOURCE INTERLINK SHAREHOLDERS TO BE VOTED ON AT THE SOURCE INTERLINK SPECIAL MEETING | 16? |
| Proposal One — Issuance of Our Common Stock in Merger | 16? |
| Proposal Two — Amendment to Our Articles of Incorporation | 16? |
| Proposal Three — Our Reincorporation from a Missouri Corporation to a Delaware Corporation | 16? |
| Proposal Four — Grant of Discretionary Authority to Our Board to Adjourn Special Meeting | 17? |
| LEGAL MATTERS | 17? |
| EXPERTS | 17? |
| WHERE YOU CAN FIND MORE INFORMATION | 17? |
| INDEX TO FINANCIAL STATEMENTS | F-1 |
| Annex A — Agreement and Plan of Merger | A-1 |
| Annex B — Opinion of Source Interlink's Financial Adviser | B-1 |
| Annex C — Agreement and Plan of Reincorporation Merger | C-1 |
| Annex D — Proposed Certificate of Incorporation of Source Interlink (a Delaware corporation) | D-1 |
| Annex E — Proposed Bylaws of Source Interlink (a Delaware corporation) | E-1 |
| Employment Agreement | |
| The 1999 Equity Participation Plan | |
| The 1999 Employee Equity Participation and Incentive Plan | |
| Amended and Restated Executive Stock Incentive Plan | |
| Amended and Restated General Stock Incentive Plan | |
| Multi-Tenant Industrial Triple Net Lease | |
| Consent of BDO Seidman LLP | |
| Consent of PricewaterhouseCoopers LLP | |
| Form of Proxy Card | |
| Consent of Jeffries & Company, Inc. | |

v

IB 00014

This proxy statement/ prospectus incorporates important business and financial information about us from other documents that are not included in or delivered with this proxy statement/ prospectus. This information is available to you without charge upon your request. You can obtain the documents incorporated by reference in this proxy statement/ prospectus by requesting them in writing or by telephone from us at the following address and telephone number:

Source Interlink Companies, Inc.
27500 Riverview Center Boulevard, Suite 400
Bonita Springs, Florida 34134
Attention: General Counsel
(239) 949-4450

If you would like to request documents, we must receive your request by February 21, 2005 in order for you to receive them before the special meeting.

See "Where You Can Find More Information" beginning on page 174.

vi

IB 00015

QUESTIONS AND ANSWERS ABOUT THE MERGER

*The following section provides answers to frequently asked questions about our special meeting, the merger, the effect of the merger on the holders of our common stock and our reincorporation from a Missouri corporation to a Delaware corporation. This section, however, only provides summary information. For a more complete response to these questions and for additional information, please refer to the cross-referenced page(s) for each question.*

**Q:**  **What is the proposed merger? (see page 36)**

**A:**  Under the terms of the proposed merger, Alliance will merge with and into Alligator Acquisition, LLC, our wholly owned subsidiary. The merger agreement is included as *Annex A* to this proxy statement/ prospectus. We encourage you to read carefully the merger agreement in its entirety, as it is the principal legal document that sets forth the terms of and governs the merger.

**Q:**  **Why are the companies proposing the merger? (see pages 39-42)**

**A:**  Our management proposed this merger to further our objective of creating the premier provider of information, supply chain managemen and logistics services to retailers and producers of home entertainment content products and to produce greater shareholder value than would be achieved absent the merger. We believe that the merger provides significant market opportunities to take advantage of our strong retailer relationships and experience in marketing our products by expanding product offerings beyond our existing magazine fulfillment business to DVDs, CDs, video games and related home entertainment products and accessories. In addition, we believe that our in-store merchandising capabilities will be strengthened. We also believe this transaction will position us as the distribution channel of choice for film studios, record labels, publishers and other producers of home entertainment content products. We expect to benefit from substantial cost savings in the areas of procurement, marketing, information technology and administration and from other operational efficiencies, particularly in the distribution and fulfillment functions, where we plan to consolidate some distribution operations, reorganize others and leverage our best practices across all of our distribution operations. As a result, we believe the merger will enhance our financial strength, increase our visibility in the investor community and strengthen our ability to pursue further strategic acquisitions.

**Q:**  **What am I being asked to vote on at the special meeting? (see pages 166-173)**

**A:**  Our board is asking you to vote upon the following:

1.  A proposal to approve the issuance of our common stock to Alliance stockholders in connection with the merger of Alliance with and into Alligator Acquisition, LLC, our wholly owned subsidiary, pursuant to an Agreement and Plan of Merger dated as of November 18, 2004, by and among Source Interlink, Alligator Acquisition, LLC and Alliance;

2.  A proposal to amend our articles of incorporation to effect an increase in the number of authorized shares of our common stock from 40,000,000 to 100,000,000;

3.  A proposal to effect our reincorporation from a Missouri corporation to a Delaware corporation;

4.  A proposal to grant discretionary authority to our board to adjourn or postpone the special meeting to a later date, if necessary, to solicit additional proxies if there are not sufficient votes in favor of the foregoing proposals; and

5.  Any other business as may properly come before the special meeting and any adjournment or postponement of the special meeting.

The consummation of the merger is contingent upon approval of (i) proposal one and (ii) either proposal two or proposal three. If our shareholders do not approve either proposal two or proposal three, then proposal one will not be effected, even if approved by our shareholders, and the merger will not be consummated. Additionally, if our shareholders do not approve proposal one, then proposal two will not be effected, even if approved by our shareholders; but proposal three will be effected if approved by our shareholders regardless of whether proposal one or proposal two is approved.

vii

IB 00016

**Q:** What will a shareholder receive when the merger occurs? (see page 57)

**A:** *Source Interlink Shareholders:*

Source Interlink shareholders will not receive consideration directly from the merger. After the merger, each share of our common stock and each option, warrant or other right to acquire our common stock will remain outstanding.

*Alliance Stockholders:*

• Alliance common stockholders will receive for each share of Alliance common stock they hold a number of shares of our common stock based on the "Exchange Ratio."

• The "Exchange Ratio" will be the quotient obtained by dividing (a) the aggregate number of shares of our common stock issued and outstanding (including shares issuable upon exercise of all unexpired and unexercised options, warrants or other rights to acquire our common stock) immediately prior to the effective time of the merger by (b) the aggregate number of shares of Alliance common stock issued and outstanding (including shares directly or indirectly issuable upon exercise of all unexpired and unexercised options, warrants or other rights to acquire Alliance capital stock) immediately prior to the effective time of the merger.

• Instead of fractional shares of our common stock, Alliance stockholders will receive cash in an amount equal to such fraction multiplied by the average of the closing prices reported on the Nasdaq National Market for our common stock for the ten trading days immediately preceding the effective date of the merger.

• Each option, warrant or other right to acquire Alliance capital stock outstanding immediately prior to the merger will automatically become an option, warrant or other right to acquire shares of our common stock. The number of shares of our common stock that may be acquired under such option, warrant or other right will be equal to the product of the number of Alliance shares that were directly or indirectly issuable upon the exercise of such option, warrant or other right to acquire Alliance capital stock before the merger multiplied by the Exchange Ratio. The exercise price per share for such option, warrant or other right to acquire our common stock will be the pre-merger exercise price per share for such option, warrant or other right to acquire Alliance capital stock divided by the Exchange Ratio.

**Q:** What percentage of the combined company will the Source Interlink equityholders and the Alliance equityholders own following the merger?

**A:** The equityholders of Alliance and Source Interlink immediately prior to the merger will each hold 50% of the fully diluted capitalization of the combined company immediately following the merger.

**Q:** When do you expect the merger to be completed? (See pages 69-71)

**A:** We and Alliance are working toward consummating the merger as quickly as possible. We hope to consummate the merger during the first quarter of our 2006 fiscal year promptly following the approval of the merger by our shareholders. However, the merger is subject to several conditions that could affect the timing of its consummation, including approval of the issuance of our common stock to Alliance stockholders in connection with the merger.

**Q:** Are there risks involved in undertaking the merger? (see pages 8-21)

**A:** Yes. The merger (including the possibility that the merger may not be consummated) poses a number of risks to us and our shareholders. In addition, both we and Alliance are subject to various risks associated with our respective businesses and industries, certain of which may be heightened by the merger. These risks are discussed in greater detail under the caption "Risk Factors" beginning on page 8 below We encourage you to read and consider all of these risks carefully.

**Q:** Is the merger subject to governmental approvals? (see pages 55)

**A:** Yes. This merger is subject to review by the U.S. Department of Justice and the U.S. Federal Trade Commission to determine whether it is in compliance with applicable antitrust laws. Under the provisions

IB 00017

of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, the merger may not be consummated until the specified waiting period requirements of that Act have been satisfied. The U.S. Federal Trade Commission has granted early termination of the waiting period, thereby satisfying the requirements.

**Q:    What is the proposed amendment to our articles of incorporation? (see pages 166-168)**

**A:**    The proposed amendment to our articles of incorporation is to increase the number of shares of common stock that we are authorized to issue from 40,000,000 shares to 100,000,000 shares. The additional authorized common stock will be required to complete the merger with Alliance if proposal three relating to the reincorporation is not approved. In addition, although we have no other specific plans to use the additional authorized shares of our common stock, our board believes that it is prudent to increase the number of authorized shares of common stock to the proposed level in order to provide a reserve of shares available for issuances in connection with possible future actions. Such future actions may include financings, corporate mergers, acquisitions of property, employee benefit plans and other general corporate purposes.

**Q:    What is our proposed reincorporation from a Missouri corporation to a Delaware corporation? (see pages 168-173)**

**A:**    The proposed reincorporation involves changing our state of incorporation from Missouri to Delaware. The reincorporation will be effected by merging Source Interlink into a wholly owned subsidiary, also named Source Interlink Companies, Inc., which is incorporated in Delaware. Throughout this proxy statement/ prospectus, the terms "Source Interlink Missouri" and "Source Interlink" refer to Source Interlink Companies, Inc., the existing Missouri corporation, and the term "Source Interlink Delaware" refers to the new Delaware corporation, which is the proposed successor to Source Interlink Missouri in the proposed reincorporation.

Upon the consummation of the reincorporation, Source Interlink Missouri will cease to exist as a corporate entity and Source Interlink Delaware will continue to operate our business under the name Source Interlink Companies, Inc. Each outstanding share of Source Interlink Missouri common stock, $0.01 par value, will be automatically converted into one share of Source Interlink Delaware common stock, $0.01 par value, upon the effective date of the reincorporation. Each stock certificate representing issued and outstanding shares of Source Interlink Missouri common stock will continue to represent the same number of shares of common stock of Source Interlink Delaware.

We expect to consummate the reincorporation promptly following the approval of proposal three by our shareholders.

**Q:    Why are we reincorporating as a Delaware corporation? (see pages 169-170)**

**A:**    As we plan for the future, our board and management believe it is essential to be able to draw upon well established principles of corporate governance in making legal and business decisions. The prominence and predictability of Delaware corporate law provide a reliable foundation on which our corporate governance decisions can be based, and we believe that our shareholders will benefit from the responsiveness of Delaware corporate law to their needs and to those of the corporation they own.

**Q:    What approvals of our shareholders are required for approval of the merger? (see page 33)**

**A:**    The consummation of the merger is contingent upon the approval by our shareholders of the following:

•  proposal one relating to the issuance of our common stock in connection with the merger; and

•  either (a) proposal two relating to the amendment to our articles of incorporation to effect an increase in the number of authorized shares of our common stock or (b) proposal three relating to our reincorporation from a Missouri corporation to a Delaware corporation.

The affirmative vote of the holders of a majority of the shares of our common stock entitled to vote and represented, in person or by proxy, at the special meeting is required to approve proposal one (relating to the issuance of our common stock in connection with the merger).

ix

IB 00018

The affirmative vote of the holders of a majority of the issued and outstanding shares of our common stock is required to approve proposal two (relating to the amendment to our articles of incorporation to effect an increase in the number of authorized shares of our common stock).

The affirmative vote of the holders of two-thirds of the issued and outstanding shares of our common stock is required to approve proposal three (relating to our reincorporation from a Missouri corporation to a Delaware corporation).

Q:    **Does our board support the transaction? (see pages 39-41)**

A:    Yes. After careful consideration, our board, by a unanimous vote of those directors present at a special meeting of the board held to consider the merger, recommends that our shareholders vote in favor of proposal one (relating to the issuance of our common stock in connection with the merger), proposal two (relating to the amendment to our articles of incorporation to effect an increase in the number of authorized shares of our common stock), proposal three (relating to our reincorporation from a Missouri corporation to a Delaware corporation) and proposal four (relating to the grant of discretionary authority to our board to adjourn or postpone the special meeting to a later date, if necessary).

Q:    **Are there any of our officers, directors and shareholders already committed to voting in favor of the merger? (see page 75)**

A:    Yes. Our officers and directors, who collectively hold approximately 6.2% of the outstanding shares of our common stock as of January 14, 2005, entered into voting agreements with Alliance requiring them to vote all of their shares in favor of proposals one and two.

Q:    **Are there any Alliance officers, directors and stockholders already committed to voting in favor of the merger? (see page 75)**

A:    Yes. The majority stockholder of Alliance, which holds approximately 63.8% of the voting power of Alliance as of January 14, 2005, has entered into a voting agreement with us in which it has agreed to vote in favor of the merger agreement. Therefore, there are a sufficient number of shares of Alliance capital stock committed to approve the merger agreement on behalf of the Alliance stockholders.

Q:    **What are the United States federal income tax consequences of the merger? (see pages 52-53)**

A:    It is a condition to the merger that both Source Interlink and Alliance receive legal opinions to the effect that the merger will constitute a "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended. Assuming that the merger so qualifies, Source Interlink shareholders and Alliance stockholders generally will not recognize gain or loss for United States federal income tax purposes as a result of the merger, except for gain or loss attributable to cash received by Alliance stockholders in lieu of fractional shares.

The tax consequences of the merger to you will depend upon your own situation. You should consult your tax advisors for a full understanding of these tax consequences.

Q:    **What is the spin-off of Alliance's DMISG business units? (see pages 54-55)**

A:    In addition to its core distribution and fulfillment business, Alliance operated two other strategic business units collectively referred to as the Digital Media Infrastructure Services Group, or the DMISG. One business developed and marketed e-commerce enabling databases for home entertainment products, while the other offered kiosk-based retail merchandising solutions. These businesses represented approximately 1.4% and 2.0% of Alliance's consolidated sales for the year ended December 31, 2003 and the nine month period ended September 30, 2004, respectively.

On December 31, 2004, Alliance disposed of all of the operations conducted by the DMISG business lines through a spin-off to its existing stockholders. The name of the entity now conducting the DMISG business lines is Digital On-Demand, Inc., or Spinco. Following the spin-off, Alliance will provide limited transition services to Spinco for a period of no more than six months. Thereafter, Alliance will have no continuing involvement in the day to day management and operation of Spinco. Since the date of the

x

IB 00019

spin-off, Spinco has not had any continuing involvement in the management and operation of Alliance's core distribution and fulfillment business.

**Q:**   **What are the business consequences of such spin-off? (see pages 54-55)**

**A:**   As a result of the spin-off, the assets comprising the DMISG business including its intellectual properties and know-how will not become assets of the combined company, and the combined company will not recognize any capital appreciation related to the value of these assets. Alliance entered into several agreements with Spinco relating to their continuing commercial relationship. These agreements provide Alliance and its subsidiaries, among other things, with certain rights for a limited time to use Spinco's databases in connection with Alliance's core distribution and fulfillment business and to promote DMISG's retail merchandising systems. The combined company will obtain Alliance's rights under these agreements in connection with the merger. Following the expiration or earlier termination of the licensing and co-marketing agreements, Spinco's assets may not be available to mitigate the risks to Alliance or, after the merger, the combined company posed by increasing acceptance of digital distribution of home entertainment content products.

**Q:**   **What do I need to do now? (see pages 33-34)**

**A:**   First, carefully read and consider the information contained in this proxy statement/ prospectus. There are several ways your shares can be represented at our shareholder meeting if you are unable to attend the meeting in person. You can indicate on the enclosed proxy card how you want to vote and then date, sign and mail the proxy card in the enclosed return envelope as soon as possible. You can also cast your vote by telephone by calling the number on your proxy card or over the Internet by going to the web site designated on your proxy card.

Your vote is important regardless of the number of shares that you own.

**Q:**   **Why is my vote important? (see pages 33-34)**

**A:**   If you do not submit a proxy or vote in person at the special meeting, it will have no effect on the vote of proposal one (relating to the issuance of shares of our common stock in connection with the merger) or proposal four (relating to the grant of discretionary authority to our board to adjourn or postpone the special meeting to a later date, if necessary), assuming the presence of a quorum, but will have the same effect as a vote against proposal two (relating to the amendment to our articles of incorporation to effect an increase in the number of authorized shares of our common stock) and proposal three (relating to our reincorporation from a Missouri corporation to a Delaware corporation).

If you submit a proxy and affirmatively elect to abstain from voting, your proxy will be counted as present for purposes of determining the presence of a quorum and will have the same effect as a vote against each of proposals one, two, three and four to be voted on at the special meeting. To consummate the merger, our shareholders must approve (i) proposal one and (ii) either proposal two or proposal three.

**Q:**   **If my broker holds my shares in "street name," will my broker vote my shares? (see pages 33-34)**

**A:**   Your broker will not vote your shares unless you follow the directions your broker provides to you regarding how to vote your shares. If you fail to provide your broker with instructions, it will have no effect in determining the number of votes for or against proposal one (relating to the issuance of shares of our common stock in connection with the merger) or proposal four (relating to the grant of discretionary authority to our board to adjourn or postpone the special meeting to a later date, if necessary) but will have the same effect as a vote against proposal two (relating to the amendment to our articles of incorporation to effect an increase in the number of authorized shares of our common stock) and proposal three (relating to our reincorporation from a Missouri corporation to a Delaware corporation). You should therefore be sure to provide your broker with instructions on how to vote your shares. Please check the voting form used by your broker to see if it offers telephone or Internet submission of proxies.

IB 00020

**Q:**  Can I change my vote after I have mailed my proxy card? (see page 34)

**A:**  Yes. Shareholders who hold shares in their own name can change their vote at any time before their proxy is voted at our special meeting. You can do this by using any of the following methods:

  • timely delivery by mail, telephone or the Internet of a valid, subsequently-dated proxy;

  • delivery to our secretary before or at the special meeting of written notice revoking your proxy or of your intention to vote by ballot at the special meeting; or

  • submitting a vote by ballot at the special meeting.

  If you have instructed a broker to vote your shares, you must follow your broker's directions in order to change those instructions.

**Q:**  When and where is the special meeting? (see page 32)

**A:**  Our special meeting will take place on February 28, 2005, at our offices located at 27500 Riverview Center Boulevard, Suite 400, Bonita Springs, Florida, at 10:00 a.m., local time.

**Q:**  Should stockholders send in their stock certificates now? (see page 58)

**A:**  No. After the merger is completed, we will send Alliance stockholders written instructions for exchanging their stock certificates. Alliance stockholders should not submit their Alliance stock certificates for exchange until they receive written instructions and other documentation from the exchange agent. Source Interlink shareholders do not need to exchange their existing stock certificates in connection with the merger and may keep their existing stock certificates.

  If our reincorporation from a Missouri corporation to a Delaware corporation is approved, it will not be necessary for our shareholders to exchange their existing stock certificates for stock certificates of Source Interlink Delaware. However, shareholders may exchange their certificates if they so choose. Source Interlink and Alliance shareholders may consult their brokers or our company with respect to any question regarding the mechanics of obtaining new stock certificates.

**Q:**  Whom do I contact if I have questions about the special meeting or the merger?

**A:**  If you have any questions about the special meeting, the merger, the effect of the merger on the holders of our common stock or the reincorporation or if you need additional copies of this proxy statement/ prospectus or the enclosed proxy, you should contact:

**Source Interlink Companies, Inc.**
**27500 Riverview Center Boulevard, Suite 400**
**Bonita Springs, FL 34134**
**Attention: General Counsel**
**(239) 949-4450**

You may also obtain additional information about us from documents filed with the Securities and Exchange Commission by following the instructions in the section entitled "Where You Can Find More Information" on page 174.

xii

---

IB 00021

# SUMMARY

*This summary highlights selected information from this proxy statement/ prospectus that we believe is important to you. This summary may not contain all of the information that is important to you, and we encourage you to read this proxy statement/ prospectus in its entirety. The information contained in this summary is qualified in its entirety by, and should be read in conjunction with, the detailed information and financial statements, including the notes thereto, appearing elsewhere in this proxy statement/ prospectus and the documents incorporated into this proxy statement/ prospectus by reference. See "Where You Can Find More Information" on page 174. We have included references to other portions of this proxy statement/ prospectus to direct you to a more complete description of the topics presented in this summary.*

*This summary and the balance of this document contain forward-looking statements about events that are not certain to occur, and you should not place undue reliance on those statements. Please carefully read "Cautionary Statement Concerning Forward-Looking Statements" on page 7 of this document.*

*Alliance Entertainment Corp. historically operated two strategic business units: the core Distribution & Fulfillment Services Group, Inc., or the DFSG; and the Digital Media Infrastructure Services Group, or the DMISG. On December 31, 2004, the DMISG was spun-off to Alliance's stockholders. The name of the spun-off company comprising the DMISG business is Digital On-Demand, Inc., or Spinco. In this proxy statement/ prospectus, the term "Alliance" refers only to DFSG, unless otherwise indicated. Except as otherwise indicated, the financial statements included herein present the financial position of Alliance Entertainment Corp. on a consolidated basis, including the financial positions of both the DFSG and the DMISG, without giving effect to the spin-off. In the proxy statement/ prospectus, references to "we," "us," "our," and "ours" refer to Source Interlink and its wholly owned subsidiaries, including Alligator Acquisition, LLC, prior to the merger.*

*This proxy statement/ prospectus contains trademarks, trade names, service marks, and service names of Source Interlink, Alliance and other companies.*

## The Companies

**Source Interlink Companies, Inc.** (see page 94)
**Alligator Acquisition, LLC**
27500 Riverview Center Blvd., Suite 400
Bonita Springs, Florida 34134
(239) 949-4450

We provide information, fulfillment and/or marketing services to retailers, which operate collectively more than 80,000 stores, most major magazine publishers and consumer product manufacturers of confections and general merchandise. We are the largest direct-to-retail magazine distributor in the United States with more than 10,000 bookstores, music stores and other specialty retail outlets, such as Barnes & Noble, Inc., Borders Group, Inc., Musicland Stores Corporation and Virgin Records America, Inc. We refer to these types of customers as the "specialty retail market." Additionally, we are a leading provider in the United States of design, manufacture and management services to the front-end of supermarkets, discount stores, drug stores, convenience stores, terminals and newsstands, such as Food Lion, LLC, Kroger Company, Target Corporation, Walgreen Company and Winn-Dixie Stores, Inc. We refer to these types of customers as the "mainstream retail market."

Our business model is designed to provide a complete array of products and value-added services to retailers in both the specialty and mainstream retail markets. These services include product fulfillment for retailers, publisher rebate and other incentive payment collection, fixture design and manufacturing, information technology and other management services. Our extensive relationships with retailers, as well as publishers and other vendors, throughout the United States and Canada, have enabled us to build a reputation for reliable and timely service and an efficient fulfillment infrastructure to service these markets. We believe that by acting as an outsource coordinator of all these services we are well positioned to continue our growth by attracting new customers, both in the United States and internationally, and by providing additional products and services to our extensive customer base.

1

IB 00022

Alligator Acquisition, LLC is a Delaware limited liability company and our wholly owned subsidiary. Alligator Acquisition, LLC was organized for the purpose of entering into the merger agreement with Alliance. It has not conducted any business operations. If the merger is completed, Alliance will cease to exist following the merger of it with and into Alligator Acquisition, LLC.

**Alliance Entertainment Corp.** (see page 124)
4250 Coral Ridge Drive
Coral Springs, Florida 33065
(954) 255-4000

Alliance provides logistics and supply chain management services for the home entertainment product market. Specifically, Alliance offers just-in-time product distribution and fulfillment, category management, consumer direct fulfillment (CDF) and third-party logistics services. Alliance utilizes advanced technology and industry and marketplace expertise to deliver innovative and value-added solutions to its customers and trading partners. Its well established logistics infrastructure allows it to manage a catalogue of over 400,000 stock keeping units of home entertainment content products, including CDs, DVDs, video games and related products and accessories. Alliance's customers include specialty and independent retailers, mass merchandisers, supermarkets and e-commerce retailers. In total, Alliance provides services to more than 5,000 accounts with over 30,000 retail store locations including: Barnes & Noble, Inc., Trans World Entertainment Corp., The Musicland Group, Inc., Fry's Electronics, Inc., Circuit City Stores, Inc., BJ's Wholesale Club, Inc., Toys "R" Us, Inc., Sears, Roebuck and Co. and thousands of independent retailers. Alliance's e-commerce customers include: barnesandnoble.com, aol.com, amazon.com, circuitcity.com, bestbuy.com, and QVC.com.

Prior to the spin-off described below, in addition to its core logistics and supply chain management business, Alliance operated two other business units collectively referred to as the Digital Media Infrastructure Services Group, or the DMISG. The DMISG consists of two separate businesses: one business develops and markets e-commerce enabling databases for home entertainment products, while the other offers kiosk-based retail merchandising solutions. The DMISG was spun-off to the stockholders of Alliance as of December 31, 2004. The DMISG will not be included in the merger.

*Reasons for the Merger* (see pages 39-41)

Our management proposed this merger to further our objective of creating the premier provider of information, supply chain management and logistics services to retailers and producers of home entertainment content products and to produce greater shareholder value than would be achieved absent the merger. We believe that the merger provides significant market opportunities to take advantage of our strong retailer relationships and experience in marketing our products by expanding product offerings beyond our existing magazine fulfillment business to DVDs, CDs, video games and related home entertainment products and accessories. In addition, we believe that our in-store merchandising capabilities will be strengthened. We also believe this transaction will position us as the distribution channel of choice for film studios, record labels, publishers and other producers of home entertainment content products. We expect to benefit from substantial cost savings in the areas of procurement, marketing, information technology and administration and from other operational efficiencies, particularly in the distribution and fulfillment functions, where we plan to consolidate some distribution operations, reorganize others and leverage our best practices across all of our distribution operations. As a result, we believe the merger will enhance our financial strength, increase our visibility in the investor community and strengthen our ability to pursue further strategic acquisitions.

**Board of Directors and Management Following the Merger** (see pages 50 and 87)

Upon the consummation of the merger, Alan Tuchman, President and Chief Operating Officer of Alliance, is expected to join our existing executive management team. The executive management team following the consummation of the merger is expected to include:

• S. Leslie Flegel as Chairman and Chief Executive Officer;

• James R. Gillis as President and Chief Operating Officer;

2

IB 00023

- Jason S. Flegel as Executive Vice President;

- Alan Tuchman as Executive Vice President;

- John A. Amann as Executive Vice President; and

- Marc Fierman as Chief Financial Officer.

We and Alliance have agreed that, immediately after the consummation of the merger, the combined company's board will consist of eleven directors, including six members designated by us (who are expected to be S. Leslie Flegel, James R. Gillis, A. Clinton Allen, Ariel Emanuel, Allan R. Lyons and Aron S. Katzman), and five members designated by Alliance. Alliance has not yet designated any individuals to serve on the board. Six of the directors will be "independent" under the rules of the SEC and NASD with respect to the combined company.

The combined company's bylaws will provide that the board will be divided into three classes of directors, with the classes to be as nearly equal in number as possible. One class of directors will be elected each year at our annual meeting to serve for a three-year term. Three of the directors designated by Alliance will serve in the class of directors whose term expires at the 2005 annual meeting. Three of the directors designated by us, and one of the directors designated by Alliance will serve in the class of directors whose term expires at our 2006 annual meeting. The remaining three directors designated by us, and the remaining director designated by Alliance, will serve in the class of directors whose term expires at the 2007 annual meeting. Pursuant to a stockholders agreement, AEC Associates, L.L.C., Alliance's majority stockholder, will designate three individuals for election at our 2005 annual meeting.

**Recommendations to Source Interlink Shareholders** ( see pages 166-173)

Our board believes that the merger is advisable, fair to, and in the best interests of, our shareholders and recommends that our shareholders vote **FOR** the following proposals:

- The issuance of our common stock to Alliance stockholders in connection with the merger of Alliance with and into Alligator Acquisition, LLC, our wholly owned subsidiary, pursuant to an Agreement and Plan of Merger dated as of November 18, 2004, by and among Source Interlink, Alligator Acquisition, LLC and Alliance;

- The amendment of our articles of incorporation to effect an increase in the number of authorized shares of our common stock from 40,000,000 to 100,000,000;

- Our reincorporation from a Missouri corporation to a Delaware corporation; and

- The grant of discretionary authority to our board to adjourn or postpone the special meeting to a later date, if necessary, to solicit additional proxies if there are not sufficient votes in favor of the foregoing proposals.

The consummation of the merger is contingent upon approval of (i) proposal one and (ii) either proposal two or proposal three. If our shareholders do not approve either proposal two or proposal three, then proposal one will not be effected, even if approved by our shareholders, and the merger will not be consummated. Additionally, if our shareholders do not approve proposal one, then proposal two will not be effected, even if approved by our shareholders; but proposal three will be effected if approved by our shareholders regardless of whether proposal one or proposal two is approved.

**Opinion of Source Interlink's Financial Advisor** (see pages 42-50)

On November 18, 2004, Jefferies & Company, Inc., financial advisor to our company, rendered to our board its oral opinion, subsequently confirmed by delivery of a written opinion dated November 18, 2004, that, as of such date and based upon and subject to the factors and assumptions set forth in the opinion and based upon such other matters as Jefferies discussed with the board, the exchange ratio in the merger is fair to our company from a financial point of view. **The full text of Jefferies' written opinion is included as** *Annex B* **to this proxy statement/ prospectus. We encourage you to read carefully this opinion in its entirety and the**

3                                                IB 00024

description on pages 42-50 for a description of the procedures followed, assumptions made, matters considered and limitations on the review undertaken. Jefferies provided its opinion for the use and benefit of our board and Jefferies' opinion does not constitute a recommendation as to how any shareholder should vote on the merger or any matter related thereto.

## Record Date for Voting; Shareholder Vote Required (see pages 32-33)

Each holder of record as of January 14, 2005, of our common stock is entitled to cast one vote per share.

The affirmative vote of the holders of a majority of the shares of our common stock entitled to vote and represented, in person or by proxy, at the special meeting is required to approve proposal one (relating to the issuance of our common stock in connection with the merger).

The affirmative vote of the holders of a majority of the issued and outstanding shares of our common stock is required to approve proposal two (relating to the amendment to our articles of incorporation to effect an increase in number of authorized shares of our common stock).

The affirmative vote of the holders of two-thirds of the issued and outstanding shares of our common stock is required to approve proposal three (relating to our reincorporation from a Missouri corporation to a Delaware corporation).

The affirmative vote of the holders of a majority of the shares of our common stock entitled to vote and represented, in person or by proxy, at the special meeting is required to approve proposal four (relating to the grant of discretionary authority to our board to adjourn or postpone the special meeting to a later date, if necessary).

## Conditions to the Consummation of the Merger (see pages 69-71)

The obligations of Alliance and Source Interlink to consummate the merger are subject to the satisfaction or waiver of conditions including, but not limited to, the following:

- the approval of the merger and merger agreement by Alliance's stockholders and our shareholders;

- all waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, will have expired or terminated early and all other material antitrust approvals will have been obtained, which condition has been satisfied;

- the amendment of our articles of incorporation to increase the authorized shares of our common stock or the consummation of our reincorporation from a Missouri corporation to a Delaware corporation;

- Alliance obtaining the consent of its primary lender or the establishment of alternative financing arrangements for the combined company; and

- the consummation of the spin-off of the DMISG, which condition has been satisfied.

## Material U.S. Federal Income Tax Consequences of the Merger (see pages 51-53)

It is a condition to the consummation of the merger that we receive a written opinion from Wilson Sonsini Goodrich & Rosati, Professional Corporation, and Alliance receive a written opinion from Munger, Tolles & Olson LLP, in each case dated as of the effective date of the merger, to the effect that the merger will qualify as a "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code. In the event that counsel to either party does not deliver its tax opinion, the closing condition will nevertheless be satisfied if counsel to the other party delivers its opinion to the effect that the merger will qualify as a "reorganization." Neither we nor Alliance intend to waive this closing condition; however, in the event that either we or Alliance waive receipt of such written opinion, we will file a new proxy statement/ prospectus that includes disclosure describing the tax consequences of the merger and requesting the approval of the merger by our shareholders.

IB 00025

Assuming the merger qualifies as a "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code, holders of Alliance common stock whose shares are exchanged in the merger for shares of our common stock generally will not recognize gain or loss for U.S. federal income tax purposes as a result of the merger, except to the extent of cash received in lieu of a fractional share of our common stock.

The discussion of material U.S. federal income tax consequences of the merger contained in this proxy statement/ prospectus is a general summary and is not a complete analysis or description of all potential U.S. federal income tax consequences of the merger. The discussion does not address tax consequences that may vary with, or are contingent on, individual circumstances. In addition, it does not address any foreign, state or local taxes. We strongly urge each holder of Alliance capital stock to consult his or her tax advisor to determine the particular U.S. federal, state, local or foreign income or other tax consequences of the merger to such stockholder.

### Dissenters' or Appraisal Rights (see page 165)

Under Missouri law, our shareholders will not have dissenters' rights of appraisal in connection with the issuance of shares of our common stock in the merger. If our reincorporation from a Missouri corporation to a Delaware corporation were to occur prior to the merger, under Delaware law, our stockholders also would not have appraisal rights.

Under Delaware law, Alliance stockholders are entitled to appraisal rights in connection with the proposed merger. Appraisal rights entitle Alliance stockholders who submit a proper written demand for appraisal to Alliance, who do not otherwise vote in favor of the merger and who meet certain other conditions, to receive a valuation of their shares and a payment of that value in cash in lieu of the consideration called for by the merger agreement. Failure by a dissenting stockholder to follow the steps required by law for perfecting appraisal rights may lead to the loss of those rights, in which case such dissenting stockholder will be treated in the same manner as a non-dissenting shareholder.

Pursuant to the terms of the merger agreement, we will be released from our obligation to consummate the merger if the shares of Alliance common stock held by stockholders who have exercised and perfected appraisal rights exceed 5% of the outstanding shares of Alliance common stock.

### Interests of Certain Persons in the Merger (see pages 50-51)

When our shareholders consider the recommendations of our board that such shareholders vote in favor of the proposals presented at the special meeting, they should be aware that certain directors, executive officers and affiliates of Source Interlink and Alliance have interests in the merger that may be different from, or in addition to, your interests. In particular, all executive officers have interests in the combined company as employees in terms of job responsibilities, working environment and compensation which are in addition to and different from their interests as shareholders. All continuing directors will have the responsibility of being directors of a larger company after the merger. Additional interests include the following:

- Messrs. S. Leslie Flegel, James R. Gillis, Jason S. Flegel and Marc Fierman are expected to enter into employment agreements and receive cash signing bonuses, conditioned by and effective upon the consummation of the merger.

- Ariel Emanuel, one of our directors, will be paid $1.5 million upon consummation of the merger as compensation for consulting services provided to us in connection with the merger. Mr. Emanuel was not a director at the time we entered into this arrangement with him nor when the board approved the merger.

- Indemnification provided to the present and former executives and directors of Alliance.

- In connection with the merger, Alan Tuchman, a director of Alliance and its President and Chief Operating Officer, is expected to become one of our Executive Vice Presidents.

- Two directors of Alliance are partners of The Yucaipa Companies, LLC, an entity affiliated with AEC Associates, L.L.C., Alliance's majority stockholder. Yucaipa will receive a fee of approximately

5

IB 00026

http://yahoo.brand.edgar-online.com/EFX dll/EDGARpro.dll?FetchFilingHTML1?SessionID=DbxMIg...   10/24/200:

$4.0 million in connection with the merger pursuant to an existing management services agreement with Alliance. Yucaipa will also enter into a new consulting agreement with Source Interlink.

• AEC Associates will enter into a stockholder's agreement with Source Interlink addressing certain governance and other matters.

• AEC Associates is the majority stockholder of Spinco. In connection with the spin-off, Alliance and Spinco have entered into a number of agreements including a distribution and separation agreement, licensing and co-marketing agreement, transition/ shared services agreement and tax-sharing and indemnification agreement. The combined company will assume the rights and obligations of Alliance under these contracts upon consummation of the merger. For a description of these contracts, see "Agreements Related to the Merger and Other Transactions — Agreements between Alliance and Spinco" beginning on page 77.

As of January 14, 2005, the percentage of outstanding voting shares held by our directors, executive officers and their affiliates, in the aggregate, is 6.2%.

### Restrictions on Alternative Transactions (see pages 66-68)

The merger agreement contains restrictions on the ability of each of Alliance and Source Interlink and their representatives and related parties to solicit or engage in discussions or negotiations with a third party with respect to a proposal to acquire a significant interest in the applicable company. Notwithstanding these restrictions, the merger agreement provides that under specified circumstances, if either party receives an acquisition proposal from a third party that is a superior proposal, as defined in the merger agreement, such party may engage in negotiations regarding the superior proposal with that third party.

### Anticipated Accounting Treatment of the Merger (see pages 53-54)

We will account for the merger under the purchase method of accounting for business combinations under accounting principles generally accepted in the United States, which means that the assets and liabilities of Alliance will be recorded, as of the completion of the merger, at their fair values and added to those of our company.

### Trading of Source Interlink Common Stock (see page 30)

Our common stock is currently traded on the Nasdaq National Market under the symbol "SORC." We intend to apply for inclusion on the Nasdaq National Market of the shares of our common stock to be issued in connection with the merger. Nasdaq's approval of this application is a condition to the consummation of the merger.

IB 00027

## CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS

This proxy statement/ prospectus and the other documents incorporated by reference into this proxy statement/ prospectus contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Statements in this proxy statement/ prospectus and the other documents incorporated into this proxy statement/ prospectus by reference that are not historical facts are identified as "forward-looking statements" for the purpose of the safe harbor provided by Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act, and Section 27A of the Securities Act of 1933, as amended, or the Securities Act. Forward-looking statements include projections, assumptions or information concerning possible or assumed future actions, events or results of operations of Source Interlink, Alliance or the combined company. These statements involve estimates and assumptions based on the judgment of each company's management. A number of risks and uncertainties may cause actual results to differ materially from those suggested by the forward-looking statements. Forward-looking statements include the information in this proxy statement/ prospectus and the other documents incorporated by reference into this proxy statement/ prospectus regarding:

• Our forecasts, plans and growth strategy;

• Market acceptance and continuing demand for magazines, DVDs, CDs and other home entertainment content products;

• Market conditions and opportunities;

• Operating efficiencies, cost savings and other benefits and opportunities that may result from the integration of Alliance and Source Interlink;

• The impact of competition and competitive products;

• The amount and accounting treatment of costs and expenses related to the merger and subsequent integration of these businesses; and

• Retention of key management and employees.

These statements may be preceded by, followed by or include the words "believes," "expects," "anticipates," "intends," "plans," "estimates" or similar expressions. We claim the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995 for all forward-looking statements. We do not undertake any obligation to publicly update any forward-looking statements to reflect subsequent events or circumstances.

7

IB 00028

*In addition to the other information included in this proxy statement/prospectus, including the matters addressed in "Cautionary Statemen Concerning Forward-Looking Statements," you should consider carefully the following risks before voting at the special meeting. The merger involves a high degree of risk for Source Interlink and Alliance. You should read and consider the risks and uncertainties associated with each of the businesses of Source Interlink and Alliance because these risks will also affect the combined company after the merger. In addition, we believe that there are risks and uncertainties that may not presently known to Source Interlink and Alliance, or that currently are not believed to be important to Source Interlink and Alliance, which may also adversely affect the merger and the combined company after the merger.*

### Risks Relating to the Merger

**Following the merger, the combined company will have a significant shareholder whose interests may conflict with yours.**

Upon the consummation of the merger, the combined company's largest shareholder, AEC Associates, L.L.C. will beneficially own approximately 35.3% of the combined company's outstanding voting power. AEC Associates will also have the right to designate three nominees for election to the eleven member board of the combined company which it is expected to exercise for our 2005 annual meeting. In addition, for as long as AEC Associates (together with its members and affiliates acting as a group) owns an aggregate of at least 10% of the combined company's outstanding common stock, AEC Associates will have certain additional director designation rights as further described in the risk factor entitled "We have limitations on changes of control that could reduce your ability to sell our shares at a premium." For example, for actions that require a supermajority of the board, such as a change of control, AEC Associates designated directors may effectively have enough votes to prevent any such action from being taken by the combined company. As a result, AEC Associates will have the ability through its ownership of the combined company's common stock and its representation on the board to exercise significant influenc over the combined company's major decisions and over all matters requiring shareholder approval. AEC Associates may have interests that differ from those of other shareholders of the combined company.

**The combined company may not realize some of the expected benefits of the merger.**

We believe that the merger provides significant market opportunities to take advantage of the customer bases and distribution channels of the formerly separate businesses in order to promote and sell the products and services of one company to the existing customers and business partners of the other company. However, the combined company may be unable to take advantage of these cross-selling opportunities and othe revenue synergies for several reasons. Difficulties in integrating the two companies could result in disruption of customer services, which coul cause existing customers to reduce or cease doing business with the combined company altogether. Moreover, the salespersons of one compan may not be successful in marketing the products and services of the other company or the existing customers and business partners of either company may not be receptive to the products and services of the other.

We also expect the combined company to benefit from substantial cost savings in the areas of procurement, marketing, information technology and administration and from other operational efficiencies. The combined company may not realize these savings within the time periods contemplated, or at all. If the benefits of the merger do not exceed the associated costs, or if costs related to the merger exceed estimates, the combined company's business and financial results could be materially harmed.

8

IB 00029

The combined company may be unable to integrate the operations of Scale and Alliance successfully.

The merger involves the integration of two companies that previously have operated independently, which is a complex, costly and time-consuming process. The difficulties of combining the companies' operations include, among other things:

• the necessity of coordinating geographically disparate organizations, systems and facilities;

• integrating personnel with diverse business backgrounds;

• consolidating corporate and administrative functions;

• limiting the diversion of management resources necessary to facilitate the integration;

• implementing compatible information and communication systems, as well as common operating procedures;

• creating compatible financial controls and comparable human resources practices;

• coordinating sales and marketing functions;

• maintaining customer care services and retaining key customers;

• retaining key management and employees; and

• preserving the collaboration, distribution, marketing, promotion and other important relationships of each company.

The process of integrating operations could cause an interruption of, or loss of momentum in, the activities of the combined company's business and the loss of key personnel. The diversion of management's attention, any delays or difficulties encountered in connection with the merger and the integration of the two companies' operations or the costs associated with these activities could harm the business, results of operations, financial condition or prospects of the combined company after the merger.

**Source Interlink and Alliance expect to incur significant costs associated with the merger, and if the merger is consummated these costs will be paid by the combined company.**

We estimate that we will incur direct transaction costs of approximately $3.9 million associated with the merger, which will be included as a part of the total purchase cost for accounting purposes. In addition, Alliance estimates that it will incur direct transaction costs of approximately $6.4 million that will be expensed as incurred. The actual transaction costs may be higher than these estimates. If the merger is consummated, the combined company will be responsible for any unpaid transaction costs of both companies. We and Alliance believe the combined company may incur charges to operations, which we cannot currently reasonably estimate, in the quarter in which the merger is consummated or in subsequent quarters to reflect costs associated with integrating the two companies. There can be no assurance that the combined company will not incur additional merger costs in subsequent periods that may have a material adverse effect on the combined company's financial position, results of operations or liquidity.

**The value of our common stock to be issued to Alliance stockholders in the merger will fluctuate prior to the consummation of the merger.**

The total number of shares of our common stock to be issued or reserved for issuance in the merger for the shares of Alliance capital stock is equal to the number of shares of our common stock issued and outstanding and shares issuable upon the exercise of all unexpired and unexercised options, warrants or other rights to acquire our common stock immediately prior to the consummation of the merger. The exchange ratio will not be adjusted for changes in the market price of our common stock. As a result, the relative dollar value of our common stock that Alliance stockholders will receive and that our shareholders will retain upon the consummation of the merger will depend on the market value of our common stock when the merger is consummated, and may increase or decrease from the date you submit your proxy or the time of our

9

IB 00030

shareholders meeting. The market price of our common stock is subject to the general price fluctuations in the market for publicly traded equity securities and has recently experienced significant volatility. We cannot predict or give you any assurances as to the market price of our common stock at any time before or after the consummation of the merger, and therefore, cannot value with any degree of certainty the consideration that will be paid in the merger.

Our shareholders are urged to obtain current market quotations for our common stock before voting their shares at the special meeting.

**The market price of our common stock may decline as a result of the merger.**

The market price of our common stock may decline as a result of the merger for a number of reasons, including if:

• the integration of our company and Alliance is not completed in a timely and efficient manner;

• the costs associated with the merger or the integration of our company and Alliance are higher than anticipated;

• the combined company does not achieve the perceived benefits of the merger as rapidly or to the extent anticipated by financial or industry analysts or investors; or

• the effect of the merger on the combined company's financial results is not consistent with the expectations of financial or industry analysts or investors.

**Failure to consummate the merger could negatively impact the future business and operations of each company and the market price of our common stock.**

If the merger is not consummated for any reason, our company and Alliance will be subject to a number of material risks, including:

• under the circumstances described in the merger agreement, we could be required to pay Alliance a termination fee in the amount of up to $5.0 million;

• the market price of our common stock may decline to the extent that the current market price reflects a market assumption that the merger will be consummated;

• each company's costs related to the merger, such as legal and accounting fees and a portion of the investment banking fees, must be paid by that company even if the merger is not consummated and certain of these would be expensed in the fiscal quarter in which the transaction was terminated;

• the benefits that each company expects to realize from the merger would not be realized; and

• the diversion of management attention from the day-to-day businesses of our company and Alliance, the scaling back of marketing and capital spending and the unavoidable disruption to each company's employees and each company's relationships with customers and suppliers during the period before the consummation of the merger may make it difficult for each company to regain its financial and market positions if the merger does not occur.

**Certain of our officers and directors have conflicts of interest that may influence them to support or approve the merger.**

Certain of our executive officers and directors have interests in the merger that may be different from, or in addition to, the interests of our shareholders generally. Additional interests include the following:

• In connection with the merger, Messrs. S. Leslie Flegel, James R. Gillis, Jason S. Flegel and Marc Fierman are expected to enter into employment agreements and receive cash signing bonuses, conditioned by and effective upon the consummation of the merger; and

10

IB 00031

- Ariel Emanuel, one of our directors, will be paid $1.5 million upon the consummation of the merger as compensation for consulting services provided to us in connection with the merger. Mr. Emanuel was not a director at the time we entered into this arrangement with him nor when the board approved the merger.

As a result of these interests, our directors and executive officers are or may have been more likely to vote to approve or recommend the approval of the merger agreement and the merger than if they did not have these interests. Our shareholders should consider whether these interests may have influenced these directors and executive officers to support or recommend the merger. You may read more about these interests as described under "The Merger — Interests of Source Interlink Directors, Officers and Affiliates in the Transaction" on page 50.

**There may be sales of a large number of shares of our common stock after the merger that could cause our stock price to fall.**

A large number of shares of our common stock may be sold into the public market within short periods of time at various dates following the closing of the merger. As a result, our stock price could fall. Of the approximately 26.7 million shares of our common stock to be issued in connection with the merger, approximately 18.8% of such shares will be immediately available for resale by former stockholders of Alliance and approximately 81.2% of such shares will be subject to "lock-up agreements" that restrict the timing of the resale of these shares. Under the lock-up agreements, shares will be released and available for sale in the public market as follows:

- up to 33 1/3% of the shares subject to lock-up agreements may be sold in the public market three months after the closing date of the merger;

- up to a further 33 1/3% of the shares subject to lock-up agreements may be sold in the public market six months after the closing date of the merger; and

- the remaining shares subject to lock-up agreements may be sold in the public market nine months after the closing date of the merger.

Any disposition of our common stock by former Alliance stockholders will also be subject to compliance with the Securities Act, including Rules 144 and 145 thereunder. While Rule 145 under the Securities Act may impose some limitations on the number of shares certain Alliance stockholders may sell, including AEC Associates, sales of a large number of newly released shares of our common stock could occur and that could result in a sharp decline in our stock price. In addition, the sale of these shares could impair the combined company's ability to raise capital through the sale of additional stock. See the sections entitled "Agreements Related to the Merger and Other Transactions — Stockholder's Agreement" beginning on page 75.

**During the pendency of the merger, we may not be able to enter into a merger or business combination with another party at a favorable price because of restrictions in the merger agreement.**

Covenants in the merger agreement may impede the ability of each of our company and Alliance to make acquisitions or complete other transactions that are not in the ordinary course of business but that could be favorable to them and their respective shareholders pending consummation of the merger. Any such transactions will require the consent of the other party. As a result, if the merger is not consummated, we may be at a disadvantage to our competitors. In addition, while the merger agreement is in effect and subject to very narrowly defined exceptions, we and Alliance are prohibited from soliciting, initiating, encouraging or entering into certain extraordinary transactions, such as a merger, sale of assets or other business combination outside the ordinary course of business, with any third party.

11

IB 00032

*In addition to certain risks described above that relate to the merger, the combined company, and Source Interlink and Alliance, individually, are subject to the following risks that could adversely affect the combined company.*

**We and Alliance have concentrated customer bases, which may increase as a result of the merger, and the combined company's revenues could be adversely affected if it loses any of its largest customers or if these customers are unable to pay amounts due to the combined company.**

A significant percentage of the sales of both companies are derived from a limited number of customers. In particular, for the year ended January 31, 2004, Barnes & Noble, Inc. and Borders Group, Inc. accounted for approximately 26.8% and 23.8% of our total revenues, respectively. For the nine month period ended October 31, 2004, Barnes & Noble, Inc. and Borders Group, Inc. accounted for approximately 24.1% and 22.8% of our total revenues, respectively.

Alliance also has a significant concentration of revenues from its largest customers. In particular, for the year ended December 31, 2003 and the nine month period ended September 30, 2004, Barnes & Noble, Inc. accounted for approximately 33.8% and 33.5% of Alliance's total net revenues, respectively. We believe that following the merger the combined company's customer base may become even more highly concentrated as sales to Barnes & Noble, Inc. increase as a percentage of the combined company's total revenues. On a pro forma basis, sales to Barnes & Noble, Inc. would have represented approximately 32.3% and 31.2% of the combined company's total revenues for the year ended January 31, 2004 and the nine month period ended October 31, 2004, respectively.

As a result of this customer concentration, the combined company will be highly dependent on a small number of customers for a substantial portion of its revenues. If any of these customers were to terminate their relationship with us, significantly reduce their purchases from us or experience problems in paying amounts due to us, it would result in a material reduction in the combined company's revenues and operating profits.

**The combined company will depend on access to credit.**

The combined company will have significant working capital requirements principally to finance inventory and accounts receivables. We are currently a party to a revolving credit facility and term loan with Wells Fargo Foothill, Inc., and Alliance is a party to a revolving credit facility with General Electric Capital Corporation. In addition, both companies are extended trade credit by their suppliers. Under the terms of their credit facilities, both companies are required to obtain the consent of their respective lenders to the merger. Additionally, as a condition to each parties' obligation to consummate the merger, either Alliance must obtain the consent of General Electric Capital Corporation to the merger or the parties must arrange for alternative financing with another lender on substantially similar terms as those currently in place with General Electric Capital Corporation. Alliance may not be able to obtain the consent of General Electric Capital Corporation to the merger and an alternative financing arrangement may not be secured on terms reasonably acceptable to Source Interlink or Alliance within the time required by the merger agreement, if at all. If the required consent is not obtained and alternative financing arrangements are not made, neither Alliance nor Source Interlink would be required to consummate the merger. If each party waives this merger condition and the parties consummate the merger, the combined company will either be in breach of both outstanding credit facilities or will be required to repay all outstanding amounts thereunder.

Following the merger, the combined company's business will depend on the availability of a credit facility and continued extension of credit by suppliers to support its working capital requirements. There can be no assurance that the combined company can retain either the credit facility of Alliance with General Electric Capital Corporation or our credit facility with Wells Fargo Foothill, secure another credit facility on acceptable terms, if at all, or continue to have the same credit and payment terms from suppliers. Additionally, to maintain the right to borrow revolving loans and avoid a default under a credit facility, the combined company will likely be required to comply with various financial and operating covenants and maintain sufficient eligible assets to support revolving loans pursuant to a specified borrowing base. The combined

12

IB 00033

company's ability to comply with these covenants or maintain sufficient eligible assets may be affected by events beyond its control, including prevailing economic, financial and industry conditions, and the combined company may be unable to comply with these covenants or maintain sufficient eligible assets in the future. A breach of any of these covenants or the failure to maintain sufficient eligible assets could result in a default under these credit facilities. If the combined company defaults, its revolving lender will no longer be obligated to extend revolving loans to it and could declare all amounts outstanding under its credit facility, together with accrued interest, to be immediately due and payable If the combined company were unable to repay those amounts, the combined company's lender could proceed against the collateral granted to it to secure that indebtedness. The results of such actions would have a significant negative impact on the combined company's results of operations and financial condition.

**A disruption in the operations of the combined company's key shippers could cause a decline in its sales or a reduction in its earnings.**

We and Alliance are dependent on commercial freight carriers, primarily Federal Express and UPS, respectively, to deliver our respective products. If following the merger the operations of these carriers are disrupted for any reason, the combined company may be unable to deliver its products to its customers on a timely basis. If the combined company cannot deliver its products in an efficient and timely manner, its revenues and operating profits could suffer.

For the nine months ended October 31, 2004, our freight cost represented approximately 5.6% of our total revenue. For the nine months ended September 30, 2004, Alliance's freight costs represented approximately 3.3% of its net sales. If freight costs were to increase and the combined company were unable to pass that increase along to its customers due to competition within the combined company's industry, the combined company's financial results could suffer.

**The combined company's strategy will include making additional acquisitions that may present risks to the business.**

Making additional strategic acquisitions is part of our strategy and is expected to be a part of the combined company's strategy. The ability to make acquisitions will depend upon identifying attractive acquisition candidates and, if necessary, obtaining financing on satisfactory terms. Acquisitions, including those that we have already made, may pose certain risks to the combined company. These include the following:

• the combined company may be entering markets in which it has limited experience;

• the acquisitions may be potential distractions to management and may divert company resources and managerial time;

• it may be difficult or costly to integrate an acquired business' financial, computer, payroll and other systems into its own;

• the combined company may have difficulty implementing additional controls and information systems appropriate for a growing company;

• some of the acquired businesses may not achieve anticipated revenues, earnings or cash flow;

• the combined company may have unanticipated liabilities or contingencies from an acquired business;

• the combined company may have reduced earnings due to amortization expenses, goodwill impairment charges, increased interest costs and costs related to the acquisition and its integration;

• the combined company may finance future acquisitions by issuing common stock for some or all of the purchase price which could dilute the ownership interests of the shareholders;

• acquired companies will have to become, within one year of their acquisition, compliant with SEC rules relating to internal control over financial reporting adopted pursuant to the Sarbanes-Oxley Act of 2002;

13

IB 00034

• the combined company may be unable to retain management and other key personnel of an acquired company; or

• the combined company may impair relationships with an acquired company's employees, suppliers or customers by changing management.

To the extent that the value of the assets acquired in any prior or future acquisitions, including goodwill or intangible assets with indefinite lives, becomes impaired, the combined company would be required to incur impairment charges that would affect earnings. Such impairment charges could reduce the combined company's earnings and have a material adverse effect on the market value of the combined company's common stock after the merger. For example, in connection with our acquisition of a magazine distribution company in 2001, we recorded in fiscal year 2002 an asset impairment charge totaling $78.1 million. See Note 6 to our consolidated financial statements for the fiscal year ended January 31, 2002 which are incorporated by reference into this proxy statement/ prospectus.

If the combined company is unsuccessful in meeting the challenges arising out of its acquisitions, its business, financial condition and future results could be materially harmed.

**We depend on access to accurate information on retail sales of magazines in order to offer certain services to our customers, and we could lose a significant competitive advantage if our access to such information were diminished.**

We use information concerning the retail sales of single copy magazines to:

• compare the revenue potential of various front-end fixture designs to assist our customers in selecting designs intended to maximize sales in the front-end;

• identify sales trends at individual store locations permitting us to provide just-in-time inventory replenishment and prevent stock outs; and

• offer both retailers and publishers information services, such as ICN and Cover Analyzer, and customized sales reporting.

As a result of the merger, we expect that the combined company will provide similar services with respect to home entertainment content products which would require us to obtain and use information regarding these products. We gain access to this information principally through relationships with A.C. Nielsen & Company and Barnes & Noble, Inc. We do not currently have written agreements with these providers. We also obtain a significant amount of information in connection with our rebate claim submission services. Our access to information could be restricted as a result of the inability of any of our data partners to supply information to us or as a result of the discontinuation or substantial modification of the current incentive payment programs for magazines. If our access to information were reduced, the value of our information and design services could materially diminish and our publisher and retailer relationships could be negatively impacted.

**Alliance's sales may suffer due to a shift in consumer demand away from physical media sales and toward digital media downloading and other delivery methods.**

Current technology allows consumers to buy music digitally from many providers such as Apple Computer (through iTunes), Music Match, Rhapsody, Microsoft (through MSN) and others. The sale of digital music has grown significantly in the past year, and the recording industry saw sales for CDs decline significantly from 2001 to 2003. As this method of selling music increases in popularity and gains consumer acceptance, it may adversely impact Alliance's sales and profitability. The recording industry also continues to face difficulties as a result of illegal online file-sharing and downloading. While industry associations and manufacturers have launched legal action against downloaders and file sharers to stop this practice, there can be no assurance of the outcome or effect of these lawsuits. File sharing and downloading, both legitimate and illegal, could continue to exert pressure on the recording industry and the demand for CDs. Additionally, as other forms of media become available for digital download, Alliance's sales and profitability may be adversely affected.

14

IB 00035

Recent advances in the technologies to deliver movies to viewers may adversely affect public demand for DVDs offered by the combined company. For example, some digital cable providers and internet companies offer movies "on demand" with interactive capabilities such as start, stop and rewind. Direct broadcast satellite and digital cable providers have been able to enhance their on-demand offerings as a result of their ability to transmit over numerous channels. Apart from on-demand technology, the recent development and enhancement of personal video recorder technology with "time-shifting" technology (such as that used by TiVo and certain cable companies) has given viewers greater interactive control over broadcasted movies and other program types. Also, companies such as Blockbuster Entertainment and NetFlix are now offering subscription services which provide consumers the ability to rent VHS cassettes and DVDs for indefinite periods of time without being subject to late fees. If these methods of watching filmed entertainment increase in popularity and gain consumer acceptance, they may adversely impact Alliance's sales and profits.

**We participate in highly competitive industries and competitive pressures may result in a decrease in our revenues and profitability.**

Each of our business groups faces significant competition. Our Magazine Fulfillment group distributes magazines in competition with a number of national and regional companies, including Anderson News Company, Hudson News Company, Chas. Levy Company LLC, News Group and Ingram Book Group. It is possible that there could be other entrants into the magazine fulfillment industry such as publishers or printers. Our In-Store Services group has a substantial number of direct competitors for its claims submission program, and it competes with other manufacturers in its display fixture business. Our Wood Manufacturing group competes in a highly fragmented industry with a significant number of direct competitors.

In addition, some of our information and management services may be performed directly by publishers and other vendors, retailers or distributors. Other information service providers, including A.C. Nielsen Company, Information Resources and Audit Bureau of Circulations, also collect sales data from retail stores. If these service providers were to compete with us, given their expertise in collecting information and their industry reputations, they could be formidable competitors.

Some of our existing and potential competitors have substantially greater resources and greater name recognition than we do with respect to the market or market segments they serve. Because of each of these competitive factors, we may not be able to compete successfully in any of these markets with existing or new competitors. Competitive pressures may result in a decrease in the number of customers we serve, a decrease in our revenues or a decrease in our operating profits.

**Alliance participates in a highly competitive industry and competitive pressures may result in a decrease in its revenues and profitability.**

Alliance supplies home entertainment content products in competition with a number of national and regional wholesalers and category management companies. As relates to its fulfillment and category management services, Alliance's competitors include Handleman Company, Anderson Merchandisers, L.P., Ingram Entertainment, Inc. and Baker & Taylor, Inc. In addition, major record labels and film studios increasingly compete with Alliance by establishing direct trading relationships with the larger retail chains. Alliance believes that recent consolidation in the retail industry and initiatives by major record labels and film studios to increase the depth of inventory maintained by these larger retailers may have the effect of increasing their market share at the expense of smaller chains and independent stores.

Some of Alliance's existing and potential competitors have substantially greater resources and greater name recognition than it does with respect to the market or market segments they serve. Because of each of these competitive factors, Alliance may not be able to compete successfully in these markets with existing or new competitors. Competitive pressures may result in a decrease in the number of customers it serves, a decrease in its revenues or a decrease in its operating profits.

15

IB 00036

Source Interlink and Alliance conduct a growing portion of their businesses internationally, which presents additional risks to the combined company over and above those associated with its domestic operations.

Approximately 9.6% of our total revenues for the year ended January 31, 2004, and approximately 10.5% of our total revenues for the nine months ended October 31, 2004, were derived from the export of U.S. publications to overseas markets, primarily to the United Kingdom and Australia. In addition, approximately 18.0% and 17.9% of our gross domestic distribution for the year ended January 31, 2004 and the nine months ended October 31, 2004, respectively, consisted of the domestic distribution of foreign publications imported for sale to U.S. markets.

A growing portion of Alliance's revenues is also derived from international sales. Approximately 12.3% of Alliance's total net revenues for the year ended December 31, 2003, and approximately 13.1% of its total net revenue for the nine months ended September 30, 2004, were derived from international customers.

The conduct of business internationally presents additional inherent risks including:

• unexpected changes in regulatory requirements;

• import and export restrictions;

• tariffs and other trade barriers;

• differing technology standards;

• resistance from retailers to our business practices;

• employment laws and practices in foreign countries;

• political instability;

• fluctuations in currency exchange rates;

• imposition of currency exchange controls; and

• potentially adverse tax consequences.

Any of these risks could adversely affect revenue and operating profits of the combined company's international operations.

In connection with Alliance's business, certain suppliers have adopted policies restricting the export of certain home entertainment content products by domestic distributors. However, consistent with industry practice, Alliance distributes its merchandise internationally. Following the merger, the combined company would be adversely affected if a substantial portion of its suppliers enforced any restriction on the combined company's ability to sell its home entertainment content products outside the United States.

**A substantial majority of magazines distributed are purchased from four suppliers and our revenues could be adversely affected if we are unable to receive magazine allotments from these suppliers.**

Substantially all of the magazines distributed in the United States are supplied by or through one of four national distributors, Comag Marketing Group, LLC, Curtis Circulation Company, Kable Distribution Services, Inc. and Warner Publisher Services, Inc. Each title is supplied by one of these national distributors to us and cannot be purchased from any alternative source. Our success is largely dependent on our ability to obtain product in sufficient quantities on competitive terms and conditions from each of the national distributors. In order to qualify to receive copy allotments, we are required to comply with certain operating conditions, which differ between the specialty retail market and the mainstream market. Our ability to economically satisfy these conditions may be affected by events beyond our control, including the cooperation and assistance of our customers. A failure to satisfy these conditions could result in a breach of our purchase arrangements with our suppliers and entitle our suppliers to reduce our copy allotment or discontinue our right to receive product for distribution to our customers. If our supply of magazines were reduced, interrupted or discontinued, customer service would be disrupted and existing customers may reduce or cease doing business

16

IB 00037

IB 00038

with us altogether, thereby causing our revenue and operating income to decline and resulting in our failure to meet expectations.

**If Alliance were unable to receive products from its top suppliers, its sales and profitability could be adversely affected.**

Products supplied to Alliance by its top ten suppliers represented approximately 72.0% of Alliance's total purchases for the fiscal year ended December 31, 2003 and 66.9% of Alliance's total purchases for the nine months ended September 30, 2004. The products supplied by Alliance's suppliers are proprietary to individual major labels and studios and may not be obtained from any alternative source. Alliance's success depends upon Alliance's ability to obtain product in sufficient quantities on competitive terms and conditions from each of the major home entertainment labels and studios. If Alliance's supply of products were interrupted or discontinued, then customer service could be adversely affected and customers may reduce or cease doing business with Alliance causing Alliance's sales and profitability to decline.

**Virtually all of the combined company's sales will be made on a "sale or return" basis and higher than expected returns could cause it to overstate revenue for the period affected.**

As is customary in the home entertainment content product industry, virtually all of the combined company's sales will be made on a "sale or return" basis. During the nine months ended October 31, 2004, approximately 55 out of every 100 magazine copies distributed domestically by Source Interlink and between approximately 15 and 18 out of every 100 DVDs and CDs, respectively, distributed domestically by Alliance were returned unsold by their customers for credit; however, the sell-through rate has historically varied from period to period. Revenues from the sale of merchandise that the combined company will distribute are recognized at the time of delivery, less a reserve for estimated returns. The amount of the return reserve is estimated based on historical sell-through rates. If sell-through rates in any period are significantly less than historical averages, this return reserve could be inadequate. If the return reserve proved inadequate, it would indicate that actual revenue in prior periods was less than accrued revenue for such periods. This would require an increase in the amount of the return reserve for subsequent periods which may result in a reduction in operating income for such periods.

**Alliance's business is highly seasonal, and financial results could be negatively impacted if its fourth quarter's sales are weak.**

Alliance generated 36.6% of its total net sales in the fourth quarter of its 2003 fiscal year coinciding with the holiday shopping season. Alliance's results of operations for the entire year depend more heavily on fourth quarter results. Factors that could adversely affect sales and profitability in the fourth quarter include:

- unavailability of, and low customer demand for, particular products;

- unfavorable economic conditions;

- inability to hire adequate temporary personnel;

- inability to anticipate consumer trends; and

- inability to maintain adequate inventory levels.

**The combined company may lose or fail to attract key personnel, customers and business partners due to uncertainties associated with or other consequences of the merger.**

Current and prospective management, employees, customers and business partners of our company and Alliance may experience uncertainty about their future relationships with the combined company. Such uncertainty may adversely affect the combined company's ability to attract, motivate and retain key management, sales, marketing, technical and other personnel. Current and prospective customers and business partners may, in response to the announcement, pendancy or consummation of the merger, delay or cancel purchasing decisions as they evaluate the likelihood of successful integration of the combined company or may

17

IB 00039

instead purchase products or services from competitors. Additionally, some of these customers and business partners may feel that the combined company poses new competitive threats to their businesses and as a result may discontinue or reduce the scope of their relationships with our company or Alliance or avoid renewing or entering new relationships with the combined company. Any delay or reduction in, or cancellation of, purchasing could adversely affect the business of the combined company.

**We depend on the efforts of certain key personnel, the loss of whose services could adversely affect our business.**

We depend upon the services of our chief executive officer and chief operating officer and their relationships with customers and other third parties. The loss of these services or relationships could adversely affect our business and the implementation of our growth strategy. This in turn could materially harm our financial condition and future results. Although we have employment agreements with each of our chief executive officer and chief operating officer, the services of these individuals may not continue to be available to the combined company. We carry key person life insurance on the lives of both our chief executive officer and chief operating officer.

**The combined company's management and internal systems might be inadequate to handle its potential growth including growth resulting from the merger with Alliance.**

To manage future growth, including growth resulting from the merger, the combined company's management must continue to improve operational and financial systems and expand, train, retain and manage its employee base. The combined company will likely be required to manage an increasing number of relationships with various customers and other parties. The combined company's management may not be able to manage the company's growth effectively. If the combined company's systems, procedures and controls are inadequate to support its operations, its expansion could be halted and it could lose opportunities to gain significant market share. Any inability to manage growth effectively may harm the combined company's business.

**The combined company's operations could be disrupted if its information systems fail, causing increased expenses and loss of sales.**

The businesses of our company and Alliance depend on the efficient and uninterrupted operation of their respective computer and communications software and hardware systems, including their replenishment and order regulation systems, and other information technology. If the combined company's systems were to fail for any reason or if it were to experience any unscheduled down times, even for only a short period, its operations and financial results could be adversely affected. We and Alliance have in the past experienced performance problems and unscheduled down times, and these problems could recur. The combined company's systems could be damaged or interrupted by fire, flood, hurricanes, power loss, telecommunications failure, break-ins or similar events. We have, and the combined company is expected to have, formal disaster recovery plans in place. However, these plans may not be entirely successful in preventing delays or other complications that could arise from information systems failure, and, if they are not successful, the combined company's business interruption insurance may not adequately compensate it for losses that may occur.

**A portion of our business depends on current sales rebate programs, and our results of operation could be adversely affected if these programs were discontinued or materially modified.**

The process of collecting rebates and other incentive payments offered by magazine publishers is an integral part of our business. Magazine publishers are not under long-term contractual obligations to continue these incentive programs. Moreover, some retailers purchase magazines at discounted prices instead of receiving rebate payments. If the current industry rebate practice were to significantly diminish in popularity, either as a result of decisions by publishers or retailers, we would experience a significant reduction in our operating profits.

18

IB 00040

Under our advance pay program, we acquire the rights of our customers to receive incentive payments from publishers and we could be materially harmed if the publishers were unable to make the payments to us.

The amounts payable to us as a result of our right to receive incentive payments varies significantly during a fiscal quarter. In some cases, we assume the risk otherwise borne by our customers that publishers will refuse or be unable to pay incentive payments. Moreover, it is possible that acquisition of these rights could be re-characterized as a financial transaction rather than as a true sale, in which case we may be treated as a creditor of our customer in any bankruptcy proceeding involving the customer. Consequently, we bear a risk in the case of any bankruptcy proceeding involving any of our customers that we would not receive a substantial portion of the payments due us or that we may be required to disgorge some amounts previously received under our advance pay program. We maintain a reserve for such contingencies, but these reserves may be inadequate. If our reserve is inadequate, we could experience a material reduction in our operating profits.

**We and Alliance depend on the Internet to deliver some of our services, and the use of the Internet may expose the combined company to increased risks.**

Many of our and Alliance's operations and services, including replenishment and order regulation systems, PIN, ICN, customer direct fulfillment and other information technology, involve the transmission of information over the Internet. The businesses of the combined company therefore will be subject to any factors that adversely affect Internet usage including the reliability of Internet service providers, which from time to time have operational problems and experience service outages.

In addition, one of the requirements of the continued growth of the combined company's business over the Internet is the secure transmission of confidential information over public networks. Failure to prevent security breaches of the combined company's or its customers' networks or well-publicized security breaches affecting the Internet in general could significantly harm the growth and revenue of the combined company. Advances in computer capabilities, new discoveries in the field of cryptography or other developments may result in a compromise or breach of the algorithms the combined company uses to protect content and transactions or its customers' proprietary information in its databases. Anyone who is able to circumvent the combined company's security measures could misappropriate proprietary and confidential information or could cause interruptions in its operations. The combined company may be required to expend significant capital and other resources to protect against such security breaches or to address problems caused by security breaches.

**Following the merger, the combined company bylaws will require supermajority approval of its board before it can take certain actions. This requirement may restrict strategic transactions involving the combined company.**

Upon the consummation of the merger, the combined company's bylaws will be amended to provide that the affirmative vote of at least 75% of its entire board will be required to (i) approve or recommend a reorganization or merger of the combined company in a transaction that will result in its shareholders immediately prior to such transaction not holding, as a result of such transaction, at least 50% of the voting power of the surviving or continuing entity, (ii) a sale of all or substantially all of the combined company's assets which would result in its shareholders immediately prior to such transaction not holding, as a result of such sale, at least 50% of the voting power of the purchasing entity, or (iii) a change in the combined company bylaws. This requirement may prevent the combined company from making changes and taking other actions that are subject to this supermajority approval requirement. This requirement may limit the ability of the combined company to pursue strategies or enter into strategic transactions for which the supermajority approval of the board cannot be obtained.

**We have limitations on changes of control that could reduce your ability to sell our shares at a premium.**

Our articles of incorporation and bylaws currently contain provisions that could reduce the likelihood of a change of control or acquisition of our company, which could limit your ability to sell our shares at a premium or otherwise affect the price of our common stock. In order to consummate the merger, we must either amend

IB 00041

our articles of incorporation to effect an increase in our authorized common stock pursuant to proposal two or reincorporate from Missouri into Delaware pursuant to proposal three. In either case, the combined company's charter documents will also contain provisions which could have similar anti-takeover effects. These provisions would do the following:

• permit the combined company's board to issue up to 2,000,000 shares of preferred stock and to determine the price, rights, preferences, privileges and restrictions of that preferred stock;

• permit the combined company's board to issue up to 100,000,000 shares of common stock;

• require that a change of control of the combined company be approved by a supermajority of at least 75% of the members of the board;

• provide for a classified board of directors;

• provide that, for as long as AEC Associates (together with its members and affiliates acting as a group) owns an aggregate of at least 10% of the combined company's common stock, AEC Associates will have the right to designate an individual (or individuals) of its choice for election by the board for any seat that is last occupied or vacated by a director designated by Alliance or AEC Associates, except if such designation would result in the directors designated by AEC Associates having a disproportionate board representation to AEC Associates' (together with its members and affiliates acting as a group) ownership of the combined company's common stock;

• permit the combined company's board to increase its own size and fill the resulting vacancies;

• limit the persons who may call special meetings of shareholders; and

• establish advance notice requirements for nominations for election to the combined company's board or for proposing matters that can be acted on by shareholders at shareholders meetings.

**Our common stock price has been volatile, which could result in substantial losses for shareholders.**

Our common stock is currently traded, and after the merger is expected to continue to be traded, on the Nasdaq National Market. Our average daily trading volume for the three month period ending January 14, 2005 was approximately 190,000 shares. In the future, we may experience more limited daily trading volume. The trading price of our common stock has been and may continue to be volatile. The closing sale prices of our common stock, as reported by the Nasdaq National Market, have ranged from a high of $14.35 to a low of $8.39 for the 52-week period ending October 31, 2004. Broad market and industry fluctuations may significantly affect the trading price of our common stock, regardless of our actual operating performance. The trading price of our common stock could be affected by a number of factors, including, but not limited to, announcements of new services, additions or departures of key personnel, quarterly fluctuations in our financial results, changes in analysts' estimates of our financial performance, general conditions in our industry and conditions in the financial markets and a variety of other risk factors, including the ones described elsewhere in this proxy statement/ prospectus. Periods of volatility in the market price of a company's securities sometimes result in securities class action litigation. If this were to happen to the combined company, such litigation would be expensive and would divert management's attention. In addition, if the combined company needed to raise equity funds under adverse conditions, it would be difficult to sell a significant amount of our stock without causing a significant decline in the trading price of our stock.

**If our accounting controls and procedures are circumvented or otherwise fail to achieve their intended purposes, our business could be seriously harmed.**

Although we evaluate our disclosure controls and procedures as of the end of each fiscal quarter, and are in the process of reviewing and establishing internal control over financial reporting in order to comply with SEC rules relating to internal control over financial reporting adopted pursuant to the Sarbanes-Oxley Act of 2002, we may not be able to prevent all instances of accounting errors or fraud in the future. Controls and procedures do not provide absolute assurance that all deficiencies in design or operation of these control systems, or all instances of errors or fraud, will be prevented or detected. These control systems are designed to

20

IB 00042

provide reasonable assurance of achieving the goals of these systems in light of legal requirements, company resources and the nature of our business operations. These control systems remain subject to risks of human error and the risk that controls can be circumvented for wrongful purposes by one or more individuals in management or non-management positions. The combined company's business could be seriously harmed by any material failure of these control systems.

**Alliance's business depends in part on the current advertising allowances, volume discounts and other sales incentive programs, and it results of operation could be adversely affected if these programs were discontinued or materially modified.**

Under terms of purchase prevailing in its industry, the profitability of Alliance's operations are enhanced by advertising allowances, volume discounts and other sales incentive programs offered by record labels and movie studios. Such content providers are not under long-term contractual obligations to continue these programs, and in 2003 one major record label eliminated advertising allowances and volume discounts on a limited number of stock keeping units. If record labels or movie studios, or both, decide to discontinue these programs, Alliance would experience a significant reduction in operating profits.

21

IB 00043

SOURCE INTERLINK SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA

The following selected consolidated financial data are only a summary and should be read in conjunction with our financial statements and related notes thereto included in our annual reports and other financial information included in our filings with the SEC. See "Where You Can Find More Information" on page 174. The consolidated statement of operations data for the years ended January 31, 2002, 2003 and 2004 and the balance sheet data as of January 31, 2003 and 2004, which have been prepared in accordance with accounting principles generally accepted in the U.S., are derived from our financial statements audited by BDO Seidman, LLP, an independent registered public accounting firm, which are incorporated by reference into this proxy statement/ prospectus. The consolidated statements of operations data for the years ended January 31, 2000 and 2001 and the balance sheet data as of January 31, 2000, 2001 and 2002, which have been prepared in accordance with accounting principles generally accepted in the U.S., are derived from our audited financial statements which are not incorporated by reference into this proxy statement/ prospectus. The selected consolidated financial data for the nine month periods ended October 31, 2003 and 2004 and the balance sheet data as of October 31, 2004 have been derived from our unaudited historical interim consolidated financial statements, which are incorporated by reference into this proxy statement/ prospectus, and include, in the opinion of our management, all adjustments, consisting of normal recurring adjustments, which we consider necessary to present fairly the results of operations and financial positions of such periods Historical operating results are not necessarily indicative of the results that may be expected for any future period.

| | Year Ended January 31, | | | | | Nine Months Ended October 31, | |
|---|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 | 2003 | 2004 |
| | (In thousands, except per share data) | | | | | (Unaudited) | |
| **CONSOLIDATED STATEMENT OF OPERATIONS DATA:** | | | | | | | |
| Revenues | $82,279 | $92,423 | $238,923 | $290,894 | $333,134 | $258,687 | $273,175 |
| Cost of revenues | 48,806 | 53,792 | 176,357 | 216,483 | 244,755 | 189,986 | 199,822 |
| Gross profit | 33,473 | 38,631 | 62,566 | 74,411 | 88,379 | 68,701 | 73,353 |
| Selling, general and administrative expenses | 12,162 | 23,279 | 38,978 | 46,564 | 52,642 | 39,763 | 40,874 |
| Fulfillment freight | — | — | 7,931 | 14,721 | 16,381 | 12,995 | 15,244 |
| Relocation expenses(1) | — | — | — | 1,926 | 1,730 | 1,730 | 1,552 |
| Amortization of goodwill | 2,718 | 2,994 | 5,424 | — | — | — | — |
| Goodwill impairment charge(2) | — | — | 78,126 | — | — | — | — |
| Operating income (loss) | 18,593 | 12,358 | (67,893) | 11,200 | 17,626 | 14,213 | 15,683 |
| Other income (expense) | | | | | | | |
| Interest expense, net | (919) | (2,312) | (3,338) | (3,765) | (3,647) | (3,550) | (2,673 |
| Other | (152) | 36 | (2,339) | 514 | (316) | 168 | 207 |
| Total other income (expense) | (1,071) | (2,276) | (5,677) | (3,251) | (3,963) | (3,382) | (2,466 |
| Income before income taxes | 17,522 | 10,082 | (73,570) | 7,949 | 13,663 | 10,831 | 13,217 |
| Income tax expense | 7,499 | 3,965 | (705) | 611 | 3,615 | 3,115 | 4,204 |
| Net income (loss) | $10,023 | $ 6,117 | $(72,865) | $ 7,338 | $ 10,048 | $ 7,716 | $ 9,013 |
| Earnings (loss) per share — basic | $ 0.65 | $ 0.35 | $ (4.07) | $ 0.40 | $ 0.54 | $ 0.42 | $ 0.40 |
| Earnings (loss) per share — diluted | $ 0.60 | $ 0.33 | $ (4.07) | $ 0.40 | $ 0.51 | $ 0.40 | $ 0.37 |
| Weighted average of shares outstanding in computing: | | | | | | | |
| Basic net income per share | 15,332 | 17,591 | 17,915 | 18,229 | 18,476 | 18,378 | 22,727 |
| Diluted net income per share | 16,815 | 18,348 | 17,915 | 18,478 | 19,866 | 19,487 | 24,606 |

22

IB 00044

| | At January 31, | | | | | October 31, 2004, |
|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2003 | 2004 | (Unaudited) |
| | (In thousands) | | | | | |
| CONSOLIDATED BALANCE SHEET DATA: | | | | | | |
| Cash | $ 1,738 | $ 1,085 | $ 2,943 | $ 5,570 | $ 4,963 | $ 1,584 |
| Working capital(3) | 59,162 | 60,277 | (9,424) | (3,519) | 19,418 | 51,827 |
| Total assets | 158,289 | 158,448 | 164,430 | 157,239 | 164,101 | 200,385 |
| Current maturities of debt | 174 | 116 | 42,097 | 29,215 | 4,059 | 2,491 |
| Debt, less current maturities | 32,215 | 31,780 | 15,578 | 17,026 | 31,541 | 31,570 |
| Total liabilities | 53,169 | 48,658 | 120,887 | 106,320 | 97,027 | 76,727 |
| Total equity | 105,120 | 109,790 | 43,543 | 50,919 | 67,074 | 123,658 |

(1) Relocation costs in fiscal 2004 relate to the consolidation of our prior offices from St. Louis, Missouri, High Point, North Carolina and San Diego, California to our new offices in Bonita Springs, Florida. Relocation costs in fiscal 2005 relate to the acceleration of our relocation process from the distribution fulfillment center in Milan, Ohio to Harrisburg, Pennsylvania as a result of our expansion into the mainstream retail market.

(2) Charge related to the impairment of the goodwill attributed to our Magazine Distribution and Wood Manufacturing businesses.

(3) Includes current maturities of debt.

23

IB 00045

ALLIANCE SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA

The following selected financial data of Alliance contains the consolidated positions of Alliance, including the operations of the DFSG and the DMISG. The following selected financial data are only a summary and should be read in conjunction with Alliance's financial statements and related notes thereto and with "Alliance Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this proxy statement/ prospectus. The consolidated statement of operations data for the years ended December 31, 2001, 2002 and 2003 and the balance sheet data as of December 31, 2002 and 2003, which have been prepared in accordance with accounting principles generally accepted in the U.S., are derived from the historical consolidated financial statements of Alliance audited by PricewaterhouseCoopers LLP, independent public accountants, which are included elsewhere in this proxy statement/ prospectus. The consolidated statements of operations data for the years ended December 31, 1999 and 2000 and the balance sheet data as of December 31, 1999, 2000 and 2001, which have been prepared in accordance with accounting principles generally accepted in the U.S., are derived from the audited historical consolidated financial statements of Alliance that are not included in this proxy statement/ prospectus. The selected consolidated financial data for the nine-month periods ended September 30, 2003 and 2004 and the balance sheet data as of September 30, 2004 have been derived from the unaudited historical interim consolidated financial statements of Alliance (including the operations of the DFSG and the DMISG), which are included elsewhere in this proxy statement/ prospectus, and include, in the opinion of Alliance's management, all adjustments, consisting of normal recurring adjustments, which Alliance considers necessary to present fairly the results of operations and financial positions of such periods. Historical operating results are not necessarily indicative of the results that may be expected for any future period.

| | Year Ended December 31, | | | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 | 2003 | 2003 | 2004 |
| | (In thousands, except per share data) | | | | | (Unaudited) | |
| **CONSOLIDATED STATEMENT OF OPERATIONS DATA:** | | | | | | | |
| Net sales | $377,387 | $ 469,717 | $599,179 | $807,773 | $869,890 | $551,576 | $646,342 |
| Cost of goods sold | 321,769 | 407,117 | 518,505 | 703,788 | 759,508 | 477,845 | 552,304 |
| Gross profit | 55,618 | 62,600 | 80,674 | 103,985 | 110,382 | 73,731 | 94,038 |
| Selling, general and administrative expenses | 50,787 | 87,825 | 87,547 | 99,282 | 104,532 | 74,211 | 84,423 |
| Severance expense | — | — | — | — | 1,108 | — | — |
| Amortization of intangible assets | 3,300 | 7,702 | 2,622 | — | — | — | — |
| Asset impairment charge | — | 108,857 | 3,115 | — | — | — | — |
| Cost of failed acquisition opportunity | 1,016 | — | 600 | — | — | — | — |
| Operating income (loss) | 515 | (141,784) | (13,210) | 4,703 | 4,742 | (480) | 9,615 |
| Interest expense, net | 4,886 | 5,718 | 5,096 | 3,602 | 2,468 | 1,806 | 1,160 |
| Other (income) expense | 5 | 3,416 | 2,396 | (416) | — | — | — |
| Income (loss) before provision for income taxes | (4,376) | (150,918) | (20,702) | 1,517 | 2,274 | (2,286) | 8,455 |
| Provision for income taxes | — | — | — | 704 | 1,026 | — | 3,424 |
| Net income (loss) | $ (4,376) | $(150,918) | $ (20,702) | $  813 | $  1,248 | $ (2,286) | $  5,031 |
| **Loss applicable to common stockholders** | | | | | | | |
| Net income (loss) | $ (4,376) | $(150,918) | $ (20,702) | $  813 | $  1,248 | $ (2,286) | $  5,031 |
| Dividends on preferred stock | (1,863) | (7,477) | (9,480) | (10,477) | (10,608) | (7,894) | (8,058 |
| Loss applicable to common stockholders | $ (6,239) | $(158,395) | $ (30,182) | $ (9,664) | $ (9,360) | $(10,180) | $ (3,027 |
| Earnings (loss) per share — basic | $  (0.19) | $  (2.26) | $  (0.42) | $  (0.13) | $  (0.13) | $  (0.14) | $  (0.04 |
| Earnings (loss) per share — diluted | $  (0.19) | $  (2.26) | $  (0.42) | $  (0.13) | $  (0.13) | $  (0.14) | $  (0.04 |

24

IB 00046

| | Year Ended December 31, | | | | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 1999 | 2000 | 2001 | 2002 | 2003 | 2003 | 2004 |
| | (In thousands, except per share data) | | | | | (Unaudited) | |
| Weighted average of shares outstanding in computing: | | | | | | | |
| Basic net income per share | 32,778 | 70,125 | 71,739 | 71,739 | 71,739 | 71,739 | 71,740 |
| Diluted net income per share | 32,778 | 70,125 | 71,739 | 71,739 | 71,739 | 71,739 | 71,740 |

| | At December 31, | | | | | September 30, 2004 |
| --- | --- | --- | --- | --- | --- | --- |
| | 1999 | 2000 | 2001 | 2002 | 2003 | |
| | (In thousands) | | | | | (Unaudited) |
| CONSOLIDATED BALANCE SHEET DATA: | | | | | | |
| Cash | $ 48,265 | $ 10,381 | $ 3,262 | $ 7,015 | $ 9,520 | $ 2,785 |
| Working capital(1) | 47,626 | (3,249) | (7,782) | (3,438) | (997) | 1,133 |
| Total assets | 390,862 | 276,172 | 305,879 | 340,494 | 368,744 | 316,545 |
| Current maturities of debt | 1,543 | 1,521 | 1,322 | 801 | 2,029 | 9,152 |
| Debt, less current maturities | 5,638 | 4,011 | 3,199 | 8,190 | 11,958 | 3,521 |
| Total liabilities, including redeemable preferred stock | 235,363 | 278,437 | 338,326 | 382,605 | 420,215 | 371,033 |
| Total stockholders' equity (deficit) | 155,499 | (2,265) | (32,447) | (42,111) | (51,471) | (54,488) |

(1) Includes current maturities of debt.

IB 00047

UNAUDITED PRO FORMA
CONDENSED COMBINED FINANCIAL DATA

The following unaudited *pro forma* condensed combined financial data with respect to Source Interlink is based on our historical consolidated financial statements. Set forth below is the following unaudited *pro forma* financial data:

• Unaudited *pro forma* condensed combined balance sheet data as of October 31, 2004, assuming the business combination between Source Interlink and Alliance occurred on October 31, 2004; and

• Unaudited *pro forma* condensed combined statement of operations data for the nine months ended October 31, 2004, assuming the business combination between Source Interlink and Alliance occurred as of February 1, 2003; and

• Unaudited *pro forma* condensed combined statement of operations data for the year ended January 31, 2004, assuming the business combination between Source Interlink and Alliance occurred as of February 1, 2003.

The unaudited *pro forma* condensed combined financial information is presented for informational purposes only, is based on certain assumptions that we believe are reasonable and does not purport to represent our financial condition or our results of operations had the business combination occurred on or as of the dates noted above or to project the results for any future date or period. In the opinion of management, all adjustments have been made that are necessary to present fairly the unaudited *pro forma* condensed combined financial information.

The unaudited pro forma condensed combined statements of operations do not include adjustments to eliminate operations of Alliance that were phased out prior to the acquisition of Alliance by Source Interlink. These operations did not meet the criteria for discontinued operations treatment under FASB 144, and therefore are included in the pro forma statement of operations. For the year ended January 31, 2004, the following amounts are included in the Alliance historical financial statements related to these operations: (1) revenues of $7.5 million; (2) cost of revenues of $14.2 million; (3) selling, general and administrative expenses of $7.4 million; and (4) interest charges of $0.9 million. For the nine month period ended October 31, 2004, the following amounts are included in the Alliance historical financial statements related to these operations: (1) revenues of $1.2 million; (2) cost of revenues of $1.1 million; (3) selling, general and administrative expenses of $1.2 million; and (4) interest charges of $0.4 million.

The merger and related transactions will be treated as a purchase business combination for accounting purposes, and Alliance's assets acquired and liabilities assumed will be recorded at their fair value. For the purposes of this unaudited condensed pro forma consolidated financial data, we have assumed that our common stock price is $11.31 per share (based on an average of closing prices for our common stock from November 12, 2004 through November 26, 2004, which is the five trading days before and after the day the transaction was announced) and that approximately 50.4 million shares of our common stock are outstanding at the date of the consummation of the merger.

The allocations of the purchase price to Alliance's assets, including intangible assets, and liabilities are only preliminary allocations based on estimates of fair values and will change when actual fair values are determined. Among the provisions of Statement of Financial Accounting Standards No. 141, "Business Combinations," criteria have been established for determining whether intangible assets should be recognized separately from goodwill. Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets" ("SFAS 142") provides, among other guidelines, that goodwill and intangible assets with indefinite lives will not be amortized, but rather are tested for impairment on at least an annual basis.

The unaudited *pro forma* condensed combined financial information should be read in conjunction with our unaudited pro forma condensed combined financial statements, our consolidated financial statements and unaudited condensed consolidated financial statements and related notes, included herein by reference, and the information set forth in "Source Interlink's Management's Discussion and Analysis of Financial Condition and Results of Operations."

26

IB 00048

| | Year Ended January 31, 2004 | Nine Months Ended October 31, 2004 |
|---|---|---|
| | (In thousands, except per share amounts) (Unaudited) | |
| **Statement of Operations Data:** | | |
| Revenues | $1,190,668 | $906,438 |
| Cost of revenues | 969,809 | 723,500 |
| Gross profit | 220,859 | 182,938 |
| Selling, general and administrative expenses | 150,383 | 122,092 |
| Severance | 1,108 | — |
| Fulfillment freight | 43,580 | 36,559 |
| Relocation expenses(1) | 1,730 | 1,552 |
| Operating income | 24,058 | 22,735 |
| Other income (expense) | | |
| Write off deferred financing costs and original issue discount | — | (1,494) |
| Interest expense, net | (4,864) | (1,074) |
| Other | (316) | 207 |
| Total other income (expense) | (5,180) | (2,361) |
| Income tax expense | 5,788 | 7,122 |
| Net income | 13,090 | 13,252 |
| Earnings (loss) per share — basic | $ 0.29 | $ 0.27 |
| Earnings (loss) per share — diluted | $ 0.28 | $ 0.26 |
| Weighted average of shares outstanding in computing: | | |
| Basic net income per share | 45,147 | 49,398 |
| Diluted net income per share | 46,627 | 51,643 |

| | As of October 31, 2004 |
|---|---|
| | (Unaudited) |
| **Balance Sheet Data:** | |
| Cash | $  4,311 |
| Total Assets | 768,666 |
| Current maturities of long-term debt | 40,218 |
| Debt, less current maturities | 38,892 |
| Total Liabilities | 334,075 |
| Total Equity | 434,591 |

---

(1) Relocation costs in fiscal 2004 relate to the consolidation of our prior offices from St. Louis, Missouri, High Point, North Carolina and San Diego, California to our new offices in Bonita Springs, Florida. Relocation costs in fiscal 2005 relate to the acceleration of our relocation process from the distribution fulfillment center in Milan, Ohio to Harrisburg, Pennsylvania as a result of our expansion into the mainstream retail market.

27

IB 00049

COMPARATIVE PER SHARE DATA

The following tables present unaudited comparative historical per share data of Source Interlink and Alliance, excluding the DMISG, and unaudited combined pro forma per share data after giving effect to the merger as a purchase by us of Alliance, excluding the DMISG, assuming the merger had been consummated at the beginning of our earliest period presented below. The following data assumes the issuance of approximately 26.7 million shares of our common stock (based on an assumed market price of $11.31 per share of our common stock) in exchange for all shares of Alliance common stock outstanding at the effective time of the merger and assumes the assumption of Alliance options and warrants based upon the same exchange ratio. The actual number of shares of our common stock to be exchanged for all of the outstanding Alliance capital stock will be determined at the effective time of the merger as set forth in the section "The Merger Agreement" beginning on page 57. This data has been derived from, and should be read in conjunction with, the selected historical financial data, selected unaudited pro forma combined condensed financial data, unaudited pro forma combined condensed financial statements and notes thereto and consolidated financial statements of Source Interlink and Alliance, excluding the DMISG, and notes thereto, each appearing elsewhere in this proxy statement/ prospectus. The unaudited pro forma per share data is presented for information purposes only and is not intended to represent or be indicative of the consolidated results of operations or financial condition of the combined company that would have been reported had the merger been completed as of the dates presented, and should not be taken as representative of the future consolidated results of operations or financial condition of the combined company.

| | Year Ended as of January 31, 2004 | Nine Months Ended as of October 31, 2004 |
| --- | --- | --- |
| **Source Interlink historical:** | | |
| Basic earnings per share | $0.54 | $0.40 |
| Diluted earnings per share | $0.51 | $0.37 |
| Book value per share(1) | $3.53 | $5.23 |

| | Year Ended as of December 31, 2003 | Nine Months Ended as of September 30, 2004 |
| --- | --- | --- |
| **Alliance historical (4):** | | |
| Basic loss per share | $(0.13) | $(0.04) |
| Diluted loss per share | $(0.13) | $(0.04) |
| Book value per share(1) | $(0.72) | $(0.76) |

| | Year Ended as of December 31, 2003 | Nine Months Ended as of September 30, 2004 |
| --- | --- | --- |
| **Alliance pro forma (3, 4):** | | |
| Basic earnings per share | $0.01 | $0.05 |
| Diluted earnings per share | $0.01 | $0.05 |
| Book value per share(1) | $0.63 | $0.67 |

28

IB 00050

http://yahoo.brand.edgar-online.com/EFX dll/EDGARpro.dll?FetchFilingHTML1?SessionID=DbxMIg...     10/24/200:

| | Year Ended as of January 31, 2004 | Nine Months Ended as of October 31, 2004 |
|---|---|---|
| **Pro forma combined:** | | |
| Basic earnings per share(2) | $0.29 | $0.27 |
| Diluted earnings per share(2) | $0.28 | $0.26 |
| Book value per share(1) | N/A | $8.63 |
| Equivalent pro forma basic earnings per share | $0.08 | $0.07 |
| Equivalent pro forma earnings per share | $0.07 | $0.07 |
| Equivalent pro forma book value per share(1) | N/A | $2.25 |

---

(1)   Computed by dividing total shareholders' equity by the number of shares of capital stock outstanding at the end of the period on a historical and pro forma combined basis, as applicable.

(2)   Basic pro forma earnings per share is calculated based on the exchange of 102.3 million shares of Alliance common stock outstanding on a weighted average basis during the twelve-month period ended January 31, 2004 and during the nine-month period ended October 31, 2004, respectively, for shares of our common stock assuming an exchange ratio of 0.2606 shares of our common stock per share of Alliance common stock, and the conversion of all Alliance preferred stock into Alliance common stock immediately prior to the merger.

(3)   Alliance pro forma per share information calculated assuming the conversion of the Series A1, Series A2, and Series B preferred stock to common stock. The calculation assumes the Series A1, Series A2, and Series B preferred stock converted into 25.4 million shares of common stock for the year ended December 31, 2003 and 27.2 million shares of common stock for the nine months ended September 30, 2004, and that these shares were outstanding at the beginning of the respective periods.

(4)   Alliance historical basic and diluted earnings and loss per share calculated without consideration for the effect of the exchange ratio noted in footnote (2) above.

29

IB 00051

MARKET PRICE AND DIVIDEND INFORMATION

**Source Interlink Common Stock**

Our common stock is traded on The Nasdaq National Market under the symbol "SORC".

The following table sets forth, for the fiscal quarters indicated, based on published financial sources, the high and low bid prices per share of our common stock as reported on the Nasdaq National Market:

**Source Interlink Common Stock**

| | High | Low |
|---|---|---|
| Year Ending January 31, 2005 | | |
| Fourth Quarter(through January 14, 2005) | $13.58 | $ 9.94 |
| Third Quarter | 10.73 | 8.39 |
| Second Quarter | 11.39 | 8.89 |
| First Quarter | 13.58 | 10.31 |
| Year Ended January 31, 2004 | | |
| Fourth Quarter | $14.30 | $ 8.10 |
| Third Quarter | 9.82 | 7.70 |
| Second Quarter | 8.59 | 5.50 |
| First Quarter | 5.51 | 4.33 |
| Year Ended January 31, 2003 | | |
| Fourth Quarter | $ 5.93 | $ 3.76 |
| Third Quarter | 6.41 | 4.26 |
| Second Quarter | 5.75 | 3.82 |
| First Quarter | 5.79 | 4.07 |

**Alliance Capital Stock**

There is no established trading market for Alliance capital stock.

**Recent Closing Prices**

The following table sets forth the per share closing price of our common stock as reported on the Nasdaq National Market on November 17 2004, the last full trading day prior to the announcement of the signing of the merger agreement, and January 14, 2005, the most recent practicable date prior to the mailing of this proxy statement/prospectus to our shareholders. Also set forth is the implied equivalent value of one share of Alliance common stock on each such date assuming an exchange ratio of 0.2606 shares of our common stock for each share of Alliance common stock and the conversion of all Alliance preferred stock into Alliance common stock. The exchange ratio will change depending on the number of outstanding shares of Alliance and Source Interlink as of the effective time so as to result in the equityholders of Source Interlink and Alliance immediately prior to the merger each owning 50% of the fully diluted capitalization of Source Interlink immediately following the merger.

| Date | Source Interlink Common Stock | Equivalent Alliance Price per Share |
|---|---|---|
| November 17, 2004 | $10.84 | $2.83 |
| January 14, 2005 | $12.46 | $3.25 |

The above table shows only historical comparisons. These comparisons may not provide meaningful information to our shareholders in determining whether to approve the proposals relating to the merger. Our shareholders are urged to obtain current market quotations for our common stock and to review carefully the

30

IB 00052

other information contained in this proxy statement/prospectus in considering whether to approve the proposals contained in this proxy statement/prospectus.

## Shareholders

As of January 14, 2005, there were approximately 94 holders of record of our common stock and 73 holders of record of Alliance common stock.

## Dividends

Alliance distributed shares in Spinco to holders of its common stock on December 31, 2004. Subject to the foregoing, neither we nor Alliance has ever declared or paid dividends on its common stock.

Our board presently intends to retain all of our earnings, if any, for the development of our business for the foreseeable future. The declaration and payment of cash dividends in the future will be at the discretion of the board of the combined company and will depend upon a number of factors, including, among others, any restrictions contained in our credit facilities and our future earnings, operations, capital requirements and general financial condition and such other factors that the board may deem relevant. Currently, our credit facilities prohibit the payment of cash dividends or other distributions on our capital stock or payments in connection with the purchase, redemption, retirement or acquisition of our capital stock.

31

IB 00053

We are sending you this document to provide you with important information in connection with the solicitation of proxies by our board fo use at the special meeting of our shareholders and at any adjournment or postponement of the special meeting. This proxy statement/prospectu: is being mailed to our shareholders on or about January 25, 2005.

**Date, Time and Place of the Source Interlink Special Meeting**

The date, time and place of the special meeting of our shareholders are as follows:

February 28, 2005,
at 10:00 a.m. Eastern Time
at the following location:

Source Interlink Companies, Inc.
27500 Riverview Center Boulevard, Suite 400
Bonita Springs, Florida 34134

**Purpose of the Special Meeting**

At the special meeting, our shareholders will be asked to consider and vote upon the following:

1. A proposal to approve the issuance of our common stock to Alliance stockholders in connection with the merger of Alliance with and into Alligator Acquisition, LLC, our wholly owned subsidiary, pursuant to an Agreement and Plan of Merger dated as of November 18, 2004, by and among Source Interlink, Alligator Acquisition, LLC and Alliance;

2. A proposal to amend our articles of incorporation to effect an increase in the number of authorized shares of our common stock from 40,000,000 to 100,000,000;

3. A proposal to effect our reincorporation from a Missouri corporation to a Delaware corporation;

4. A proposal to grant discretionary authority to our board to adjourn or postpone the special meeting to a later date, if necessary, to solicit additional proxies if there are not sufficient votes in favor of the foregoing proposals; and

5. Any other business as may properly come before the special meeting and any adjournment or postponement of the special meeting.

**Record Date**

Our board has fixed the close of business on January 14, 2005 as the record date for determining our shareholders entitled to vote at the special meeting. Only holders of record of our common stock as of the close of business on that date are entitled to vote at the special meeting. As of the record date, there were 23,724,940 shares of our common stock issued and outstanding, constituting all of our outstanding voting stock. Each share of our common stock issued and outstanding as of the record date entitles its holder to cast one vote at the special meeting.

**Quorum**

To conduct business at the special meeting, a quorum must be present. The holders of a majority of the shares of our common stock issued and outstanding and entitled to vote at the special meeting constitute a quorum. Holders of shares of common stock present in person or represented by proxy (including holders of shares who abstain or do not vote with respect to one or more of the matters presented for shareholder approval) will be counted for purposes of determining whether a quorum exists at the special meeting. If a quorum is not present at the special meeting, the special meeting may be adjourned or postponed to solicit additional proxies.

32

IB 00054

The affirmative vote of the holders of a majority of the shares of our common stock entitled to vote and represented, in person or by proxy, at the special meeting is required to approve proposal one (relating to the issuance of our common stock in connection with the merger).

The affirmative vote of the holders of a majority of the issued and outstanding shares of our common stock is required to approve proposal two (relating to the amendment to our articles of incorporation to effect an increase in the number of authorized shares of our common stock).

The affirmative vote of the holders of two-thirds of the issued and outstanding shares of our common stock is required to approve proposal three (relating to our reincorporation from a Missouri corporation to a Delaware corporation).

The affirmative vote of the holders of a majority of the shares of our common stock entitled to vote and represented, in person or by proxy, at the special meeting is required to approve proposal four (relating to the grant of discretionary authority to our board to adjourn or postpone the special meeting to a later date, if necessary).

The consummation of the merger is contingent upon approval of (i) proposal one and (ii) either proposal two or proposal three. If our shareholders do not approve either proposal two or proposal three, then proposal one will not be effected, even if approved by our shareholders and the merger will not be consummated. Additionally, if our shareholders do not approve proposal one, then proposal two will not be effected even if approved by our shareholders; but proposal three will be effected if approved by our shareholders regardless of whether proposal one or proposal two is approved.

### Voting of Shares

*General.* Shares may be voted at the special meeting by submitting a proxy in the manner described below or voting in person at the special meeting. To vote by proxy you must either (i) complete and mail to our company the enclosed proxy card in the enclosed envelope, (ii) use the telephone number on the proxy card to submit your proxy card telephonically or (iii) visit the website designated on the proxy card to submit your proxy on the Internet. Shares represented by a properly executed and dated proxy will be voted at the special meeting in accordance with the instructions indicated on the proxy. Proxies that are properly executed and dated but which do not contain voting instructions will be voted **FOR** each of the proposals. The proxy holder may vote the proxy in its discretion as to any other matter which may properly come before the meeting.

*Abstentions.* The shares represented by a properly executed proxy marked **ABSTAIN** as to a particular proposal will not be voted with respect to that proposal at the special meeting. If you submit a proxy and affirmatively elect to abstain from voting, your proxy will be counted as present for purposes of determining the presence of a quorum and will have the same effect as a vote **AGAINST** each of proposal one (relating to the issuance of our common stock in connection with the merger), proposal two (relating to the amendment of our articles of incorporation to effect an increase in the number of authorized shares of our common stock), proposal three (relating to our reincorporation from a Missouri corporation to a Delaware corporation) and proposal four (relating to the grant of discretionary authority to our board to adjourn or postpone the special meeting to a later date, if necessary). Approvals by our shareholders of (i) proposal one and (ii) either proposal two or proposal three are necessary to consummate the merger.

*Broker Non-Votes.* If your shares of our common stock are held by your broker, your broker will vote your shares for you only if you provide instructions to your broker on how to vote your shares. You should follow the directions provided by your broker regarding how to instruct your broker to vote your shares. Your broker cannot vote your shares of our common stock without specific instructions from you. Because the affirmative vote of a majority of the outstanding shares of our common stock is required to pass proposal two (relating to the amendment of our articles of incorporation to increase the number of authorized shares of our common stock) and an affirmative vote of two-thirds of the outstanding shares of our common stock is required to pass proposal three (relating to our reincorporation from a Missouri corporation to a Delaware corporation), if you do not instruct your broker how to vote, it will have the effect of a vote **AGAINST**

33

IB 00055

proposals two and three. Because the affirmative vote of a majority of the shares entitled to vote and represented in person or by proxy at the special meeting is required to pass each of proposal one (relating to the issuance of our common stock in connection with the merger) and proposal four (relating to the grant of discretionary authority to our board to adjourn or postpone the special meeting to a later date, if necessary), if you do not instruct your broker how to vote, it will have no effect on the votes related to proposals one and four.

*Voting Shares in Person that Are Held through Brokers.* If your shares are held by your broker or another nominee and you wish to vote those shares in person at the special meeting, you must obtain from the nominee holding your shares of our common stock a properly executed legal proxy identifying you as a Source Interlink shareholder, authorizing you to act on behalf of the nominee at the special meeting and identifying the number of shares with respect to which the authorization is granted.

## How to Revoke a Proxy

Shareholders who hold shares in their own name can change their vote at any time before their proxy is voted at our special meeting. You can do this by using any of the following methods:

- timely delivery by mail, telephone or the Internet of a valid, subsequently-dated proxy;

- delivery to our secretary before or at the special meeting of written notice revoking your proxy or of your intention to vote by ballot at the special meeting; or

- submitting a vote by ballot at the special meeting.

If you have instructed a broker to vote your shares, you must follow your broker's directions in order to change those instructions.

## Voting Agreements

As of January 14, 2005, our directors and executive officers holding as a group approximately 6.2% of the outstanding shares of our common stock entitled to vote on the merger agreement have agreed to vote all of their shares of Source Interlink common stock in favor of the proposals presented in this proxy statement/ prospectus and have executed and delivered to Alliance irrevocable proxies to vote their shares in favor of the merger proposals. For more information, see "Agreements Related to the Merger and Other Transactions — Source Interlink Voting Agreements" on page 75.

## Solicitation of Proxies and Expenses Associated Therewith

We will pay our own costs of soliciting proxies, including the costs of any proxy solicitor we may elect to employ, and will share equally with Alliance the expenses incurred in connection with the filing and printing of this proxy statement/prospectus. We will reimburse brokers, banks, fiduciaries, nominees and others for the out-of-pocket expenses and other reasonable clerical expenses they incur in forwarding proxy materials to beneficial owners of our common stock held in their names. We have engaged Mellon Investor Services LLC to serve as our proxy solicitor in connection with the special meeting and will pay a fee of approximately $10,000 plus reasonable expenses for its services. Certain of our directors, officers and employees may also solicit proxies, without additional remuneration, by telephone, facsimile, electronic mail, telegraph and in person.

## Shareholder Proposals

Our bylaws limit the business that may be transacted at a special meeting of shareholders to matters relating to the purposes of the meeting stated in the notice of the meeting. Accordingly, shareholders may not submit other proposals for consideration at the special meeting.

Proposals of shareholders submitted pursuant to Rule 14a-8 under the Exchange Act to be presented at the 2005 annual meeting of shareholders must have been received by us at our principal executive offices no later than January 14, 2005 in order to be considered for inclusion in our proxy materials for that meeting.

IB 00056

Recommendation of the Source Interlink Board of Directors

After careful consideration, our board, by a unanimous vote of those directors present at a special meeting of the board held to consider the merger, has approved the merger and the other transactions contemplated by the merger agreement. Our board has determined the merger is consistent with, and in furtherance of, our long-term business strategy and that the merger is advisable, fair to, and in the best interests of, our company and our shareholders and recommends that our shareholders vote **FOR** each of proposal one (relating to the issuance of our common stock in the merger), proposal two (relating to the amendment to our articles of incorporation to effect an increase in the number of authorized shares of our common stock), proposal three (relating to our reincorporation from a Missouri corporation to a Delaware corporation) and proposal four (relating to the grant of discretionary authority to our board to adjourn or postpone the special meeting to a later date, if necessary). For more information on these recommendations, see "The Merger — Reasons of Our Board of Directors for the Merger" beginning on page 39.

35

IB 00057

*The following is a description of the material aspects of the proposed merger. The following discussion is a summary only and may not contain all of the information that is important to you. We encourage you to read carefully this entire proxy statement/prospectus, including th merger agreement included as Annex A to this proxy statement/prospectus, for a more complete understanding of the merger.*

## General

Each of Source Interlink's and Alliance's board of directors has approved the merger agreement. At the effective time of the merger, Alliance will merge with and into Alligator Acquisition, LLC, our wholly owned subsidiary.

In the merger, each share of Alliance common stock will be automatically converted into the right to receive that number of shares of our common stock based on the Exchange Ratio. The "Exchange Ratio" will be the quotient obtained by dividing (a) the aggregate number of shares of our common stock issued and outstanding (including shares issuable upon the exercise of all unexpired and unexercised options, warrants or other rights to acquire our common stock) immediately prior to the effective time of the merger by (b) the aggregate number of shares of Alliance common stock issued and outstanding (including shares directly or indirectly issuable upon the exercise of all unexpired and unexercised options, warrants or other rights to acquire Alliance capital stock) immediately prior to the effective time of the merger.

We will not issue fractional shares of our common stock in the merger. Instead, each Alliance stockholder otherwise entitled to a fractional share will receive cash, without interest, in lieu of a fraction of a share of our common stock. As of the effective time of the merger, we will deposit such amount with the exchange agent and will cause the exchange agent to forward payments to the owners of fractional interests.

At the effective time of the merger, each outstanding Alliance stock option, warrant and other right to acquire Alliance capital stock will cease to represent a right to acquire shares of Alliance capital stock and will be converted into an option, warrant or other right to acquire a number of shares of our common stock equal to the number of shares of Alliance common stock directly or indirectly issuable upon the exercise of such option, warrant or other right to acquire Alliance capital stock multiplied by the Exchange Ratio, at a per share exercise price equal to the existing per share exercise price of such option, warrant or other right to acquire Alliance capital stock divided by the Exchange Ratio.

## Background of the Merger

On a regular basis, both we and Alliance evaluate different strategies for improving our respective competitive positions and enhancing shareholder value, including opportunities for mergers with other companies, acquisitions of other companies and marketing and development alliances. In particular, we have for some time pursued a multi-faceted growth strategy that has included strategic alliances with, or acquisition of, businesses engaged in the fulfillment of products other than magazines for the purpose of complementing our existing fulfillment business.

On or about April 28, 2004, S. Leslie Flegel, our chairman and chief executive officer, John J. Ledecky, our largest shareholder, and Ariel Emanuel, our advisor and now one of our directors, held a conference call to discuss possible business opportunities for us involving the distribution of video and audio products.

On June 22, 2004, Mr. Emanuel introduced Messrs. Flegel and Gillis to Erika Paulson, a director of Alliance and a partner with The Yucaipa Companies, LLC, or Yucaipa, which is affiliated with Alliance's controlling stockholder, AEC Associates, L.L.C. After an informal, general discussion regarding their respective businesses, Ms. Paulson and Messrs. Flegel and Gillis agreed that they should meet again to discuss their mutual interests.

On July 7, 2004, Mr. Tony Schnug, acting chief executive officer and a director of Alliance and a partner with Yucaipa, joined Ms. Paulson and Messrs. Flegel and Gillis for a dinner during which the possibility of effecting a business combination between Source Interlink and Alliance was discussed. At the conclusion of

IB 00058

the meeting, all parties concluded that additional discussions should be held to explore a potential business combination.

On July 8, 2004, Ms. Paulson and Mr. Schnug visited our world headquarters in Bonita Springs, Florida. During the visit, our executive personnel provided Ms. Paulson and Mr. Schnug with an overview of our business.

On July 14, 2004, Mr. Flegel presented a summary description of the business of Alliance to the members of our board in conjunction with the annual meeting of the board. At the meeting, the board members discussed the strategic rationale for a merger of the two companies, including the potential benefits and synergies that would result from such a merger and the potential risks of the transaction. The board directed Mr. Flegel to continue to move forward with discussions on behalf of the company.

On July 16, 2004, we signed a mutual confidentiality agreement with Alliance and Alliance presented us with a preliminary information request.

On July 21, 2004, Mr. Flegel, together with Jason S. Flegel, our executive vice president, Marc Fierman, our chief financial officer, Douglas J. Bates, our general counsel, and George Nobbe, our senior vice president, visited Alliance's principal executive offices in Coral Springs, Florida. During that visit, representatives of Alliance provided representatives of our company with an overview of the business of Alliance. Messrs. Flegel, Fierman and Bates met separately with Ms. Paulson, Mr. Schnug and George Campagna, Alliance's chief financial officer, to discuss the possible economic terms of the transaction and transaction structures and to develop a schedule for completion of each parties' due diligence.

Over the course of the next several weeks, representatives of our company and Alliance exchanged certain business and financial information and continued to discuss the merits of a merger of the two companies.

On July 27, 2004, Mr. Flegel updated the board with respect to discussions held with Yucaipa and Alliance. Mr. Flegel summarized the contents of the presentation made by Alliance at the prior meeting held at Alliance's executive offices concerning Alliance's business and reviewed his observations from the plant tour. Mr. Flegel further reported that we had engaged BDO Seidman to assist in the financial due diligence investigation of Alliance.

On July 30, 2004, Mr. Flegel held a conference call with our board to discuss the status of negotiations with Yucaipa and Alliance.

On August 2, 2004, Mr. Flegel and Ms. Paulson met in the morning to discuss the basic economic terms and structure of the transaction and matters related to management.

On August 2, 2004, our board held a meeting in which Mr. Flegel discussed the negotiations with Yucaipa and Alliance. At this meeting, Mr. Fierman presented various financial analyses regarding Source Interlink and Alliance. Our board then discussed the proposed economic terms of the transaction and transaction structures. Our board instructed Mr. Flegel to continue discussions with Yucaipa and Alliance.

On August 10, 2004, Source Interlink and Alliance signed a standstill agreement.

On August 12, 2004, Mr. Bates and Mr. Fierman held a conference call with representatives of Yucaipa and Alliance to discuss the process for drafting the transaction documents and conducting due diligence on each of the companies. We instructed Wilson Sonsini Goodrich & Rosati, Professional Corporation, our mergers and acquisition special counsel, to begin work on a merger agreement and other documentation for the potential merger.

On August 16, 2004, Jefferies & Company, Inc., or Jefferies, met with representatives of our company to discuss the potential transaction with Alliance.

During the four-week period beginning August 10, 2004, representatives of our company and Alliance and their financial advisors continued their exchange and review of information concerning the companies, and representatives of our company and Alliance and their legal counsel continued to negotiate and exchange

37

IB 00059

drafts of the various merger documents. The first draft of the merger agreement was distributed on August 18, 2004.

During the week of August 23, 2004, Wilson Sonsini Goodrich & Rosati prepared and distributed to Munger Tolles & Olson LLP, legal counsel to Alliance, drafts of a merger agreement and related transaction documents.

From August 23 through August 25, 2004, our personnel and our legal counsel and accountants visited Alliance's offices to conduct due diligence.

On August 30 and August 31, 2004, Alliance personnel and its legal counsel and accountants visited our offices to conduct due diligence.

On September 1, 2004, Mr. Flegel met with representatives of Jefferies regarding the potential merger and discussed the possibility of retaining Jefferies to represent us in connection with these discussions. Later that day, we retained Jefferies as our financial advisor in connection with a potential merger with Alliance.

On September 9, 2004, Mr. Flegel met with Ms. Paulson in New York to discuss the economic terms of the transaction, including terms relating to the transaction structure and management matters.

On September 10, 2004, Mr. Flegel met with Ronald Burkle, the managing partner of Yucaipa, to discuss the strategic rationale for a merger of the two companies, including the potential benefits and synergies that would result from such a merger. Following the meeting, Mr. Flegel updated the board of directors with respect to the discussions held with Alliance and Yucaipa.

On September 10, 2004, Source Interlink and Alliance signed a letter agreement to extend the standstill agreement.

On September 17, 2004, Mr. Flegel updated our board with respect to the discussions held with Alliance and Yucaipa including negotiations relating to the economic terms of the transaction and transaction structures.

On September 18, 2004, Mr. Flegel updated our board with respect to the discussions held with Alliance and Yucaipa.

During the week of September 20, 2004, Cohen & Grigsby, our legal counsel, and BDO Seidman presented the preliminary results of their due diligence investigations to us. Also, during this week, Wilson Sonsini Goodrich & Rosati and Munger Tolles & Olson continued to exchange drafts of the merger agreement and related transaction documents.

On September 20, 2004, our board held a special meeting. Mr. Flegel updated the board on the status of discussions with Alliance, including the proposed structure and terms of the merger. The board discussed various issues arising in connection with the negotiations, including the possibility of not pursuing the merger. Mr. Bates reviewed with the directors their fiduciary duties relating to these issues.

On September 22, 2004, Mr. Flegel held a conference call with Mr. Burkle to inform him of the decision by our board to cease discussions with Alliance concerning the potential merger.

For a several week period beginning on September 22, 2004, representatives of our company and Alliance engaged in informal discussions regarding a business relationship.

On October 19, 2004, Mr. Flegel and Mr. Burkle met to discuss issues relating to transaction structure and to consider resuming merger discussions. Following this meeting, our board held a special meeting. Mr. Flegel updated the board on the status of discussions with Alliance, including the proposed structure of the merger. The board authorized and directed Mr. Flegel to resume formal merger discussions with Alliance.

From October 19, 2004 through November 17, 2004, our company and Alliance, with respective counsel, continued to negotiate the terms of the merger and the merger documents.

During the week of October 25, 2004, representatives of Source Interlink and representatives of Wilson Sonsini Goodrich & Rosati traveled to Los Angeles to meet with representatives of Alliance and Munger

38

IB 00060

Tolles & Olson. The parties held meetings for several days at which the parties negotiated the terms of the proposed transaction. Following these discussions, Wilson Sonsini Goodrich & Rosati and Munger Tolles & Olson continued to exchange drafts of the merger agreement and related transaction documents.

On October 28, 2004, Mr. Flegel updated our board with respect to the discussions held with Alliance and Yucaipa.

On November 9, 2004, the independent members of our board held a meeting to discuss the proposed transaction with Alliance.

On November 17, 2004, our board held a special meeting to consider the proposed merger with Alliance. At this meeting, Mr. Flegel summarized the strategic rationale for and the terms of the proposed merger. Representatives of Wilson Sonsini Goodrich & Rosati reviewed with the directors their fiduciary duties and reported to the board on the material terms and conditions of the merger agreement and the related transaction documents, including open issues related thereto. Representatives of Cohen & Grigsby and BDO Seidman presented summaries of their respective legal and accounting due diligence review of Alliance. Representatives of Jefferies presented various financial analyses to our board. During the meeting, the board asked various questions and discussed the potential merger.

On November 17, 2004, Alliance's board of directors met in Los Angeles and unanimously approved the merger.

On November 18, 2004, our board held another special meeting to consider the proposed merger with Alliance. At such meeting, our management and legal counsel updated the board with respect to the status of negotiations with Alliance and Yucaipa. Representatives of Jefferies then rendered an oral opinion to our board that, based on and subject to the various considerations and assumptions set forth therein, the exchange ratio was fair to our company from a financial point of view. After deliberating upon the matters raised at the special meetings held on November 17, 2004 and November 18, 2004, our board by a unanimous vote of those directors present, determined that the merger was consistent with and in furtherance of the long-term business interests of our company and fair to, and in the best interests of, our company and our shareholders, and that the merger agreement was advisable, and approved the merger, the issuance of shares of our common stock in the merger and related matters.

During the afternoon of November 18, 2004, Source Interlink, Alliance and the other parties thereto executed the merger agreement and the related transaction documents. Following the close of trading on November 18, 2004, Source Interlink and Alliance jointly issued a press release announcing the merger.

**Reasons of Our Board of Directors for the Merger**

At a meeting held on November 18, 2004, our board concluded that the merger was consistent with and in furtherance of the long-term business interests of our company and fair to, and in the best interests of, our company and our shareholders, and that the merger agreement was advisable. Accordingly, our board determined to recommend that our shareholders approve and adopt the merger agreement and approve the merger and the issuance of the shares of our common stock in the merger. The summary set forth below briefly describes the primary reasons, factors and information taken into account by our board in reaching its conclusion. Our board did not assign any relative or specific weights to the factors considered in reaching such determination, and individual directors may have given differing weights to different factors.

In reaching its decision to approve the merger agreement and proceed with the business combination with Alliance, our board consulted with our management, legal advisors and financial advisors regarding the strategic, operational and financial aspects of the merger. In the course of reaching its decision to approve the merger agreement, the board considered a variety of factors, including the following material factors:

• management's belief that the merger can further our objective of creating the premier provider of information, supply chain management and logistics services to retailers and producers of home entertainment content products and to produce greater shareholder value than would be achieved absent the merger;

39

IB 00061

- the belief that the combined company can capitalize on our extensive market expertise at the front-end checkout and our strong retail relationships to expand our direct-to-retail distribution and fulfillment services beyond the magazine periodicals business to include Alliance's home entertainment content products;

- the belief that Alliance's in-store merchandising capabilities and comprehensive inventory and category management services should prove invaluable as the companies combine their diverse skill sets;

- the importance of market position, scale and financial resources of Alliance;

- the benefits of becoming a larger organization with over 2,700 combined employees, which would provide access to greater financial, development, distribution channel and other resources;

- the cost savings synergies that may be achieved from procurement, marketing, information technology and administrative and other operating efficiencies;

- historical information concerning Source Interlink's and Alliance's respective businesses, prospects, financial performance and condition operations, management and competitive position, including the results of operations for each company;

- current financial market conditions and historical market price, volatility and trading information with respect to our common stock;

- the consideration to be paid to Alliance's stockholders pursuant to the merger;

- a comparison of comparable merger transactions;

- the belief that the terms of the merger agreement, including the parties' representations, warranties and covenants, and the conditions to their respective obligations, are reasonable;

- the potential for third parties to enter into strategic relationships with or to acquire us or Alliance;

- detailed financial analysis and pro forma and other information with respect to the companies presented to the board of directors;

- the opinion of Jefferies that the exchange ratio was fair to our company from a financial point of view, and the procedures and methods used by Jefferies to reach that opinion;

- the impact of the merger on our customers, strategic partners and employees; and

- reports from our management and legal and financial advisors as to the results of the due diligence investigation of Alliance.

In its review of the proposed merger, our board considered the potential adverse impact of other factors, including:

- the risk that the potential benefits and cost synergies sought in the merger might not be fully realized;

- the risk that, because the exchange ratio provides for no adjustment for changes in the market price of our common stock, the per share value of the consideration to be received by Alliance stockholders on the date of closing might be more than the price immediately before the announcement of the merger due to fluctuations in the market value of our common stock;

- the risk that the combined company's financial results will not meet expectations given the current economic climate and the combined companies' customer base;

- the limitations imposed on the conduct of our business prior to the consummation of the merger;

- the risks relating to Alliance's business and how they would affect the operations of the combined company;

40

IB 00062

- the possibility that the merger might not be consummated and the effect of public announcement of the merger on:

  - our ability to attract and retain key management, marketing, technical, administrative and other personnel; and

  - the progress and status of certain projects and customer accounts;

- the substantial charges to be incurred in connection with the merger, including costs of integrating the businesses and transaction expenses arising from the merger;

- the risk that, despite the efforts of the combined company, key management, marketing, technical, administrative and other personnel might not remain employed by the combined company;

- the challenges of integrating the businesses of Source Interlink and Alliance;

- the revised composition of our board of directors following the merger;

- the fact that the combined company will have a significant shareholder who will be able to exercise significant influence over all matters requiring shareholder approval; and

- the various other risks and uncertainties described under the section of this proxy statement/prospectus entitled "Risk Factors."

Our board did not find it constructive to and did not quantify, rank or otherwise assign relative weights to the factors considered in reaching its decision. Our board considered all of the factors outlined above, both positive and negative, in reaching its decision; however, individual members of our board may have placed different weights on different factors.

**After considering all of the information and factors discussed in this section, our board, by a unanimous vote of those directors present at a special meeting of the board held to consider the merger, approved the merger agreement, the merger and the other transactions contemplated thereby and believes that the terms of the merger are advisable, fair to and in the best interests of our company and our shareholders. Our board recommends that our shareholders vote FOR the proposals relating to approval of the merger agreement and the proposed merger, the issuance of shares of our common stock in the merger and the amendment to our articles of incorporation and the other proposals to be presented to our shareholders at the special meeting.**

**Reasons of Alliance's Board of Directors for the Merger**

In reaching its decision to approve the merger agreement and the merger and proceed with the business combination, Alliance's board of directors consulted with Alliance's management and legal counsel. Alliance's board of directors considered many factors in the course of reaching its decision, including, but not limited to, the following:

- an analysis of the historical information concerning our business, financial condition and competitive position;

- the expanded channels for sales growth afforded by leveraging our retail relationships (including supermarkets) to increase Alliance's product offerings in these retail channels;

- the potential strategic benefits of combining the companies to become a single distribution channel for publishers, media and entertainment companies;

- the complementary nature of the clients of each company, and the breadth and reach of the combined company to almost every major retailer in the country;

- the enhanced opportunities to expand our magazine distribution services to mainstream retailers by leveraging Alliance's retail services group and vendor managed inventory offering;

- the potential cost savings created by consolidation of certain functions, reductions in workforce, and application of process improvements across the combined company;

IB 00063

IB 00064

• the strengthened financial position of the combined company and the valuation of the Alliance business;

• the increased ability to grow through significant acquisitions;

• the ability of the current Alliance stockholders to retain the DMISG businesses through a spin-off of the assets;

• the strength and experience of our management team;

• the continued representation of Alliance stockholders on the board of directors and committees of the combined company;

• the belief that the terms and conditions of the merger agreement are reasonable, including the amount and form of consideration, the nature of the parties' representations, warranties and obligations, and the conditions to their respective obligations to close the transaction;

• the commitment of certain of our officers and directors to vote for the merger agreement;

• the potential of alternative transactions or continued existence as a privately-held company; and

• the increased liquidity that Alliance stockholders and option holders will enjoy through ownership of publicly traded stock, and the assumption of all Alliance options, warrants or other rights to acquire capital stock by the combined company.

The Alliance board of directors also identified and considered a number of potentially negative factors related to the merger, including;

• the risk that cost synergies may not be capable of being realized;

• the risk that the combined company will not meet its projections;

• the lack of any adjustment in the exchange ratio for fluctuations in our stock price which could result in a valuation of the Alliance business that is less than the price immediately prior to the announcement of the merger;

• the risk that the integration of the two companies could be time consuming and costly;

• the inability of the combined company's stock to continue to trade at our historical trading multiples;

• the risks related to the combined company's business;

• the possibility that the merger might not be completed in a timely fashion; and

• the competitive nature of the business and the pressure on margins.

After careful consideration of all factors, including the potential negative facts, the Alliance board of directors concluded that the potential benefits of the merger outweighed the potential negative factors associated with the merger.

This discussion of the information and factors considered by the Alliance board of directors is not intended to be exhaustive. In making its determination, the Alliance board of directors considered factors as a whole and did not assign specific or relative weights to the factors. Nor did the Alliance board of directors reach specific conclusions on any single factor (or any aspect thereof) considered, but rather, it conducted an overall analysis of these factors. In addition, individual members of the Alliance board of directors may have given different weight to different factors.

**Opinion of Jefferies & Company, Inc., Financial Advisor to Source Interlink Companies, Inc.**

Source Interlink retained Jefferies & Company, Inc., or Jefferies, to act as its financial advisor in connection with the merger of Alliance with and into Source Interlink's wholly owned subsidiary, Alligator Acquisition, LLC, pursuant to the merger agreement. As part of Jefferies' engagement, Source Interlink's board of directors requested Jefferies to render an opinion to Source Interlink as to the fairness, from a

IB 00065

IB 00066

financial point of view, of the exchange ratio pursuant to the merger agreement to Source Interlink. On November 18, 2004, Jefferies rendered to the Source Interlink board of directors its oral opinion, subsequently confirmed by the delivery of a written opinion dated November 18, 2004, that as of that date, and based upon and subject to the various considerations and assumptions set forth in the opinion, the exchange ratio pursuant to the merger agreement was fair to Source Interlink from a financial point of view.

The full text of the Jefferies opinion, which sets forth, among other things, assumptions made, procedures followed, matters considered and limitations on the scope of the review undertaken by Jefferies in rendering its opinion, is attached as *Appendix B* to this proxy statement/prospectus and is incorporated herein by reference in its entirety. Source Interlink and its board of directors urge its shareholders to, and they should, read the Jefferies opinion carefully and in its entirety. The Jefferies opinion is addressed to the board of directors of Source Interlink. The Jefferies opinion addresses only the fairness, from a financial point of view and as of the date of the Jefferies opinion, of the exchange ratio, and does not address any other aspect of the merger. The opinion does not constitute a recommendation to any shareholder as to how such shareholder should vote or act on any matter related to the transaction. The summary of the Jefferies opinion in this proxy statement/prospectus is qualified in its entirety by reference to the full text of the Jefferies opinion.

In connection with its opinion, Jefferies, among other things:

• reviewed the merger agreement (including the schedules and attachments thereto);

• reviewed certain financial and other information about Source Interlink and Alliance that was publicly available;

• reviewed certain internal financial and operating information, including financial forecasts and projections that were provided to Jefferies by Source Interlink and Alliance;

• reviewed certain financial forecasts and commentary prepared by Wall Street research analysts who report on comparable companies and other industry research;

• reviewed the historical stock prices and trading volumes of the common stock of Source Interlink;

• reviewed certain cost savings and operating synergies projected by management of Source Interlink and Alliance to result from the transactions contemplated by the merger agreement;

• held discussions with members of management of Source Interlink and Alliance concerning the respective companies' historical and current operations and financial conditions, current and future business prospects and joint prospects for the combined companies;

• reviewed the potential pro forma impact of the transaction provided by management of Source Interlink;

• performed an analysis of the valuations of publicly traded companies Jefferies deemed comparable to Source Interlink and Alliance;

• performed a discounted analysis of Alliance's projected future cash flows on a stand-alone basis; and

• reviewed public information with respect to certain other business combinations that Jefferies deemed generally relevant.

In addition to the foregoing, Jefferies performed such other studies, analyses, and investigations and considered such other financial, economic and market criteria as it considered appropriate in arriving at its opinion. In connection with its review, Jefferies did not assume any responsibility for independent verification of any of the foregoing information. With Source Interlink's permission, Jefferies relied upon the accuracy and completeness of all of the financial, accounting, legal, tax and other information discussed with or reviewed by Jefferies and assumed such accuracy and completeness for purposes of rendering its opinion to the Source Interlink board of directors.

With respect to the financial projections and financial models of Source Interlink and Alliance and the joint prospects of the combined companies, including the cost savings and operating synergies referred to

43

IB 00067

above, provided to Jefferies by management of Source Interlink and Alliance, Jefferies assumed, with Source Interlink's consent and based upon discussions with the management of Source Interlink and Alliance, that such forecasts had been reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of such managements, at the time of preparation, of the future operating and financial performance of Source Interlink and Alliance and the combined companies. With respect to the financial projections and financial models provided to and examined by Jefferies, Jefferies noted in its opinion that projecting future results of any company is inherently subject to uncertainty. In its opinion, Jefferies noted that although such projections and models did not form the principal basis for its opinion, but rather constituted one of many items that Jefferies considered, changes to such projections and models could affect the opinion rendered to the Source Interlink board of directors. Jefferies noted in its opinion that it was not expressing any opinion with respect to any of such forecasts, projections or estimates or the assumptions on which they were based. In rendering its opinion Jefferies assumed with Source Interlink's permission the following:

- the transactions contemplated by the merger agreement would be consummated in a manner that complies in all respects with the applicable provisions of the Securities Act and all other applicable federal and state statutes, rules and regulations;

- the transactions contemplated by the merger agreement would be consummated in accordance with the terms described in the merger agreement, without any material amendments thereto and without any waiver by Source Interlink or Alliance of any material conditions;

- there was not as of the date of the opinion, and there would not as a result of the consummation of the transactions contemplated by the merger agreement be, any default, or event of default, under any indenture, credit agreement or other material agreement or instrument to which Source Interlink, Alliance or any of their respective subsidiaries or affiliates is a party; and

- all material assets and liabilities (contingent or otherwise, known or unknown) of Source Interlink and Alliance were as set forth in their respective consolidated financial statements provided to Jefferies.

Further, as Jefferies discussed with the Source Interlink board of directors, in its analysis of the transaction Jefferies assumed with Source Interlink's permission that (1) neither the Principal Stockholder (as defined in the merger agreement) (nor any transferee of the "beneficial ownership" of any of the Principal Stockholder's shares of capital stock of Alliance) nor any "group" which includes the Principal Stockholder (or such transferee) (within the meaning of Section 13(d) of the Exchange Act, and the rules and regulations promulgated thereunder) would control the combined company after or as a result of the transaction; and (2) any tax liabilities resulting from the spin-off of Alliance's "All Music Guide" and "Digital-On-Demand" businesses would be fully offset by available Alliance net operating losses or subject to indemnification. In rendering its opinion, Jefferies also assumed that there had not been any material changes in Source Interlink's or Alliance's financial conditions or results of operations since the most recent financial statements made available to Jefferies, other than in the ordinary course of business.

Jefferies was not requested to make, and did not make or obtain, an independent evaluation or appraisal of Source Interlink's or Alliance's assets or liabilities (contingent or otherwise), nor was Jefferies furnished with any such evaluations or appraisals. Jefferies did not conduct a physical inspection of the properties and facilities of either Source Interlink or Alliance.

The Jefferies opinion necessarily is based upon information available to it as of the date of the opinion and upon financial, economic, market and other conditions as they existed and could be evaluated on the date of the opinion. The Jefferies opinion does not address the merits of Source Interlink's or its board's decision to enter into the merger agreement as opposed to any alternative business transaction that might have been available to Source Interlink, nor does it address Source Interlink's underlying business decision to effect the merger. Further, the Jefferies opinion does not express any opinion as to what the value of Source Interlink common stock will be when issued or the prices at which Source Interlink common stock will trade at any time.

In preparing its opinion to the Source Interlink board of directors, Jefferies performed a variety of financial and comparative analyses. The preparation of a fairness opinion is a complex process and is not

44

IB 00068

necessarily susceptible to partial analysis or summary description. Jefferies believes that its analyses must be considered as a whole and that selecting portions of its analyses and of the factors considered by it, without considering all analyses and factors, could create a misleading view of the processes underlying the Jefferies opinion. No company or transaction used in the analysis performed by Jefferies as a comparison is identical to Source Interlink, Alliance, or the transaction between Source Interlink and Alliance. In addition, Jefferies may have given variou analyses more or less weight than other analyses, and may have deemed various assumptions more or less probable than other assumptions, so that the range of valuations resulting from any particular analysis described below should not be taken to be Jefferies' view of Alliance's actual value. In performing its analysis, Jefferies made numerous assumptions with respect to industry performance, general business and economic conditions and other matters, many of which are beyond Source Interlink's or Alliance's control. The analyses performed by Jefferies are not necessarily indicative of actual values or actual future results, which may be significantly more or less favorable than suggested by such analyses. In addition, analyses relating to the value of businesses or assets do not purport to be appraisals or to necessarily reflect the prices at which businesses or assets may actually be sold. The analyses performed were prepared solely as part of Jefferies' analysis of the fairness, from a financial point of view, of the exchange ratio and were provided to the Source Interlink board of directors in connection with the delivery of the Jefferies opinion.

The following is a summary of the material financial analyses performed by Jefferies in connection with providing its opinion to the Source Interlink board of directors. Certain of the summaries of those financial analyses include information presented in tabular format. In order to fully understand the material financial analyses used by Jefferies, the tables should be read together with the text of each summary. The tables alone do not constitute a complete description of the material financial analyses.

### *Comparable Company Analysis*

Jefferies reviewed publicly available information as of November 16, 2004, to calculate specific financial and operating information, market values and trading multiples (as described below) and then compared Alliance's financial and operating information provided to it by Alliance, with the corresponding financial and operating information, market values and trading multiples of the following selected companies:

- Handleman Company

- Ingram Micro, Inc.

- Navarre Corporation

- Noland Company

- Tech Data Corporation

- United Natural Foods, Inc.

- United Stationers, Inc.

- WESCO International, Inc.

Jefferies selected such companies for comparison with Alliance because they are the publicly-traded companies most similar to Alliance in the distribution industry with operations that are comparative to certain operations of Alliance. The selected companies were considered comparative to Alliance by Jefferies because each had distribution operations, operating scale and capabilities similar to Alliance, similar operating margins to Alliance, and faced comparable industry trends and economic challenges.

The following table presents for the periods indicated, the multiples implied by the ratio of enterprise value (which is defined as equity value plus total debt less total cash) to LTM EBITDA and to estimated EBITDA for fiscal years 2004 and 2005 for the comparable companies listed above. Source Interlink's fiscal year ends on January 31. To conform with Source Interlink's fiscal year end, Alliance provided Jefferies with financial information annualized to a January 31 fiscal year end. However, for valuation purposes to compare similar time periods Jefferies applied calendar year end (December 31) multiples in the comparable companies analysis to the January 31 fiscal year end figures for Alliance as there was only a one-month

IB 00069

difference. For example, in the tables immediately below, FY 2004 reflects a December 31, 2004 fiscal year end for the comparable company multiples and a January 31, 2005 fiscal year end for Alliance.

|  | Selected Comparable Company Multiples | | | |
|---|---|---|---|---|
|  | Low | Mean | Median | High |
| Enterprise Value as a Multiple of: | | | | |
| LTM EBITDA | 5.5x | 11.6x | 9.3x | 25.0x |
| FY 2004E EBITDA | 7.9x | 11.2x | 9.6x | 20.4x |
| FY 2005E EBITDA | 6.1x | 9.0x | 8.5x | 14.0x |

The following table presents, for the periods indicated, the multiples implied by the ratio of equity value over net income for each of the LTM and estimated fiscal years 2004 and 2005 for the comparable companies listed above.

|  | Selected Comparable Company Multiples | | | |
|---|---|---|---|---|
|  | Low | Mean | Median | High |
| Equity Value as a Multiple of Net Income: | | | | |
| LTM Equity Value/ Net Income | 15.0x | 21.6x | 19.9x | 33.7x |
| FY 2004E Equity Value/ Net Income | 14.6x | 20.1x | 19.3x | 29.1x |
| FY 2005E Equity Value/ Net Income | 12.2x | 16.4x | 15.8x | 25.4x |

Applying the analysis set forth in the tables above, Jefferies derived a range of implied enterprise values as follows:

|  | Implied Transaction Value Range | |
|---|---|---|
|  | Low | High |
|  | (In millions) | |
| LTM EBITDA | $221.9 | $767.1 |
| FY 2004E EBITDA | $227.2 | $621.5 |
| FY 2005E EBITDA | $242.7 | $488.7 |
| LTM Net Income | $331.2 | $610.8 |
| FY 2004E Net Income | $255.9 | $416.2 |
| FY 2005E Net Income | $247.5 | $409.6 |

At the time Jefferies presented the fairness opinion to the board of directors of Source Interlink, it calculated the transaction's enterprise value to be $307.5 million based on the 20-day moving average as of November 16, 2004, fully diluted share count and net debt of $10.51, 28.0 million and $13.0 million, respectively.

Jefferies did not consider the implied enterprise value based upon a multiple of revenue to be an accurate indicator of the enterprise value o Alliance because it does not take into consideration the profitability of the company. Profitability can be measured in any number of ways, most commonly however, it is measured by EBITDA and net income. A more appropriate and accurate method of measuring transaction value is either as a multiple of some measure of profitability, for instance EBITDA or net income, or alternatively by using a discounted cash flow analysis.

No company utilized in the comparable company analysis is identical to Alliance. In evaluating the comparative companies, Jefferies made judgments and assumptions with regard to industry performance, general business, economic, market and financial conditions and other matters, many of which are beyond Alliance's control, such as the impact of competition and technology on its business and the industry generally, industry growth and the absence of any material adverse change in its financial condition and prospects or the industry or in the financial markets in general. Mathematical analysis, such as determining the average or median, is not in itself a meaningful method of using comparable company data.

46

IB 00070

As part of its analysis, Jefferies reviewed twelve precedent transactions within the distribution industry and related industries. For each of these precedent transactions, Jefferies compared the multiples of enterprise value to LTM EBITDA and equity value to LTM net income as of the announcement date of each transaction. These transactions were (listed as acquirer/target/announcement date):

- Ingram Micro, Inc./Tech Pacific Group/September 26, 2004

- McKesson Medical-Surgical/Moore Medical Corp./January 20, 2004

- Henry Schein, Inc./demedis GmbH and Euro Dental Holding GmbH/January 8, 2004

- Fresh Del Monte Produce, Inc./Standard Fruit & Vegetable Co./January 27, 2003

- Staples, Inc./Medical Arts Press, Inc./July 9, 2002

- Fleming Companies, Inc./Core-Mark International, Inc./April 24, 2002

- Performance Food Group Co./Quality Foods, Inc./April 10, 2002

- Patterson Dental Company/JA Webster, Inc./July 9, 2001

- Deere & Co./Richton International Corp./May 30, 2001

- Revy Home Centers, Inc./RONA, Inc./May 14, 2001

- Avnet, Inc./Kent Electronics Corp./March 22, 2001

- Fisher Scientific International/PSS World Medical, Inc./June 22, 2000

The following table presents, for the periods indicated, the multiples implied by the ratio of enterprise value to LTM EBITDA and equity value to net income for the comparable transactions listed above.

|  | Selected Comparable Company Multiples | | | |
|---|---|---|---|---|
|  | Low | Mean | Median | High |
| Enterprise Value as a Multiple of: | | | | |
| LTM EBITDA | 7.7x | 11.2x | 9.9x | 18.4x |
| Equity Value as a Multiple of Net Income: | | | | |
| LTM Equity Value/ Net Income | 9.0x | 19.2x | 18.7x | 32.1x |

Applying the analysis set forth in the tables above, Jefferies derived a range of implied enterprise values as follows:

|  | Implied Enterprise Value Range | |
|---|---|---|
|  | Low | High |
|  | (In millions) | |
| LTM EBITDA | $300.2 | $650.8 |
| LTM Net Income | $239.7 | $599.9 |

At the time Jefferies presented the fairness opinion to the board of directors of Source Interlink, it calculated the transaction's enterprise value to be $307.5 million based on the parameters described above.

Jefferies did not consider the implied enterprise value based upon a multiple of revenue to be an accurate indicator of the enterprise value o

IB 00071

most commonly however, it is measured by Lu...... ...... ..pp....... ...... ......
is either as a multiple of some measure of profitability, for instance EBITDA or net income, or alternatively by using a discounted cash flow analysis.

47

IB 00072

No transaction utilized as a comparison in the precedent transaction analysis is identical to the transaction between Source Interlink and Alliance. In evaluating the Source Interlink and Alliance transaction, Jefferies made judgments and assumptions with regard to industry performance, general business, economic, market, and financial conditions and other matters, many of which are beyond Alliance's control, such as the impact of competition and technology on its business and the industry generally, industry growth, and the absence of any adverse material change in its financial condition and prospects or in its industry or in the financial markets in general. Mathematical analysis, such as determining the average or the median, is not in itself a meaningful method of using comparable transaction data.

### Discounted Cash Flow Analysis

Using operating projections provided to Jefferies by Alliance management, Jefferies performed a discounted cash flow analysis in which it estimated Alliance's value by adding the discounted value of its annual projected free cash flows (unlevered net income, plus depreciation and amortization, less capital expenditures, plus or minus changes in working capital, as the case may be, exclusive of cost savings and operating synergies projected by management of Source Interlink and Alliance to result from the transactions contemplated by the merger agreement) for a five year period (FY 2006 through FY 2010) to Alliance's discounted terminal value. Jefferies based Alliance's terminal value on a multiple of Alliance's FY 2010 EBITDA. Jefferies used a discount rate range of 16.0% to 18.0%, which was based on Alliances' weighted average cost of capital.

The following table presents the implied enterprise valuation based on a discounted cash flow analysis:

| | Multiple of 2010E EBITDA | | |
| | (in millions except for multiples) | | |
| Discount Rate | 8.0x | 10.0x | 12.0x |
|---|---|---|---|
| 16.00% | $284.5 | $333.1 | $381.8 |
| 17.00% | 274.4 | 321.0 | 367.6 |
| 18.00% | 264.7 | 309.4 | 354.1 |

### Contribution Analysis

Jefferies performed a contribution analysis in which it reviewed certain historical and estimated future operating and financial information for Source Interlink, Alliance and the pro forma combined company provided to Jefferies by Source Interlink and Alliance. The analysis was based on the relative contributions of each party to the pro forma combined company's revenue, EBITDA, free cash flow, net income, cash, accounts receivable, inventory, accounts payable, total debt, and bank loan availability for the LTM period and estimated revenue, EBITDA, free cash flow, and net income for the fiscal years ended 2006 and 2007, which excluded transaction related costs and expenses, transaction related bonuses paid or to be paid to management of Alliance and any tax liabilities the combined company may have from the spin-off of Alliance's "All Music Guide" and "Digital-On-Demand" businesses prior to the closing of the merger. The estimated financial

48

IB 00075

Alliance to the combined company for such periods:

| | LTM | FY 2006E | FY 2007E |
|---|---|---|---|
| Revenue | 73.0% | 69.1% | 67.3% |
| EBITDA | 62.1% | 52.4% | 51.3% |
| Free Cash Flow | 60.9% | 47.3% | 46.6% |
| Net Income | 60.7% | 49.0% | 48.0% |
| Cash | 0.0% | | |
| Accounts Receivable | 63.5% | | |
| Inventory | 87.0% | | |
| Accounts Payable | 80.6% | | |
| Total Debt | 55.2% | | |
| Bank Loan Availability | 77.1% | | |

Based on the exchange ratio and the capitalization figures of the companies provided to Jefferies by Alliance and Source Interlink as of the date of the merger agreement, Alliance stockholders would beneficially own approximately 50% of the outstanding shares of common stock of the combined company (calculated on a fully-diluted basis) immediately following the merger, as further discussed in the section entitled "Questions and Answers About the Merger — What percentage of the combined company will the Source Interlink equityholders and the Alliance equityholders own following the merger?"

*Accretion/ Dilution Analysis*

Jefferies reviewed various pro forma financial impacts of the merger on the holders of Source Interlink and Alliance provided to Jefferies by Source Interlink and Alliance based on the exchange ratio and the estimated financial results of Source Interlink and Alliance for fiscal year 2006, 2007, 2008, 2009 and 2010, and assuming cost savings and operating synergies resulting from the merger. The estimated financial result and cost savings and other operating synergies were based upon Source Interlink and Alliance management estimates. Based on these projections and assumptions, Jefferies noted that the merger would result in accretion to the projected earnings per share of Source Interlink for each of fiscal years 2006, 2007, 2008, 2009 and 2010. The actual operating or financial results achieved by the combined entity may vary from projected results. Furthermore, these variations may be material.

Jefferies also considered the historical trading prices and volumes for Source Interlink common stock.

Jefferies' opinion was one of many factors taken into consideration by Source Interlink's board of directors in making its determination to recommend the transaction.

Jefferies was selected by the Source Interlink board of directors based on Jefferies' qualifications, expertise and reputation. Jefferies is an internationally recognized investment banking and advisory firm. Jefferies, as part of its investment banking business, is continuously engaged in the valuation of businesses and securities in connection with mergers and acquisitions, leveraged buyouts, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements and valuations for corporate and other purposes. In the past, Jefferies has provided services to, and received compensation from, Source Interlink on matters related to certain transactions, including acting as lead underwriter for Source Interlink in the public offering of 4,800,000 shares in March 2004 for which Jefferies received approximately $2.3 million in compensation. In the ordinary course of Jefferies' business, it publishes research reports on securities of Source Interlink and Jefferies and its affiliates may trade or hold such securities of Source Interlink for its own accounts and for the accounts of its customers and, accordingly, may at any time hold long or short positions in those securities.

Pursuant to an engagement letter dated September 1, 2004, as amended on November 12, 2004, Source Interlink engaged Jefferies to provide financial advisory services to Source Interlink and its board of directors

IB 00074

in connection with a merger with or into another person or group of affiliated persons, including, among other things, rendering its opinion described herein. Pursuant to the terms of the engagement letter, Source Interlink paid Jefferies a fee of $650,000 for rendering its opinion. The terms of the fee arrangement with Jefferies, which are customary in transactions of this nature, were negotiated at arm's length between the Source Interlink management team and Jefferies, and the Source Interlink board of directors were aware of the arrangement. In addition, Source Interlink agreed to reimburse Jefferies for its out-of-pocket expenses, including attorney's fees, incurred in connection with its engagement and to indemnify Jefferies and certain related persons against any liabilities and expenses arising out of or in conjunction with its rendering of services pursuant to its engagement, except if such liabilities are found in a final court judgment to be the direct result of Jefferies' gross negligence or bad faith.

**Interests of Source Interlink Directors, Officers and Affiliates in the Transaction**

When considering the recommendation of our board, you should be aware that certain of our directors, officers and affiliates have interests in the transaction that are different from, or are in addition to, your interests. Our board was aware of these potential conflicts and considered them.

All executive officers have interests in the combined company as employees in terms of job responsibilities, working environment and compensation which are in addition to and different from their interests as shareholders. All continuing directors will have the responsibility of being directors of a larger company after the merger. Under the terms of the merger agreement, the following members of our executive management team and board of directors will become executive officers and/or members of the board of the combined company:

| Name | Current Position with Source Interlink | New Position with Source Interlink |
|---|---|---|
| S. Leslie Flegel | Chairman of the Board and Chief Executive Officer | Chairman of the Board and Chief Executive Officer |
| James R. Gillis | President, Chief Operating Officer and Director | President, Chief Operating Officer and Director |
| Jason S. Flegel | Executive Vice President | Executive Vice President |
| John A. Amann | Executive Vice President | Executive Vice President |
| Marc Fierman | Chief Financial Officer | Chief Financial Officer |
| A. Clinton Allen | Director | Director |
| Ariel Emanuel | Director | Director |
| Aron S. Katzman | Director | Director |
| Allan R. Lyons | Director | Director |

Messrs. S. Leslie Flegel, James R. Gillis, Jason S. Flegel and Marc Fierman are expected to enter into employment agreements and receive cash signing bonuses, conditioned by and effective upon the consummation of the merger.

In order to accommodate the new directors to be designated to our board of directors, certain of the existing directors will be reclassified into a different class. This will have the effect, if the merger takes place, of extending the tenures of Messrs. Gillis and Katzman whose term will expire in 2006 rather than 2005.

Ariel Emanuel, one of our directors, will be paid $1.5 million upon the consummation of the merger as compensation for consulting services provided to us in connection with the merger. Mr. Emanuel was not a director at the time we entered into this arrangement with him nor when the board approved the merger.

As a result of these interests, these directors and officers could be more likely to vote to approve the issuance of the shares of our common stock in connection with the merger than if they did not hold these interests. Our shareholders should consider whether these interests may have influenced these directors and officers to support or recommend the merger agreement.

50

IB 00075

You should be aware that certain of Alliance's directors, officers and affiliates have interests in the transaction that are different from, or are in addition to, your interests. The Alliance board was aware of these potential conflicts and considered them.

In connection with the merger, Alan Tuchman, a director of Alliance and its President and Chief Operating Officer, is expected to become one of our Executive Vice Presidents.

Two directors of Alliance, Tony Schnug and Erika Paulson, are partners of The Yucaipa Companies, LLC, an entity affiliated with AEC Associates, L.L.C., Alliance's majority stockholder. Yucaipa will receive a fee of approximately $4 million in connection with the merger pursuant to an existing management services agreement with Alliance. Yucaipa will also enter into a new consulting agreement with Source Interlink, which is described in more detail in "Agreements Related to the Merger and Other Transactions — Consulting Agreement" on page 77.

AEC Associates will enter into a stockholder's agreement with Source Interlink addressing certain governance and other matters as further described in "Agreements Related to the Merger and Other Transactions — Stockholder's Agreement" on beginning page 75.

AEC Associates is a majority stockholder of Spinco. In connection with the spin-off, Alliance and Spinco have entered into a number of agreements including the distribution and separation agreement, licensing and co-marketing agreement, transition/shared services agreement and tax-sharing and indemnification agreement. The combined company will assume the rights and obligations of Alliance under these agreements upon consummation of the merger. For a description of these agreements, see "Agreements Related to the Merger and Other Transactions — Agreements between Alliance and Spinco" beginning on page 77.

Provisions in the merger agreement provide that we will cause all rights to indemnification existing in favor of Alliance's officers and directors and certain acquired subsidiaries as of November 18, 2004 for their acts and omissions prior to the effective time of the merger, whether provided in Alliance's certificate of incorporation, bylaws, other charter documents or in indemnification agreements, to be observed by us or Alligator Acquisition, LLC for six years following the merger. We must also cause the surviving entity to provide officers' and directors' liability insurance for six years following the transaction covering those persons who were covered by Alliance's directors' and officers' liability insurance policies as of November 18, 2004.

## No Dividends

Alliance stockholders are not entitled to receive any dividends or other distributions on shares of our common stock until the merger is consummated and they have surrendered their Alliance stock certificates in exchange for shares of our common stock. Subject to the effect of applicable laws, promptly following surrender of Alliance stock certificates and the issuance of the corresponding Source Interlink stock certificates, Alliance stockholders will be paid the amount, if any, of dividends or other distributions, without interest, paid to our shareholders with record dates after the consummation of the merger but before such shareholders surrendered their Alliance stock certificates.

## Material U.S. Federal Income Tax Consequences

The following summary discusses the material U.S. federal income tax consequences of the merger to Alliance stockholders who exchange their shares of Alliance common stock for shares of our common stock in the merger. This discussion represents the opinion of Wilson Sonsini Goodrich & Rosati, Professional Corporation, special counsel to Source Interlink, and Munger, Tolles & Olson LLP, counsel to Alliance, as reflected in Exhibits 8.1 and 8.2 to the registration statement of which this proxy statement/ prospectus forms a part. This discussion does not address the tax consequences of the merger to holders of options or warrants to acquire, or securities convertible into, Alliance common stock. This discussion does not address the tax consequences of the spin-off of Spinco to Alliance or its stockholders. This discussion addresses only Alliance stockholders who are U.S. citizens or residents and hold Alliance common stock as capital assets (generally, property held for investment purposes). It does not address all of the U.S. federal income tax consequences

51

IB 00076

that may be relevant to a particular Alliance stockholder in light of that stockholder's individual circumstances or to an Alliance stockholder who is subject to special rules, including, without limitation:

- a financial institution or insurance company;

- a mutual fund;

- a tax-exempt organization;

- a pass-through entity or an investor in such an entity;

- a dealer or broker in securities or foreign currencies;

- a stockholder who holds individual retirement or other tax-deferred accounts;

- a trader in securities who elects to apply a mark-to-market method of accounting;

- a stockholder who is subject to the alternative minimum tax provisions of the Internal Revenue Code;

- a stockholder who holds Alliance common stock as part of a hedge, appreciated financial position, straddle, constructive sale or conversion transaction; or

- a stockholder who acquired his or her shares of Alliance common stock pursuant to the exercise of employee stock options or otherwise as compensation.

This discussion is based on the Internal Revenue Code, applicable Treasury regulations, administrative interpretations and court decisions, each as in effect as of the date of this proxy statement/ prospectus and all of which are subject to change, possibly with retroactive effect. This discussion does not address any state, local or foreign tax consequences of the merger.

**Alliance stockholders are strongly urged to consult their tax advisors as to the specific tax consequences to them of the merger in light of their particular circumstances, including the applicability and effect of U.S. federal, state, local and foreign income and other tax laws.**

It is a condition to the completion of the merger that we receive a written opinion from Wilson Sonsini Goodrich & Rosati, Professional Corporation, and Alliance receive a written opinion from Munger, Tolles & Olson LLP, in each case dated as of the effective date of the merger, to the effect that the merger will qualify as a "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code. This condition to the completion of the merger is referred to as the tax opinion closing condition. In the event that counsel to either party does not deliver its tax opinion, the tax opinion closing condition will nevertheless be satisfied if counsel to the other party delivers its opinion to the effect that the merger will qualify as a "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code. The following material U.S. federal income tax consequences would result from such qualification:

- an Alliance stockholder whose shares of Alliance common stock are exchanged in the merger for shares of our common stock will not recognize gain or loss as a result of the merger, except to the extent of cash, if any, received in lieu of a fractional share of our common stock;

- an Alliance stockholder's tax basis in shares of our common stock received in the merger will equal the tax basis of the Alliance common stock surrendered in the merger, reduced by the portion of that tax basis allocable to a fractional share of our common stock for which cash is received;

- an Alliance stockholder's holding period for shares of our common stock received in the merger will include the holding period for the shares of Alliance common stock surrendered in the merger;

- to the extent that an Alliance stockholder receives cash in lieu of a fractional share of our common stock, the stockholder will be deemed to have received that fractional share in the merger and then to have received the cash in redemption of that fractional share. The stockholder generally will recognize gain or loss equal to the difference between the cash received and the portion of the stockholder's tax basis in the shares of Alliance common stock surrendered allocable to that fractional share. This gain

IB 00077

IB 00078

or loss generally will be long-term capital gain or loss if the holding period for those shares of Alliance common stock is more than one year at the effective time of the merger; and

• none of Source Interlink, Alligator Acquisition, LLC, or Alliance will recognize gain or loss solely as a result of the merger.

No ruling has been or will be sought from the Internal Revenue Service, or the IRS, with respect to the U.S. federal income tax consequences of the merger. The tax opinions are not binding on the IRS or any court, nor do they preclude the IRS from asserting a contrary position. The tax opinions will rely on assumptions, including the absence of changes in existing facts and law and the completion of the merger in the manner contemplated by the merger agreement, as well as representations and covenants made by us, Alligator Acquisition, LLC and Alliance, including those contained in representation letters of our officers and the officers of Alligator Acquisition, LLC and Alliance. If any of these assumptions, representations or covenants is inaccurate, the tax opinions may not be rendered and the tax consequences of the merger could differ from those discussed in this proxy statement/ prospectus. Neither we nor Alliance intends to waive the tax opinion closing condition. In the event that either we or Alliance waive the tax opinion closing condition, we will file a new proxy statement/ prospectus that will include disclosure describing the tax consequences of the merger and requesting the approval of the merger by the shareholders of Source Interlink and Alliance taking this waiver into account.

An Alliance stockholder exercising dissenters' rights with respect to Alliance common stock who receives payment for such stock in cash will generally recognize gain or loss for federal income tax purposes, measured by the difference between the stockholder's basis in such stock and the amount of cash received, provided that the payment is not treated as a dividend for federal income tax purposes. A sale of Alliance common stock pursuant to the exercise of dissenters' rights generally will not be treated as a dividend if, as a result of such sale, the stockholder owns no shares of our common stock (either actually or constructively within the meaning of Section 318 of the Internal Revenue Code) after the transaction.

Irrespective of the merger's status as a "reorganization," an Alliance stockholder would recognize income or gain to the extent shares of our common stock received in the merger were treated as received in exchange for services or property other than solely Alliance common stock. All or a portion of any such income could be taxable as ordinary income. Gain also would be recognized to the extent an Alliance stockholder were treated as receiving (directly or indirectly) consideration other than our common stock in exchange for Alliance common stock or to the extent the Alliance common stock surrendered in the merger is not equal in value to our common stock received in the exchange.

**ALLIANCE STOCKHOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE SPECIFIC TAX CONSEQUENCES OF THE MERGER TO THEM, INCLUDING THE APPLICATION AND EFFECT OF U.S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX LAWS.**

### Accounting Treatment for the Merger

The merger will be accounted for as a purchase business combination for financial accounting purposes in accordance with accounting principles generally accepted in the United States. For purposes of preparing the combined company's consolidated financial statements, the combined company will establish a new accounting basis for Alliance's assets and liabilities based upon their fair values as of the effective date of the merger, the merger consideration and the costs of the merger. Any excess of cost over the fair value of the net tangible and identifiable intangible assets of Alliance will be recorded as goodwill. Pursuant to Statements of Financial Accounting Standards No. 141, "Business Combinations" and No. 142, "Goodwill and Other Intangible Assets," goodwill is not subject to amortization over its estimated useful life. Rather, goodwill will be subject to at least annual assessment for impairment based on a fair value test. Identifiable intangible assets with finite lives will be amortized over those lives. A final determination of the intangible asset values and required purchase accounting adjustments, including the allocation of the purchase price to the assets acquired and liabilities assumed based on their respective fair values, has not yet been made. The combined company will determine the fair value of Alliance's assets and liabilities and will make appropriate business combination

53

IB 00079

accounting adjustments. However, for purposes of disclosing pro forma information in this proxy statement/ prospectus, the combined company has made a preliminary determination of the purchase price allocation, based upon current estimates and assumptions, which is subject to revision upon consummation of the merger.

Reported financial condition and results of operations of the combined company will reflect Alliance's balances and results after consummation of the merger, but will not be restated retroactively to reflect the historical financial position or results of operations of Alliance

**Spin-Off of Certain Non-Core Assets of Alliance**

In addition to its core distribution and fulfillment business, Alliance operated two other strategic business units collectively referred to as the Digital Media Infrastructure Services Group, or the DMISG. One business develops and markets e-commerce enabling databases for home entertainment products, while the other offers kiosk-based retail merchandising solutions. These businesses represented approximately 1.4% and 2.0% of Alliance's consolidated sales for the year ended December 31, 2003 and for the nine months ended September 30, 2004, respectively, and recorded net losses of $10.3 million and $4.2 million during such periods. Cash used in operations of the DMISG business totaled $8.3 million and $1.8 million for the year ended December 31, 2003 and the nine months ended September 30, 2004, respectively.

On December 31, 2004, Alliance distributed certain assets and liabilities through a spin-off of the shares of Spinco, an entity owned by the Alliance stockholders and formed for the purpose of conducting the DMISG business. The assets transferred include:

- All databases, software systems and applications, domain names, trademarks, copyrights, patents and other intellectual property related solely to the DMISG business;

- Rights under agreements with customers, vendors, and content providers related solely to the DMISG business;

- Rights under licenses, leases, and other contract rights related solely to the DMISG business;

- The difference in the working capital of the DMISG between the date of the merger agreement and December 31, 2004;

- All tangible personal property related solely to the DMISG business; and

- All accounts receivable arising in the ordinary course of business to the extent related solely to the DMISG business.

The liabilities assumed by Spinco include:

- All current liabilities incurred and expenses accrued related solely to the DMISG business;

- All liabilities, claims or actions arising from the operation of the DMISG business after the date of distribution, including obligations under assigned contracts;

- All accrued vacation, personal days and floating holidays of employees engaged in the DMISG business; and

- Tax liabilities associated with the spin-off resulting from the failure of Alliance's consolidated net operating losses or other attributes to fully offset any gain arising from the spin-off.

Alliance continues to be responsible for all liabilities and obligations not assumed by Spinco, including all taxes relating to periods prior to the date of distribution, all amounts owed under Alliance's credit facility with General Electric Credit Corporation, and all intercompany receivables. Since 1999, Alliance has invested approximately $43.0 million to fund operations of the DMISG. The DMISG was distributed to the Alliance common stockholders in connection with the spin-off and will not be part of the remaining assets of Alliance in the merger. Spinco has covenanted that Alliance had a tangible net worth of at least $20.7 million as of December 31, 2004.

For not more than six months following the spin-off of the DMISG business, Alliance will provide limited human resource, accounting and other transition services to Spinco for which Spinco will compensate Alliance at the estimated cost to Alliance of providing such services. Thereafter, Alliance will have no continuing

54                                                                          IB 00080

involvement in the day to day management and operation of Spinco. Since the date of the spin-off, Spinco has not had any continuing involvement in the management and operation of Alliance's core distribution and fulfillment business.

In connection with the distribution, Spinco and Alliance entered into a number agreements. For a discussion of these agreements, please see "Agreements Related to the Merger and Other Transactions — Agreements Between Alliance and Spinco" beginning on page 77. The rights and obligations of Alliance under each of these agreements will become those of the combined company following the merger.

As a result of the spin-off, the DMISG businesses are no longer included within Alliance nor will these business lines be part of the combined company after the consummation of the merger.

### Regulatory Filings and Approvals Required to Complete the Merger

This merger is subject to review by the U.S. Department of Justice and the U.S. Federal Trade Commission to determine whether it is in compliance with applicable antitrust laws. Under the provisions of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, the merger may not be consummated until the specified waiting period requirements of that Act have been satisfied. Source Interlink and Alliance have filed notification reports, together with requests for early termination of the waiting period, with the U.S. Department of Justice and the U.S. Federal Trade Commission under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended. The U.S. Federal Trade Commission has granted early termination of the waiting period, satisfying the requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended. At any time before or after the merger, the U.S. Federal Trade Commission, the U.S. Department of Justice or any state could take any action under the applicable antitrust or competition laws as it deems necessary or desirable. This action could include seeking to enjoin the completion of the merger or requiring Source Interlink or Alliance to dispose of certain businesses or assets. Private parties may also institute legal actions under the antitrust laws under some circumstances.

In addition, the consummation of the merger is subject to the effectiveness of the registration statement of which this proxy statement/prospectus is a part and compliance with applicable corporate laws of the State of Missouri and the State of Delaware.

### Certain Securities Laws Considerations

The shares of our common stock to be issued in the merger will be registered under the Securities Act. These shares will be freely transferable under the Securities Act, except for shares of our common stock issued to any person who is deemed to be an affiliate of our company or Alliance. Persons who may be deemed to be affiliates include individuals or entities that control, are controlled by, or are under common control with our company or Alliance and may include ours or Alliance's executive officers and directors, as well as their principal equityholders. Neither Source Interlink's nor Alliance's affiliates may sell their shares of our common stock acquired in the merger except pursuant to:

• an effective registration statement under the Securities Act covering the resale of those shares;

• an exemption under paragraph (d) of Rule 145 under the Securities Act; or

• any other applicable exemption under the Securities Act.

### No Appraisal or Dissenters' Rights

Neither Missouri corporate law nor Delaware corporate law (if applicable after the reincorporation), will provide holders of our common stock with appraisal or dissenters' rights in connection with the merger.

55

IB 00081

**Listing on the Nasdaq National Market of Source Interlink Common Stock to be Issued in the Merger**

Our common stock is currently traded on the Nasdaq National Market under the symbol "SORC." We intend to apply for inclusion on the Nasdaq National Market of the shares of our common stock to be issued and reserved for issuance in connection with the merger. Nasdaq's approval of this application is a condition of the consummation of the merger.

56

IB 00082

# THE MERGER AGREEMENT

*This section of the joint proxy statement/prospectus describes the Agreement and Plan of Merger, or merger agreement, by and among Source Interlink, Alliance and Alligator Acquisition, LLC, dated as of November 18, 2004. This summary may not contain all the information that is important to you and is qualified in its entirety to the full text of the merger agreement, which is attached to this proxy statement/ prospectus as Annex A. We urge you to read the full text of the merger agreement carefully.*

## Structure of the Merger

At the effective time of the merger, Alliance will merge with and into our wholly owned subsidiary, Alligator Acquisition, LLC. Upon the consummation of the merger, Alligator Acquisition, LLC will continue as the surviving entity, be a wholly owned subsidiary of us and be renamed Source Alliance LLC.

## Effective Time of the Merger

The merger agreement provides that the merger will become effective at the time a certificate of merger is filed with the Secretary of State of the State of Delaware in accordance with the relevant provisions of the Delaware General Corporation Law and the Delaware Limited Liability Company Act. The consummation of the merger will take place no later than the second business day after the conditions to the merger set forth in the merger agreement are satisfied or waived, or at such other time, date and place as the parties may agree.

## Manner and Basis of Converting Shares of Alliance Preferred Stock and Alliance Common Stock

Alliance is required to effect a conversion of all Alliance preferred stock into Alliance common stock prior to the consummation of the merger, and accordingly, no Alliance preferred stock will be outstanding at the effective time of the merger.

As of the effective time of the merger, each share of Alliance common stock issued and outstanding immediately prior to the consummation of the merger (including the shares of Alliance common stock issuable upon conversion of the Alliance preferred stock), other than any dissenting shares and shares of Alliance capital stock held by Alliance or Alliance's wholly owned subsidiaries, will be cancelled and extinguished and converted automatically into the right to receive such number of shares of our common stock as would result by dividing (x) the number of shares of our common stock issued and outstanding (including shares issuable upon the exercise of all unexpired and unexercised options, warrants or other rights to acquire our common stock) ten business days prior to our shareholder meeting convened to vote on the matters contemplated by the merger agreement by (y) the sum of (A) the aggregate number of shares of Alliance common stock outstanding immediately prior to the effective time, including all shares of Alliance common stock into which Alliance preferred stock shall be converted prior to such time plus (B) the aggregate number of shares of Alliance common stock issuable, directly or indirectly, upon exercise of all unexpired and unexercised options, warrants or other rights to acquire, directly or indirectly, shares of Alliance common stock immediately prior to the effective time (excluding shares of Alliance common stock into which Alliance preferred stock, if any, may be converted as of such time), each of (x) and (y) as specified in the final capitalization certificates delivered by each of Source Interlink and Alliance to the other, which we refer to as the Exchange Ratio. We have agreed not to issue any additional shares of capital stock from and after the date that is ten business days prior to our special meeting to the effective time.

The Exchange Ratio to be used by the stockholders of Alliance for each share of Alliance common stock depends upon the fully diluted number of shares of our common stock and Alliance common stock outstanding (including shares reserved for issuance upon exercise or conversion of options, warrants and other rights) immediately prior to the effective time of the merger. Since the fully diluted number of Source Interlink common stock and Alliance common stock is subject to change, the exact Exchange Ratio cannot be conclusively determined at this time.

No fractional shares of our common stock will be issued in the merger. Instead, each Alliance stockholder otherwise entitled to a fractional share will receive a cash amount, without interest, determined by

57

IB 00083

multiplying that fraction by the average of the closing prices of our common stock on the Nasdaq National Market during the ten consecutive trading days ending on and including the last trading day prior to the effective time.

### Directors and Officers of Source Interlink Upon Completion of the Merger

At the effective time, our board of directors will consist of 11 directors, six of whom will be designated by us (who are expected to be S. Leslie Flegel, James R. Gillis, A. Clinton Allen, Ariel Emanuel, Allan R. Lyons and Aron S. Katzman) and five of whom shall be designated by Alliance. Alliance has not yet designated individuals to serve on the board. Six of the directors must be "independent" under the rules of the SEC and NASD with respect to the combined company. See "Management — Executive Officers and Directors Post-Merger." Our existing directors who are not designated as directors after consummation of the merger are expected to resign effective upon consummation of the merger.

Our existing officers are expected to remain in their current positions with us, and Alan Tuchman, Alliance's current president and chief operating officer, is expected to join our company as one of our executive vice presidents. The individuals currently contemplated to become the directors and officers of our company immediately following the consummation of the merger are identified under the heading entitled "Management."

### Increasing Authorized Source Interlink Common Stock After the Merger

The merger agreement provides that:

- as a condition to closing, we will either amend our articles of incorporation to increase the total number of authorized shares of our common stock from 40,000,000 to 100,000,000 or have effected our reincorporation from a Missouri corporation to a Delaware corporation, in either case to provide for an adequate number of shares of common stock to be issued in connection with the merger; and

- our board will recommend that our shareholders vote in favor of the approval and adoption of such amendment and proposed reincorporation at our shareholders meeting.

### Exchange of Alliance Stock Certificates

Following the effective time of the merger, an exchange agent, selected by us and subject to Alliance's reasonable satisfaction, will mail to each record holder of Alliance common stock a letter of transmittal and instructions specifying other details of the exchange. The record holders will use the letter of transmittal to exchange Alliance stock certificates for the shares of our common stock and cash in lieu of fractional shares of our common stock which the record holders of Alliance common stock are entitled to receive in connection with the merger. We will only issue Alliance stockholders shares of our common stock or checks in lieu of fractional shares in the name in which their surrendered Alliance stock certificates are registered. If Alliance stockholders wish to have their certificates issued in a different name, they must present the exchange agent with all documents required to show and effect the unrecorded transfer of ownership and show that they paid any applicable stock transfer taxes.

. At and after the effective time of the merger, transfers of Alliance capital stock will not be registered on the stock transfer records of Alliance. In the event of a transfer of ownership of Alliance capital stock which is not registered in the transfer records of Alliance, a certificate evidencing the proper number of shares of our common stock, together with a check for cash to be paid in lieu of fractional shares and any dividends or distributions payable thereon, may be issued to the transferee thereof if the certificate evidencing such Alliance common stock is presented to the exchange agent accompanied by all documents required to evidence and effect such transfer and to evidence that any applicable stock transfer taxes have been paid. We will not pay dividends or other distributions on any shares of our common stock to be issued to the holder of any Alliance stock certificate that is not surrendered until the Alliance capital stock certificate is surrendered as provided in the merger agreement. No interest will be payable on the cash to be paid to Alliance stockholders in lieu of the issuance of fractional shares of our common stock.

58

IB 00084

Alliance stockholders should not submit their Alliance stock certificates for exchange until they receive the transmittal instructions and a form of letter of transmittal from the exchange agent.

Our shareholders do not need to exchange their existing stock certificates in connection with the merger and may keep their existing stock certificates.

## Assumption of Alliance Stock Options and Warrants

At the effective time of the merger, we will assume each outstanding option to purchase Alliance capital stock, whether or not exercisable at the effective time of the merger. Each Alliance option will continue to be subject to the same terms and conditions set forth in the Alliance stock option plans (and any applicable stock option agreement for such Alliance option) that it was subject to immediately prior to the consummation of the merger, including any repurchase rights or vesting provisions, except for the following two adjustments. First, each assumed Alliance option will be exercisable, or will become exercisable in accordance with its terms, for that number of whole shares of our common stock equal to the product of the number of shares of Alliance common stock that were issuable upon exercise of that option immediately prior to the consummation of the merger multiplied by the Exchange Ratio, rounded to the nearest whole number of shares of our common stock. Second, the per share exercise price for the shares of our common stock issuable upon exercise of each assumed Alliance option will be equal to the quotient determined by dividing (x) the exercise price per share of Alliance common stock at which that option was exercisable immediately prior to the completion of the merger by (y) the Exchange Ratio, rounded to the nearest whole cent. After the consummation of the merger, we will issue to each person who holds an assumed Alliance option a document evidencing the assumption of that option by us. Within 30 days after the effective time of the merger, we will register the shares of our common stock issuable upon exercise of the assumed Alliance options by filing a Form S-8 with the SEC.

At the effective time of the merger, we will assume each issued and outstanding warrant and other rights to acquire Alliance common stock whether or not exercisable at the effective time of the merger, in accordance with the terms of such warrants and other rights.

Any Alliance options or warrants exercisable prior to the effective time of the merger, in whole or in part, for Alliance preferred stock will be (or will become) exercisable for our common stock in accordance with the preceding two paragraphs as if the Alliance preferred stock underlying such options or warrants had been converted to Alliance common stock in accordance with the conversion rate or rates applicable to the Alliance preferred stock.

## Representations and Warranties

The merger agreement contains various representations and warranties of the parties, which will expire at the effective time of the merger. These representations and warranties are not easily summarized, and Source Interlink and Alliance stockholders are referred to Articles IV and V of the merger agreement attached as *Annex A* to this proxy statement/ prospectus for the complete text of these provisions.

### *Representations and Warranties of Alliance*

The representations and warranties made by Alliance to us include representations and warranties related to:

• the corporate organization, good standing and qualification to do business of Alliance and its subsidiaries and the certificate of incorporation and bylaws of Alliance;

• Alliance's capitalization;

• Alliance's subsidiaries;

• Alliance's power and authority to enter into the merger agreement and perform the transactions contemplated thereby, the absence of any conflicts between the merger agreement and Alliance's charter documents and applicable laws and regulations, the absence of any defaults under applicable

59

IB 00085

contractual arrangements, and the absence of any liens created or imposed by the entry into the merger agreement and the performance by Alliance of its obligations thereunder;

• governmental approvals and stockholder votes required by Alliance to complete the merger;

• Alliance's financial statements and the accuracy and completeness of information furnished by Alliance for inclusion in this proxy statement/ prospectus and the related registration statement;

• the absence of any undisclosed liabilities of Alliance and its subsidiaries;

• the absence of certain changes or events related to Alliance since December 31, 2003;

• litigation involving Alliance and its subsidiaries;

• compliance by Alliance and its subsidiaries with applicable legal requirements and permits required to conduct the respective businesses of Alliance and its subsidiaries and their compliance with those permits;

• Alliance's and its subsidiaries' taxes, tax returns and audits;

• labor and employment matters;

• Alliance's employee benefit plans;

• environmental matters pertaining to Alliance;

• real property of Alliance and its subsidiaries;

• title to properties and condition of assets of Alliance and its subsidiaries;

• insurance matters;

• relationships with Alliance's customers and suppliers and affiliated transactions;

• names under which Alliance and its subsidiaries have done business;

• certain material contracts of Alliance and its subsidiaries;

• restrictions on business activities made by Alliance and its subsidiaries;

• intellectual property matters pertaining to Alliance and its subsidiaries;

• records of Alliance and its subsidiaries;

• payments required to be made by Alliance to brokers and finders in connection with the merger;

• actions taken by the board of directors of Alliance to comply with Section 203 of the Delaware General Corporation Law relating to certain business combinations with interested stockholders; and

• the accuracy of the information supplied by Alliance for inclusion in the merger agreement and certain related agreements and schedules.

*Representations and Warranties of Source Interlink*

The representations and warranties made by us to Alliance include representations and warranties related to:          IB 00086

LLC;

• our capitalization;

• our subsidiaries;

60

IB 00087

- our power and authority to enter into the merger agreement and perform the transactions contemplated thereby, the absence of any conflicts between the merger agreement and our charter documents and applicable laws and regulations, the absence of any defaults under applicable contractual arrangements, and the absence of any liens created or imposed by the entry into the merger agreement and the performance by us of our obligations thereunder;

- governmental approvals and shareholder votes required by us to consummate the merger;

- our financial statements, SEC filings and reports, the accuracy and completeness of information furnished by us for inclusion in this proxy statement/ prospectus and the related registration statement and compliance with Section 404 of the Sarbanes-Oxley Act of 2002;

- the absence of any undisclosed liabilities of us and our subsidiaries;

- the absence of certain changes or events relating to us and our subsidiaries since February 1, 2004;

- litigation involving us and our subsidiaries;

- compliance by us and our subsidiaries with applicable legal requirements and permits required to conduct the respective businesses of our company and our subsidiaries and our compliance with those permits;

- taxes, tax returns and audits pertaining to us and our subsidiaries;

- labor and employment matters;

- our employee benefit plans;

- environmental matters pertaining to us;

- real property of our company and our subsidiaries;

- title to properties and condition of assets of our company and our subsidiaries;

- insurance matters;

- relationships with our customers and suppliers and affiliated transactions;

- names under which we and our subsidiaries have done business;

- certain of our material contracts and those of our subsidiaries;

- restrictions on business activities made by us and our subsidiaries;

- intellectual property matters pertaining to us and our subsidiaries;

- our records and those of our subsidiaries;

- payments required to be made by us to brokers and finders in connection with the merger;

- the fairness opinion delivered by Jefferies to our board regarding the transaction;

- certifications of our chief execution officer and chief financial officer required by Sections 302 and 906 of the Sarbanes-Oxley Act of 2002; and

- our compliance with applicable anti-takeover legislation under federal and Missouri law.

IB 00088

Under the terms of the merger agreement, we have agreed that during the period from November 18, 2004 until the earlier of the termination of the merger agreement in accordance with its terms or the effective time of the merger, we and our subsidiaries will carry on our business in the usual, regular and ordinary course, comply with all applicable laws and regulations and use all reasonable efforts to preserve intact our present business organization and keep available the services of present executive officers and key employees, unless Alliance consents in writing (such consent not to be unreasonably withheld or delayed). In addition, during

61

IB 00089

such period we will not, without the prior written consent of Finisar (such consent not to be unreasonably withheld),
following or permit any of our subsidiaries to do any of the following:

- declare, set aside or pay any dividends on, or make any other distributions (whether in cash, securities or other property) in respect of, any of our capital stock (other than dividends and distributions by one of our direct or indirect wholly owned subsidiaries to us);

- split, combine or reclassify any of our capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for any of our capital stock or any of our other securities;

- purchase, redeem or otherwise acquire any shares of our capital stock or any other of our securities or any rights, warrants or options to acquire any such shares or other securities (except for the acquisition in compliance with any applicable laws of our common stock from former employees, directors and consultants in accordance with agreements providing for the repurchase of shares at their original issuance price in connection with any termination of services to us);

- issue, deliver, sell, grant, pledge or otherwise dispose of or encumber any of our capital stock, any other voting securities or any securitie convertible into or exchangeable for, or any rights, warrants or options to acquire, any such shares, voting securities or convertible or exchangeable securities (other than the issuance of our common stock upon the exercise of our stock options and warrants and the grant of options to acquire our common stock not to exceed 200,000 shares in the aggregate; provided that all options granted shall have an exercise price equal to the fair market value thereof on the date of grant and shall otherwise be upon customary terms, and provided further that no options may be granted after the delivery by us of our capitalization certificate pursuant to the terms of the merger agreement);

- amend our articles of incorporation, bylaws or other comparable charter or organizational documents, except as provided in the merger agreement;

- acquire by merging or consolidating with, or by purchasing all or a substantial portion of the assets or any stock of, or by any other manner, any business or any corporation, partnership, joint venture, limited liability company, association or other business organization or division thereof or any assets that are material, in the aggregate, to us and our subsidiaries, taken as a whole;

- whether or not in the ordinary course of business, sell, lease, license, encumber, dispose of or otherwise transfer any assets material to us and our subsidiaries, taken as a whole (including any material accounts, leases, contracts or intellectual property or any material assets or the stock of any of our subsidiaries, but excluding the sale of inventory in the ordinary course of business);

- enter into any agreement or arrangement that materially limits or otherwise materially restricts us, any subsidiaries or any of our respective affiliates or any successor thereto from engaging or competing in any line of business or in any location;

- adopt or implement any stockholder rights plan;

- except for a confidentiality agreement as permitted by the terms of the merger agreement, enter into an agreement with respect to any merger, consolidation, liquidation or business combination, or any acquisition or disposition of all or substantially all of the assets or securities of us or any of our subsidiaries;

- incur any indebtedness for borrowed money or guarantee any such indebtedness of another person (except draw-downs in the ordinary course of business under revolving credit facilities in existence on the date of the merger agreement), issue, sell or amend any debt securities or warrants or other rights to acquire any of our debt securities or those of any of our subsidiaries, guarantee any debt securities of another person, enter into any "keep well" or other agreement to maintain any financial statement condition of another person or enter into any arrangement having the economic effect of any of the foregoing, or make any loans, advances (other than routine advances to ou employees or those of any

62

IB 00090

of its subsidiaries in the ordinary course of business) or capital contributions to, or investment in, any other person, other than us or any of our direct or indirect wholly owned subsidiaries;

• make any capital expenditures or other expenditures with respect to property, plant or equipment in excess of $750,000 in the aggregate for us and our subsidiaries, taken as a whole;

• make any changes in accounting methods, principles or practices in effect at January 31, 2004, except to the extent required by the SEC or a change in generally accepted accounting principles, as concurred in by our independent registered public accounting firm, or, except as so required, change any assumption underlying, or method of calculating, any bad debt, contingency or other reserve;

• except in the ordinary course of business, modify, amend or terminate any material contract or agreement to which we or any of our subsidiaries is party, or knowingly waive, release or assign any material rights or claims (including any write-off or other compromise of any of our accounts receivable or those of any of its subsidiaries);

• except in the ordinary course of business, enter into any material contract or agreement or license any material intellectual property rights to or from any third party;

• except as required to comply with applicable law or agreements, plans or arrangements existing on the date hereof, take any action with respect to, adopt, enter into, terminate or amend any Source Interlink employee agreement for the benefit or welfare of any current or former director, officer, employee or consultant or any collective bargaining agreement, increase in any material respect the compensation or fringe benefits of, or pay any bonus to, any director, officer, employee or consultant (whether in cash, stock, equity securities, property or otherwise), waive any stock repurchase rights, accelerate, amend or change the period of exercisability of options or restricted stock or re-price options granted under any employee, consultant, director or other stock plans or authorize cash payments in exchange for any options granted under any of such plans, pay any material benefit not provided for as of the date of the merger agreement under any Source Interlink employee benefit plan, or take any action other than in the ordinary course of business to fund or in any other way secure the payment of compensation or benefits under any Source Interlink employee benefit plan or Source Interlink employee agreement;

• make or rescind any material tax election, settle or compromise any material tax liability, amend any material tax return, adopt or change any material accounting method in respect of taxes, or consent to any extension or waiver of the applicable statute of limitations in respect of taxes;

• initiate, compromise, pay, discharge or settle any material claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), litigation or arbitration proceeding for an amount in the aggregate that exceeds $100,000, exclusive of any amounts covered by Source Interlink insurance policies;

• fail to maintain insurance at levels substantially comparable to levels existing as of the date of the merger agreement;

• hire any employee who would have an annual base salary in excess of $200,000; or

• authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

**Alliance's Conduct of Business Prior to the Consummation of the Merger**

Under the terms of the merger agreement, Alliance has agreed that during the period from November 18, 2004 until the earlier of the termination of the merger agreement in accordance with its terms or the effective time of the merger, Alliance will, except for those transactions relating to the spin-off, carry on its business in the usual, regular and ordinary course, comply with all applicable laws and regulations and use all reasonable efforts to preserve intact its present business organization and keep available the services of present executive officers and key employees, unless we consent in writing (such consent not to be unreasonably withheld or delayed). In addition, except for those transactions relating to the spin-off, during such period Alliance will

63

IB 00091

not, without our prior written consent (such consent not to be unreasonably withheld or delayed), do any of the following or permit any of its subsidiaries to do any of the following:

- declare, set aside or pay any dividends on, or make any other distributions (whether in cash, securities or other property) in respect of, any of its capital stock (other than dividends and distributions by a direct or indirect wholly owned subsidiary of Alliance to its parent; provided that such parent is Alliance or certain subsidiaries of Alliance and other than dividends on preferred stock declared or paid in shares of preferred stock as provided in Alliance's certificate of incorporation);

- split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for any of its capital stock or any of its other securities;

- purchase, redeem or otherwise acquire any shares of its capital stock or any other of its securities or any rights, warrants or options to acquire any such shares or other securities (except for the acquisition in compliance with any applicable laws of Alliance common stock from former employees, directors and consultants in accordance with agreements providing for the repurchase of shares at their original issuance price in connection with any termination of services to Alliance);

- issue, deliver, sell, grant, pledge or otherwise dispose of or encumber any shares of its capital stock, any other voting securities or any securities convertible into or exchangeable for, or any rights, warrants or options to acquire, any such shares, voting securities or convertible or exchangeable securities (other than the issuance of Alliance common stock upon the exercise of options outstanding on the date of the merger agreement in accordance with their present terms, the conversion of Alliance preferred stock to common stock in accordance with Alliance's certificate of incorporation and the grant of options to purchase Alliance common stock not to exceed 300,000 shares in the aggregate; provided that all options granted shall have an exercise price equal to the fair market value thereof (which in no event shall be less than $2.60 per share) on the date of grant and shall otherwise be upon customary terms, and provided further that no options may be granted after the delivery by Alliance of its capitalization certificate pursuant to the terms of the merger agreement;

- amend its certificate of incorporation, bylaws or other comparable charter or organizational documents;

- acquire by merging or consolidating with, or by purchasing all or a substantial portion of the assets or any stock of, or by any other manner, any business or any corporation, partnership, joint venture, limited liability company, association or other business organization or division thereof or any assets that are material, in the aggregate, to Alliance and its subsidiaries, taken as a whole;

- whether or not in the ordinary course of business, sell, lease, license, encumber, dispose of or otherwise transfer any assets material to Alliance and its subsidiaries, taken as a whole (including any material accounts, leases, contracts or intellectual property or any material assets or the stock of any subsidiaries, but excluding the sale of inventory in the ordinary course of business);

- enter into any agreement or arrangement that materially limits or otherwise materially restricts Alliance or any subsidiaries or any of their respective affiliates or any successor thereto from engaging or competing in any line of business or in any location;

- except for a confidentiality agreement as permitted by the terms of the merger agreement, enter into an agreement with respect to any merger, consolidation, liquidation or business combination, or any acquisition or disposition of all or substantially all of the assets or securities of Alliance or any subsidiaries;

- incur any indebtedness for borrowed money or guarantee any such indebtedness of another person (except draw-downs in the ordinary course of business under revolving credit facilities in existence on the date of the merger agreement), issue, sell or amend any debt securities or warrants or other rights to acquire any debt securities of Alliance or any subsidiaries, guarantee any debt securities of another person, enter into any "keep well" or other agreement to maintain any financial statement condition of another person or enter into any arrangement having the economic effect of any of the foregoing, or

64

IB 00092

make any loans, advances (other than routine advances to employees of Alliance or any subsidiary in the ordinary course of business) or capital contributions to, or investment in, any other person, other than Alliance or any subsidiaries;

• make any capital expenditures or other expenditures with respect to property, plant or equipment in excess of $11.5 million in the aggregate for Alliance and its subsidiaries, taken as a whole, of which no more than $3.0 million in the aggregate may be used for the "All Media Guide" and "Digital On-Demand" businesses;

• make any changes in accounting methods, principles or practices in effect at December 31, 2003, except to the extent required by a change in generally accepted accounting principles, as concurred in by its independent public auditors, or, except as so required, change any assumption underlying, or method of calculating, any bad debt, contingency or other reserve;

• except in the ordinary course of business, modify, amend or terminate any material contract or agreement to which Alliance or any subsidiaries is party, or knowingly waive, release or assign any material rights or claims (including any write-off or other compromise of any accounts receivable of Alliance or any subsidiaries);

• except in the ordinary course of business, enter into any material contract or agreement or license any material intellectual property rights to or from any third party;

• except as required to comply with applicable law or agreements, plans or arrangements existing on the date hereof, take any action with respect to, adopt, enter into, terminate or amend certain employee agreements for the benefit or welfare of any current or former director, officer, employee or consultant or any collective bargaining agreement, increase in any material respect the compensation or fringe benefits of, or pay any bonus to, any director, officer, employee or consultant (whether in cash, stock, equity securities, property or otherwise), waive any stock repurchase rights, accelerate, amend or change the period of exercisability of options or restricted stock or reprice options granted under any employee, consultant, director or other stock plans or authorize cash payments in exchange for any options granted under any of such plans, pay any material benefit not provided for as of the date of this Agreement under any Alliance employee benefit plans or employee agreements or take any action other than in the ordinary course of business to fund or in any other way secure the payment of compensation or benefits under any Alliance employee benefit plans or employee agreements;

• make or rescind any material tax election, settle or compromise any material tax liability, amend any material tax return, adopt or change any material accounting method in respect of taxes, or consent to any extension or waiver of the applicable statute of limitations in respect of taxes;

• initiate, compromise, pay, discharge or settle any material claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), litigation or arbitration proceeding for an amount in the aggregate that exceeds $100,000, exclusive of any amounts covered by Alliance insurance policies;

• fail to maintain insurance at levels substantially comparable to levels existing as of the date of the merger agreement;

• hire any employee who would have an annual base salary in excess of $200,000; or

• authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

**Certain Covenants**

Under the terms of the merger agreement, Alliance and Source Interlink have each agreed that until the earlier of the termination of the merger agreement in accordance with its terms or the effective time of the

65

IB 00093

merger, each of them will, among other things and subject to certain exceptions specified in the merger agreement:

- use commercially reasonable efforts to take, or cause to be taken, all actions, and do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by the merger agreement as promptly as practicable;

- give the other party prompt notice of, and to use commercially reasonable efforts to remedy, the occurrence or failure to occur of any event, which occurrence or failure to occur would reasonably be expected to cause any of the representations or warranties of Alliance or Source Interlink, as the case may be, in the merger agreement to constitute a material adverse effect on either party, and any failure on the part of Alliance or Source Interlink, as the case may be, to comply with or satisfy any covenant, agreement or condition to be complied with or satisfied under the merger agreement in all material respects;

- cooperate with one another and use commercially reasonable efforts to comply with all legal requirements and make all filings required by any governmental entity in connection with the merger and the transactions contemplated by the merger agreement;

- respond as promptly as practicable to any inquiries or requests received from any governmental entity with respect to the merger or any other transaction contemplated by the merger agreement;

- jointly prepare this proxy statement/ prospectus and related registration statement; and

- furnish certificates to one another setting forth certain capitalization information.

We shall, if required by the rules of the Nasdaq National Market, file a notification form with respect to our common stock to be issued pursuant to the terms of the merger agreement.

## Restrictions on Solicitation of Alternative Acquisition Proposals

Under the terms of the merger agreement, neither Alliance nor Source Interlink shall authorize or permit any of their respective directors, officers, investment bankers (or other financial advisors), attorneys or accountants, and neither shall authorize or knowingly permit any of their respective employees or other advisors or representatives, to directly or indirectly:

- solicit or initiate or knowingly encourage any proposal that constitutes, or could reasonably be expected to lead to, an Acquisition Proposal (defined below);

- participate or engage in discussions or negotiations with, or disclose or provide any non-public information relating to itself or its subsidiaries to, or afford access to any of its properties, books or records or that of its subsidiaries to, any person with respect to an Acquisition Proposal; or

- enter into any agreement or agreement in principle with any person with respect to an Acquisition Proposal.

Under the terms of the merger agreement, each of Alliance and Source Interlink shall promptly advise the other, in writing (and in any event within one business day of attaining knowledge), of its receipt of any Acquisition Proposal or any proposal, inquiry or request related to, or that could reasonably be expected to lead to, any Acquisition Proposal. Each of Alliance and Source Interlink shall promptly provide the other, in writing, with the terms and conditions of any such Acquisition Proposal, or such proposal, inquiry or request, and the identity of the person making the same. Each of Alliance and Source Interlink shall promptly inform the other of any material changes in the status and any material changes or modifications in the terms of any Acquisition Proposal, proposal, inquiry or request. Promptly upon determination by the board of directors of Alliance or Source Interlink, as applicable, that an Acquisition Proposal constitutes a Superior Proposal, Alliance or Source Interlink, as applicable, shall deliver to the other a written notice advising them that the board of directors of Alliance or Source Interlink, as applicable, has so determined, specifying the terms and

IB 00094

http://yahoo.brand.edgar-online.com/EFX dll/EDGARpro.dll?FetchFilingHTML1?SessionID=DbxMIg...     10/24/200:

conditions of such Superior Proposal and the identity of the person making such Superior Proposal, and prior to the execution of the Superior Proposal.

Notwithstanding the foregoing, prior to obtaining shareholder approval of the merger, each of Alliance or Source Interlink, as applicable, and its representatives may participate or engage in discussions or negotiations with, or disclose or provide any non-public information relating to itself or its subsidiaries to, or afford access to any of its properties, books or records or that of its subsidiaries to, any person that has made a bona fide written Acquisition Proposal if the following conditions are met:

- such person has submitted a written Acquisition Proposal which did not result from a violation by Alliance or Source Interlink, as applicable, of certain obligations as specified in the merger agreement;

- the board of directors of Alliance or Source Interlink, as applicable, has determined in good faith by resolution duly adopted, after consultation with outside legal counsel and its financial advisor, that such Acquisition Proposal constitutes or would reasonably be expected to lead to a Superior Proposal;

- in certain circumstances as specified in the merger agreement, such person has entered into a confidentiality agreement with Alliance or Source Interlink, as applicable, on terms that are no less favorable to the other than the confidentiality agreement entered into between Alliance and Source Interlink in connection with the merger (which shall not preclude discussions or negotiations with Alliance or Source Interlink, as applicable, relating to the proposal or offer from such person required by the terms of the merger agreement and which shall not contain any exclusivity provision or other term that could restrict in any manner the other party's ability to consummate the transactions contemplated by the merger agreement); and

- prior to, or substantially concurrent with, disclosing or providing any such non-public information, Alliance or Source Interlink, as applicable, shall disclose or provide all such information to the other.

Our board has agreed to maintain at all times its recommendation in favor of approving the merger agreement and the transactions contemplated thereby except that our board shall be permitted to:

- withdraw or modify in a manner adverse to Alliance (or not to continue to make) such recommendation;

- approve or recommend a Superior Proposal; and/or

- enter into an agreement regarding such Superior Proposal,

if the following conditions are met:

- a majority of our board has determined in good faith, following consultation with outside counsel, that taking such action is required in order for the members of our board to comply with their fiduciary duties to our shareholders under applicable law;

- we have given Alliance three business days' prior written notice of its intention to take such action, and we shall have considered in good faith any proposed changes to the merger agreement proposed by Alliance (it being understood and agreed that any material amendment to the financial or other material terms of a Superior Proposal, if any, shall require a new three business day period to afford Alliance the opportunity to negotiate with us); and

- we have materially complied with certain obligations specified in the merger agreement with respect to such Superior Proposal, if any.

The merger agreement defines an Acquisition Proposal as any inquiry, offer or proposal from any third party (whether or not in writing) (other than an offer or proposal by or on behalf of the other party, including

67

IB 00095

- a transaction pursuant to which any third party acquires or would acquire beneficial ownership of more than 15% of the outstanding voting power of Source Interlink or Alliance, as applicable, whether from it or pursuant to a tender offer, exchange offer or otherwise;

- a merger, consolidation, business combination, reorganization, share exchange, sale of all or substantially all assets, recapitalization, liquidation, dissolution or similar transaction which would result in a third party acquiring 15% or more of the fair market value of the assets of Source Interlink or Alliance, as applicable, and its subsidiaries, taken as a whole;

- any transaction which would result in a third party acquiring 15% or more of the fair market value of the assets (including, without limitation, the capital stock of subsidiaries) of Source Interlink or Alliance, as applicable, and its subsidiaries, taken as a whole, immediately prior to such transaction (whether by purchase of assets, acquisition of stock of a subsidiary or otherwise); or

- any combination of the foregoing.

The merger agreement defines a Superior Proposal as any bona fide written Acquisition Proposal (with all of the percentages included in the definition of Acquisition Proposal increased to 50% for purposes of this definition) that a majority of the members of the board of directors of Source Interlink or Alliance, as applicable, determines in good faith by resolution duly adopted, after consultation with its outside legal counsel and its financial advisor:

- could result in a transaction, that, if consummated, is more favorable to the stockholders of Source Interlink or Alliance, as applicable, from a financial point of view than the merger (after taking into account any revisions made or proposed by Alliance);

- is reasonably capable of being consummated on the terms proposed (taking into account all legal, financial, regulatory and other relevant considerations); and

- has committed financing, is not subject to a financing contingency or has financing that is reasonably likely to be obtained.

### Obligation of Alliance's Board of Directors to Convene Stockholder Meeting and Recommend Approval and Adoption of the Merger Agreement

The merger agreement provides that Alliance will use commercially reasonable efforts to promptly and duly call, give notice of, convene and hold as promptly as practicable after the declaration of effectiveness of the registration statement, a meeting of stockholders for the purpos of considering and voting upon the merger agreement and the transactions contemplated thereby (or seek the written consent of the stockholders of Alliance to approve such matters). The board of directors of Alliance will recommend approval of such matters by the stockholders of Alliance and will include such recommendation in this proxy statement/ prospectus. Neither the board of directors of Alliance nor any committee thereof shall withdraw or modify, or propose or resolve to withdraw or modify in a manner adverse to us, the recommendation of the board of directors of Alliance that the stockholders of Alliance vote in favor of such matters. Alliance shall use commercially reasonable efforts to solicit from its stockholders proxies or written consents in favor of such matters.

### Obligation of Source Interlink's Board of Directors to Convene Shareholder Meeting and Recommend Approval of Matters Contemplated by the Merger Agreement

The merger agreement provides that we shall use commercially reasonable efforts to promptly and duly call, give notice of, convene and hold as promptly as practicable after the declaration of effectiveness of the registration statement a meeting of shareholders for the purpose of considering and voting upon the matters contemplated by the merger agreement, among other things. Subject to certain exceptions, our board will recommend approval and adoption of such matters by our shareholders and will include such recommendation

68

IB 00096

in this proxy statement/ prospectus and neither our board nor any committee thereof shall withdraw or modify, or propose or resolve to withdraw or modify in a manner adverse to Alliance, the recommendation of board that our shareholders vote in favor of such matters. Subject to certain exceptions, we shall use commercially reasonable efforts to solicit from our shareholders proxies in favor of such matters.

### Conditions to the Consummation of the Merger

#### Conditions to the Obligations of Each Party

The merger agreement provides that the obligations of Source Interlink, Alligator Acquisition, LLC and Alliance to effect the merger and otherwise consummate the transactions contemplated by the merger agreement are subject to the satisfaction, at or prior to the consummation of the merger, of the following conditions, in addition to the additional conditions applicable to the respective parties set forth below:

- our shareholders will have approved the matters contemplated by the merger agreement in the manner required by applicable law, by the applicable regulations of the Nasdaq Stock Market and by the vote of the requisite holders of the issued and outstanding shares of our capital stock under applicable law and our articles of incorporation;

- the stockholders of Alliance will have approved the matters contemplated by the merger agreement in the manner required by applicable law and by the vote or written consent of the requisite holders of the issued and outstanding shares of capital stock of Alliance under applicable law and the certificate of incorporation of Alliance;

- all waiting periods (and any extension of such waiting period) under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, relating to the merger will have expired or terminated early and all other material antitrust approvals required to be obtained in connection with the merger will have been obtained, which condition has been satisfied;

- none of the parties to the merger agreement will be subject to any order or injunction of a court of competent jurisdiction that prohibits the consummation of the merger, and in the event any such order or injunction will have been issued, each party agrees to use its commercially reasonable efforts to have any such injunction lifted;

- other than the filing of the certificate of merger, all authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any governmental authority in connection with the merger and the consummation of the other transactions contemplated by the merger agreement, the failure of which to file, obtain or occur is reasonably likely to have a material adverse effect on either Source Interlink or Alliance, respectively, will have been filed, been obtained or occurred on terms and conditions which could not reasonably be likely to have a material adverse effect on either Source Interlink or Alliance, respectively;

- the registration statement will have become effective under the Securities Act and no stop order suspending the effectiveness of the registration statement will have been issued and no proceeding for such purpose and no similar proceeding in respect of this proxy statement/ prospectus, shall have been initiated or threatened in writing (and not abandoned or withdrawn) by the SEC or its staff;

- prior to the consummation of the merger, the shares of our common stock to be issued pursuant to the transactions contemplated by the merger agreement will be approved for listing on the Nasdaq National Market subject to official notice of issuance;

- we will have amended our articles of incorporation to increase the authorized shares of our common stock from 40,000,000 to 100,000,000 or will have effected our reincorporation as a Delaware corporation to provide for an adequate number of shares of common stock to be issued pursuant to the terms of the merger agreement;

- Alliance will have obtained the consent of its primary lender, General Electric Capital Corporation, or Alliance or Source Interlink will have entered into an alternative financing arrangement for the

IB 00097

combined company on terms no less favorable than those offered by General Electric Capital Corporation; and

. • Alliance will have consummated the spin-off of the DMISG, which condition has been satisfied.

### Additional Conditions to the Obligations of Alliance

The merger agreement provides that the obligation of Alliance to effect the merger and otherwise consummate the transactions contemplated by the merger agreement is subject to the satisfaction, at or prior to the consummation of the merger, of the following conditions (any of which may be waived, in writing, by Alliance in its sole discretion), in addition to the conditions set forth above under "Conditions to the Obligations of Each Party":

• our representations and warranties set forth in the merger agreement will have been accurate on the date of the merger agreement and will be accurate at and as of the effective time of the merger as if made as of the effective time, except for those representations and warranties that address matters only as of a particular date, which will be accurate as of that date, and where the failure of the representations and warranties to be accurate would not reasonably be expected to have a material adverse effect on us, taken as a whole, provided that for purposes of this condition, all "material adverse effect" and materiality terms in the representations and warranties in Article IV of the merger agreement will be inapplicable, and Alliance will have received a certificate signed on our behalf by our chief executive officer and chief financial officer to such effect;

• we will have performed in all material respects the obligations required to be performed by us under the merger agreement on or prior to the consummation of the merger, and Alliance will have received a certificate signed on our behalf by our chief executive officer and chief financial officer to such effect;

• except as contemplated in the disclosure schedule delivered by us to Alliance in conjunction with the execution of the merger agreement, there shall not have occurred, since the date of the merger agreement, any change, event, occurrence, development or circumstance which, individually or in the aggregate, constitutes or could reasonably be expected to result in, a material adverse effect on us, and Alliance will have received a certificate signed on our behalf by our chief executive officer and chief financial officer to such effect;

• Alliance will have received a written opinion from its tax counsel, Munger, Tolles & Olson, LLP, in form and substance reasonably satisfactory to it to the effect that the merger will constitute a tax-free reorganization under the Internal Revenue Code and such opinion will not have been withdrawn;

• the amendment of our bylaws as contemplated by the merger agreement will have been approved and adopted by our board prior to the effectiveness of the merger;

• Alliance will have received a true and correct final capitalization certificate from us and such certificate will be true and correct immediately prior to the effective time;

• we will have obtained resignations from the members of our board who will not continue on the board of directors of the combined company;

• we will have executed and delivered the stockholder's agreement to AEC Associates, L.L.C.; and

• we will have executed and delivered the consulting agreement to The Yucaipa Companies LLC.

### Additional Conditions to the Obligations of Source Interlink and Alligator Acquisition, LLC

The merger agreement provides that the obligations of Source Interlink and Alligator Acquisition, LLC to effect the merger and otherwise consummate the transactions contemplated by the merger agreement are subject to the satisfaction, at or prior to the consummation of the merger, of the following conditions (any of

70

IB 00098

which may be waived by Source Interlink in its sole discretion), in addition to the conditions set forth above under "Conditions to the Obligations of Each Party":

- the representations and warranties of Alliance set forth in the merger agreement will have been accurate on the date of the merger agreement and will be accurate at and as of the effective time of the merger as if made as of the effective time, except for those representations and warranties that address matters only as of a particular date, which will be accurate as of that date, and where the failure of the representations and warranties to be accurate would not reasonably be expected to have a material adverse effect on Alliance, taken as a whole, provided that for purposes of this condition, all "material adverse effect" and materiality terms in the representations and warranties in Article V of the merger agreement will be inapplicable, and we will have received a certificate signed on behalf of Alliance by its chief executive officer and chief financial officer to such effect;

- Alliance will have performed in all material respects the obligations required to be performed by it under the merger agreement on or prior to the consummation of the merger, and we will have received a certificate signed on behalf of Alliance by its chief executive officer and chief financial officer to such effect;

- except as contemplated in the disclosure schedule delivered by Alliance to us in conjunction with the execution of the merger agreement, there shall not have occurred, since the date of the merger agreement, any change, event, occurrence, development or circumstance which, individually or in the aggregate, constitutes or could reasonably be expected to result in, a material adverse effect on Alliance, and we will have received a certificate signed on behalf of Alliance by its chief executive officer and chief financial officer to such effect;

- dissenters' rights, as contemplated by the terms of the merger agreement, shall not have been exercised with respect to more than five percent of the outstanding shares of Alliance common stock;

- all shares of Alliance preferred stock shall have been converted into Alliance common stock prior to the effective time;

- we shall have received a written opinion from our tax counsel, Wilson Sonsini Goodrich & Rosati, Professional Corporation, in form and substance reasonably satisfactory to us to the effect that the merger will constitute a tax-free reorganization under the Internal Revenue Code and such opinion will not have been withdrawn;

- we will have received a true and correct final capitalization certificate from Alliance and such certificate will be true and correct immediately prior to the effective time;

- certain agreements specified in the disclosure schedule delivered by Alliance to us in conjunction with the execution of the merger agreement will have been terminated;

- AEC Associates will have executed and delivered the stockholder's agreement to us; and

- Yucaipa will have executed and delivered the consulting agreement to us.

## Termination of the Merger Agreement

The merger agreement provides that Source Interlink and Alliance can agree by mutual written consent to terminate the merger agreement at any time before the consummate of the merger. In addition, either Source Interlink or Alliance may terminate the merger agreement at any time before the consummation of the merger if:

- the merger has not been consummated by April 30, 2005, provided that the terminating party shall not have breached in any material respect its obligations under the merger agreement in any manner that shall have been a principal cause of the failure to consummate the merger by such date;

- the Alliance stockholders fail to vote in favor of the matters contemplated by the merger agreement, including the adoption of the merger agreement, or if Alliance has not notified its stockholders of a

71

IB 00099

merger agreement prior to the date of the special meeting of our shareholders; provided that the right to terminate the merger agreement in this respect shall not be available to any party whose failure to fulfill any obligation under the merger agreement has been a principal cause of the failure to obtain such requisite vote and shall not be available to Alliance if the failure to obtain such requisite vote has been principally caused by a breach by Alliance or AEC Associates, Alliance's majority stockholder, of the Alliance Voting Agreement;

- our shareholders fail to vote in favor of the matters contemplated by the merger agreement, including the issuance of our common stock in the merger, provided that the right to terminate the merger agreement in this respect shall not be available to any party whose failure to fulfill any obligation under the merger agreement has been a principal cause of the failure to obtain such requisite vote; or

- a governmental entity has issued a final and nonappealable order, decree or ruling or taken any other final and nonappealable action having the effect of permanently restraining, enjoining or otherwise prohibiting the merger.

The merger agreement further provides that we may terminate the merger agreement at any time before the consummation of the merger if any of the following occurs:

- Alliance materially and knowingly breaches certain obligations under the merger agreement related to restrictions on solicitation or the submission of certain matters to a stockholder vote, subject to limited exceptions for curing certain breaches;

- there has been a breach of or failure to perform any representation, warranty, covenant or agreement on the part of Alliance set forth in the merger agreement, which breach would cause certain closing conditions set forth in the merger agreement not to be satisfied, and which shall not have been cured within 15 days following receipt by Alliance of written notice of such breach from us (except in the case of a breach that is not curable or efforts to cure such breach have ceased); or

- we concurrently enter into a definitive agreement for a Superior Proposal in accordance with, or have otherwise complied with, all provisions of the merger agreement in relation thereto and concurrently with such termination, we have paid to Alliance a termination fee pursuant to the terms of the merger agreement.

The merger agreement also provides that Alliance may terminate the merger agreement at any time before the consummation of the merger if any of the following occurs:

- we materially and knowingly breach certain obligations under the merger agreement related to restrictions on solicitation or the submission of certain matters to a shareholder vote, subject to limited exceptions for curing certain breaches;

- our board withdraws, modifies, conditions or qualifies its recommendation in favor of the merger in a manner adverse to Alliance, approves or recommends to our shareholders an Acquisition Proposal (other than by Alliance or its affiliates), approves or recommends that our shareholders tender their shares in any tender or exchange offer that is an Acquisition Proposal (other than by Alliance or its affiliates), or approves a resolution or agrees to do any of the foregoing;

- any third party acquires beneficial ownership of a majority of the outstanding shares of our common stock; or

- there has been a breach of or failure to perform any representation, warranty, covenant or agreement by us set forth in the merger agreement, which breach would cause certain closing conditions set forth in the merger agreement not to be satisfied, and which shall not have been cured within 15 days following our receipt of written notice of such breach from Alliance (except in the case of a breach that is not curable or efforts to cure such breach have ceased).

72

IB 00100

### Shared Fees and Expenses

The merger agreement provides that all fees and expenses incurred in connection with the merger agreement and the transactions contemplated thereby including, without limitation, all legal, accounting, financial advisory, consulting and all other fees and expenses of third parties shall be paid by the party incurring such expenses, whether or not the merger is consummated except that Source Interlink and Alliance shall share equally (i) the aggregate filing fees of the parties' pre-merger notification report under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and compliance with other foreign antitrust laws, if any, and (ii) all fees and expenses, other than accountants' and attorneys' fees, incurred with respect to the printing and filing of the proxy statement/ prospectus (including any related preliminary materials) and the related registration statement and any amendments or supplements thereto.

### Fees to Be Paid by Source Interlink in the Event the Merger Agreement is Terminated

Under the terms of the merger agreement, we will pay a $5.0 million termination fee to Alliance if:

- we materially and knowingly breach certain obligations under the merger agreement related to restrictions on solicitation or the submission of certain matters to a shareholder vote, subject to limited exceptions for curing certain breaches;

- our board withdraws, modifies, conditions or qualifies its recommendation in favor of the merger in a manner adverse to Alliance, approves or recommends to our shareholders an Acquisition Proposal (other than by Alliance or its affiliates), approves or recommends that our shareholders tender their shares in any tender or exchange offer that is an Acquisition Proposal (other than by Alliance or its affiliates), or approves a resolution or agrees to do any of the foregoing;

- any third party acquires beneficial ownership of a majority of the outstanding shares of our common stock; or

- we terminate the merger agreement and concurrently enters into a definitive agreement for a Superior Proposal in accordance with, or has otherwise complied with, all provisions of the merger agreement in relation thereto and concurrently with such termination.

If the merger has not been consummated by April 30, 2005, we will also pay a $5.0 million termination fee to Alliance if a third party has made an Acquisition Proposal and not withdrawn such Acquisition Proposal as of April 30, 2005 and within twelve months following such termination, a third party acquisition is consummated or we enter into a definitive agreement providing for a third party acquisition (for purposes of this clause, the term "Acquisition Proposal" shall have the meaning assigned to such term above except that it shall refer only to us and references to "15%" in the definition shall be references to 50%).

We will pay to Alliance a $2.0 million termination fee plus Alliance's reasonable, out-of-pocket expenses incurred in connection with the transactions contemplated by the merger agreement (such amount not to exceed $5.0 million in the aggregate) if the merger agreement is terminated because our shareholders fail to vote in favor of the matters contemplated by the merger agreement.

If (1) the merger agreement is terminated because our shareholders fail to vote in favor of the matters contemplated by the merger agreement, (2) a third party has made an Acquisition Proposal and not withdrawn such Acquisition Proposal at the time of our shareholder meeting and (3) within twelve months following such termination, a third party acquisition is consummated or we enter into a definitive agreement providing for a third party acquisition (for purposes of this clause, the term "Acquisition Proposal" shall have the meaning assigned to such term except that it shall refer only to us and references to "15%" in the definition shall be references to 50%), we shall pay to Alliance an amount, if any, equal to $5.0 million less $2.0 million less Alliance's reasonable, out-of-pocket expenses incurred in connection with the transactions contemplated by the merger agreement.

73

IB 00101

**Extension, Waiver and Amendment**

Either Source Interlink or Alliance may extend the time for the performance of any of the other's obligations or other acts under the merger agreement, waive any inaccuracies in the other's representations and warranties contained in the merger agreement or in any document delivered pursuant to the merger agreement and waive compliance by the other with any of the agreements or conditions contained in the merger agreement.

The merger agreement may only be amended if such amendment is in writing and is signed by each of the parties to the merger agreement. Such amendment may take place at any time prior to the completion of the merger, and, subject to applicable law, whether before or after approval by the stockholders of Alliance or our shareholders.

### Definition of Material Adverse Effect

For purposes of the merger agreement the term "material adverse effect" when used in connection with an entity, means any change, event, occurrence, violation, inaccuracy, circumstance, development or effect that is or is reasonably likely to (i) be materially adverse to the business operations, assets, capitalization, results of operations or financial condition of such entity and its subsidiaries taken as a whole or (ii) materially impede the ability of such entity to consummate the transactions contemplated by the merger agreement.

Notwithstanding the previous paragraph, in no event shall any of the following, alone or in combination, be deemed to constitute, nor shall any of the following be taken into account in determining whether there has been or will be, a "material adverse effect":

• any changes, events, occurrences, violations, inaccuracies, circumstances, developments or effects that are caused or resulting from conditions affecting the industries in which the relevant entity and its subsidiaries participates, the U.S. economy as a whole, or foreign economies as a whole in any countries where the relevant entity or its subsidiaries have material operations or the capital markets generally (which changes in each case do not materially and disproportionately affect the relevant entity and its subsidiaries);

• any changes, events, occurrences, violations, inaccuracies, circumstances, developments or effects that are caused by or resulting from an outbreak or escalation of hostilities involving the United States, the declaration by the United States of a national emergency or war, or the occurrence of any acts of terrorism;

• any changes, events, occurrences, violations, inaccuracies, circumstances, developments or effects that are attributable to the public announcement or pendency of the merger agreement or the performance of the merger agreement by the relevant entity; or

• in our case, any change in the market price or trading volume of our common stock, in and of itself, after the date of the merger agreement.

74

---

IB 00102

AGREEMENTS RELATED TO THE MERGER AND OTHER TRANSACTIONS

**Source Interlink Voting Agreements**

Concurrent, and in connection, with the merger agreement, Source Interlink and Alliance entered into voting agreements with each of the following directors and officers of Source Interlink (in their capacities as stockholders of Source Interlink): S. Leslie Flegel, James R. Gillis, Jason S. Flegel, John R. Amann, Marc Fierman, Randell S. Minix, A. Clinton Allen, Ariel Emanuel, Aron S. Katzman, Allan R. Lyons, Harry L. Franc, III and Kenneth F. Teasdale. Pursuant to the agreement and subject to certain conditions specified therein, each of our shareholders who is a party to the voting agreement agreed to:

• retain our shares until the merger is effective;

• vote in favor of the share issuance and the actions contemplated by the merger agreement;

• vote in favor of the amendment of our articles of incorporation to increase our authorized capital stock;

• vote against any action in opposition to the merger, including an Acquisition Proposal or Superior Proposal (as such terms are defined in the merger agreement);

• vote in favor of the directors designated by AEC Associates, L.L.C., the majority stockholder of Alliance, at the 2005 Source Interlink annual meeting; and

• grant an irrevocable proxy to Alliance to vote on their behalf.

**Alliance Voting Agreement**

Also concurrent, and in connection, with the merger agreement, Source Interlink, Alliance and AEC Associates entered into a voting agreement that obligates AEC Associates to:

• retain Alliance shares until the merger is effective;

• convert all Alliance preferred stock to common;

• vote in favor of the merger agreement;

• vote in favor of the Distribution (as defined in the merger agreement);

• vote against any action in opposition to the merger, including an Acquisition Proposal or Superior Proposal (as such terms are defined in the merger agreement); and

• grant an irrevocable proxy to us to vote on their behalf.

The agreement includes an ability for us to act on behalf of AEC Associates to call a stockholder meeting or solicit written consent to approve the merger. As of January 14, 2005, AEC Associates beneficially owns 63.8% of the voting securities of Alliance.

**Source Interlink Affiliate Agreements**

Also concurrent, and in connection, with the merger agreement, we and certain stockholders who may be deemed affiliates of Alliance entered into affiliate agreements. Pursuant to the agreements and subject to certain conditions specified therein, the affiliated stockholders agreed not to sell, transfer or otherwise dispose of any shares of our common stock issued to such stockholders in the merger unless such dispositions comply with applicable securities laws and certain other conditions.

**Stockholder's Agreement**

In connection with the merger agreement, Source Interlink and AEC Associates negotiated a stockholder's agreement to be entered into at the effective time of the merger. After the effective time of the merger, AEC Associates will own approximately 35.3% of the outstanding

IB 00104

Pursuant to the agreement and subject to certain conditions specified therein, Source Interlink and AEC Associates agreed to the following terms:

*Board Composition and Committees at the Effective Time.* At the effective time of the merger, the combined company's board will be comprised of 11 members, including (i) six members designated by us (who are expected to be S. Leslie Flegel, James R. Gillis, A. Clinton Allen, Ariel Emanuel, Allan R. Lyons and Aron S. Katzman), and five members designated by Alliance. Alliance has not yet designated any individuals to serve on the board. Six of the directors will be "independent" under the rules of the SEC and NASD with respect to the combined company.

*Bylaws Amendment.* Our bylaws at the effective time shall provide, among other things, that:

• the board shall consist of between three and 11 members;

• a change of control of us shall be approved by supermajority of at least 75% of the members of our board; and

• for as long as AEC Associates (together with its members and affiliates acting as a group) owns an aggregate of at least 10% of our outstanding common stock, if an Alliance or Source Interlink director is unable to fulfill their term in office, the remaining Alliance or Source Interlink directors, as the case may be, shall have the exclusive right to designate an individual to fill the vacancy.

*Board of Directors.* Until the date AEC Associates, together with those parties acting in concert with AEC Associates, no longer owns an aggregate of at least 10% of our outstanding common stock:

• AEC Associates has the right to designate an individual (or individuals) of its choice for election by the board for any seat that is last occupied or vacated by a director designated by Alliance or AEC Associates, except if such designation would result in the director designated by AEC Associates having a disproportionate board representation to AEC Associates' (together with its members and affiliates) ownership of our common stock.

• We and AEC Associates agree that AEC Associates will designate three individuals for election at the 2005 Source Interlink annual meeting. We will not place any other nominees on the ballot for the 2005 annual meeting for election as a director unless required by law

• As soon as reasonably practicable after the effective time of the merger, we shall cause each standing committee of the board to include a least one director designated by Alliance and be comprised of a majority of directors designated by us.

• Each director of Alliance that is "independent" or fulfills an SEC or NASD requirement that is unable to fulfill his or her term shall be replaced by a director of similar credentials to satisfy the requirement.

*Voting.* Through our 2007 annual meeting of shareholders, AEC Associates will (i) vote for all board nominees, (ii) be present at all meetings, in person or by proxy and (iii) not, without supermajority board approval, take any action, directly or indirectly, intended to remove or that will result in removing any director from the board.

*Lockup.* AEC Associates will initially be locked up following the consummation of the merger, after which time shares will be released from the lock-up as follows: (i) one-third of its shares will be released three months following the consummation of the merger, (ii) an additional one-third of its shares will be released six months following the consummation of the merger and (iii) the remaining one-third of its shares will be released nine months following the consummation of the merger.

*Further Restrictions.* Through our 2007 annual meeting of shareholders, AEC Associates will not make any disposition of shares of our common stock:

• to any member or affiliate of AEC Associates unless that member or affiliate agrees to be bound by the stockholder's agreement; or

• without supermajority board approval, to persons initiating unsolicited tender offers and similar events.

IB 00105

http://yahoo.brand.edgar-online.com/EFX_dll/EDGARpro.dll?FetchFilingHTML1?SessionID=DbxMIg...    10/24/200:

*Demand Registration Rights.* After the initial three-month lock-up period expires, AEC Associates is entitled to three demand registrations (only as to shares that are then free from the lock-up), which must be in firmly committed, underwritten public offerings.

*Piggyback Registration Rights.* After the initial lock-up expires, AEC Associates is entitled to unlimited piggyback registration rights, which are subject to underwriter cutbacks.

*Market Standoff.* For as long as AEC Associates (together with its members and affiliates acting as a group) owns an aggregate of 10% or more of our outstanding common stock, it will agree to a public offering lock-up such that neither it nor any of its members or affiliates acting as a group will effect any disposition under the same circumstances and for the same period as is required of our directors in the same offering.

*Noncompetition Covenants.* AEC Associates will not for a period of two years from the effective time of the merger (i) engage or participate in the business of Alliance, (ii) solicit employees or consultants of Alliance or its successor or any subsidiary thereof or (iii) solicit or interfere with customers of Alliance or its successor or any subsidiary thereof. AEC Associates will not disclose confidential information. "Business" is defined as distribution and fulfillment of prepackaged, physical VHS video cassettes, CDs or DVDs containing audio or video files or other prepackaged, physical product containing audio or video files, provided, however that the foregoing does not include video games.

## Consulting Agreement

In connection with the merger agreement, we and Yucaipa, an entity affiliated with Alliance's majority stockholder, AEC Associates, negotiated a consulting agreement to be entered into at the effective time of the merger. Pursuant to the consulting agreement and subject to certain conditions specified therein, Yucaipa agreed to provide us, upon our request, with consulting and financial services for an annual fee of $1.0 million, plus out-of-pocket expenses. The right to fees is conditioned upon termination of the existing management services agreement between Yucaipa and Alliance and Yucaipa's receipt of payments of no more than $4.0 million from Alliance for services rendered in connection with the merger or the termination of the management services agreement. The term of the consulting agreement is for a period of five years. Either party may terminate the consulting agreement at any time; however, if we terminate the agreement then we shall pay Yucaipa a cash termination payment equal to the remaining unpaid portion of the fees owed for the term in which the termination occurs plus $1.0 million. Yucaipa agrees, during the term of the consulting agreement and for one year thereafter, not to solicit any employees or consultants of our company or Alliance.

## Agreements between Alliance and Spinco

In connection with Alliance's distribution of its "All Media Guide" and "Digital On-Demand" businesses completed December 31, 2004, Alliance entered into a number agreements with Spinco. The rights and obligations of Alliance under each of these agreements will become those of the combined company following the merger.

### *Distribution and Separation Agreement*

Alliance and Spinco entered into a distribution and separation agreement on December 31, 2004 to effect the spin-off. As part of that agreement, Spinco agreed that for a period of one year it would not engage in the business of distribution and fulfillment of prepackaged physical VHS video cassettes, CDs or DVDs containing audio or video files or other prepackaged, physical products, containing audio or video files, provided however that the foregoing does not include video games. The agreement also provides that Spinco will indemnify Alliance against any and all liabilities, in perpetuity, relating to or arising out of certain assumed liabilities other than tax liabilities, which is addressed in the tax-sharing and indemnification agreement referred to below.

77

IB 00106

*Licensing and Co-Marketing Agreement*

Effective as of January 1, 2005, AEC One Stop Group, Inc., or One Stop, a subsidiary of Alliance, and All Media Guide LLC, or AMG LLC, a subsidiary of Spinco, entered into a license agreement for a period of 5 years (which is renewable for additional 1 year terms), pursuant to which:

- AMG LLC is licensing the "All Media Guide" databases to One Stop for internal use for $300,000 annually;

- Existing license terms with respect to "theStore24" are grandfathered in place relating to certain customer agreements, and a 1 1/4% royalty on One Stop product sales will be paid by One Stop to AMG LLC for new agreements for revenues derived by One Stop from "theStore24" (Spinco's proprietary customer direct ordering system); and

- AMG LLC is licensing its music sampling product and its image library to One Stop at a discounted rate.

One Stop also entered into a co-marketing agreement permitting it to market RedDotNet products (kiosks to disseminate in-store product information, samples, etc), which Digital On-Demand, Inc., a California corporation and a subsidiary of Spinco, will support.

*Transition/Shared Services Agreement*

For a period of no more than six months following January 1, 2005, Alliance will: assist in the transition of employees to Spinco at its cost; provide certain human resources services to Spinco at a cost of $1,812 per month; and provide certain other services at its cost.

*Tax Sharing and Indemnification Agreement*

In connection with the spin-off, Spinco and Alliance entered into a tax sharing and indemnification agreement, addressing, among other items:

- Alliance's inclusion of the income of Spinco (including any deferred items triggered into income by Treasury Regulations Section 1.1502-13) on Alliance's consolidated federal income tax return (and any comparable state returns) for all periods through the date of the spin-off, and the payment of any taxes attributable to such income;

- the indemnity to be provided by Spinco to Alliance for any taxes payable by Alliance with respect to the spin-off (including each of the steps comprising part of the spin-off) for the taxable year in which the spin-off occurs (including, primarily, taxes resulting from any failure of Alliance's consolidated net operating losses or other attributes to fully offset any gain arising from the spin-off, but excluding taxes arising from transactions or activities of Alliance other than the spin-off);

- the indemnity to be provided by Alliance to Spinco with respect to any taxes of Alliance or its subsidiaries payable by Spinco as a result of the application of Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law);

- the conduct of any audits and contests relating to Alliance's taxes; and

- the term of the indemnity provisions, which will generally expire on the date that is 30 days following the expiration of the applicable statute of limitations.

IB 00107

http://yahoo.brand.edgar-online.com/EFX_dll/EDGARpro.dll?FetchFilingHTML1?SessionID=DbxMIg...    10/24/200

**UNAUDITED PRO FORMA**
**CONDENSED COMBINED FINANCIAL STATEMENTS**

The following unaudited *pro forma* condensed combined financial statements with respect to Source Interlink is based on our historical consolidated financial statements. Set forth below are the following unaudited *pro forma* financial statements:

- The unaudited *pro forma* condensed combined balance sheet as of October 31, 2004, assuming the business combination between Source Interlink and Alliance occurred on October 31, 2004; and

- The unaudited *pro forma* condensed combined statement of operations for the nine months ended October 31, 2004, assuming the business combination between Source Interlink and Alliance occurred as of February 1, 2003; and

- The unaudited *pro forma* condensed combined statement of operations for the year ended January 31, 2004, assuming the business combination between Source Interlink and Alliance occurred as of February 1, 2003.

The unaudited *pro forma* condensed combined financial statements are presented for informational purposes only, is based on certain assumptions that we believe are reasonable and does not purport to represent our financial condition or our results of operations had the business combination occurred on or as of the dates noted above or to project the results for any future date or period. In the opinion of management, all adjustments have been made that are necessary to present fairly the unaudited *pro forma* condensed combined financial information.

The unaudited pro forma condensed combined statements of operations do not include adjustments to eliminate operations of Alliance that were phased out prior to the acquisition of Alliance by Source Interlink. These operations did not meet the criteria for discontinued operations treatment under FASB 144, and therefore are included in the pro forma statement of operations. For the year ended January 31, 2004, the following amounts are included in the Alliance historical financial statements related to these operations: (1) revenues of $7.5 million; (2) cost of revenues of $14.2 million; (3) selling, general and administrative expenses of $7.4 million; and (4) interest charges of $0.9 million. For the nine month period ended October 31, 2004, the following amounts are included in the Alliance historical financial statements related to these operations: (1) revenues of $1.2 million; (2) cost of revenues of $1.1 million; (3) selling, general and administrative expenses of $1.2 million; and (4) interest charges of $0.4 million.

The merger and related transactions will be treated as a purchase business combination for accounting purposes, and Alliance's assets acquired and liabilities assumed will be recorded at their fair value. For the purposes of this unaudited condensed pro forma consolidated financial data, we have assumed that our common stock price is $11.31 per share (based on an average of closing prices for our common stock from November 12, 2004 through November 26, 2004, which is the five trading days before and after the day the transaction was announced) and that approximately 50.4 million shares of our common stock are outstanding at the date of consummation of the merger.

The allocations of the purchase price to Alliance's assets, including intangible assets, and liabilities are only preliminary allocations based on estimates of fair values and will change when actual fair values are determined. Among the provisions of Statement of Financial Accounting Standards No. 141, "Business Combinations," criteria have been established for determining whether intangible assets should be recognized separately from goodwill. Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets," ("SFAS 142") provides, among other guidelines, that goodwill and intangible assets with indefinite lives will not be amortized, but rather are tested for impairment on at least an annual basis.

The unaudited *pro forma* condensed combined financial information should be read in conjunction with our consolidated financial statements and unaudited condensed consolidated financial statements and related notes, included herein by reference, and the information set forth in "Source Interlink Management's Discussion and Analysis of Financial Condition and Results of Operations."

79

IB 00108

## UNAUDITED PRO FORMA CONDENSED COMBINED BALANCE SHEET

| | Historical Source Interlink October 31, 2004(a) | Historical Alliance September 30, 2004(a) | Pro Forma Adjustments | Pro Forma Source Interlink Companies |
|---|---|---|---|---|
| | | | (In thousands) | |
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash | $  1,584 | $  2,785 | $  (58)(b) | $  4,311 |
| Trade Receivables | 65,737 | 119,967 | (2,486)(b) | 183,218 |
| Purchased claims receivable | 3,324 | — | — | 3,324 |
| Inventories | 14,114 | 123,330 | (1,821)(b) | 135,623 |
| Income tax receivable and other current assets | 5,394 | 1,874 | (125)(b) | 7,143 |
| Deferred tax asset | 3,405 | — | — | 3,405 |
| Advances under magazine export agreement | 1,525 | — | — | 1,525 |
| Total current assets | 95,083 | 247,956 | (4,490) | 338,549 |
| Property, plant and equipment, net | 21,732 | 50,818 | (17,753)(b) 10,460  (c) | 65,257 |
| Goodwill, net | 63,087 | 3,876 | 175,971  (d1) (3,876)(d5) | 239,058 |
| Intangible assets, net | 13,179 | 12,022 | 90,520  (d2) (12,022)(d5) | 103,699 |
| Deferred tax asset | 652 | — | 12,982  (d3) | 13,634 |
| Other assets | 6,652 | 1,873 | (56)(b) | 8,469 |
| Total assets | $200,385 | $ 316,545 | $ 251,736 | $768,666 |
| **LIABILITIES AND EQUITY** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable, accrued expenses and other current liabilities | $ 40,765 | $ 209,096 | $  (1,797)(b) 1,000  (d4, f) | $249,064 |
| Current maturities of long-term debt | 2,491 | 37,727 | — | 40,218 |
| Total current liabilities | 43,256 | 246,823 | (797) | 289,282 |
| Long-term debt | 31,570 | 3,521 | 3,801  (d8, e) | 38,892 |
| Other liabilities | 1,901 | — | 4,000  (d4, f) | 5,901 |
| Total liabilities | 76,727 | 250,344 | 7,004 | 334,075 |
| Preferred Stock, Series A1 Cumulative | — | 35,103 | (35,103)(d6) | — |
| Preferred Stock, Series A2 Cumulative | — | 68,838 | (68,838)(d6) | — |
| Preferred Stock, Series B Cumulative | — | 16,748 | (16,748)(d6) | — |
| **Stockholders' Equity:** | | | | |
| Common stock | 237 | 7 | (7)(d7) 267  (d10) | 504 |
| Additional paid-in capital | 149,178 | 114,983 | (114,983)(d7) 9,280  (d9) 301,386  (d10) | 459,844 |
| Accumulated deficit | (26,765) | (169,478) | 169,478  (d7) | (26,765) |
| Foreign currency translation | 1,575 | — | — | 1,575 |
| Less: Treasury Stock | (567) | — | — | (567) |
| Total stockholders' equity | 123,658 | (54,488) | 365,421 | 434,591 |
| Total liabilities and stockholders' equity | $200,385 | $ 316,545 | $ 251,736 | $768,666 |

See notes to unaudited *pro forma* condensed combined balance sheet.

IB 00109

IB 00110

# NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED BALANCE SHEET

(a) Certain reclassifications have been made to the historical presentation of Source Interlink and Alliance to conform to the presentation used in the unaudited pro forma condensed consolidated balance sheet.

(b) To eliminate the following assets and liabilities of Alliance included in their September 30, 2004 balance sheet related to DMISG. These assets and liabilities were distributed by Alliance through a spin-off of the shares of Spinco to the Alliance stockholders. The assets and liabilities are as follows: (1) $0.06 million of cash; (2) $2.5 million of net accounts receivable; (3) $1.8 million of inventory; (4) $0.1 million of other assets; (5) $17.8 million of net property and equipment; (6) $0.06 million of other assets; and (7) $1.8 million of accounts payable, accrued expenses and other current liabilities.

(c) To adjust the estimated value of net property, plant and equipment acquired to its estimated fair market value. The estimated increase in the fair value is approximately $10.5 million. The final valuation of the net property, plant and equipment will be determined at a future date based upon independent third-party appraisals.

(d) In connection with the business combination, Alliance will merge with and into a wholly owned subsidiary of Source Interlink and Alliance common stockholders will receive for each share of Alliance common stock they hold a number of shares based on the exchange ratio as previously defined in this proxy statement/prospectus. Based on the fully diluted shares outstanding as of January 14, 2005, approximately 26.7 million shares of our common stock will be issued in exchange for all outstanding common stock of Alliance and result in the equity holders of Alliance and Source Interlink immediately prior to the merger each holding 50% of the fully diluted capitalization of the combined company immediately following the merger.

Under the purchase method of accounting, the total estimated consideration as shown in the table below is allocated to Alliance's tangible and intangible assets and liabilities based on their estimated fair values as of the date of the business combination. The preliminary estimated consideration is as follows:

|  |  | Common Shares | Capital in Excess of Par Value | Total |
|---|---|---|---|---|
|  |  |  | (in thousands) |  |
| (d10) | Issuance of Source shares to Alliance stockholders (26.7 million shares at $11.31) | $267 | $301,386 | $301,653 |
| (d9) | Fair value of options and warrants issued |  |  | 9,280 |
| (d8) | Estimated transaction costs |  |  | 3,801 |
|  | Total consideration |  |  | $314,734 |

The estimated consideration is preliminarily allocated as follows:

| (d7) | Alliance historical net book value | $ (54,488) |
|---|---|---|
| (d6) | Conversion of Alliance preferred stock to common stock | 120,689 |
| (d5) | Elimination of Alliance historical goodwill and intangibles | (15,898) |
| (b) | Elimination of Spinco assets and liabilities | (20,502) |
| (c) | Estimate of adjustment to fair value property and equipment | 10,460 |
| (d4) | To record liability related to consulting agreement with Yucaipa | (5,000) |
| (d3) | Estimate of adjustment to deferred tax asset valuation allowance | 12,982 |
| (d2) | Estimate of adjustment to fair value identifiable intangible assets | 90,520 |
| (d1) | Estimate of adjustment to goodwill | 175,971 |
|  | Total consideration allocated | $314,734 |

(e) Estimated Source Interlink transaction costs will be funded through borrowings on its revolving line of credit.

81

IB 00111

(t) In connection with the merger agreement, we entered into a consulting agreement with Alliance requiring a payment of $750,000 per year for a period of five years. Under the agreement, these payments are guaranteed and no additional services are required.

We have not completed an assessment of the fair values of assets and liabilities of Alliance and the related business integration plans. The assessment will not be completed until the full review of the assets has been completed. We expect that the ultimate purchase price allocation will include adjustments to the fair values of depreciable tangible assets, identifiable intangible assets (some of which will have indefinite lives and liabilities, including the establishment of any potential liabilities associated with business integration plans. Accordingly, to the extent such assessments indicate that the fair value of the assets and liabilities differ from their net book values, such differences would be allocated to those assets and liabilities. For purposes of the allocation above, we have allocated $90.5 million to identifiable intangible assets, the majority allocated to definitive life intangibles such as customer lists and software.

82

IB 00112

**For the nine month period ended October 31, 2004**

| | Historical Source Interlink October 31, 2004 | Historical Alliance September 30, 2004 | Pro Forma Adjustments | Pro Forma Source Interlink |
|---|---|---|---|---|
| | (In thousands, except per share data) | | | |
| Revenues | $273,175 | $646,342 | $(13,079)(a) | $906,438 |
| Cost of Revenues | 199,822 | 552,304 | (7,311)(a) | 723,500 |
| | | | (21,315)(d) | |
| Gross Profit | 73,353 | 94,038 | 15,547 | 182,938 |
| Selling, General and Administrative Expenses | 40,874 | 84,423 | (8,725)(a) | 122,092 |
| | | | (375)(b) | |
| | | | 5,670 (c) | |
| | | | 225 (e) | |
| Fulfillment Freight | 15,244 | — | 21,315 (d) | 36,559 |
| Relocation Expenses | 1,552 | — | — | 1,552 |
| Operating Income (Loss) | 15,683 | 9,615 | (2,563) | 22,735 |
| Other Income (Expense): | | | | |
| Write off deferred financing costs and original issue discount | (1,494) | — | — | (1,494) |
| Interest expense, net | (1,179) | (1,160) | 1,265 (a) | (1,074) |
| Other | 207 | — | — | 207 |
| Total Other Income (Expense) | (2,466) | (1,160) | 1,265 | (2,361) |
| Income before Income Taxes | 13,217 | 8,455 | (1,298) | 20,374 |
| Income Tax Expense | 4,204 | 3,424 | (506) (f) | 7,122 |
| Net Income | $ 9,013 | $ 5,031 | $ (792) | $ 13,252 |
| Earnings per Share — Basic | $ 0.40 | $ 0.19 | — | $ 0.27 |
| Earnings per Share — Diluted | $ 0.37 | $ 0.19 | — | $ 0.26 |
| Weighted Average of shares outstanding — Basic | 22,727 | 26,671 | — | 49,398 |
| Weighted Average of shares outstanding — Diluted | 24,606 | 27,037 | — | 51,643 |

See notes to unaudited *pro forma* condensed combined statement of operations.

83

IB 00113

NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED
STATEMENT OF OPERATIONS
For the nine month period ended October 31, 2004

(a) To eliminate the following revenues, cost of revenues, selling, general and administrative expense and interest charges of Alliance included in the statement of operations for the nine month period ended September 30, 2004 related to DMISG. These operations were distributed by Alliance through a spin-off of the shares of Spinco to the Alliance stockholders. The amounts are as follows: (1) $13.1 million o revenues; (2) $7.3 million of cost of revenues; (3) $8.7 million of selling, general and administrative expenses; and (4) $1.3 million of interest expense.

(b) To eliminate $0.4 million of management fees to Yucaipa, an entity affiliated with Alliance's majority stockholder for management services provided to Alliance, which Alliance has recorded in their historical financial statements. This fee is considered a nonrecurring charge as Yucaipa will have no continuing role in the management of Alliance after the merger.

(c) To record $5.7 million of additional depreciation and amortization expense resulting from the adjustment to Alliance's property and equipment assets and identifiable intangible assets based on the adjustment of such assets to fair value as discussed in Note (d) of the Notes to the Unaudited Pro Forma Condensed Consolidated Balance Sheet. We have assumed a remaining useful life of 40 years for the buildings, which is in accordance with our capitalization policies. We expect that the ultimate purchase price allocation will include adjustments to the fair values of identifiable intangible assets (some of which will have indefinite lives). For purposes of the amortization expense recorded above we have allocated approximately $90.5 million to identifiable intangible assets, including allocations to definitive life intangibles such as customer lists and software contracts and we have assumed a 12 year average useful life.

(d) Reclassification of fulfillment freight from cost of revenues to a separate selling, general and administrative line item has been made to the historical presentation of Alliance to conform to our presentation.

(e) To record licensing fee expense to Spinco for the "All Media Guide" database in the amount of $0.2 million for the nine month period ended October 31, 2004.

(f) Represents the aggregate pro forma statutory income tax effect (39%) of Notes (a) through (e) above.

84

IB 00114

**UNAUDITED PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS**
**For the year ending January 31, 2004**

| | Historical Source Interlink January 31, 2004 | Historical Alliance December 31, 2003 | Pro Forma Adjustments | Pro Forma Source Interlink |
|---|---|---|---|---|
| | (In thousands, except per share data) | | | |
| Revenues | $333,134 | $869,890 | $(12,356)(a) | $1,190,668 |
| Cost of Revenues | 244,755 | 759,508 | (7,255)(a) | 969,809 |
| | | | (27,199)(d) | |
| Gross Profit | 88,379 | 110,382 | 22,098 | 220,859 |
| Selling, General and Administrative Expenses | 52,642 | 104,532 | (14,151)(a) | 150,383 |
| | | | (500)(b) | |
| | | | 7,560 (c) | |
| | | | 300 (e) | |
| Severance Expenses | — | 1,108 | — | 1,108 |
| Fulfillment Freight | 16,381 | — | 27,199 (d) | 43,580 |
| Relocation Expenses | 1,730 | — | | 1,730 |
| Operating Income | 17,626 | 4,742 | 1,690 | 24,058 |
| Other Income (Expense): | | | | |
| Write off deferred financing costs and original issue discount | — | — | — | — |
| Interest expense, net | (3,647) | (2,468) | 1,251 (a) | (4,864) |
| Other | (316) | — | — | (316) |
| Total Other Income (Expense) | (3,963) | (2,468) | 1,251 | (5,180) |
| Income before Income Taxes | 13,663 | 2,274 | 2,941 | 18,878 |
| Income Tax Expense | 3,615 | 1,026 | 1,147 (f) | 5,788 |
| Net Income | $ 10,048 | $ 1,248 | $ 1,794 | $ 13,090 |
| Earnings per Share — Basic | $ 0.54 | $ 0.05 | — | $ 0.29 |
| Earnings per Share — Diluted | $ 0.51 | $ 0.05 | — | $ 0.28 |
| Weighted Average of shares outstanding — Basic | 18,476 | 26,671 | — | 45,147 |
| Weighted Average of shares outstanding — Diluted | 19,866 | 26,761 | — | 46,627 |

See notes to unaudited *pro forma* condensed combined statement of operations.

85

IB 00115

**NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED
STATEMENT OF OPERATIONS
For the year ending January 31, 2004**

(a) To eliminate the following revenues, cost of revenues, selling, general and administrative expense and interest charges of Alliance included in the statement of operations for the year ended December 31, 2003 related to DMISG. These operations were distributed by Alliance to Spinco, an entity owned by the Alliance stockholders. The amounts are as follows: (1) $12.4 million of revenues; (2) $7.3 million of cost of revenues; (3) $14.2 million of selling, general and administrative expenses; and (4) $1.3 million of interest expense.

(b) To eliminate $0.5 million of management fees to Yucaipa, an entity affiliated with Alliance's majority stockholder for management services provided to Alliance, which Alliance has recorded in their historical financial statements. This fee is considered a nonrecurring charge as Yucaipa will have no continuing role in the management of Alliance after the merger.

(c) To record $7.6 million of additional depreciation and amortization expense resulting from the adjustment to Alliance's property and equipment assets and identifiable intangible assets based on the adjustment of such assets to fair value as discussed in Note (d) of the Notes to the Unaudited Pro Forma Condensed Consolidated Balance Sheet. We have assumed a remaining useful life of 40 years for the buildings, which is in accordance with our capitalization policies. We expect that the ultimate purchase price allocation will include adjustments to the fair values of identifiable intangible assets (some of which will have indefinite lives). For purposes of the amortization expense recorded above we have allocated approximately $90.5 million to identifiable intangible assets, including allocations to definitive life intangibles such as customer lists and software and we have assumed a 12 year average useful life.

(d) Reclassification of fulfillment freight from cost of revenues to a separate selling, general and administrative line item has been made to the historical presentation of Alliance to conform to our presentation.

(e) To record the annual licensing fee expense to Spinco for the "All Media Guide" database in the amount of $0.3 million.

(f) Represents the aggregate pro forma statutory income tax effect (39%) of Notes (a) through (e) above.

86

IB 00116

MANAGEMENT

**Executive Officers and Directors Post-Merger**

Upon the consummation of the merger, the board of directors of the combined company is expected to be comprised of eleven individuals. Six directors will be designated by us, three of whom will be independent (under the rules of the SEC and NASD with respect to the combined company). Five directors will be designated by Alliance, three of whom will be independent (under the rules of the SEC and NASD with respect to the combined company).

The combined company's bylaws will provide that the board will be divided into three classes of directors, with the classes to be as nearly equal in number as possible. One class of directors will be elected each year at our annual meeting to serve for a three-year term. Three of the directors designated by Alliance will serve in the class of directors whose term expires at our 2005 annual meeting of shareholders. At our 200? annual meeting of shareholders, AEC Associates will have the right to designate three individuals as nominees for election to the board. See "Agreements Related to the Merger and Other Transactions — Stockholder's Agreement." Three of the directors designated by us, and one of the directors designated by Alliance will serve in the class of directors whose term expires at our 2006 annual meeting of shareholders. The remaining three directors designated by us, and the remaining director designated by Alliance, will serve in the class of directors whose term expires at our 2007 annual meeting of shareholders.

The following table lists the names, ages and positions of individuals expected to be executive officers of Source Interlink as well as the individuals expected to be designated by Source Interlink as directors of Source Interlink upon the consummation of the merger. Alliance has not yet designated any individuals to serve as directors on the board. The ages of the individuals are provided as of January 14, 2005.

| Name(1) | Age | Position(s) |
|---|---|---|
| S. Leslie Flegel | 67 | Chairman of the Board of Directors, Chief Executive Officer and Director(2)(4) |
| James R. Gillis | 52 | President, Chief Operating Officer and Director(2)(3) |
| Jason S. Flegel | 39 | Executive Vice President |
| Alan Tuchman | 45 | Executive Vice President |
| John R. Amann | 52 | Executive Vice President |
| Marc Fierman | 44 | Chief Financial Officer |
| A. Clinton Allen | 60 | Director(2)(4) |
| Ariel Emanuel | 43 | Director(2)(4) |
| Allan R. Lyons | 64 | Director(2)(3) |
| Aron S. Katzman | 67 | Director(2)(3) |

(1)  Alliance has not yet designated any individuals to serve on the post-merger board of directors as their designees. Therefore, the individuals to serve as Class I director are unknown at this time.

(2)  Our board is expected to designate these 6 individuals to serve on the post-merger board of directors as our designees as provided for in the merger agreement. All of our other current directors are expected to resign from the board of directors.

(3)  Class II Director. Term will expire at our 2006 annual meeting of shareholders.

(4)  Class III Director. Term will expire at our 2007 annual meeting of shareholders.

**S. Leslie Flegel** , *Chairman of the Board of Directors, Chief Executive Officer and Director*. S. Leslie Flegel has been our Chairman of the Board of Directors and Chief Executive Officer since our inception in March 1995. For more than 14 years prior thereto, Mr. Flegel was the principal owner and Chief Executive Officer of Display Information Systems Company, our predecessor. S. Leslie Flegel is the father of Jason S. Flegel, one of our Executive Vice Presidents.

87

IB 00117

James R. Gillis , *President and Director.* James R. Gillis became our President in December 1998, was appointed as a member of our board in March 2000 and became our President and Chief Operating Officer in August 2000. Prior thereto, he served as the President and Chief Executive Officer of Brand Manufacturing Corp., which we acquired in January 1999.

Jason S. Flegel , *Executive Vice President.* Jason S. Flegel has served as one of our Executive Vice Presidents since June 1996. Prior thereto, and since our inception in March 1995, he served as Vice President — Western Region. For more than two years prior thereto, Mr. Flegel was an owner and the Chief Financial Officer of Display Information Systems Company, our predecessor. Jason S. Flegel is the son of S. Leslie Flegel.

Alan Tuchman , *Executive Vice President.* Alan Tuchman has been President and Chief Operating Officer of Alliance since 2000. Mr. Tuchman joined Alliance in 1991 and was Vice President from that time until 1996, when he became Senior Vice President of Strategic Planning. Mr. Tuchman held this position until 1997 when he became President of AEC One Stop Group, Inc., a subsidiary of Alliance. In January 2000, Mr. Tuchman was appointed to his current position of President and Chief Operating Officer of Alliance.

John R. Amman , *Executive Vice President.* John R. Amann joined our company in September 2003 as President and Chief Executive Officer of one of Source Interlink's subsidiaries. In March 2004, he was promoted to the office of Executive Vice President — Sales and Marketing. For approximately 10 years prior to joining Source Interlink, Mr. Amann served as Vice President — Circulation and Labor for the New York Post. Prior thereto, he was Vice President of TV Guide, Inc. and Chief Executive Officer of Murdoch Magazines Distribution, Inc.

Marc Fierman , *Chief Financial Officer.* Marc Fierman has served as Source Interlink's Chief Financial Officer since November 2002. Prior thereto, he served as Vice President of Finance (July 2001 to November 2002) and Vice President of Finance — Display Division (March 1999 to June 2001). From April 1997 to February 1999, Mr. Fierman served as the chief financial officer of Brand Manufacturing Corp., which we acquired in January 1999.

A. Clinton Allen , *Director.* A. Clinton Allen was appointed to our board in April 2004. He currently is Chairman and Chief Executive Officer of A.C. Allen & Company, an investment banking consulting firm. Mr. Allen was Vice Chairman of Psychemedics Corporation, a provider of drug testing services, from October 1989 and Chairman of Psychemedics Corporation from March 2002, until November 2003. Mr. Allen was Vice Chairman and a director of the DeWolfe Companies, until it was acquired by Cendant Corporation in September 2002. Additionally, he was a director and member of the executive committee of Swiss Army Brands, until it was acquired by Victorinox Corporation in August 2002.

Mr. Allen is the Lead Director of Steinway Musical Instruments, Inc., one of the world's largest manufacturers of musical instruments; a director and Chairman of Collector's Universe, Inc., a provider of services and products to dealers and collectors of high-end collectibles; a director of Integrated Alarm Services Group, Inc., the largest provider of wholesale security monitoring in the United States; a director of Brooks Automation Inc., a manufacturer of integrated tool and factory automation solutions for the global semiconductor and related industries and a director of LKQ Corporation, the largest nationwide supplier of recycled OEM automotive parts.

Ariel Emanuel , *Director.* Ariel Emanuel was appointed to our board in November 2004. At present, Mr. Emanuel is a member of The Endeavor Agency LLC, a California-based talent agency which he founded in 1995. Mr. Emanuel is active in P.S. Arts, an entertainment industry sponsored organization working to bring arts education to public schools in Southern California and served as co-chair of the 2002 Earth to LA biennial fund-raising event for the Natural Resources Defense Council.

Allan R. Lyons , *Director.* Allan R. Lyons joined us as a member of the board in March 2003. From January 2000 to the present, Mr. Lyons has been the managing member of 21st Century Strategic Investment Planning, LC, a money management firm with more than $20.0 million under management. He is a member of the Board of Directors of Franklin Credit Management Corp., a specialty consumer finance and asset management company based in New York, NY. In late 1999, Mr. Lyons retired from Piaker & Lyons, a

IB 00118

http://yahoo.brand.edgar-online.com/EFX dll/EDGARpro.dll?FetchFilingHTML1?SessionID=DbxMIg...   10/24/2005

diversified certified public accounting firm where he specialized in taxes, estate and financial planning. Before joining the Executive Officer of Piaker & Lyons in 1994, Mr. Lyons had been a partner of the firm since 1968.

Aron S. Katzman , *Director*. Mr. Katzman has served as a member of our board since its inception in March 1995. Mr. Katzman was a founder of Medicine Shoppe International, Inc. and served on its board of directors until it was purchased by Cardinal Health in 1994. Mr. Katzman served as the Chairman and Chief Executive Officer of Roman Company, a manufacturer and distributor of fashion custom jewelry. Mr. Katzman is a member of the board of directors of Foto, Inc. Presently, Mr. Katzman is Chairman and Chief Executive Officer of Decorating Den of Missouri.

## Employment Contracts and Change-in-Control Arrangements Post-Merger

In May 2003, we entered into a new employment and non-competition agreement with our Chairman and Chief Executive Officer, S. Leslie Flegel, providing for his continued service in that position until January 31, 2006. Mr. Flegel received base compensation of $535,000 during the 2004 fiscal year. Mr. Flegel's base compensation is subject to annual adjustment at the discretion of the compensation committee of our board. The agreement also provides for the award of two cash incentives. The first entitles Mr. Flegel to receive a bonus of up to 50% of his base compensation depending on the degree to which we achieve our projected consolidated net income. The second permits the compensation committee to award to Mr. Flegel a discretionary bonus of up to 50% of his base compensation depending on such factors as the committee determines to be relevant. The agreement also entitles Mr. Flegel to receive $250,000 as consideration for his agreement to refrain from engaging, directly or indirectly, in the rendering of services competitive with those offered by our company during the term of his employment and for one year thereafter.

In December 1998, we entered into an employment and non-competition agreement with our President and Chief Operating Officer, James R. Gillis, which we amended in August 2000 and again in July 2002. The agreement provides for Mr. Gillis to serve as President and Chief Operating Officer until January 30, 2006. As base compensation for his services, Mr. Gillis received an annual salary of $425,000 during the 2004 fiscal year. For the 2005 fiscal year the compensation committee has set the annual salary for Mr. Gillis at $450,500. Under the agreement, Mr. Gillis is also entitled to receive a guaranteed annual bonus of $250,000 as long as he is employed by the company on February 28 of each year and a discretionary bonus of up to $100,000 each fiscal year at the discretion of the compensation committee. Mr. Gillis agreed to refrain from disclosing information confidential to us during the term of the employment agreement and agreed not to engage, directly or indirectly, in the rendering of services competitive with those offered by us during the term of his employment and for two years thereafter.

We expect to enter into a new employment agreement with Mr. Gillis, providing for his continued service as our President and Chief Operating Officer for a period of five years. Under the proposed terms of the agreement, Mr. Gillis would receive base compensation of: $475,000 during the 2006 fiscal year; $525,000 during the 2007 fiscal year; and $600,000 from the start of the 2008 fiscal year through the expiration of the employment agreement. These annual rates may be adjusted from time to time at the discretion of the compensation committee. The agreement would also provide for the award of a guaranteed annual bonus in an amount equal to 50% of Mr. Gillis' base salary in effect in a given year. Mr. Gillis would also be entitled to make more than the guaranteed annual bonus, up to 100% of his base compensation in effect in a given year, half of which would depend upon the degree to which we achieve our projected net income and half of which would be based on Mr. Gillis' performance. Mr. Gillis would agree to refrain from disclosing information confidential to us during the term of the employment agreement and not to engage, directly or indirectly, in the rendering of services competitive with those offered by us during the term of the employment agreement and for up to two years thereafter. We expect to enter into a formal employment agreement with Mr. Gillis prior to the consummation of the merger. In addition, Mr. Gillis may also receive a cash signing bonus in an amount to be determined, conditioned by and effective upon the consummation of the merger.

IB 00119

In January 2001, we entered into an employment agreement with Jason S. Flegel, our Executive Vice President — Operations, which automatically continues for one year terms unless terminated by either Mr. Flegel or the company on ninety days notice. Under his employment agreement, Mr. Flegel received an annual base compensation of $275,000 during the 2004 fiscal year. For the 2005 fiscal year the compensation committee has set the annual salary for Mr. Flegel at $291,500. In addition, the agreement permits the compensation committee to award to Mr. Flegel a discretionary bonus of up to $100,000 on such basis as the committee determines to be relevant. Mr. Flegel agreed to refrain from disclosing information confidential to us during the term of the employment agreement and agreed not to engage, directly or indirectly, in the rendering of services competitive with those offered by us during the term of his employment and for two years thereafter.

In July 2003, we entered into a new employment and non-competition agreement with our Chief Financial Officer, Marc Fierman, providing for his continued service in that position until January 31, 2006. As compensation for his services, Mr. Fierman received a base salary of $200,000 for the 2004 fiscal year (subject to an annual mandatory increase of 6% per year) and a guaranteed bonus equal to 20% of his base salary. The agreement also permits the compensation committee to award to Mr. Fierman a discretionary bonus of up to 30% of his base compensation depending on such factors as the committee determines to be relevant. Mr. Fierman agreed to refrain from disclosing information confidential to us during the term of the employment agreement and agreed not to engage, directly or indirectly, in the rendering of services competitive with those offered by us during the term of his employment and for six months thereafter.

In January 2004, Alliance and Alan Tuchman entered into an employment agreement. The agreement provides for Mr. Tuchman to be President of Alliance until January 1, 2007. As base compensation for his services, Mr. Tuchman receives an annual salary of $411,531, which is subject to adjustment annually. Under the agreement, Mr. Tuchman is eligible to receive a bonus of up to 50% of his base salary depending upon whether he meets performance goals established by Alliance's board. Mr. Tuchman agreed to refrain from disclosing confidential information to Alliance during the term of the employment agreement and agreed not to engage, directly or indirectly, in the rendering of services competitive with those offered by Alliance during the term of his employment and for one year thereafter.

Messrs. S. Leslie Flegel, James R. Gillis (as discussed above), Jason S. Flegel and Marc Fierman are expected to enter into employment agreements and receive cash signing bonuses, conditioned by and effective upon the consummation of the merger.

**Board Committees Post-Merger**

Upon the consummation of the merger, the board will have an audit committee, a compensation committee, a capital markets committee and a nominating and corporate governance committee. A majority of each committee of our board will be comprised of directors designated by us. One director designated by Alliance will serve on each board committee. All committee chairmen serving prior to the consummation of the merger will remain in their positions. The membership of each committee has not yet been determined.

90

IB 00120

**Executive Compensation Post-Merger**

The following table presents a summary of the compensation paid by Source Interlink or Alliance during the indicated fiscal years to the chief executive officer of the combined company upon the consummation of the merger and the four most highly paid executive officers of the combined company following the consummation of the merger (the "**Post-Merger Named Executive Officers**"). This compensation table excludes other compensation in the form of perquisites and other personal benefits to an executive officer where that compensation constituted the lesser of $50,000 or 10% of his total annual salary and bonus in the fiscal year.

| Name and Principal Position | Fiscal Year (a) | Annual Compensation | | | Long-Term Compensation | | All Other Compensation ($) |
|---|---|---|---|---|---|---|---|
| | | Salary ($) | Bonus ($) | Other Annual Compensation | Restricted Stock Award ($) | Securities Underlying Options (#) | |
| S. Leslie Flegel | 2004 | 552,851 | 250,000 | — | | 150,000 | 19,909 |
| Chief Executive Officer | 2003 | 535,704 | 250,000 | | | — | 5,000 |
| | 2002 | 455,000 | 200,000 | | | 450,000 | 4,250 |
| James R. Gillis | 2004 | 418,571 | 250,000 | — | | 50,000 | 16,245 |
| President and Chief | 2003 | 404,990 | 250,000 | | 92,400(b) | — | 5,000 |
| Operating Officer | 2002 | 350,000 | 250,000 | — | | 250,000 | 4,250 |
| Alan Tuchman | 2004 | 384,179 | 49,155 | — | | — | 9,152 |
| Executive Vice President | 2003 | 358,376 | 60,000 | — | | — | 9,580 |
| | 2002 | 352,027 | 100,000 | — | | — | 9,494 |
| Jason S. Flegel | 2004 | 290,866 | 125,000 | — | | 50,000 | 14,577 |
| Executive Vice President | 2003 | 241,666 | — | — | | — | 5,000 |
| | 2002 | 204,000 | — | — | | 131,000 | 4,250 |
| Marc Fierman | 2004 | 206,410 | 40,000 | — | | 25,000 | 14,029 |
| Chief Financial Officer | 2003 | 183,654 | 5,000 | — | | 55,000 | 4,685 |
| | 2002 | 160,386 | — | — | | 5,356 | 4,010 |

(a)   For all individuals referenced in this table other than Mr. Tuchman, the information contained herein is presented for our fiscal years ended January 31, 2002, 2003 and 2004. For Mr. Tuchman, the information contained herein is presented for Alliance's fiscal years ended December 31, 2001, 2002 and 2003.

(b)   During fiscal 2003, Mr. Gillis received 20,000 shares of restricted stock having a value of $92,400. All restrictions applicable to such shares lapsed during the 2004 fiscal year. Dividends will be paid with respect to the reported shares of restricted stock, if any, when paid with respect to the outstanding shares of common stock generally. We do not intend to pay any dividends on its common stock and is prohibited from doing so under its currently effective credit arrangements.

91

IB 00121

Source Interlink Option Grants

### Option Grants in Fiscal Year 2004

The following table presents information for the year ended January 31, 2004 with respect to each grant of stock options to the Post-Merger Named Executive Officers (assuming that the merger had been consummated as of such date):

| Name | Individual Grants | | | | Potential Realized Value at Assumed Annual Rates of Stock Price Appreciation for Option Term | |
| | Number of Securities Underlying Options Granted (#) | Percent of Total Options Granted to Employees in Fiscal Year | Exercise or Base Price ($/Share) | Expiration Date | 5% ($) | 10% ($) |
| --- | --- | --- | --- | --- | --- | --- |
| S. Leslie Flegel | 150,000(a) | 18.1% | $4.56 | 2/1/2013 | 430,164 | 1,090,120 |
| James R. Gillis | 50,000(b) | 6.0% | $4.56 | 2/1/2013 | 143,388 | 363,373 |
| Jason S. Flegel | 50,000(b) | 6.0% | $4.56 | 2/1/2013 | 143,388 | 363,373 |
| Marc Fierman | 25,000(a) | 3.0% | $4.56 | 2/1/2013 | 71,694 | 181,687 |

(a) 33.33% of the reported options became immediately exercisable, an additional 33.33% became exercisable on February 1, 2004 and the remainder on February 1, 2005.

(b) All of the reported options became exercisable on November 1, 2003.

Mr. Tuchman did not receive any option grants during Alliance's fiscal year ended December 31, 2003.

### Aggregated Option Exercises in Fiscal Year 2004 and Fiscal Year End 2004 Option Values

The following table presents information for the year ended January 31, 2004 with respect to stock option exercises by the Post-Merger Named Executive Officers (assuming that the merger had been consummated as of such date).

| Name | Shares Acquired on Exercise (#) | Value Realized ($) | Number of Securities Underlying Unexercised Options at Fiscal Year End (#) | | Value of Unexercised In-The-Money Options at Fiscal Year End ($) | |
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| --- | --- | --- | --- | --- | --- | --- |
| S. Leslie Flegel | — | — | 1,385,000 | 100,000 | $7,202,500 | $849,000 |
| James R. Gillis | — | — | 634,667 | — | $4,289,155 | $ — |
| Alan Tuchman | — | — | 114,090 | — | $ 545,708 | $ — |
| Jason S. Flegel | — | — | 283,425 | 16,666 | $2,025,267 | $156,035 |
| Marc Fierman | — | — | 81,023 | 22,333 | $ 652,497 | $175,719 |

The number of securities underlying Mr. Tuchman's options has been calculated by multiplying the number of shares of Alliance common stock issuable upon exercise of outstanding options held by Mr. Tuchman by an exchange ratio of 0.2606. The exercise prices have been adjusted by dividing the current exercise price for outstanding options held by Mr. Tuchman by 0.2606.

## Compensation of Directors of Source Interlink

Under our current policy, which will be the policy of the combined company after the consummation of the merger, each of our directors who is not also one of our employees receives (i) an annual retainer of $30,000 and (ii) an additional $2,500 for each quarterly board meeting attended. Chairmen of committees receive an additional retainer ranging from $5,000 to $15,000 per year depending on the committee chaired. Each member of the audit committee, other than the chairman, receives an additional $2,000 per year. All director fees are payable quarterly either in cash or shares of our common stock valued at 90% of the last reported sale price on the payment date. Directors are also entitled to be reimbursed for expenses incurred by them in attending meetings of the board and its committees. Our directors also receive an annual grant of

IB 00122

IB 00123

stock options for the purchase of 10,000 shares of our stock at an exercise price equal to the last reported sale price on the date of grant, typically the first business day in February of each year. These options are fully vested on the date of issuance.

### Compensation Committee Interlocks and Insider Participation Post-Merger

Any compensation committee interlocks and insider participation will be determined as soon as practicable following designation of the members of the post-merger compensation committee.

### Related Party Transactions of Post-Merger Management

We are not a party to any transaction or series of similar transactions in which the amount involved exceeded or will exceed $60,000 and in which any director, executive officer or holder of more than 5% of its common stock of our company following the merger had or will have an interest, other than as described under "Source Interlink Principal Shareholders", "Management — Employment Contracts and Change-in-Control Arrangements Post-Merger" and the transactions described below.

Ariel Emanuel, one of our directors, will be paid $1.5 million upon consummation of the merger as compensation for consulting services provided to us in connection with the merger. Mr. Emanuel was not a director at the time we entered into this arrangement with him nor when the board approved the merger.

In connection with the merger agreement, Source Interlink and Yucaipa, an entity affiliated with AEC Associates, negotiated a consulting agreement to be entered into at the effective time of the merger. AEC Associates will become a holder of 35.3% of our outstanding common stock immediately following the merger. See "Agreements Related to the Merger and Other Transactions — Consulting Agreement" beginning on page 77 above.

AEC Associates is the majority stockholder of Spinco. In connection with the spin-off, Alliance and Spinco entered into a number of agreements including a distribution and separation agreement, licensing and co-marketing agreement, transition/ shared services agreement and tax-sharing and indemnification agreement. The combined company will assume the rights and obligations of Alliance under these agreements upon consummation of the merger. For a description of these agreements, please see "Agreements Related to the Merger and Other Transactions — Agreements between Alliance and Spinco" beginning on page 77.

93

IB 00124

SOURCE INTERLINK BUSINESS

## Overview

We provide information, fulfillment and/or marketing services to retail companies that collectively operate more than 80,000 stores, to most major magazine publishers and to consumer product manufacturers of confections and general merchandise. We are the largest direct-to-retail magazine distributor in the United States to more than 10,000 retail outlets, including book stores, music stores and other specialty retailers, such as Barnes & Noble, Inc., Borders Group, Inc., Musicland Stores Corporation and Virgin Records America, Inc. Additionally, we are a leading provider in the United States of design, manufacture and management services to the front-end of supermarkets, discount stores, drug stores, convenience stores, terminals and newsstands, such as Food Lion, LLC, The Kroger Company, Target Corporation, Walgreen Company and Winn-Dixie Stores, Inc.

Our business model is designed to provide a complete array of products and value-added services to retailers in both the specialty and mainstream retail markets. These services include product fulfillment to retailers for publishers, publisher rebate and other incentive payment collection, fixture design and manufacturing, information technology and other management services. Our extensive relationships with retailers, as well as publishers and other vendors, throughout the United States and Canada, have enabled us to build a reputation for reliable and timely service and an efficient fulfillment infrastructure to service these markets. We believe that by acting as an outsourced coordinator of all these services we are well positioned to continue adding customers, both in the United States and internationally, and to continue providing additional products and services to our extensive customer base.

## Industry Overview

### Magazine Fulfillment

According to Harrington Associates, LLC, the total market for sales of single-copy magazines at retail in the United States of America has been estimated to total approximately $4.55 billion in 2003. The structure of the distribution channel for single-copy magazines has changed little over the past several decades. Publishers each generally engage a single national distributor, which acts as its representative to regional and local wholesalers and furnishes billing, collecting and marketing services throughout the United States or other territory. These national distributors then secure distribution to retailers directly, or more typically, through a number of regional and local wholesalers. The wholesalers maintain direct vendor relationships with the retailers. Retailers in the mainstream retail market require these wholesalers to provide extensive in-store services including receiving, verifying, stocking new issues and removing out-of-date issues. However, this traditional structure is not economically viable in the specialty retail market. Thus, in contrast, wholesalers servicing the specialty retail market typically do not provide these in-store services.

### Front-End Management

The retail sale of single-copy magazines is largely an impulse purchase decision by the consumer. As a result, publishers and manufacturers of other impulse merchandise such as confections and general merchandise (i.e., razor blades, film, batteries, etc.) consider it important for their products to be on prominent display in those areas of a store where they will be seen by the largest number of shoppers in order to increase the likelihood that their products will be sold. Retailers typically display magazines, confections and general merchandise in specific aisles, or the "mainline," and the checkout area, or the "front-end." Product visibility is highest in the front-end because every shopper making a purchase must pass through this area.

94

IB 00125

Due to the higher visibility and resulting perception of increased sales potential, publishers and other vendors compete for favorable display space in the front-end. To secure the desired display space, publishers and other vendors offer rebate and other incentive payments to retailers, such as:

- initial fees to rearrange front-end display fixtures to ensure the desired placement of their products;

- periodic placement fees based on the location and size of their products' display; and

- cash rebates based on the total sales volume of their products.

Due to the high volume of sales transactions and great variety of incentive programs offered, there is a significant administrative burden associated with front-end management. As a result, most retailers have historically outsourced the information gathering and administration of magazine claims collection to third parties such as our company. This relieves retailers of the administrative burdens, such as monitoring thousands of titles each with a distinct incentive arrangement.

### Information Services

Prompt delivery of information regarding sales activity, including timing of the redesign of front-end space, changes in display positions or the discontinuance of a vendor's product, is important to publishers and other vendors of front-end products. This information allows publishers and other vendors to make important strategic decisions in advance of re-configurations and other changes implemented by retailers to the front-end. Conversely, timely delivery of information about publisher or other vendor price changes, special promotions, new product introductions and other plans is important to retailers because it enables them to enhance the revenue potential of the front-end. Historically, information available to publishers and other vendors regarding retail activity at the front-end and information available to retailers about publisher or other vendors has been fragmented and out-of-date. This has been the result of a number of factors, including:

- the sale of front-end products, including magazines, through national distributors, which minimized direct contact between retailers and publishers or other vendors;

- the lack of an efficient information collection system to gather information specifically regarding front-end product sales;

- the difficulty of gathering and organizing data from a large number of retailers selling magazines and other front-end products over a large geographic area; and

- the lack of an efficient, cost-effective means to disseminate information.

We believe that there is an increasing demand on the part of publishers and other vendors of front-end products for more frequent and detailed information regarding front-end retail activity. Through our three operating groups we have access to a significant amount of information regarding retail front-end and mainline sales activity.

### Our Business

Our business consists of three synergistic operating groups: Magazine Fulfillment, In-Store Services and Wood Manufacturing.

- Our Magazine Fulfillment group provides domestic and foreign titled magazines to specialty retailers, such as bookstores and music stores, and to mainstream retailers, such as supermarkets, discount stores, drug stores, convenience stores and newsstands. This group also exports domestic titled magazines from more than 100 publishers to foreign markets worldwide. We provide fulfillment services to more than 23,000 retail stores, 7,000 of which also benefit from our selection and logistical procurement services.

- The In-Store Services group assists retailers in the mainstream retail market with the design and implementation of their front-end merchandising programs. This group provides other value-added services to retailers, publishers and other vendors, including assistance with publisher rebate and other

95

---

IB 00126

fee collection and access to real-time sales information on more than 10,000 magazine titles, thereby enabling them to make more informed decisions regarding their product placement and distributing efforts.

• The Wood Manufacturing group designs and manufactures wood displays and store fixtures for leading specialty retailers.

*Magazine Fulfillment*

In the spring of 2001, we established our Magazine Fulfillment group with the acquisition of The Interlink Companies, Inc., a group of affiliated specialty magazine distributors. This strategic acquisition provided a platform from which we intend to offer an expanding list of merchandise and services to retailers, including those currently served by our In-Store Services and Wood Manufacturing groups.

In May 2002, we expanded our product offerings by licensing the domestic distribution rights to a group of foreign magazine titles. In 2003, we expanded our market by licensing the international distribution rights to a group of domestic magazine titles and established a London, U.K. office to support our international magazine fulfillment business and to offer front-end management services to retailers that presently lack the expertise to fully realize the sales potential of their front-ends. In 2004, we purchased the distribution rights licensed in 2002 and 2003.

Historically, our Magazine Fulfillment group has primarily supplied magazines to the specialty retail market, where we are the principal magazine supplier for Barnes & Noble, Inc. and Borders Group, Inc. In 2004, we initiated service to more than 500 stores in the mainstream market. Currently, we supply more than 1,800 stores operated by approximately 40 mainstream retailers, such as Target Corporation, Wal-Mart Stores, Inc., CVS Corporation, Rite Aid Corporation and 7-Eleven, Inc.

We receive bulk magazine allotments at strategically located distribution centers. The principle distribution centers are located Carson City Nevada, Harrisburg, Pennsylvania and Dallas, Texas. From each of these distribution points, we process orders and ship the magazines to the retailers by commercial freight carriers, primarily Federal Express ground service. Given our broad distribution infrastructure, we are capable of delivering magazines overnight to virtually any location within the continental United States.

Our Magazine Fulfillment group is presently organized into the following divisions:

*Magazine Distribution — Specialty Market.* We purchase magazines from publishers typically on a fully returnable basis. Merchandise is received in bulk at our strategically located distribution centers. Using just-in-time replenishment and order regulation systems, our employees fulfill the merchandise orders and ship the required merchandise by third party carrier directly to individual retail outlets.

*Magazine Distribution — Mainstream Market.* Similar to the Specialty Market, we purchase magazines from publishers typically on a fully returnable basis. Merchandise is received in bulk at our strategically located distribution centers. Using just-in-time replenishment and order regulation systems, our employees fulfill the merchandise orders. Unlike the Specialty Market, however, the required merchandise is shipped to individual retail outlets by a combination of third party carriers and in-house truck delivery. In certain high volume stores, we also provide in-store merchandising primarily through third party contractors.

*Import Distribution.* We are the exclusive U.S. distributor of a group of foreign magazine titles. Typically, we arrange for these foreign magazines to be shipped directly from the foreign publisher to magazine wholesalers throughout the United States. Our Magazine Distribution — Specialty Market division is a principle customer of our Import Distribution division.

*Export Distribution.* This division represents more than 100 domestic publishers to foreign markets worldwide. We provide a comprehensive logistical solution to our customers by maintaining close relationships with foreign magazine wholesalers, arranging for delivery of magazines to the wholesaler's designated freight agent and assisting in the development of marketing programs designed to increase the sale of the magazines supplied by our publisher client.

96

IB 00127

*Fulfillment Services.* We developed our back room management services to enable publishers having direct trading relationships with retailers to access just-in-time replenishment and order regulation. We are engaged by publishers to act as their order fulfillment and shipping agent. Rather than purchasing merchandise, our fulfillment services clients furnish merchandise to us that we then package into individual orders and ship directly to individual retail outlets.

*Return Processing.* We serve as a processor of returns for many of those retailers who purchase magazines from multiple suppliers. This service consists of counting covers of unsold magazines and preparing return forms required by wholesalers to obtain credit.

Our Magazine Fulfillment group's logistical functions are linked by just-in-time replenishment and order regulation systems. By utilizing our systems, publishers and retailers are able to more effectively manage their inventory levels. We leverage third-party freight carriers, maximize the efficiency of our fixed asset base and permit retailers to reorder and return titles efficiently.

The total market for sales of single-copy magazines at retail in the United States was approximately $4.55 billion in calendar year 2003. In fiscal 2004, we estimate that we domestically distributed magazines having a retail value of approximately $387.0 million, or approximately 8.5% of this retail market.

Our Magazine Fulfillment group's revenues accounted for $214.7 million and $197.7 million of our total revenues for the nine months ended October 31, 2004 and 2003, respectively. Its revenues accounted for $255.8 million, $211.7 million and $155.8 million of our total revenues for our fiscal years ended January 31, 2004, 2003 and 2002, respectively. Operating income from this group accounted for $13.0 million and $10.4 million of our total operating income for the nine months ended October 31, 2004 and 2003, respectively. Its operating income (loss) accounted for $15.0 million, $7.4 million and $ (67.7) million of our total operating income (loss) for our fiscal years ended January 31, 2004, 2003 and 2002, respectively. Total assets for the group were $68.8 million, $47.7 million, $32.9 million and $37.0 million at October 31, 2004 and January 31, 2004, 2003 and 2002, respectively.

### In-Store Services

The In-Store Services group provides publisher rebate and other incentive payment collection, information technology and front-end services, including fixture design and manufacture.

*Claim Submission Services.* Claim submission services have been the historical core of our business. U.S. and Canadian retailers engage our In-Store Services group to accurately monitor, document, claim and collect publisher rebate and other incentive payments. Our services are designed to relieve our clients of the substantial administrative burden associated with documenting, verifying and collecting their payment claims, and to collect a larger percentage of the potential incentive payments available to the retailers.

We established our Advance Pay Program as an enhancement to our claim submission services. Typically, retailers are required to wait a significant period of time to receive payments on their claims for incentive rebates. We improve the retailer's cash flow by advancing the claims for rebates and other incentive payments filed by us on their behalf, less our commission, within a contractually agreed upon period after the end of each quarter.

*Information Services.* In connection with our claim submission services, we gather extensive information on magazine sales, pricing, new titles, discontinued titles and display configurations on a chain-by-chain and store-by-store basis. As a result, we are able to furnish our clients with reports of total sales, sales by class of trade and sales by retailer, as well as reports of unsold magazines and total sales ranking. Our newest product, the Cover Analyzer, permits subscribers to determine the effectiveness of particular magazine covers on sales for 300 top selling titles in the United States. Our website gives subscribers the capability to react more quickly to market changes, including the ability to reorder copies of specific issues, track pricing information, to introduce new titles, and act on promotions offered by publishers. Publishers also use the website to promote special incentives and advertise and display special editions, new publications and upcoming covers. We have supplemented our own data with data obtained under agreements with Barnes & Noble, Inc., Walgreen Company and The Kroger Company.

97

IB 00128

*Front-End Management.* Our extensive information resources and experience in claim submission processing enable us to assist retailers in managing the design and configuration of the front-end to increase sales and incentive payment revenues. Our services in this regard frequently include designing front-end display fixtures, supervising fixture installation, selecting products and negotiating, billing and collecting incentive payments from vendors. We frequently assist our retailer clients in the development of specialized marketing and promotional programs, which include special mainline or front-end displays and cross-promotions of magazines and products of interest to the readers of these magazines.

*Front-End and Point-of-Purchase Display Fixtures.* To enhance retailers' efficiency during implementation of a front-end merchandising program, we acquired the capacity to design, manufacture, deliver and dispose of custom front-end and point-of-purchase displays for both retail store chains and product manufacturers. Retailers perceive our experience in managing front-end programs supported by our information services as helpful in improving the revenue generated at the front-end. In addition, we believe that our influence on the design and manufacture of display fixtures enhances our ability to incorporate features that facilitate the gathering of information. Raw materials used in manufacturing our fixtures include wire, powder coating, metal tubing and paneling, all of which are readily available from multiple sources.

Revenues from the In-Store Services group accounted for $40.0 million and $46.3 million of our total revenues for the nine months ended October 31, 2004 and 2003, respectively. Its revenues accounted for $58.6 million, $61.8 million and $65.1 million of our total revenues for our fiscal years ended January 31, 2004, 2003 and 2002, respectively. Operating income (loss) from this group accounted for $11.7 million and $13.8 million of our total operating income for the nine months ended October 31, 2004 and 2003, respectively. Its operating income accounted for $16.4 million, $4.6 million and $9.6 million of our total operating income for our fiscal years ended January 31, 2004, 2003 and 2002, respectively. Total assets for the group were $93.0 million, $101.3 million, $109.0 million and $110.0 million at October 31, 2004 and January 31, 2004, 2003 and 2002, respectively. Total assets include assets now identified under the Shared Services group because comparable information is not available for January 31, 2002 and 2001 under the current presentation. Excluding those assets, total assets for the group were $79.0 million at January 31, 2004.

### Wood Manufacturing

The Wood Manufacturing group manufactures custom wood store fixtures and displays to customer specifications using wood veneers and laminates. Delivery of fixtures is highly concentrated in our third fiscal quarter as a result of the demands of retailers to be ready for the critical holiday selling season. To assure that their seasonal demands for the delivery are met, retailers typically provide commitments well in advance of anticipated product delivery. Accordingly, our inventory levels increase during seasonal periods when retailers are not opening or remodeling stores, typically November through April.

Revenues from the Wood Manufacturing group accounted for $18.4 million and $14.6 million of our total revenues for the nine months ended October 31, 2004 and 2003, respectively. Its revenues accounted for $18.7 million, $17.5 million and $18.0 million of our total revenues for our fiscal years ended January 31, 2004, 2003 and 2002, respectively. Operating income from this group accounted for $2.6 million and $0.9 million of our total operating income for the nine months ended October 31, 2004 and 2003, respectively. Its operating income (loss) accounted for $1.0 million, $(0.7) million and $(9.8) million of our total operating income (loss) for our fiscal years ended January 31, 2004, 2003 and 2002, respectively. Total assets for the group were $17.8 million, $15.1 million, $15.4 million and $17.4 million at October 31, 2004 and January 31, 2004, 2003 and 2002, respectively.

### Customers

Our customers in the specialty retail market consist of bookstore chains, music stores and other specialty retailers. Our customers in the mainstream retail market consist primarily of grocery stores, drug stores and mass merchandise retailers. Two customers account for a large percentage of our total revenues. Barnes & Noble, Inc. accounted for 24.1%, 23.5%, 26.8%, 27.7% and 23.2% of total revenues in the nine months ended October 31, 2004 and 2003, and in the fiscal years ended January 31, 2004, 2003 and 2002 respectively.

98

IB 00129

Borders Group, Inc. accounted for 22.8%, 21.1%, 23.8%, 25.8% and 23.1% of total revenues in the nine months ended October 31, 2004 and 2003, and in the fiscal years ended January 31, 2004, 2003 and 2002, respectively.

## Marketing and Sales

Our Magazine Fulfillment group's target market includes magazine publishers, distributors and retailers. We specialize in providing nationwide magazine distribution to specialty retailers with a national or regional scope. We believe that our distribution centers differentiate u from our national competitors and are a key element in our marketing program. Our distribution centers focus on our just-in-time replenishment and our ability to deliver magazines, particularly those published on a weekly basis, overnight to virtually any location within the continental United States.

We focus our marketing efforts for our In-Store Services and Wood Manufacturing groups on developing and maintaining primary relationships with customers. While we frequently attend trade shows and advertise in trade publications, we emphasize personal interaction between our sales force and customers so that our customers are encouraged to rely on our dependability and responsiveness. Sales of our services are not particularly seasonal; however, delivery of new display fixtures is highly concentrated in our third fiscal quarter as a result of the demands of retailers in advance of the holiday season. As a result, inventories of fixtures tend to be lowest during our fourth fiscal quarter and increase throughout the first and second fiscal quarters in anticipation of the delivery demands of retailers in the third quarter.

To enhance the frequency of contact between our sales force and our customers, we have organized our direct sales force into a unified marketing group responsible for soliciting sales of all products and services available from each of our operating groups. We believe this combined marketing approach will enhance cross-selling opportunities and lower the cost of customer acquisition.

## Competition

Our Magazine Fulfillment group's principal competitors consist of national distributors, regional wholesalers, secondary or local wholesalers, and specialty distributors.

Competition is generally met on matters such as reliability, value added services and price.

In our In-Store Services group, competitors for its claim filing services are primarily privately held companies, while our principal competitors for our fixture manufacturing services are both private and public manufacturing companies of varying sizes. Some of these companies could compete effectively with us, particularly in the manufacture and installation of display fixtures. In addition, we may face competition for our In-Store Services group's information services from dedicated information providers. The principal competitive factors in this market include access to information, technological support, accuracy, system flexibility, financial stability, customer service, and reputation.

Our Wood Manufacturing group competes in a highly fragmented industry generally consisting of individual craftsmen, furniture manufacturers and other woodworking enterprises. The principal competitive factors in the wood manufacturing market include price, reliability and quality of services.

## Management Information Systems

The efficiency of our Magazine Fulfillment group is supported by our information systems that combine traditional outbound product counts with real-time register activity. Our ability to access real-time register data enables us to quickly adjust individual store merchandise allocations in response to variation in consumer demand. This increases the probability that any particular merchandise allotment will be sold rather than returned for credit. In addition, we have developed sophisticated database management systems designed to track various on-sale and off-sale dates for the numerous issues and regional versions of the magazine titles that we distribute.

Software used in connection with our claims submission program and in connection with our subscriber information website was developed specifically for our use by a combination of in-house software engineers

99

---

IB 00130

and outside consultants. We believe that certain elements of these software systems are proprietary to us. Other portions of these systems are licensed from a third party that assisted in the design of the system. We also receive systems service and upgrades under the license. We believe that we have obtained all necessary licenses to support our information systems.

## Employees

As of October 31, 2004, we had 1,300 employees, of whom 951 were full-time employees. Approximately 80 of our employees in Philadelphia, Pennsylvania are covered by a collective bargaining agreement with Teamsters Local Union No. 837, which expires in December 2005. Approximately 73 of our employees in Quincy, Illinois are covered by a collective bargaining agreement with Local 822 and District 55, International Association of Machinists & Aerospace Workers, which expires in January 2008. Approximately 114 of our employees in Brooklyn, New York were covered by a collective bargaining agreement with the Local 810, Steel, Metals, Alloys and Hardware Fabricators and Warehousemen that expired in September 2004. Subsequent to our acquisition of the assets of Empire State News, we recognized Teamsters Local Union Number 375 as the collective bargaining agent for nine truck drivers located in Buffalo, New York. We are currently negotiating collective bargaining agreements with each of these unions. We believe our relations with our employees are good.

## Properties

Our principal corporate offices are located at 27500 Riverview Center Boulevard, Bonita Springs, Florida. As of October 31, 2004, we owned or leased approximately 1,000,000 square feet of manufacturing facilities, 200,000 square feet of distribution centers and 70,000 square feet of office space. The following table presents information concerning our principal properties:

| Location | Description | Segment | Size (sq. ft.) | Owned/ Leased |
|---|---|---|---|---|
| Bonita Springs, FL | Office | Worldwide Headquarters | 62,000 | Leased |
| New York, NY | Office | In-Store Services/ Magazine Fulfillment | 3,500 | Leased |
| Rockford, IL | Manufacturing/ In-Store Services/ Distribution Center | Magazine Fulfillment | 300,000/10,500 | Owned |
| Brooklyn, NY | Manufacturing | In-Store Services | 90,000 | Leased |
| Philadelphia, PA | Manufacturing | In-Store Services | 110,000 | Owned |
| Vancouver, B.C. | Manufacturing | In-Store Services | 51,000 | Leased |
| Quincy, IL | Manufacturing | Wood Manufacturing | 258,000 | Owned |
| Albemarle, NC | Manufacturing | Wood Manufacturing | 190,000 | Leased |
| Dallas, TX | Distribution Center | Magazine Fulfillment | 48,000 | Leased |
| Harrisburg, PA | Distribution Center | Magazine Fulfillment | 142,000 | Leased |
| Carson City, NV | Distribution Center | Magazine Fulfillment | 135,000 | Leased |

Each of our owned real properties is encumbered by a mortgage in favor of our senior lender, Wells Fargo Foothill. We believe our facilities are adequate for our current level of operations and that all of our facilities are adequately insured.

## Legal Proceedings

We are party to routine legal proceedings arising out of the normal course of business. Although it is not possible to predict with certainty the outcome of these unresolved legal actions or the range of possible loss, we believe that none of these actions, individually or in the aggregate, will have a material adverse effect on our financial condition or results of operations.

100

IB 00131

SOURCE INTERLINK MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Overview

Our business consists of four business segments: Magazine Fulfillment, In-Store Services, Wood Manufacturing and Shared Services. Our segment reporting is structured based on the reporting of senior management to our chief executive officer.

- Our Magazine Fulfillment group provides domestic and foreign titled magazines to specialty retailers, such as bookstores and music stores, and to mainstream retailers, such as supermarkets, discount stores, drug stores, convenience stores and newsstands. This group also exports domestic titled magazines from more than 100 publishers to foreign markets worldwide. We provide fulfillment services to more than 23,000 retail stores, 7,000 of which also benefit from our selection and logistical procurement services.

- Our In-Store Services group assists retailers with the design and implementation of their front-end area merchandise programs, which generally have a three-year life cycle. We also provide other value-added services to retailers, publishers and other vendors. These services include assisting retailers with the filing of claims for publisher incentive payments, which are based on display location or total retail sales, and providing publishers with access to real-time sales information on more than 10,000 magazine titles, thereby enabling them to make more informed decisions regarding their product placement, cover treatments and distribution efforts.

- Our Wood Manufacturing group designs and manufactures wood display and store fixtures for leading specialty retailers.

- Our Shared Services group consists of overhead functions not allocated to the other groups. These functions include corporate finance, human resource, management information systems and executive management that are not allocated to the three operating groups. Upon completion of the consolidation of our administrative operations, we restructured our accounts to separately identify corporate expenses that are not attributable to any of our three main operating groups. Prior to fiscal year 2004, these expenses were included within our In-Store Services group.

### *Revenues*

The Magazine Fulfillment group derives revenues from:

- selling and distributing magazines, including domestic and foreign titles, to specialty and mainstream retailers throughout the United States and Canada;

- exporting domestic titles internationally to foreign wholesalers or through domestic brokers;

- serving as a secondary national distributor;

- providing return processing services for major specialty retail book chains; and

- serving as an outsourced fulfillment agent and backroom operator for publishers.

The In-Store Services group derives revenues from:

- designing, manufacturing and invoicing participants in front-end merchandising programs;

- providing claim filing services related to rebates owed to retailers from publishers or their designated agents;

- storing, shipping, installing, and removing front-end fixtures; and

- providing information and management services relating to magazine sales to retailers and publishers throughout the United States and Canada.

101

IB 00132

The Wood Manufacturing group derives revenues from designing, manufacturing and installing custom wood fixtures primarily for retailers.

### Cost of Revenues

Our cost of revenues for the Magazine Fulfillment group consists of the costs of magazines purchased for resale less all applicable publisher discounts and rebates.

Our cost of revenues for the In-Store Services and the Wood Manufacturing groups includes:

• raw materials consumed in the production of display fixtures, primarily steel, wood and plastic components;

• production labor; and

• manufacturing overhead.

### Selling, General and Administrative Expenses

Selling, general and administrative expenses for each of the operating groups include:

• non-production labor;

• rent and office overhead;

• insurance;

• professional fees; and

• management information systems.

Expenses associated with corporate finance, human resources, management information systems and executive offices are included within the Shared Services group and are not allocated to the other groups.

### Fulfillment Freight

Fulfillment freight consists of our direct costs of distributing magazines by third-party freight carriers, primarily Federal Express ground service. Freight rates are driven primarily by the weight of the copies being shipped and the distance between origination and destination.

Fulfillment freight is not disclosed as a component of cost of revenues, and, as a result, gross profit and gross profit margins are not comparable to other companies that include shipping and handling costs in cost of revenues.

Fulfillment freight has increased proportionately as the amount of product we distribute has increased. We anticipate the continued growth in our Magazine Fulfillment group will result in an increase in fulfillment freight. Generally, as pounds shipped increase, the cost per pound charged by third party carriers decreases. As a result, fulfillment freight as a percent of Magazine Fulfillment group revenue should decline slightly in the future.

### Relocation Expenses

Relocation expenses in 2003 consisted primarily of the cost of transferring existing employees and offices from their former locations in High Point, North Carolina, St. Louis, Missouri, and San Diego, California, to our new offices in Bonita Springs, Florida. In addition, during the nine months ended October 31, 2004, we began expansion into the mainstream retail market. The expansion schedule required an acceleration of the relocation process from the distribution fulfillment center in Milan, Ohio to Harrisburg, Pennsylvania, which was completed by April 30, 2004.

102

IB 00133

IB 00134

Results of Operations

The following table sets forth, for the periods presented, information relating to our operations (in thousands):

| | Year Ended January 31, | | | | | | Nine Months Ended October 31, | | | |
| | 2002 | | 2003 | | 2004 | | 2003 | | 2004 | |
| | $ | Margin % | $ | Margin % | $ | Margin % | $ | Margin % | $ | Margin % |
| | | | | | | | | (Unaudited) | | |
| **Magazine Fulfillment** | | | | | | | | | | |
| Revenues | $155,805 | | $211,663 | | $255,814 | | $197,719 | | $214,723 | |
| Cost of Revenues | 126,217 | | 164,702 | | 194,467 | | 151,268 | | 162,646 | |
| Gross Profit | 29,588 | 19.0% | 46,961 | 22.2% | 61,347 | 24.0% | 46,451 | 23.5% | 52,077 | 24.3% |
| Operating Expenses(1) | 97,297 | | 39,600 | | 46,389 | | 34,379 | | 37,508 | |
| Operating Income (Loss) | (67,709) | (43.5)% | 7,361 | 3.5% | 14,958 | 5.8% | 10,418 | 5.3% | 13,017 | 6.2% |
| **In-Store Services(2)** | | | | | | | | | | |
| Revenues | $ 65,148 | | $ 61,754 | | $ 58,601 | | $ 46,353 | | $ 40,003 | |
| Cost of Revenues | 33,978 | | 35,391 | | 33,931 | | 26,110 | | 22,260 | |
| Gross Profit | 31,170 | 47.8% | 26,363 | 42.7 | 24,670 | 42.1% | 20,243 | 43.7% | 17,743 | 44.4% |
| Operating Expenses(1) | 21,571 | | 21,812 | | 8,245 | | 6,404 | | 6,052 | |
| Operating Income | 9,599 | 14.7% | 4,551 | 7.4% | 16,425 | 28.0% | 13,839 | 29.9% | 11,691 | 29.2% |
| **Wood Manufacturing** | | | | | | | | | | |
| Revenues | $ 17,970 | | $ 17,477 | | $ 18,719 | | $ 14,615 | | $ 18,449 | |
| Cost of Revenues | 16,162 | | 16,390 | | 16,357 | | 12,608 | | 14,916 | |
| Gross Profit | 1,808 | 10.1% | 1,087 | 6.2% | 2,362 | 12.6% | 2,007 | 13.7% | 3,533 | 19.2% |
| Operating Expenses(1) | 11,591 | | 1,799 | | 1,373 | | 1,074 | | 925 | |
| Operating Income (Loss) | (9,783) | (54.4)% | (712) | (4.1)% | 989 | 5.3% | 933 | 6.4% | 2,608 | 14.1% |
| **Shared Services(2)** | | | | | | | | | | |
| Revenues | $ — | | $ — | | $ — | | $ — | | $ — | |
| Cost of Revenues | — | | — | | — | | — | | — | |
| Gross Profit | — | | — | | — | | — | | — | |
| Operating Expenses(1) | — | | — | | 14,746 | | 10,977 | | 11,633 | |
| Operating (Loss) | — | | — | | (14,746) | — | (10,977) | — | (11,633) | — |
| **Total** | | | | | | | | | | |
| Revenues | $238,923 | | $290,894 | | $333,134 | | $258,687 | | $273,175 | |
| Cost of Revenues | 176,357 | | 216,483 | | 244,755 | | 189,986 | | 199,822 | |
| Gross Profit | 62,566 | 26.2% | 74,411 | 25.6% | 88,379 | 26.5% | 68,701 | 26.6% | 73,353 | 26.9% |
| Operating Expenses(1) | 130,459 | | 63,211 | | 70,753 | | 52,758 | | 56,118 | |
| Operating Income (Loss) | (67,893) | (28.9)% | 11,200 | 3.9% | 17,626 | 5.3% | 14,213 | 5.4% | 15,683 | 5.7% |

(1) Operating expenses include selling, general and administrative expenses, fulfillment freight and amortization of goodwill.

(2) Prior to fiscal year 2004 amounts currently reported as Shared Services were reported as a component of In-Store Services.

· 103

IB 00135

*Results for the Nine Month Period ended October 31, 2004 Compared to the Nine Month Period ended October 31, 2003*

*Revenues*

Revenues for the nine month period ended October 31, 2004 increased $14.5 million, or 5.6%, from the comparable period of the prior year due primarily to an increase in revenue in our Magazine Fulfillment and Wood Manufacturing groups as described below.

Our Magazine Fulfillment group's revenues for the nine month period ended October 31, 2004 were $214.7 million, an increase of $17.0 million or 8.6% as compared to the nine months ended October 31, 2003. The group's revenues for the nine months ended October 31, 2004 and 2003 are comprised of the following components (in thousands):

|  | 2004 | 2003 | Change |
|---|---|---|---|
| Domestic distribution | $170,805 | $158,793 | $12,012 |
| Export distribution | 28,731 | 24,947 | 3,784 |
| Secondary wholesale distribution | 13,380 | 12,913 | 467 |
| Other | 2,805 | 2,152 | 653 |
| Intra-segment sales | (998) | (1,086) | 88 |
| Total | $214,723 | $197,719 | $17,004 |

Domestic distribution consists of the gross amount of magazines (both domestic and imported titles) distributed to domestic retailers and wholesalers, less actual returns received, less an estimate of future returns and customer discounts. The $12.0 million increase in domestic distribution relates primarily to a $49.2 million increase in gross distribution partially offset by an estimated higher return rate. The increase in gross distribution related both to an increase in copies distributed as well as an increase in the amount billed per copy. Gross domestic distribution to our two largest customers increased $30.8 million. Estimated sell-through for the period was lowered from 48.5% to 44.2%.

Our export distribution began operation in March 2003. Export distribution increased $3.8 million for the nine month period ended October 31, 2004 over the comparable period of the prior year due primarily to an additional month of distribution in the current period.

Our In-Store Services group's revenues for the nine months ended October 1, 2004 were $40.0 million, a decrease of $6.4 million or 13.7% over the comparable period of the prior year.

The group's revenues for the nine months ended October 31, 2004 and 2003 are comprised of the following components (in thousands):

|  | 2004 | 2003 | Change |
|---|---|---|---|
| Claim filing and information | $13,499 | $ 9,874 | $ 3,625 |
| Front end wire and services | 26,504 | 36,479 | (9,975) |
| Total | $40,003 | $46,353 | $(6,350) |

Our claim filing revenues are recognized at the time the claim is paid. The increase in revenues in the nine months ended October 31, 2004 relate to the timing of the cash payments received on the claims. In addition, we acquired Promag Retail Services, LLC in August 2004 which also contributed to the increased revenues for the nine month period ended October 31, 2004.

Our front end wire and services revenues declined due to the cyclical nature of the industry. Major chains typically purchase new front-end fixtures every three years; however, the use of the front end fixtures has been extending beyond this life cycle.

Our Wood Manufacturing group's revenues for the nine months ended October 1, 2004 were $18.4 million, an increase of $3.8 million or 26.2% over the comparable period of the prior year. The increase for the

IB 00136

nine month period ended October 31, 2004 relates to an increase in the number of store openings and remodelings performed by our customers. In addition, we added a number of significant new customers in the second quarter of the nine month period.

*Gross Profit*

Gross profit for the nine months ended October 31, 2004 increased $4.7 million, or 6.8%, over the same period in the prior fiscal year primarily due to an increase in sales volume in our Magazine Fulfillment group and our Wood Manufacturing Group. The increase was partially offset by decreases in our In-Store Services group.

Gross profit in our Magazine Fulfillment group for the nine months ended October 31, 2004 increased approximately $5.6 million, or 12.1%, over the comparable period of the prior year. The increase related primarily to the increased distribution revenue as described above and the improvement in gross profit margins from 23.5% to 24.3%. The improved gross profit amounts and margin for the nine month period ended October 31, 2004 are related to our domestic distribution businesses generally having higher profit margins than our export distribution and secondary wholesale businesses and, as a result, overall gross profit margins improve as the portion of total revenues is weighted more heavily toward our domestic operations. We have also been able to utilize the working capital raised through our equity offering and operating profits to improve selling and buying terms with some of our major suppliers and customers. In addition, we receive certain supplier rebates on gross distribution and as efficiency decreases those rebates become a greater portion of the overall gross profit contribution yielding higher gross profit margins.

Gross profit in our In-Store Services group for the nine month period ended October 31, 2004 decreased $2.5 million, or 12.3%, over the comparable period of the prior year. The decrease in gross profit is primarily due to a decrease in revenues as described above as the gross margin percentage remained consistent.

Gross profit in our Wood Manufacturing group increased $1.5 million or 76.0% for the nine month period ended October 31, 2004 increased $1.5 million, or 6.0%, over the comparable period of the prior year. The increase related primarily to operational efficiencies at the manufacturing facilities.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses for the nine month period ended October 31, 2004 increased $1.1 million, or 2.8%, over the same period of the prior year. Selling, general, and administrative expenses as a percent of revenues declined from 15.4% to 15.0% in those same periods.

The Magazine Fulfillment group's selling, general, and administrative expenses in the nine month period ended October 31, 2004 increased $0.88 million, or 4.1%, over the same period of the prior year. As a percentage of sales, selling, general and administrative expenses decreased from 10.8% to 10.4% in the nine month period ended October 31, 2004 compared to the nine month period ended October 31, 2003. The increase in overall expenses and change in those expenses as related to sales are related to our ability to leverage existing infrastructure over a larger base of distribution and the consolidation of our distribution center in Milan, Ohio into Harrisburg, Pennsylvania.

The selling, general, and administrative expenses of In-Store Services in the nine month period ended October 31, 2004 decreased $0.35 million, or 5.5%, compared to the nine month period ended October 31, 2003. The decrease relates to a reduction in executive salary expense in the nine month period ended October 31, 2004 compared to the nine month period ended October 31, 2003.

The selling, general, and administrative expenses of Shared Services for the nine month period ended October 31, 2004 increased $0.73 million, or 6.7%, compared to the nine month period ended October 31, 2003. The overall increase is primarily due to Sarbanes-Oxley compliance charges and increased depreciation expense due to increased capital expenditures.

105

IB 00137

The Wood Manufacturing group's selling, general, and administrative expenses in the nine month period ended October 31, 2004 decrease $0.15 million, or 13.9%, compared to the nine month period ended October 31, 2003. The decrease was attributable primarily to a head count reduction.

### Fulfillment Freight

Fulfillment freight expenses in the nine month period ended October 31, 2004 increased $2.2 million, or 17.3%, compared to the nine months ended October 31, 2003. Fulfillment Freight expense as a percent of gross domestic distribution in the nine month period ended October 31, 2004 decreased from 4.1% to 4.0% compared to the nine month period ended October 31, 2003. The decrease as a percentage of gross domestic distribution is attributable to both the consolidation of our distribution center in Milan, Ohio into Harrisburg, Pennsylvania and the decrease in cost per pound as the weight increases in our freight providers pricing schedule.

### Relocation Expenses

During the nine months ended October 31, 2004, we began expansion into the mainstream retail market. The expansion schedule required an acceleration of the relocation process from the distribution fulfillment center in Milan, Ohio to Harrisburg, Pennsylvania, which was completed by the end of April 30, 2004. Relocation expenses recorded in the first quarter, including a lease termination charge and the transfer of employees and equipment, were approximately $1.6 million.

During the nine month period ended October 31, 2003, we relocated the magazine distribution back office from San Diego, California to Bonita Springs, Florida. The total expense recorded related to this relocation was $1.7 million.

### Operating Income

Operating income for the nine months ended October 31, 2004 increased $1.5 million or 10.3%, compared to the nine months ended October 31, 2003 due to the factors described above.

Operating profit margins for the nine month period ended October 31, 2004 improved to 5.7% from 5.5% in the comparable period of the prior year. The increase for the nine month period ended October 31, 2004 was due to the improvement in our gross profit coupled with increased revenue from the Wood Manufacturing and Magazine Fulfillment Groups and a decrease in our selling, general, and administrative expenses as a percent of revenues.

### Interest Expense

Interest expense includes the interest and fees on our significant debt instruments and outstanding letters of credit.

Interest expense decreased $1.6 million, or 54.8%, for the nine month period ended October 31, 2004 compared to the nine month period ended October 31, 2003. This decrease was due to significantly lower borrowings. The lower borrowing levels are due to the raising of proceeds from the sale of 3.8 million shares of our common stock.

### Other Income (Expense)

Other income (expense) consists of items outside of the normal course of operations. Due to its nature, comparability between periods is nc generally meaningful.

For the nine month periods ended October 31, 2004 and 2003, we recorded charges of approximately $1.5 million and $0.86 million, respectively, related to the write off of deferred financing charges as a result of paying off certain debt instruments, as described below in "Liquidity and Capital Resources."

106

IB 00138

*Income Tax Expense*

The effective income tax rates were 31.8% and 28.8% for the nine months ended October 31, 2004 and 2003, respectively.

The difference between the statutory rate and effective tax rates relates primarily to the realization of a portion of the net operating loss carry-forward acquired with our acquisition of Interlink.

***Results for the Fiscal Year Ended January 31, 2004 Compared to the Fiscal Year Ended January 31, 2003***

*Revenues*

Revenues for the fiscal year ended January 31, 2004 increased $42.2 million, or 14.5%, over the prior fiscal year due primarily to an increase in revenue in our Magazine Fulfillment group.

Our Magazine Fulfillment group's revenues for the fiscal year ended January 31, 2004 were $255.8 million, an increase of $44.1 million, o 20.9%, over the prior fiscal year. The group's revenues for the fiscal years ended January 31, 2004 and 2003 are comprised of the following components (in millions):

|  | 2004 | 2003 | Change |
|---|---|---|---|
| Domestic distribution | $204.6 | $188.6 | $16.0 |
| Export distribution | 32.0 | — | 32.0 |
| Secondary wholesale distribution | 17.3 | 21.7 | (4.4) |
| Other | 3.4 | 2.5 | 0.9 |
| Intra-segment sales | (1.5) | (1.1) | (0.4) |
| Total | $255.8 | $211.7 | $44.1 |

Domestic distribution consists of the gross amount of magazines (both domestic and imported titles) distributed to domestic retailers and wholesalers, less actual returns received (collectively, "actual net distribution"), less an estimate of future returns and customer discounts. The $16.0 million increase in domestic distribution consisted of a $26.3 million increase in actual net distribution, less a $10.1 million decrease from the impact of the change in the sales return reserve as compared to the prior year's change, and a $0.2 million increase in customer discounts. Actual net domestic distribution increased from $189.8 million to $216.1 million; an increase of $26.3 million or 13.9%. This increase was driven primarily by the growth of distribution to our two main customers, which increased from $155.5 million to $173.7 million or $18.2 million. The sales return reserve related to our domestic distribution increased from $33.1 million to $41.4 million or $8.3 million. Customer discounts increased from $3.0 million to $3.2 million.

Our export distribution began operation in March 2003. Actual net export distribution was $52.4 million. At January 31, 2004, the sales return reserve related to our export distribution was $20.4 million.

Revenues from our secondary wholesale operations decreased due to a decrease in the number wholesale operations we serviced either because they were able to obtain distribution directly from a primary distributor or were no longer deemed credit worthy.

Our In-Store Services group's revenues for the fiscal year ended January 31, 2004 were $58.6 million, a decrease of $3.2 million or 5.1% over the prior fiscal year.

The group's revenues for the fiscal years ended January 31, 2004 and 2003 are comprised of the following components (in millions):

|  | 2004 | 2003 | Change |
|---|---|---|---|
| Claim filing and information | $14.0 | $14.0 | $ — |
| Wire manufacturing | 44.6 | 47.8 | (3.2) |
| Total | $58.6 | $61.8 | $(3.2) |

107

IB 00139

IB 00140

Our wire manufacturing revenues declined due to the cyclical nature of the industry (major chains purchase new front-end fixtures every three years) and pricing pressure in our industry.

Our Wood Manufacturing group's revenues for the fiscal year ended January 31, 2004 were $18.7 million, an increase $1.2 million or 7.1% compared to the prior fiscal year.

*Gross Profit*

Gross profit for the fiscal year ended January 31, 2004 increased $14.0 million, or 18.8%, over the prior fiscal year due primarily to an increase in gross profit in our Magazine Fulfillment group.

Gross profit margins for the fiscal year ended January 31, 2004 increased 0.9% over the prior fiscal year. Margins improved or (declined) in our Magazine Fulfillment, In-Store Services, and Wood Manufacturing groups by 1.8%, (0.6)%, and 6.4%, respectively.

Gross profit in our Magazine Fulfillment group for the fiscal year ended January 31, 2004 increased $14.4 million, or 30.6%, over the prior fiscal year. The increase related to both the increase in revenue described above as well as improving margins. The gross profit margins in our domestic distribution businesses are generally higher than our secondary wholesale business and, as a result, gross profit margins improve as the portion of total revenues is weighted more heavily toward our domestic operations. The margins in our distribution business also improved as a result of a shift in product mix from lower margin domestic titles to higher margin imported titles.

Gross profit in our In-Store Services group for the fiscal year ended January 31, 2004 decreased $1.7 million, or 6.4%, over the prior fiscal year. The decrease related to both the decrease in revenues described above as well as declining margins. The decrease in margins is both due to a decrease in pricing as well as the recent increase in commodity prices particularly steel, which is a major component of our front-end fixtures.

Gross profit in our Wood Manufacturing group for the fiscal year ended January 31, 2004 increased $1.3 million, or 117.3%, over the prior fiscal year. The increase related to both the increase in revenue described above as well as improving margins. The prior fiscal year results included a significant inventory write-off related to a lost customer.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses for the fiscal year ended January 31, 2004 increased $6.0 million, or 13.0%, over the prior fiscal year. Selling, general, and administrative expenses as a percent of revenues declined from 16.0% to 15.8% in those same periods.

The Magazine Fulfillment group's selling, general, and administrative expenses for the fiscal year ended January 31, 2004 increased $3.5 million, or 14.1%, over the prior fiscal year. The inception of our magazine export business resulted in $2.5 million of the increase.

The combined selling, general and administrative expenses of In-Store Services and Shared Services for the fiscal year ended January 31, 2004 increased $3.0 million, or 14.9%, over the prior fiscal year. The increase is attributable to an expanded corporate infrastructure to support our enlarged scope of operations.

The Wood Manufacturing group's selling, general, and administrative expenses for the fiscal year ended January 31, 2004 decreased $0.4 million, or 23.7%, over the prior fiscal year. The decrease was attributable to both the unusually high level of expenses in the fourth quarter of fiscal 2003 as well as the cost savings attributable to the consolidation of our manufacturing capacity in Carson City, Nevada into the facility in Albemarle, North Carolina.

*Fulfillment Freight*

Fulfillment freight expenses for the fiscal year ended January 31, 2004 increased $1.7 million, or 11.5%, over the prior fiscal year. Freight as a percentage of the Magazine Fulfillment group's revenues decreased from

IB 00141

6.9% to 6.4% due to improvement in the efficiency of our distribution model and an increase in the number of pounds distributed. Under our existing contract, our freight rates per pound decrease as the number of pounds shipped increases.

### Relocation Expenses

During fiscal 2004, we relocated our magazine distribution back office from San Diego, California to Bonita Springs, Florida. The total expense recorded in the period related to this relocation was $1.7 million.

During fiscal 2003, we relocated our claim submission and fixture billing center from High Point, North Carolina to Bonita Springs, Florida. The total expense recorded in the period related to this relocation was $1.9 million.

### Operating Income

Operating income for the fiscal year ended January 31, 2004 increased $6.4 million, or 57.4%, compared to the prior fiscal year due to the factors described above.

Operating profit margins for the fiscal year ended January 31, 2004 improved to 5.3% from 3.9% in the prior fiscal year. The increase was due to the improvement in our gross profit margins and the decrease in our selling, general, and administrative expenses as a percent of revenues.

### Interest Expense

Interest expense includes the interest and fees on our significant debt instruments and outstanding letters of credit.

### Other Income (Expense)

Other income (expense) consists of items outside of the normal course of operations. Due to its nature, comparability between periods is not generally meaningful.

Other expense in the fiscal year ended January 31, 2004 includes a charge of $0.9 million related to the refinancing of our senior credit facilities.

Other income in the fiscal year ended January 31, 2004 related primarily to the favorable settlement of an outstanding liability.

### Income Tax Expense

The effective income tax rates were 26.5% and 7.7% for the fiscal years ended January 31, 2004 and 2003, respectively.

The difference between the statutory rate and effective tax rates relates primarily to the realization of a portion of the net operating loss carry-forward acquired with our acquisition of Interlink and tax credits received from the state of Florida related to our relocation.

### Results for the Fiscal Year Ended January 31, 2003 Compared to the Fiscal Year Ended January 31, 2002

### Revenues

Revenues for the fiscal year ended January 31, 2003 increased $52.0 million, or 21.8%, over the prior fiscal year due primarily to an increase in revenue in our Magazine Fulfillment group. Fiscal 2002 includes eight months of operations of this group.

IB 00142

Our Magazine Fulfillment group's revenues for the fiscal year ended January 31, 2003 were $211.7 million, an increase of $55.9 million or 35.9% as compared to the prior year. The group's revenues are comprised of the following components (in millions):

|                                  | 2003    | 2002    | Change  |
|----------------------------------|---------|---------|---------|
| Domestic distribution            | $188.6  | $135.8  | $52.8   |
| Secondary wholesale distribution | 21.7    | 20.2    | 1.5     |
| Other                            | 2.5     | 0.6     | 1.9     |
| Intra-segment sales              | (1.1)   | (0.8)   | (0.3)   |
| Total                            | $211.7  | $155.8  | $55.9   |

Domestic distribution consists of the gross amount of magazines (both domestic and imported titles) distributed to domestic retailers and wholesalers, less actual returns received (collectively, "actual net distribution"), less an estimate of future returns and customer discounts. The $52.8 million increase in domestic distribution consisted of a $49.5 million increase in actual net distribution, plus a $4.5 million increase from the impact of the change in the sales return reserve as compared to the prior year's change, and less a $1.2 million increase in customer discounts. Actual net domestic distribution increased from $140.3 million to $189.8 million; an increase of $49.5 million or 35.3%. This increase was driven primarily by the growth of distribution to our two main customers, which increased from $101.1 million to $155.5 million or $54.4 million. The sales return reserve related to our domestic distribution decreased from $34.9 million to $33.1 million or $1.8 million. Customer discounts increased from $1.8 million to $3.0 million.

Our In-Store Services group revenues for the fiscal year ended January 31, 2003 were $61.8 million, a decrease of $3.3 million or 5.1% as compared to the prior fiscal year.

The group's revenues are comprised of the following components (in millions):

|                              | 2003   | 2002   | Change   |
|------------------------------|--------|--------|----------|
| Claim filing and information | $14.0  | $12.6  | $1.4     |
| Wire manufacturing           | 47.8   | 52.5   | (4.7)    |
| Total                        | $61.8  | $65.1  | $(3.3)   |

Our wire manufacturing revenues declined due to pricing pressure in the industry.

Our Wood Manufacturing group's revenues for the fiscal year ended January 31, 2003 were $17.5 million, a decrease of $0.5 million or 2.7% as compared to the prior fiscal year.

*Gross Profit*

Gross profit for the fiscal year ended January 31, 2003 increased $11.8 million, or 18.9%, over the prior fiscal year due primarily to an increase in gross profit in our Magazine Fulfillment group.

Gross profit margins in the fiscal year ended January 31, 2003 decreased 0.6% over the prior fiscal year. Margins improved or (declined) in our Magazine Fulfillment, In-Store Services, and Wood Manufacturing groups by 3.2%, (4.9)%, and (3.9)%, respectively.

Gross Profit in our Magazine Fulfillment group for the fiscal year ended January 31, 2003 increased $17.4 million, or 58.7% as compared to the prior fiscal year. The increase related to both the increase in revenue described above as well as improving margins. The gross profit margins in our domestic distribution businesses are generally higher then our secondary wholesale business and, as a result, gross profit margins improve as the portion of total revenues is weighted more toward our domestic operations. In addition, gross profit margins from imported titles are generally higher than domestic titles, which began operations in May 2002.

110

IB 00143

Gross profit in our In-Store Services group for the fiscal year ended January 31, 2003 decreased $4.8 million, or 15.4%, as compared to the prior fiscal year. The decrease related to both the decrease in revenues described above as well as declining margins.

Gross profit in our Wood Manufacturing group for the fiscal year ended January 31, 2003 decreased $0.7 million, or 39.9%, as compared to the prior fiscal year. The decrease resulted from a significant inventory write-off related to a lost customer.

### Selling, General and Administrative Expenses

Selling, general and administrative expenses for the fiscal year ended January 31, 2003 increased $7.6 million, or 19.5%, compared to the prior fiscal year. Selling, general, and administrative expenses as a percent of revenues declined from 16.3% to 16.0%.

The Magazine Fulfillment group's selling, general, and administrative expenses for the fiscal year ended January 31, 2003 increased $6.4 million, or 34.9%, as compared to the prior fiscal year.

The combined selling, general, and administrative expenses of the In-Store Services and Shared Services groups' for the fiscal year ended January 31, 2003 increased $1.1 million, or 5.8%, as compared to the prior fiscal year.

The Wood Manufacturing group's selling, general, and administrative expenses increased $0.1 million, or 5.3%.

### Fulfillment Freight

Fulfillment freight expenses for the fiscal year ended January 31, 2003 increased $6.7 million, or 85.2%, compared to the prior fiscal year due to growth in our Magazine Fulfillment group. Freight as a percentage of the Magazine Fulfillment group's revenues increased from 5.1% to 6.9%. The increase is attributable to the growth of our fulfillment business whereby we ship other company's product for a fee.

### Relocation Expenses

During the fiscal year ended January 31, 2003, we relocated our claim submission and fixture billing center in High Point, North Carolina to Bonita Springs, Florida. The total expense recorded in the period related to this relocation was $1.9 million.

### Amortization of Goodwill

Prior to the fiscal year ended January 31, 2003, we amortized goodwill consistent with accounting literature in effect at that time. Effective February 1, 2002, we adopted Statement of Financial Accounting Standards "FAS" No. 142 and ceased amortizing goodwill.

### Asset Impairment Charges

In the fiscal year ended January 31, 2002, pursuant to an independent valuation of our intangible assets (goodwill) in accordance with FAS No. 121, it was determined that an impairment charge was required. The impairment charge reduced the carrying value of goodwill on our balance sheet related to the Magazine Fulfillment and Wood Manufacturing groups to zero.

### Interest Expense

Interest and related expenses are primarily due to our significant debt instruments, which consisted of our former revolving line of credit with Bank of America, our former credit facilities with Congress Financial, our Industrial Revenue Bonds related to our Rockford, Illinois manufacturing facility and debt to prior owners of Interlink.

111

IB 00144

Interest expense for the fiscal year ended January 31, 2003 increased from the fiscal year ended January 31, 2002 due to the acquisition of Interlink and the assumption of its related bank debt.

*Other Income (Expense)*

Other income (expense) consists of items outside of the normal course of operations. Due to its nature, comparability between periods is no generally meaningful.

Other income in the fiscal year ended January 31, 2003 related primarily to the favorable settlement of an outstanding liability.

*Income Tax Expense (Benefit)*

The effective income tax rate for the fiscal years ended January 31, 2003 and 2002 was 6.3% and 0.7%, respectively.

The difference in fiscal 2003 between the effective tax rate and the statutory rate related to the realization of a portion of the net operating loss carry-forwards acquired with our acquisition of Interlink that was fully reserved at the end of fiscal 2002.

The difference in fiscal 2002 between the effective tax rate and the statutory rate related to the asset impairment charge of goodwill that was not tax deductible.

**Liquidity and Capital Resources**

*Overview*

Our primary sources of cash include receipts from our customers, borrowings under our credit facilities and from time to time the proceeds from the sale of common stock.

Our primary cash requirements for the Magazine Fulfillment group consist of the cost of magazines and the cost of freight, labor and facility expense associated with our distribution centers.

Our primary cash requirements for the In-Store Services group consist of the cost of raw materials, labor, and factory overhead incurred in the production of front-end displays, the cost of labor incurred in providing our claiming, design and information services and cash advances funding our Advance Pay program. Our Advance Pay program allows retailers to accelerate collections of their rebate claims through payment from us in exchange for the transfer to us of the right to collect the claim. We then collect the claims when paid by publishers for our own account.

Our primary cash requirements for the Wood Manufacturing group consist of the cost of raw materials, the cost of labor, and factory overhead incurred in the manufacturing process.

Our primary cash requirements for the Shared Services group consist of salaries, professional fees and insurance not allocated to the operating groups.

The following table presents a summary of our significant obligations and commitments to make future payments under debt obligations and lease agreements due by fiscal year as of October 31, 2004 (in thousands).

|  | | Payments Due by Period | | | |
|  | Total | Less than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
| --- | --- | --- | --- | --- | --- |
| Debt obligations | $34,061 | $1,279 | $5,315 | $ 5,271 | $22,196 |
| Operating leases | 34,108 | 1,289 | 8,132 | 6,499 | 18,188 |
| Total contractual cash obligations | $68,169 | $2,568 | $13,447 | $11,770 | $40,384 |

112

IB 00145

IB 00146

The following table presents a summary of our commercial commitments and the notional amount expiration by period (in thousands):

| | Total | Less than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
|---|---|---|---|---|---|
| | | Notional Amount Expiration by Period | | | |
| Financial standby letters of credit | $3,750 | $3,750 | $ — | $ — | $ — |
| Total commercial commitments | $3,750 | $3,750 | $ — | $ — | $ — |

*Comparison of the Nine Month Period ended October 31, 2004 to the Nine Month Period ended October 31, 2003*

*Operating Cash Flow*

Net cash (used in) provided by operating activities was ($19.9) million and $2.6 million for the nine months ended October 31, 2004 and 2003, respectively.

Operating cash flows for the nine months ended October 31, 2004 were primarily from net income ($9.0 million), plus non-cash charges including depreciation and amortization ($4.0 million) and provisions for losses on accounts receivable ($0.6 million), a write off of deferred financing costs and original issue discount ($1.5 million), a decrease in inventories ($3.4 million) and a decrease in other assets ($0.6 million). These cash providing activities were offset by an increase in accounts receivable ($24.7 million) and a decrease in accounts payable and accrued expenses ($14.3 million).

The increase in accounts receivable for the nine months ended October 31, 2004 was primarily due to an increase in accounts receivable in our Magazine Fulfillment group. The increase was due to an overall increase in distribution levels, especially in the last month of the quarter, more lenient payment terms offered to a significant customer in exchange for more favorable pricing, and the increase in the sales return reserve from the end of fiscal 2004. Receivables in our Wood Manufacturing division increased by approximately $2.9 million, due to additional revenues in the period of approximately $3.8 million. The In-Store Services Group had an increase in accounts receivable of approximately $3.4 million due primarily due to the seasonal nature of the wire manufacturing business, which generally has the highest receivable balance in the third quarter. The fourth quarter is generally our best collection and cash flow quarter of the year as revenues from the third quarter are collected.

The decrease in accounts payable and accrued expenses in the current period of $14.3 million relates (i) to a decrease in the accounts payable in our Magazine Fulfillment group where we utilized available funds to pay vendors earlier in order to generate additional margin, (ii) a reduction in customer deposits due to change in payment terms and (iii) timing of payments to vendors in the current period.

Operating cash flows for the nine months ended October 31, 2003 were primarily from net income ($7.7 million), adding back non-cash charges such as depreciation and amortization ($3.0 million) and provisions for losses on accounts receivable ($1.6 million), and a significant increase in accounts payable ($11.3 million). These cash providing activities were offset by a significant increase in accounts receivable ($20.5 million).

The increase in accounts receivable and accounts payable related primarily to the magazine export agreement and the inception of that business. The magazine export agreement allowed us to become a leading exporter of domestic titles to wholesalers overseas. Magazines are purchased directly from domestic publishers and sold on extended terms to foreign distribution agents who distribute the magazines to retailers in their geographic territories. The inception of this business resulted in an increase in accounts receivable and an increase in accounts payable. The first nine months of the current year includes eight months of operations from this business and only five months of cash collections due to standard payment terms of 90 days, which is typical for this segment of the industry.

113

IB 00147

*Investing Cash Flow*

Net cash used in investing activities was $14.3 million and $3.2 million for the nine months ended October 31, 2004 and 2003, respectively

For the nine months ended October 31, 2004, cash used in investing activities was reduced by capital expenditures of $4.1 million, which in part related to our expansion of our distribution facility in Harrisburg, Pennsylvania. Our advance pay program generated net cash flow of $2.6 million in the nine months ended October 31, 2004. In addition, we advanced to the prior operator of our export distribution business $6.8 million at January 31, 2004. The advances were made as part of the agreement to collect the prior operator's receivables and pay outstanding payables so as to create a seamless transition for both the customers and suppliers. We collected $5.3 million of the advances during the nine months ended October 31, 2004.

In August 2004, we acquired all customer-based intangibles (i.e., all market composition, market share and other value) respecting claiming and information services of PROMAG Retail Services, LLC ("Promag") for approximately $13.2 million. Of the $13.2 million purchase price, $10.0 million was funded from a term loan discussed below and $0.75 million in a promissory note payable over a three year period to Promag. Promag provides claim filing services related to rebates owed retailers from publishers or their designated agent throughout the United States and Canada.

In September 2004, we acquired substantially all of the assets and liabilities of Empire State News Corp. ("Empire"), a magazine wholesaler in northwest New York state, for approximately $5.0 million. The purchase price consisted of $3.3 million of cash paid and $1.6 million of deferred consideration in the form of two notes payable ($1.2 million) and deferred compensation, subject to finalization of working capital adjustments in accordance with the purchase agreement.

For the nine months ended October 31, 2003, cash provided by investing activities related to capital expenditures of $1.4 million, which related primarily to our relocation to Florida, and $1.4 million of payments made related to the acquisition of customer lists under the export agreement and a contingent payment of $1.0 million under the magazine import agreement. Finally, in connection with the magazine export agreement discussed in the section above, we advanced $4.7 million during the nine months ended October 31, 2003.

Our borrowing agreements limit the amount of our capital expenditures in any fiscal year.

*Financing Cash Flow*

Outstanding balances on our credit facility fluctuate partially due to the timing of the retailer rebate claiming process and our Advance Pay program, the seasonality of our front end wire and services business and the payment cycle of the magazine distribution business. Because the magazine distribution business and Advance Pay program cash requirements peak at our fiscal quarter ends, the reported bank debt levels usually are the maximum level outstanding during the quarter.

Payments under our Advance Pay program generally occur just prior to our fiscal quarter end. The related claims are not generally collected by us until 30-60 days after the advance is made. As a result, our funding requirements peak at the time of the initial advances and decrease over this period as the cash is collected on the related claims.

The front end wire and services business is seasonal because most retailers prefer initiating new programs before the holiday shopping season begins, which concentrates revenues in the second and third quarter. Receivables from these fixture programs are generally collected from all participants within 180 days. We are usually required to tender payment on the costs of these programs (raw material and labor) within a shorter period. As a result, our funding requirements peak in the second and third fiscal quarters when we manufacture the wire fixtures and decrease significantly in the fourth and first fiscal quarters as the related receivables are collected and significantly less manufacturing activity is occurring.

114

IB 00148

Within our magazine distribution business, our significant customers pay weekly, and we pay our suppliers monthly. As a result, funding requirements peak at the end of the month when supplier payments are made and decrease over the course of the next month as our receivables are collected.

Net cash provided by financing activities was $30.8 million and $0.0 million for the nine months ended October 31, 2004 and 2003, respectively.

Financing activities in the nine month period ended October 31, 2004 consisted of proceeds from the sale of 3.8 million shares of common stock. The proceeds of $40.5 million (net of underwriting and related expenses) from the sale were utilized to repay the Wells Fargo Foothill original term loan, the Hilco Capital note payable and the notes payable to former owners ($22.4 million through October 31, 2004). For the nine month period ended October 31, 2004, borrowings on the credit facilities totaled $8.9 million and a term loan in the amount of $10.0 million was issued related to the Promag transaction. In addition, the cash provided by the activities noted above was offset by an $11.1 million decrease in checks issued and outstanding at October 31, 2004. Finally, the exercise of employee stock options in the period generated approximately $4.9 million.

Financing activities for the nine month period ended October 31, 2004 consisted primarily of repayments on our credit facilities ($15.7 million) and proceeds from the issuance of notes payable ($20.0 million). These borrowings were offset by a $5.5 million reduction of checks issued and outstanding at October 31, 2003. The exercise of employee stock options in the period generated approximately $1.9 million

### Comparison of Fiscal Years Ended January 31, 2002, 2003 and 2004

#### Operating Cash Flow

Net cash provided by (used by) operating activities was $12.3 million, $20.6 million and $(1.6) million for the fiscal years ended January 31, 2004, 2003 and 2002, respectively.

Operating cash flows for the fiscal year ended January 31, 2004 were primarily from net income ($10.0 million), plus non-cash charges including depreciation and amortization ($4.1 million) and provisions for losses on accounts receivable ($1.8 million), a decrease in accounts receivable ($0.5 million) and a decrease in other current and non-current assets ($2.0 million). These cash providing activities were offset by an increase in inventory ($1.3 million), and a decrease in accounts payable and accrued expenses other current and non-current liabilities ($5.7 million).

Accounts receivable and accounts payable balances were impacted by the inception of the magazine export business, which had trade receivable of $14.2 million and trade payables of $10.0 million at January 31, 2004. The magazine export agreement allowed us to become a leading exporter of domestic titles to foreign wholesalers and domestic brokers who transport the product overseas. The fiscal year includes eleven months of operations from this business and only eight months of cash collections due to standard payment terms of at least 90 days, which is typical in the industry.

Accounts receivable related to our domestic magazine distribution businesses decreased $2.6 million primarily due to the increase in the sales return reserve partially offset by the growth in trade receivables as a result of higher distribution levels. Inventories for this business increased $1.7 million primarily to support higher distribution levels.

Accounts receivable in our front-end fixture manufacturing and claim filing services decreased $6.7 million due to both better collection procedures as well as the lower revenue base.

Operating cash flow for the fiscal year ended January 31, 2003 was primarily from net income ($7.3 million), adding back non-cash charges such as depreciation and amortization ($3.3 million) and provisions for losses on accounts receivable ($2.0 million) and a significant decrease in accounts receivable ($17.6 million). These cash providing activities were offset by a significant reduction in accounts payable ($9.7 million).

115

IB 00149

The decrease in accounts receivable relates primarily to a significant decrease in receivables related to front-end fixture programs, which were at unusually high levels at January 31, 2002 and subsequently collected in the first quarter of fiscal 2003.

The decrease in receivables related to front-end fixture programs relates primarily to the timing of payments by significant participants of cost-shared front-end fixture programs. Our year-end balance at January 31, 2002 was inflated by the significantly higher revenue in the third quarter of fiscal 2002 that was, for the most part, collected in the first quarter of fiscal 2003.

Improved cash flow and profits in our Magazine Distribution group allowed for a significant reduction in accounts payable ($13.0 million of the total decrease). We believe that this decrease was necessary to bring us within payment terms with all our publishers, which has significantly improved our relationship with the publishing community and allowed us to expand our business with those publishers.

Negative operating cash flow for the fiscal year ended January 31, 2002 was $1.6 million despite a net loss of $72.9 million. The difference related to significant non-cash charges including depreciation and amortization ($7.8 million), provisions for losses on accounts receivable ($2.8 million) and an asset impairment charge ($78.1 million). In addition to the non-cash charges we also experienced a significant increase in accounts payable ($23.1 million), which increased cash flow from operations. This increase related to our recently purchased Interlink subsidiaries and an increase in the average days outstanding to our vendors. These increases were offset by a significant increase in accounts receivable ($36.9 million) and inventories ($3.2 million). The increase in accounts receivable was attributable to both the purchase of the Interlink companies and a significant amount of third quarter wire manufacturing revenues not being collected until the first quarter of fiscal 2003.

*Investing Cash Flow*

Net cash provided by (used in) investing activities was $(9.5 million), $(12.8 million) and $2.3 million in the fiscal years ended January 31 2004, 2003 and 2002, respectively.

In the fiscal year ended January 31, 2004, cash used in investing activities related to capital expenditures of $2.1 million, which primarily related to our relocation to Florida and expansion of our distribution facility in Harrisburg, Pennsylvania, and $2.4 million of payments related to acquisition of the customer lists under the import and export agreement. Our advance pay program generated net cash flow of $1.8 million in the fiscal year ended January 31, 2004. We also advanced to the prior operator of our export distribution business $6.8 million. The advances were made as part of the agreement to collect the prior operator's receivables and pay outstanding payables so as to create a seamless transition for both the customers and suppliers. This balance had decreased to approximately $3.0 million at March 31, 2004.

In the fiscal year ended January 31, 2003, cash used in investing activities related to capital expenditures of $4.4 million, which related primarily to our relocation to Florida, the acquisition of Innovative Metal Fixtures ($2.0 million of a total purchase price of approximately $2.6 million; the remaining portion consisting of a note payable to the former owner) and a payment under a magazine import agreement ($2.0) million related to the domestic distribution of foreign titles. Our advance pay program used net cash flow of $4.4 million.

In the fiscal year ended January 31, 2002, cash used in investing activities related to the acquisition of Interlink totaling $13.7 million and capital expenditures of $3.7 million. Cash from investing activities included $3.5 million from the sale of software. Our advance pay program provided net cash flow of $16.0 million. The unusually high cash flow from the advance pay program was due to improvement in the collection process.

The faster collection cycle for our claim receivables resulted from providing publishers with the claim information in an electronic format allowing for quicker processing. As a result of this new process, claims outstanding related to our Advance Pay program decreased compared to the prior fiscal year-end, without a significant decrease in either the number or amount of claims filed.

116

IB 00150

Our borrowing agreements limit the amount of our capital expenditures in any fiscal year.

### Financing Cash Flow

Outstanding balances on our credit facility fluctuate partially due to the timing of the retailer rebate claiming process and our Advance Pay program, the seasonality of our wire manufacturing business, and the payment cycle of the magazine distribution business. Because the magazine distribution business and Advance Pay program cash requirement peak at our fiscal quarter ends, the reported bank debt levels usually are the maximum level outstanding during the quarter.

Payments under our Advance Pay program generally occur just prior to our fiscal quarter end. The related claims are not generally collected by us until 90 days after the advance is made. As a result, our funding requirements peak at the time of the initial advances and decrease over the next 90 days as the cash is collected on the related claims.

The wire manufacturing business is seasonal because most retailers prefer initiating new programs before the holiday shopping season begins, which concentrates revenues in the second and third quarter. Receivables from these fixture programs are generally collected from all participants within 120 days. We are usually required to tender payment on the costs of these programs (raw material and labor) within a shorter period. As a result, our funding requirements peak in the second and third fiscal quarters when we manufacture the wire fixtures and decrease significantly in the fourth and first fiscal quarters as the related receivable are collected and significantly less manufacturing activity is occurring.

Within our magazine distribution business, our significant customers pay weekly, and we pay our suppliers monthly. As a result, funding requirements peak at the end of the month when supplier payments are made and decrease over the course of the next month as our receivables are collected.

Net cash (used in) provided by financing activities was ($3.4 million), ($5.2 million), and $1.2 million in the fiscal years ended January 31, 2004, 2003 and 2002, respectively.

In the fiscal year ended January 31, 2004, cash used in financing activities related to our various credit facilities included net repayments under revolving credit facilities of $27.7 million, payments of notes payable of $6.0 million and proceeds from the issuance of notes payable of $20.0 million. The exercise of employee stock options generated $2.8 million in proceeds. Outstanding checks increased $7.5 million as our new consolidated financing facility allowed for more efficient cash management.

In the fiscal year ended January 31, 2003, cash used in financing activities related to our various credit facilities included net repayment under revolving credit facilities of $7.7 million and repayments of notes payable of $2.8 million. In addition, we repaid approximately $1.0 million of various notes outstanding to the prior owners of acquired companies. Outstanding checks increased $6.6 million relating to the timing of our payments to retailers under the Advance Pay program. At January 31, 2003, we had completed the filing of the quarterly rebate claims and had just processed a large number of payments, which was not the case at the end of 2002.

In the fiscal year ended January 31, 2002, cash provided by financing activities related to borrowing under our revolving credit facility totaling $5.7 million. These borrowing were partially offset by a $4.6 million reduction of checks issued and outstanding at January 31, 2002 compared to 2001. This amount is driven primarily by the timing of our Advance Pay program, which requires significant cash outflows near our fiscal year-end.

### Debt

At October 31, 2004, our total debt obligations were $34.1 million, excluding outstanding letters of credit. Debt consists primarily of our amounts owed under a revolving credit facility, a term loan with Wells Fargo Foothill and the agreement for purchase of the magazine export business.

On October 30, 2003, we entered into a credit agreement with Wells Fargo Foothill. The credit agreement enabled us to borrow up to $45.0 million under a revolving credit facility. The credit agreement was

117

IB 00151

to expire on October 30, 2006 and was secured by all of the assets of the Company. In August 2004, the Company amended the credit facility with Wells Fargo Foothill. The amended facility now extends through October 31, 2009 and provides for a $10.0 million term note payable the bears interest at the prime rate plus 2.0% (6.75% at October 31, 2004). In addition, the Company reduced the $45.0 million revolving credit facility to $40.0 million however the total credit facility remains $50.0 million. The term note is payable over five years with initial quarterly installments of $0.25 million payable over four quarters beginning October 31, 2004. The quarterly installments increase to $0.35 million, $0.50 million, $0.65 million and $0.75 million, respectively, over the subsequent four years.

Borrowings under the revolving credit facility bear interest at a rate equal to the prime rate (4.75% at October 31, 2004) plus up to 0.5% based on an availability calculation and carries a facility fee of 1/4% per annum on the difference between $40.0 million and the average principal amount outstanding under the facility including advances under the revolving credit facility and letters of credit. The balance on the credit facility at October 31, 2004 was $20.7 million.

Availability under the revolving facility is limited by a borrowing base calculation, as defined in the agreement. The calculation resulted in excess availability of $11.4 million at October 31, 2004.

On October 30, 2003, we entered into a credit agreement with Hilco Capital. The note payable had a face value of $15.0 million and was recorded net of the original issuance discount related to the fair value of warrants issued concurrently with the note. The note payable bore interest at a rate equal to the greater of the prime rate (4.75% at October 30, 2004) plus 7.75% or 12% and deferred interest of 2% due at the termination of the agreement on October 30, 2006. The term loan was paid in full during the quarter ended October 31, 2004.

Under the credit agreements, we are required to maintain a specified minimum level of EBITDA and compliance with specified fixed charge coverage and debt to EBITDA ratios. In addition, we are prohibited, without consent from our lenders, from:

• incurring or suffering to exist additional indebtedness or liens on our assets,

• engaging in any merger, consolidation, acquisition or disposition of assets or other fundamental corporate change,

• permitting a change of control of our company,

• paying any dividends or making any other distribution on capital stock or other payments in connection with the purchase, redemption, retirement or acquisition of capital stock,

• changing our fiscal year or methods of accounting, and

• making capital expenditures in excess of $7.15 million during fiscal year 2005 and $3.4 million during fiscal year 2006 and each subsequent fiscal year.

In connection with our acquisition of the magazine export business leased by us since March 2003, we agreed to make nine quarterly payments of approximately $0.4 million beginning in January 2004. The balance outstanding under this agreement at October 31, 2004 was $2.16 million.

In connection with the acquisition of the assets of Empire, we issued notes payable totaling $1.2 million to Empire and one of the former owners of Empire. The notes payable bear interest at the lowest rate per annum allowable under Section 1274 of the Internal Revenue Code, which was 2.35% as of October 31, 2004.

A note payable, due in fiscal 2003, in the principal amount of $1.6 million to the previous owner of an acquired company was being disputed by us under the conditions of the acquisition agreement. We received a favorable arbitration ruling during the fourth quarter of fiscal 2004, and in March 2004, we settled the remaining note payable, interest accrued thereon and the indemnification claim by the Company for $1.6 million.

118

IB 00152

*Critical Accounting Policies and Estimates*

Management's Discussion and Analysis of Financial Condition and Results of Operations is based on our consolidated financial statements which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires management to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent liabilities. Management bases its estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Senior management has discussed the development, selection and disclosure of these estimates with the audit committee of the board. Actual results may differ from these estimates under different assumptions and conditions.

Management believes the following critical accounting policies affect its more significant judgments and estimates used in the preparation of its consolidated financial statements.

*Revenue Recognition*

We record a reduction in revenue for estimated magazine sales returns and a reduction in cost of sales for estimated magazine purchase returns. Estimated sales returns are based on historical sales returns and daily point-of-sale data from significant customers. The purchase return estimate is calculated from the sales return reserve based on historical gross profit. If the historical data we use to calculate these estimates does not properly reflect future results, revenue and/or cost of sales may be misstated.

*Allowance for Doubtful Accounts*

We provide for potential uncollectible accounts receivable based on customer-specific information and historical collection experience. If market conditions decline, actual collection experience may not meet expectations and may result in increased bad debt expenses.

*Taxes on Earnings*

The carrying value of our net deferred tax assets assumes that we will be able to generate sufficient future taxable income in certain tax jurisdictions, based on estimates and assumptions. If these estimates and assumptions change in the future, we may be required to increase or decrease valuation allowances against its deferred tax assets resulting in additional income tax expenses or benefits.

*Valuation of Long-Lived Assets Including Goodwill and Purchased Intangible Assets*

We review property, plant and equipment, goodwill and purchased intangible assets for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable. Our asset impairment review assesses the fair value of the assets based on the future cash flows the assets are expected to generate. An impairment loss is recognized when estimated discounted future cash flows expected to result from the use of the asset plus net proceeds expected from the disposition of the asset (if any) are less than the carrying value of the asset. This approach uses our estimates of future market growth, forecasted revenue and costs, expected periods the asset will be utilized and appropriate discount rates. Such evaluations of impairment of long-lived assets including goodwill and purchased intangible assets are an integral part of, but not limited to, our strategic reviews of our business and operations. Deterioration of our business overall or within a business segment in the future could also lead to impairment adjustments as such issues are identified.

*Internal Controls Over Financial Reporting*

We are currently undergoing the rigorous process to ensure compliance with the new regulations under Section 404 of the Sarbanes-Oxley Act that take effect for our fiscal year ending January 31, 2005. In the course of documenting and testing, certain aspects of our internals controls over financial reporting have been

119

IB 00153

identified that we believe require remediation. In these instances, we have implemented such remediation. While we continue to dedicate substantial resources to this effort we cannot be certain that all remediation efforts will be timely completed and tested by us and our independent auditor so that management and our independent auditor will be able to express an unqualified opinion on the effectiveness of our internal controls as at our fiscal year ending January 31, 2005.

*Recent Accounting Pronouncements*

In April 2003, the FASB issued SFAS No. 149, "Amendment of Statement 133 on Derivative Instruments and Hedging Activities", which amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities." SFAS No. 149 is effective for all contracts entered into or modified after June 30, 2003. The adoption of this standard did not have a material impact on our consolidated financial statements.

In May 2003, the FASB issued SFAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity." SFAS No. 150 requires that certain financial instruments, which under previous guidance were accounted for as equity, must now be accounted for as liabilities. The financial instruments affected include mandatory redeemable stock, certain financial instruments that require o may require the issuer to buy back some of its shares in exchange for cash or other assets and certain obligations that can be settled with shares of stock. SFAS No. 150 is effective for all financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The adoption of this standard did not have a material impact on our consolidated financial statements.

In January 2003, the FASB issued Interpretation No. 46 (FIN 46), "Consolidation of Variable Interest Entities." FIN 46 requires the consolidation of variable interest entities in which an enterprise absorbs a majority of the entity's expected losses, receives a majority of the entity's expected residual returns, or both, as a result of ownership, contractual or other financial interests in an entity. The provisions of FIN 46 were effectively immediately for those variable interest entities created after January 31, 2003. The provision, as amended December 2003, are effective immediately for those variable interest entities held prior to February 1, 2003 that are considered to be special purpose entities. The provisions, as amended, are to be applied no later than the end of the first reporting period that ends after March 15, 2004 for all other variable interest rate entities held prior to February 1, 2003. The adoption of this standard did not have a material impact on our consolidated financial statements.

*Quantitative and Qualitative Disclosures About Market Risk*

Our primary market risks include fluctuations in interest rates and exchange rate variability.

Our debt relates to credit facilities with Wells Fargo Foothill. See "— Liquidity and Capital Resources — Debt"

The revolving credit facility with Wells Fargo Foothill has an outstanding principal balance of approximately $20.70 million at October 31 2004. Interest on the outstanding balance is charged based on a variable interest rate related to the prime rate (4.75% at October 31, 2004) plus a margin specified in the credit agreement (0.00% at October 31, 2004).

The amended credit facility provides for a $10 million term note payable that bears interest at the prime rate plus 2.0% (6.75% at October 31, 2004). The term note is payable over five years in installments of $0.25 million over four quarters beginning October 31, 2004 the the quarterly installments increase to $0.35, $0.50, $0.65 and $0.75 million, respectively, over the subsequent four years.

The original term note payable with Wells Fargo Foothill was paid in full in March 2004.

The note payable with Hilco Capital was repaid in full during the quarter ended October 31, 2004.

120

IB 00154

Interest expense from these credit facilities is subject to market risk in the form of fluctuations in interest rates.

In March 2004, we utilized the proceeds from a sale of our common stock to pay-down all but a nominal amount of the Hilco Capital note payable, repay the term note portion of the Wells Fargo Foothill credit facility, and repaid all outstanding balances owed under the revolving credit portion of the Wells Fargo Foothill credit facility.

We do not perform any interest rate hedging activities related to these two facilities.

We have exposure to foreign currency fluctuations through our operations in Canada. These operations accounted for approximately $2.0 million, which represented 2.1% of our revenues for the quarter ended October 31, 2004. We generally pay the operating expenses related to these revenues in the corresponding local currency. We will be subject to any risk for exchange rate fluctuations between such local currency and the dollar.

Additionally, we have exposure to foreign currency fluctuation through our exporting of foreign magazines and the purchased of foreign magazine for domestic distribution.

Revenues derived from the export of foreign titles (or sale to domestic brokers who facilitate the export) totaled $28.7 million for the period ended October 31, 2004 or 13.4% of total revenues. For the most part, our export revenues are denominated in dollars and the foreign wholesaler is subject to foreign currency risks. We have the availability to control foreign currency risk via increasing or decreasing the local cover price paid in the foreign markets. There is a risk that a substantial increase in local cover price due to a decline in the local currency relative to the dollar could decrease demand for these magazines at retail and negatively impact our results of operations.

Gross domestic distribution of imported titles totaled approximately $68.4 million (of a total $381.1 million or 17.9%). Foreign publications are purchased in both dollars and the local currency of the foreign publisher, primarily Euros and pound sterling. In the instances where we buy in the foreign currency, we generally have the ability to set the domestic cover price, which allows us to control the foreign currency risk. Foreign titles generally have significantly higher cover prices then comparable domestic titles, are considered somewhat of a luxury item, are sold only at select retail locations, and sales do not appear to be highly impacted by cover price increases. However, a significant negative change in the relative strength of the dollar to these foreign currencies could result in higher domestic cover prices and result in lower sales of these titles at retail, which would negatively impact our results of operations.

We do not conduct any significant hedging activities related to foreign currency.

121

IB 00155

# SOURCE INTERLINK PRINCIPAL SHAREHOLDERS

The following table sets forth as of January 14, 2005, after giving effect to the consummation of the merger, certain information concerning the ownership of our common stock by:

- each person who is known to us to own beneficially 5% or more of our outstanding common stock;

- each of our directors, our chief executive officer and our four other most highly paid executive officers in fiscal 2004; and

- all directors and executive officers as a group.

The information presented below is based on information supplied by our officers and directors and Schedules 13D and 13G filed with the SEC as of January 14, 2005. Unless otherwise indicated, the persons named below have sole voting and investment power with respect to all shares shown as beneficially owned by them, except to the extent authority is shared by spouses under applicable community property laws.

Beneficial ownership is determined in accordance with the rules of the SEC and generally includes all shares over which the subject individual has or shares voting or investment power. Shares of common stock subject to options that are currently exercisable within 60 days o the date of this report are treated as outstanding for the purpose of computing the percentage ownership of the subject individual. These shares, however, are not considered outstanding when computing the percentage ownership of any other person.

As of January 14, 2005, there were 23,724,940 shares of our common stock outstanding.

The following table assumes the issuance of 26.7 million shares of our common stock in exchange for all shares of Alliance common stock outstanding, or an exchange ratio of 0.2606 shares of our common stock per share of Alliance common stock.

| Name of Beneficial Owner | Number of Shares Beneficially Owned | Percent of Shares Beneficially Owned Pre-Merger | Percent of Shares Beneficially Owned Post-Merger |
|---|---|---|---|
| Jonathan J. Ledecky | | | |
| 901 15th Street NW, Suite 950 | | | |
| Washington, D.C. 20005 | 1,840,000 | 7.8% | 3.6% |
| S. Leslie Flegel(6) | 1,610,785(1),(2) | 6.5% | 3.2% |
| James R. Gillis(6) | 533,268(1) | 2.2% | 1.0% |
| Jason S. Flegel(6) | 374,660(1),(3) | 1.6% | * |
| Allan R. Lyons(6) | 346,037(1),(4) | 1.5% | * |
| Aron S. Katzman(6) | 329,467(1) | 1.4% | * |
| Randall S. Minix(6) | 125,714(1) | * | * |
| Harry L. Franc, III(6) | 125,005(1) | * | * |
| Kenneth F. Teasdale(6) | 103,948(1) | * | * |
| Marc Fierman(6) | 86,356(1) | * | * |
| John R. Amann(6) | 55,977(1) | * | * |
| A. Clinton Allen(6) | 46,000(1),(5) | * | * |
| Ariel Emanuel(6) | — | * | * |
| All directors and executive officers, as a group (12 persons) | 3,737,217 | 14.4% | 7.1% |

\*    Less than 1%

(1)    Includes shares issuable under options that are currently exercisable within 60 days in the amounts following each respective beneficial owner: S. Leslie Flegel — 1,085,000 shares; James R. Gillis — 424,667 shares; Allan R. Lyons — 20,000 shares; Jason S. Flegel — 300,091 shares; Aron S. Katzman — 70,000 shares; Randall S. Minix — 80,000 shares; Harry L. Franc, III — 80,000 shares; Kenneth F.

IB 00156

Teasdale — 50,000 shares; Marc Fierman — 85,356; John R. Amann — 50,000 shares; and A. Clinton Allen 10,000 shares.

(2)  Mr. Flegel holds 515,085 of these shares with his spouse as joint tenants and thereby shares voting and investment power over those shares with her.

(3)  Of the reported shares, 74,569 shares are held by Mr. Flegel's spouse individually and as a custodian for Mr. Flegel's minor children. Mr. Flegel disclaims beneficial ownership of these securities, and this statement shall not be deemed an admission that he is the beneficial owner of the securities for any purpose.

(4)  Of the reported shares, 112,010 shares are held by Mr. Lyons' spouse. Mr. Lyons disclaims beneficial ownership of these securities, and this statement shall not be deemed an admission that he is the beneficial owner of the securities for any purpose.

(5)  Of the reported shares, 4,000 shares are held by Mr. Allen's spouse. Mr. Allen disclaims beneficial ownership of these securities, and this statement shall not be deemed an admission that he is the beneficial owner of the securities for any purpose.

(6)  The business address of our officers and directors is in care of Source Interlink Companies, Inc., 27500 Riverview Center Boulevard, Suite 400, Bonita Springs, Florida 34134.

123

IB 00157

**ALLIANCE BUSINESS**

### Overview

Alliance provides logistics and supply chain management services for the home entertainment product market. Specifically, Alliance offers just-in-time product distribution and fulfillment, category management, consumer direct fulfillment (CDF) and third-party logistics services. Alliance utilizes advanced technology and industry and marketplace expertise to deliver innovative and value-added solutions to its customers and trading partners. Its well established logistics infrastructure allows it to manage a catalogue of over 400,000 stock keeping units of home entertainment content products, including CDs, DVDs, video games and related products and accessories.

Alliance's customers include specialty and independent retailers, mass merchandisers, supermarkets and e-commerce retailers. In total, Alliance provides services to more than 5,000 accounts with over 30,000 retail store locations including: Barnes & Noble, Inc., Trans World Entertainment Corp., The Musicland Group, Inc., Fry's Electronics, Inc., Circuit City Stores, Inc., BJ's Wholesale Club, Inc., Toys "R" Us, Inc., Sears, Roebuck and Co. and thousands of independent retailers. Alliance's e-commerce customers include: barnesandnoble.com, aol.com, amazon.com, circuitcity.com, bestbuy.com and QVC.com. Alliance maintains on a smaller scale an international customer base, primarily in South America and Europe, such as HMV, and Promotora.

Prior to the spin-off described below, in addition to its core logistics and supply chain management business, Alliance operated another business unit known as the Digital Media Infrastructure Services Group, or the DMISG. The DMISG consists of two separate businesses: one business that develops and markets e-commerce enabling databases for home entertainment products, while the other offers kiosk-based retail merchandising solutions. The DMISG was spun-off to the stockholders of Alliance as of December 31, 2004. The DMISG will not be included in the merger.

### Industry Overview

According to the Recording Industry Association of America, the total U.S. market in 2003 for retail sales of prerecorded music was $11.9 billion. According to the Motion Picture Association, the total U.S. market in 2003 for retail sales of DVDs was estimated at $20.6 billion, growing approximately 49.3% from 2002. Music and video content products are predominantly produced and supplied by the major labels, consisting of four large music companies and their related distribution companies, and the major feature film studios, consisting of six large film studios and their distribution companies.

The major music manufacturers/labels (with their related distribution units) are:

• Vivendi Universal S.A. (Universal Music and Video Distribution)

• Sony BMG Music Entertainment Company (Sony Music Distribution)

• WEA Distribution (Warner Music Group)

• Thorne-EMI (EMD Marketing)

The major film studios (with their related distribution units) are:

• The Walt Disney Company (Buena Vista Home Entertainment)

• Time-Warner Inc. (Warner Home Video)

• Sony Corp. (Columbia Tri-Star Home Video)

• The News Corporation (Twentieth Century Fox Home Entertainment)

• Viacom Inc. (Paramount Home Video)

• General Electric Company (NBC Universal Studios)

IB 00158

http://yahoo.brand.edgar-online.com/EFX dll/EDGARpro.dll?FetchFilingHTML1?SessionID=DbxMIg...    10/24/200:

IB 00159

Music and videos not produced by the major manufacturers are supplied by thousands of independent labels and studios. Many "independents" have distribution relationships with a major manufacturer, a single purpose distribution company, or a diverse solutions provider like Alliance.

This allows the independents to get their product to market without entering into thousands of individual relationships with retailers.

Retailers of home entertainment products are comprised of a diverse and evolving number of brick-and-mortar and e-commerce merchants. The home entertainment media retail channel is comprised of:

• Specialty Retailers (e.g. Barnes & Noble, Inc., Trans World Entertainment Corp., The Musicland Group, Inc., Hastings Entertainment, Inc., Fry's Electronics, Inc., Circuit City Stores, Inc., Toys "R" Us, Inc. and BrandsMart USA)

• Independent Retailers (defined as businesses operating up to 20 store locations)

• Mass Merchandisers (e.g. Kmart Corporation, Sears, Roebuck and Co., and Fred Meyer/The Kroger Company)

• Supermarkets (e.g. The Kroger Company, Ahold USA, Inc., and Ukrop's Supermarkets, Inc.)

• E-commerce retailers (e.g. amazon.com, barnesandnoble.com, circuitcity.com, and bestbuy.com)

An industry of intermediaries exists between the labels and studios, on the one hand, and the retail market, on the other. These intermediaries include traditional distributors, category management companies, diverse solutions providers and others. To better compete for sales to retailers, most of these intermediary companies assume partial roles in the distribution process, which includes order processing, credit and inventory management, collections, returns logistics, advertising and marketing support, information and database services, fulfillment and in-store merchandising services. They also assume a substantial portion of the risk inherent in the music and video sales business because they maintain large inventories. These functions would otherwise be the responsibility of the labels or studios.

Most independent retailers depend on intermediaries to provide the majority of their inventory. Yet, many large national and regional chains, and some of the largest independent retailers, bypass intermediaries and go directly to the major labels and studios for the majority of their product. They then turn to other distributors for the remainder of their lower volume/higher margin inventory.

Internet retailers are an important part of the home entertainment media retail channel. Because several of the largest music and video online retailers lack product distribution infrastructure, they need to outsource technology, information management, supply chain management and customer care capabilities. Generally, these e-commerce retailers rely on third parties to enable their product information, ordering systems, and distribution processes.

**Seasonality And Working Capital**

Sales of home entertainment products are traditionally highest during the fourth calendar quarter (the holiday season), while returns are highest during the first calendar quarter. Consequently, working capital needs for the home entertainment products marketplace are typically highest in the fourth quarter due to increases in inventories purchased for the holiday selling season and extension of credit terms to certain customers. Historically, industry participants have financed their working capital needs through cash generated from operations and bank borrowings.

**Industry Trends**

Alliance believes suppliers and retailers of home entertainment products will place an increased premium on intermediaries that can provide an array of commerce solutions, such as large and diverse inventories, technology and information management services, compressed delivery schedules, and a variety of value-added services. Alliance believes that the focus on intermediaries, and the solutions they provide, will continue

125

IB 00160

to grow in the face of increasing competitive pressures on retailers and as the entertainment media consumer continues to evolve and become more sophisticated.

This evolving supply chain dynamic will place even more reliance on the intermediaries' merchandising, technology, information management, supply chain management and customer care services core competencies. There has been significant consolidation among intermediaries over the last several years, as many have failed by not offering value added solutions to meet the demands of suppliers and retailers of physical entertainment media.

## Alliance's Services

Alliance provides logistics and supply chain management services for the home entertainment product market. Alliance offers a complete suite of solutions to its customers by leveraging its core competencies, which include merchandising and category management, information technology, logistics, supply chain management and customer care services. Alliance has devoted substantial time and resources to stocking a comprehensive product offering for its retail customers. Alliance manages a large, diversified catalogue of over 400,000 music, video and video game stock keeping units and other related home entertainment products. Although Alliance acquires the majority of the titles it offers to retailers on a non-exclusive basis from the major labels and studios, Alliance does maintain some exclusive trading relationships with certain independent music labels. These relationships allow Alliance to bring the products of independent music labels to the consumer market.

Alliance's solutions include the following:

*Distribution and Fulfillment Services.* Alliance's distribution and fulfillment services form the foundation of its value added solutions and are utilized by virtually every customer. Critical to its distribution and fulfillment services are Alliance's deep catalogue and strong trading relationships. These services also include next day order delivery, ready-for-shelf inventory preparation such as price labeling and security device placement and a variety of EDI related tools. Alliance receives orders via EDI, the Internet and a variety of other mediums.

*Category Management Services.* Category management, also referred to as Vendor Managed Inventory (VMI), is a complete point-of-sale solution. In recent years, Alliance has created relationships with retailers who have not traditionally offered home entertainment products such as mass merchandisers, supermarkets and certain specialty retailers. Alliance's category management solution includes establishing the department within the stores, fixturing, merchandising, pricing and promotion, marketing assistance, product preparation, logistics and in-store services, thereby allowing these retailers to fully outsource the management of the entire home entertainment department.

*Consumer Direct Fulfillment.* Alliance also supports brick-and-mortar retailers in their e-commerce initiatives, as well as "pure play" e-commerce retailers. Alliance's e-commerce customers, such as barnesandnoble.com, amazon.com, and bestbuy.com, utilize Alliance's technology information, supply chain management and customer care expertise. Alliance either distributes the products directly to the consumer, under the retailer's identity, or to a designated distribution center operated by the retailer.

Alliance also provides e-commerce retailers, such as circuitcity.com, The Musicland Group, Inc. and sonystyle.com, various "turnkey" offerings (TheStore24). These services range from website hosting to back-end transaction management. Alliance offers individualized service which allow it to assume nearly all facets of its e-commerce clients' infrastructure needs. This allows the retailer to focus on generating sales and promoting its brand while reducing backend and technology related expenses. These services include:

• Product fulfillment entailing product handling, logistics and technology capabilities enabling direct consumer product delivery;

• Comprehensive turnkey E-commerce platform, which includes state of the art search and navigation, real-time inventory querying and commitment capabilities, credit card processing and settlement services;

126

IB 00161

• Consigned inventory management capabilities;

• Custom packaging, promotional inserts including coupons and a large variety of shipping options; and

• Customer care services interacting directly with the customer on behalf of the retailer.

*Third Party Logistics Services.* Alliance has begun to use its distribution and logistics expertise and existing infrastructure to distribute non home entertainment products for select customers on a fee for services basis. For certain customers, in a more complex execution, Alliance provides warehouse management and fulfillment services from the customer's warehouse. Alliance currently provides this service for The Beanstalk Group, a licensing and merchandising company, which distributes products on behalf of Ford Motor Company catalog brands, GE and many others. In 2004, Alliance set up a new distribution facility, complete with warehouse management system and related infrastructure for Christian Casey, LLC, an apparel manufacturer.

## Alliance's Strategy

Alliance's strategy is to become the leading logistics and supply chain management provider of infrastructure services to the home entertainment products marketplace. To accomplish this, Alliance is focused on the following initiatives:

*Increase Market Share.* Alliance intends to continue to increase its market share by entering new markets, acquiring new customers, and further penetrating existing customers. Alliance plans to accomplish these goals by providing more value-added services, such as VMI services and additional cost-effective distribution and fulfillment services tailored to each customers' specific needs. In the past, Alliance has actively initiated contact with retailers that have not previously offered music and video, such as bookstores, toy stores, drug stores and grocery stores, to generate more sales opportunities of home entertainment products. Alliance will continue to make these contacts to secure alternative retail channels for music and video offerings. Further, Alliance intends to market its distribution logistics services to emerging distribution channels, including consumer goods and services companies, consumer electronics manufacturers and media companies.

Additionally, Alliance continues to increase its home video and games inventory to support the marketplace demand for DVDs and video games. This product diversity allows Alliance and its customers to satisfy consumer demand and minimize inventory risk. In recent years, DVD sales have grown significantly and are expected to grow in the foreseeable future as the DVD format becomes a more mainstream consumer product.

*Enhance Logistics and Supply Chain Management.* Alliance has made a significant investment in the development of a sophisticated and scalable logistics infrastructure. This infrastructure investment allows Alliance to distribute products throughout the United States. Alliance has approximately 450,000 square feet of warehousing and distribution space, at four separate locations in three states. Alliance's primary distribution center (approximately 185,000 square feet) is located in Florida. In addition, Alliance manages two other warehouses on behalf of its third party logistics customers totaling 160,000 square feet.

As its business grows, Alliance continues to invest in warehouse automation that includes high-speed sortation and labeling equipment. Additionally, Alliance has invested in specialized boxing and in-line invoice printing and inserting equipment for consumer direct fulfillment as well as equipment for receiving and returns processing.

*Expand Vendor Managed Inventory Services.* Alliance began offering VMI services in 2001. Historically, these services, which involve complete category management including inventory management, selection and stocking for a retailer, have been targeted to mass merchandisers. Alliance has not only targeted mass merchandisers, but also focused on specialty retailers such as BrandsMart USA and supermarkets such as Giant Foods, Inc. and Ukrop's Supermarkets, Inc. VMI services allow retailers to outsource all or a substantial portion of the inventory management responsibility for their in-store music and video products. As more retailers become aware of VMI cost savings and operating efficiencies, Alliance believes that its VMI services will continue to be a significant growth area for its business.

127

IB 00162

*Increase Retail Technology Offerings*. Alliance will continue to provide brick-and-mortar retailers with innovative services designed to increase in-store sales, such as the Alliance Music Index through AMIgo and WebAMI, a comprehensive database detailing artist, title, label and other product information, allowing retailers to check inventory and execute purchases directly to Alliance's warehouse over the Internet. Alliance will also continue to offer in-store interactive kiosk technology to educate and entertain consumers through its continuing relationship with Spinco.

*Grow Consumer Direct Fulfillment Services*. To expand its CDF business, Alliance developed a "turnkey," e-commerce application, called TheStore24. TheStore24 is an advanced infrastructure designed specifically to develop and deliver tailored "end-to-end" solutions to support e-commerce objectives of both traditional and non-traditional entertainment retailers. Merchants place their logo, colors and pallet and other retailer specific information on an Internet site, customized and maintained on their behalf by Alliance. Alliance provides the fulfillment, billing and other transaction processing services associated with consumer orders. Alliance intends to continue to develop its services in this area to capture new business as retailers increasingly outsource all aspects of their online businesses. Alliance will also continue to acquire new CDF customers independent of its TheStore24 offering.

## Sales And Marketing

Alliance's sales and marketing staff, which consists of approximately 425 people, is focused on maintaining customer relationships with music and video retailers. Alliance's sales organization consists of industry veterans with vast knowledge of both entertainment media and retail operations. Alliance tailors its sales organization to different retail sectors, including national chains, independent stores, and e-commerce. Additionally, Alliance has a dedicated sales staff and merchandising staff to manage the growth of Alliance's VMI business. These field personnel conduct training in the VMI systems and procedures, and are familiar with the local markets in which they work so as to maximize effective product placement and promotion.

The sales group works closely with Alliance's marketing organization to increase market awareness and generate demand for Alliance's products and services. The marketing group understands the dynamics involved with selling music and video products, with label and studio support, and the distribution channels through which such products move. Alliance's marketing activities include soliciting and securing advertising dollars from the major labels and studios, publication of am2ped magazine and the creation of specialty products.

## Technology, Information and Supply Chain Management Infrastructure

Alliance has developed sophisticated warehouse management systems and related technology to increase productivity while driving down costs. These systems enable Alliance to operate its distribution centers 24 hours a day, 7 days a week.

Alliance's primary operating systems are built on an open architecture platform and provide the high level of scalability and performance required to manage Alliance's large and complex business operations. This infrastructure is supported by hardware, software and database applications, including Hewlett Packard Unix servers, high-end EMC storage solutions and Oracle and IBM Unidata databases.

PrimeMover, Alliance's enterprise resource planning system, is a proprietary, real-time information system and operating environment, used across substantially all of its operations. Alliance has designed PrimeMover as a scalable system that can support increased transaction volume. Presently, PrimeMover supports over 500 connections (terminals, printers, PCs), with an internal response time of less than one second. PrimeMover supports operational functions that include client account management, inventory management, order management and accounting.

Alliance's warehouse management system, or WMS, seamlessly integrates with PrimeMover and supports over 400 users maintaining over 350,000 inventory storage locations throughout three warehouses. WMS provides a real-time interface to 300 radio-frequency terminals, a 11,800 position pick-to-light system and fully-integrated zero accumulation conveyors to facilitate a paperless order process. Additionally, six high-

128

IB 00163

speed sorters are deployed for order processing, labeling, receiving and returns processing, all of which are connected to Alliance's WMS. WMS makes extensive use of bar coding and scanning technologies for virtually every function performed in Alliance's distribution centers. Moreover, all WMS manifesting and shipping functionality include links to United Parcel Service, Federal Express, DHL and the United States Postal Service for freight processing and shipment tracking.

Alliance's VMI suite is a proprietary, real-time, integrated retail inventory management system comprised of point-of-sales processing, sales analysis, inventory management and replenishment, stock keeping unit level trending, product ordering, and promotional pricing modules used to manage over 2,900 retail locations. Field personnel in retail locations utilize Alliance's mobile computers with integrated laser readers running its proprietary xperTrak software for order receiving, inventory cycle counting, returns processing and data communications to the core system. The VMI suite is fully integrated with Prime Mover and WMS environments forming a solid, accurate and reliable platform for managing Alliance's clients' disparate requirements.

Alliance has made strategic investments in material handling automation. Such investments include computer-controlled order selection systems that provide labor efficiencies and increase productivity and handling efficiencies. Alliance has acquired four high-speed order sortation and labeling machines. These machines increase Alliance's batch picking capabilities for up to 100 orders at a time, automatically sort the batches and provide the ability to print and apply custom labels for its retail customers. These sortation machines reduce labor costs and create value for Alliance's retail trading partners, including "shelf-ready" deliveries and high order accuracy rate. Alliance has two additional sorters used for receiving and customer returns processing, respectively.

Alliance also invested in specialized equipment for its rapidly growing e-commerce accounts. Alliance installed specialized boxing and in-line invoice printing and insertion equipment capable of processing over 3,000 consumer orders per hour and automated shipping and manifesting equipment that produce a high-quality product at a lower cost. Both of these investments have increased CDF through-put and lowered labor costs. Recently, Alliance installed an automated storage and retrieval system to automatically handle and manage as many as 16,000 vendor return cartons in its national returns processing center in Shepherdsville, Kentucky.

Alliance's proprietary e-commerce platform, or TheStore24, is built on Microsoft.net and SQL 2000 and is a robust, highly scalable solution that is well integrated with PrimeMover. TheStore24 deploys a modular software architecture enabling the integration of features, functionality and tools to enhance Alliance's e-commerce services. TheStore24 features dynamic high-speed search, navigational tools, a comprehensive product database and a virtual shopping cart. All of Alliance's e-commerce offerings utilize Alliance's proprietary, real-time inventory availability technology.

For brick-and-mortar retailers and as part of its e-commerce platform, Alliance has developed WebAMI and AMIGO, an Internet-based ordering tool that allows active clients to search its inventory availability files and place orders any time, day or night.

All of Alliance's systems are supported by an innovative data warehouse platform. This platform allows Alliance to accumulate all of the market, customer and sales information of its business. Alliance employs sophisticated data mining tools to manage and report on virtually every aspect of its business. Additionally, certain trading partners can access this data warehouse platform through a secure Internet protocol in order to obtain and review information about their business dealings with Alliance. In certain cases, customers have demanded the availability of such data.

Alliance also deploys a variety of additional hardware and software to manage its business, including a complete suite of electronic data interchange tools that enable it to take client orders, transmit advanced shipping notifications, and place orders with its manufacturing trading partners. Alliance also uses an automated e-mail response system and automated call distribution system to manage its call center and conduct customer care services.

129

IB 00164

Alliance employs various security measures and backup systems designed to protect against unauthorized use or failure of its information systems. Access to Alliance's information systems is controlled through firewalls and passwords, and Alliance utilizes additional security measures to safeguard sensitive information. In 2004, Alliance built a disaster recovery data center in its Shepherdsville, Kentucky distribution facility to ensure uninterrupted operations in case of such an event. This facility houses duplicate servers and databases, which are updated continuously, for all mission-critical systems as well as full Internet connectivity. Additionally, Alliance has backup power sources for blackouts and other emergency situations. Although Alliance has never experienced any material failures or downtime with respect to any systems operations, any systems failure or material downtime could prevent it from taking orders and/or shipping product.

Alliance believes that in order to remain competitive, it will be necessary to continuously invest and upgrade all of its information systems.

## Customers

Alliance provides products and services, in some capacity, to a large number of the brick and mortar and e-commerce retailers of home entertainment products. Alliance's customers can generally be categorized as follows:

*Specialty Retailers:* National and regional brick-and-mortar retailers who specialize in a particular category of products. This retail category includes music stores, bookstores, consumer electronics stores and toy stores. Aside from the specialty music retailers, Alliance believes that this category of retailers lacks experience in the sales and marketing of home entertainment products, thus they rely heavily on Alliance's industry expertise and relationships to merchandise the products. Some of Alliance's customers in this area include:

Barnes & Noble, Inc.  
Hastings Entertainment, Inc.  
The Musicland Group, Inc.  
Toys "R" Us, Inc.  
BrandsMart USA  

Circuit City Stores, Inc.  
Virgin Entertainment Group, Inc.  
Trans World Entertainment Group  
Fry's Electronics, Inc.  
Borders Group, Inc.  

*Independent Retailers:* Retailers whose product mix is comprised predominantly of music, movie and video games and operate less than 20 stores.

*Mass Merchandisers:* National and regional retailers offering a wide array of products and product categories. Some of Alliance's representative customers in this area include:

BJ's Wholesale Club, Inc.  
Meijer Stores L.P.  
Fred Meyer/The Kroger Company  

Sears, Roebuck and Co.  
Kmart Corporation  

*Supermarkets:* Alliance has made important inroads into this category of retailers. Current customers include:

The Kroger Company  
HEB  

Ukrop's Super Markets, Inc.  
Ahold USA, Inc.  

130

IB 00165

*E-commerce retailers:* Brick-and-mortar and "pure play" e-commerce retailers and other constituencies whose on-line activities may involve the sale of physical entertainment media. These customers include:

amazon.com
circuitcity.com
barnesandnoble.com
bestbuy.com
blockbuster.com
sonystyle.com

Musicland Group Brands
FYE.com (Trans World)
aol.com
QVC.com
towerrecords.com

Retailer clients who elect multiple solutions and service offerings enter into contractual relationships with Alliance that define the scope of these services. These clients include Barnes & Noble, Inc., Toys "R" Us, Inc., Meijer and many e-commerce retailers.

Alliance's largest customer is Barnes & Noble, Inc. Barnes & Noble's brick-and-mortar locations, as well as its e-commerce arm, barnesandnoble.com, accounted for approximately 34% of Alliance's net sales in the fiscal year ended December 31, 2003. Alliance has been providing music and video products since 1993 to Barnes & Noble and since 1998 to barnesandnoble.com. Alliance and Barnes & Noble currently have a contractual agreement extending the relationship of the parties through mid-2006. Despite the fact that Barnes & Noble is Alliance's largest customer, Alliance is committed to fostering its trading relationships with all key industry constituencies.

Alliance also maintains trading relationships with customers outside the United States, which has accounted for approximately 12% of Alliance's annual net sales historically.

## Competition

Competitive factors in the home entertainment industry include service, product availability, quality, technological capability and price. Although Alliance is a diversified company, offering a variety of solutions to its customers, it faces competition from several national, and numerous regional, wholesaler and category management companies as well as third party logistics providers. As it relates to Alliance's fulfillment and category management services, its competitors include Handleman Company, Anderson Merchandisers L.P., Ingram Entertainment, Inc., Baker & Taylor, Inc. and others.

Alliance also faces competition from its suppliers. The major and independent labels sell substantial amounts of their products directly to retailers. To date, these parties appear not to have focused as much on fulfilling the needs of smaller independent stores or providing value-added services such as VMI or E-commerce. From time to time, retail chain customers have chosen to purchase a percentage of their products directly from the majors or the independent labels and studios, rather than to continue to purchase from Alliance or other intermediaries. The film studios on the other hand continue to aggressively offer vendor managed inventory services for their products to many major retail customers.

## Additional Background Information

In addition to its core distribution and fulfillment business, Alliance had two other strategic business units referred to collectively as the DMISG. One business unit develops and markets e-commerce enabling databases for home entertainment products, while the other offers kiosk-based retail merchandising solutions. On December 31, 2004, Alliance disposed of all of the operations of the DMISG via a spin-off to Alliance's existing shareholders.

Since the spin-off, the DMISG is no longer included within Alliance nor are its respective business lines going to be part of the combined organization after consummation of the merger with us. Alliance's existing shareholders will control these businesses and, subject to limited restrictions contained in the merger agreement, will be free to operate or pursue further strategic transactions with them independently of the operations of the combined organization. See "Agreements Related to the Merger and Other Transactions."

IB 00166

**Employees**

As of October 31, 2004, Alliance had 1,414 employees, consisting of 697 employees who constitute its warehousing and distribution personnel and 717 who perform all other functions for Alliance. 153 of these employees are associated with the DMISG. In addition, Alliance regularly uses the services of temporary and contract personnel. Alliance believes that it maintains a good working relationship with its employees, none of whom are covered by any collective bargaining arrangements.

**Facilities**

Alliance operates the following facilities:

| Location | Purpose | Square Footage | Owned or Rented |
|---|---|---|---|
| Coral Springs, FL | Distribution Corporate Offices | 250,000 | Owned |
| Coral Springs, FL | Distribution Annex | 46,000 | Rented |
| Shepherdsville, KY | Distribution Center | 169,000 | Rented |
| Dayton, NJ | Distribution | 42,000 | Rented |

Alliance's principal operations are conducted from its corporate headquarters and principal distribution facility in Coral Springs, Florida. This facility is 250,000 square feet of which 185,000 square feet are dedicated to distribution and the remainder houses Alliance's corporate headquarters. Alliance owns this facility and substantially all of its contents and improvements.

Alliance rents the Dayton, New Jersey facility from Barnes & Noble, Inc., its largest customer.

Alliance also maintains several smaller sales offices in California, Connecticut, New York and Virginia.

**Legal Proceedings**

Alliance is party to routine legal proceedings arising out of its normal course of business. Although it is not possible to predict with certainty the outcome of these unresolved actions or the range of possible loss, Alliance believes that none of these actions, individually or in the aggregate, will have a material adverse effect on Alliance's financial condition or results of operations.

132

IB 00167

**ALLIANCE MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

### Overview

Alliance management's discussion and analysis includes the operation of its two business segments: the Distribution and Fulfillment Services Group (which Alliance refers to as its Fulfillment Group) and the Digital Media Infrastructure Services Group (which Alliance refers to as its Digital Media Group).

- The Fulfillment Group provides supply chain management, logistical and other value added services to retailers in the home entertainment products market place that collectively operate more than 30,000 retail store locations. Although just-in-time product distribution and fulfillment of DVDs, CDs, video games and other home entertainment content products remain its core business, the Fulfillment Group provides VMI retailers with an array of services, including inventory selection, marketing, promotion, merchandising, and inventory management. The Fulfillment Group also offers specialized services designed to meet the unique requirements of e-commerce retailers, such as barnesandnoble.com, amazon.com and aol.com, including direct consumer product delivery, credit card processing and settlement, customized packaging and shipping, and customer care services.

- The Digital Media Group licenses, distributes and provides for its customers multi-media merchandising stations that give consumers immediate in-store access to product information and data. The Digital Media Group's information databases for music, movies and video games offer e-commerce retailers, Internet content providers and technology companies descriptive and relational home entertainment metadata in a variety of delivery formats and options, tailored to each individual customers' needs. On December 31, 2004 the business of the Digital Media Group was distributed to the stockholders of Alliance and will not become part of the combined company.

### Revenues

The Fulfillment Group derives revenues from:

- selling, distributing and shipping DVDs, CDs, video games and other home entertainment content products to retailers throughout the United States;

- serving as an outsourced fulfillment agent and backroom operator for e-commerce retailers; and

- serving as a category manager for mass merchants, specialty retailers and supermarkets which include merchandising home entertainmen products.

The Digital Media Group derives revenues from:

- sales, service and maintenance of merchandising "Kiosk" display stations; and

- multi-media merchandising stations, database and streaming media licensing fees.

### Cost of Goods Sold

The Fulfillment Group's cost of goods sold consists of:

- the cost of home entertainment content products purchased for resale, less all applicable discounts, allowances and rebates; and

- outbound shipping costs associated with the transportation of merchandise to the customer by third-party freight carriers, primarily United Parcel Service.

133

IB 00168

The Digital Media Group's cost of goods sold consists of:

- production parts and costs associated with Kiosk manufacturing and service maintenance; and

- depreciation of capitalized payroll and outside contractor fees which are incurred to develop and maintain the multi-media merchandising stations database and music, movie, video and streaming media entertainment databases.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses for both the Fulfillment Group and the Digital Media Group include:

- non-production labor;

- shipping supplies;

- rent and office overhead;

- insurance;

- bad debt;

- professional fees; and

- technology costs.

**Results of Operations**

The following table set forth, for the periods presented, information relating to Alliance's operations (in thousands):

| | Year Ended December 31, | | | | | | Nine Months Ended September 30, | | | |
| | 2001 | | 2002 | | 2003 | | 2003 | | 2004 | |
| | $ | Margin % | $ | Margin % | $ | Margin % | $ | Margin % | $ | Margin % |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | (Unaudited) | | | |
| **Fulfillment** | | | | | | | | | | |
| Net Sales | $588,604 | | $793,486 | | $857,534 | | $542,432 | | $633,263 | |
| Cost of goods sold | 512,264 | | 693,886 | | 752,253 | | 472,446 | | 544,993 | |
| Gross profit | 76,340 | 13.0% | 99,600 | 12.6% | 105,281 | 12.3% | 69,986 | 12.9% | 88,270 | 13.9% |
| Operating expenses(1) | 63,946 | | 87,163 | | 91,489 | | 63,676 | | 75,698 | |
| Operating income (loss) | 12,394 | 2.1% | 12,437 | 1.6% | 13,792 | 1.6% | 6,310 | 1.2% | 12,572 | 2.0% |
| **Digital Media** | | | | | | | | | | |
| Net Sales | $ 10,575 | | $ 14,287 | | $ 12,356 | | $ 9,144 | | $ 13,079 | |
| Cost of goods sold | 6,241 | | 9,902 | | 7,255 | | 5,399 | | 7,311 | |
| Gross profit | 4,334 | 41.0% | 4,385 | 30.7% | 5,101 | 41.3% | 3,745 | 40.9% | 5,768 | 44.1% |
| Operating expenses(1) | 27,316 | | 12,119 | | 14,151 | | 10,535 | | 8,725 | |
| Operating income (loss) | (22,982) | (217.3)% | (7,734) | (54.1)% | (9,050) | (73.2)% | (6,790) | (74.3)% | (2,957) | (22.6)% |
| **Parent** | | | | | | | | | | |
| Net Sales | — | | — | | — | | — | | — | |
| Cost of goods sold | — | | — | | — | | — | | — | |
| Gross profit | — | 0.00% | — | 0.00% | — | 0.00% | — | 0.00% | — | 0.00% |
| Operating expenses(1) | 2,622 | | — | | — | | — | | — | |
| Operating income (loss) | (2,622) | 0.00% | — | 0.00% | — | 0.00% | — | 0.00% | — | 0.00% |

134

IB 00169

IB 00170

| | Year Ended December 31, | | | | | | Nine Months Ended September 30, | | | |
| | 2001 | | 2002 | | 2003 | | 2003 | | 2004 | |
| | $ | Margin % | $ | Margin % | $ | Margin % | $ | Margin % | $ | Margin % |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | (Unaudited) | | | |
| Total | | | | | | | | | | |
| Net Sales | $599,179 | | $807,773 | | $869,890 | | $551,576 | | $646,342 | |
| Cost of goods sold | 518,505 | | 703,788 | | 759,508 | | 477,845 | | 552,304 | |
| Gross profit | 80,674 | 13.5% | 103,985 | 12.9% | 110,382 | 12.7% | 73,731 | 13.4% | 94,038 | 14.5% |
| Operating expenses(1) | 93,884 | | 99,282 | | 105,640 | | 74,211 | | 84,423 | |
| Operating income (loss) | $(13,210) | (2.2)% | $ 4,703 | 0.6% | $ 4,742 | 0.5% | $ (480) | (0.1)% | $ 9,615 | 1.5% |

(1)  Operating expenses include selling, general and administrative expenses, severance expenses, asset impairment charges, amortization of intellectual property and acquisition costs.

*Results for the Nine Month Period ended September 30, 2004 Compared to the Nine Month Period ended September 30, 2003*

*Net Sales*

Net sales for the nine-month period ended September 30, 2004 increased $94.8 million, or 17.2%, from the prior year period primarily as a result of increased net sales recorded by the Fulfillment Group.

The Fulfillment Group's net sales were $633.3 million for the nine-month period ended September 30, 2004, an increase of $90.8 million, or 16.7%, as compared to the nine-month period ended September 30, 2003. This increase resulted principally from the growing popularity of the DVD video format and the related increase in sales by the retailers with whom Alliance maintains trading relationships. Export sales for the nine-month period ended September 30, 2004 increased $11.4 million, or 15.5%, from the corresponding period of the prior year, resulting from the addition of new international accounts and increased sales to established international customers.

The Digital Media Group recorded net sales of $13.1 million for the nine-month period ended September 30, 2004, an increase of $3.9 million, or 43.0%, as compared to the nine-month period ended September 30, 2003. Kiosk and related licensing and maintenance revenues for the nine-month period ended September 30, 2004 were $8.5 million, an increase of $3.6 million, or 73.3%, over the nine-month period ended September 30, 2003. Licensing and related revenues generated from the entertainment database for the nine-month period ended September 30, 2004 were $4.6 million, an increase of $0.3 million, or 8.0%, over the nine-month period ended September 30, 2003.

*Gross Profit*

Gross profit for the nine-month period ended September 30, 2004 increased 27.5%, to $94.0 million from $73.7 million for the nine-month period ended September 30, 2003. This increase was primarily the result of a favorable CD and DVD sales mix of catalog product which increased gross margins from 13.4% in the nine-month period ended September 30, 2003 to 14.5% in the nine-month period ended September 30, 2004.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses for the nine-month period ended September 30, 2004 increased $10.2 million, or 13.8%, to $84.4 million from $74.2 million in the nine-month period ended September 30, 2003, but declined as a percentage of net sales from 13.5% in the nine-month period ended September 30, 2003 to 13.1% in the nine-month period ended September 30, 2004. Increased sales and marketing expenses and increased fulfillment expenses associated with delivering higher sales volumes accounted for the increase in absolute dollars.

IB 00171

*Operating Income (Loss)*

Operating income for the nine-month period ended September 30, 2004 increased $10.1 million to $9.6 million from an operating loss of $0.5 million for the nine-month period ended September 30, 2003, while operating margins increased to 1.5% from (0.1)% for the nine-month periods ended September 30, 2004 and 2003, respectively. This improvement in operating margins was a result of the increase in the gross profit and the decrease in selling, general and administrative expenses as a percentage of net sales.

*Interest Expense, Net*

Net interest expense for the nine-month period ended September 30, 2004 was $1.2 million, a 35.8% decrease from the same period of 2003. The improvement over the prior year was primarily due to improved cash flow and lower average borrowings under the Alliance revolving credit facility.

*Income Taxes*

The effective tax rate was 40.4% for the nine-month period ended September 30, 2004 as compared to 0% for the nine-month period ended September 30, 2003. Alliance accounts for income taxes in accordance with the provision of SFAS 109, "Accounting for Income Taxes," which requires that deferred income taxes be determined based on the estimated future tax effects of differences between the financial statement and tax bases of assets and liabilities given the provisions of the enacted tax laws. In assessing the realizability of the deferred tax assets, Alliance considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which the temporary differences become deductible. Management considers the scheduled reversal of deferred tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. The provision for income taxes for the nine months ended September 30, 2004 includes current tax expense of $0.1 million and deferred tax expense of $3.3 million.

***Results for the Fiscal Year Ended December 31, 2003 Compared to the Fiscal Year Ended December 31, 2002***

*Net Sales*

Net sales for the fiscal year ended December 31, 2003 increased $62.1 million, or 7.7%, from the prior year primarily as a result of increased net sales recorded by the Fulfillment Group.

The Fulfillment Group's net sales were $857.5 million for the fiscal year ended December 31, 2003, an increase of $64.0 million, or 8.1%, as compared to the fiscal year ended December 31, 2002. This increase resulted principally from the growing popularity of the DVD video format, a related increase in sales by the retailers with whom Alliance maintains trading relationships and the establishment of trading relationships with new vendor managed inventory retailers. Export sales for fiscal 2003 increased $22.4 million, or 26.4%, from the prior year, resulting from the addition of new international accounts and increased sales to established international customers.

The Digital Media Group recorded net sales of $12.4 million for the fiscal year ended December 31, 2003, a decrease of $1.9 million, or 13.5%, from the fiscal year ended December 31, 2002. Kiosk and related licensing and maintenance revenues for fiscal 2003 were $6.2 million a decrease of $2.2 million, or 26.1%, from fiscal 2002. Licensing and related revenues generated from the entertainment database for fiscal 2003 were $6.2 million, an increase of $0.3 million from fiscal 2002.

*Gross Profit*

Gross profit for the fiscal year ended December 31, 2003 increased 6.2%, to $110.4 million from $104.0 million for the fiscal year ended December 31, 2002. Alliance's gross profit margin decreased slightly from 12.9% in the fiscal year ended December 31, 2002 to 12.7% in the fiscal year ended December 31, 2003. The decrease in gross profit margin resulted from a higher representation in the product mix by DVDs, which typically have a lower profit margin than other home entertainment content products. Included in gross profit

136

IB 00172

for the fiscal year ended December 31, 2003 were losses of $6.6 million related to the write down of inventory associated with product lines phased out during the year.

### Selling, General and Administrative Expenses

Selling, general and administrative expenses for the fiscal year ended December 31, 2003 increased $5.3 million, or 5.3%, to $104.5 million from $99.3 million in the fiscal year ended December 31, 2002, but declined as a percentage of net sales from 12.3% in the fiscal year ended December 31, 2002 to 12.0% in the fiscal year ended December 31, 2003. Increased sales and marketing expenses and increased fulfillment expenses associated with delivering higher sales volumes accounted for the increase.

### Severance Expenses

During the fiscal year ended December 31, 2003, Alliance streamlined the operations of the Fulfillment Group and the Digital Media Group resulting in the elimination of several positions. In connection with the elimination of these positions, Alliance incurred severance expenses of $1.1 million.

### Operating Income

Operating income for the fiscal year ended December 31, 2003 increased nominally from the fiscal year ended December 31, 2002, while operating margins decreased slightly for the fiscal year ended December 31, 2003.

### Interest Expense, Net

Net interest expense for the fiscal year ended December 31, 2003 was $2.5 million, a 31.5% decrease from the $3.6 million recorded in the fiscal year ended December 31, 2002. The improvement over the prior year was primarily due to improved cash flow and lower average borrowings under the Alliance revolving credit facility.

### Other Income

At December 31, 2002, Alliance recorded a gain on the sale of various equipment.

### Income Taxes

The effective tax rate was 45.1% for the fiscal year ended December 31, 2003 as compared to 46.4% for the fiscal year ended December 31, 2002.

Alliance recognizes deferred tax assets and liabilities based on the difference between the financial reporting and tax basis of assets and liabilities using the enacted tax rates. Alliance provides a valuation allowance for deferred tax assets for which it does not consider realization of such assets to be more likely than not. The provision for income taxes for the year ended December 31, 2003 includes current tax expense of $0.1 million and deferred tax expense of $0.9 million. The provision for income taxes for the year ended December 31, 2002 includes deferred tax expense of $0.7 million. In accordance with the American Institute of Certified Public Accountants Statements of Position ("SOP") 90-7, the deferred amounts have been credited against the reorganization value. At December 31, 2003 and 2002, Alliance had deferred tax assets of approximately $67.9 million and $67.2 million, respectively, deferred tax liabilities of $11.2 million and $8.8 million, respectively, and a valuation allowance of $56.7 million and $58.4 million, respectively.

### Results for the Fiscal Year Ended December 31, 2002 Compared to the Fiscal Year Ended December 31, 2001

### Net Sales

Net sales for the fiscal year ended December 31, 2002 increased $208.6 million, or 34.8%, from the prior year primarily as a result of increased net sales recorded by the Fulfillment Group.

137

IB 00173

The Fulfillment Group's net sales were $793.5 million for the fiscal year ended December 31, 2002, an increase of $204.9 million, or 34.8%, as compared to the fiscal year ended December 31, 2001. This increase resulted principally from the development and commercialization of Alliance's vendor managed inventory program and increased sales by e-commerce retailers serviced by Alliance as a result of increased market acceptance of the Internet as a legitimate shopping venue.

The Digital Media Group recorded net sales of $14.3 million for the fiscal year ended December 31, 2002, an increase of $3.7 million, or 35.1%, from the fiscal year ended December 31, 2001. Kiosk and related licensing and maintenance revenue for fiscal 2002 were $8.4 million, an increase of $5.6 million, or 200.0%, from fiscal 2001. Licensing and related revenues generated from the entertainment database for fiscal 2002 were $5.9 million, a decrease of $1.9 million, or 24.0% from fiscal 2001.

### Gross Profit

Gross profit for the fiscal year ended December 31, 2002 increased 28.9%, to $104.0 million from $80.7 million for the fiscal year ended December 31, 2001. Alliance's gross profit margin decreased slightly from 13.5% in the fiscal year ended December 31, 2001 to 12.9% in the fiscal year ended December 31, 2002. The decrease in gross profit margin resulted from a higher representation in the product mix by DVDs, which typically have a lower profit margin than other home entertainment content products.

### Selling, General and Administrative Expenses

Selling, general and administrative expenses for the fiscal year ended December 31, 2002 increased $11.7 million, or 13.4%, to $99.3 million from $87.5 million in the fiscal year ended December 31, 2001, but declined as a percentage of net sales from 14.6% in the fisca year ended December 31, 2001 to 12.3% in the fiscal year ended December 31, 2002. Increased sales and marketing expenses and increased fulfillment expenses associated with delivering higher sales volumes accounted for the increase.

### Amortization of Intangibles

In connection with Alliance's reorganization in August of 1998, the portion of Alliance's reorganization value, which could not be attributed to specific assets, was allocated to "Reorganization value in excess of amounts allocable to identifiable assets" ("reorganization value") and was being amortized over ten years. Upon the adoption of SFAS No. 142 on January 1, 2002, reorganization value is no longer amortized, but assessed annually for impairment. In accordance with SOP 90-7, Alliance's deferred tax liability amount is credited against the reorganization value. The amortization of the reorganization value for the year ended December 31, 2001 was $2.6 million.

### Asset Impairment and Cost of Failed Acquisition

Alliance recognized an asset impairment charge of $3.1 million in the fiscal year ended December 31, 2001 related to the Digital Media Group's property, plant and equipment. In the fiscal year ended December 31, 2001, Alliance wrote-off $0.6 million of costs related to a failed acquisition.

### Operating Income (Loss)

Operating income for the fiscal year ended December 31, 2002 increased $17.9 million to income of $4.7 million from a loss of $(13.2) million for the fiscal year ended December 31, 2001, while operating margins increased to 0.6% from (2.2)% for the fiscal year ended December 31, 2002 and 2001, respectively.

### Interest Expense, Net

Net interest expense for the fiscal year ended December 31, 2002 was $3.6 million, a 29.3% decrease from the $5.1 million recorded in the fiscal year ended December 31, 2001. The improvement over the prior year was primarily due to improved cash flow and lower average borrowings under the Alliance revolving credit facility.

138

IB 00174

*Income Taxes*

The effective tax rate was 46.4% for the fiscal year ended December 31, 2002 as compared to 0% for the fiscal year ended December 31, 2001. Alliance recognizes deferred tax assets and liabilities based on the difference between the financial reporting and tax basis of assets and liabilities using the enacted tax rates. Alliance provides a valuation allowance for deferred tax assets for which it does not consider realization of such assets to be more likely than not. The provision for income taxes for the year ended December 31, 2002 includes deferred tax expense of $0.7 million. In accordance with SOP 90-7, the deferred amounts have been credited against the reorganization value. For the year ended December 31, 2001, no benefit for income taxes was recorded because the book loss was offset by an equal deferred tax valuation allowance. At December 31, 2002 and 2001, Alliance had deferred tax assets of approximately $67.2 million and $63.2 million, deferred tax liabilities of $8.8 million and $5.6 million, and a valuation allowance of $58.4 million and $57.6 million.

## Liquidity and Capital Resources

Alliance's capital requirements relate primarily to working capital and the expansion of its infrastructure to accommodate sales growth. Working capital needs are seasonal and typically are highest in the third and fourth fiscal quarters due to increases in inventories purchased for the holiday selling season and extension of credit terms to certain customers. Alliance maintains significant inventory levels to fulfill its operating commitment to maintain a large and diverse catalog of physical entertainment media. Inventories generally can be returned to suppliers. Historically, Alliance has financed its working capital needs through cash generated from operations, trade credit and borrowings against its asset-based revolving credit facility. The credit facility provides for borrowings of up to $135.0 million. This credit facility matures on August 19, 2006 and includes a $12.5 million letter of credit sub-facility.

The following table presents a summary of Alliance's significant obligations and commitments to make future payments under debt obligations, capital leases and operating leases due as of September 30, 2004 (in thousands):

| Total Alliance Consolidated | Total | Less Than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
|---|---|---|---|---|---|
| Revolver | $28,575 | $28,575 | $ — | $ — | $ — |
| Debt Obligations | 11,824 | 8,611 | 3,031 | 182 | — |
| Capital Leases | 849 | 541 | 308 | — | — |
| Operating Leases | 7,683 | 2,043 | 4,242 | 1,280 | 118 |
| | $48,931 | $39,770 | $7,581 | $1,462 | $118 |

The following table presents a summary of Alliance's commercial commitments and the notional amount expiration by periods in thousands:

| Total Alliance Consolidated | Total | Less Than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
|---|---|---|---|---|---|
| Financial standby letters of credit | $5,599 | $5,514 | $ 85 | $ — | $ — |

Alliance extends credit to national chain accounts, specialty and independent retailers, mass merchandisers, supermarkets and e-commerce retailers. All new accounts are required to complete a comprehensive credit application, including trade references, bank references and certain financial data. A small percentage of independent retailers are required to sign a personal guarantee on the full accounts receivable balance. Established accounts are periodically required to update credit information to keep or establish new credit limits. Credit terms are generally thirty to sixty days. Credit limits are set after reviewing past payment history with other suppliers, financial statement strength and general interviews with each retailer's financial manager and sales representatives.

139

IB 00175

*Comparison of the Nine Month Period ended September 30, 2004 to the Nine Month Period ended September 30, 2003*

### Operating Cash Flow

Net cash used in operating activities amounted to $25.6 million for the nine-month period ended September 30, 2004, an increase of $25.0 million over the nine-month period ended September 30, 2003. Cash used in operating activities was primarily related to an increase in inventory of $26.0 million, resulting from increases in inventory purchased for the holiday selling season. Accounts payable and accrued expenses decreased $84.6 million during the nine-month period ended September 30, 2004 as a result of Alliance taking advantage of various prompt pay discounts offered by vendors before the holiday season and customary payments to suppliers for its seasonal product purchases. Accounts receivable decreased $62.1 million during the nine-month period ended September 30, 2004, as a result of strong collections and seasonality, providing a partial offset to cash used during the period. Non-cash items of depreciation and amortization were $10.0 million, bad debt expense was $3.9 million and deferred income taxes and income taxes payable were $3.4 million for the nine-month period ended September 30, 2004.

Net cash used in operating activities was $0.6 million for the nine-month period ended September 30, 2003. Cash used in operating activities was primarily related to an increase in inventory of $11.3 million, resulting from increases in inventory purchased for the holiday selling season. Accounts payable and accrued expenses decreased $27.2 million during the nine-month period ended September 30, 2003, resulting from customary payments to suppliers for its seasonal product purchases. Accounts receivable decreased $29.9 million during the nine-month period ended September 30, 2003, as a result of strong collections and seasonality, providing a partial offset to cash used during the period. Non-cash items of depreciation and amortization were $8.5 million and bad debt expense was $2.8 million for the nine-month period ended September 30, 2003.

### Investing Cash Flow

Net cash used in investing activities was $8.3 million for the nine-month period ended September 30, 2004 and $8.0 million for the nine-month period ended September 30, 2003, which primarily represented capital expenditures for warehouse machinery, technology, automation equipment, information technology equipment, a disaster recovery site in 2004, and enhancements to the Digital Media Group's database.

### Financing Cash Flow

Net cash provided by financing activities was $27.2 million for the nine-month period ended September 30, 2004, consisting primarily of borrowings of $28.6 million on the revolving credit facility. This was partially offset by payments of $1.4 million on the building mortgage, long-term debt payments, and payments on equipment capital leases during the nine-month period ended September 30, 2004.

Net cash provided by financing activities was $6.1 million for the nine-month period ended September 30, 2003, consisting primarily of an increase in borrowings under Alliance's revolving credit facility by $4.8 million and net proceeds received on long-term debt of $1.8 million. This was partially offset by payments on equipment capital leases of $0.5 million during the nine-month period ended September 30, 2003.

*Comparison of Fiscal Years ended December 31, 2003, 2002 and 2001*

### Operating Cash Flow

Net cash provided by operating activities was $39.6 million for the fiscal year ended December 31, 2003. Cash provided was primarily related to Alliance's extended credit terms with major vendors, beyond the customary 60 days. The extended terms allowed Alliance to increase accounts payable and accrued expenses of $49.6 million for the fiscal year ended December 31, 2003 over the fiscal year ended December 31, 2002. Non-cash items of depreciation and amortization were $11.5 million and bad debt expense was $6.9 million. Deferred income taxes were $0.9 million; this portion of the tax provision does not require a cash payment. Offsets to cash provided were an increase in accounts receivable of $29.2 million, which typically increases as a result of fourth quarter sales volume, and an increase in inventory levels of $1.3 million.

140

IB 00176

Net cash provided by operating activities was $2.1 million for the fiscal year ended December 31, 2002. Cash provided by operating activities was primarily related to an increase in accounts payable and accrued expenses of $19.0 million, non-cash items, such as depreciation and amortization, of $11.0 million and bad debt expense of $7.4 million. Deferred income taxes were $0.7 million for the year ended December 31, 2002 and an inventory revaluation of $3.3 million was recorded in December of 2002. Offsets to cash provided were an increase in accounts receivable of $6.6 million, which typically increases as a result of fourth quarter sales volume, and an increase in inventory levels of $33.9 million, necessary to keep fill rates at a competitive standard and to keep inventory at higher levels as a result of sales growth of 34.8% in the fiscal year ended December 31, 2002.

Net cash provided by operating activities was $46.2 million for the year ended December 31, 2001. Cash provided by operating activities was primarily related to an increase in accounts payable and accrued expenses of $92.2 million, non-cash items, such as depreciation and amortization, of $12.4 million, bad debt expense of $5.1 million, and an asset impairment charge of $3.1 million. Offsets to cash provided were an increase in accounts receivable of $52.1 million, which typically increases as a result of fourth quarter sales volume, and an increase in inventory levels of $0.2 million.

*Investing Cash Flow*

Net cash used in investing activities was $13.3 million, $12.5 million and $9.9 million for the fiscal years ended December 31, 2003, 2002 and 2001, respectively. The net cash used in investing activities was primarily related to capital expenditures for warehouse technology, equipment and enhancements to the Digital Media Group's database.

*Financing Cash Flow*

Net cash (used in) provided by financing activities was $(23.8) million, $14.2 million and $(43.4) million for the fiscal years ended December 31, 2003, 2002 and 2001, respectively. The fluctuation in cash (used in) provided by financing activities is primarily due to payments on and borrowings against Alliance's revolving credit facility. Payments on the revolving credit facility were $27.6 million during 2003, payments on capital leases were $0.7 million for the year ended December 31, 2003 and net proceeds from long-term debt were $4.5 million during 2003. Borrowings against the revolving credit facility were $10.3 million during 2002, net proceeds from long-term debt were $4.4 million for the year ended December 31, 2002, and capital lease payments were $0.6 million during 2002. Payments on the revolving credit facility were $53.5 million during 2001 and payments on long-term debt and capital leases were $1.7 million for the year ended December 31, 2001. Proceeds from the issuance of Alliance Series B Preferred Stock were $11.8 million during 2001.

*Debt*

The availability under the asset-based revolving credit facility is subject to a borrowing base of eligible accounts receivable and eligible inventory and further reduced by outstanding letters of credit. At September 30, 2004 and December 31, 2003, Alliance had $100.7 million and $129.4 million, respectively, available under the credit facility. The outstanding balance under the credit facility as of September 30, 2004 was $28.6 million. Alliance did not have a credit facility balance outstanding as of December 31, 2003.

Alliance is required to achieve certain financial covenant ratios including a minimum EBITDA (earnings before interest, taxes, depreciation and amortization) ratio, a fixed coverage ratio (EBITDA plus capital expenditures divided by interest expense) and a maximum capital expenditure payout ratio, measured quarterly, based upon its trailing twelve months. While Alliance's management believes these objectives are reasonable, actual results may differ materially from those projected which may adversely affect Alliance's ability to meet one or more of the financial covenants. Alliance's business is historically seasonal and the achievement of forecasted objectives requires a strong fourth quarter performance. If a violation of one or more of the financial covenants occurs, Alliance would be required to obtain a waiver from the lenders. Under the terms of the revolving credit facility, Alliance was in default of certain financial covenants and obtained

141

IB 00177

the necessary waivers and amendments to be in compliance as of December 31, 2003, 2002, and 2001. As of September 30, 2004 Alliance is in compliance with all financial covenants.

Alliance believes its borrowing availability under the credit facility and cash flows from operations will be sufficient to meet its operating and capital requirements through December 31, 2004. Alliance's future operating and capital requirements, however, will depend on numerous factors, including growth and profitability of the business and future results of operations.

In June of 2002, Alliance replaced its taxable bond from the city of Coral Springs, Florida with an $8.5 million conventional mortgage loan through SunTrust Bank (the "SunTrust Mortgage"). The SunTrust Mortgage is secured by the land and building at Alliance's Coral Springs location. The principal balance of the taxable bond at the time of repayment was $3.9 million.

The SunTrust Mortgage matures on June 1, 2005 and has monthly principal payments of approximately $31,000 plus interest at a rate of LIBOR plus 2 1/2 percent. The principal payments were determined based on a 15-year amortization of the outstanding principal amount of the SunTrust Mortgage. On the maturity date, the aggregate unpaid principal balance of the mortgage, accrued and unpaid interest and all costs and expenses due under the terms of the SunTrust Mortgage shall be due and payable. The total principal balance of $7.7 million is classified as current at September 30, 2004.

In March of 2003, Alliance, through AEC One Stop Group, Inc., entered into a loan agreement with SunTrust Leasing Corporation (the "SunTrust Loan") for the purchase of equipment to be used at Alliance's various locations. A credit line of $6.8 million was approved under the SunTrust Loan, with a five-year repayment term under each promissory note. The total principal balance of the SunTrust Loan outstanding as of September 30, 2004, representing three promissory notes, was $4.1 million, including the current portion of $1.0 million.

## Critical Accounting Policies and Estimates

The following critical accounting policies are affected by management's judgments, estimates and/or assumptions during preparation of Alliance's consolidated financial statements.

### Revenue Recognition and Returns Policy

Alliance derives revenue primarily from two principal sources: the sale of pre-recorded music, video and accessories and the sale of kiosk type multi-media merchandising stations and the licensing of its e-commerce enabling database. Revenue from the sale and distribution of pre-recorded music and video, music accessories and other related products, including the sale of kiosk-type multi-media merchandising stations, is recognized when the products are shipped. Revenue from the licensing of Alliance's e-commerce enabling database is recognized based on the terms of the underlying licensing agreement.

As a general practice, Alliance reserves for sales returns and allowances at the time the sale is recorded. Alliance records estimated reductions to revenue for anticipated customer returns based on historical experience. Customer returns are allowed provided they occur before the cutout period, which is the last date for return of product as specified by a vendor. Manufacturers of physical entertainment media products provide incentives to customers for limiting returns and provide disincentives for excessive returns. Certain of Alliance's sales are made to customers under agreements permitting certain limited rights of return. It is Alliance's policy not to accept product returns which cannot be returned to its vendors. Product sales are recognized as revenue upon shipment of the product, net of estimated returns and other allowances primarily consisting of volume rebates, timely payment discounts, and advertising discounts. Any significant increase in return levels or significant decline in industry sales could have a material adverse effect on Alliance's financial results.

### Allowance for Doubtful Accounts

Alliance regularly evaluates the collectibility of its accounts receivable based on a combination of factors. In circumstances where Alliance is aware of a specific customer's inability to meet its financial obligations

142

IB 00178

(e.g., bankruptcy filings, substantial credit down-grades), Alliance records a specific reserve for bad debt against amounts due to reduce the net receivable to an amount it reasonably believes will be collected. For all other customers, Alliance recognizes reserves for bad debt based upon the length of time the receivables are past due and on its historical experience. If circumstances change (e.g., higher than expected defaults or an unexpected material adverse change in a customer's ability to meet its financial obligations), Alliance reserves the full amount as uncollectible on a customer-by-customer basis.

### Sales Concentration

Historically, one customer, Barnes & Noble, Inc., has accounted for a significant portion of Alliance's revenues. For the nine months ended September 30, 2004 and 2003, approximately 33.5% and 33.9%, respectively, of Alliance's net revenues were derived from sales to this significant customer. This customer is expected to continue to account for a significant portion of Alliance's net revenue. Alliance's financial results would be materially affected if this customer significantly reduced its purchases from Alliance.

### Valuation of Long-Lived Assets

Alliance assesses the carrying value of long-lived assets and intangibles whenever events or changes in circumstances indicate that the carrying value may not be recoverable, but in no case less than annually. Factors Alliance considers important, which could trigger an impairment review, include the following:

- Significant under-performance relative to historical or projected future operating results;

- Significant changes in the manner or use of an asset;

- Significant adverse change in legal factors or in the business climate;

- Adverse action or assessment by a regulator;

- Unanticipated competition;

- Loss of key personnel; and

- More-likely-than-not expectation that a reporting unit or significant portion of a reporting unit will be sold or otherwise disposed of.

When there is evidence that one or more of the above indicators have been triggered, Alliance tests such assets for potential impairment. The carrying value of a long-lived asset is considered impaired when the anticipated cash flows are less than the asset's carrying value. In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair market value of the asset. Fair market value is determined primarily by using the anticipated cash flows discounted at a rate commensurate with the risk involved.

### Recent Accounting Pronouncements

In January 2003, the Financial Accounting Standards Board ("FASB") issued Interpretation ("FIN") 46, "Consolidation of Variable Interest Entities," which provides guidance on when to consolidate variable interest entities. In December 2003, the FASB revised FIN 46 with FIN 46 (R), which further explains how to identify variable interest entities ("VIEs") and how to determine when a business enterprise should include the assets, liabilities, noncontrolling interest and results of VIEs in its financial statements. In addition to conforming to previously issued FASB Staff Positions, FIN 46(R) deferred the implementation date for certain VIEs. FIN 46(R) is effective for non public entities for the fiscal period beginning after December 15, 2004. Alliance's management does not believe that FIN No. 46(R) will have a material impact on Alliance's financial position, results of operations or cash flows.

In April 2003, Statement of Financial Accounting Standards No. 149, "Amendment of Statement 133 on Derivative Instruments and Hedging Activities," was issued. SFAS No. 149 amends and clarifies accounting for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities under SFAS No. 133. SFAS No. 149 is effective for contracts entered into or modified after

143

IB 00179

June 30, 2003 and for hedging relationships designated after June 30, 2003. The adoption of this statement did not impact Alliance's financial position, results of operations or cash flows.

In May 2003, the FASB issued Statement of Financial Accounting Standards No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity." SFAS No. 150 establishes standards for how companies classify and measure certain financial instruments with characteristics of both liabilities and equity. It requires companies to classify a financial instrument that is within its scope as liability (or an asset in some circumstances). SFAS No. 150 is effective immediately for financial instruments entered into or modified after May 15, 2003 and in the first interim period after June 15, 2003 for all other financial instruments. Alliance has adopted SFAS No. 150.

In December 2003, the Securities and Exchange Commission ("SEC") issued Staff Accounting Bulletin ("SAB") No. 104, "Revenue Recognition," which supercedes SAB 101, "Revenue Recognition in Financial Statements." SAB 104's primary purpose is to rescind accounting guidance contained in SAB 101 related to multiple element revenue arrangements, superceded as a result of the issuance of the Emerging Issues Task Force ("EITF") 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables." The issuance of SAB 104 reflects the concepts contained in EITF 00-21; the other revenue recognition concepts contained in SAB 101 remain largely unchanged. The issuance of SAB 104 did not have a material impact on Alliance's financial position, results of operations or cash flows.

## Seasonality

Alliance's quarterly sales and operating results vary significantly from quarter to quarter and will likely continue to do so in the future as a result of seasonal variations in the demand for music and video products. Historically, sales are highest during the third and fourth quarters (the holiday season), while returns are highest during the first half of the year. Due to this seasonality, Alliance typically experiences significant changes in cash flows and capacity needs during the year, with the heaviest credit needs and highest capacity requirements typically occurring during the third and fourth fiscal quarters.

## Quantitative and Qualitative Disclosures About Market Risk

Alliance's primary market risks include fluctuations in interest rates and exchange rate variability.

The revolving credit facility has an outstanding balance of approximately $28.6 million at September 30, 2004. Interest on the outstanding balance was charged based on the prime rate plus 0.25% (5.00%) at September 30, 2004. Interest expense from this credit facility is subject to market risk in the form of fluctuations in interest rates.

In connection with the SunTrust Mortgage discussed above, Alliance entered into interest rate swap and cap agreements to manage the interest rate risk exposures of its variable-rate debt portfolio. These instruments are not designated as hedges, and, accordingly, are recorded at fair value as an asset or liability in the consolidated balance sheets and interest income/expense in the consolidated statements of operations.

Additionally, Alliance has exposure to foreign currency fluctuation through export sales to international accounts. A significant change in the relative strength of the dollar to foreign currencies could result in a negative impact on Alliance's results of operations. Alliance does not conduct any hedging activities related to foreign currency.

144

IB 00180

ALLIANCE PRINCIPAL STOCKHOLDERS

The following table sets forth as of January 14, 2005 before and after giving effect to the consummation of the merger, certain information concerning the ownership of Alliance common stock by:

- each person who is known to Alliance to own beneficially 5% or more of the outstanding shares of Alliance common stock;

- each director of Alliance, its chief executive officer and its four other most highly paid executive officers in fiscal 2004; and

- all directors and executive officers of Alliance as a group.

Beneficial ownership is determined under SEC rules and generally includes voting or investment power with respect to securities. Except as indicated by the footnotes below, Alliance believes, based on information furnished to it, that the persons and entities named in the table below have sole voting and sole investment power with respect to all shares of Alliance's capital stock beneficially owned by them, subject to community property laws where applicable. For purposes of computing the number of shares of common stock subject to options or shares of preferred stock convertible into common stock held by that person that are exercisable or convertible within 60 days of January 14, 2005, these shares are deemed outstanding and to be beneficially owned by the person holding the options for purpose of determining the percentage ownership of the optionee. These shares, however, are not deemed as outstanding for the purpose of computing the percentage ownership of any other person.

As of January 14, 2005, there were 71,758,847 shares of Alliance common stock outstanding.

The following table assumes the issuance of 26.7 million shares of our common stock in exchange for all shares of Alliance common stock outstanding, or an exchange ratio of 0.2606 shares of our common stock per share of Alliance common stock.

| Name of Beneficial Owner | Number of Alliance Shares Beneficially Owned | Percent of Shares Beneficially Owned | Number of Source Interlink Shares Beneficially Owned Post-Merger | Percent of Source Interlink Shares Beneficially Owned Post-Merger |
|---|---|---|---|---|
| AEC Associates, L.L.C.(1) | 68,259,583(2) | 72.5% | 17,787,518 | 35.3% |
| Quantum Industrial Partners LDC(3) | 5,705,801 | 7.8 | 1,486,854 | 3.0 |
| Paul McNulty, Director(3) | 5,705,801 | 7.8 | 1,486,854 | 3.0 |
| Erika Paulson, Director(1) | 68,259,583(2) | 72.5 | 17,787,518 | 35.3 |
| Tony Schnug, Chief Executive Officer and Director(1) | 68,259,583(2) | 72.5 | 17,787,518 | 35.3 |
| Thomas A. Szabo, Director(4) | 2,500,919 | 3.5 | 651,706 | 1.3 |
| Alan Tuchman, President and Chief Operating Officer(4) | 437,819(5) | * | 114,090 | * |
| Jerry Bassin, Executive Vice President(4) | 195,138(5) | * | 50,850 | * |
| Peter Blei, Executive Vice President(4) | 195,138(5) | * | 50,850 | * |

145

IB 00181

| Name of Beneficial Owner | Number of Alliance Shares Beneficially Owned | Percent of Shares Beneficially Owned | Number of Source Interlink Shares Beneficially Owned Post-Merger | Percent of Source Interlink Shares Beneficially Owned Post-Merger |
|---|---|---|---|---|
| George Campagna, Executive Vice President and Chief Financial Officer(4) | 178,430(5) | * | 46,497 | * |
| All directors and executive officers, as a group (6 persons)(2) | 77,473,828 | 79.8 | 20,188,864 | 39.9% |

(1)  The business address for such person(s) is: c/o The Yucaipa Companies, 9130 West Sunset Boulevard, Los Angeles, California 90069. Mr. Ronald Burkle holds sole voting and investment authority over the shares held by AEC Associates, L.L.C.

(2)  Includes (i) 45,811,560 shares of Alliance common stock and (ii) 21,671,886 shares of common stock issuable upon the conversion of Alliance preferred stock. Except in limited circumstances, shares of Alliance preferred stock are non-voting securities. Includes shares held by AEC Associates, L.L.C. Ms. Paulson and Mr. Schnug represent AEC Associates, L.L.C. and its affiliates. Ms. Paulson and Mr. Schnug disclaim beneficial ownership of the shares held by AEC Associates, L.L.C.

(3)  The business address for such person(s) is: Quantum Industrial Partners LLC, 888 Seventh Avenue, 33rd Floor, New York NY 10106. Mr. Paul McNulty holds sole voting and investment authority over the shares held of record by Quantum Industrial Partners LDC.

(4)  The business address for such person(s) is: c/o Alliance Entertainment Corp., 4250 Coral Ridge Drive, Coral Springs, Florida 33065.

(5)  Represents shares issuable under stock options exercisable within 60 days of January 14, 2005.

* Represents less than 1% of the total shares.

146

IB 00182

## DESCRIPTION OF SOURCE INTERLINK CAPITAL STOCK

The following is a summary of the material terms of our capital stock. It is only a summary; therefore, it is not meant to be complete and does not contain all of the information that may be important to you. Accordingly, you should read carefully the more detailed provisions of our articles of incorporation and bylaws, all of which are incorporated by reference and will be sent to shareholders of Source Interlink and Alliance upon request. See "Where You Can Find More Information," on page 174.

If our reincorporation from a Missouri corporation to a Delaware corporation is approved at the special meeting, our shareholders, whose rights are currently governed by Missouri law and our articles of incorporation and bylaws, will become stockholders of Source Interlink Companies, Inc., a Delaware corporation, which we refer to in this proxy statement/ prospectus as Source Interlink Delaware. Accordingly, following completion of the reincorporation, our stockholders' rights will be governed by Delaware law and Source Interlink Delaware's certificate of incorporation and bylaws. For more information on certain differences in the rights of stockholders that arise from distinctions between Missouri law and Delaware law, as well as from differences between our charter instruments and those of Source Interlink Delaware, see "Comparison of Stockholder Rights and Corporate Governance Matters" beginning on page 149.

### General

Our articles of incorporation authorize 42,000,000 shares of capital stock to be issued, consisting of 40,000,000 shares of common stock, $0.01 par value per share, and 2,000,000 shares of preferred stock, $0.01 par value per share. As of January 14, 2005, 23,724,940 shares of our common stock and no shares of our preferred stock were outstanding.

### Common Stock

The holders of our common stock are entitled to cast one vote for each share on all matters to be voted on by shareholders, including the election of directors. Subject to payment or provision for full cumulative dividends in respect of any outstanding shares of preferred stock, the holders of common stock are entitled to receive dividends when and if declared by our board out of legally available funds. In the event of liquidation, dissolution or winding up of the affairs of our company, the holders of the common stock are entitled to share ratably in all remaining assets available for distribution to them after the payment of liabilities and after provision has been made for each class of stock, including any preferred stock, having preference over the common stock. Holders of shares of common stock, as such, have no conversion, preemptive or other subscription rights, and there are no redemption provisions generally applicable to the common stock.

### Preferred Stock

Our board has the authority to issue preferred stock in one or more series and to fix the number of shares of each series of preferred stock. Our board also has the authority to set the voting powers, designations, preferences and relative, participating, optional or other special rights o each series of preferred stock, including the dividend rights, dividend rate, terms of redemption, redemption price or prices, conversion and voting rights and liquidation preferences. Preferred stock can be issued and its terms set by our board without any further vote or action by our shareholders.

### Warrants

As of January 14, 2005, warrants to purchase an aggregate of 585,645 shares of our common stock were outstanding at a weighted average exercise price of $7.54 per share. These warrants contain provisions that adjust the exercise price and the aggregate number of shares that may be issued upon exercise of the warrant if certain events occur.

147

IB 00183

**Options**

As of January 14, 2005, our directors, executive officers and other employees held options to purchase an aggregate of 3,642,497 of our common stock granted under our stock-based employee compensation plans at a weighted average exercise price of $6.14 per share, and 309,131 additional shares of our common stock were reserved for future issuance under these plans.

## Anti-Takeover Effects of Provisions of Our Charter Documents and Missouri Law

### Certain Provisions of the Articles of Incorporation and Bylaws

Our articles and bylaws contain provisions that may have the effect of discouraging some types of transactions that involve an actual or threatened change of control of the company, which in turn could limit shareholders' ability to sell shares at a premium. For a description of these provisions, see "Comparison of Stockholder Rights and Corporate Governance Matters" beginning on page 149.

### Size of Board, Election of Directors and Classified Board

Our articles and bylaws, when read together, provide currently for a minimum of three and a maximum of nine persons to serve on our board. However, the number of directors may be increased or decreased by a resolution adopted by the affirmative vote of a majority of the board and vacancies on the board may be filled by a majority of its directors.

The bylaws provide that the board will be divided into three classes of directors, with the classes to be as nearly equal in number as possible. One class of directors will be elected each year at our annual meeting to serve for a three-year term. Our most recent annual meeting of shareholders was held on July 14, 2004.

### Shareholder Nominations and Proposals

Our bylaws provide for advance notice requirements for shareholder nominations and proposals at annual meetings of our shareholders. Shareholders may nominate directors or submit other proposals only upon written notice to us not less than 120 days nor more than 150 days prior to the anniversary of the date of the notice to shareholders of the previous year's annual meeting. A shareholder's notice also must contain certain additional information, as specified in the bylaws. Our board may reject proposals that are not made in accordance with the procedures contained in our bylaws or that are not properly the subject of shareholder action.

### Calling Special Shareholder Meetings; Shareholder Action Without a Meeting

Matters to be acted upon by the shareholders at special meetings are limited to those specified in the notice of the meeting. A special meeting of shareholders may be called by our board, chairman or president or at the request in writing of shareholders holding at least 10% of the outstanding shares entitled to vote at the special meeting. As required by Missouri law, the bylaws provide that any action by written consent of shareholders in lieu of a meeting must be signed by the holders of all outstanding shares of common stock. Because we have publicly traded common stock, we are therefore, as a practical matter, unable to act by the written consent of its shareholders.

## Transfer Agent and Registrar

The Transfer Agent and Registrar for our common stock is Mellon Investor Services LLC.

148

IB 00184

COMPARISON OF STOCKHOLDER RIGHTS AND CORPORATE GOVERNANCE MATTERS

We are a Missouri corporation subject to the provisions of the Missouri General and Business Corporation Law of Missouri, or MGBCL. Alliance is a Delaware corporation subject to the provisions of the Delaware General Corporation Law, or DGCL. Unless we reincorporate prior to the merger, upon consummation of the merger, Alliance stockholders, whose rights are currently governed by Alliance's certificate of incorporation and bylaws and the DGCL, will become shareholders of our company and their rights will be governed by our articles of incorporation and bylaws and the MGBCL. If the merger and the reincorporation are approved by our shareholders and consummated, Alliance stockholders' rights will be governed by the DGCL and the certificate of incorporation and bylaws of Source Interlink Delaware (as defined below). Note that certain corporate actions with a bearing on stockholders' rights are limited or restricted by our credit facility with Wells Fargo Foothill. For more information, see "Source Interlink Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources — Debt" beginning on page 117.

If our reincorporation from a Missouri corporation, which we refer to as Source Interlink Missouri, to a Delaware corporation, which we refer to as Source Interlink Delaware, is approved at the special meeting, the Source Interlink Missouri shareholders, whose rights are currently governed by the MGBCL and Source Interlink Missouri's articles of incorporation and bylaws, will become stockholders of Source Interlink Delaware. Accordingly, following completion of the reincorporation, such stockholders' rights will be governed by the DGCL and Source Interlink Delaware's certificate of incorporation and bylaws. Certain differences in the rights of shareholders arise from distinctions between the MGBCL and the DGCL, as well as from differences between the charter instruments of Source Interlink Missouri and Source Interlink Delaware.

Set forth below is a brief comparison among (i) the MGBCL and Source Interlink Missouri's articles of incorporation and bylaws, (ii) the DGCL and Source Interlink Delaware's certificate of incorporation and bylaws and (iii) the DGCL and Alliance's certificate of incorporation and bylaws. For purposes of comparison, the column entitled "Rights of Source Interlink Delaware Stockholders" assumes the approval and effectiveness of the reincorporation. This comparison is not intended to be a complete or exhaustive statement of all differences, but rather a summary of the more significant differences affecting the right of such equityholders and certain important similarities. The identification of certain provisions or differences is not meant to indicate that other equally or more significant differences do not exist. For additional information regarding the specific rights of holders of Source Interlink Missouri's capital stock, one should read the section of this proxy statement/ prospectus entitled "Description of Source Interlink Capital Stock" beginning on page 147. One should read carefully the relevant provisions of the MGBCL, the DGCL, the articles of incorporation and bylaws of Source Interlink Missouri which are incorporated by reference into this proxy statement/ prospectus, the certificate of incorporation and bylaws of Source Interlink Delaware which are attached as *Annex D* and *Annex E*, respectively, to this proxy statement/ prospectus, and the certificate of incorporation and bylaws of Alliance which are available for inspection at Alliance's main office, or Alliance will send them to you upon request. The following discussion is qualified in its entirety by reference to the foregoing documents.

| | Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
|---|---|---|---|
| Class of Common Stock | Source Interlink Missouri has only one class of common stock outstanding. | Source Interlink Delaware has only one class of common stock outstanding. | Alliance has only one class of common stock outstanding. |
| Classes of Preferred Stock | Source Interlink Missouri has no shares of preferred stock outstanding and has no plans to issue any | Source Interlink Delaware has no shares of preferred stock outstanding and has no plans to issue any | Alliance has three series of preferred stock: Series A1 preferred stock; Series A2 preferred stock; and |

149

IB 00185

| | Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
|---|---|---|---|
| | shares of preferred stock. | shares of preferred stock. | Series B preferred stock. |
| Corporate Governance | The rights of Source Interlink Missouri shareholders are governed by Missouri law and under Source Interlink Missouri's articles of incorporation and bylaws.<br><br>Source Interlink Missouri has requested and recommends that its shareholders approve a proposal to reincorporate into Delaware. If the reincorporation proposal is approved, Source Interlink Missouri may reincorporate into Delaware before, upon or after the merger. | The rights of Source Interlink Delaware stockholders are governed by Delaware law and under Source Interlink Delaware's certificate of incorporation and bylaws. | The rights of Alliance stockholders are governed by Delaware law and under Alliance's certificate of incorporation and bylaws. |
| Authorized Capital Stock | The authorized capital stock of Source Interlink Missouri consists of 40,000,000 shares of common stock, $0.01 par value per share, and 2,000,000 shares of preferred stock, $0.01 par value per share.<br><br>In connection with the merger, Source Interlink Missouri's authorized common stock will be increased to consist of 100,000,000 shares of common stock, $0.01 par value per share. | The authorized capital stock of Source Interlink Delaware consists of 100,000,000 shares of common stock, par value $0.01 per share, and 2,000,000 shares of preferred stock, par value $0.01 per share. | The authorized capital stock of Alliance consists of 150,000,000 shares of common stock, par value $0.0001 per share, and 10,000,000 shares of preferred stock, par value $0.01 per share, of which 20,000 is designated as Series A1 preferred stock, 45,000 is designated as Series A2 preferred stock and 9,700,000 is designated as Series B preferred stock. The preferred stock will be converted into common stock prior to the consummation of the merger. |

150

IB 00186

| | Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
|---|---|---|---|
| **Board Authority to Designate Rights and Issue Undesignated Preferred Stock** | Source Interlink Missouri's articles of incorporation authorize its board to issue, without shareholder approval, undesignated shares of preferred stock in one or more series, and to determine the rights, preferences, privileges and restrictions of any such series and the number of shares constituting any such class or series and the designation of such class or series. | Similar to Source Interlink Missouri. | Similar to Source Interlink Missouri. |
| **Dividends and Stock Repurchases** | The MGBCL generally permits corporations to pay dividends when the net assets of the corporation are not less than its stated capital and the payment of dividends will not reduce the net assets of the corporation below its stated capital. Missouri law also provides generally that a corporation may redeem or repurchase its shares only if the redemption or repurchase would not impair the corporation's capital. | The DGCL generally permits corporations to pay dividends out of surplus, or, if there is no surplus, out of net profits for the current or preceding fiscal year in which the dividend is declared, provided that the amount of capital of the corporation following the declaration and payment of the dividend is not less than the aggregate amount of the capital represented by the outstanding stock of all classes having a preference upon the distribution of assets. The DGCL also provides that corporations may redeem or repurchase its shares only if the redemption or repurchase would not impair the capital of the corporation. | Similar to Source Interlink Delaware. |
| **Voting Rights** | The outstanding voting securities of Source Interlink Missouri | Similar to Source Interlink Missouri. | Except as discussed below, the outstanding voting securities of |

151

IB 00187

| | Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
|---|---|---|---|
| | consist of the shares of Source Interlink Missouri common stock. Each holder of Source Interlink Missouri common stock is entitled to one vote per share on all matters to be voted on by the shareholders, including election of directors. | | Alliance consist of the shares of Alliance common stock. Each holder of Alliance common stock is entitled to one vote per share on all matters to be voted on by the stockholders, including election of directors. Alliance preferred stockholders have no voting rights, except that any amendment, alteration, repeal or addition to the terms of any class of preferred stock must be approved by a majority of the shares of such class then outstanding. |
| Cumulative Voting for Election of Directors | Neither Source Interlink Missouri's articles of incorporation nor bylaws provides for cumulative voting in the election of directors, which means that the holders of a majority of the shares voted can elect all of the directors then outstanding for election. | Similar to Source Interlink Missouri. | Similar to Source Interlink Missouri. |
| Special Meetings of Equityholders; Notice | A special meeting of shareholders may be called by the board, chairman or president or at the request in writing of shareholders holding at least 10% of the outstanding shares entitled to vote at the special meeting.<br><br>Source Interlink Missouri must give each shareholder of record a written notice stating the place, date | A special meeting of stockholders may be called by the board, chairman, chief executive officer or president (in the absence of a chief executive officer).<br><br>Source Interlink Delaware must give each stockholder of record a written notice stating the place, date and hour of the meeting and the purpose of the | A special meeting of stockholders may be called by the chairman of the board, the president, any vice president, the secretary or any assistant secretary. Special meetings may also be called by any such officer at the request in writing of a majority of the board or at the request in writing of stockholders owning a majority of the capital |

152

IB 00188

| | Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
|---|---|---|---|
| | and hour of the meeting and the purpose of the meeting. Under the MGBCL, such notice must be given in writing not fewer than 10 nor more than 70 days before the date of the meeting. | meeting. Under the DGCL, such notice must be given in writing not fewer than 10 nor more than 60 days before the date of the meeting. | stock of Alliance entitled to vote at the meeting.<br><br>Alliance must give each stockholder written notice stating the place, date and hour of the meeting and the purpose of the meeting. Under the DGCL, such notice must be given in writing not fewer than 10 nor more than 60 days before the date of the meeting. |
| **Record Date for Determining Equityholders Entitled to Vote** | Source Interlink Missouri's bylaws provide that for purposes of determining the shareholders entitled to notice of a meeting or to vote at a meeting or to express consent to a corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution, or entitled to exercise any rights in respect to a change, conversion or exchange of stock or for the purpose of any other lawful action, the board may fix, in advance, a record date which shall which shall not be more than 70 nor less than 10 days before the date of such meeting, nor more than 70 days prior to any other action. | Source Interlink Delaware's bylaws provide that for purposes of determining the stockholders entitled to notice of a meeting or to vote at a meeting or express consent to corporate action without a meeting, or entitled to receive payment of any dividend or other distribution, or entitled to exercise any rights in respect to a change, conversion or exchange of stock or for the purpose of any other lawful action, the board may fix, in advance, a record date, which shall not be more than 60 days nor less than 10 days before the date of such meeting, nor more than 60 days prior to any other action. | Similar to Source Interlink Delaware. |
| **Equityholder Action by Written Consent** | As required by the MGBCL, the bylaws of Source Interlink Missouri provide that any action by written | Source Interlink Delaware's bylaws state that any action required or permitted to be taken by the | Alliance's certificate of incorporation and bylaws permit stockholder action to be taken by written |

153

IB 00189

| Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
|---|---|---|
| consent of shareholders in lieu of a meeting must be signed by the holders of all outstanding shares of common stock. Because Source Interlink Missouri has publicly traded common stock, Source Interlink Missouri is therefore, as a practical matter, unable to act by the written consent of its shareholders. | stockholders of the corporation must be effected at a duly called annual or special meeting of stockholders of the corporation and may not be effected by any consent in writing by such stockholders. | consent in lieu of a meeting |

| | | | |
|---|---|---|---|
| **Equityholder Proposals** | As set forth in the Source Interlink Missouri bylaws, only such business may be conducted before a meeting of shareholders as has been brought before such meeting by or at the direction of the board or by a shareholder who has given timely written notice to the secretary of Source Interlink Missouri. | Similar to Source Interlink Missouri, with the addition of certain procedures when no annual meeting is held in the previous year or the date of the annual meeting is changed by more than 30 days from the date of the prior year's meeting. | Neither Alliance's certificate of incorporation nor its bylaws have any provisions regarding stockholder proposals. |
| **Quorum for Meetings of Equityholders** | The holders of a majority of the outstanding stock which is entitled to vote, whether present in person or represented by proxy, constitute a quorum for the transacting of business at a meeting. | The holders of a majority of all outstanding stock entitled to vote at a Source Interlink Delaware stockholder meeting, present in person or represented by proxy, constitute a quorum for transacting business at a meeting. | The holders of a majority of all outstanding capital stock entitled to vote at a Alliance stockholder meeting, present in person or represented by proxy, constitute a quorum for transacting business at a meeting. |
| **Equityholder Inspection** | The MGBCL permits any shareholder the right at all proper times to have access to the company's stock ledger, shareholder lists and other books and records and to examine the | The DGCL permits any stockholder the right to inspect the company's stock ledger, stockholder lists and other books and records for a purpose reasonably related to | Similar to Source Interlink Delaware. |

154

IB 00190

| Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
|---|---|---|
| same under such regulations as may be prescribed by the bylaws. Source Interlink's bylaws do not contain any regulations addressing such matter. | the person's interest as a stockholder. | |

| **Number of Directors** | Source Interlink Missouri currently has eight directors. Source Interlink Missouri's articles of incorporation and bylaws, when read together, provide for a minimum of three and a maximum of nine persons to serve on its board. However, the number of directors may be increased or decreased by a resolution adopted by the affirmative vote of a majority of the board and vacancies on the board may be filled by a majority of its directors.

Pursuant to the merger agreement, Source Interlink Missouri will expand its board of directors to 11 persons upon consummation of the merger and the bylaws will provide that the number of directors may be increased or decreased by a resolution adopted by the affirmative vote of 75% of the directors then in office.

Vacancies and newly created directorships resulting from any increase in the | Source Interlink Delaware's bylaws provide for a minimum of three and a maximum of 11 persons to serve on its board. However, the number of directors may be increased or decreased by a resolution adopted by the affirmative vote of a majority of the board. If the merger is consummated, Source Interlink's board will consist of 11 directors and the bylaws will provide that the number of directors may be increased or decreased by a resolution adopted by the affirmative vote of 75% of the directors then in office.

Vacancies and newly created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director. If the merger is consummated, the bylaws will provide that, until such date as AEC Associates and its affiliates own less than | Alliance's board of director currently consists of five directors.

Alliance's bylaws provide that the number of directors shall be not less than one nor more than fifteen members. The number of directors may be changed from time to time by the board of directors or by the vote of the holders of a majority of stock entitled to vote on such matter. |

155

IB 00191

| | Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
|---|---|---|---|
| | authorized number of directors may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director. If the merger is consummated, the bylaws will provide that until such date as AEC Associates and its affiliates own less than 10% in the aggregate of the outstanding common stock of Source Interlink Missouri, (i) Source Interlink designated directors may fill vacancies left by Source Interlink designated directors by a majority vote of the remaining Source Interlink designated directors and (ii) Alliance designated directors, may fill vacancies left by Alliance designated directors by a majority vote of the remaining Alliance designated directors. | 10% in the aggregate of the outstanding common stock of Source Interlink Delaware, (i) Source Interlink designated directors may fill vacancies left by Source Interlink designated directors by a majority vote of the remaining Source Interlink designated directors and (ii) Alliance designated directors, may fill vacancies left by Alliance designated directors by a majority vote of the remaining Alliance designated directors. | |
| **Classified Board of Directors** | The bylaws provide that the board will be divided into three classes of directors, with the classes to be as nearly equal in number as possible. One class of directors will be elected each year at the annual meeting of shareholders to serve for a three-year term. The terms of each of the three classes of directors will expire in different years, so that | Similar to Source Interlink Missouri | Alliance does not have a classified board. All members of Alliance's board are up for re- election every year. |

156

IB 00192

| | Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
|---|---|---|---|
| | the shareholders will vote on the appointment or re-election of some but not all of the directors on a rotating basis at each annual meeting of the shareholders. | | |
| **Removal of Directors** | Under Source Interlink Missouri's bylaws, any director, or the entire board, may be removed with or without cause by the affirmative vote of the holders of a majority of the outstanding shares of capital stock entitled to vote generally in the election of directors cast at a meeting of the shareholders called for that purpose. | Under Source Interlink Delaware's certificate of incorporation and bylaws, directors may be removed at any time, with or without cause, by the holders of the shares representing a majority of the voting power of the corporation then entitled to vote at an election of directors. | A director or the entire board may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at the election of directors. |
| **Limitation on Personal Liability of Directors and Officers** | Neither the articles of incorporation nor the bylaws of Source Interlink Missouri addresses the limitation of liability of directors. | Source Interlink Delaware's certificate of incorporation provides that directors of the corporation will not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director to the fullest extent permitted by Delaware law. | Alliance's certificate of incorporation provides that directors of the corporation will not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. |
| **Indemnification of Directors and Officers** | Source Interlink Missouri's articles of incorporation and bylaws, when read together, provide for indemnification of directors and officers to the fullest extent permitted by Missouri law. | Source Interlink Delaware's certificate of incorporation provides for indemnification of directors and officers to the fullest extent permitted by Delaware law.<br><br>Source Interlink Delaware plans to enter into new | Alliance's bylaws provide for indemnification of any person who is or was a director or officer against all expenses, judgments, fines and/or amounts paid in settlement in any threatened pending or completed action if the person is or was a party |

157

IB 00193

| Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
|---|---|---|
| | indemnification agreements with all directors after the completion of the reincorporation. | to the action by reason of the fact that he or she is or was a director or officer of the corporation or serving a the request of the corporation as a director, officer, employee or agent of another corporation or enterprise.

No person is entitled to indemnification unless he o she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to, the best interests of the corporation and not unlawful. In actions brought on behalf of Alliance in order to procure a judgment in Alliance's favor, a person is not entitled to indemnification unless he or she both satisfies the aforementioned requirements and the court determines that he or she is entitled to indemnity. |
| **Amendments to Certificate of Incorporation** | The MGBCL provides that in order for a corporation to amend its articles or certificate of incorporation, (i) its board of directors may adopt a resolution setting forth the proposed amendment and submit it to its shareholders for a vote, or the proposed amendment may be submitted to shareholders without a | Under the DGCL, a majority vote of the outstanding shares of common stock is required to amend a company's certificate of incorporation, and a separate class vote is required for any such amendment that adversely affects that class.

Under Source Interlink Delaware's certificate of | Under the DGCL, a majority vote of the outstanding shares of common stock is required to amend a company's certificate of incorporation, and a separate class vote is required for any such amendment that adversely affects that class.

So long as any shares of Series A1 preferred, |

158

IB 00194

| Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
| --- | --- | --- |
| resolution by the board, and (ii) a majority of the outstanding shares must approve the resolution.<br><br>The MGBCL also provides that the holders of the outstanding shares of stock are entitled to vote as a class on a proposed amendment, whether or not they are entitled to vote on the amendment by the articles of incorporation, if the amendment would:<br><br>• Increase or decrease the aggregate number of authorized shares of the class,<br><br>• Increase or decrease the par value of the shares of the class, or<br><br>• Adversely affect the special rights of the shares of the class. If any proposed amendment would adversely affect the rights of one or more series of any class of stock, but does not affect the entire class, then only the shares of the series affected by the amendment will be considered a separate class for the purposes of determining whether there must be a class vote. | incorporation, the affirmative vote of sixty-six and two-thirds percent (66 2/3%) of the then outstanding voting securities of the Source Interlink Delaware, voting together as a single class, shall be required for the amendment, repeal or modification of the provisions of Article V, Article VI or Article VIII of the certificate of incorporation. | Series A2 preferred or Series B preferred are outstanding, Alliance shall not, without approval of at least a majority of shares of Series A1 preferred, Series A2 preferred, or Series B preferred then outstanding, permit, effect or validate any amendment, alteration, repeal or addition of or to any provision describing terms of such class of preferred stock (whether by amendment, merger or otherwise). |

159

IB 00195

| | Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
|---|---|---|---|
| Amendments to Bylaws | Source Interlink Missouri's bylaws may be amended, altered or repealed, or new bylaws may be adopted, by a majority vote of the board or by holders of a majority of the outstanding common stock; provided, however, that the power of the board to amend, alter or repeal shall not divest or limit the power of the shareholders to adopt, amend or repeal the bylaws.

Pursuant to the merger agreement, Source Interlink Missouri will amend its bylaws to provide that the affirmative vote of at least 75% of its board is required to amend, alter or repeal the bylaws, or to adopt new bylaws. | Source Interlink Delaware's bylaws may be amended or repealed by (a) the holders of a majority of the outstanding common stock; provided that the affirmative vote of sixty-six and two-thirds percent (66 2/3%) of the then outstanding voting securities of the Source Interlink Delaware, voting together as a single class, shall be required for the amendment, repeal or modification of the provisions of Sections 2.1, 2.2, 2.3, 2.4, 2.9, or 3.2 of the bylaws or (b) the affirmative vote of no fewer than 75% of the authorized number of directors. | Alliance's bylaws may be amended, altered or repealed, and new bylaws may be adopted, by the board or the stockholders, provided that notice of such amendment, alteration, repeal or adoption be contained in the notice of such meeting of directors or stockholders, as the case may be.

So long as any shares of Series A1 preferred, Series A2 preferred or Series B preferred are outstanding, Alliance shall not, without approval of at least a majority of shares of Series A1 preferred, Series A2 preferred, or Series B preferred then outstanding, permit, effect or validate any amendment, alteration, repeal or addition of or to any provision describing terms of such class of preferred stock (whether by amendment, merger or otherwise). |
| Anti-Takeover Provisions | The MGBCL contains both a "five year freeze" statute and a "control share acquisition" statute. The five year freeze statute generally prohibits, for a period of five years, a merger or consolidation between a "resident domestic" Missouri corporation, with shares of its stock registered | Although Delaware does not have a control share acquisition statute or a "five year freeze" statute, Section 203 of the DGCL generally prohibits a Delaware corporation from engaging in a merger or other business combination with a person owning 15% or more of the | The relevant provisions of the DGCL, including Section 203, are as described for Source Interlink Delaware. |

160

IB 00196

| Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
|---|---|---|

under the federal securities laws, and any owner of 20% or more of the corporation's stock.
The control share acquisition statute provides that "acquiring persons" who hold more than a specified percentage of the stock of a public company will not possess voting rights for the stock unless voting rights are approved by both (i) a majority of the voting stock and (ii) a majority of the voting stock excluding the shares held by the acquiring person or any officer or director of the company.

Source Interlink Missouri's certificate of incorporation and bylaws contain provisions that could reduce the likelihood of a change of control or acquisition of the company. These provisions:

• provide for a classified board of directors;

• permit the board to issue up to two million shares of preferred stock and to determine the price, rights, preferences, privileges and restrictions of that preferred stock;

• permit the board to issue up to 40 million

corporation's voting stock, referred to as an "interested stockholder" for a period of three years after that person became an interested stockholder unless any one of the following occurs:

• The owner of 15% or more of the corporation's outstanding voting stock, including any rights to acquire stock by means of an option or warrant or upon the exercise of conversion or exchange rights; or

• An affiliate or associate of the corporation and was the owner of 15% or more of the voting stock of the corporation at any time within the previous three years.

Delaware defines the term "business combination" broadly to include, among other things, mergers of the corporation or a subsidiary with or caused by the interested stockholder and sales or other dispositions to the interested stockholder, except proportionately with the corporation's other shareholders, of assets of the corporation or a subsidiary equal to 10% or more of the aggregate market value

161

IB 00197

| Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
|---|---|---|

shares of common stock;

• permit the board to increase its own size and fill the resulting vacancies;

• limit the removal of directors by the shareholders to removal for cause;

• limit the persons who may call special meetings of shareholders; and

• establish advance notice requirements for nominations for election to the board or for proposing matters that can be acted on by shareholders at shareholders meetings.

of the corporation's consolidated assets or outstanding stock. However, the three-year moratorium imposed on business combinations does not apply if:

• The board of directors approves either the business combination or the transaction which resulted in the person becoming an interested stockholder prior to the date the stockholder becomes an interested stockholder;

• The interested stockholder owns 85% of the corporation's voting stock upon consummation of the transaction which resulted in the person becoming an interested stockholder; or

• On or after the date the person becomes an interested stockholder, the board of directors and two-thirds of the voting stock not owned by the interested stockholder approve the business combination.

In addition, Source Interlink Delaware's certificate of incorporation and bylaws contain provisions that could reduce the likelihood of a change of control or acquisition of the corporation. These

162

IB 00198

| Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
| --- | --- | --- |
| | provisions: | |

provisions:

• provide for a classified board of directors;

• permit the board to issue up to two million shares of preferred stock and to determine the price, rights, preferences, privileges and restrictions of that preferred stock;

• permit the board to issue up to 100 million shares of common stock;

• limit the removal of directors by the stockholders to removal for cause;

• limit the persons who may call special meetings of stockholders; and

• establish advance notice requirements for nominations for election to the board or for proposing matters that can be acted on by stockholders at stockholders meetings.

Although a Delaware corporation to which Section 203 applies may elect not to be governed by Section 203, the board of directors of Source Interlink Delaware intends to be governed by Section 203.

163

IB 00199

| | Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
|---|---|---|---|
| **Provisions Relating to Mergers and Other Business Combinations** | The MGBCL provides that a plan of merger or consolidation must be approved by a majority of the corporation's directors and by at least two-thirds of the outstanding shares entitled to vote. | The relevant provisions of the DGCL are as described for Alliance. | The DGCL generally requires that a merger or consolidation or sale, lease or exchange of all or substantially all of a corporation's property and assets be approved by the directors and by a majority of the outstanding stock. |
| | The MGBCL also provides that approval of the sale of all or substantially all of the assets of a corporation, if not made in the usual and regular course of its business, requires the affirmative vote of the holders of at least two-thirds of the outstanding shares entitled to vote. The sale of all or substantially all of the assets of a corporation not made in the ordinary course of business does not require prior approval by the corporation's board of directors. | If the merger is consummated, Source Interlink Delaware's bylaws will provide that at least 75% of Source Interlink Delaware's entire board is required to (i) approve or recommend a reorganization or merger of Source Interlink Delaware in a transaction that will result in Source Interlink Delaware's stockholders immediately prior to such transaction not holding, as a result of such transaction, at least 50% of the voting power of the surviving or continuing entity, (ii) a sale of all or substantially all of the assets of the corporation which would result in Source Interlink Delaware's stockholders immediately prior to such transaction not holding, as a result of such sale, at least 50% of the voting power of the purchasing entity. | Under the DGCL, a surviving corporation need not obtain stockholder approval for a merger if: |
| | | | • Each share of the surviving corporation's stock outstanding prior to the merger remains outstanding in identical form after the merger; |
| | Pursuant to the merger agreement, at least 75% of Source Interlink Missouri's entire board is required to (i) approve or recommend a reorganization or merger of Source Interlink Missouri in a transaction that will result in Source Interlink Missouri's shareholders immediately prior to such transaction not holding, as a result of | | • The merger agreement does not amend the certificate of incorporation of the surviving corporation and |
| | | | • Either no shares of common stock of the surviving corporation are to be issued or delivered in the merger, or, if common stock will be issued or delivered, it will not increase the number of shares of common stock outstanding prior to the merger by more than 20%. |

164

IB 00200

| | Rights of Source Interlink Missouri Shareholders | Rights of Source Interlink Delaware Stockholders | Rights of Alliance Stockholders |
|---|---|---|---|
| | such transaction, at least 50% of the voting power of the surviving or continuing entity, (ii) a sale of all or substantially all of the assets of the corporation which would result in Source Interlink Missouri's shareholders immediately prior to such transaction not holding, as a result of such sale, at least 50% of the voting power of the purchasing entity. | | |
| Appraisal or Dissenters' Rights | Under the MGBCL, a shareholder is entitled to receive payment for the fair value of his or her shares if the shareholder dissents from a sale or exchange of substantially all of the property and assets of the corporation or a merger or consolidation involving the corporation. A shareholder also is entitled to receive payment for the fair value of his or her shares if the shareholder dissents from according voting rights to control shares in a control share acquisition. Missouri law does not provide for appraisal or dissenters' rights in a merger of a parent corporation into a wholly owned subsidiary, as the reincorporation of Source Interlink Missouri into Delaware will be structured. | Under the DGCL no appraisal or dissenters rights are available to holders of shares of any class of stock which is listed on a national securities exchange or designated as a national market system security on an interdealer quotation system by the NASD.<br><br>Since Source Interlink Delaware is a publicly traded company, no appraisal or dissenters rights are available to Source Interlink Delaware stockholders. | Under the DGCL, the right of dissenting stockholders to obtain the fair value for their shares is available in connection with some mergers and consolidations. Appraisal rights are not available to stockholders when the corporation will be the surviving corporation in a merger and no vote of its stockholders is required to approve the merger. In addition, no appraisal rights are available to holders of shares of any class of stock which is either (i) listed on a national securities exchange or designated as a national market system security on an interdealer quotation system by the NASD or (ii) held of record by more than 2,000 stockholders. |

165

IB 00201

http://yahoo.brand.edgar-online.com/EFX_dll/EDGARpro.dll?FetchFilingHTML1?SessionID=DbxMIg...     10/24/200

PROPOSALS TO SOURCE INTERLINK SHAREHOLDERS
TO BE VOTED ON AT THE SOURCE INTERLINK SPECIAL MEETING

**Proposal One — Issuance of Our Common Stock in Merger**

*General*

Our board, by a unanimous vote of those directors present at a special meeting of the board held to consider the merger, adopted a resolution approving the merger agreement and the issuance of shares of our common stock to Alliance stockholders in connection with the merger with Alliance. The share issuance is being submitted for the approval of the shareholders pursuant to the requirements of the National Association of Securities Dealers applicable to companies with securities quoted on the Nasdaq National Market. The merger cannot be completed unless our shareholders approve this proposal one.

The material terms of the merger agreement, the merger and the issuance of the Source Interlink common stock in the merger are more fully described elsewhere in this proxy statement/prospectus and in the merger agreement attached to this proxy statement/prospectus as *Annex A*.

The consummation of the merger is contingent upon approval of (i) this proposal one and (ii) either proposal two or proposal three. If our shareholders do not approve either proposal two or proposal three, then this proposal one will not be effected, even if approved by our shareholders, and the merger will not be consummated. Additionally, if our shareholders do not approve proposal one, then proposal two will not be effected, even if approved by our shareholders; but, proposal three will be effected if approved by our shareholders regardless of whether this proposal one or proposal two is approved.

*Vote Required*

The affirmative vote of the holders of a majority of the shares of our common stock entitled to vote and represented, in person or by proxy, at the special meeting is required to approve the issuance of our common stock in connection with the merger. Unless otherwise instructed, the proxies will vote "FOR" this proposal one.

**OUR BOARD OF DIRECTORS RECOMMENDS
THAT YOU VOTE "FOR" PROPOSAL ONE**

**Proposal Two — Amendment to Our Articles of Incorporation**

*General*

Our board, by a unanimous vote of those directors present at a special meeting of the board held to consider the merger, adopted a resolution approving the adoption of an amendment to our articles of incorporation for the purpose of increasing the number of authorized shares of our common stock from 40,000,000 to 100,000,000.

The consummation of the merger is contingent upon approval of (i) proposal one and (ii) either this proposal two or proposal three. If our shareholders do not approve either proposal two or proposal three, then proposal one will not be effected, even if approved by our shareholders and the merger will not be consummated. Additionally, if our shareholders do not approve proposal one, then this proposal two will not be effected, even if approved by our shareholders; but, proposal three will be effected if approved by our shareholders regardless of whether proposal one or this proposal two is approved.

*Proposal*

Under the proposed amendment, Article 4(a) of our articles would be amended and restated in its entirety as follows:

"(a) The aggregate number of shares of capital stock which the corporation shall have the authority to issue is one hundred two million (102,000,000), each having a par value of one cent ($0.01) per share. Of

166

---

IB 00202

such authorized shares, one hundred million (100,000,000) shares are hereby classified and designated as common stock and two million (2,000,000) shares are hereby designated as preferred stock."

As of January 14, 2005, there were 23,724,940 shares of our common stock outstanding. In addition, 4,537,273 shares are subject to outstanding options, warrants or other rights to acquire our common stock or reserved for future issuance under our stock option plans. Based upon the foregoing number of outstanding and reserved shares of common stock, we currently have 11,737,787 shares of common stock remaining for other purposes.

The additional authorized capital stock will be required to consummate the merger with Alliance. Based on the number of shares of our common stock outstanding as of January 14, 2005 (including shares issuable upon exercise of option, warrants or other rights to acquire our capital stock), we would be required to issue 26,669,975 shares of our common stock and reserve 1,283,107 shares of our common stock for issuance for assumed Alliance options, warrants and other rights in connection with the merger. If we are unable to increase our authorized capital stock, and we do not otherwise effect our reincorporation from a Missouri corporation to a Delaware corporation, we would not have a sufficient number of shares to consummate the merger.

Although we have no specific plans to use the additional authorized shares of our common stock other than in connection with the merger, our board believes that it is prudent to increase the number of authorized shares of our common stock to the proposed level in order to provide a reserve of shares available for issuances in connection with possible future actions. Such actions may include, but are not limited to, annual increases in the number of shares available for issuance pursuant to our employee benefits plans and stock splits or stock dividends if our board of directors were to determine that such actions would be desirable to facilitate a broader base of shareholders. Our board also believes that the increased number of authorized shares will provide the flexibility to effect other possible actions such as financings, corporate mergers, acquisitions of property, employee benefit plans and for other general corporate purposes. Having such additional authorized common stock available for issuance in the future would allow our board to issue shares of our common stock without the delay and expense associated with seeking shareholder approval. Elimination of such delays and expense occasioned by the necessity of obtaining shareholder approval will better enable us, among other things, to engage in financing transactions and acquisitions as well as to take advantage of changing market and financial conditions on a more competitive basis as determined by our board.

The increase in authorized common stock will not have any immediate effect on the rights of existing shareholders. To the extent that the additional authorized shares are issued in the future, they will decrease the existing shareholders' percentage equity ownership and, depending on the price at which they are issued, could be dilutive to the existing shareholders.

The proposed amendment to increase the number of authorized shares of common stock could also, under certain circumstances, have an anti-takeover effect, although this is not the intention of this proposal two. For example, in the event of a hostile attempt to take over control of our company, it may be possible for us to impede the attempt by issuing shares of common stock, thereby diluting the voting power of the other outstanding shares and increasing the potential cost to acquire control of our company. The amendment therefore may have the effect of discouraging unsolicited takeover attempts. By potentially discouraging initiation of any such unsolicited takeover attempt, the proposed amendment may limit the opportunity for our shareholders to dispose of their shares at the higher price generally available in takeover attempts or that may be available under a merger proposal. The proposed amendment may have the effect of permitting our management, including our board of directors, to retain its position, and place it in a better position to resist changes that shareholders may wish to make if they are dissatisfied with the conduct of our business. However, the board is not aware of any present attempt to take control of our company or to obtain representation on our board (other than such board representation as shall be effected pursuant to the merger with Alliance) and the board of directors has NOT presented this proposal with the intent that it be utilized as an anti-takeover device.

167

IB 00203

*Vote Required*

The affirmative vote of the holders of a majority of the issued and outstanding shares of our common stock is required to approve the amendment to our articles of incorporation to effect the increase in the number of authorized shares of our common stock from 40,000,000 to 100,000,000 shares. Unless otherwise instructed, the proxies will vote "FOR" this proposal two.

**OUR BOARD OF DIRECTORS RECOMMENDS**
**THAT YOU VOTE "FOR" PROPOSAL TWO**

**Proposal Three — Our Reincorporation from a Missouri Corporation to a Delaware Corporation**

*General*

Our board, by a unanimous vote of those directors present at a special meeting of the board held to consider the merger, adopted a resolution approving the change in the state of our incorporation from Missouri to Delaware.

The consummation of the merger is contingent upon approval of (i) proposal one and (ii) either proposal two or this proposal three. If our shareholders do not approve either proposal two or this proposal three, then proposal one will not be effected, even if approved by our shareholders, and the merger will not be consummated. Additionally, if our shareholders do not approve proposal one, then proposal two will not be effected, even if approved by our shareholders; but this proposal three will be effected if approved by our shareholders regardless of whether proposal one or proposal two is approved.

Throughout this proxy statement/prospectus, the terms "Source Interlink Missouri" and "Source Interlink" refer to Source Interlink Companies, Inc., the existing Missouri corporation, and the term "Source Interlink Delaware" refers to the new Delaware corporation, a wholly owned subsidiary of Source Interlink Missouri, which is the proposed successor to Source Interlink Missouri in the proposed reincorporation.

*Proposal*

The proposed reincorporation will be effected by merging Source Interlink Missouri with and into Source Interlink Delaware, which will succeed to all of the rights, properties, assets and liabilities of Source Interlink Missouri. Upon completion of the reincorporation merger, Source Interlink Missouri, will cease to exist and Source Interlink Delaware will continue to operate the business of Source Interlink under our current name, Source Interlink Companies, Inc. Pursuant to the agreement and plan of merger, in substantially the form attached hereto as *Annex C* , each outstanding share of Source Interlink Missouri common stock, $0.01 par value per share, will be automatically converted into one share of Source Interlink Delaware common stock, $0.01 par value per share, upon the effective date of the reincorporation merger. Each stock certificate representing issued and outstanding shares of Source Interlink Missouri common stock will continue to represent the same number of shares of common stock of Source Interlink Delaware. **IT WILL NOT BE NECESSARY FOR SHAREHOLDERS OF SOURCE INTERLINK MISSOURI TO EXCHANGE THEIR EXISTING STOCK CERTIFICATES FOR STOCK CERTIFICATES OF SOURCE INTERLINK DELAWARE.** As of the effective date of the reincorporation merger, certificates which immediately prior to such effective date represented shares of common stock of Source Interlink Missouri will be deemed for all purposes to represent the same number of shares of Source Interlink Delaware common stock. Nevertheless, shareholders may exchange their certificates if they so choose. The common stock of Source Interlink Missouri is listed for trading on the Nasdaq National Market and, after the reincorporation merger, Source Interlink Delaware's common stock will continue to be traded on the Nasdaq National Market without interruption, under the same symbol, SORC, as the shares of Source Interlink Missouri common stock are currently traded.

The proposed reincorporation has been approved by our board, by a unanimous vote of those directors present at a special meeting of the board held to consider the matter. If approved by the shareholders, it is anticipated that the reincorporation merger will become effective as soon as practicable following the special

168

IB 00204

meeting. However, pursuant to the reincorporation merger agreement, the reincorporation merger may be abandoned or the reincorporation merger agreement may be amended by the Source Interlink Missouri board (except that the principal terms may not be amended without shareholder approval) either before or after shareholder approval has been obtained and prior to the effective date of the reincorporation merger if, in the opinion of our board, circumstances arise which make it inadvisable to proceed under the original terms of the reincorporation merger agreement. If this proposal three is approved by our shareholders, we expect to effect the reincorporation even if proposal one is not approved and/or the merger is not consummated. Shareholders of Source Interlink Missouri will have no appraisal rights with respect to the reincorporation merger.

Immediately following the reincorporation merger, the composition of the board of Source Interlink Delaware will be the same as the composition of the board of Source Interlink Missouri immediately prior to the reincorporation merger. The rights of Source Interlink Delaware stockholders and Source Interlink's corporate affairs will be governed by the DGCL, and the certificate of incorporation and bylaws of Source Interlink Delaware, rather than by the MGBCL, and the articles of incorporation and bylaws of Source Interlink Missouri. See "Comparison of Stockholder Rights and Corporate Governance Matters" beginning on page 149 above for a comparison of the material rights of stockholders and matters of corporate governance before and after the reincorporation merger.

The summary and discussion of the proposed reincorporation proposal and the reincorporation merger set forth in this proxy statement/prospectus is qualified in its entirety by reference to the MGBCL, the DGCL, the reincorporation merger agreement, the certificate o incorporation of Source Interlink Delaware and the bylaws of Source Interlink Delaware, copies of which are attached hereto as *Annexes C, D* and *E* , respectively. Copies of Source Interlink Missouri's articles of incorporation and bylaws are available for inspection at Source Interlink Missouri's main office, or Source Interlink Missouri will send them to you upon request. *We urge you to read each of these documents carefully for a complete understanding of your rights as a shareholder* .

If proposal one and this proposal three are approved by our shareholders, and the merger with Alliance and our reincorporation from a Missouri corporation to a Delaware corporation is consummated, the board of Source Interlink Delaware will amend the Source Interlink Delaware bylaws attached hereto as *Annex E* to reflect the terms of the bylaw amendment required by the stockholder's agreement among Source Interlink, Alliance and AEC Associates. See "Agreements Related to the Merger and Other Transactions — Stockholder's Agreement" beginning on page 75.

**APPROVAL BY SHAREHOLDERS OF THIS PROPOSAL THREE WILL CONSTITUTE APPROVAL OF THE REINCORPORATION MERGER AGREEMENT, THE CERTIFICATE OF INCORPORATION OF SOURCE INTERLINK DELAWARE, THE BYLAWS OF SOURCE INTERLINK DELAWARE, AND THE RESTATED INDEMNIFICATION AGREEMENTS OF SOURCE INTERLINK DELAWARE AND ALL PROVISIONS THEREOF.**

### Principal Reasons for the Proposed Reincorporation

As we plan for the future, our board and management believe that it is essential to be able to draw upon well established principles of corporate governance in making legal and business decisions. The prominence and predictability of Delaware corporate law provide a reliable foundation on which our corporate governance decisions can be based, and we believe that our shareholders will benefit from the responsiveness of Delaware corporate law to their needs and to those of the corporation they own.

*Prominence, Predictability and Flexibility of Delaware Law.* For many years, Delaware has followed a policy of encouraging incorporation in that state and, in furtherance of that policy, has been a leader in adopting, construing and implementing comprehensive, flexible corporate laws responsive to the legal and business needs of corporations organized under its laws. Many corporations have chosen Delaware initially as a state of incorporation or have subsequently changed corporate domicile to Delaware. Because of Delaware's prominence as the state of incorporation for many major corporations, both the legislature and courts in Delaware have demonstrated an ability and a willingness to act quickly and effectively to meet changing business needs. The Delaware courts have developed considerable expertise in dealing with corporate issues,

IB 00205

and a substantial body of case law has developed construing Delaware law, resulting in greater predictability with respect to corporate legal affairs.

*Increased Ability to Attract and Retain Qualified Directors.* Both Missouri and Delaware law permit a corporation to include a provision in its certificate of incorporation which reduces or limits the monetary liability of directors for breaches of fiduciary duty in certain circumstances The increasing frequency of claims and litigation directed against directors and officers has expanded the risks facing directors and officers of corporations in exercising their respective duties. The amount of time and money required to respond to such claims and to defend such litigation can be substantial. It is our desire to reduce these risks to our directors and officers and to limit situations in which monetary damages can be recovered against our directors so that we may continue to attract and retain qualified directors who otherwise might be unwilling to serve because of the risks involved. We believe that, in general, Delaware law provides greater protection to directors than Missouri law and that Delaware law regarding a corporation's ability to limit director liability is more developed and provides more guidance than Missouri law.

*Well Established Principles of Corporate Governance.* There is substantial judicial precedent in the Delaware courts as to the legal principles applicable to measures that may be taken by a corporation and as to the conduct of the board of directors such as under the business judgment rule and other standards. This tends to assure a significant measure of certainty to legal aspects of the conduct of business and a sound basis for planning. Therefore, we believe that our shareholders will benefit from the well established principles of corporate governance that Delaware law affords.

### No Change in the Name, Board Members, Business, Management, Employee Benefit Plans or Location of Principal Facilities of Source Interlink

The proposed reincorporation will effect a change in our legal domicile and certain other changes of a legal nature which are described in this proxy statement/prospectus. Except as contemplated in connection with the reincorporation merger, the proposed reincorporation will NOT result in any change in our name, business, management, fiscal year, assets or liabilities or location of the principal facilities. Under generally accepted accounting principles, the proposed reincorporation will not result in any gain or loss to Source Interlink Missouri or Source Interlink Delaware. The consolidated financial condition and results of operations of Source Interlink Delaware immediately after the reincorporation merger will be identical to that of Source Interlink Missouri immediately prior to the reincorporation merger. The directors of Source Interlink Missouri immediately prior to the proposed reincorporation will become the directors of Source Interlink Delaware. All employee benefit, stock option and employee stock purchase plans of Source Interlink Missouri will be assumed and continued by Source Interlink Delaware, and each option or right issued pursuant to such plans will automatically be converted into an option or right to purchase the same number of shares of Source Interlink Delaware common stock, at the same price per share, upon the same terms, and subject to the same conditions. Shareholders should note that approval of this proposal three will also constitute approval of the assumption of these plans by Source Interlink Delaware. Other employee benefit arrangements of Source Interlink Missouri will also be continued by Source Interlink Delaware upon the terms and subject to the conditions currently in effect. As noted above, after the reincorporation merger the shares of common stock of Source Interlink Delaware will continue to be traded, without interruption, in the same principal market (the Nasdaq National Market) and under the same symbol, SORC, as the shares of common stock of Source Interlink Missouri are currently traded. We believe that the proposed reincorporation will not affect any of its material contracts with any third parties and that Source Interlink Missouri's rights and obligations under such materia contractual arrangements will continue and be assumed by Source Interlink Delaware. See "Comparison of Stockholder Rights and Corporate Governance Matters" beginning on page 149 above, for a comparison of the material rights of equityholders and matters of corporate governance before and after the reincorporation merger.

### Antitakeover Implications

Delaware, like many other states, permits a corporation to adopt a number of measures designed to reduce a corporation's vulnerability to unsolicited takeover attempts through amendment of the corporate

170

IB 00206

charter or bylaws or otherwise. The proposed reincorporation is NOT being proposed in order to prevent such a change in control and our board is not aware of any present attempt to acquire control of our company or to obtain representation on our board (other than such board representation as shall be effected pursuant to the merger with Alliance).

In the discharge of its fiduciary obligations to our shareholders, our board has evaluated our vulnerability to potential unsolicited bidders. In the course of such evaluation, our board has considered certain defensive strategies designed to enhance the board's ability to negotiate with an unsolicited bidder. These strategies include, but are not limited to, the adoption of a shareholder rights plan, the establishment of a staggered board of directors, and the authorization of preferred stock, the rights and preferences of which may be determined by our board. Some of these measures have been implemented by Source Interlink Missouri under Missouri law and will be assumed or a corresponding arrangement has been provided for by Source Interlink Delaware under Delaware law. For a detailed discussion of the changes which will be implemented as part of the proposed reincorporation, see "Comparison of Stockholder Rights and Corporate Governance Matters" beginning on page 149 above.

Certain effects of the proposed reincorporation may be considered to have antitakeover implications. Section 203 of the Delaware General Corporation Law restricts certain "business combinations" with "interested stockholders" for three years following the date that a person becomes an interested shareholder, unless the board of directors approves the business combination. See "Comparison of Stockholder Rights and Corporate Governance Matters — Anti-Takeover Provisions" beginning on page 160 above.

Our board believes that unsolicited takeover attempts may be unfair or disadvantageous to us and our shareholders because, among other reasons: (i) a non-negotiated takeover bid may be timed to take advantage of temporarily depressed stock prices; (ii) a non-negotiated takeover bid may be designed to foreclose or minimize the possibility of more favorable competing bids or alternative transactions; (iii) a non-negotiated takeover bid may involve the acquisition of only a controlling interest in the corporation's stock, without affording all shareholders the opportunity to receive the same economic benefits; and (iv) certain of our contractual arrangements provide that they may not be assigned pursuant to a transaction which results in a "change of control" of company without the prior written consent of the licensor or other contracting party.

By contrast, in a transaction in which a potential acquirer must negotiate with an independent board of directors, the board can and should take account of the underlying and long-term values of our business, technology and other assets, the possibilities for alternative transactions on more favorable terms, possible advantages from a tax-free reorganization, anticipated favorable developments in our business not yet reflected in the stock price and equality of treatment of all shareholders.

Despite the belief of our board as to the benefits to shareholders of the proposed reincorporation, it may be disadvantageous to the extent that it has the effect of discouraging a future takeover attempt which is not approved by our board, but which a majority of the shareholders may deem to be in their best interests or in which shareholders may receive a substantial premium for their shares over the then current market value or over their cost basis in such shares. As a result of such effects of the proposed reincorporation, shareholders who might wish to participate in an unsolicited tender offer may not have an opportunity to do so. In addition, to the extent that provisions of Delaware law enable the board to resist a takeover or a change in control of our company, such provisions could make it more difficult to change the existing board and management.

### Material U.S. Federal Income Tax Consequences

The following discussion represents the opinion of Wilson Sonsini Goodrich & Rosati, Professional Corporation, our special counsel (as reflected in Exhibit 8.1 to the Registration Statement) with respect to the material U.S. federal income tax consequences to holders of Source Interlink Missouri common stock who receive Source Interlink Delaware common stock in exchange for their Source Interlink Missouri common stock as a result of the proposed reincorporation. It does not address the tax consequences of the proposed reincorporation to holders of options or warrants to acquire, or securities convertible into, Source Interlink common stock. This discussion addresses only our shareholders who are U.S. citizens or residents and hold our common stock as capital assets. It does not address all of the U.S. federal income tax consequences that may

IB 00207

be relevant to a particular Source Interlink shareholder in light of that shareholder's individual circumstances or to a Source Interlink shareholder who is subject to special rules, including, without limitation:

- a financial institution or insurance company;

- a mutual fund;

- a tax-exempt organization;

- a pass-through entity or an investor in such an entity;

- a dealer or broker in securities or foreign currencies;

- a shareholder who holds individual retirement or other tax-deferred accounts;

- a trader in securities who elects to apply a mark-to-market method of accounting;

- a shareholder who is subject to the alternative minimum tax provisions of the Internal Revenue Code;

- a shareholder who holds Source Interlink common stock as part of a hedge, appreciated financial position, straddle, constructive sale or conversion transaction; or

- a shareholder who acquired his or her shares of Source Interlink common stock pursuant to the exercise of employee stock options or otherwise as compensation.

The following discussion is based on the Internal Revenue Code, applicable Treasury regulations, administrative interpretations and court decisions, each as in effect as of the date of this proxy statement/prospectus and all of which are subject to change, possibly with retroactive effect. No ruling with respect to the U.S. federal income tax consequences of the proposed reincorporation has been or will be requested from the IRS, and this discussion is not binding on the IRS. In addition, the discussion does not address any state, local or foreign tax consequences of the reincorporation merger.

**Our shareholders are strongly urged to consult their tax advisors as to the specific tax consequences to them of the proposed reincorporation in light of their particular circumstances, including the applicability and effect of U.S. federal, state, local and foreign income and other tax laws.**

The proposed reincorporation is intended to qualify as a "reorganization" within the meaning of Section 368(a) of the Internal Revenue Code. Assuming the reincorporation qualifies as a "reorganization," the following tax consequences generally will result:

- No gain or loss will be recognized by holders of Source Interlink Missouri common stock upon receipt of Source Interlink Delaware common stock pursuant to the reincorporation;

- The aggregate tax basis of the Source Interlink Delaware common stock received by each shareholder in the reincorporation will be equal to the aggregate tax basis of the Source Interlink Missouri common stock surrendered in exchange therefor;

- The holding period of the Source Interlink Delaware common stock received by each shareholder of Source Interlink Missouri will include the period for which such shareholder held the Source Interlink Missouri common stock surrendered in exchange therefor; and

- Source Interlink will not recognize gain or loss for federal income tax purposes as a result of the reincorporation.

**SOURCE INTERLINK SHAREHOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE SPECIFIC TAX CONSEQUENCES OF THE PROPOSED REINCORPORATION TO THEM, INCLUDING THE APPLICATION AND EFFECT OF U.S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX LAWS.**

IB 00208

http://yahoo.brand.edgar-online.com/EFX dll/EDGARpro.dll?FetchFilingHTML1?SessionID=DbxMIg...    10/24/200:

*Vote Required*

The affirmative vote of the holders of two-thirds of the issued and outstanding shares of our common stock is required to approve our reincorporation from a Missouri corporation to a Delaware corporation. Unless otherwise instructed, the proxies will vote "FOR" this proposal three.

**OUR BOARD OF DIRECTORS RECOMMENDS
THAT YOU VOTE "FOR" PROPOSAL THREE**

**Proposal Four — Grant of Discretionary Authority to Our Board to Adjourn Special Meeting**

*General*

At the special meeting of our shareholders, and any adjournment or postponement of the special meeting, our shareholders will be asked to consider and vote upon a proposal to grant discretionary authority to our board to adjourn or postpone the special meeting to a later date, if necessary, to solicit additional proxies if there are not sufficient votes in favor of the foregoing proposals.

*Proposal*

If at our special meeting on February 28, 2005, the number of shares of our common stock present or represented and voting in favor of the proposals required to implement the merger is insufficient under Missouri law to approve such proposals, our board intends to move to adjourn the special meeting in order to enable our board to solicit additional proxies in favor of the proposals. In that event, we will ask our shareholders to vote only upon this proposal four and not upon proposal one, proposal two or proposal three.

In this proposal four, we are asking our shareholders to authorize the holder of any proxy solicited by our board to vote in favor of granting the discretionary authority to our board to adjourn or postpone our special meeting, and use the additional time to solicit additional proxies in favor of proposal one, proposal two or proposal three. If the shareholders approve this proposal four, our board could adjourn or postpone the special meeting, and any adjourned session of the special meeting, and use the additional time to solicit additional proxies in favor of proposal one, proposal two and proposal three, including the solicitation of proxies from shareholders that have previously voted against proposal one, proposal two or proposal three. Among other things, approval of this proposal four could mean that, even if we had received proxies representing a sufficient number of votes against proposal one, proposal two or proposal three to defeat them, our board could adjourn the special meeting without a vote on the proposal one, proposal two and proposal three and seek during that period to convince the holders of those shares to change their votes to votes in favor of the proposal one, proposal two and proposal three.

Our board believes that if the number of shares of our common stock present or represented at the special meeting and voting in favor of proposal one, proposal two or proposal three is insufficient to approve such proposals, it is in the best interests of our shareholders to enable the board, for a limited period of time, to continue to seek to obtain a sufficient number of additional votes in favor of such proposals to bring about their approval.

*Vote Required*

The affirmative vote of the holders of a majority of the shares of our common stock entitled to vote and represented, in person or by proxy, at the special meeting is required to approve the grant of discretionary authority to our board to adjourn or postpone the special meeting to a later date, if necessary, to solicit additional proxies if there are not sufficient votes in favor of proposal one, proposal two or proposal three. Unless otherwise instructed, the proxies will vote "FOR" this proposal four.

**OUR BOARD OF DIRECTORS RECOMMENDS
THAT YOU VOTE "FOR" PROPOSAL FOUR**

173

IB 00209

## LEGAL MATTERS

Armstrong Teasdale LLP will render an opinion on the legality of the Source Interlink common stock to be issued to Alliance stockholders in the merger.

## EXPERTS

The financial statements and schedule of Source Interlink Companies, Inc. as of January 31, 2004 and 2003 and for each of the three years in the period ended January 31, 2004 incorporated by reference in the registration statement have been audited by BDO Seidman, LLP, independent registered public accountants, to the extent and for the periods set forth in their reports incorporated herein by reference, and are herein in reliance upon such reports given upon the authority of said firm as experts in auditing and accounting.

The financial statements of Alliance as of December 31, 2003 and 2002, and for each of the three years in the period ended December 31, 2003, included in this registration statement have been so included in reliance on the report of PricewaterhouseCoopers LLP, independent accountants, given on the authority of such firm as experts in accounting and auditing.

## WHERE YOU CAN FIND MORE INFORMATION

We file annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission, or the SEC. You may read and copy any of these reports, statements or other information at the SEC's public reference room located at 450 Fifth Street, N.W., Washington D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. Our SEC filings are also available to the public from commercial document retrieval services and at the web site maintained by the SEC at http://www.sec.gov.

We have filed a registration statement on Form S-4 to register with the SEC our common stock to be issued to Alliance stockholders upon consummation of the merger. This proxy statement/ prospectus is a part of that registration statement and constitutes our prospectus in addition to being a proxy statement for our shareholder meeting. As allowed by the SEC rules, this proxy statement/ prospectus does not contain all the information you can find in the registration statement or the exhibits to the registration statement.

The SEC allows us to "incorporate by reference" information into this proxy statement/ prospectus, meaning that we can disclose important information by referring to another document filed separately with the SEC. The information incorporated by reference is deemed to be part of this proxy statement/ prospectus, except for any information superseded by information in, or incorporated by reference in, this proxy statement/ prospectus. This proxy statement/ prospectus incorporates by reference the documents, as

174

IB 00210

amended, set forth below that we have previously filed with the SEC. These documents contain important information about us and our finances.

| Securities and Exchange Commission Filings | Period |
|---|---|
| Annual Report on Form 10-K | Fiscal Year ended January 31, 2004 |
| Quarterly Report on Form 10-Q | Quarter ended April 30, 2004 |
| Quarterly Report on Form 10-Q | Quarter ended July 31, 2004 |
| Quarterly Report on Form 10-Q | Quarter ended October 31, 2004 |
| Current Reports on Form 8-K | Filed on March 3, 2004, April 16, 2004, May 21, 2004, June 10, 2004, September 2, 2004, September 13, 2004, September 16, 2004, November 18, 2004, November 24, 2004 and December 10, 2004 |
| Proxy Statement on Schedule 14A | Filed on May 28, 2004 |
| The description of the rights agreement, contained in the Registration Statement on Form 8-A/ A filed pursuant to Section 12 of the Exchange Act on October 1, 1997 Including any amendment or reports filed with the Securities and Exchange Commission for the purpose of updating this description | Filed on October 1, 1997 |

We are also incorporating by reference additional documents that we file with the Securities and Exchange Commission under Section 13 (a), 13(c), 14 or 15(d) of the Exchange Act between the date of the initial filing of the registration statement of which this proxy statement/ prospectus is a part and the effectiveness of the registration statement, as well as between the date of this proxy statement/ prospectus and the termination of the offering contemplated by this proxy statement/ prospectus.

All information contained or incorporated by reference in this proxy statement/ prospectus relating to us has been supplied by us, and all information relating to Alliance has been supplied by Alliance.

If you are a shareholder, you may have already received some of the documents incorporated by reference. Alternatively, you can obtain any of these documents through us or the Securities and Exchange Commission. Documents incorporated by reference are available from us without charge, excluding all exhibits unless we have specifically incorporated by reference an exhibit in this proxy statement/ prospectus. Shareholders may obtain documents incorporated by reference in this proxy statement/ prospectus by requesting them in writing or by telephone from the appropriate party at the following address:

Source Interlink Companies, Inc.,<br>
Attn: General Counsel<br>
27500 Riverview Center Blvd., Suite 400<br>
Bonita Springs, Florida 34134<br>
(239) 949-4450

If you are a Source Interlink shareholder and would like to request documents from us, please do so by February 21, 2005 to receive them before our special meeting.

You can also get more information by visiting our website at www.SourceInterlink.net. Except to the limited extent expressly provided in this proxy statement/ prospectus, information contained in our website is not incorporated by reference into this proxy statement/ prospectus.

175

IB 00211

You should rely only on the information contained or incorporated by reference in this proxy statement/ prospectus to vote on the proposals to our shareholders in connection with the merger. We have not authorized anyone to provide you with information that is different from what is contained in this proxy statement/ prospectus. This proxy statement/ prospectus is dated January 18, 2005. You should not assume that the information contained in this proxy statement/ prospectus is accurate as of any date other than such date, and neither the mailing of this proxy statement/ prospectus to shareholders nor the issuance of shares of our common stock in the merger shall create any implication to the contrary.

IB 00212

# INDEX TO FINANCIAL STATEMENTS

| | Page(s) |
|---|---|
| Consolidated Financial Statements for the Nine Months Ended September 30, 2004 (unaudited) | F-2 |
| Index to Consolidated Financial Statements for the Nine Months Ended September 30, 2004 (unaudited) | F-3 |
| Consolidated Balance Sheets as of September 30, 2004 (unaudited) and December 31, 2003 | F-4 |
| Consolidated Statements of Operations for the Nine Months Ended September 30, 2004 and 2003 (unaudited) | F-5 |
| Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2004 and 2003 (unaudited) | F-6 |
| Notes to Consolidated Financial Statements for the Nine Months Ended September 30, 2004 (unaudited) | F-7 |
| Consolidated Financial Statements for the Years Ended December 31, 2003 and 2002 | F-12 |
| Index to Consolidated Financial Statements for the Years Ended December 31, 2003, 2002 and 2001 | F-13 |
| Report of Independent Registered Certified Public Accounting Firm | F-14 |
| Consolidated Balance Sheets as of December 31, 2003 and 2002 | F-15 |
| Consolidated Statements of Operations for the Years Ended December 31, 2003, 2002 and 2001 | F-16 |
| Consolidated Statements of Stockholders' Equity for the Years Ended December 31, 2003, 2002 and 2001 | F-17 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2003, 2002 and 2001 | F-18 |
| Notes to Consolidated Financial Statements for the Years Ended December 31, 2003, 2002 and 2001 | F-19 |

F-1

IB 00213