Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

JONATHAN LEDECKY d/b/a IRONBOUND
PARTNERS,

    Plaintiff,

vs.                              CASE NO. 1:05 CV 01039

SOURCE INTERLINK COMPANIES, INC.,

    Defendant.
_____/

              C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF:   S. LESLIE FLEGEL

DATE:                       May 4, 2006

TIME:                       9:40 a.m. to 3:26 p.m.

LOCATION:                   27200 Riverview Center
                            Suite 309
                            Bonita Springs, FL

TAKEN BY:                   Plaintiff

REPORTER:                   Betty G. Althoff, RPR


DEFENDANT'S EXHIBIT C

Page 14

1  A. I am Chairman of the Board.
2  Q. What else?
3  A. Chief Executive Officer.
4  Q. Anything else?
5  A. No.
6  Q. How long have you been CEO of Source?
7  A. Um, since February 1st, 1995.
8  Q. And were you CEO of its predecessor companies?
9  A. I was the owner of the predecessor company of
10 one of the predecessor companies.
11 Q. How long have you been Chairman of the Board?
12 A. Since February 1st, 1995.
13 Q. How would you describe Sources' business, what
14 does it do?
15 A. Its business is primarily geared towards the
16 management of magazine sales, front end management,
17 meaning the manufacturing of it and placement of
18 products at the checkouts, and the distribution of
19 magazines, books, DVD's, and um, CD's music CD's.
20 Q. Give me one second, if you would. As CEO of
21 Source, I presume you are familiar with various public
22 documents that Source distributes, that it is required
23 to distribute under SEC rules?
24 A. Yes, I am.
25 Q. Let me show you -- let me show you Exhibit 1.

Page 15

1       (Plaintiff's Exhibit No. 1, S-4, was marked
2  for identification.)
3       THE WITNESS: Okay.
4  BY MR. MILLER:
5  Q. Do you recognize that as an S-4 that was
6  issued by Source?
7  A. Yes.
8  Q. Okay. And what was the purpose of this S-4?
9  A. Well, it's not the only S-4 we have filed,
10 so --
11 Q. True. Why don't you take a look at the about
12 the second and third page or third and fourth page. Is
13 this the S-4 that Source issued to announce the special
14 shareholders meeting to be held on February 28th, 2005,
15 at which the shareholders would vote on the proposed
16 merger of Source and Alliance?
17 A. Correct, that is correct.
18 Q. And that merger was approved on February 28th,
19 2005, by the shareholder; correct?
20 A. That is correct.
21 Q. And therefore, as of February 28, 2005, Source
22 acquired Alliance; correct?
23 A. That is correct.
24 Q. Is everything in this S-4, that was issued by
25 Source under SEC Rules, accurate?

Page 16

1  A. I would say materially so, yes.
2  Q. All right, how about nonmaterially so?
3  A. Well, any time you do a document of this size,
4  and I have seen it more often than not or as often as
5  not, there could be a terminology or a word that is
6  incorrect, but essentially, not materially incorrect.
7  Q. Okay. Are you aware of any words or phrases
8  that are incorrect in this S-4?
9  A. I am aware of a description of -- I don't
10 remember it specifically -- because I haven't read this
11 recently, but a description that I later read that I
12 felt incorrectly stated the manner in which Ari Emanuel
13 was paid.
14 Q. Okay. Tell me about that.
15 A. Well, I didn't agree to pay Ari Emanuel any
16 money, that was agreed to buy the Yucaipa people,
17 completely unrelated to me. And, um, when the payment
18 was made, it was made after the merger out of Alliance,
19 which we then owned.
20     And, um, I think that the way it is stated in
21 this, and it became an issue that I brought up with my
22 own internal people later. This is something I didn't
23 personally catch, because it is hard to read every word
24 in one of these things. That I felt that it gave the
25 impression, the way it was worded, that we had agreed

