VIDEOTAPED DEPOSITION OF JONATHAN J. LEDECKY
CONDUCTED ON WEDNESDAY, MARCH 29, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

JONATHAN LEDECKY d/b/a     )
IRONBOUND PARTNERS,        )    Case No. 1:05CV01039
                           )
        Plaintiff,          )
                           )
vs.                        )
                           )
SOURCE INTERLINK COMPANIES,)
INC.,                      )
                           )
        Defendant.          )

VIDEOTAPED DEPOSITION OF

JONATHAN J. LEDECKY

Washington, D.C.

Wednesday, March 29, 2006

Job No.: 1-74746
Pages 1 through 278
Reported by:  John L. Harmonson, RPR



DEFENDANT'S EXHIBIT D

VIDEOTAPED DEPOSITION OF JONATHAN J. LEDECKY
CONDUCTED ON WEDNESDAY, MARCH 29, 2006

Page 54

1  again, the agreement you gave me is dated
2  April 21. This is coming April 22. So it must
3  have been in that same sort of time period.
4      Q.  And you mention here in this e-mail, it
5  says: "It is tricky in that the group that
6  brought it to me needs Source to sign a
7  confidentiality agreement. I'm working on getting
8  that done with their attorneys. Hope to have
9  something to you by tomorrow."
10         Was Endeavor telling that they needed
11 to have Source enter into a nondisclosure
12 agreement similar to what you had entered into
13 with them?
14     A.  That's correct.
15     Q.  And then you say here: "Furthermore, I
16 need to be compensated for making the marriage. I
17 will get you the fee arrangement on it."
18         What were you talking about when you
19 say "the marriage" here? What is the marriage
20 you're contemplating here?
21     A.  The marriage of business opportunities
22 and situations where they could do business

Page 55

1  together, where Endeavor and Source could do
2  business together.
3      Q.  Okay. Was there any discussions when
4  you were at Endeavor about Endeavor introducing
5  Source to other entities that they could do a deal
6  with for distributing CDs and DVDs?
7      A.  There was quite a bunch of discussion
8  with Ari about various -- You know, again he
9  mentioned various movie studios, and at one point
10 he mentioned that he had relationships where he
11 had been best man or individuals that were
12 influential in this industry had been best men in
13 his wedding or he had been the best man in their
14 wedding. You know, he was in a very bullish mood
15 and mode about this set of opportunities.
16     Q.  But other than talking about doing
17 deals between Source and Endeavor involving movie
18 studios, was there any other type of opportunities
19 discussed specifically?
20     A.  Yeah. Again, without getting into
21 specific names, because no specific names were
22 mentioned, he talked about his relationships with

Page 56

1  various entertainment companies, with companies
2  that had involvement in this industry.
3      Q.  And when you wrote here that you would
4  get the fee arrangement on it, what kind of fee
5  arrangement did you have in mind at that time when
6  you wrote this?
7      A.  Well, I had in mind a fee arrangement
8  based on negotiating with Source an agreement. It
9  was probably put here deliberately vague because
10 typically you have to negotiate those situations.
11 You don't just impose a fee. And indeed, I
12 believe I sent the company something, and they
13 decided they would go with their own agreement.
14     Q.  Okay. But at the time you wrote this,
15 you had in your own mind what kind of fee
16 arrangement you would want, right?
17     A.  I think by the words "fee arrangement"
18 here, I meant more the structure of the document.
19 Because typically you send it and you have a blank
20 for what the fee -- or at least when I was doing
21 it, I would send it with a blank, and then you
22 would have a discussion with the company.

Page 57

1      Q.  But in terms of the structure of the
2  arrangement -- not the amount of money that could
3  potentially be paid to you, but in terms of the
4  structure -- what arrangement did you have in mind
5  at the time?
6      A.  What I had in mind was to get a
7  percentage of whatever profits resulted from
8  whatever enterprise resulted. And that would
9  depend on where the negotiations went. Because it
10 was such a broad-based discussion with Endeavor, I
11 wanted to try to maintain fluidity in the
12 agreement.
13     Q.  You talk here about having Source's
14 in-house lawyer vet both agreements. So at the
15 time you wrote this, you were contemplating
16 sending a proposed fee arrangement agreement
17 to Source to negotiate with them, right?
18     A.  Well, there were two things. Right,
19 one was the confidentiality agreement, which
20 again, I didn't think I was empowered to negotiate
21 on the behalf of Source. And the second was a fee
22 arrangement agreement between me and the company,

