Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION


JONATHAN LEDECKY d/b/a IRONBOUND
PARTNERS,

    Plaintiff,

vs.                              CASE NO. 1:05 CV 01039

SOURCE INTERLINK COMPANIES, INC.,

    Defendant.
_____/


C O N F I D E N T I A L


VIDEOTAPED DEPOSITION OF: JIM GILLIS

    DATE:            May 3, 2006

    TIME:            9:30 a.m. to 2:41 p.m.

    LOCATION:        27200 Riverview Center
                     Suite 309
                     Bonita Springs, FL

    TAKEN BY:        Plaintiff

    REPORTER:        Betty G. Althoff, RPR



DEFENDANT'S EXHIBIT G

Page 106

1    A. Yes.
2    Q. Do you recall your conversation with
3  Mr. Flegel?
4    A. Not specifically.
5    Q. Was Mr. Flegel, do you remember,
6  generally, Mr. Flegel was upset that they were
7  changing the terms of the meeting -- that Endeavor
8  was?
9    A. I don't think so.
10   Q. Okay. Why were you canceling the meeting
11 at that point?
12   A. Looks like I was canceling it, because
13 like I said, I wasn't going to make this guy any
14 smarter. To the point of not knowing about the
15 nondisclosure agreement, I guess, that we didn't want
16 to put all of our eggs in a basket to a, what we
17 perceived as a sales and marketing company about how
18 this would all work, if we weren't talking to the top
19 dogs, and that would be my normal delivery.
20   Q. Okay. And do you recall discussing that
21 with
22 Mr. Flegel?
23   A. No.
24   Q. Or anybody else at Source?
25   A. No.

Page 107

1    Q. Do you recall that the meeting got back on
2  track?
3    A. Yes.
4    Q. Okay. Did Mr. Ledecky get it back on
5  track?
6    A. I don't know.
7    Q. Okay. And let me show you the next
8  exhibit.
9        THE VIDEOGRAPHER: Down to ten minutes on
10    this tape.
11       MR. MILLER: Okay.
12       (Plaintiff's Exhibit No. 12, E-mail dated
13    5/11/04 to Ledecky to Jim Gillis, was marked for
14    identification.)
15  BY MR. MILLER:
16   Q. Let me show you Exhibit 12, and is that
17 two e-mails, the lower e-mail being an e-mail from
18 Mr. Ledecky to you, and upper e-mail, the top e-mail
19 being your response to Mr. Ledecky?
20   A. Yes.
21   Q. Okay. And Mr. Ledecky is saying, I assume
22 you sent this e-mail, which presumably is the one in
23 Exhibit No. 11, for all the conversations that didn't
24 show up until 1:00 p.m., and he is asking you if the
25 meeting is now back on on May 12th; correct?

Page 108

1    A. Yes.
2    Q. And you were confirming that the meeting
3  is back on for 10:00 correct?
4    A. Yes.
5    Q. All right, do you recall how the meeting
6  got back on track?
7    A. No.
8    Q. Could it have been Mr. Ledecky's
9  intervention?
10   A. Could have been me.
11   Q. You don't remember one way or the other?
12   A. I don't know.
13   Q. You do recall the meeting occurred
14 however?
15   A. Yes.
16   Q. Who was at the meeting?
17   A. Um, myself, Flegel, Leslie Flegel, I think
18 John, and um, Ariel.
19   Q. When you say John, you mean John Ledecky?
20   A. Yes.
21   Q. Tell me about what happened at the
22 meeting.
23   A. We did a round table of what Source was
24 and what Endeavor was. And Ari did a commercial on
25 his ability to get product out of the studios and

Page 109

1  allowances for checkout space. And we said with
2  those types of allowances, it was our opinion we
3  could facilitate a methodology of delivering these
4  things to the stores vis-à-vis our magazine
5  distribution pipeline.
6    Q. Uh-hmn.
7    A. As well as manufacturing vis-à-vis our
8  manufacturing companies, and then our retail chain
9  relationship, since there was various video products
10 in grocery stories ongoing, and nothing at the
11 checkout other than a couple of chains we had
12 relationships with, that weren't doing it really in
13 an organized method. But if they could get those
14 allowances in dollars, we could make that work.
15   Q. Uh-huh, what else was discussed at the
16 meeting?
17   A. I think another meeting for like a white
18 sheet.
19   Q. What does that mean?
20   A. You know, an outline of how these
21 companies would work together, and he would -- Ari
22 would make us available to the studios, and he would
23 assign someone on his side to be our guy.
24   Q. Uh-hmn, what else do you recall being
25 discussed at the meeting?

