Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

JONATHAN LEDECKY d/b/a IRONBOUND
PARTNERS,

    Plaintiff,

vs.                              CASE NO. 1:05 CV 01039

SOURCE INTERLINK COMPANIES, INC.,

    Defendant.
_____/

C O N F I D E N T I A L

| | |
|---|---|
| VIDEOTAPED DEPOSITION OF: | DOUG BATES |
| DATE: | May 5, 2006 |
| TIME: | 10:30 a.m. to 1:25 p.m. |
| LOCATION: | 27200 Riverview Center<br>Suite 309<br>Bonita Springs, FL |
| TAKEN BY: | Plaintiff |
| REPORTER: | Betty G. Althoff, RPR |


DEFENDANT'S EXHIBIT 1

Page 82

1  A.  Okay. I don't think that was, ultimately
2  a stumbling block, but it was just -- it was an issue
3  that was being batted back and forth over what the
4  right number was.
5      Q.  Okay. And is it your memory that in
6  September of 2004, the Board of Source decided to cut
7  off at that point discussions with Alliance regarding
8  the potential merger?
9      A.  Yes. There was a decision by the Board to
10 cease pursuing a potential business combination with
11 Alliance Entertainment Board.
12     Q.  Okay. And at some time later in October,
13 the potential merger got back on track; is that
14 correct?
15     A.  That is correct.
16     Q.  Do you know how that happened?
17     A.  I know there was a meeting between Leslie
18 Flegel and Ron Burkle. Um, I know that Len Rizzio
19 had something to do with it. Um, but other than
20 that, um, I don't know.
21         I know we were talking, we were still
22 talking to the guys at Alliance Entertainment, the
23 operational guys, not the Yucaipa people -- the
24 operational guys. Because we were trying to
25 negotiate a supply relationship with Alliance during

Page 83

1  that period, during the hiatus period. We were
2  trying to work out something, so that we could get
3  supplies from them, which ultimately, didn't go
4  anywhere.
5      Q.  Okay. Any other, do you have any other
6  knowledge as to how the merger talks got back on
7  track?
8      A.  Nothing of my own personal knowledge, no.
9      Q.  Okay. Um, eventually it did get back on
10 track in October; correct?
11     A.  Yes.
12     Q.  And am I correct, that the Source Board
13 approved Source's acquisition of Alliance on November
14 18th of 2004?
15     A.  Yes.
16     Q.  Okay. And I know that the, according to
17 Exhibit 9, the S-4, the special shareholder meeting
18 to vote on the approval of Source's acquisition of
19 Alliance was scheduled for February 28, 2005;
20 correct?
21     A.  That is correct.
22     Q.  Did it take place that day?
23     A.  It did.
24     Q.  And was it voted through?
25     A.  Yeah, the morning of the 28th, the meeting

Page 84

1  was held and the shareholders approved the
2  transaction.
3      Q.  Okay. And, um, what I think we were a
4  little unclear about this yesterday, so let's just
5  nail it down. Which day did the acquisition of
6  Alliance close?
7      A.  The same day in the afternoon. The
8  shareholders meeting was in the morning, the closing
9  occurred in the afternoon.
10     Q.  Okay. That would be the afternoon of
11 February 28, 2005?
12     A.  That is correct.
13     Q.  What was the resolution on the 75 percent
14 rule regarding the Board of Directors?
15     A.  It was included, any sale of the
16 company -- let me rephrase that.
17     Q.  Go ahead.
18     A.  Any change of control involving the
19 company would require, um, it would require
20 resolution approved by 75 percent of the directors
21 prior to being submitted to shareholders.
22     Q.  Okay. And do you know how that resolution
23 was arrived at?
24     A.  I don't know what the negotiation; it was
25 just told to me that that is the deal.

Page 85

1      Q.  Okay. Were you told what the deal was
2  regarding the composition of the Board of Directors?
3      A.  Yes.
4      Q.  What were you told?
5      A.  I was told that there would be five
6  directors designated by AEC Associates through Ron
7  Burkle.
8      Q.  Which is the Alliance side of the
9  transaction?
10     A.  Correct.
11     Q.  Okay.
12     A.  And six designated by Source.
13     Q.  I thought it was five, five, and one.
14     A.  This gets back to the issue of who
15 maintains control -- who has control of the board.
16     Q.  Okay.
17     A.  Okay. It was important that Source
18 designate six directors.
19     Q.  Okay.
20     A.  Okay.
21     Q.  So that they could be deemed to control?
22     A.  To have control of the board.
23     Q.  Okay.
24     A.  Now, um, in discussions, as I understand
25 it, with Alliance, both sides vetted their proposed

