UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

JONATHAN LEDECKY d/b/a         ) Civil Action No.
IRONBOUND PARTNERS,            ) 1:05CV01039(JGP)
1400 34th Street NW            )
Washington, DC  20007          )
                               )
            Plaintiff,         )
                               )
      v.                       )
                               )
SOURCE INTERLINK COMPANIES,    )
INC.                           )
27500 Riverview Center Blvd.,  )
Suite 400                      )
Bonita Springs, FL  34134      )
                               )
            Defendant.         )
_____)

DEPOSITION OF ARIEL ZEV EMANUEL

Beverly Hills, California

Thursday, May 18, 2006

Reported by:
Carmen R. Sanchez
CSR No. 5060


DEFENDANT'S EXHIBIT

Page 59

1  BY MR. MILLER:
2      Q    Okay. And you had a business
3  relationship in this case with both companies?
4      A    No.
5      MR. STERN: Objection to the form.
6  BY MR. MILLER:
7      Q    Why not?
8      A    I had a business relationship with Ron.
9  I had a relationship with Ron.
10     Q    Okay.
11     A    I didn't have a -- I hadn't -- I didn't
12 have a -- I had an understanding of Source.
13     Q    Okay.
14     A    That's, you know, if you're -- 'cause
15 what you're asking me to do is kind of, at the time, my
16 feeling.
17     Q    Okay.
18     A    I had a relationship with Ron, which
19 was, you know -- in this town, it's very hard to define
20 personal or business but I had -- fine, business
21 relationship with Ron.
22     Q    Okay.
23     A    And I had an understanding of Source.
24     Q    Understanding?
25     A    An understanding of what the company

1  was.
2  Q    Okay.
3  A    And I was trying to potentially grow --
4  I didn't know if it was going to work -- a business
5  relationship, but I definitely had a business
6  relationship with Ron.
7  Q    Okay.
8  A    I guess that's -- I mean, I'm trying
9  to -- it's a very hard.
10 Q    Fluid?
11 A    It's a very hard question for you to ask
12 as it relates to what I do for a living.
13 Q    Okay.
14 A    Okay?
15 Q    All right.
16 A    I'm trying to answer it for you.
17 Q    Okay.  I understand.  I understand.
18 A    Okay.
19 Q    Let me just make sure I understand this.
20 Basically, from your definition of essentially what an
21 agent does, this is what you do; correct?
22 A    Yes.
23 MR. STERN:  Objection to the form.
24 MR. MILLER:  Okay.
25 Q    I guess this gets back to what you were

1  Q    Okay. What was his reaction?
2  A    Well, he said to me -- I don't know if
3  it was on that call or on another call, when we were
4  negotiating the fee, he said that he had never paid
5  anybody -- you know, 'cause I think this is what his
6  company does. He buys companies. That he had paid
7  people certain amount of money, and that this was --
8  because I wanted more. He said that this was the right
9  amount, the amount that he was willing to pay me; and I
10 said I didn't think so and then -- then the
11 conversation ended. We ended the conversation, but I
12 said that if you want me on the board, I'd go on the
13 board.
14 Q    Did you discuss payment with Mr. Flegel?
15 A    No, not that I recall.
16 Q    Why not?
17 A    Because I was -- it was coming from the
18 context because of my relationship with Ron. I knew
19 Ron.
20 Q    Did you have any role in choosing any of
21 the other directors that ended up on the Source board?
22 A    Not that I recall, no.
23 MR. MILLER: Okay. Let me have this marked
24 Exhibit No. 7, please.
25          (Plaintiff's Exhibit 7 was marked for

Page 83

```
1       Q       Okay.
2               Dated March 1st of 2005; correct?
3       A       Correct.
4       Q       Just for the record, Mr. Bates is the
5  general counsel of Source; is that correct?
6       A       It says, "General Counsel" on the
7  E-mail.
8       Q       Okay.
9               Do you recall getting this E-mail
10 regarding your million-and-a-half-dollar fee?
11      A       I don't recall it, but it's there.
12      Q       Okay.
13              Do you know, did you have anything to do
14 with the invoice or causing the invoice from Endeavor
15 for the million-and-a-half-dollar fee to be sent to
16 Source?
17      A       I don't remember any of this
18 transaction.  I was just looking for my money.
19      Q       Okay.  And the money eventually did come
20 through; correct?
21      A       I believe so, yes.
22      Q       Okay.
23              When did you start negotiating the fee?
24      A       I had it with Erika Paulson and Ron, I
25 believe, when conversations got back going between the
```

Page 84

1    two companies.  I believe that's when it -- I believe
2    that's when it started; so I don't know the date.
3         Q    When the conversation -- when you say,
4    "the two companies," the conversation between Alliance
5    and Source started?
6         A    When they got back going again.
7         Q    I see.  In other words, after the
8    breakdown?
9         A    Correct.
10        Q    And once it got going again?
11        A    Correct.
12        Q    Okay.
13             Do you know what Source knew about the
14   fee you would be getting?
15        A    I don't know.]
16        Q    Was there anything in writing about the
17   fee, a contract or a written agreement or anything like
18   that?
19        A    I don't know if there was any E-mail
20   exchanged between us and Erika and Ron.  I don't
21   recall.
22        Q    What did you do to earn the fee or to
23   earn the fee for Endeavor?
24        A    You need to ask Ron and Erika and, you
25   know, talk to them.

