UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
JONATHAN LEDECKY d/b/a          ) Civil Action No.
IRONBOUND PARTNERS,             ) 1:05CV01039(JGP)
1400 34th Street NW             )
Washington, DC  20007           )
                                )
            Plaintiff,          )
                                )
      v.                        )
                                )
SOURCE INTERLINK COMPANIES,     )
INC.                            )
27500 Riverview Center Blvd.,   )
Suite 400                       )
Bonita Springs, FL  34134       )
                                )
            Defendant.          )
_____)
```

DEPOSITION OF ERIKA PAULSON

Los Angeles, California

Wednesday, May 17, 2006

Reported by:
Carmen R. Sanchez
CSR No. 5060


DEFENDANT'S EXHIBIT M

HAHN & BOWERSOCK  (800) 660-3187 FAX (714) 662-1398

7b6145a3-d8a1-4aaa-9cd6-03f5d58fe80b

Page 106

```
 1       The third block down or so there's a
 2  title that says, "Ari Emanuel." Do you see that?
 3       A    Yes.
 4       Q    On the first page. And just so I
 5  understand it, and I think it's fairly clear, but let's
 6  just make sure. The first column brings up an issue.
 7  The second column entitled, "Alliance's Position"
 8  obviously is the position at that time that Alliance
 9  had on the issue; and then the third column entitled,
10  "Source's Position" shows what Source's position was at
11  that time on the issue; correct?
12       A    Yes.
13       Q    Okay.
14            About a little over halfway down the
15  paper in the "Merger Agreement" column there's the
16  title "Ari Emanuel"; correct?
17       A    Yes.
18       Q    And if you read across, this issue deals
19  both with his appointment as a director of Source and a
20  transaction fee of some sort; correct?
21       A    Yes.
22       Q    All right. And it says in the first
23  column, "Appoint as SORC" -- that's S-O-R-C, which is
24  Source's ticker ID; correct?
25       A    Yes.
```

Page 107

```
 1       Q    "Appoint as SORC independent director,"
 2  and then over in Source's position it says, "Agreed";
 3  right?
 4       A    Yes.
 5       Q    Okay.
 6            Is that referring to what we talked
 7  about before; that is, Mr. Emanuel being that 11th
 8  director on the board of Source?
 9       A    Yes.
10       Q    Okay.
11            Now, the second line says, "Transaction
12  fee to be paid by SORC."
13            What does that refer to?
14       A    That means that we would like to have
15  Source pay Ari's fee, whatever that might be.
16       Q    Okay.
17            Is that the fee that ended up being the
18  million-and-a-half dollars?
19       A    Yes.
20       Q    Okay. And over on Source's position, it
21  says, "Think they are in agreement"; correct?
22       A    It says that, yes.
23       Q    Okay. And why does it say that? Were
24  they in agreement with that?
25       A    Well, I think --
```

Page 108

```
 1       Q    "They" being Source?
 2       A    I think they were in agreement that the
 3  combined company would pay it. I mean, we always try
 4  to get -- I think we always try to get the company to
 5  pay the transaction fees, and I think their initial
 6  position was Yucaipa should pay it; and we said, "We're
 7  not paying it, you know. Our portfolio company is
 8  paying it," which, obviously, eventually would be
 9  merged into Source; so it would be the combined company
10  who would pay the fee.
11       Q    Okay. But that's not what it says;
12  right? It says, "Transaction fee to be paid by SORC";
13  correct?
14       A    Well, Source will be Source/Alliance.
15       MR. STERN: Object to the form.
16       THE WITNESS: It would be a combined company
17  because it gets paid at close. It's contingent upon
18  the deal closing; so it would be the combined company
19  would be paying it.
20  BY MR. MILLER:
21       Q    How did you know it was contingent upon
22  the deal closing?
23       A    Because that's typically how they're
24  structured.
25       Q    Okay.
```

Page 109

