IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————————

|  |  |  |
|---|---|---|
| JONATHAN LEDECKY d/b/a | ) | |
| IRONBOUND PARTNERS, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:05CV01039 (JGP) |
| | ) | |
| SOURCE INTERLINK COMPANIES, INC., | ) | |
| | ) | |
| *Defendant.* | ) | |

—————————————————————

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Source moves for summary judgment on the ground that it did not have a "business relationship" with Endeavor. Source's assertions are belied by the record. As discussed more fully below, the record shows that:

- Mr. Ledecky introduced Source to The Endeavor Agency, LLC ("Endeavor"). (Ex. A, Def.'s Resp. to Pl.'s First Reqs. for Admis., No. 5).

- Source accepted that introduction and took part in business meetings and discussions with Endeavor, including business meetings and discussions facilitated by one of Endeavor's founding members, Ariel Emanuel ("Mr. Emanuel"). (Ex. B, Flegel Dep., 5/4/06, at 65:9-67:5, 79:16-80:12, 82:1-22, 91:1-94:5, 123:1-14, 126:17-127:7; Ex. C, Bates Dep., 5/6/06, at 61:17-62:24; Ex. D, Amendment No. 1 to Form S-4 Registration Statement filed by Source on January 18, 2005 ("S-4"), at IB 00058; Ex. E, Emanuel Dep., 5/18/06, at 35:8-37:1, 68:4-69:3, 70:18-71:8).

- Source and Endeavor entered into a written non-disclosure agreement which governs their exchange of confidential information, exploration of a business relationship, and their ongoing business relationship.  (Ex. F, Mutual Non-Disclosure Agreement; Ex A, No. 19).

- Source's SEC filings expressly state that Mr. Emanuel, a principal of Endeavor, provided consulting services to Source in connection with its merger with Alliance Entertainment Corporation ("Alliance").  (Ex. D at IB 00032).

- Endeavor sent Source an invoice for $1.5 million for consulting services rendered in connection with the Alliance merger.  (Ex. G, Invoice from Endeavor to Source; Ex. A, Nos. 25-28).

- Source paid Endeavor $1.5 million for consulting services.  (Ex. A, Nos. 25-28).

- Source appointed Mr. Emanuel, Endeavor's founder, to its Board of Directors (Mr. Emanuel was Source's primary contact at Endeavor).  (Ex. A, No. 29; Ex. H, Press Release (Nov. 18, 2004); Ex. B, Flegel Dep., 5/4/06, at 19:16-20:2; Ex. C, Bates Dep., 5/5/06, at 88:10-17).

- Source and Endeavor discussed other business dealings in addition to the consulting services rendered in connection with the Alliance merger.  (Ex. B, Flegel Dep., 5/4/06, at 146:24-151:25, 153:13-24, 154:16-23; Ex. C, Bates Dep., 5/5/06, at 118:1-22, 124:9-125:5).

Notwithstanding these facts, Source seeks summary judgment on the ground that it did not have a business relationship with Endeavor.  In support of its position, Source erroneously says it has no written agreement with Endeavor and, thus, the dealings between the companies should be characterized as something other than a "business relationship."  Even if true, which it is not, this

would not enable Source to avoid its obligations under the Referral Agreement.  As discussed more fully below, Source's motion is both factually and legally incorrect and should, therefore, be denied.

## STATEMENT OF MATERIAL FACTS

1.    On or about April 27, 2006, Mr. Ledecky and Source entered into a Referral Agreement, pursuant to which Mr. Ledecky agreed to introduce Source to a Client, and Source agreed to pay Mr. Ledecky 5% of the net income earned by Source as a result of any business relationship with that Client for a five-year period.  (Ex. I, Referral Agreement, Sections 1 and 2; Ex. J, Ledecky Dep., 3/29/06, at 131:20-133:20).

2.    After the execution of the Referral Agreement, Mr. Ledecky introduced Source to the Client, Endeavor.  (Ex. A, No. 5; Ex. J, Ledecky Dep., 3/29/06, at 135:17-136:7).  The introduction took place during a conference call arranged by Mr. Ledecky and attended by Mr. Emanuel, Mr. Ledecky, S. Leslie Flegel ("Mr. Flegel"), the Chairman and CEO of Source, and James Gillis ("Mr. Gillis"), President of Source.  (Ex. A, No. 7; Ex. D at IB 00058; Ex. B, Flegel Dep., 5/4/06, at 65:9-67:5; Ex. K, Gillis Dep., 5/3/06, at 91:17-25).  Source had no relationship with Endeavor or Mr. Emanuel prior to that introduction.  (Ex. A, Nos. 8, 12; Ex. B, Flegel Dep., 5/4/06, at 66:18-67:5).

3.    Source also entered into a written Non-Disclosure Agreement with Endeavor.  (Ex. F; Ex. A, No. 19).  That agreement was signed on April 27, 2004, the same day that Mr. Ledecky introduced Source to Mr. Emanuel.  (Ex. J, Ledecky Dep., 3/29/06, at 134:6-136:12).  The agreement states that it was entered into "in connection with exploring and evaluating a possible

business relationship (the 'Relationship') and for the purposes of the ongoing Relationship."
(Ex. F at 1).

4.      Following Mr. Ledecky's introduction of Source to Endeavor, Mr. Emanuel
participated in a number of business meetings and discussions with Source.  (Ex. B, Flegel Dep.,
5/4/06, at 65:9-67:5, 91:1-94:5, 123:1-14; Ex. C, Bates Dep., 5/5/06, at 61:17-62:24; Ex. D at IB
00058; Ex. E, Emanuel Dep., 5/18/06 at 35:8-37:1, 68:4-69:3, 70:18-71:3).  For example, in May
of 2004, Mr. Emanuel and Modi Wiczyk, another representative of Endeavor, met with Mr.
Flegel, Mr. Gillis, and Jason Flegel in New York City and discussed opportunities for Source to
enter the home entertainment content market through the distribution of CDs and DVDs at
checkout counters, as well as the possibility of taking the company private.  (Ex. B, Flegel Dep.
5/4/06 at 79:16-80:12, 82:1-22, 84:11-21; Ex. E, Emanuel Dep., 5/18/06, at 35:8-37:1).

