1



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

JONATHAN LEDECKY d/b/a IRONBOUND
PARTNERS,

    Plaintiff,

    vs.                 CASE NO. 1:05 CV 01039

SOURCE INTERLINK COMPANIES, INC.,

    Defendant.

_____/

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF:  S. LESLIE FLEGEL

| | |
|---|---|
| DATE: | May 4, 2006 |
| TIME: | 9:40 a.m. to 3:26 p.m. |
| LOCATION: | 27200 Riverview Center<br>Suite 309<br>Bonita Springs, FL |
| TAKEN BY: | Plaintiff |
| REPORTER: | Betty G. Althoff, RPR |

19

1    was on the board in 2004.

2        Q.   Okay.  Well, we can correct that.

3             It will take me a minute to track it down.

4             MR. STERN:  Can we go off the record so he can

5        hand him his glasses.

6             MR. MILLER:  Sure.

7             THE VIDEOGRAPHER:  Off the record, time is

8        10:04 p.m.

9             (Whereupon, an off the record discussion was

10       had.)

11            THE VIDEOGRAPHER:  Back on the record, the

12       time is 10:05 a.m.

13            (Plaintiff's Exhibit   No. 2,

14   Press Release, was marked for identification.)

15   BY MR. MILLER:

16       Q.   All right, Mr. Flegel, let me show you Exhibit

17   2, and ask you to take a look at that.  That is an

18   announcement, a press release actually, by your

19   company, Source, dated November 18, 2004, announcing

20   Ari Emanuel had been made a member of the Board of

21   Source; is that correct?

22       A.   That is correct.  I didn't remember it that

23   way, but that is correct.

24       Q.   Okay.  So would you agree that he was made a

25   member of the Board of Directors of Source as of

20

1   November 18th, 2004?

2        A.   Yes.

3        Q.   Okay.  So by the time he was paid the million

4   and a half dollars, at the beginning of March of 2005,

5   he had been a member of the Board of Directors of

6   Source for several months; correct?

7        A.   Yes.

8            MR. STERN:   Object to the form of the

9        question.

10           THE WITNESS:   I am sorry?  I didn't hear you.

11           MR. STERN:   I was just making an objection to

12       form for the record.

13           THE WITNESS:   Okay.

14   BY MR. MILLER:

15       Q.   Is that correct?

16       A.   It appears it is correct, yes.

17       Q.   And he was paid a million and a half dollars

18   within a couple days after the closing, after the

19   merger actually occurred on February 28th, 2005;

20   correct?

21       A.   That is correct.

22       Q.   All right.  Are you saying that it is not a

23   material fact that there was a statement in your S-4

24   that one of your Board Directors, one of your members

25   of your Board of Directors was going to be paid a

1       A.  I would suspect that I have been, but I don't

2   remember any specifics.

3       Q.  All right.  Let me direct your attention to,

4   again, we are still talking about Exhibit 6 now, which

5   is in front of you.  Let me direct your attention to

6   paragraph marked paragraph one, introduction by

7   Ironbound.  Do you see that paragraph?

8       A.  Yes.

9       Q.  Do you see that, it says, "Promptly after the

10  execution of this agreement, Ironbound shall arrange a

11  preliminary telephone conference between Source and

12  representatives of the client"; do you see that

13  sentence?

14      A.  Yes.

15      Q.  Did that happen?

16      A.  Did he arrange a telephone call; is that what

17  you're asking me?

18      Q.  Yes.

19      A.  Yes.

20      Q.  Okay.  And who was the telephone call with?

21      A.  It was with Ari Emanuel, I don't remember if

22  Ari had anyone else on the phone or not, I don't

23  believe he did -- John and myself with Jim Gillis

24  present on the boat.

25      Q.  Okay.  Who arranged that telephone call?

1        A.  I believe John did.

2        Q.  When you say John, you mean Mr. Ledecky?

3        A.  Yes.

4        Q.  When you say Ari Emanuel, Mr. Emanuel was and

5   I think is, but in any event, was at the time the

6   principal of Endeavor, a company called Endeavor;

7   correct?

8        A.  I had no idea who Mr. Emanuel was, and I had

9   no idea what his position reference Endeavor at the

10  time was.

11       Q.  You know he is associated with a company

12  called Endeavor?

13       A.  I know he is involved with Endeavor.

14       Q.  Go ahead.

15       A.  I know that he is involved with Endeavor, but

16  to this moment, I do not know what his specific title

17  or position is there.

18       Q.  All right, prior to that phone call that

19  Mr. Ledecky arranged, had you ever had any dealings

20  with Endeavor before?

21       A.  Never heard of them before, no.

22       Q.  Had Source ever had any dealings with Endeavor

23  before?

24       A.  No.

25       Q.  Had you had any dealings with Ari Emanuel

1    before that phone call?

2         A.  No.

3         Q.  Had Source had any dealings with Ari Emanuel

4    before that phone call?

