

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION


JONATHAN LEDECKY d/b/a IRONBOUND PARTNERS,

    Plaintiff,

vs.                          CASE NO. 1:05 CV 01039

SOURCE INTERLINK COMPANIES, INC.,

    Defendant.
_____/


C O N F I D E N T I A L


| | |
|---|---|
| VIDEOTAPED DEPOSITION OF: | DOUG BATES |
| DATE: | May 5, 2006 |
| TIME: | 10:30 a.m. to 1:25 p.m. |
| LOCATION: | 27200 Riverview Center<br>Suite 309<br>Bonita Springs, FL |
| TAKEN BY: | Plaintiff |
| REPORTER: | Betty G. Althoff, RPR |


Donovan Court Reporting, Inc.  239-793-0021
www.donovanreporters.com

1  to, I am not saying that there is no definition in
2  here. I think if you read the context it is clear in
3  which -- what business relationship means.
4      Q.   All right, tell me where you see that.
5      A.   I think when you look at the concept of,
6  in paragraph one, where you talk about the
7  "evaluation of a proposed business venture, that the
8  um, Source has the unfettered discretion to accept or
9  reject any proposed business relationship with the
10 client." And particularly with the respect to the
11 next sentence, which talks about it being manifested
12 by a written agreement between the parties.
13     Q.   Uh-huh.
14     A.   It is clear that we are talking about a
15 relationship here that is, um, a commercial
16 relationship, where each party is benefiting.
17     Q.   Okay. Is there a difference between a
18 commercial relationship and a business relationship?
19     A.   No.
20     Q.   Okay. So it is, all right. So you
21 believe that in context, it means any type of
22 business relationship in which there is a benefit to
23 each side?
24     A.   Monetary benefit, yeah. It is, it was, it
25 is designed to be, as I intended it, that is what it

41

1    was, yeah.
2         Q.    Okay.  And beyond that, however, there is
3    no limitation in here as to what type of
4    relationship, business relationship that would be,
5    because as you said before, no one knew what form it
6    was going to take.
7         A.    The concept was it was a relationship
8    between Source and the client, and we didn't know
9    what -- there was no restriction on, um, particularly
10   on the form that that would take.
11        Q.    Uh-huh, okay.  And so, just so I am
12   understanding, am I understanding that one of the
13   reasons it was left vague in here is because of just
14   that, because nobody knew what form it was going to
15   take?
16        A.    I didn't know what form it was going to
17   take, and my discussions with Mr. Ledecky, led me to
18   believe he didn't know what form it would take.
19        Q.    Okay, that is fair enough.
20              Um, it then talks about in paragraph two,
21   and again, I am referring to Exhibit 5.  In paragraph
22   two, entitled Compensation, it talks about what
23   compensation Ironbound would receive if it is due
24   compensation under this contract; correct?
25        A.    Yes.

44

1       "Acceptance shall be manifest only by
2   execution of a written agreement between Source and
3   the client"; correct?
4       A.   Yes.
5       Q.   Is there a definition of what type of
6   written agreement it must be?
7       A.   No, only that it has to be a written
8   agreement, um, which would be an on paper, language
9   agreement between the two parties.
10      Q.   Okay.  But it doesn't say, for example, it
11  has to be a contract?
12          MR. STERN:  Object to the form.
13  BY MR. MILLER:
14      Q.   Correct?
15      A.   I can only tell you that a written
16  agreement, in my mind, is the same as a contract.
17      Q.   Okay.  But it might be different in other
18  people's minds; correct?
19      A.   No, I don't think it's possible to think
20  that a written agreement is anything other than a
21  contract.
22      Q.   Really?  Okay, does it say that in here
23  anywhere?
24      A.   No, it doesn't say that anywhere.
25      Q.   It doesn't say it has to be a distribution

1   Q. We'll show you Exhibit 7.
2   A. Yes.
3   Q. And this is the final, um, mutual
4 nondisclosure agreement that was signed by you on
5 behalf of Source; correct?
6   A. Correct.
7   Q. And in this final version, the name of the
8 other party is listed as the Endeavor Agency, LLC;
9 correct?
10   A. It is.
11   Q. And whenever we have been talking about
12 Endeavor during this deposition, we will be referring
13 to the Endeavor Agency LLC; all right?
14   A. Okay.
15   Q. And you said you don't remember whether
16 you filled in the name of the Endeavor Agency, LLC or
17 whether you got a final draft with that name already
18 in there?
19   A. Correct.
20   Q. This is -- and did you have authority to
21 sign this written agreement on behalf of Source?
22   A. I did.
23   Q. Okay. And this written agreement is also
24 signed on behalf of the Endeavor Agency by their
25 General Counsel, Tom McGuire; correct?