Page 17

1  to pay that money, when we hadn't.
2  Q. "We" who?
3  A. That Source.
4  Q. Well, in fact, Source did pay the money,
5  didn't it?
6  A. Source, Source -- Alliance paid the money, and
7  Source owned Alliance at the time -- but it had nothing
8  to do with the fact that we had agreed to any portion
9  of that. That was preagreed upon by Ron Burkle and
10 Yucaipa with Ari Emanuel, which I was not privy to any
11 of those discussions.
12 Q. You knew he was going to get a million and a
13 half dollars; correct, did you not, Mr. Flegel?
14 A. I knew at some point time the Yucaipa people
15 informed me that they were paying, that they had agreed
16 to pay Ari Emanuel a million and a half dollars.
17 Q. In fact, that fact is listed in this S-4,
18 isn't it? The fact that he is going to be paid a
19 million and a half dollars.
20 A. It is listed did in the S-4.
21 Q. And are you saying that, tell me again what
22 the discrepancy is?
23 A. I am saying I didn't agree to pay that money,
24 and it was paid by Alliance. Frankly, I wasn't
25 surprised that it wasn't paid prior to the merger, but

Page 18

1  I was told for technical reasons it had to be paid
2  after the merger, because it was only due upon the
3  conclusion of the merger. And therefore, was --
4      Q. Who told you that?
5      A. Sorry?
6      Q. Who told you that?
7         MR. STERN: Object to the form of the
8      question. I would advise you not to reveal any
9      attorney-client communications.
10 BY MR. MILLER:
11     Q. All right, go ahead and continue with your
12 answer.
13     A. And so, in effect, um, it was paid by
14 Alliance, which at the time, as a result of the merger,
15 we then owned, but it had nothing to do with anything I
16 had agreed to do.
17     Q. And you don't -- and Mr. Emanuel was a member
18 of the Board of Directors of Source at the time he was
19 paid the million and a half dollars; correct?
20     A. He -- I am not sure I remember precisely when
21 the sequence of events was. I don't know if that
22 happened before or after.
23     Q. Well, the Board of Source approved the merger
24 in November of 2004; correct?
25     A. The board, yeah, and I do not believe that he

Page 19

1  was on the board in 2004.
2      Q. Okay. Well, we can correct that.
3         It will take me a minute to track it down.
4         MR. STERN: Can we go off the record so he can
5      hand him his glasses.
6         MR. MILLER: Sure.
7         THE VIDEOGRAPHER: Off the record, time is
8      10:04 p.m.
9         (Whereupon, an off the record discussion was
10     had.)
11        THE VIDEOGRAPHER: Back on the record, the
12     time is 10:05 a.m.
13        (Plaintiff's Exhibit No. 2,
14 Press Release, was marked for identification.)
15 BY MR. MILLER:
16     Q. All right, Mr. Flegel, let me show you Exhibit
17 2, and ask you to take a look at that. That is an
18 announcement, a press release actually, by your
19 company, Source, dated November 18, 2004, announcing
20 Ari Emanuel had been made a member of the Board of
21 Source; is that correct?
22     A. That is correct. I didn't remember it that
23 way, but that is correct.
24     Q. Okay. So would you agree that he was made a
25 member of the Board of Directors of Source as of

Page 20

1  November 18th, 2004?
2      A. Yes.
3      Q. Okay. So by the time he was paid the million
4  and a half dollars, at the beginning of March of 2005,
5  he had been a member of the Board of Directors of
6  Source for several months; correct?
7      A. Yes.
8         MR. STERN: Object to the form of the
9      question.
10        THE WITNESS: I am sorry? I didn't hear you.
11        MR. STERN: I was just making an objection to
12     form for the record.
13        THE WITNESS: Okay.
14 BY MR. MILLER:
15     Q. Is that correct?
16     A. It appears it is correct, yes.
17     Q. And he was paid a million and a half dollars
18 within a couple days after the closing, after the
19 merger actually occurred on February 28th, 2005;
20 correct?
21     A. That is correct.
22     Q. All right. Are you saying that it is not a
23 material fact that there was a statement in your S-4
24 that one of your Board Directors, one of your members
25 of your Board of Directors was going to be paid a