15 (Pages 54 to 57)

VIDEOTAPED DEPOSITION OF JONATHAN J. LEDECKY
CONDUCTED ON WEDNESDAY, MARCH 29, 2006

Page 74

1  with Leslie in Greece on Sunday, April 25, 2004?
2      A.  I recall having a conversation with
3  him, yes.
4      Q.  Okay.
5      A.  He was on a boat.
6      Q.  Tell me about that conversation.
7      A.  I think the conversation is really
8  summarized in the e-mail.
9      Q.  Okay. So this e-mail here is a fair
10 summary of what you and Leslie talked about?
11     A.  Yes. I mean, Leslie left that
12 potential compensation vague, as I said in the
13 e-mail, and I'm not comfortable with that, so I
14 wanted to memorialize the understanding between
15 Source and myself, which was, as I mentioned
16 earlier, based on earlier attempts with Leslie to
17 get agreement.
18     Q.  And you wrote here: "A leading company
19 on the West Coast wants to enter into an exciting
20 business relationship with Source."
21         Generally, what did you and Leslie talk
22 about in terms of this exciting business

Page 75

1  relationship that you had in mind?
2      A.  I left it very general and vague
3  because, one, until I felt that I had an agreement
4  memorialized with the company, why would I
5  disclose the nature of the opportunity, No. 1.
6         And No. 2, in our discussion with
7  Mr. Emanuel that I had in his office, there was
8  such a broad-based discussion of opportunities
9  that I thought the important thing was to get the
10 two sides together. And I wanted to make sure
11 that in making the marriage, as I referred to it,
12 that I would get paid this time.
13     Q.  So you didn't talk anything about the
14 potential of distributing DVDs at checkouts at
15 grocery stores?
16     A.  I can't specifically recall that. But
17 in general, when I do these things, to give the
18 potential client all of the information sort of
19 defeats the purpose of making the introduction and
20 having a business relationship around it. So I
21 would assume -- and again, I'm making an
22 assumption -- I discussed it the way it is in this

Page 76

1  e-mail.
2      Q.  Okay. But you right now don't recall
3  specifically what you talked about in terms of
4  this potential business relationship?
5      A.  I think I discussed the fact that it
6  was a potentially exciting business relationship,
7  that it could be potentially extremely lucrative,
8  and that there -- that I would like to be paid for
9  it.
10     Q.  And Leslie didn't ask you, "Well, can
11 you give me a little bit more information?"
12     A.  My recollection would be that he may
13 have asked me that, and I said I would prefer that
14 we have an agreement. But again, that's my
15 recollection. I did not take notes -- you know,
16 extraneous notes on the subject.
17     Q.  Do you recall how long this phone call
18 was?
19     A.  It wasn't a long phone call, because
20 Leslie was on a boat, and you could hear them
21 sailing, and it was windy. And my recollection is
22 it was maybe a five-minute, ten-minute

Page 77

1  conversation, at best, because they were in the
2  middle of doing something else.
3      Q.  And then did Leslie tell you to call
4  and talk to Doug about details?
5      A.  Yes.
6      Q.  All right. You wrote here: "Leslie
7  also indicated he was going to compensate me for
8  making a deal happen between Source and this
9  company."
10        So was there a discussion about a deal
11 between this company that you wanted to introduce
12 Source to and Source doing a deal with them?
13     A.  Again, as I mentioned earlier, it could
14 be what was discussed was the nature of a joint
15 venture arrangement, introduction by the company.
16 Now, of course, Endeavor, being a talent agency,
17 was in the business of making deals, putting deals
18 together. So in the conversation I had with Ari,
19 things were so expansive that to try to narrow it
20 down before the parties met didn't make much sense
21 to me. It was more to put the two parties on the
22 playing field and see what would happen together.