Page 114

1  Q. All right. Did you know or do you know
2  now that Ron Burkle was the head of a company called
3  Yucaipa?
4  A. I know that, yes.
5  Q. And Yucaipa was the parent company of
6  Alliance; correct?
7  A. It is or was, yes.
8  Q. Okay. Until Source bought Alliance?
9  A. Correct.
10 Q. So you don't have, as we sit here today,
11 you don't have any recollection of any of these other
12 things being discussed at the New York City meeting,
13 these things that are referred to here in this May
14 14th e-mail?
15 A. No.
16 Q. Okay. Is your memory, and I just want to
17 be clear. Is your memory, you know they were not
18 discussed or you just don't remember one way or the
19 other?
20 A. Well, the stuff that is two days after the
21 meeting of John informing me what he spoke to Leslie
22 about, I believe he sent this memo.
23    I don't believe that when I was sitting in a
24 meeting with Ari Emanuel, we talked about buying out
25 the company with Ron Burkle or Mike, whatever his

Page 115

1  last name that looks Greek. I don't even know who
2  that guy is, but not with me in the room.
3      THE VIDEOGRAPHER: Down to two minutes.
4      MR. MILLER: You need to change your tape.
5      THE VIDEOGRAPHER: Yes. Good time?
6      MR. MILLER: Yeah, that is fine. Off the
7  record. The time is 11:56 a.m.
8      (Whereupon, a brief break was taken.)
9      THE VIDEOGRAPHER: Back on the record, the
10 time is 12:04 p.m.
11 BY MR. MILLER:
12 Q. Okay. Let me just find my place again.
13 Do you recall that -- well, let me ask you this.
14 After your meeting in New York City with
15 Mr. Emanuel, and whoever else was at the meeting,
16 Mr. Ledecky and Mr. Flegel, you said you came back
17 and you talked to a grocery store chain?
18 A. Yes.
19 Q. It was Kroger, I think you said?
20 A. It was.
21 Q. All right, what else happened?
22 A. I guess I came home.
23 Q. Okay. Were there any further discussions?
24 Did you have any further discussions with anybody at
25 Source regarding Endeavor?

Page 116

1  A. No.
2  Q. Did you have any further discussions with,
3  um, anybody at Endeavor?
4  A. Um, may or may not have had a conversation
5  with one Mr. Modi.
6  Q. Okay. Who is he?
7  A. He is a guy that worked for Endeavor.
8  Q. Let me repeat that last question. Did you
9  have any discussions with anybody at Endeavor?
10 A. If I did it was with Modi. It seems like
11 that I had a call with them post Ari's meeting.
12 Q. Uh-hmn and what would that have been
13 about?
14 A. About the white sheet that we were going
15 to put together.
16 Q. Do you recall that within a month or so
17 after the meeting in New York, that Mr. Flegel became
18 upset because he was not receiving return phone calls
19 from Mr. Emanuel?
20 A. No.
21 Q. You don't recall that at all?
22 A. No.
23 Q. Did you have any discussions with
24 Mr. Flegel about how things were proceeding with
25 Endeavor?