Page 122

1  stock option agreement, dated July 19, 2005?
2      A.  That is what it says.
3      Q.  Okay.  Do you recall sending that to
4  Mr. Emanuel?
5      A.  No, but I have no doubt that I did.
6      Q.  Okay.
7         (Plaintiff's Exhibit No. 24,
8  Option Agreement, was marked for identification.)
9         THE WITNESS:  By the way, just so it is
10     clear for the record, all nonemployee directors
11     get stock options every year.  It is part of the
12     compensation package.
13 BY MR. MILLER:
14     Q.  Let me show you Exhibit 24.  Is that the
15 Director Stock Option Agreement signed by Mr. Emanuel
16 that is referred to in Exhibit 23?
17     A.  Short of comparing it to one in the
18 official records of the company, it appears that it
19 is.
20     Q.  Okay.
21        (Plaintiff's Exhibit No. 25,
22 E-mail dated 2/24/05 to Flegel from Doug Bates, was
23 marked for identification.)
24 BY MR. MILLER:
25     Q.  Let me show you Exhibit 25.  Is that an

Page 123

1  e-mail, well, two e-mails, the bottom e-mail being
2  one from Mr. McGuire to you with a copy to
3  Mr. Emanuel and a Gary Rosenfelt, dated February 4,
4  2005, and the top being an e-mail from you to
5  Mr. Flegel, dated February 24, 2005, and attaching a
6  document entitled engagement letter that is not
7  signed.
8      A.  That is what it is.
9      Q.  Okay.  Do you recall these documents?
10     A.  This is the document, this Exhibit 25 is
11 the document that I was referring to when we were
12 discussing the other e-mail.
13     Q.  Okay.  So this is the document you said
14 with the terms that were unusual to you.
15     A.  Yeah, that is a mild under statement.
16     Q.  Okay.  I think that was --
17     A.  -- 20.
18     Q.  Yes, Exhibit 20.  So this is the document
19 that was referred to in Exhibit 20?
20     A.  Correct.
21     Q.  And this document was never executed on
22 behalf of Source?
23     A.  No, it was not.
24     Q.  Were there any negotiations over trying to
25 come up with new drafts of this document?

Page 124

1      A.  Not of this document.  There was no way to
2  even start with this document, it was so off the
3  mark.
4      Q.  Okay.
5         (Plaintiff's Exhibit No. 26, E-mail dated
6  3/21/05 from Tom McGuire re: Form of Engagement
7  Agreement, was marked for identification.)
8  BY MR. MILLER:
9      Q.  Let me show you Exhibit 26.  Is that, at
10 least the bottom e-mail from you to Mr. McGuire dated
11 March 11, 2005, and attaching a draft engagement
12 agreement?
13     A.  Yes, that is what it appears to be.
14     Q.  Okay.  Do you recall this draft engagement
15 agreement?
16     A.  I recall the draft, this version has
17 markings on it that are not mine.
18     Q.  Okay.  Well, what can you tell me about
19 this engagement agreement, why were you exchanging
20 this with Mr. McGuire?
21     A.  Um, at this time, my recollection is that
22 Leslie was working very hard to enter into some kind
23 of an agreement with Endeavor.  Um, and um, the
24 agreement that we had gotten from McGuire earlier
25 was, as I said, it was really off the mark.

Page 125

1         And so Leslie sketched out for me a
2  proposal, um, which is reflected in the draft
3  agreement that is here, the printed part of it, as a
4  proposal to Yucaipa -- to Endeavor concerning some
5  type of a services they were going to provide.
6      Q.  Okay.  What happened with this agreement?
7      A.  Sales representative, that is what it was.
8  Well, my recollection here is that I sent them the
9  original draft of this document in early March, and
10 we didn't hear anything, we didn't hear anything, we
11 didn't hear anything -- at least I didn't hear
12 anything.
13        Then at the end of March, we had a board
14 meeting scheduled for April the 4th, I think is the
15 right date.
16     Q.  Okay.
17     A.  And, um, if something like this was going
18 to be entered into, if we were going to have an
19 effective agreement, as it says in the e-mail from me
20 to Tom McGuire, this had to be approved by the Board
21 of Directors, because of Ari's status as a Director.
22     Q.  Okay.
23     A.  And that was a condition to having any
24 kind of an agreement with a related party.  And
25 Leslie wanted to present it to the Board, and we