1   fine.  So this is a Source Interlink Companies
2   document.
3        A     My understanding is I was a consultant
4   for Yucaipa.
5        Q     Okay.  Why do you say that?
6        A     Because that's what I believe.
7        Q     Why?  Could you spell that out for me?
8        A     Because I did this -- I was acting on
9   behalf of -- from my perspective, on behalf of Yucaipa
10  in this; and my million-and-a-half was always a
11  conversation with Ron Burkle and Erika Paulson.
12       Q     Okay.
13             So if I understand correctly, you're
14  saying that this is not an accurate statement in this
15  document?
16       A     I'm not saying any -- I'm not -- I'm not
17  doing that.  I'm not answering those questions.  I'm
18  just telling you what my belief is.  You're asking my
19  belief, and that's my belief.
20       Q     Okay.
21             Have you, as a board member, been
22  notified or been told at all that there is anything
23  inaccurate in any of the company's SEC filings?
24       A     I'm not answering any of these questions
25  because I don't know what you're talking -- you're

1      Q      Are you aware that the general counsel,
2   Mr. Bates, for Source -- general counsel for Source,
3   Mr. Bates, has stated or is asserting a materiality
4   defense to any misstatement in SEC filings regarding
5   this matter?
6          MR. STERN:  Objection to the form;
7   mischaracterizes his testimony.
8          THE WITNESS:  I don't know anything about that.
9          MR. MILLER:  Okay.
10     Q      So the board has not been notified about
11  anything like that?
12     A      No, I don't recall.  I don't know.
13     Q      Were you, in your role in this merger --
14     A      Uh-huh.
15     Q      -- between Alliance and Source, were you
16  acting in the interest of one side as opposed to the
17  other?
18     A      I think I've already stated that.
19         MR. McGUIRE:  You can answer the question
20  again.
21         THE WITNESS:  Yes.
22         MR. MILLER:  Okay.
23     Q      Whose side?
24     A      Ron Burkle's and Erika Paulson's.
25     Q      Okay.  And that was Alliance's side,

1    therefore; correct?
2         A    It was Yucaipa/Alliance, yes.
3         Q    Okay. Yucaipa and Alliance were on the
4    same side?
5         A    I'm sorry, yes.
6         Q    And on the opposite side from Source of
7    this transaction?
8         A    Correct.
9         Q    Source ended up acquiring Alliance;
10   correct?
11        A    Yes.
12        Q    Do you think it's important that it
13   might be misstated in this public filing that one of
14   the directors of Source was working for the entity on
15   the other side of this transaction?
16        MR. STERN: Objection to the form.
17        THE WITNESS: What?
18   BY MR. MILLER:
19        Q    Do you think that it's important -- an
20   important fact that in this SEC public filing it
21   indicates that you were working on one side of the
22   transaction, when you were actually working for the
23   company on the other side of the transaction from
24   Source?
25        MR. McGUIRE: I think that misstates his

1      A    No, not that I recall.

2      Q    Have you talked about it with anybody
3 over at Yucaipa?

4      A    No, not that I recall.

5      Q    Okay.  And that would include
6 Mr. Burkle.

7      A    Actually, I said to Mr. Burkle coming
8 off the plane today that I had -- I had this -- that I
9 had this.  That's all I said to him.

10     Q    Okay.

11     A    Two-second passing.

12    MR. MILLER:  All right.  I have no further
13 questions.

14    MR. STERN:  Let me take like five minutes; see
15 if I have anything.

16    MR. McGUIRE:  Okay.

17        (A recess was taken at 1:35 p.m.
18        until 1:37 p.m.)

19    MR. STERN:  Okay.  I just have probably one
20 question.

21    THE WITNESS:  Okay.

22

23                EXAMINATION

24 BY MR. STERN:

25     Q    Mr. Emanuel, do you recall attending a

Page 119

1  Source board meeting where you were asked to excuse
2  yourself so they could discuss a proposed transaction
3  with Endeavor?
4        A     Yes, that was my first -- actually, my
5  first board meeting. I think it was -- if I recall,
6  down in Florida, yes.
7        Q     Okay.
8              Do you recall it being like the April
9  2004 time period, around there?
10       A     I don't remember the date.
11       Q     2005, actually.
12             And do you recall hearing or learning
13 anything about what the result of that discussion was
14 at the board meeting after you left?
15       A     Well, if I recall, they asked me to
16 leave the room, I think, to discuss my -- and I just
17 left, and then I went to the airport. I just left.
18 I'm getting kicked out of the meeting. I'm going home.
19 And I think it had to do with my commission on the DVD
20 deal that I wanted -- that I recall.
21       Q     And do you recall hearing anything after
22 that meeting about what was resolved?
23       A     Yeah, I didn't get it. Nobody -- they
24 didn't want to pay me. Because I was on the board,
25 they didn't want to pay me.

1    Q    Anything else?

2    A    Not that I recall. I mean, it's just
3    that I'm trying to think the exact language. I think
4    Leslie called me and said we couldn't -- "I couldn't
5    get you your -- your deal on the DVD deal; that you're
6    a board member now." Something to that effect. I don't
7    really recall all the language.

8         MR. STERN:  Nothing further.
9         MR. MILLER:  Okay. That's it. We're done.
10        THE REPORTER:  Mr. Stern, did you want a copy
11   of this transcript as well?
12        MR. STERN:  Yes.
13             (Deposition proceedings concluded at
14   1:39 p.m.  Declaration under penalty of perjury on the
15   following page hereof.)