```
 1            Did you talk with anyone at Source about
 2  that particular topic, that they would be paying it
 3  after the merger?
 4       A    I think I had -- early on I -- I had
 5  some discussions, and I don't remember if they were
 6  with Leslie or not. And their view was that initially
 7  that Yucaipa should pay it, and I said that we're not.
 8       Q    Did you --
 9       A    We're not paying that. Our portfolio
10  company will pay that which, you know, again, it would
11  eventually be a Source/Alliance combined company.
12       Q    Okay.
13            Did you tell anyone at Source what the
14  final fee would be, the million-and-a-half dollars?
15       A    I don't remember if I did specifically
16  or if Ron did.
17       Q    And who decided that the fee would be a
18  million-and-a-half dollars?
19       A    I believe Ron Burkle.
20       Q    Are you aware of any written agreement
21  by which Mr. Emanuel was going to be paid this
22  million-and-a-half-dollar fee?
23       A    No.
24       Q    Are you aware of any contract that
25  required any entity to pay Mr. Emanuel a
```

HAHN & BOWERSOCK (800) 660-3187 FAX (714) 662-1398

7b6145a3-d8a1-4aaa-9cd6-03f5d58fe80b

Page 110

```
1  million-and-a-half-dollar fee?
2    A    No, I'm not.
3    Q    Do you know if Mr. Burkle told
4  Mr. Flegel that Source had to pay Mr. Emanuel's fee?
5    A    I don't know.
6    Q    So the million-and-a-half-dollar fee
7  decided by Mr. Burkle was, as far as you know, done
8  orally?
9    A    Yes.
10   Q    Okay. So if I understand this
11 correctly, then -- and the fee was paid by Source after
12 the merger; correct?
13   A    The fee was paid by the combined
14 company, yes.
15   Q    Okay. After the merger?
16   A    Yes.
17   Q    And the combined company was a public
18 company; right?
19   A    Yes.
20   Q    Still is a public company?
21   A    Yes.
22   Q    Okay. So, as I understand it -- oh, and
23 Mr. Burkle is a shareholder of that public company?
24   A    Yes.
25   Q    Through AEC?
```

Page 111

```
1    A    Yes.
2    Q    Right? Okay.
3         So, as I understand it, the testimony is
4  that a publicly traded company agreed to pay one of its
5  directors a million-and-a-half dollars based on an oral
6  agreement of one of its shareholders; is that right?
7    MR. STERN: Object to the form.
8    THE WITNESS: I'm not sure what public company
9  has to do with it but --
10 BY MR. MILLER:
11   Q    Well, you're aware -- you're on the
12 board of a public company; right?
13   A    Yes.
14   Q    You know that a public company has
15 fiduciary duties to its shareholders; correct?
16   A    It was disclosed in the S-4.
17   Q    I understand that. Do you understand
18 that a public company has fiduciary duties to its
19 shareholders; is that correct?
20   A    Yes, and I understand it was fully
21 disclosed. So, yes, Source, the combined company with
22 Alliance, did pay Ari Emanuel a fee.
23   Q    And it was based on the oral say-so of
24 one of its shareholders; correct?
25   MR. STERN: Object to the form.
```

Page 112

```
1    THE WITNESS: I don't know of any written
2  document.
3  BY MR. MILLER:
4    Q    Okay. Does Mr. Burkle know that
5  Mr. Flegel has testified that Source paid Mr. Emanuel
6  this million-and-a-half dollars because Mr. Burkle told
7  Mr. Flegel they had to?
8    MR. STERN: Object to the form.
9    THE WITNESS: I have no idea what Mr. Burkle
10 knows.
11 BY MR. MILLER:
12   Q    Mr. Burkle obviously had a personal
13 interest in this merger as well, obviously; correct?
14   A    I don't know.
15   Q    Well, I mean, he ended up being a large
16 shareholder of Source. He was personally interested in
17 this merger.
18   MR. STERN: Object to the form.
19   THE WITNESS: Yes, he ended up being a large
20 shareholder of Source.
21   MR. MILLER: Okay.
22   THE WITNESS: I think all shareholders
23 benefited from the merger.
24 BY MR. MILLER:
25   Q    Okay. Do you think all shareholders
```

Page 113

```
1  were okay with a million-and-a-half dollars being paid
2  based on the oral say-so of Mr. Burkle?
3    A    I think all shareholders --
4    MR. STERN: Object to the form.
5    THE WITNESS: I think all shareholders are
6  participating in significant value creation by
7  combining the two companies.
8  BY MR. MILLER:
9    Q    That wasn't my question. My question
10 is: Do you think that all shareholders would be okay
11 with one of the directors being paid a
12 million-and-a-half dollars based on the oral say-so of
13 Mr. Burkle?
14   A    I don't know.
15   MR. STERN: Object to the form.
16 BY MR. MILLER:
17   Q    How would you describe Mr. Emanuel's
18 role in process that ended up in the merger?
19   MR. STERN: Object to the form.
20   THE WITNESS: I would describe it very -- it
21 was at a very high level.
22 BY MR. MILLER:
23   Q    What do you mean by that?
24   A    As far as I know, I had a few
25 conversations with him regarding the status of where
```

Page 114