5.      Subsequently, Messrs. Flegel and Gillis traveled to Los Angeles for a business
meeting at Endeavor's offices.  During the business meeting, Mr. Emanuel introduced Messrs.
Flegel and Gillis to Ms. Erika Paulson, a director of Alliance and a partner with The Yucaipa
Companies, LLC ("Yucaipa"), an affiliate of Alliance's controlling stockholder.  (Ex. A, No. 15;
Ex. D at IB 00058; Ex. B, Flegel Dep., 5/4/06, at 91:1-92:2, 94:12-24).  After the introduction,
Ms. Paulson discussed the possibility of a merger between Source and Alliance.  (Ex. B, Flegel
Dep., 5/4/06, at 91:1-94:5).

6.      Following that meeting, Mr. Emanuel took part in telephone calls and other meetings
relating to the negotiation of the merger between Source and Alliance.  (Ex. B, Flegel Dep.,
5/4/06, at 123:1-23, 126:17-127:7, Ex. E, Emanuel Dep., 5/18/06 at 68:4-69:3, 70:18-71:3).
When merger discussions between Source and Alliance broke down, Mr. Emanuel

communicated with both Mr. Flegel and representatives of Alliance in order to convince the parties to resume discussions. (Ex. E, Emanuel Dep., 5/18/06 at 70:18-71:8).

7.    In addition to discussions and meetings relating to the Alliance merger, Source and Endeavor also discussed the possibility of entering into other written agreements in addition to the Non-Disclosure Agreement, and they exchanged proposed drafts of such an agreement. (Ex. B, Flegel Dep., 5/4/06, at 146:24-151:25; Ex. C, Bates Dep., 5/5/06, at 118:1-22, 124:9-125:5). Endeavor also set up meetings between Source and individuals in the entertainment industry and the licensing business. (Ex. B, Flegel Dep., 5/4/06, at 153:13-24, 154:16-23).

8.    Prior to the merger with Alliance, Source placed Mr. Emanuel on its Board of Directors. (Ex. A, No. 29; Ex. H, Press Release (Nov. 18, 2004); Ex. B, Flegel Dep., 5/4/06, at 19:16-20:2; Ex. C, Bates Dep., 5/5/06, at 88:10-17). When Source sent a proxy statement to its shareholders recommending that the merger be approved, it informed those shareholders that Mr. Emanuel would be paid $1.5 million for consulting services provided to Source in connection with the merger. (Ex. D at IB 00032). Source has admitted that the $1.5 million fee was paid by Source to Endeavor as a "consultant fee" for "services rendered by Emanuel on Endeavor's behalf in connection with the Alliance merger." (Ex. A, Nos. 25-28; *see also* Ex. G).

9.    Both before and after the merger, Source's officers admitted that Source owed Mr. Ledecky compensation in connection with the merger. (Ex. J, Ledecky Dep., 3/29/06, at 259:2-262:9, 263:9-264:19; Ex. B, Flegel Dep., 5/4/06, at 165:6-166:16). Prior to the merger, Mr. Gillis, Source's President, told Mr. Ledecky that, when the transaction was completed, Mr. Ledecky could expect compensation "in the millions," and Mr. Flegel, Source's Chairman and CEO, admitted to Source's financial advisor, that, if the merger went through, Mr. Ledecky would be owed "millions of dollars." (Ex. J, Ledecky Dep., 3/29/06, at 259:2-262:9; *see also*

Ex. B, Flegel Dep., 5/4/06, at 164:9-165:5). The day after the Alliance merger closed, Mr. Flegel

sent Mr. Ledecky an e-mail stating that Mr. Ledecky was "the one who got this started." (Ex. L,

E-mail of 3/1/05 from L. Flegel to J. Ledecky; Ex. B, Flegel Dep., 5/4/06, at 162:10-164:4).

Even after Mr. Ledecky demanded compensation under the Agreement, Mr. Flegel admitted to

Mr. Ledecky that Source owed him "something" for his role in bringing about the merger,

although he disagreed as to how much. (Ex. J, Ledecky Dep., 3/29/06, at 263:9-264:19; *see also*

Ex. B, Flegel Dep., 5/4/06, at 165:6-166:16).


<u>ARGUMENT</u>

I.    <u>Summary Judgment Standard</u>

Summary judgment is proper only when "there is no genuine issue as to any material fact

and . . . the moving party is entered is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(c); *White v. Fraternal Order of Police*, 909 F.2d 512, 516 (D.C. Cir. 1990); *Alyeska Pipeline

Serv. Co. v. U.S. Envtl. Prot. Agency*, 856 F.2d 309, 313 (D.C. Cir. 1988). Summary judgment

will not lie "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *See also Gilvin

v. Fire*, 259 F.3d 749, 756 (D.C. Cir. 2001) ("[a] dispute about a material fact is 'genuine' if a

reasonable jury, drawing all reasonable inferences in [the nonmovant's] favor, could return a

verdict against the [movant]"). Furthermore, the nonmoving party is not required to resolve

issues of fact conclusively in his favor to avoid summary judgment. "'[A]ll that is required is

that sufficient evidence supporting the claimed factual dispute be shown to require a jury or

judge to resolve the parties' differing versions of the truth at trial.'" *Anderson*, 477 U.S. at 248-

49 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

Finally, a court should not make credibility determinations or weigh the evidence when ruling on

a motion for summary judgment. Rather, "[t]he evidence of the non-movant is to be believed,

and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *Robinson-Smith v. Gov't Employees Ins. Co.*, 323 F.

Supp. 2d 12, 17 (D.D.C. 2004) (quoting *Anderson*, 477 U.S. at 255).

In this case, discovery has produced more than sufficient evidence to permit a reasonable

jury to return a verdict for Mr. Ledecky. Both documentary evidence and deposition testimony

have revealed that, following Mr. Ledecky's introduction, Source and Endeavor entered into a

business relationship, evidenced by a written Non-Disclosure Agreement and confirmed by

Source's own public filings. (Statement of Material Facts ("SMF"), *supra*, at ¶¶ 2-8). The

business relationship resulted in the introduction of Source to Alliance and led to a merger that

produced substantial net income to Source and a $1.5 million fee for Endeavor. (SMF at ¶¶ 5, 8;

Ex. B, Flegel Dep., 5/4/06, at 193:12-194:4). Although Mr. Ledecky believes that these facts

firmly establish that he is entitled to compensation under the Referral Agreement, at the very

least, there is a genuine dispute over these material facts which renders summary judgment

inappropriate.

II.     Contrary to Source's Assertions, the Conditions Precedent to
        Plaintiff's Recovery Under the Referral Agreement Have Been Satisfied.