5         A.  No.

6         Q.  Go back to paragraph one of the referral

7    agreement, it says:

8              "Thereafter, upon the reasonable request of

9    Source, Ironbound shall assist Source with its

10   evaluation and negotiation of any proposed business

11   venture between client and Source;" do you see that?

12        A.  Yes.

13        Q.  Okay.  If we continue on, a couple sentences

14   down, it says:

15             "Source shall have the unfettered discretion

16   to accept or eject any proposed business relationship

17   with client without liability to Ironbound;" do you see

18   that?

19        A.  Yes.

20        Q.  Okay.  Is there any sort of definition in here

21   anywhere as to the term "business relationship"?

22        A.  You would have to repeat that, because I am

23   not sure exactly what you mean by that.

24        Q.  Does the agreement define the term "business

25   relationship"?

73

1    in Exhibit 6 was Endeavor?

2        A.  I don't recall, I really, truly do not recall.

3        Q.  How did you find out that the client referred

4    to in Exhibit 6 was Endeavor?

5        A.  I am not sure that I knew it was Endeavor when

6    we had the call.  I remember we, I was on vacation in

7    Greece on a boat in the Aegean Sea on the satellite

8    telephone.

9        Q.  Uh-hmn.

10       A.  And it was difficult to hear.  And all I knew

11   I was talking to this guy who was talking a mile a

12   minute, spewing out ideas.

13       Q.  Who are you referring to?

14       A.  To Mr. Emanuel.

15       Q.  Okay, go ahead.

16       A.  Okay.  And candidly, I didn't know what the

17   heck he was talking about for half of what he was

18   saying, except something about an opportunity to sell

19   DVD's at checkouts in America.

20       Q.  Was Source doing that at the time already?

21       A.  We didn't sell DVD's at checkouts in America,

22   but we did a lot of business at the checkouts in

23   America.

24       Q.  Tell me what you remember of that telephone

25   call, and when I say that telephone call, I mean the

77

1          A.  I presume that is the document, yes.

2          Q.  Did you have any discussions with anyone at

3     Source regarding this phone call, this first phone call

4     with Mr. Emanuel and Mr. Ledecky?

5          A.  None other than Jim Gillis that I can recall.

6          Q.  Tell me about your conversation with

7     Mr. Gillis.

8          A.  I was on a boat at Greece, so I didn't have

9     contact with anybody else at Source.

10         Q.  Tell me about your conversation with

11    Mr. Gillis?

12         A.  I asked Mr. Gillis if he really thought it was

13    something we could do, that could happen.  He was

14    dubious about it, too.

15             The checkout is a very difficult place for

16    products to get on.  They -- it's not a free ride for

17    anybody.  They have to invest a lot of money to get

18    there.

19             It is not our decision, it is a retailer's

20    decision eventually, what goes on.  We can make

21    recommendations, but it is eventually their decision.

22    And so when we got off the phone, I was just talking to

23    Jim about whether it was really a real deal, whether he

24    really thought it was or not.

25         Q.  What was his response?

79

1    seeking information about Source in preparation for

2    meeting with you?

3        A.  Yes.  I was informed that they wanted no know

4    about the company, what we did, have a better

5    understanding of what we did.  And, um, frankly that

6    give a little, to my mind, gave some credence to what

7    they were saying, the fact that they were actually

8    taking some time to do some research.

9        Q.  Who informed you that they wanted that

10   information?

11       A.  I don't remember.

12       Q.  Did you provide the information?

13       A.  I presume we do -- did, I mean I had no reason

14   not to, and I think we did.  I just don't remember

15   exactly what or how we did.

16       Q.  Did there come a point in time in late April,

17   early May, when a meeting was set up for May 12th to

18   occur in New York City, between the representatives of

19   Endeavor and you and other representatives?

20       A.  We considered that early or late May, May 12th

21   -- early May.

22       Q.  May 12th would be, I would say mid-May.

23       A.  Mid-May, okay.

24       Q.  Were there conversations in late April and

25   early May regarding setting up a meeting on May 12th in

Ledecki -vs- Source Interlink                    S. Leslie Flegel

80

1    New York, between representatives of Source and

2    representatives of Endeavor?

3        A.   Yes, there were conversations about setting up

4    a meeting.

5        Q.   Okay.  Did you agree to attend a meeting in

6    New York City?

7        A.   Yes.

8        Q.   Let me finish my question.

9        A.   When what, I am sorry.

10       Q.   Did you agree to attend a meeting in New York

11   City on May 12th with representatives from Endeavor?

12       A.   I did.

13       Q.   Do you recall that prior to the meeting

14   actually occurring, after it had been arranged but

15   before it occurred, that Endeavor started changing the

16   terms of the meeting.  In other words, Mr. Emanuel was

17   not going to come, somebody else was going to come; do

18   you recall that happening?

19       A.   I don't recall specifically, except that

20   developed into a pretty typical pattern, so I am not

21   shocked by that.

22       Q.   Do you recall that there was a problem setting

23   up the May 12th meeting?