61

1   A.    In fact, I know that he is not the
2   principal of Endeavor.
3   Q.    Okay. Who is the principal of Endeavor?
4   A.    I do not know. Ari Emmanuel is one of
5   several members of the Endeavor Agency, LLC.
6   Q.    Okay.
7   A.    Okay. I don't know, I would not
8   characterize him as the principal. I am not even
9   sure he is the controlling member.
10  Q.    All right, I just want to make sure we are
11  talking about the same person.
12  A.    Right.
13  Q.    When we talk about Mr. Emanuel or Ari, we
14  are talking about Ari Emmanuel, who is in some
15  fashion associated with the Endeavor Agency?
16  A.    Yes.
17  Q.    Okay. Now, are you aware that from April,
18  through April and May of 2004, um, that there were
19  discussions between Endeavor on the one hand and
20  Source on the other?
21  A.    I know there have -- which were several
22  communications between members of the Endeavor Agency
23  or their representatives, and representatives of
24  Source Interlink Company.
25  Q.    Uh-huh.

                                                                      62

1    A.    I did not participate in those, and I do
2    not know the substance of those conversations.
3    Q.    That was going to be my next question.  I
4    just wanted to make sure.  Were you involved in any
5    of those discussions?
6    A.    No.
7    Q.    Okay.  Did you hear about what happened in
8    those discussions?
9    A.    No, not I mean, I knew they were taking
10   place.  I didn't know what they were about.
11   Q.    Uh-huh.
12   A.    But, I knew they were taking place, and I
13   knew it had something to do with DVD's, sourcing
14   DVD's through the studios.
15   Q.    Okay.
16   A.    But that is all I, I mean I didn't know
17   other than that.
18   Q.    Were you aware that in June of 2004 there
19   was a meeting in Los Angeles, which included
20   Mr. Flegel, Mr. Gillis, Mr. Emmanuel and Erika
21   Paulson?
22   A.    I have heard that.
23   Q.    Okay.  You were not party to that meeting?
24   A.    I was not party to that meeting.
25   Q.    Okay.  Were you told what happened at that

1  Yucaipa.
2      Q.    Do you know if Mr. Emanuel had any role in
3  the merger or the acquisition -- would you prefer
4  merger or acquisition, it doesn't matter?
5      A.    That doesn't matter.  I don't want to call
6  it a purchase, because it wasn't a purchase.
7      Q.    Do you know if Mr. Emanuel had any role in
8  the merger of Source and Alliance?
9      A.    Um, no, I don't know.
10     Q.    Okay.  Um, and do you know if Mr. Emanuel
11 was named to Source's Board of Directors?
12     A.    He was.
13     Q.    And do you know that that occurred on
14 November 18th, 2004?
15     A.    Yes, I do.
16     Q.    And that is the correct date?
17     A.    Yes.
18     Q.    Okay.  Um, are you aware of a consulting
19 agreement that -- or an issue that came up --
20 regarding a consulting agreement payment of a million
21 and a half dollars to Mr. Emanuel?
22     A.    I know of no consulting agreement, no
23 written consulting arrangement or oral for that
24 matter, I don't know of one.
25     Q.    He was paid a million and a half dollars,

115

1    Q.   Is that the wire information, the wire
2  transfer detail for the million and a half dollar
3  payment to Endeavor?
4    A.   I don't know, I mean I have no way of
5  evaluating this.
6    Q.   Okay.
7    A.   It is a wire transfer detail for a million
8  and a half dollars, but I mean I could look.
9    Q.   Okay.
10   A.   It says the beneficiary is Endeavor,
11 but --
12   Q.   You are aware that Source paid Endeavor
13 the million and a half dollars?
14   A.   I am.
15   Q.   Okay.  Do you know, are there multiple
16 accounts that Source has?
17   A.   At the time that this was done, our
18 accounts were in a bit of disarray, in part because
19 on February 28th this merger was not the only
20 transaction we did.
21   Q.   On that day?
22   A.   On that day.
23   Q.   Okay.
24   A.   The second transaction was a complete
25 restructuring of our secured line credit facility,

 1      Q.      In the e-mail from Mr. McGuire to you, he
 2   says: "Doug, now I need two things from you and Jim
 3   Gillis. I need your responses on the commission
 4   agreement I e-mailed to you some time ago, and I need
 5   to get an offer from Source to quantify the number of
 6   options Source is willing to make part of its payment
 7   to Endeavor."
 8           What commission agreement is he talking
 9   about there, do you know?
10      A.      We had it as an exhibit, it was that crazy
11   thing.
12      Q.      I don't think we have gotten to it yet.
13      A.      There was one, there was an agreement that
14   Tom McGuire drafted, which I received, I think in
15   early February, which related to some kind of ongoing
16   business that they thought they were going to be able
17   to bring to us. It was the most ludicrous document
18   that I have read in a long time, but that is what he
19   is referring to.
20      Q.      Okay. Is that the ten percent agreement?
21      A.      I think it called for payment to them of
22   ten percent of revenue, yeah.
23      Q.      Okay. All right, I think we will be
24   getting into that. And he goes on to say: "I need
25   to get an offer from Source to quantify the number of