Page 21

1  million and a half dollars by your company?
2         MR. STERN: Object to the form of the
3      question.
4         THE WITNESS: No, I didn't say that was
5      immaterial, I didn't say that.
6  BY MR. MILLER:
7      Q. Okay. What is immaterial then?
8      A. I didn't say anything was immaterial. I
9  didn't say that was -- I said from time to time -- I
10 said that this is materially correct.
11     Q. Right?
12     A. And from time to times, in filings of S-4's
13 there are misstatements that are not material, that is
14 what I said.
15     Q. And I asked you if there were any nonmaterial
16 misstatements in the S-4, and we talked about that.
17     A. But I said -- no one denies that he was paid
18 the million and a half dollars. What I think is not
19 material -- what I think is incorrect -- I am not a
20 Judge whether it is material or not, and I don't
21 believe it is material -- was the specific wording of
22 it.
23     Q. Uh-huh, Okay. Um, and the S-4 that we have
24 been looking at Exhibit Number 1, as we said before,
25 that was to announce the special shareholders meeting

Page 82

1   Q. And did Mr. Ledecky do that?
2   A. He set up a meeting with a Mr. Emanuel and a
3   guy by the name of Modi Whitecheck I believe attended.
4   Q. Was that in New York?
5   A. That was in New York.
6   Q. Who attended that meeting in New York?
7   A. Well, Modi Whitecheck and Ari Emanuel and
8   John, myself, I think Jim was there, I am not sure, but
9   I think he was, Jim Gillis.
10  Q. Mr. Gillis?
11  A. Yes. And I think that my son, Jason Flegel,
12  was sort of in and out of the meeting.
13  Q. Was there more than one meeting in New York
14  with these individuals or just one?
15  A. I think just one.
16  Q. Okay. Tell me what happened at this meeting.
17  A. Well, the meeting went off on a number of
18  tangents. It was about doing the deal we talked about,
19  and they Ari Emanuel popped up with taking the company
20  private.
21  Q. Taking what company private?
22  A. Source private.
23  Q. Okay.
24  A. And he may have even talked about somehow the
25  relationship with Endeavor, but I don't remember

Page 83

1   exactly what he was talking about. We talked about, he
2   asked me if I would have an interest in taking the
3   company private. My answer was, is and will always be
4   yes to that question, just something that as a
5   businessman, I would always explore. And I have
6   explored it in the past before that. And in fact, I am
7   exploring it right now. So it wasn't unusual for me to
8   say yes to that.
9       And he was talking about all of these contacts
10  with private equity firms that he had, and that he
11  could get the backing, and that he was going to put his
12  own money into it, and um, you know, um, a good sales
13  pitch.
14  Q. Who did he mention, any specific people or
15  backers he could get?
16  A. I don't, he is the kind of guy that throws so
17  much at you so fast that it is very difficult to
18  remember exactly what he said and what he didn't say,
19  and who he said. He throws a million names at you.
20  Q. Did he mention Ron Burkle in this meeting?
21  A. No, I do not -- if he did, I don't recall us
22  mentioning Ron Burkle, and I really didn't know who Ron
23  Burkle was by the way.
24  Q. Was Dean Hind at this meeting?
25  A. Dean may or may not have been. He usually

Page 84

1   attends meetings I have, and he was with the company at
2   the time. So --
3   Q. And what was his position with the company?
4   A. Dean at that point in time was a consultant to
5   the company helping me with, primarily working with
6   capital markets, doing a lot of follow-up work for me
7   in New York City.
8   Q. Is he with the company currently?
9   A. He is and he is a full time employee of the
10  company at this point.
11  Q. All right. What else was discussed at the May
12  meeting in New York City?
13  A. Well, we were talking about, um, the checkout
14  opportunity, which this was -- this whole thing was
15  about the checkout opportunity. And, um, we talked
16  about that and the specifics, and we talked about the,
17  um, what it would take, who would do what, the meetings
18  that would be set up, and the enormous numbers were
19  thrown about in that meeting by Ari. And, um, I think
20  John bought into those numbers -- John Ledecky bought
21  into those numbers as well.
22      It turned out to be -- I think, I don't think
23  anybody had bad intentions -- it turned out to be not
24  true. But I do believe that the principal discussion
25  was that. And then the discussion got to come about,