20 (Pages 74 to 77)

VIDEOTAPED DEPOSITION OF JONATHAN J. LEDECKY
CONDUCTED ON WEDNESDAY, MARCH 29, 2006

Page 78

1  And if something came out of that relationship, I
2  wanted to be compensated for it.]
3      Q.  Okay. And then you wrote here: "I
4  will disclose the name of the potential business
5  partner in Appendix A."
6          So here you described Endeavor as a
7  potential business partner for Source?
8      A.  Correct.
9      Q.  So you're talking about, in your mind,
10 at least when you wrote this, you were thinking
11 about this being a potential joint venture or
12 partnership between the companies?
13         MR. SCHWARTZ: Objection; asked and
14 answered. Well, objection.
15         THE WITNESS: When you do that, I
16 always lose the question. I'm sorry, can you
17 repeat the question?
18         MR. STERN: Can you repeat the
19 question?
20         (Whereupon, the record was read back by the
21 Reporter as follows:
22         QUESTION: So you're talking about, in

Page 79

1  your mind, at least when you wrote this, you
2  were thinking about this being a potential
3  joint venture or partnership between the
4  companies?)
5          THE WITNESS: It could be a joint
6  partnership. It could be a business relationship.
7  It could be the introduction of third parties,
8  like movie studios, other players that would want
9  to do business with Source. That was the nature
10 of the discussion we had had with Ari that day.
11 EXAMINATION BY MR. STERN:
12     Q.  Okay. But in terms of the relationship
13 between Source and Endeavor, it was envisioned it
14 would be a relationship in which Endeavor would be
15 making some money as well as Source, right?
16     A.  That there would be commerce between
17 the firms that could be in any shape or form. And
18 again, that's what we couldn't decipher at the
19 time. So I was trying to protect myself by having
20 a somewhat global agreement so that whatever came
21 out of those relationships, I would be compensated
22 for, whether that was a joint venture, whether it

Page 80

1  was a merger, whether it was an introduction to
2  other parties. You know, I had seen Source do
3  very creative things in the past. And I had seen,
4  obviously from watching it in the meetings with
5  Endeavor, that Endeavor was a pretty creative
6  place, too. So I was trying to capture lightning
7  in a bottle and make sure that I was paid for it.
8      Q.  But you certainly had in mind whatever
9  deal might result would have been a deal in which
10 Endeavor would have made some money out of it as
11 well?
12         MR. SCHWARTZ: Objection; asked and
13 answered.
14         THE WITNESS: Absolutely.
15 EXAMINATION BY MR. STERN:
16     Q.  It wasn't going to be a thing where
17 Endeavor was going to help introduce Source to
18 someone else and then Endeavor wouldn't get any
19 money out of it, right?
20     A.  Again, I think at that time it was
21 here's a chance for two businesses to come
22 together, a chance to do commerce together and

Page 81

1  have mutual benefit from that relationship. And
2  so that's what I was trying to literally get in
3  the middle of and get paid for doing, that I was
4  bringing these two parties together. And that's
5  what people do when they're trying to make deals
6  happen.
7      Q.  Okay. But they were trying to get
8  together and get benefits in terms of making
9  money, though, right?
10         MR. SCHWARTZ: Objection; asked and
11 answered. Objection.
12         MR. STERN: State your objection.
13 EXAMINATION BY MR. STERN:
14     Q.  Please answer the question.
15         MR. SCHWARTZ: He's answered the
16 question.
17         MR. STERN: I understand your
18 objection. You state your objection --
19         MR. SCHWARTZ: I'm going to cut it off
20 if you keep going. He's answered the question.
21         You can try to answer it again if you
22 can.

21 (Pages 78 to 81)

VIDEOTAPED DEPOSITION OF JONATHAN J. LEDECKY
CONDUCTED ON WEDNESDAY, MARCH 29, 2006

Page 130

1  up a conference call among Endeavor and yourself
2  and Source the next day, right?
3      A.  That's correct.
4      Q.  And do you recall who was the person
5  that was going to be responsible for sort of
6  getting everybody together on this conference
7  call?
8      A.  Well, I say in the e-mail that perhaps
9  Delia, because she knows where everybody is, can
10 put together the call three ways.
11     Q.  Do you recall where you were at that
12 time when you had this call?
13     A.  I believe I was in Washington, D.C., in
14 my office at 34th Street.
15     Q.  And here you talk in the third
16 paragraph here, you will e-mail Appendix A to
17 Source. "You can take the company name and add to
18 the nondisclosure and fax it back to me and we
19 should be covered on all sides."
20         Was Appendix A going to be the document
21 that disclosed the name of Endeavor to Source?
22     A.  It appears to be, yes.