Page 117

1  A. No.
2  Q. Did you have any discussions with anybody
3  at Source regarding how things were proceeding at
4  Endeavor?
5  A. I may have with Jason.
6  Q. Jason?
7  A. Jason Flegel.
8  Q. What is his position with Source?
9  A. He is EVP of Operations.
10 Q. That is Executive Vice-President?
11 A. Yes.
12 Q. And what discussion did you have with him?
13 A. He and I were putting together that white
14 sheet with Modi.
15 Q. Okay. And did you have any discussions
16 with Mr. Ledecky about how things were going with
17 Endeavor?
18 A. I don't remember.
19 Q. You might have, but you don't recall?
20 A. Correct.
21    (Plaintiff's Exhibit No. 14, E-mail dated
22 6/07/04 to Ledecky from Jim Gillis, was marked for
23 identification.)
24 BY MR. MILLER:
25 Q. Let me show you Exhibit number 14. Is

Page 118

1  this two e-mails, the lower e-mail being one from
2  Mr. Ledecky to you, and the upper e-mail being your
3  response to Mr. Ledecky?
4     A.  Yes.
5     Q.  And the lower one is dated June 4, and
6  your reply is dated June 7th of 2004; correct?
7     A.  Yes.
8     Q.  And Mr. Ledecky there is providing you
9  with a phone number for Mr. Emanuel; is that correct?
10    A.  I have no idea what this is.
11    Q.  Okay.  Well, you see the subject line
12 there is "Ari, phone"?
13    A.  Okay.  I am horrible with that subject
14 line.
15    Q.  That is all right, that is what I am here
16 for.  Do you see the subject line is "Ari, phone"?
17    A.  I do.
18    Q.  Okay.  Does that refresh your memory that
19 you were getting a phone number for Mr. Emanuel for
20 Mr. Ledecky?
21    A.  I don't think so.
22    Q.  All right, what do you think this was?
23    A.  I think this was, for some reason, us
24 wanting to get Modi on the phone.
25    Q.  Do you know why he put Ari phone in the

Page 119

1  subline instead of Modi phone?
2     A.  You will have to ask him.
3     Q.  Let me see number 13, please.  Do you
4  recall having, after this or during this period of
5  time, early June, do you recall making a phone call
6  to Mr. Emanuel?
7     A.  I talked to him 20 times, and I don't
8  remember when exactly.
9     Q.  You talked to him 20 times prior to the
10 merger?
11    A.  No, I mean during, about, around, in
12 between, after, he was not that hard to get on the
13 phone, but I remember Modi was hard to get on the
14 phone.
15    Q.  Okay.  What conversations did you have
16 with Mr. Emanuel?
17    A.  Get Modi on the phone.  Stuff like that.
18    Q.  Okay.  Did you have any subsequent
19 conversations with Mr. Emanuel in these 20 or so
20 phone calls?
21    A.  They were before, during and after so --
22    Q.  Before, during and after what?
23    A.  The merger.
24    Q.  Okay.
25    A.  I would say it was more directing the

Page 120

1  traffic of his troops.  If I would call him, it would
2  be about something that wasn't happening from one of
3  his employees.
4     Q.  Okay.  Was there any further conversations
5  with Mr. Emanuel regarding this proposal to get
6  together to distribute DVD's at grocery stores?
7     A.  Yes.
8     Q.  Tell me about those.
9     A.  Just the general form that his guy, Modi,
10 was the guy that could put together the formula to
11 get to the chains -- to the gro -- to the studios,
12 because he could leverage the other things that Ari
13 was doing with his cast of characters, and his stable
14 of stars, and that sort of thing, and get us
15 appointments, et cetera.
16    Q.  Did you have any discussions with him
17 regarding the merger?
18    A.  No.
19    Q.  Never?
20    A.  Um, I wouldn't say I had a discussion with
21 Ari directly in regards to the merger, no, just
22 myself and him.  Would I have been in the room when
23 that was being discussed, likely.
24    Q.  Okay.  But you don't recall any of those,
25 specifically?

Page 121

1     A.  I don't recall me calling him specifically
2  and saying what about --
3     Q.  Do you recall any of the discussions where
4  he might have been in the room with you?
5     A.  Yes.
6     Q.  Okay.  Tell me about that.
7     A.  We went to his office, which I remember
8  distinctly, because I threw up on the front porch.
9     Q.  Uh-huh.
10    A.  And had a chitchat about how we were going
11 to go to the studios, and how we were going to go get
12 those studios, et cetera.  And Modi still hadn't
13 coughed up this white sheet yet, as to how the
14 companies were going to play together.  And he had --
15 or a woman by the name of Erika Paulson came into the
16 room.
17    Q.  When was this meeting, roughly?
18    A.  Ahh.
19    Q.  How long after the New York meeting?
20    A.  Ahh.  I mean shorter than three months,
21 longer than one.
22    Q.  Is that the first time you met Erika
23 Paulson?
24    A.  Yes.
25    Q.  Okay.  I think I will be able to nail down