32 (Pages 122 to 125)

Page 126

1  hadn't heard anything.
2       Now, to my knowledge we never did hear
3  anything, but I do know that at the board meeting in
4  early April of '05, Ari was there. Um, and it was on
5  the agenda, and it was presented to the Board. Well,
6  it was on the agenda and I advised Ari he would have
7  to excuse himself, so he did. And the Board, um,
8  considered the matter, looked at the agreement, and I
9  don't think saying that they were hostile is too
10 strong a word. They were upset.
11     Q.  Okay.
12     A.  The board felt two directors, in
13 particular that I can remember, Clint Allen and Gray
14 Davis were concerned, significantly, over entering
15 into an agreement with a director, which called for
16 him to be paid significant sums, if everything was to
17 be believed, that Ari asserted Endeavor could do, in
18 a manner which of the type of relationship that many
19 of them would do without asking for compensation.
20     And on top, more importantly to them,
21 because this may involve more than just a director
22 would normally do. There was a concern, um, that it
23 would be optically, when you looked at our public
24 filings, because this would have to be disclosed.
25 The amount of money we compensated, and everything,

Page 127

1  that the conflict of interest would be so bad, and
2  the numbers would be so high, if we were to be
3  believed, if Endeavor was to be believed, that it
4  would look really, really, really bad --
5       Q.  Okay.
6       A.  -- to investors. And they were not
7  willing to pay the director, a related party, that
8  kind of money.
9       Q.  Okay.
10      A.  Now, they did, however, say they would
11 consider the matter, if a more reasonable agreement
12 could be structured that eliminated the conflicts of
13 interest that they were concerned about. And they
14 referred the matter to the nominating and corporate
15 governance committee, so that the whole board didn't
16 have to address it later, the nominating and
17 corporate governance committee could look at it, work
18 out a deal and recommend it to the whole board.
19      Principally, because the governance
20 committee is the one that deals with those type of
21 conflicts, and also, the two directors that were the
22 most concerned about this agreement, Clint Allen and
23 Gray Davis were both on that committee. So the board
24 felt if they were okay with it, it was probably going
25 to be okay then.

Page 128

1  And it was referred to them and that is
2  where it sat. And as far as I know, Endeavor after
3  that, um, and we told them that the Board had refused
4  it, had no interest in renegotiating it in another
5  way, structuring it.
6       Q.  When that was at the April 4th board
7  meeting that this occurred, you said?
8       A.  Yes.
9       Q.  All right, and what happened after it went
10 to the committee?
11      A.  It went to the committee, and as far as I
12 know, um, it is my understanding that Leslie told
13 Endeavor either though Ari or otherwise, that the
14 board -- of the board's concerns, and I assume,
15 although I don't know, talked to them about
16 restructuring the deal.
17      I know there were some follow along
18 discussions, because Tom McGuire said that to me.
19 Where, you know, and we would have sometimes things
20 would happen where I needed Ari. And he would say,
21 "Oh, by the way, do you know anything about that
22 sales rep agreement"? And, um, I would say, "No,
23 have you?" And he would say, "Well, if you hear
24 anything, you let me know, and I will let you know,"
25 and it was that sort of thing.

Page 129

1       But as far as I know, my understanding is
2  that Endeavor decided that it was not worth their
3  time and didn't want to pursue it any more.
4       Q.  Okay. During this period of time, that is
5  March, April of 2005, were you being contacted or did
6  you have any contact with Mr. Ledecky's counsel,
7  Mr. Schwartz?
8       A.  Yes.
9       Q.  Okay. And those contacts were regarding
10 Mr. Ledecky's desire to be paid under this referral
11 agreement, as a result of the acquisition of Alliance
12 by Source?
13      A.  Um, I think it was starting in early March
14 I guess I had a couple of conversations with
15 Mr. Schwartz about, about John's claim that he was
16 due money under the referral agreement.
17      Q.  Okay. Do you recall during those
18 conversations telling Mr. Schwartz that, um, Source
19 was in negotiations with Mr. Emanuel regarding
20 entering into a -- some sort of sales rep or some
21 sort of agreement, written agreement with
22 Mr. Emanuel?
23      A.  Um, I don't remember that, no.
24      Q.  Do you remember telling Mr. Schwartz that
25 it was actually close to being signed?