```
 1  the transaction stood.
 2      Q   I'm sorry.  You had very few --
 3      A   I had a few conversations with him
 4  regarding the status of where the transaction stood.
 5  He wasn't involved in the day-to-day negotiations.
 6      Q   Okay.
 7          Did he act as a consultant for Alliance
 8  in this merger?
 9      A   I don't know what the definition of
10  "consultant" would be.
11      Q   Well, under -- what definition would you
12  like to use?
13      A   I wouldn't characterize him as a
14  consultant, I don't think.
15      Q   Okay.
16          Did he act as an advisor to Alliance in
17  this merger?
18      A   He acted as someone who was -- he was,
19  you know, staying in the loop on the negotiations or on
20  the status of the merger.  That's a better word for it,
21  "status."
22      Q   Okay.  So was he acting as an advisor
23  for Alliance on the merger?
24      A   I -- I -- I mean, I think of an advisor
25  as someone who's involved on a day-to-day basis.  No.
```

Page 115

```
 1      Q   And he was not?
 2      A   No.
 3      Q   Okay.
 4          Do you know what role he played for
 5  Source in the process moving forward towards the
 6  merger?
 7      A   I don't know.
 8      Q   Was Mr. Mohrmann paid anything as a
 9  result of this merger?
10      A   To date, no.  There were discussions
11  regarding that.
12      Q   With whom?
13      A   Mr. Burkle.
14      Q   What kind of discussions?
15      A   Discussions about how, you know, he was
16  the one who was really responsible for us becoming
17  aware of and being interested in Source, and he should
18  be paid something.
19      Q   Has an amount been discussed?
20      A   Not specifically, no.
21      Q   Has a general amount been discussed?
22      A   Not that I remember.
23      Q   Okay.
24          Has a form of payment been discussed?
25      A   I think we'd be contemplating doing
```

Page 116

```
 1  something in cash.
 2      Q   The merger occurred the end of February.
 3  Was voted on by the shareholders; and, therefore,
 4  closed the end of February of 2005; correct?
 5      A   Yes.
 6      Q   So that's well over a year ago now;
 7  right?
 8      A   Yes.
 9      Q   Why is this still an open issue with
10  Mr. Mohrmann?
11      A   Because there hasn't been a lot of focus
12  on it.  He hasn't necessarily pushed the issue, and
13  we've been focused on other things so ....
14      Q   Does it have anything to do with this
15  litigation?
16      A   No.
17      Q   Why is Mr. Mohrmann being treated
18  differently than Mr. Emanuel?
19      A   He's not.  He's just not as aggressively
20  pursuing it as Mr. Emanuel.
21      Q   Okay.  So Mr. Emanuel got his
22  million-and-a-half dollars because he was aggressively
23  pursuing it?
24          MR. STERN:  Object to the form.
25          THE WITNESS:  I think he was very concerned
```

Page 117

```
 1  about getting a fee.  I mean, that was -- that was
 2  something he was focused on.
 3  BY MR. MILLER:
 4      Q   Is a finder's fee -- I mean, would you
 5  characterize Mr. Emanuel's fee as a finder's fee, as
 6  it's referred to in a couple of the memos we've seen
 7  here today?
 8      A   I would characterize it as a -- I don't
 9  know if "finder's fee" is the right word.
10      Q   All right.
11          What would you characterize it as?
12      A   Maybe it was, you know, he allowed us
13  the forum to have a first meeting with these guys.
14      Q   Okay.
15      A   So I don't know if that's necessarily
16  find the transaction, but he facilitated or provided a
17  forum for a meeting, which kicked the transaction off.
18      Q   Okay.
19          Is it common in that sort of situation
20  for someone to get a fee if a deal results?
21      A   I don't know.
22      Q   You don't know?
23      A   I mean, I don't know what "common"?  I
24  don't know what the industry --
25      Q   Is it unusual?
```