As discussed above, Mr. Ledecky fulfilled his obligations under the Referral Agreement

by introducing Source to Endeavor. (SMF at ¶¶ 1-2). Following that introduction, Source and

Endeavor entered into a business relationship (SMF at ¶¶ 2-8), evidenced by a written Non-

Disclosure Agreement (SMF at ¶ 3), that has resulted in substantial net income to Source. (Ex.

B, Flegel Dep., 5/4/06, at 193:12-194:4). Thus, every condition precedent to Mr. Ledecky's

recovery under the Referral Agreement has been fulfilled and he is entitled to compensation.

A.     There Is Substantial Evidence That Source and
       Endeavor Entered Into a Business Relationship.

The material facts show that, under any reasonable interpretation of the term "business

relationship," a business relationship was established between Source and Endeavor. As

discussed above, Source and Endeavor entered into a written Non-Disclosure Agreement (SMF

at ¶ 3), following which Mr. Emanuel introduced Source to Alliance. (SMF at ¶ 5). Business

meetings and discussions took place between Source and Endeavor's representatives regarding

both the Alliance merger and other business opportunities. (SMF at ¶¶ 4-7). Ultimately, Mr.

Emanuel, a founding member of Endeavor, was appointed to Source's Board of Directors, and

Endeavor was paid $1.5 million by Source for consulting services rendered in connection with

the merger. (SMF at ¶ 8). There can be no reasonable dispute that these facts establish the

existence of a business relationship between Source and Endeavor. At the very least, they are

substantial evidence of a business relationship, creating a genuine issue of material fact that

precludes summary judgment.

Source attempts to ignore the facts in claiming that its relationship with Endeavor was

something other than a business relationship. Never mind that Source was introduced to

Endeavor's Emanuel during a conference call set up by Mr. Ledecky, the purpose of which was

to discuss *business* opportunities for Source; never mind that Source entered into a Non-

Disclosure Agreement with Endeavor to govern their *business* relationship; never mind that

Source attended *business* meetings with Endeavor's representatives, including Mr. Emanuel;

never mind that Source's representatives corresponded with Mr. Emanuel and others at Endeavor

regarding *business* matters; never mind that Source was introduced to Alliance by Mr. Emanuel

during a *business* meeting at Endeavor's offices; never mind that Mr. Emanuel continued to

correspond with Source and with Alliance regarding the merger negotiations; never mind that

Mr. Emanuel was placed on Source's Board of Directors prior to the merger with Alliance; and

never mind that Source's own SEC filings state that Endeavor was paid $1.5 million by Source

for services rendered to Source by Mr. Emanuel in connection with the merger.  Notwithstanding

all these uncontested facts, Source now makes the incredible claim that it did not have a business

relationship with Endeavor.  (Source Mem. of P. & A. at 8).

     In an attempt to narrow the meaning of the term "business relationship" in order to justify

its denial that such a relationship existed between it and Endeavor, Source cites a handful of

inapposite cases involving actions for tortious interference with business relationships.  (Source

Mem. of P. & A. at 9).  Those cases dealt with the question of whether the plaintiffs could

recover damages based on alleged future business that was lost due to the defendants'

interference.  *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 815 (Fla. 1995); *St.

Johns River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*, 784 So.2d 500, 505-06 (Fla.

Dist. Ct. App. 2001); *Thunderwave Inc. v. Carnival Corp.*, 954 F.Supp. 1562, 1566-67 (S.D. Fla.

1997).  The plaintiffs in those cases were denied recovery because they had failed to prove,

beyond mere speculation, that future business would have resulted absent the defendants'

interference.  *Ethan Allen, Inc.*, 647 So. 2d at 815 (holding that the plaintiff could not recover

damages, in a tortious interference with business relationship case, where the relationship was

based on speculation regarding future sales to past customers);  *St. Johns River Water Mgmt.

Dist.*, 784 So.2d at 505-06 (holding that the defendant was entitled to a directed verdict where

there was no evidence that the plaintiff's contract with the city of Daytona Beach would have

gone forward absent the defendant's interference); *Thunderwave Inc.*, 954 F. Supp. at 1566-67

(holding that the plaintiff could not recover in a tortious interference with business relationship action where it had not alleged any identifiable agreement with any identifiable customer, instead relying on mere "hopeful projections").

The holdings of those cases do not apply to the instant case, which is not an action for tortious interference with a prospective business relationship, and in which there is no need to speculate as to whether Source and Endeavor would have entered into a business relationship in the future that would have yielded income to Source. Those events have already occurred, and the facts show that Source and Endeavor entered into a business relationship that led to the largest merger in Source's history. To the extent, then, that Source attempts to use cases involving tortious interference with prospective business relationships to narrow the definition of "business relationship," as that term is used in the Referral Agreement, its reliance on those cases is misplaced.

Moreover, in contrast with Source's position that the term "business relationship" was meant to be narrow, Source's General Counsel, Doug Bates, testified in his deposition that the meaning of the term "business relationship," as used in the Referral Agreement, was left vague by the parties because they did not know what form the relationship between Source and Endeavor would take and "there was no restriction on, um, particularly on the form that that would take." (Ex. C, Bates Dep., 5/5/06, at 40:20-41:18). Mr. Ledecky also testified that his intention was to be compensated regardless of the type of enterprise that resulted from the relationship between Source and Endeavor, stating that "[b]ecause it was such a broad-based discussion with Endeavor, I wanted to try to maintain fluidity in the agreement," and "I was trying to protect myself by having a somewhat global agreement so that whatever came out of those relationships, I would be compensated." (Ex. J, Ledecky Dep., 3/29/06, at 57:1-12, 79:12-

80:7). In light of the fact that the parties intended the term "business relationship" to cover any possible relationship between Source and Endeavor, Source's argument that the term should be narrowly defined for the purposes of summary judgment is unfounded.