24       A.   I don't recall.

25       Q.   Do you recall being upset that Endeavor was

82

1      Q.  And did Mr. Ledecky do that?

2      A.  He set up a meeting with a Mr. Emanuel and a

3  guy by the name of Modi Whitecheck I believe attended.

4      Q.  Was that in New York?

5      A.  That was in New York.

6      Q.  Who attended that meeting in New York?

7      A.  Well, Modi Whitecheck and Ari Emanuel and

8  John, myself, I think Jim was there, I am not sure, but

9  I think he was, Jim Gillis.

10     Q.  Mr. Gillis?

11     A.  Yes.  And I think that my son, Jason Flegel,

12  was sort of in and out of the meeting.

13     Q.  Was there more than one meeting in New York

14  with these individuals or just one?

15     A.  I think just one.

16     Q.  Okay.  Tell me what happened at this meeting.

17     A.  Well, the meeting went off on a number of

18  tangents.  It was about doing the deal we talked about,

19  and they Ari Emanuel popped up with taking the company

20  private.

21     Q.  Taking what company private?

22     A.  Source private.

23     Q.  Okay.

24     A.  And he may have even talked about somehow the

25  relationship with Endeavor, but I don't remember

84

1    attends meetings I have, and he was with the company at

2    the time.  So --

3        Q.  And what was his position with the company?

4        A.  Dean at that point in time was a consultant to

5    the company helping me with, primarily working with

6    capital markets, doing a lot of follow-up work for me

7    in New York City.

8        Q.  Is he with the company currently?

9        A.  He is and he is a full time employee of the

10    company at this point.

11        Q.  All right.  What else was discussed at the May

12    meeting in New York City?

13        A.  Well, we were talking about, um, the checkout

14    opportunity, which this was -- this whole thing was

15    about the checkout opportunity.  And, um, we talked

16    about that and the specifics, and we talked about the,

17    um, what it would take, who would do what, the meetings

18    that would be set up, and the enormous numbers were

19    thrown about in that meeting by Ari.  And, um, I think

20    John bought into those numbers -- John Ledecky bought

21    into those numbers as well.

22            It turned out to be -- I think, I don't think

23    anybody had bad intentions -- it turned out to be not

24    true.  But I do believe that the principal discussion

25    was that.  And then the discussion got to come about,

91

Q.  Do you recall, in June of 2004, having a
meeting in Los Angeles, where Mr. Emanuel introduced
you to Erica Paulson?

A.  I do.

Q.  Okay.  How did that meeting come about?

A.  Well, I had to be in San Francisco on other
business with Jim Gillis, and the program, the concept
of this idea had pretty much come to a standstill.
Because we just couldn't get our arms around it, and I
had a lot of things going on in our company.

Jim suggested that we meet with Ari Emanuel in
Los Angeles.  I really didn't want to go to the
meeting.  I thought it was a waste of time.  But it was
still a very exciting prospect, an idea.  So I agreed
to go to the meeting.

And in the meeting, Ari was somewhat
apologetic for the lack of response, but said that this
was still a very exciting idea, and let's get it
resurrected and let's go, and let's see what we can do.

And, um, I had -- and then he said he had a
woman he wanted us to meet, who was in the outer
office, and did I mind if he brought her in?  And I
said, "No, but what is it in reference to?"  He says,
"Well, she has some ideas that she wants to talk to you
about."  So I said, "Okay."  And she came into the room

1    and introduced herself as working for Yucaipa, who I

2    had heard of.

3            I was familiar -- interestingly enough, I was

4    familiar with Yucaipa -- i was not interested -- I was

5    not familiar with Ron Burkle.  I knew Yucaipa, because

6    Yucaipa was a name of a company that had purchased

7    grocery chains that I was familiar with, and I knew

8    that Yucaipa had sold those chains to Kroger.

9            I just didn't follow that very closely, and

10   while Ron Burkle apparently was known by a lot of

11   people, I really didn't know much about him at all.  I

12   just had heard the name, but really didn't know --

13   let's put it this way, I didn't know him the way I know

14   him today.  I didn't know who he was, like I know who

15   he is.  A lot of people know him now, because he has

16   become infamous, I guess you might say.

17           But anyway, she said she represented Yucaipa.

18   Q.   When you say "she," are you referring --

19   A.   Erica.

20   Q.   -- to Erica Paulson?

21   A.   Yes.

22   Q.   All right, go ahead.

23   A.   And that Yucaipa and Ron Burkle had been

24   following our company for months, and had a great

25   interest in our company, and that Ron Burkle, who um, I

1    now knew to be the head of Yucaipa, and had a little

2    better sense of who he was, um, just through common

3    exposure, but I still didn't know much about him.

4         She said Ron Burkle loved our company, and had

5    a great interest in our company.  And I remember saying

6    to her that I didn't have any desire to sell the

7    company, so what was his interest?  And I was, you

8    know, just sitting in a meeting.  She then said, "Are

9    you aware that Yucaipa owns Alliance Entertainment?"