                                                                      124

 1      A.    Not of this document.  There was no way to
 2  even start with this document, it was so off the
 3  mark.
 4      Q.    Okay.
 5            (Plaintiff's Exhibit No. 26, E-mail dated
 6  3/21/05 from Tom McGuire re: Form of Engagement
 7  Agreement, was marked for identification.)
 8  BY MR. MILLER:
 9      Q.    Let me show you Exhibit 26.  Is that, at
10  least the bottom e-mail from you to Mr. McGuire dated
11  March 11, 2005, and attaching a draft engagement
12  agreement?
13      A.    Yes, that is what it appears to be.
14      Q.    Okay.  Do you recall this draft engagement
15  agreement?
16      A.    I recall the draft, this version has
17  markings on it that are not mine.
18      Q.    Okay.  Well, what can you tell me about
19  this engagement agreement, why were you exchanging
20  this with Mr. McGuire?
21      A.    Um, at this time, my recollection is that
22  Leslie was working very hard to enter into some kind
23  of an agreement with Endeavor.  Um, and um, the
24  agreement that we had gotten from McGuire earlier
25  was, as I said, it was really off the mark.

125

1    And so Leslie sketched out for me a
2    proposal, um, which is reflected in the draft
3    agreement that is here, the printed part of it, as a
4    proposal to Yucaipa -- to Endeavor concerning some
5    type of a services they were going to provide.
6        Q.    Okay.  What happened with this agreement?
7        A.    Sales representative, that is what it was.
8    Well, my recollection here is that I sent them the
9    original draft of this document in early March, and
10   we didn't hear anything, we didn't hear anything, we
11   didn't hear anything -- at least I didn't hear
12   anything.
13       Then at the end of March, we had a board
14   meeting scheduled for April the 4th, I think is the
15   right date.
16       Q.    Okay.
17       A.    And, um, if something like this was going
18   to be entered into, if we were going to have an
19   effective agreement, as it says in the e-mail from me
20   to Tom McGuire, this had to be approved by the Board
21   of Directors, because of Ari's status as a Director.
22       Q.    Okay.
23       A.    And that was a condition to having any
24   kind of an agreement with a related party.  And
25   Leslie wanted to present it to the Board, and we

129

1       But as far as I know, my understanding is
2  that Endeavor decided that it was not worth their
3  time and didn't want to pursue it any more.
4       Q.   Okay.  During this period of time, that is
5  March, April of 2005, were you being contacted or did
6  you have any contact with Mr. Ledecky's counsel,
7  Mr. Schwartz?
8       A.   Yes.
9       Q.   Okay.  And those contacts were regarding
10 Mr. Ledecky's desire to be paid under this referral
11 agreement, as a result of the acquisition of Alliance
12 by Source?
13      A.   Um, I think it was starting in early March
14 I guess I had a couple of conversations with
15 Mr. Schwartz about, about John's claim that he was
16 due money under the referral agreement.
17      Q.   Okay.  Do you recall during those
18 conversations telling Mr. Schwartz that, um, Source
19 was in negotiations with Mr. Emanuel regarding
20 entering into a -- some sort of sales rep or some
21 sort of agreement, written agreement with
22 Mr. Emanuel?
23      A.   Um, I don't remember that, no.
24      Q.   Do you remember telling Mr. Schwartz that
25 it was actually close to being signed?

                                                                    130

1     A.    I don't remember that, no.
2     Q.    Are you saying you might have said that
3  or you --
4     A.    I might have said that, because at the
5  time, I will tell you that this is the agreement we
6  were working on, and what was eventually presented to
7  the board who rejected it.
8     Q.    Okay.  But you don't recall one way or the
9  other whether you said that?
10    A.    I don't recall one way or the other
11 whether I said it.
12    Q.    All right.
13         MR. MILLER:  Can we take a five minute break
14    and let me check my notes, and see what else I
15    need to go through and we will wrap up shortly.
16         THE VIDEOGRAPHER:  Off the record.  The time
17    is 1:05 p.m.
18         (A short break was held.)
19         THE VIDEOGRAPHER:  Back on the record.  The
20    time is 1:14 p.m.
21 BY MR. MILLER:
22    Q.    Mr. Bates, you were here yesterday when
23 Mr. Flegel gave his deposition; correct?
24    A.    I was.
25    Q.    Okay.  And he discussed various investment