Page 85

1   all of a sudden Ari switched it to, the focus of the
2   meeting to going private.
3   Q. Any other topics talked about at the meeting?
4   A. Any what?
5   Q. Any other topics discussed at the meeting?
6   A. Not that I remember specifically, no.
7   Q. How long did the meeting last?
8   A. I don't remember, maybe a couple of hours. I
9   don't time meetings.
10  Q. And how was the meeting left?
11  A. I think it was left that, um, Modi Whitecheck,
12  who was their operations guide, was going to be in
13  touch with Jason to figure out models, economic models
14  and financial models. I think that was -- and that was
15  the primary thing in terms of the actual business
16  opportunity -- and I think that we talked about Ari
17  getting back about the idea of going private.
18  Q. And did he do that?
19  A. Um, he didn't make anything happen. I mean he
20  talked about it a few times, and I don't know exactly
21  what happened, but nothing came of it.
22      (Plaintiff's Exhibit No. 7, E-mail dated
23  5/14/04 to Flegel from Ledecky, was marked for
24  identification.)
25      THE VIDEOGRAPHER: Mr. Miller, you have about

### Page 122

1  the mutual board member, and that is how Ari Emanuel
2  got on the board. We agreed it was somebody we both
3  knew. And I always liked Ari, it wasn't that I didn't
4  like him. And I was still trying to get the deal done
5  with Ari, which, by the way, my board eventually felt
6  was a conflict of interest and that we shouldn't do;
7  but in any event, Ari -- we came up with the name Ari.
8      I said, "I think I am okay with Ari." He
9  said, "I think I am okay with Ari." He said, "Let's
10 think about it overnight and let's talk in the
11 morning." And I said, "Okay, providing it's Ari or
12 someone else that we mutually agree to, then we have a
13 deal." And that is how the deal got resurrected.
14     Q. From the time that the deal broke down in the
15 middle of September, September 20th and 22nd of 2004,
16 until this meeting that you had with Mr. Burkle, did
17 you have any conversations with Mr. Emanuel about the
18 deal, the deal being the Alliance deal?
19     A. Um, I -- yes, I did, because, number one, I
20 told him that we -- but he knew the deal was off. I
21 told him that we -- that through Len Rizzio -- Len
22 Rizzio played a major role in this deal happening. And
23 I told him that through Len Rizzo we were able to
24 resurrect the deal, and that would he be agreeable to
25 serving as a board member.

### Page 123

1      Q. Prior to that, prior to your meeting with
2  Mr. Burkle, did you have conversations where
3  Mr. Emanuel contacted you, to basically try and get the
4  Alliance deal back on track, to get you talking to
5  Mr. Burkle again?
6      A. The principal thing that he tried to do for me
7  in that regard was to primarily get the Kroger meeting
8  on. That was a huge deal. My guys were --
9  particularly Jim Gillis -- very sensitive about the
10 relationship we have with Kroger, because they are such
11 a major customer of ours.
12     And so, Ari called me -- Ron Burkle called Ari
13 and told him the deal was off. I didn't do that, Ron
14 Burkle did it. And --
15     Q. And then did Emanuel call you?
16     A. Huh?
17     Q. Did Mr. Emanuel call you?
18     A. He called me and he said, "It's really a
19 shame, it's crazy you guys can't get together, this is
20 a good deal." And I said, "Ari, what is dead is dead,
21 okay, let's not discuss it. I said it in those terms."
22 I said, "This deal is dead, I don't want it to come
23 alive," because at the time I didn't. But, I said, "I
24 don't see why we have to embarrass ourselves in front
25 of a major retailer in America. And if you can do