Page 131

1      Q.  And then Doug wrote in response to you
2  on the next morning, April 27, 9:06 a.m., that he
3  didn't have, as of that e-mail, the Appendix A.
4  Do you recall whether you actually sent an
5  Appendix A to anyone at Source for the conference
6  call?
7      A.  I don't have specific recall of that,
8  but I certainly think I would have done that prior
9  to the call, because that would have wrapped
10 things up.
11     Q.  Do you recall whether or not you
12 disclosed the name of Endeavor just in the
13 nondisclosure agreement and never sent a separate
14 Appendix A to them?
15     A.  Again, I have no recollection either
16 way.
17         (Exhibit 13 marked for identification and
18 attached hereto.)
19 EXAMINATION BY MR. STERN:
20     Q.  I've handed you what's been marked as
21 Exhibit 13. The cover sheet of this document, is
22 that your handwriting?

Page 132

1      A.  Yes, it is.
2      Q.  Does this appear to be a fax of the
3  referral agreement to Doug Bates to obtain his
4  signature on the document?
5      A.  Yes.
6      Q.  And if you look at the last page here,
7  it appears to have your signature on the document?
8      A.  Correct.
9      Q.  So you signed it before you sent it to
10 him, right?
11     A.  Yes.
12         MR. STERN: Okay. Let's do this as 14.
13         (Exhibit 14 marked for identification and
14 attached hereto.)
15 EXAMINATION BY MR. STERN:
16     Q.  I've handed you what's been marked as
17 Exhibit 14. And looking at the last page of
18 Exhibit 14, does this appear to have Doug Bates'
19 signature on it?
20     A.  Yes.
21     Q.  And then if you look at the top of each
22 page in this document, there appears to be a fax

Page 133

1  legend --
2      A.  Yes.
3      Q.  -- with a date and time stamp. Does
4  there appear to be a date and a time stamp on
5  that?
6      A.  Yes.
7      Q.  And it says April 27, 2004, and 10:19,
8  right?
9      A.  That's what it says.
10     Q.  And as you recall, would that be
11 10:19 in the morning that you received this?
12     A.  It would be very difficult to recall
13 the exact time of a fax received in 2004. I can
14 only go by what's on the document, Kevin. So I
15 have no recollection whether that's correct,
16 whether daylight savings time changed and it was
17 really 9:19 or 11:19. I can't comment on that.
18     Q.  Well, do you recall --
19     A.  I certainly would have received this
20 document prior to the phone call.
21     Q.  Okay. And you recall receiving this
22 document prior to having the phone call?

VIDEOTAPED DEPOSITION OF JONATHAN J. LEDECKY
CONDUCTED ON WEDNESDAY, MARCH 29, 2006

Page 134

1  A. Yes.
2     MR. STERN: Let's mark that.
3  (Exhibit 15 marked for identification and
4  attached hereto.)
5  EXAMINATION BY MR. STERN:
6  Q. This is Exhibit 15. Does this appear
7  to be a fax of the nondisclosure agreement between
8  Source and Endeavor signed by Doug Bates?
9  A. Yes.
10 Q. And does it appear from the fax legend
11 on top that it was sent on 4/27/2004 at 10:49?
12 A. Yes, it does.
13 Q. So it appears, based on the time line,
14 assuming these fax legends are accurate, that
15 about a half hour after --
16 A. Yes, sir.
17 Q. -- Doug Bates sent you the signed
18 referral agreement, he sent you the signed
19 nondisclosure agreement, right?
20 A. Correct.
21    MR. STERN: Let's mark this.
22 (Exhibit 16 marked for identification and

Page 135

1  attached hereto.)
2  EXAMINATION BY MR. STERN:
3  Q. Exhibit 16 has been handed to you.
4  Does this appear to be a fax from Tom McGuire to
5  you?
6  A. Yes.
7  Q. And if you look at the fax legend on
8  top there, it says April 27, 2004, 8:22 a.m.
9  A. That would have been Western time.
10 Q. Pacific time. So that would have been
11 approximately 11:22 a.m. Eastern time?
12 A. Right.
13 Q. And this appears to be the
14 nondisclosure agreement signed by Tom McGuire on
15 behalf of Endeavor, right?
16 A. Yes.
17 Q. So as of approximately 11:22 in the
18 morning, April 27th, you had all the executed
19 agreements --
20 A. Correct.
21 Q. -- that you needed to do to have this
22 conference call, right?