Page 122

1  that date. Let me show you Exhibit 15.
2       (Plaintiff's Exhibit No. 15,
3  E-mail dated 6/15/04 from Jim Gillis to Kathy Glover,
4  was marked for identification.)
5  BY MR. MILLER:
6       Q. That is an e-mail, two e-mails again. One
7  from Kathy Glover to you, subject being Ari Emanuel
8  called, and then your response to Ms. Glover,
9  correct, on the top?
10      A. Okay.
11      Q. Is that correct?
12      A. It is correct.
13      Q. All right, do you recall calling
14 Mr. Emanuel after getting this e-mail?
15      A. It says they are going to call me.
16      Q. Do you recall receiving a call?
17      A. Not specifically, but I don't recall not
18 receiving a call. I told you I talked to him.
19      Q. Okay.
20      (Plaintiff's Exhibit No. 16, E-mail dated
21 6/15/04 from Jim Gillis to Kathy glover, was marked
22 for identification.)
23 BY MR. MILLER:
24      Q. Let me show you Exhibit 16, and this is
25 also two e-mails, the bottom e-mail being the same

Page 123

1  one as we just saw in Exhibit 15; correct?
2       A. Yes.
3       Q. And the top e-mail you have a different
4  response, it simply says, "You there?" Do you know
5  what that is about?
6       A. I know exactly what that is about.
7       Q. All right, tell me.
8       A. I usually ask somebody if they are there,
9  if they are there. It has nothing to do with this
10 memo. I just happen to be on the Blackberry, and I
11 shipped it back to the girl.
12      Q. Okay. Do you recall any conversation with
13 Mr. Emanuel as a result of these e-mails?
14      A. I know I spoke to him before, during and
15 after, I just don't remember specifically what the
16 conversations were. But I can tell you the gist of
17 Ari and I talking was to get Modi to the finish line
18 of how the companies were going to work together.
19      Q. Okay.
20         And when you are saying you were talking
21 with him about getting Modi onboard as to how the
22 companies were going to work together, you were
23 talking about the DVD and grocery stores deal?
24      A. Correct.
25      Q. Okay.

Page 124

1       A. And how we were going to get stuff from
2  studios.
3       Q. Okay. Any other conversations or topics
4  ongoing to discuss with Mr. Emanuel?
5       A. He wanted to know if I could get some
6  Hustler product, for his telephone venture in the UK.
7       Q. What does that mean?
8       A. He wanted some Hustler product for his
9  telephone venture in the UK.
10      Q. You mean like Larry Flint, Hustler?
11      A. Yes.
12      Q. Any other topics?
13      A. He wanted to know if we could sell Schreck
14 on watches, in book stores, in the college book
15 stores.
16      Q. Uh-huh.
17      A. Um, I had a builder from Ft. Lauderdale
18 that I knew, whose daughter was working for some
19 programer for the Academy Awards, wanted to get a job
20 in our HR department. I talked to him about that.
21      Q. Uh-huh, anything else?
22      A. I talked to him about the possibility of
23 doing Napa Auto Parts Stores with magazine delivery,
24 and they were going to give us access to Nascar and
25 their events.

Page 125

1       Q. Uh-huh.
2       A. That is it, I think.
3       Q. All right, no other conversations that you
4  can recall?
5       A. Nothing else that I can recall.
6       (Plaintiff's Exhibit No. 17, E-mail dated
7  6/21/04 to Jim Gillis from Kathy Glover, was marked
8  for identification.)
9  BY MR. MILLER:
10      Q. Let me show you Exhibit No. 17, is that an
11 e-mail from Kathy Glover to you?
12      A. Yes.
13      Q. And Kathy Glover, again, was your
14 assistant at this time; correct?
15      A. Yes, sir.
16      Q. And she is saying in this e-mail dated
17 June 21, 2004, Dennis Smith called, he has an update
18 for you, and then put a telephone number; correct?
19      A. Yes.
20      Q. Who is Dennis Smith?
21      A. He is my attorney.
22      Q. Okay. Do you know what that is about? I
23 don't want to get into attorney-client stuff.
24      A. That is why I can't tell you what it is
25 about.