In a footnote to its opening brief, Source cites a portion of Mr. Emanuel's deposition in which he stated that he had a business relationship with Ron Burkle, Yucaipa's principal and Alliance's controlling shareholder. (Source Mem. of P. & A. at 11 n.6). In a later footnote, Source claims that Mr. Emanuel was paid $1.5 million for consulting services rendered to Alliance, not Source. (Source Mem. of P. & A. at 12 n.7). However, the fact that Mr. Emanuel had a business relationship with Mr. Burkle does not preclude Endeavor and Mr. Emanuel from having a business relationship with Source as well. Moreover, during his deposition, Mr. Emanuel admitted that he signed a questionnaire sent to him by Source's General Counsel for the purpose of preparing documents to be filed by Source with the SEC. (Ex. E, Emanuel Dep., 5/18/06, at 77:6-81:4). That questionnaire stated that Mr. Emanuel served as a consultant to *Source*, and Mr. Emanuel admitted that the questionnaire was accurate. (Ex. E, Emanuel Dep., 5/18/06, at 77:6-82:7). Indeed, in one of Source's own SEC filings, Source itself stated that Mr. Emanuel was paid for consulting services rendered to *Source*, (Ex. D at IB 00032), and that Mr. Emanuel served as Source's advisor. (Ex. D at IB 00058). Source's President, Mr. Gillis, testified that Source's SEC filing was accurate (Ex. K, Gillis Dep., 5/3/06, at 177:7-8). In short, there is ample evidence, including documents signed by Mr. Emanuel and issued by Source, establishing that Source and Endeavor had a business relationship.

      B.    <u>Source and Endeavor Entered Into a Written Agreement</u>.

Having accepted the benefit of Mr. Ledecky's introduction and having proceeded with a business relationship with Endeavor, Source now attempts to seize on any technicality it can find

to avoid its liability to Mr. Ledecky.  Unable to deny the basic facts giving rise to an ongoing

business relationship, Source seeks to avoid liability by arguing that it had no written agreement

with Endeavor and, for that reason, it is not liable to Mr. Ledecky under the Referral Agreement.

This argument is both factually and legally inaccurate.

    The Referral Agreement states that Source's acceptance of its business relationship with

Endeavor was to be "manifest only by execution of a written agreement between Source and

[Endeavor]."  (Ex. I at Section 1).  As an initial matter, and regardless of how Source seeks to

characterize that agreement, whether in its papers or in the agreement itself, the Non-Disclosure

Agreement between Source and Endeavor is by definition a written agreement between the

parties.  This is evidenced by the fact that the agreement confers specific rights and liabilities on

each party that are legally enforceable.

    Moreover, the Referral Agreement does not specify that the written agreement

contemplated by Section 1 must be of any particular type.  In fact, Source's General Counsel

admitted that there is no definition of "written agreement" in the Referral Agreement, and stated

it "only . . . has to be a written agreement, um, which would be an on paper, language agreement

between the two parties."  (Ex. C, Bates Dep., 5/5/06, at 44:1-9).  The evidence developed by

Mr. Ledecky shows that Source and Endeavor entered into a written agreement evidencing their

business relationship, thus satisfying the provision in the Referral Agreement.  Nonetheless,

Source attempts to explain this fact away.

    Source and Endeavor executed the written Non-Disclosure Agreement "in connection

with exploring and evaluating a possible business relationship (the 'Relationship') and for the

purposes of the ongoing Relationship."  (Ex. F at 1; SMF at ¶ 3).  The Non-Disclosure

Agreement delineates the rules under which Source and Endeavor could exchange business

information.  (Ex. F).  Mr. Emanuel himself testified that a Non-Disclosure Agreement was a

common first step taken by Endeavor when it was entering into a business relationship with

another company.  (Ex. E, Emanuel Dep., 5/18/06, at 27:16-28:12.  *See also* Ex. M, Paulson

Dep., 5/17/06, at 48:8-17) (testifying that a confidentiality agreement is a "common agreement

that's entered into between two companies that are entering into a business relationship").  The

fact that the Non-Disclosure Agreement was entered into for the purpose of governing Source

and Endeavor's ongoing relationship satisfies the Referral Agreement's written agreement

provision.

Source argues that language inserted by Source into the Non-Disclosure Agreement

disclaiming that a relationship had been established between Source and Endeavor precludes the

Non-Disclosure Agreement from qualifying as the type of written agreement that was

contemplated in the Referral Agreement.  (Source Mem. of P. & A. at 10-11).  In an attempt to

place form over substance, Source is asking the Court to ignore the fact of the business

relationship between Source and Endeavor, and instead rely solely on a disclaimer conveniently

inserted into the Non-Disclosure Agreement in order to excuse Source from its obligations to Mr.

Ledecky.

Source's argument that the Non-Disclosure Agreement is not a written agreement

governing a business relationship is contrary to the terms of the agreement itself.  By its terms,

the Non-Disclosure Agreement not only governed the parties' initial business discussions, but

their ongoing relationship as well.  In so doing, the agreement confers specific legally

enforceable rights and liabilities on each party, which relate to their continuing business

relationship.  In this respect, the Non-Disclosure Agreement serves as an executory contract

governing the rights and obligations of Source and Endeavor with respect to future business

dealings.  Source's effort to characterize the Non-Disclosure Agreement as something other than a written agreement governing a business relationship is an exercise of form over substance. Once Source accepted the introduction and decided to enter into discussions with Endeavor, this agreement governed their business relationship.  To the extent Source and Endeavor discussed transactions, exchanged confidential information, and took part in meetings in which introductions were made, Source and Endeavor have a business relationship, and the Non-Disclosure Agreement governs that relationship.

Of course, Source's characterization of the Non-Disclosure Agreement is not dispositive in addressing the true nature of the relationship created thereunder.  Indeed, Florida courts have specifically held that, where two parties have a relationship with each other, those parties' characterization of the nature of their relationship is not dispositive.  In *Parker v. Domino's Pizza, Inc.*, 629 So.2d 1026  (Fla. Dist. Ct. App. 1994), the court considered the question of whether the defendant pizza company was liable for the acts of its franchisee.  *Id.* 1026-27.  It held that, although the franchise agreement between the parties stated that the franchisee was an independent contractor, *id.* at 1027, this did not establish the status of the parties' relationship as a matter of law.  *Id.* at 1029.  The court stated that "[i]t is clear that the nature and extent of the relationship of parties said to occupy the status of principal and agent presents a question of fact . . . and is not controlled by descriptive labels employed by the parties themselves."  *Id.* at 1027 (citing *Holiday Inns, Inc. v. Shelburne*, 576 So.2d 322 (Fla. Dist. Ct. App. 1991); *Nazworth v. Swire Florida, Inc.*, 486 So.2d 637 (Fla. Dist. Ct. App. 1986)).  *See also Singer v. Star*, 510 So.2d 637, 640 (Fla. Dist. Ct. App. 1987) (holding that "a statement in an agreement between parties that one is an independent contractor . . . is not dispositive of that issue" and "[a] jury may infer the existence of an agency even when both the principal and the agent deny it").