10   Which I was not aware of that.

11        And I said -- but I knew who they were because

12   we supplied Barnes & Noble and they do as well.  So I

13   said, "I am aware of who Alliance is, and I didn't know

14   you owned them."  And she said, well, we have been

15   tracking your company, we were referred to you by

16   somebody from St. Louis, from Wetterau, a company I

17   know, being from St. Louis.  And that, and referred by

18   a person from Wetterau, who I did not know of or had

19   never heard of before.

20        And she said, "Do you have any interest in

21   that and would you be willing to meet?  We are not

22   trying to buy you.  We would be interested in a merger

23   because, um, we would like to become involved in a

24   public company, so that our stock would become liquid,

25   our value would become liquid in the company."

94

1          And I said, "Yes, I would be willing to meet."

2    And she said, "Fine," um, I and another gentleman from

3    Yucaipa will came to Naples and meet with you, and see

4    if there is anything that could be arranged.  So that

5    is principally what took place at the meeting.

6          THE VIDEOGRAPHER:  I need to change tapes.

7          Off the record 12:02 p.m..

8          (A short break was held.)

9          THE VIDEOGRAPHER:   Back on the record, the

10         time is 12:11 p.m..

11   BY MR. MILLER:

12         Q.  How was the meeting with Erica Paulson, I am

13   sorry, let me ask you this.  I think you said before

14   prior to this meeting with Erica Paulson and

15   Mr. Emanuel, had your company had any dealings with

16   Alliance?

17         A.  No.

18         Q.  Had you had any dealings with Erica Paulson?

19         A.  No.

20         Q.  Had your company had any dealings with

21   Yucaipa?

22         A.  No.

23         Q.  Had you had any dealings with Ron Burkle?

24         A.  No.

25         Q.  And when I say had you, I mean before the

123

1         Q.   Prior to that, prior to your meeting with

2    Mr. Burkle, did you have conversations where

3    Mr. Emanuel contacted you, to basically try and get the

4    Alliance deal back on track, to get you talking to

5    Mr. Burkle again?

6         A.   The principal thing that he tried to do for me

7    in that regard was to primarily get the Kroger meeting

8    on.  That was a huge deal.  My guys were --

9    particularly Jim Gillis -- very sensitive about the

10   relationship we have with Kroger, because they are such

11   a major customer of ours.

12            And so, Ari called me -- Ron Burkle called Ari

13   and told him the deal was off.  I didn't do that, Ron

14   Burkle did it.  And --

15        Q.   And then did Emanuel call you?

16        A.   Huh?

17        Q.   Did Mr. Emanuel call you?

18        A.   He called me and he said, "It's really a

19   shame, it's crazy you guys can't get together, this is

20   a good deal."  And I said, "Ari, what is dead is dead,

21   okay, let's not discuss it.  I said it in those terms."

22   I said, "This deal is dead, I don't want it to come

23   alive," because at the time I didn't.  But, I said, "I

24   don't see why we have to embarrass ourselves in front

25   of a major retailer in America.  And if you can do

126

1        A.   Because I thought we would have a nightmarish

2   venture to try to find a guy that we both liked and

3   felt would be fair and neutral; and that was the

4   purposes of being the 11th board member, not because he

5   had any influence one way or the other.  He had no more

6   influence over Burkle than he had over me.

7        Q.   Do you recall having a lunch meeting with

8   Mr. Ledecki in April of last year in Baltimore?

9        A.   I do.

10        Q.   Do you recall discussing this whole topic with

11   him then?

12        A.   I remember -- I do, yes.

13        Q.   Do you recall the issue of Mr. Emanuel's

14   million and a half dollar payment coming up during that

15   lunch meeting?

16        A.   I do.

17        Q.   Do you recall telling Mr. Ledecki that one of

18   the reasons that Mr. Emanuel got that million and a

19   half dollar payment was because he was a key player in

20   getting this merger back on track?

21        A.   I think that I saw that testimony, and I think

22   that that was a misinterpretation.  What Ari Emanuel

23   did was calm down -- and I will say this.  He had

24   nothing to do with getting the merger back on track.

25   What he did do was calm down Burkle, who has kind of a

127

1    violent temper.  And Ari -- I think Ari got Burkle -- I

2    think he played a little bit of a role to the extent

3    where he just got Burkle to the point where he wasn't

4    fuming, and he would at least listen to Len Rizzio; but

5    Len Rizzio was the one that got this thing back on

6    track.  Ari Emanuel, mostly his role was to try to

7    resurrect that, to keep that Kroger meeting going.

8        Q.  At your lunch meeting in April of 2005 with

9    Mr. Ledecky, did you tell Mr. Ledecky that one of the

10   reasons that Mr. Emanuel got the million and a half

11   dollar payment, was because he was the key player in

12   getting the Alliance deal back on track?

13       A.  What I said to him is that he got a million

14   and a half dollars from Ron Burkle, not from me.  I

15   made that very, very clear in that meeting.