### Page 124

1  anything to help me convince them to stay, not send
2  their people home from the Kroger meeting, I would
3  appreciate that."
4      We sort of went into the night like until nine
5  o'clock or ten o'clock that night, because everybody
6  was hanging out in Cincinnati, Ohio, trying to figure
7  out if the meeting was going to take place at six
8  o'clock the next morning.
9      And Ari, he didn't speak to Ron Burkle, he
10 spoke to somebody at Yucaipa. And called me and said,
11 "They will not attend the meeting." And then I said,
12 "Then this deal is really dead, and I don't want to
13 have anything to do with them." Okay, and so that was
14 Ari's only involvement in it, from that perspective.
15     Q. Did you tell Mr. Gillis that Ari was involved
16 in getting the conversations back on track between you
17 and Mr. Burkle?
18     A. I wouldn't have told them that because he may
19 or may not believe that, but I wouldn't have told him
20 that because that's not how it happened.
21     Q. Do you know why Mr. Gillis would say you told
22 him that?
23     A. Mr. Gillis also told you that the company paid
24 for the trip to Greece, which wasn't true, so I can't
25 explain why he said what he said.

### Page 125

1      Q. Did you tell Mr. Ledecky that Mr. Emanuel was
2  a key figure in getting the Burkle conversations going
3  again?
4      A. He tried, Ari Emanuel, and that is probably
5  what I was saying, is that he was trying to. He got
6  nowhere. That deal was dead, believe me, when I tell
7  you. It happened, which is kind of a miracle, but it
8  only happened because Len Rizzio got involved. And Len
9  Rizzio had enormous leverage to get it resurrected for
10 two reasons: He owned a third of Yucaipa stock and he
11 was the biggest customer of the company.
12     And the contract was coming up, which is
13 coming up now. So it was within a year or so of the
14 deal, the contract was coming up, and Len Rizzio wasn't
15 going to renew the contract with Alliance, which would
16 have -- and Len Rizzio, himself, told me he was
17 prepared to walk away from his fifty million dollar
18 investment, before he would let them be the supplier if
19 this deal didn't happen; and he had the leverage to do
20 it. Ari Emanuel had zero leverage in this deal,
21 nothing to do with it.
22     Q. I don't understand then. Why was Mr. Emanuel
23 the one you and Mr. Burkle chose to be the, I guess the
24 independent, what was it, 12th member on the board of
25 directors?

Page 126

1   A. Because I thought we would have a nightmarish
2   venture to try to find a guy that we both liked and
3   felt would be fair and neutral; and that was the
4   purposes of being the 11th board member, not because he
5   had any influence one way or the other. He had no more
6   influence over Burkle than he had over me.
7   Q. Do you recall having a lunch meeting with
8   Mr. Ledecky in April of last year in Baltimore?
9   A. I do.
10   Q. Do you recall discussing this whole topic with
11   him then?
12   A. I remember -- I do, yes.
13   Q. Do you recall the issue of Mr. Emanuel's
14   million and a half dollar payment coming up during that
15   lunch meeting?
16   A. I do.
17   Q. Do you recall telling Mr. Ledecky that one of
18   the reasons that Mr. Emanuel got that million and a
19   half dollar payment was because he was a key player in
20   getting this merger back on track?
21   A. I think that I saw that testimony, and I think
22   that that was a misinterpretation. What Ari Emanuel
23   did was calm down -- and I will say this. He had
24   nothing to do with getting the merger back on track.
25   What he did do was calm down Burkle, who has kind of a