Page 136

1  A. Yes, sir.
2  Q. And do you recall the call taking place
3  shortly thereafter you received all that?
4  A. Per the e-mails you shared with me,
5  they were pointing toward a 1:00 o'clock, it
6  looked like, phone call. The phone call certainly
7  took place because I do remember the call.
8  Q. Okay. And you remember it happening on
9  the same day that you got everything executed?
10 A. I believe that's why they were coming
11 in such sequence, because people were gearing
12 towards the call.
13 Q. Okay. And how did you know who from
14 Endeavor was going to be on the call?
15 A. Oh, I think that was arranged with Ari
16 Emanuel and Tom McGuire. Tom McGuire was the
17 interface for most of the back and forth, as you
18 see from your exhibits.
19 Q. All right. So you learned from Tom
20 McGuire that there was going to be Emanuel from
21 Endeavor on the call, and then there was you, and
22 Leslie Flegel?

Page 137

1  A. And Jim Gillis.
2  Q. And Jim Gillis?
3  A. And maybe Tom McGuire as well.
4  Q. Do you remember when the call happened,
5  do you recall who was on the line?
6  A. My recollection would be myself, Jim
7  Gillis, Leslie Flegel, Ari Emanuel, and Tom
8  McGuire. There may have been some other people
9  from Endeavor.
10 Q. Okay. Do you remember how long the
11 call lasted?
12 A. My recollection is the call lasted less
13 than an hour, with a move towards next steps, to
14 arrange next steps, what those next steps would
15 be, whether it would be additional information
16 that both companies would need to understand each
17 other more fully, whether it was information
18 regarding people's schedules. It was
19 administerial in nature.
20 Q. So you recall the call taking somewhat
21 less than an hour?
22 A. Again, that's my recollection. I don't

VIDEOTAPED DEPOSITION OF JONATHAN J. LEDECKY
CONDUCTED ON WEDNESDAY, MARCH 29, 2006

Page 194

1  entered your mind. So I'm trying to answer the
2  hypotheticals you're giving me. But as a
3  businessman, it hasn't entered my mind. Since
4  you're giving me the opportunity to think about it
5  and say maybe -- I mean, I think it's great that
6  you think that, because that would be good for me.
7  If you think that I can have a multiple series of
8  relationships past five years, that's great for
9  me, and that will help me in the case.
10     Q.  I'm not trying to tell you what my
11  position is. I'm trying to get your understanding
12  of the agreement.
13     A.  But you've opened my eyes to a new
14  element of this agreement that I hadn't thought of
15  previously, which is this document here, actually
16  I could potentially do that, and that's really
17  good news for me.
18     Q.  I wish you luck on that.
19         Going back to -- Since we're on a
20  hypothetical here, in terms of the Alliance
21  merger, is it your position that you can recover
22  compensation under this agreement past -- for that

Page 195

1  transaction past April 27, 2009?
2     A.  You'll have to repeat the question
3  again. I'm sorry.
4     Q.  It's your position or your
5  understanding based on reading this document that
6  you can recover compensation for that transaction
7  past April 27, 2009?
8     A.  And my answer again, Kevin, with all
9  due respect, because I'm not trying to be rude to
10  you, is I would have to sit down and talk to my
11  counsel about what the position would be based on
12  that agreement. I wouldn't be able to give you an
13  honest answer because I don't have one. I'm not
14  the lawyer. So I would have to go -- just as your
15  client would go to their counsel to discuss it, I
16  would have to go to my counsel.
17     Q.  So you don't know one way or the other
18  right now sitting here reading this document?
19         MR. SCHWARTZ: Objection; asked and
20  answered.
21  EXAMINATION BY MR. STERN:
22     Q.  Just answer, please.

Page 196

1     A.  Okay. I'm sorry, what was the question
2  again?
3     Q.  So right now, you cannot state with
4  any -- take a position or state with any certainty
5  whether you believe you're entitled to
6  compensation for the Alliance transaction beyond
7  April 27, 2009?
8     A.  That's correct, I wouldn't know that
9  answer yet.
10     Q.  Now, explain to me, why do you believe
11  you're entitled to compensation for the Alliance
12  transaction under this agreement?
13     A.  Could you be more specific?
14     Q.  Well, you brought a lawsuit here
15  claiming that you're entitled to compensation.
16     A.  Right. That should speak for itself,
17  shouldn't it? You should have the answer to that
18  already, because we gave you all the answers. So
19  you're asking me to answer it again?
20     Q.  No, I didn't ask you that question yet.
21  I'm trying to understand the reasons why you
22  believe you're entitled, on the record, to