### Page 162

1    time is 1:34 p.m.
2    BY MR. MILLER:
3    Q. All right, so do you have any knowledge as
4    to how the million and a half dollar fee was
5    negotiated for Mr. Emanuel?
6    A. I asked the question from Les Flegel, and
7    he told me it was a negotiation between Burkle and
8    Ari Emanuel.
9    Q. When did you ask Mr. Flegel this?
10   A. It was with -- after a conversation with
11   John Ledecky, and it would probably be post-closing
12   by about a week or something like that.
13   Q. What was the conversation you had with
14   Mr. Ledecky that prompted that conversation with
15   Mr. Flegel?
16   A. He asked me my opinion on what the
17   arrangement was or -- and questioned the compensation
18   from Ari.
19   Q. Have you talked to Mr. Emanuel about how
20   his million and a half was --
21   A. No.
22   Q. -- negotiated or arrived at?
23   A. I have not.
24   Q. Have you talked to Mr. Emanuel about
25   anything to do with his or Endeavors, rather, million

### Page 163

1    and a half dollar fee?
2    A. No. Other than we elected as a board to
3    not pay any fees going forward or something like
4    that. There was something in a board meeting that
5    he, when he became a board member, he was no longer
6    allowed to receive anything or something. We
7    didn't -- there is board minutes here or something
8    that said when he became a board member, it seems to
9    me that they were -- it was a conflict for him to
10   receive any more money.
11   Q. Was he entitled to receive any more money?
12   A. No, but I think it was going forward.
13   Q. What was going forward?
14   A. If he did anything for the company going
15   forward, now that he was with Alliance -- Source as
16   opposed to Yucaipa.
17   Q. Do you know how the million and a half
18   dollars was paid?
19   A. I don't.
20   Q. Do you know what Mr. Emanuel did,
21   specifically, to earn the million and a half dollars
22   for Endeavor?
23   A. What he did for Endeavor, I have no idea
24   what the arrangement was between Yucaipa and
25   Endeavor.

### Page 164

1    Q. -- you would agree, I assume, that the
2    million and a half dollar fee was paid as a result of
3    business services, consulting services?
4    MR. STERN: Object to the form.
5    THE WITNESS: I have no idea what the
6    arrangement was or why they had the arrangement.
7    It would be my understanding that Ari Emanuel was
8    compensated by Mr. Burkle's company in conjunction
9    with him doing work for Yucaipa to have a deal
10   with Alliance/Source.
11   BY MR. MILLER:
12   Q. Do you know if during, going back to the
13   nondisclosure agreement that we looked at earlier
14   this morning between Endeavor and Source; do you
15   recall that document?
16   A. I can go back to it; what number was it?
17   Q. It is Exhibit No. 6.
18   A. I have got it.
19   Q. Got it?
20   A. Yep.
21   Q. Do you recall discussing that document?
22   A. I remember you and I discussing it.
23   Q. Yes, that is what I mean.
24   A. Uh-huh.
25   Q. As far as you know, has there been any

### Page 165

1    violation of that agreement by Source?
2    MR. STERN: Objection, asked and answered.
3    THE WITNESS: I am not aware that we, Source
4    violated this agreement, if that is the question.
5    BY MR. MILLER:
6    Q. Okay, or Endeavor?
7    A. Neither one.
8    Q. Okay. Are there any, other than this
9    document, that you are holding, Exhibit No. 6, are
10   there any other written agreements that you are aware
11   of between Source and Endeavor?
12   A. Not that I am aware of.
13   Q. Okay. Do you know of any other written
14   agreements between Source and Endeavor that had been
15   considered?
16   A. Well, the white sheet that we put together
17   initially, to get Endeavor to do the audiences for
18   the studios, to get the product to the grocery store
19   checkouts was going to come to some sort of written
20   agreement.
21   Q. Uh-huh, well, did it?
22   A. No.
23   Q. And why not?
24   A. It was on their side, I have no idea, it
25   just never got there.