In the instant case, Source and Endeavor entered into an agreement which, by its terms, governed both their initial discussions and their ongoing relationship and which imposed legal liabilities and obligations on each. That Source seeks to characterize its relationship with Endeavor as something other than a business relationship is irrelevant. When parties enter into an agreement that governs the exchange of confidential information, engage in discussions about business opportunities, and attend meetings at which introductions are made to advance those opportunities (*i.e.*, Endeavor's introduction of Source to Alliance), there is, by definition, a written agreement and a business relationship.

Source also attempts to make much of fact that the Non-Disclosure Agreement, although signed on the same day Source was introduced to Endeavor, was actually signed before the introduction was made. (Source Mem. of P. & A. at 9). In fact, the Non-Disclosure Agreement was signed either immediately prior to or contemporaneously with the introduction and in preparation for it. (Ex. J, Ledecky Dep., 3/29/06, at 134:6-136:12). It was not signed by Source until after the name of the Client (Endeavor) was inserted into the agreement. (Ex. C, Bates Dep., 5/5/06, at 56:1-10). At that point, Source had the opportunity to decline to go forward with the introduction and the relationship arising therefrom. Instead, Source entered into a written agreement outlining the terms and conditions that would govern, at least in part, its relationship with Endeavor. Had Source decided to forego a business relationship with Endeavor after the introductory phone call, no compensation would have been owed to Mr. Ledecky. But Source did not decline to go forward with the relationship. Rather, it accepted the introduction and continued its business relationship with Endeavor, which was governed by the plain terms of the Non-Disclosure Agreement. The fact that the Non-Disclosure Agreement was signed before the phone call during which Mr. Ledecky introduced Source to Endeavor is irrelevant.

C.      A Party Which, By Its Own Acts, Prevents the Performance of
        a Contract Provision, Cannot Take Advantage of Its Own Wrong.

Under Florida law,[1] "a party who, by his own acts, prevents performance of a contract

provision cannot take advantage of his own wrong." *N. Am. Van Lines v. Collyer*, 616 So.2d

177, 179 (Fla. Dist. Ct. App. 1993) (holding that the plaintiffs' professed inability to pay

arbitration fees did not relieve them of the duty to submit to arbitration under the contract).  In

other words, "[o]ne who prevents happening of condition precedent cannot avail himself of his

own wrong to relieve himself of liability on contract." *Hart v. Pierce*, 98 Fla. 1087, 1088, 125

So. 243, 243 (Fla. 1929) (holding that a real estate broker who produced a buyer willing, ready,

and able to purchase according to the seller's offer was entitled to a commission even though the

sale was not consummated because of the seller's refusal to complete the transaction).  Further,

"he who himself prevents the happening or performance of a condition precedent, upon which

his liability, by the terms of the contract, is made to depend, cannot avail himself of his own

wrong and relieve himself from his responsibility to the obligee." *Walker v. Chancey*, 96 Fla.

82, 87-88, 117 So. 705, 707 (Fla. 1928) (internal quotation marks and citation omitted) (holding

that where a real estate broker procures a purchaser on the terms set forth in the listing agreement

and the purchaser enters into a sales agreement with the seller, but the seller refuses to carry out

the transaction, the broker is still entitled to a commission).  *See also Ne. Drilling Inc. v. Inner

Space Servs., Inc.*, 243 F.3d 25, 40 (1st Cir. 2001) (citing *Restatement (Second) of Contracts* §

245 (1981)) ("a contractual condition precedent is deemed excused when a promisor hinders or

precludes fulfillment of a condition and that hindrance or preclusion contributes materially to the

nonoccurrence of the condition"); *Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 542 (7th Cir.

---

[1] Under the terms of the Referral Agreement, Florida law applies to the interpretation of the contract (Ex. I at
Section 5(d)), although, as discussed below, it does not apply to other issues raised by the Defendant.

1996) ("[i]t is basic contract law that a party who prevents the occurrence of a condition precedent may not stand on that condition's non-occurrence to refuse to perform his part of the contract"); *Gulf, Mobile and Ohio R.R. Co. v. Illinois Cent. R.R. Co.*, 128 F. Supp. 311, 324 (N.D. Ala. 1954) ("[a] contracting party impliedly obligates himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove").

In this case, there is a written agreement that governs the business relationship between Source and Endeavor. Specifically, and as discussed above, the Non-Disclosure Agreement governs the initial and ongoing relationship between those parties, imposing legal rights and obligations on each. Notwithstanding the existence of this written agreement, Source seeks to avoid liability to Mr. Ledecky by relying on disclaimer language inserted by Source into the Non-Disclosure Agreement that characterizes the parties' relationships and obligations thereunder as something other than a business relationship. As discussed above, however, Source's characterization of its relationship with Endeavor is irrelevant. Source cannot use disclaimer language that it inserted into the Non-Disclosure Agreement to prevent the happening of a condition precedent upon which Source's liability under the Referral Agreement depends. Source's attempt to characterize the Non-Disclosure Agreement, which, by its own terms, governs Source's ongoing relationship with Endeavor, as something other than a business relationship, is nothing more than an effort by Source to avoid liability to Mr. Ledecky. Source cannot, however, avoid liability by the use of self-serving characterizations of its relationship with Endeavor.

Of course, even if the Non-Disclosure Agreement did not qualify as a written agreement under Section 1 of the Referral Agreement, which it does, Source cannot use its failure to satisfy

a condition precedent entirely within its control to avoid compensating Mr. Ledecky.  That Source chose not to enter into a written consulting agreement with Endeavor does not excuse Source from its obligations to Mr. Ledecky.  Because Mr. Ledecky introduced Source to Endeavor, and Source earned net income as a result of that relationship, Mr. Ledecky is entitled to compensation, regardless of whether Source failed to fulfill a condition precedent that was entirely within its own control.

        D.       There is Evidence that Source Refused to Enter Into Additional
                <u>Agreements with Endeavor in Order to Avoid Liability to Mr. Ledecky</u>.