16            In fact, John later called me a liar, because

17   he saw that it was a Source that paid the -- he didn't

18   say, "You're a liar."  He indicated, his implication

19   was that I lied to him, which I didn't do.

20            Because right after that lunch, I called Doug

21   Bates and said, "Why would John Ledecky think we paid

22   that money?"  And Doug said, "Because we -- that money

23   got paid after the merger.  And the way it appeared,

24   Source -- Alliance paid it, but Source at that time

25   owned Alliance."

146

1          A.   I thought the merger closed on March 1st.

2          Q.   No.   I believe the merger -- we can go back to

3     the F-4 and see when the date of special stockholder

4     meeting was, but the special stockholder meeting was

5     February 28, 2005.

6          A.   I don't remember the sequence.   And I can tell

7     you, I genuinely do not remember that that was paid by

8     Source.   I really thought Alliance paid.

9          I knew Alliance was paying it, and it didn't

10    make a whole lot of difference.   Because on March 1st

11    we were going to end up owning Alliance, so if they

12    paid it on February 28th or if they paid it on March

13    2nd, it was coming out of the same till, which was

14    eventually going to be my till, okay?

15         Q.   Uh-hmn.

16         A.   So I guess this wasn't of critical importance

17    to me.   I just didn't remember that we paid it, when I

18    met with John at lunch.   I just really, truly didn't

19    remember that.

20         Can you even begin to imagine what was going

21    on in my life at that moment?   I mean there was a lot

22    of things happening, so it easily could have been

23    something that I didn't see.

24         Q.   Were there any business agreements or any sort

25    of contracts that were discussed or contemplated

1    between Source and Endeavor?

2         A.  Oh, sure, yes.

3         Q.  Such as what?

4         A.  We, for months, tried to come together with an

5    agreement, um, with Endeavor to have a business

6    relationship.  Endeavor -- we could never agree on what

7    Endeavor would either do or be paid.  They kept coming

8    back with ridiculous ideas.  And one, I remember, was

9    ten percent of revenues.

10        I mean we don't make ten percent of revenues

11   on any business we have, so how could I pay a guy ten

12   percent of revenue for something?  So those were the

13   kind of ridiculous things they came to us.

14        So we tried, and I even think there were

15   probably some contracts -- proposals for contracts that

16   went back and forth.  But two things happened:  Number

17   one is, we never could agree on financial terms.  And

18   secondly, the -- physically, the job Endeavor was

19   supposed to do in getting us to the studios -- let's go

20   back to the original concept that John got so excited

21   about, in terms of the amount of money that could be

22   made from the checkout business in America, which was

23   the basis of all of the discussions with Ari Emanuel

24   and John Ledecky.  Is that the, that Ledecky (sic) had

25   this enormous influence at the studio levels, and was

148

1    going to get us promotional allowances.

2         Q.   You mean Emanuel had the influence?

3         A.   Who did I say?

4         Q.   You said Ledecky.

5         A.   No.  I mean Ari Emanuel.  See, you're talking

6    to an old man who gets confused.

7              So effectively he didn't make anything happen.

8    He had one set of meetings.  Jim Gillis saw some guys.

9    And it turned out to be a bunch of baloney, really, to

10   be honest with you.

11             We did eventually get some DVD's at checkouts,

12   and it is -- right now, as we sit here today, it is a

13   blooming failure program.

14        Q.   Let me show you Exhibit 13.

15        A.   Okay.

16             (Plaintiff's Exhibit No. 13, Email dated

17   2/24/05 to Flegel from Bates, was marked for

18   identification.)

19   BY MR. MILLER:

20        Q.   Is that an e-mail from Mr. Bates to you

21   attaching both an e-mail from Tom McGuire to Mr. Bates

22   and a draft engagement letter?

23        A.   Yes.

24        Q.   Okay.  Do you recall seeing this document?

25        A.   I do.

**Ledecki -vs- Source Interlink**                    **S. Leslie Flegel**

149

1        Q.   All right.  And what is this engagement letter

2   about?

3        A.   What?  What?  I am sorry?

4        Q.   What is the engagement letter about?

5        A.   It is about entering into an engagement with

6   Endeavor to represent us, um, in the area of getting

7   the DVD deals.

8            This is, as I remember it -- I am not reading

9   it per se, but the DVD deals, and then other deals.

10  Because at that point they started talking about doing

11  other kinds of deals, like getting us together with

12  Martha Stewart, which also nothing came out of.

13           And, um, so we had basically said -- and Ari

14  Emanuel has, and Endeavor has tremendous contacts and

15  relationships, I mean they can walk into almost

16  anybody's office.  But my experience with them is that

17  -- and I don't know how he gets deals done in his

18  business -- because I never see anything ever come to

19  fruition.

20           And they sent this deal, and basically talking

21  about in the percent of revenues.  Any businessman will

22  tell you that nobody in the world could make that kind

23  of a deal.  If you look at our company, we made

24  operating profit of about three percent of revenues

25  this last year, so how can I pay somebody ten percent

1    of revenues as a commission?