Page 127

1   violent temper. And Ari -- I think Ari got Burkle -- I
2   think he played a little bit of a role to the extent
3   where he just got Burkle to the point where he wasn't
4   fuming, and he would at least listen to Len Rizzio; but
5   Len Rizzio was the one that got this thing back on
6   track. Ari Emanuel, mostly his role was to try to
7   resurrect that, to keep that Kroger meeting going.
8   Q. At your lunch meeting in April of 2005 with
9   Mr. Ledecky, did you tell Mr. Ledecky that one of the
10   reasons that Mr. Emanuel got the million and a half
11   dollar payment, was because he was the key player in
12   getting the Alliance deal back on track?
13   A. What I said to him is that he got a million
14   and a half dollars from Ron Burkle, not from me. I
15   made that very, very clear in that meeting.
16   In fact, John later called me a liar, because
17   he saw that it was a Source that paid the -- he didn't
18   say, "You're a liar." He indicated, his implication
19   was that I lied to him, which I didn't do.
20   Because right after that lunch, I called Doug
21   Bates and said, "Why would John Ledecky think we paid
22   that money?" And Doug said, "Because we -- that money
23   got paid after the merger. And the way it appeared,
24   Source -- Alliance paid it, but Source at that time
25   owned Alliance."

Page 128

1   Because I said, "I never agreed to pay Ari
2   Emanuel anything." I told John that, I think that Ari
3   put the arm on Ron Burkle to a great degree because --
4   telling Ron Burkle -- trying to convince Ron Burkle
5   that he played a role in keeping me calm and keeping
6   him calm until the event took place.
7   That was between Ari and Ron Burkle. It was
8   not between me. I never had one discussion ever with
9   Ari Emanuel about paying him anything for any role he
10   played in this company, in this deal, none whatsoever.
11   Q. At your lunch meeting in April of 2005 with
12   Mr. Ledecky in Baltimore, did you tell Mr. Ledecky that
13   one of the reasons that Mr. Emanuel got paid a million
14   and a half dollars was because he was a key player in
15   getting the Alliance deal back on track?
16   MR. STERN: Objection; asked and answered.
17   MR. MILLER: He hasn't answered the question
18   directly.
19   MR. STERN: I believe he has.
20   BY MR. MILLER:
21   Q. Did you tell him that or not?
22   A. I think I -- did I say it in those words, no.
23   What I said to him was that Ron Burkle felt,
24   apparently, Ron Burkle had a reason for paying him the
25   million and a half dollars. I don't know what that

Page 129

1   reason was. But I assume that Ari went to Ron Burkle
2   and said, "This deal wouldn't have happened if I didn't
3   calm you and Leslie down, and I think I am entitled to
4   something for it."
5   Ron Burkle told me he was paying Ari the
6   money, and he wasn't particularly happy about it. But
7   he did tell me he was paying the money, because he had
8   a relationship with Ari Emanuel that he didn't want to
9   wreck. He, in fact, was trying to buy Endeavor at the
10   time, and I guess he had his reasons for paying the
11   money.
12   I didn't pay him the money, I didn't agree to
13   pay him the money; and that is the truth.
14   Q. Why was the money paid after the merger if it
15   was supposedly coming -- excuse me. Let me finish my
16   question.
17   A. I thought you finished.
18   Q. Why was the money paid after the merger if,
19   according to you, it came from Yucaipa?
20   A. Because we thought, as it was explained -- I
21   asked that same question, by the way. Because we
22   thought -- because what I was told, is that it wasn't
23   going to be paid until the merger was completed.
24   Because at any time a deal like this could fall apart,
25   up to the last minute, and it wasn't going to be paid.

Page 138

1  about that, and he said there was a -- something
2  technically with --
3      MR. STERN: I am going to counsel the witness
4      not to reveal your communications with your
5      attorney.
6      THE WITNESS: Okay. In any event, we -- um,
7      there was some technical reason that he needed to
8      come on the board or for 404 compliance reasons.
9  BY MR. MILLER:
10 Q. Now, you have testified today that, um,
11 Mr. Emanuel -- well, let's put it this way.
12     Again, going back to your -- Source's
13 admissions that have been put forth in this case
14 already. Source has admitted that Mr. Emanuel, acting
15 on Endeavor's behalf, provided consulting services in
16 connection with the merger between Source and Alliance;
17 are you aware of that?
18 A. Um, he didn't render consulting services to
19 me.
20 Q. That is not what the admission says. The
21 admission simply says that, "Source admits that
22 Mr. Emanuel, acting on Endeavor's behalf, provided
23 consulting services in connection with the merger
24 between Source and Alliance;" is that accurate? And
25 we'll get to who he provided the services for in a