Page 197

1  compensation under this agreement for the Alliance
2  transaction.
3     A.  And my answer would be that we've
4  submitted a 50-page discussion with the court as
5  to why I'm entitled.
6     Q.  Okay. But I'm not asking what your
7  lawyer submitted to the court. I'm asking you
8  under oath as you sit here today why you believe
9  you're entitled to it.
10     A.  Because Endeavor, which is the nature
11  of the relationship, brought Alliance and Source
12  together. And under the nature of this document,
13  that entitles me to compensation for the Alliance
14  transaction.
15     Q.  Okay. So is it simply by virtue of
16  Endeavor introducing Alliance to Source that you
17  believe you're entitled to compensation?
18     A.  Yes.
19     Q.  What if they had not done that and
20  instead had just provided consulting services in
21  connection with the merger?
22     A.  That would still qualify, because the

VIDEOTAPED DEPOSITION OF JONATHAN J. LEDECKY
CONDUCTED ON WEDNESDAY, MARCH 29, 2006

Page 218

1 it, yes. Again, as I've told you several times in
2 the testimony here, there were several things that
3 were going on, and as the e-mail suggests, they're
4 trying to get information for conversations in the
5 next few weeks with people at Source.
6    Q.   Okay. But the information request
7 appears to be focused on retail outlets?
8    A.   Because in our first conversation, that
9 was the first topic that we were focused on. As
10 you can see from the nature of the questions, if
11 we read the questions into the record, you see he
12 says, "I think I heard three years." Well, he
13 heard the term "three years" on the phone call the
14 day before.
15       So they're trying to get additional
16 information.
17    Q.   What did you do? When you got that
18 e-mail, what did you do?
19    A.   I interfaced with Source. I probably
20 sent an e-mail and then made a phone call.
21    Q.   Did you get the information?
22    A.   No. An e-mail came back, a little

Page 219

1 e-mail with some comments in it.
2    Q.   So Source didn't provide you the
3 information, is what you're saying?
4    A.   Source didn't initially provide it
5 right off the bat. They needed to be talked to
6 and coached. And again, the role that a person in
7 my job plays, which is to try to keep the train
8 moving down the tracks, that's what we were trying
9 to do.
10       MR. STERN: Let's mark this.
11       (Exhibit 19 marked for identification and
12 attached hereto.)
13 EXAMINATION BY MR. STERN:
14    Q.   Does this appear to be an e-mail --
15 There's two e-mails. The first e-mail is an
16 e-mail from you to Jim Gillis dated May 2, 2004.
17 And what were you doing here?
18    A.   I was trying to arrange for a meeting
19 on Wednesday, May 12th, as the subject header
20 says. And Jim, not seeing that, says: "Jon,
21 dates?"
22       And then he's responding to the text of

Page 220

1 my e-mail about when they're flying in from 10:00
2 to 2:00 or 2:00 to 6:00 for meetings on the 12th,
3 and he was confused and said, "What dates are you
4 talking about?"
5    Q.   So here you were trying to set up a
6 meeting on May 12th in New York --
7    A.   Right.
8    Q.   -- between Endeavor and Source, right?
9    A.   Right.
10       (Exhibit 20 marked for identification and
11 attached hereto.)
12 EXAMINATION BY MR. STERN:
13    Q.   You've been handed what's been marked
14 as Exhibit 20. And to cut to the chase, does this
15 appear to be the e-mail in which Source confirms a
16 May 12th meeting with Endeavor?
17    A.   Yes.
18       MR. STERN: Let's mark that.
19       (Exhibit 21 marked for identification and
20 attached hereto.)
21 EXAMINATION BY MR. STERN:
22    Q.   You've been handed what's been marked