Page 166

1  Q. What do you mean by it was on their side?
2  A. It was the Modi problem, and getting him
3  on the horn, and getting him to focus on exactly what
4  it was they were going to do for us.
5  Q. Okay. Any other written agreements
6  between Source and Endeavor that were proposed that
7  you are aware of?
8  A. No.
9  Q. Any written agreements between Source and
10 Emanuel, Mr. Emanuel, that you were aware of?
11 A. No.
12 Q. Any proposed written agreements between
13 Source and Mr. Emanuel that you were aware of?
14 A. No.
15 Q. Mr. Emanuel became a member of the board;
16 correct?
17 A. Yes.
18 Q. Do you know why that is?
19 A. He became a member of the board to balance
20 the board out between -- when the merger happened
21 there had to be X amount of board seats. Some Source
22 guys left, some Yucaipa guys came on, and he became
23 the swing guy.
24 Q. Do you know if that was something that the
25 Alliance people wanted to have happen in order for

Page 167

1  this merger to go through?
2  A. Yes.
3  Q. All right, tell me about that.
4  A. Nothing more than what you just said.
5  Q. That is that Alliance wanted him to be on
6  the board?
7  A. Yes.
8  Q. Okay.
9  A. Are we done with 6?
10 Q. For now, yeah. I don't know if we will
11 come back to it.
12     (Plaintiff's Exhibit No. 21, E-mail dated
13 11/17/04 From Diana Cullingham to Jim Gillis, was
14 marked for identification.)
15 BY MR. MILLER:
16 Q. What -- who decided that it was going to
17 be Mr. Emanuel to take a seat on the board in order
18 to, as you put it, balance it out?
19 A. Who proposed him?
20 Q. Uh-huh.
21 A. Um, I was under the impression that he was
22 proposed as part of a negotiation between Burkle and
23 Flegel.
24 Q. Was it proposed by Mr. Flegel?
25 A. I don't remember.

Page 168

1  Q. Okay. Let me show you Exhibit 21. Is
2  that a three e-mail chain, starting at the bottom and
3  working up, an e-mail from Diana Cullingham to you
4  with a cc to Kathy Glover; second, your response to
5  Ms. Culingham; and third, a response back from
6  Ms. Culingham to you.
7  A. Okay. All right.
8  Q. Okay. Is that what those document is,
9  those three e-mails?
10 A. Yes.
11 Q. Who is Diana Culingham?
12 A. She is an Executive Assistant to Jason
13 Flegel.
14 Q. And did you send out the consent form for
15 Mr. Emanuel to sit on the board or did you get it
16 sent to you?
17 A. I -- um, because the lawyers were in my
18 office, meaning counsel was in my office, in our
19 general office.
20 Q. Uh-huh.
21 A. Diana and all of our PA's kind of sort of
22 work together. And I am guessing, only guessing,
23 that this came out of a lawyer's office to get
24 something signed. And since it was perceived I am
25 the operational guy, and I have the Ari contact, get

Page 169

1  Jim to get this guy to sign this, and it got faxed
2  out. I don't remember directing anybody to do it,
3  but it would have been done in my name, yes.
4      It looks like somebody called me along the
5  line, they were trying to do this in the background.
6  Somebody is getting a board meeting together, it
7  could be Doug's office, it could be Dean Hind's
8  office. They are just using my people, because the
9  people report up to me.
10     They sent it to me, and this is Blackberry.
11 Valerie was the assistant PA in the legal department.
12 And so I had her resign it and send it to Ari, and
13 fax it back to you, and call me that it all got done.
14 And it is called to sit on our board of director's
15 form, and I would have probably gotten that from Doug
16 or somebody.
17 Q. All right.
18 A. This is just a mechanical thing, just a
19 form signing.
20 Q. Are you aware of any other potential
21 agreements between Mr. Emanuel or Endeavor and
22 Source?
23 A. Not other than what I spoke of.
24     MR. MILLER: Okay. This is number 22.
25     (Plaintiff's Exhibit No. 22, Engagement