In addition to the Non-Disclosure Agreement, Source and Endeavor considered entering into other written agreements to govern their relationship, and drafts of such agreements were circulated between representatives of Source and Endeavor.  (Ex. B, Flegel Dep., 5/4/06, at 146:24-151:13; Ex. C, Bates Dep., 5/5/06, at 118:1-22, 124:9-125:5).  In fact, shortly before Mr. Ledecky filed the instant case, Source's General Counsel, Doug Bates, informed Mr. Matthew Schwartz, counsel for Mr. Ledecky, that Source and Endeavor were close to signing an agreement.  (Ex. N, Decl. of Matthew D. Schwartz, Esq.; *see also* Ex. C, Bates Dep., 5/5/06, at 129:17-130:11).  However, after this lawsuit was filed, Source and Endeavor never signed that agreement.  Based on these facts, a reasonable jury could infer that Source and Endeavor did not execute that agreement so that Source could claim as a defense to Mr. Ledecky's suit that it had no written agreement with Endeavor.  Because there is a material factual dispute as to the reason Source and Endeavor failed to sign a second written agreement to govern their relationship, summary judgment should be denied with respect to Mr. Ledecky's claim for breach of the duty of good faith and fair dealing.

III.    Mr. Ledecky Was Not Required to Hold a Florida Brokerage
        License to Perform the Introduction of Source to Endeavor.

As an initial matter, it is important to note that Source's argument that Mr. Ledecky was required to hold a Florida broker's license because, it claims, Mr. Ledecky brokered a business transaction in Florida contradicts Source's argument that no business relationship was established in this case.  On the one hand, Source claims there was no business relationship between Source and Endeavor, yet, on the other hand, it claims that Mr. Ledecky acted as the broker of a business transaction when it introduced Source to Endeavor.  Thus, Source apparently has a dispute of material fact with itself.

Moreover, contrary to the claims made in Source's opening brief, Source's Chairman and CEO, Mr. S. Leslie Flegel, has admitted that Mr. Ledecky did not serve as a broker to Source. Indeed, during his deposition, Mr. Flegel testified under oath as follows:

Q.    All right.  Did Mr. Ledecky provide assistance to you in Source's purchasing of the Alliance business?

A.    None that I can recall.

Q.    Okay.  Did Mr. Ledecky act as a facilitator in the Source purchase of Alliance?

A.    No.

Q.    Did he act as a negotiator in the Source purchase of Alliance?

A.    None that I can recall.

Q.    Did he act as a broker in the Source purchase of Alliance?

A.    None that I can recall.

Q.    Did he act as a go-between in the Source purchase of Alliance?

A.    None that I can recall.

* * *

    Q.    Did he act as a broker in any culminated business deals for Source in 2004-2005?

    A.    None that I can think of.

(Ex. B, Flegel Dep. at 156:8-22, 158:9-11).  Notwithstanding this sworn testimony of its own Chairman and CEO, Source now insists that Mr. Ledecky acted as a broker under Florida law without holding a Florida broker's license.  Although the Florida broker licensing statute does not govern this case, as discussed in detail below, even if it did apply, the record shows that Mr. Ledecky did not engage in brokerage when he introduced Source to Endeavor.  Mr. Ledecky did not solicit a potential buyer, seller or merger partner, nor did he negotiate the sale of a business enterprise or opportunity.  Rather, understanding that Source desired to expand into new markets and believing that Endeavor could help Source in this respect (*see, e.g.*, Ex. J, Ledecky Dep., 3/29/06, at 68:3-18), Mr. Ledecky introduced Source to a company with valuable connections and relationships in the entertainment industry.  (Ex. J, Ledecky Dep., 3/29/06, at 50:4-53:10, 55:3-56:2).  The purpose was to provide Source with assistance in increasing its national distribution and fulfillment business.  (Ex. O, Ledecky Decl., at ¶ 3).  Mr. Ledecky explained that he did not have in mind any particular business opportunity when he introduced Source to Endeavor, but, rather, "there was such a broad based discussion of opportunities that I thought the important thing was to get the two sides together," (Ex. J, Ledecky Dep., 3/29/06, at 74:18-75:12), and that he "was trying to capture lightning in a bottle and make sure I was paid for it." (Ex. J, Ledecky Dep. at 79:12-80:7).  As such, even if Florida law applies to this issue, Mr. Ledecky did not broker a business or business opportunity, and his lack of a Florida brokerage license is not grounds for summary judgment.

A.    Florida Law Does Not Apply to Mr. Ledecky's Actions.

As an initial matter, although Florida law governs the parties' rights and obligations under the Referral Agreement, it does not govern whether Mr. Ledecky was required to hold a brokerage license in order to be compensated for introducing Source to Endeavor.  Whether Mr. Ledecky was required to be licensed is not a matter of contract interpretation, but, rather, an issue of compliance with the appropriate regulatory scheme.  While no District of Columbia court has directly addressed this issue, in *Prudential Securities, Inc. v. Norcom Development, Inc.*, 1999 WL 294806 (S.D.N.Y. May 11, 1999), the United States District Court for the Southern District of New York addressed a case involving a contract whereby the defendant agreed that the plaintiff would act as its exclusive agent for identifying potential opportunities for business transactions.  *Id.* at *1.  The plaintiff's efforts on behalf of the defendant resulted in the sale of real estate in North Carolina.  *Id.* at *2.  Although the parties' agreement contained a provision that New York law would apply, the court held that, while New York law applied to contractual issues, North Carolina law would apply to the issue of whether the plaintiff brokered real estate without a license.  *Id.  See also Weatherby Assocs., Inc. v. Ballack*, 783 So.2d 1138, 1143 (Fla. Dist. Ct. App. 2001) (holding that, although the parties' agreement contained a Connecticut choice-of-law provision, the trial court appropriately applied the law of the forum state in awarding attorney's fees, because those fees were awarded pursuant to a state statute, not under the agreement).[2]  Thus, the fact that the Referral Agreement contains a Florida choice-of-

---

[2] As recognized in *Prudential Securities, Inc., infra,* and *Weatherby Associates, Inc.*, if adopted, a position such as that offered by Source would lead to an untenable result.  This is further illustrated with a simple analogy.  For example, assume a Florida resident entered into a listing agreement with a licensed District of Columbia broker to purchase real estate in the District of Columbia, and that agreement contained a Florida choice-of-law provision.  While the validity and enforcement of the contract terms would be governed by Florida law, the buyer would not be permitted to invalidate the contract on the grounds that the broker was not licensed under the Florida broker licensing statute.

law provision does not govern the question of whether Mr. Ledecky was required to hold a broker's license under a state statute.