2         So -- and the problem is that as a talent

3    agent, they get ten percent of a deal they cut for an

4    actor or actress or a television show.  It's a totally

5    different deal.

6         So their head -- it's not that they were

7    trying to be, you know, malicious or anything about

8    this or greedy, they don't get it.  They don't run

9    businesses.

10        Q.  And this e-mail from Mr. Bates to you is dated

11   February 24th, 2005; correct?

12        A.  Yes.

13        Q.  All right.  I am assuming this agreement was

14   never signed; correct?

15        A.  Never signed.

16             MR. MILLER:  All right.  Can I have the last

17        one in number four.

18             (Plaintiff's Exhibit No. 14, Engagement

19   Agreement between Source and Endeavor, was marked for

20   identification.)

21   BY MR. MILLER:

22        Q.  Let me show you Exhibit Number 14; do you

23   recognize that?

24        A.  Yeah, I kind of remember this.

25        Q.  What is it?

Ledecki -vs- Source Interlink                S. Leslie Flegel

151

1      A.   It looks to me like another attempt at

2   another, um, engagement agreement between us and

3   Endeavor.

4      Q.   Okay.  Did you -- is this one that was drafted

5   by your company?

6      A.   I am sorry?

7      Q.   Is this one that was drafted by your company?

8      A.   Um, I don't know, I would -- I don't know.

9      Q.   And the date on this draft is March 2nd, 2005,

10   correct, up at the top?

11      A.   Yes.

12      Q.   All right.  Was this one ever executed?

13      A.   No.

14      Q.   Why not?

15      A.   Because in the end, um, we really came to the

16   conclusion that there was no meaningful deal that could

17   be done between us and Endeavor.  Mostly we couldn't

18   get them on the phone, we couldn't even get them to

19   respond to documents, we couldn't get them to respond

20   to anything.

21          They were supposed to set up follow-up

22   meetings.  That never took place.  And finally, I just

23   threw my hands up in the air, and said nothing is going

24   to come about this, let's just go about our business

25   and do other things.

153

1      Q.  How long after the merger was closed, did they

2  start?

3      A.  I don't know, I think pretty quickly, but I

4  don't remember.

5      Q.  Okay.

6      A.  The merger was around March 1st, and we met in

7  April, so, you know.

8      Q.  All right, so through March and April?

9      A.  I would guess, yes.

10     Q.  How many conversations did you have with

11  Mr. Ledecky, roughly, regarding this topic?

12     A.  I don't have a clue; I don't remember.

13     Q.  Did Endeavor provide any services at any time

14  to Source?

15     A.  Um, none that I recall.

16     Q.  Did they provide any consulting services?

17     A.  None that I recall.  They set up some meetings

18  to try to make some deals happen, like with Martha

19  Stewart.

20     Q.  Uh-huh.

21     A.  Jeff Zuckerman of NBC, a meeting was set up.

22  I have had maybe half a dozen meetings with people like

23  that that Ari has set up meetings with, that absolutely

24  nothing has ever come out of.

25     Q.  Did Endeavor provide any marketing assistance

154

1   to Source?

2       A.   They tried to, they sat up some meetings, as I

3   mentioned earlier, for Jim Gillis to talk to some of

4   the studio heads -- nothing came of that.  But in terms

5   of marketing, in the sense of a real business marketing

6   like to -- I am not sure what you mean?

7       Q.   However you interpret the term "marketing

8   assistance".

9       A.   No.   I mean, I don't call a meeting set up

10  with Martha Stewart to discuss business opportunities a

11  marketing meeting.  I don't know if you do or not, but

12  I don't.   So -- but Endeavor has provided no services

13  in our normal course of business for Source.

14      Q.   Is Endeavor doing anything for Source now?

15      A.   No.

16      Q.   Is Endeavor bringing any business

17  opportunities to Source?

18      A.   The -- Endeavor set up, Ari Emanuel, which I

19  assume was one in the same with Endeavor, set up a

20  meeting for me with a guy who is in the licensing

21  business -- I forget his name right now -- about six

22  weeks ago or so in New York City.  Um, nothing came of

23  it.  Never heard from Ari or this guy again.

24          MR. MILLER:  I will keep going.  Anybody need

25      a break?

1        Q.  I recognize that, and you have testified at

2   great lengths about that.  I am asking you a very

3   specific question.  Did Mr. Emanuel or his company,

4   Endeavor, for Source, take any role in the

5   Source-Alliance merger?

6        A.  If he did, he did it without my asking him to

7   or without my approval to.

8        Q.  All right.  Did Mr. Ledecky provide assistance

9   to you in Source's purchasing of the Alliance business?

10       A.  None that I can recall.

11       Q.  Okay.  Did Mr. Ledecky act as a facilitator in

12  the Source purchase of Alliance?