Page 139

1  moment.
2  A. Okay.
3  Q. All I am asking is: Do you agree with your
4  company's admissions?
5  A. I agree that that is accurate.
6  Q. Let me just so -- we were talking over each
7  other. Let me say it again.
8      It is accurate, Mr. Emanuel, acting on
9  Endeavor's behalf, provided consulting services in
10 connection with the merger between Source and Alliance;
11 that is accurate?
12 A. If that is what we said, that is accurate,
13 yes, that we said that.
14 Q. Your contention is that those consulting
15 services were provided to Yucaipa or Alliance or who?
16 A. Were provided to Yucaipa and Ron Burkle.
17 Q. Okay. So your contention is that the
18 consulting services that he provided on Endeavor's
19 behalf, in connection with the merger between Source
20 and Alliance, was on behalf of Yucaipa and Mr. Burkle?
21 A. And Alliance -- I mean I am not sure which
22 slot it went into, but yeah.
23 Q. Your contention is that those consulting
24 services that were performed on Endeavor's behalf were
25 not performed for Source?

Page 140

1  A. That is true, it was not for Source. I had no
2  discussions, ever, with Ari Emanuel about performing --
3  being paid a consulting fee or being a consultant for
4  Source to get this deal done.
5  Q. Okay. And you recognize, obviously, in the
6  context of this case, that is an important distinction
7  to make?
8  A. I do recognize that, yes.
9  Q. Okay. You recognize that if he was consulting
10 for Yucaipa, that is one thing and doesn't necessarily
11 impact you and your company; correct?
12     MR. STERN: Object to the form of the
13     question.
14     THE WITNESS: Sorry?
15     MR. STERN: I am just making an objection.
16 BY MR. MILLER:
17 Q. Go ahead.
18 A. Okay. I think that is true. I think he was
19 representing Yucaipa. He was representing Yucaipa.
20 Q. But if he was performing these services for
21 Source, that could be considered deemed a business
22 relationship between Endeavor and Source; right?
23     MR. STERN: Object to the form of the
24     question; calls for a legal conclusion.
25     MR. MILLER: Go ahead.

Page 141

1      THE WITNESS: Can I answer that question?
2      MR. MILLER: Yeah.
3      MR. STERN: To the extent that you can.
4      THE WITNESS: Sorry?
5      MR. STERN: To the extent that you can.
6      THE WITNESS: He is asking for an opinion
7      about the business relationship.
8  BY MR. MILLER:
9  Q. I am not asking for an opinion.
10 A. Say that again, then I didn't understand.
11 Q. You understand that if Mr. Emanuel, on
12 Endeavor's behalf, provided these consulting services
13 in connection with the merger to Source, that it is
14 possible that could be considered to be a business
15 relationship between Endeavor and Source?
16     MR. STERN: Object to the form of the
17     question, it calls for a legal conclusion.
18     THE WITNESS: I don't believe it is an issue,
19     because he did -- and I don't know that.
20     I don't really mean to get into --
21 BY MR. MILLER:
22 Q. Let me be clear, Mr. Flegel. I am not trying
23 to get you to say he did. I am not trying to slip a
24 fast one in here on you.
25     Your position is that his consulting services