Page 221

1 as Exhibit 21. And the first e-mail here appears
2 to be an e-mail from you to Jim Gillis and Leslie
3 Flegel dated May 11th. Tell me what this e-mail
4 is about.
5    A.   Prior to the May 12th meeting, Endeavor
6 called and basically tried to cancel the meeting
7 because of schedule conflicts. And the initial
8 e-mail back from Jim was that, okay, you know,
9 reading between the lines here, Leslie is not
10 happy about that, so we're going to say no more
11 meeting.
12       And then, of course, I was able to put
13 the meeting back on track by talking to Ari and
14 telling him that it was crucial that they have the
15 meeting as scheduled since Leslie was going to be
16 traveling.
17    Q.   Okay.
18    A.   And the meeting, I believe, went back
19 on track.
20    Q.   Aren't you here talking about trying to
21 have a meeting on May 11th but not involving the
22 higher-ups, basically? It would be this guy named

VIDEOTAPED DEPOSITION OF JONATHAN J. LEDECKY
CONDUCTED ON WEDNESDAY, MARCH 29, 2006

Page 234

1  schedule the meetings.
2      Q.  All right. But the meeting was put
3  back on?
4      A.  Yes, it was, for 10:00 o'clock the next
5  day at Source's offices in New York.
6      Q.  And tell me about that meeting, which I
7  assume took place on May 12, 2004.
8      A.  It was a great meeting. It was a love
9  fest.
10     Q.  Tell me a little bit more besides that.
11     A.  Leslie and Ari hit it off quite well.
12 They had a lot in common, both from a heritage
13 standpoint and a view of the world standpoint, and
14 they had a very productive conversation. Ari was
15 respectful as Leslie began his pitch. He
16 interrupted at the appropriate time and moved the
17 conversation forward. It was about a three-hour
18 meeting. There were other people from Source that
19 came in and out of the meeting during the course
20 of it. It started out as a slide show with Source
21 trying to give Endeavor a more complete view of
22 the business, sort of the Wall Street slide show

Page 235

1  Leslie would do when he was visiting with analysts
2  that gave a point of discussion. And the
3  discussions became very wide-ranging and free-form
4  in terms of the different possibilities that could
5  take place between Source and Endeavor.
6      Q.  What kind of possibilities were
7  discussed?
8      A.  The DVD possibility was discussed. The
9  possibility of Endeavor acquiring Source was
10 discussed. CDs were discussed. Relationships
11 with movie studios were discussed.
12         Like I said, it really ran the gamut of
13 the different types of business relationships that
14 the companies could pursue together.
15     Q.  Was there any discussion about Endeavor
16 introducing Source to a third party to merge or
17 acquire?
18     A.  That was one of the things that was
19 alluded to at the time by Ari Emanuel when he was
20 discussing Endeavor acquiring Source. It was very
21 clear, obviously, that Endeavor didn't have the
22 direct resources to do that and would have to join

Page 236

1  up with some partner to do that. So that was the
2  nature of the discussion.
3      Q.  In terms of a partner, would it be like
4  a venture capitalist or some other --
5      A.  You know, I think at that time Ari
6  discussed a wide range of relationships and
7  connections that he had with individuals in
8  finance. At some point, whether it was in that
9  conversation or another conversation, he did
10 mention that one of the relationships he had was
11 with a man who either he was a best man in his
12 wedding or was the best man in the guy's wedding.
13 I believe it was he was the best man in Ari's
14 wedding, a fellow by the name of Ron Burkel.
15     Q.  This was at this meeting, or subsequent
16 to that?
17     A.  Again, I don't have a direct
18 recollection as to whether or not it was at that
19 meeting or subsequent to that meeting, but
20 certainly in a conversation that I was part of,
21 Ari did discuss about his relationship with Ron
22 Burkel, because -- for several reasons. I

Page 237

1  remember one of them being that I had played golf
2  with Mr. Burkel previously, so I had actually
3  spent time with him. So when it came up, it was,
4  "Oh, you were in Ron Burkel's wedding," or "Ron
5  Burkel was in your wedding. Gee, I played golf
6  with him in Scotland, and he's an interesting
7  guy," that sort of thing.
8         That's why my memory was refreshed on
9  that, because you remember that kind of thing.
10 But whether it was in that actual meeting or a
11 subsequent meeting, I don't have a direct
12 recollection of that.
13     Q.  In terms of Ron Burkel, what was
14 discussed about him?
15     A.  Well, that he was the head of a very
16 powerful firm that had billions of dollars of
17 capital access, a firm called Yucaipa, which I
18 dare not even try to spell for you, but I think
19 it's Y-U-C-A-I-P-A, something like that.
20     Q.  Okay. Anything else beside that that
21 was talked about with regard to Ron Burkel?
22     A.  Pardon me?