Moreover, it would be inappropriate to apply Florida brokerage licensing law where, as here, the effect would be to invalidate the Referral Agreement between Source and Mr. Ledecky. Indeed, the Restatement (Second) Conflicts of Laws provides that "A choice of law which invalidates the contract may be disregarded on the ground that the parties can be assumed to have intended that the contract would be binding, and if they chose a law which invalidates the contract, it can be assumed that they did so by mistake."[3]  Section 187, cmt. e.  Here, Source argues that the parties chose Florida law not only as the law that governs the interpretation of the agreement, but also to impose the Florida statutory scheme for the licensing of brokers of business relationships and opportunities.  Unless Source had no intention of fulfilling its obligations at the time it entered into the contract, it is preposterous to argue that the parties intended to invalidate their own agreement by choosing a statutory scheme that would void the contract.

Because the choice-of-law provision in the Referral Agreement does not apply to the issue of whether Mr. Ledecky was required to hold a Florida broker's license, the Court should look to the District of Columbia's choice-of-law rules in determining which law to apply.  In the District of Columbia, to determine which jurisdiction's law applies to substantive issues, the courts apply a governmental interest analysis.  *Dennis v. Edwards*, 831 A.2d 1006, 1012 (D.C. 2003).  Under this analysis, courts evaluate the governmental policies underlying the applicable

---

[3] While the District of Columbia has not addressed this particular comment to the Restatement, it has applied the Restatement (Second) Conflict of Laws to analyze the proper choice of law.  *See, e.g.*, *Samra v. Shaheen Business and Investment Group, Inc.*, 355 F. Supp. 2d 483, 495 n.8, 496 (D.D.C. 2005) (applying sections 187 and 188 of the Restatement); *see also Vaughan v. Nationwide Mut. Ins. Co.*, 702 A.2d 198, 200-201 (D.C. App. 1997).

conflicting laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case. *Id.* (citing *In re Estate of Delaney*, 819 A.2d 968, 988 (D.C. 2003)). "[W]hen both states have an interest in applying their own laws to the facts of the case, . . . the law of the forum 'will be applied unless the foreign state has a greater interest in the controversy.'" *Herbert v. Dist. of Columbia*, 808 A.2d 776, 779 (D.C. 2002) (quoting *Kaiser-Georgetown Cmty. v. Stutsman*, 491 A.2d 502, 509 (D.C. 1985)).

In *Dorothy K. Winston & Co. v. Town Heights Development, Inc.*, 376 F. Supp. 1214 (D.D.C. 1974), a case strikingly similar to the instant case, the United States District Court for the District of Columbia considered whether a real estate agent located in the District of Columbia who was approached by a Florida company to sell Florida real estate would be subject to the Florida broker licensing laws. *Id.* at 1215, 1217-18. Noting that the performance of the contract (*i.e.*, the soliciting of potential buyers), occurred in any number of jurisdictions, the court focused on the respective interests of Florida and the District of Columbia in having their own laws apply. *Id.* at 1219. The court stated that "'[o]bjections to application of foreign law would be justified if this analysis were to disclose that important interests of the forum would be sacrificed to advance equal or lesser interests of another jurisdiction." *Id.* (quoting *Mazza v. Mazza*, 475 F.2d 385, 391 (D.C. Cir. 1973)). Applying this standard, the court found that Florida's interest in registering real estate brokers in order to protect Florida consumers from disreputable real estate brokers did not outweigh the District of Columbia's interest in insuring that contracts entered into in the District are faithfully performed. *Id.* Rather, "D.C.'s interest in insuring performance of this contract would be unduly hampered by the application of Florida law while not significantly advancing Florida's public policy." *Id.* Thus, the court held that District of Columbia law would govern. *Id.*

As in *Dorothy K. Winston & Co.,* in the instant case, the District of Columbia has an interest in ensuring that a contract entered into by a District resident is faithfully performed, and that interest is not outweighed by Florida's interest in the application of its broker licensing statute to a District resident.  Mr. Ledecky is a resident of the District of Columbia (Ex. J, Ledecky Dep., 3/29/06, at 14:4-7; Ex. O at ¶ 1), he conducts business in the District of Columbia (Ex. J, Ledecky Dep., 3/29/06, at 15:8-18; Ex. O at ¶ 1), the Referral Agreement between Source and Mr. Ledecky was negotiated by Mr. Ledecky from the District of Columbia (Ex. O at ¶ 2), the Referral Agreement was executed by Mr. Ledecky in the District of Columbia (Ex. J, Ledecky Dep., 3/29/06, at 129:15-130:14, 131:20-136:12), Mr. Ledecky performed the introduction of Source to Endeavor from the District of Columbia (Ex. J, Ledecky Dep., 3/29/06, at 129:15-130:14; Ex. O at ¶ 7),[4] and Mr. Ledecky assisted Source in facilitating a business relationship with Endeavor through telephone and e-mail communications from the District of Columbia.  (Ex. O at ¶ 7).  Indeed, Source's attempts to deny the substantial relationship that the Referral Agreement has to this forum were rejected by the Court when it denied Source's Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue or, Alternatively, to Transfer Venue.  The Court recognized the interest of this forum by denying Source's motion.  (Mem. Order of Aug. 26, 2005).  The District of Columbia, therefore, has a substantial interest in this case.  Even if this case had involved brokerage, then, which it did not, the applicable licensing requirements would be those of the District of Columbia, not Florida.

_____

[4] Furthermore, Endeavor, the company that Mr. Ledecky introduced to Source, is located in California (Ex. J, Ledecky Dep., 3/29/06, at 50:4-12), and Mr. Ledecky did not perform any actions in the state of Florida with respect to the introduction of Source to Endeavor, nor did he broker real estate, a business enterprise, or a business opportunity within the state of Florida.  In fact, when Mr. Ledecky introduced Mr. Emanuel to Source's officers through a conference call, Source's officers were not even located in the United States.  They were sailing on a boat off the coast of Greece.  (Ex. B, Flegel Dep., 5/4/06, at 73:3-8; 77:2-9; Ex. K, Gillis Dep., 5/3/06, at 53:8-15, 91:17-25).