13       A.  No.

14       Q.  Did he act as a negotiator in the Source

15  purchase of Alliance?

16       A.  None that I can recall.

17       Q.  Did he act as a broker in the Source purchase

18  of Alliance?

19       A.  None that I can recall.

20       Q.  Did he act as a go-between in the Source

21  purchase of Alliance?

22       A.  None that I can recall.

23       Q.  Mr. Ledecky did introduce you to Ari Emanuel

24  and Endeavor; correct?

25       A.  Absolutely, yes.

157

1    Q.  All right.  Did he act as a negotiator between

2    Source and Endeavor?

3    A.  In reference to the original programs we

4    talked about, I would say facilitator as opposed to

5    negotiator.

6    Q.  Okay.  Did he act as a go-between?

7    A.  Yes.

8    Q.  Okay.  Did he act -- you said he did not act

9    at a negotiator?

10   A.  Um, I wouldn't quite put it in those terms.  I

11   don't think we really even got to that point, but he

12   certainly was a facilitator.

13   Q.  Okay.  Um, and you never got to the point of

14   purchasing a business from Endeavor; correct?

15   A.  Correct.

16   Q.  Or Endeavor purchasing a business from you,

17   correct?

18   A.  Correct.

19   Q.  Basically, what Mr. Ledecky did was put you

20   and Mr. Emanuel, and therefore, Source and Endeavor

21   together; correct?

22   A.  That is correct.

23   Q.  All right.  Did Mr. Ledecky act as a

24   negotiator in any deal that came to fruition for Source

25   during this time period we have been talking about?

158

A.   In terms of a business deal --

Q.   Yeah, this is -- I think we are all talking about business deals.

A.   Okay.  Um, none that I can recall.

Q.   Okay.  Did he act -- was that as a negotiator? Did he act as a facilitator in any culminated business deals for Source during this period of time 2004-2005?

A.   None that I can think of.

Q.   Did he act as broker in any culminated business deals for Source in 2004-2005?

A.   None that I can think of.

Q.   I am sorry, you have to answer after I am done with my question.

A.   I am sorry.  None that I can recall.

Q.   Okay.  Now, you had -- you know that Mr. Ledecky has made -- you are aware, certainly by this time, that Mr. Ledecky has made demands from Source for payment, under his referral agreement, as a result of the Source purchase of Alliance; correct?

A.   Yes.

Q.   And Source has refused to make any payment to Mr. Ledecky, correct?

A.   Well, since the lawsuit has been filed, I think that is true.

Q.   Okay.  Did you make any offers to pay

162

1    one who got it started?

2        A.  I don't recall saying that.  I recall saying

3    that he got something started.  I remember something to

4    that effect, but I don't remember that it was in

5    relationship to the Alliance deal itself.

6            But, um, my relationship with John and

7    Endeavor was relative to the discussion that we had;

8    and I don't believe that John or Ari Emanuel were

9    responsible for the Alliance deal.

10       Q.  Let me show you Exhibit 15.

11           (Plaintiff's Exhibit No. 15, E-mail dated

12   3/1/05 to Ledecky from SLF, was marked for

13   identification.)

14   BY MR. MILLER:

15       Q.  Is that an e-mail you sent to Mr. Ledecky on

16   March 1st, 2005?

17       A.  Yep.

18       Q.  And is that the day that the Alliance merger

19   actually closed?

20       A.  Right.

21       Q.  And you're responding to an e-mail, and you

22   say to him there, "I am very happy to hear from you and

23   I have missed you.  Thank you for your support and you

24   are the one that got this started."

25       A.  Well, John did --

163

1      Q.  Does that e-mail say that?

2      A.  Yes.

3      Q.  And aren't you telling him there, when you say

4  "You are the one who got this started," you are talking

5  about the Alliance merger, right?

6      A.  I am talking about our being in the DVD

7  business, and an introduction to us to that business,

8  and I think he did get that started.  I don't think he

9  had -- I don't think he did the Alliance deal.

10     Q.  Uh-huh.

11     A.  I think he got us started down the track of

12  getting in the DVD business, and that is what I

13  believe.

14     Q.  And you got into the DVD business by buying

15  Alliance, right?

16     A.  I got into the DVD -- the entire intent of

17  getting into the DVD business was to do a startup to

18  supply checkouts.  I had decided to not do that,

19  because it was difficult to do, and we were trying to

20  find a partner to buy DVD's from, if we are going to do

21  that, because I could start a -- invest the capital

22  structure to start up a big DVD inventory.

23          And the truth of the matter is, John did

24  introduce me to Ari Emanuel; and if he had not done

25  that, it is very possible that Alliance would have

1    contacted me on their own.  They were looking into us

2    on their own.  And I don't know that, but John did get

3    me started on thinking about the DVD business.  That is

4    fact, he did, I give him credit for that.

5         Q.  Did you have conversations regarding the

6    merger of Source with Alliance with John Chiles?

7         A.  Well, sure, I did.  We hired him to be -- to

8    do an opinion letter.