Page 146

1  A. I thought the merger closed on March 1st.
2  Q. No. I believe the merger -- we can go back to
3  the F-4 and see when the date of special stockholder
4  meeting was, but the special stockholder meeting was
5  February 28, 2005.
6  A. I don't remember the sequence. And I can tell
7  you, I genuinely do not remember that that was paid by
8  Source. I really thought Alliance paid.
9     I knew Alliance was paying it, and it didn't
10 make a whole lot of difference. Because on March 1st
11 we were going to end up owning Alliance, so if they
12 paid it on February 28th or if they paid it on March
13 2nd, it was coming out of the same till, which was
14 eventually going to be my till, okay?
15 Q. Uh-hmn.
16 A. So I guess this wasn't of critical importance
17 to me. I just didn't remember that we paid it, when I
18 met with John at lunch. I just really, truly didn't
19 remember that.
20    Can you even begin to imagine what was going
21 on in my life at that moment? I mean there was a lot
22 of things happening, so it easily could have been
23 something that I didn't see.
24 Q. Were there any business agreements or any sort
25 of contracts that were discussed or contemplated

Page 147

1  between Source and Endeavor?
2  A. Oh, sure, yes.
3  Q. Such as what?
4  A. We, for months, tried to come together with an
5  agreement, um, with Endeavor to have a business
6  relationship. Endeavor -- we could never agree on what
7  Endeavor would either do or be paid. They kept coming
8  back with ridiculous ideas. And one, I remember, was
9  ten percent of revenues.
10    I mean we don't make ten percent of revenues
11 on any business we have, so how could I pay a guy ten
12 percent of revenue for something? So those were the
13 kind of ridiculous things they came to us.
14    So we tried, and I even think there were
15 probably some contracts -- proposals for contracts that
16 went back and forth. But two things happened: Number
17 one is, we never could agree on financial terms. And
18 secondly, the -- physically, the job Endeavor was
19 supposed to do in getting us to the studios -- let's go
20 back to the original concept that John got so excited
21 about, in terms of the amount of money that could be
22 made from the checkout business in America, which was
23 the basis of all of the discussions with Ari Emanuel
24 and John Ledecky. Is that the, that Ledecky (sic) had
25 this enormous influence at the studio levels, and was

Page 148

1  going to get us promotional allowances.
2  Q. You mean Emanuel had the influence?
3  A. Who did I say?
4  Q. You said Ledecky.
5  A. No. I mean Ari Emanuel. See, you're talking
6  to an old man who gets confused.
7     So effectively he didn't make anything happen.
8  He had one set of meetings. Jim Gillis saw some guys.
9  And it turned out to be a bunch of baloney, really, to
10 be honest with you.
11    We did eventually get some DVD's at checkouts,
12 and it is -- right now, as we sit here today, it is a
13 blooming failure program.
14 Q. Let me show you Exhibit 13.
15 A. Okay.
16    (Plaintiff's Exhibit No. 13, Email dated
17 2/24/05 to Flegel from Bates, was marked for
18 identification.)
19 BY MR. MILLER:
20 Q. Is that an e-mail from Mr. Bates to you
21 attaching both an e-mail from Tom McGuire to Mr. Bates
22 and a draft engagement letter?
23 A. Yes.
24 Q. Okay. Do you recall seeing this document?
25 A. I do.

Page 149

1  Q. All right. And what is this engagement letter
2  about?
3  A. What? What? I am sorry?
4  Q. What is the engagement letter about?
5  A. It is about entering into an engagement with
6  Endeavor to represent us, um, in the area of getting
7  the DVD deals.
8     This is, as I remember it -- I am not reading
9  it per se, but the DVD deals, and then other deals.
10 Because at that point they started talking about doing
11 other kinds of deals, like getting us together with
12 Martha Stewart, which also nothing came out of.
13    And, um, so we had basically said -- and Ari
14 Emanuel has, and Endeavor has tremendous contacts and
15 relationships, I mean they can walk into almost
16 anybody's office. But my experience with them is that
17 -- and I don't know how he gets deals done in his
18 business -- because I never see anything ever come to
19 fruition.
20    And they sent this deal, and basically talking
21 about in the percent of revenues. Any businessman will
22 tell you that nobody in the world could make that kind
23 of a deal. If you look at our company, we made
24 operating profit of about three percent of revenues
25 this last year, so how can I pay somebody ten percent