B.    Even if Florida Law Does Apply, Mr. Ledecky
Did Not Act as a Broker Under Florida Law.

Even if Florida law is applied to this issue, however, summary judgment is inappropriate because Mr. Ledecky did not act as a broker under Florida law.  In order to prove that Mr. Ledecky acted as a broker under the applicable Florida statute, Source would need to prove that he negotiated the sale, exchange, or purchase of a business enterprise or business opportunity, or that he took part in the procuring of a seller or purchaser of a business enterprise or business opportunity.  Fla. Stat. § 475.01(1)(a).  In fact, Mr. Ledecky did not perform any of these functions.[5]  Rather, he introduced Source to a company, Endeavor, that had substantial connections in the entertainment industry, and it was Endeavor, through Mr. Emanuel, that acted to procure a merger partner for Source.  To the extent that anyone acted as a broker under Florida law, it was Mr. Emanuel, not Mr. Ledecky.[6]

In arguing that Mr. Ledecky acted as a broker, Source relies heavily on *Meteor Motors, Inc. v. Thompson Halbach & Associates*, 914 So.2d 479 (Fla. Dist. Ct. App. 2005).  That case, however, merely stands for the proposition that an individual in Mr. Emanuel's position is required to obtain a Florida brokerage license.  It does not speak to an individual in Mr. Ledecky's position.

In *Meteor Motors*, the plaintiff and the defendant entered into an agreement whereby the plaintiff agreed to pay the defendant a commission if the defendant located a buyer for an automobile dealership owned by the plaintiff.  *Id.* at 481.  Christopher Halbach, a principal and

---

[5] In its opening brief, Source includes a footnote wherein it appears to assert that Mr. Ledecky has stated that he "assist[ed] in the procuring of prospects in the negotiation or closing of any transaction which does, or is calculated to, result in a sale, exchange, or leasing thereof. . . ."  (Source Mem. of P. & A. at 16 n.10).  This is a quote from the Florida brokerage statute (Fla. Stat. § 475.01(1)(a)), not a statement made by Mr. Ledecky.

[6] Interestingly, Mr. Ledecky is unaware of any evidence that Source ever resisted paying Endeavor its $1.5 million fee on the basis that neither Endeavor or Mr. Emanuel was licensed as a broker under Florida law, even though it was Mr. Emanuel who actually brought Source together with Alliance.

employee of the defendant, solicited potential buyers and, ultimately, located the company that purchased the dealership. *Id.* The court found that the defendant could not recover its commission because it engaged in brokerage activities in the state of Florida without a license when it solicited potential purchasers for a Florida business. *Id.* at 483.

Analogizing *Meteor Motors* to the instant case, it is Mr. Emanuel, not Mr. Ledecky, who stands in the shoes of Christopher Halbach. It was Mr. Emanuel who introduced Source to Alliance, not Mr. Ledecky. Mr. Ledecky did not solicit potential sellers or purchasers; rather, he simply introduced Source to the man who did engage in such solicitation. Indeed, Source's Chairman and CEO has admitted that Mr. Ledecky did not broker the Alliance merger. Mr. Flegel testified during his deposition that Mr. Ledecky did not act as a broker with respect to the Alliance merger or any other culminated business deals for Source during 2004 or 2005. (Ex. B, Flegel Dep. at 156:8-158:11). In light of the fact that Source, through Mr. Flegel, has already conceded that Mr. Ledecky did not act as a broker, the Court should find that Florida's broker licensing laws are no obstacle to the enforcement of the Referral Agreement.

IV.    Mr. Ledecky's Implied Contract Claims Should Stand.

The parties have already briefed the issue of whether Mr. Ledecky may plead his equitable claims in the alternative. Plaintiff respectfully refers the Court to his Opposition to Defendant's Motion to Dismiss, Supplemental Memorandum in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss Implied Contract Claims, and Plaintiff's Surreply in Opposition to Defendant's Motion to Dismiss Implied Contract Claims. Plaintiff agrees with Source that implied contract claims may not lie where an enforceable contract exists between the parties and the contract governs the subject matter at issue. (*See* Pl.'s Opp'n to Def.'s Mot. to Dismiss at 3-7). Although Source apparently has now conceded that an enforceable contract

exists and that Mr. Ledecky's erroneous use of the "LLC" designation does not invalidate the contract (Source Mem. of P. & A. at 19), it has not conceded that the Referral Agreement applies to the subject matter at issue in this case. As a result, Mr. Ledecky's equitable claims should stand as an alternative means of recovery should Source argue that the Referral Agreement does not apply to the subject matter of the instant action.

Moreover, in its Reply Memorandum in Further Support of its Motion to Dismiss Plaintiff's Implied Contract Claims, Source asserted that there is a question as to whether Mr. Ledecky "has standing as a non-party to the [Referral] Agreement to enforce it." (Source Reply Mem. in Supp. of Mot. to Dismiss at 8-9). While Mr. Ledecky disagrees with this assertion, assuming, for the sake of argument, that Source's position is correct, the Referral Agreement cannot be a bar to the equitable claims of an individual who, Source claims, is not a party to that agreement and has no standing to enforce it.[7] Once again, therefore, Mr. Ledecky's equitable claims may remain as an alternative means of recovery.[8]

<u>Conclusion</u>

For the foregoing reasons, Plaintiff respectfully requests that Source's Motion for Summary Judgment be denied.

Respectfully submitted,

---

[7] If Source will unequivocally agree that the Referral Agreement covers the subject matter of this dispute and that Mr. Ledecky has standing to enforce that agreement, Plaintiff will then agree to the dismissal of his equitable claims.

[8] Source also argues that, although a plaintiff may recover under an implied contract theory if it is found that no enforceable contract exists between the parties, there is an exception under Florida law that prevents recovery if the plaintiff has failed to comply with Florida's broker licensing requirements. (Source Mem. of P & A. at 19-20). This argument fails because, for the reasons set forth above, Mr. Ledecky was not required to register as a broker under Florida law.

      /s/ Allison Sinoski

Jan Paul Miller
  THOMPSON COBURN LLP
  One U.S. Bank Plaza
  St. Louis, Missouri  63101-1611
  (314) 552-6365 (telephone)
  (314) 552-7365 (facsimile)

Allison Sinoski (D.C. Bar No. 482593)
  THOMPSON COBURN LLP
  1909 K. Street, N.W. Ste. 600
  Washington, D.C.  20006-1167
  (202) 585-6900 (telephone)
  (202) 585-6969 (facsimile)

*Attorneys for Plaintiff Jonathan Ledecky d/b/a Ironbound Partners*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of July, 2006, a true and correct copy of the foregoing

Memorandum in Opposition to Defendant's Motion for Summary Judgment, was mailed

electronically through CM/ECF to:

        Kevin E. Stern
        C. Allen Foster
        Maria Hallas
        GREENBERG TRAURIG, LLP
        800 Connecticut Ave., N.W.
        Suite 500
        Washington, D.C.  20006

                                    /s/ Allison Sinoski