9         Q.  Do you know -- have you been told that

10   Mr. Chiles has said that you told him that Mr. Ledecky

11   would be paid a lot of money if the merger went

12   through?

13        A.  I don't remember ever saying that to John

14   Chiles.

15        Q.  Okay.  Do you know that Mr. Chiles has told

16   Mr. Ledecky that you said that?

17        A.  I don't know that I said that.

18        Q.  Okay.  Are you denying that you said that to

19   Mr. Chiles?

20        A.  I just said, no, I just said, I don't remember

21   saying that to him.

22        Q.  Okay.  Are you saying --

23        A.  I am not denying I said that, I just don't

24   recall.

25        Q.  Okay.  So you could have said it; you don't

165

1    remember?

2        A.  I don't remember.

3        Q.  You don't know of any reason why Mr. Chiles

4    would lie about that?

5        A.  I don't think Mr. Chiles is a liar.

6        Q.  Okay.  Do you recall having a discussion with

7    Mr. Ledecky before your April lunch in Baltimore, some

8    time in March -- or actually, strike that -- let me get

9    the time frame right.  Excuse me a second.

10          After the merger was closed, and before your

11   lunch meeting in April in Baltimore with Mr. Ledecky,

12   do you recall having another conversation with

13   Mr. Ledecky regarding his desire to be paid as a result

14   of the Source-Alliance merger?

15       A.  I had discussions with Mr. Ledecky about that,

16   yes.

17       Q.  Okay.  Do you recall that during one of those

18   discussions, prior to your lunch in Baltimore in April,

19   that you told Mr. Ledecky that you do owe him something

20   as a result of the Source-Alliance merger, but that the

21   board would not allow you to pay him millions of

22   dollars?

23       A.  You know, I will tell you that I felt that

24   John did get us started in the DVD business.  I don't

25   know that I, per se, said that we owed him something

1    for Alliance, but I didn't fell that John was entitled

2    to millions of dollars.  I don't remember what I said

3    reference my board, but I don't believe that he was --

4    and I don't believe that anybody was.

5           Because I don't think anybody -- unless maybe

6    Len Rizzio, who never has asked for anything, because

7    Len Rizzio was the guy who made that deal happen.  That

8    deal was dead, and he is the one that made it happen.

9        Q.  My question is:  Did you tell Mr. Ledecky

10   during one of these conversations that you do owe him

11   something, but that the board would not allow you to

12   pay him millions?

13       A.  I was trying to appease John, and I might have

14   said that to him, because I didn't want to lose him as

15   an ally or as a friend, so I might have said that to

16   him.

17          MR. MILLER:  Okay.  I think it would be a good

18       time to take five minutes.

19          THE VIDEOGRAPHER:  Off the record.  The time

20       is 2:30 p.m.

21          (A discussion was held off the record.)

22          THE VIDEOGRAPHER:  Back on the record.  The

23       time is 2:44 p.m.

24   BY MR. MILLER:

25       Q.  Mr. Flegel, what are your duties and

193

1          MR. STERN:  Object to the form of the

2     question, hypothetical, mischaracterizes the

3     evidence.

4          MR. MILLER:  Go ahead.

5          THE WITNESS:  He is not entitled to five --

6     even in this contract, he is not entitled to five

7     percent of the value.  He claims he is entitled to

8     five percent of the net earnings minus allocated,

9     properly allocated expenses.

10   BY MR. MILLER:

11        Q.  Uh-huh.

12             And do you know what that is right now, what

13   the net earnings are from your Alliance business?

14        A.  I know what it was for the last year, yes.

15        Q.  What was it?

16        A.  Approximately six million dollars.

17        Q.  And that is on operating income of about

18   thirty-five million dollars?

19        A.  Operating income of thirty-four and a half

20   million.

21        Q.  So your position is if -- what you're saying

22   is, if Mr. Ledecky were to be found -- and I recognize

23   you're not agreeing that he would be -- but if

24   Mr. Ledecky were to be found to be entitled to five

25   percent for the next five years of the net income from

194

 1    your Alliance business, it would be five percent of six

 2    million for last year, and then five percent of

 3    whatever the net income is for the following years?

 4        A.   That is correct.

 5          MR. STERN:  Object to the form of the

 6        question.

 7    BY MR. MILLER:

 8        Q.   If this liability was disclosed, could that

 9    cause problems for trying to sell this company, if you

10    decide to do that?

11          MR. STERN:  Object to the form of the

12        question; hypothetical.

13          You can answer, if you can.

14          THE WITNESS:  Okay.  In my opinion, I don't

15        believe it would.

16    BY MR. MILLER:

17        Q.   Uh-huh.  Is that one of the reasons why it's

18    not listed in your 10-K?

19        A.   No.

20        Q.   What is the difference between the thirty-four

21    and a half million figure and the six million figure

22    that you gave?

23        A.   Um, well, a little item called taxes is a

24    pretty significant number.

25        Q.   Uh-huh.