Table of Contents

As filed with the Securities and Exchange Commission on January 18, 2005

Registration No. 333-12165

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

Amendment No. 1
to
# Form S-4
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

# Source Interlink Companies, Inc.
*(Exact name of registrant as specified in its charter)*

| Missouri | 5192 | 43-1710906 |
|---|---|---|
| *(State or Other Jurisdiction of Incorporation or Organization)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification Number)* |

27500 Riverview Center Boulevard, Suite 400
Bonita Springs, Florida 34134
(239) 949-4450
*(Address, Including Zip Code, and Telephone Number,
Including Area Code, of Registrant's Principal Executive Offices)*

Douglas J. Bates, Esq.
General Counsel
Source Interlink Companies, Inc.
27500 Riverview Center Boulevard, Suite 400
Bonita Springs, Florida 34134
(239) 949-4450
*(Name, Address, Including Zip Code, and Telephone Number,
Including Area Code, of Agent for Service)*

IB 00005

*Copies to:*

| Charles C. Cohen, Esq. | Steven V. Bernard, Esq. | Robert B. Knauss, Esq. |
|---|---|---|
| Marc P. Taxay, Esq. | Steve L. Camahort, Esq. | Sandra Seville-Jones, Esq. |
| Cohen & Grigsby, P.C. | Steven Liu, Esq. | Munger, Tolles & Olson LLP |
| 11 Stanwix Street, 15th Floor | Wilson Sonsini Goodrich & Rosati, P.C. | 355 South Grand Avenue |
| Pittsburgh, PA 15222-1319 | 650 Page Mill Road | 35th Floor |
| (412) 297-4900 | Palo Alto, CA 94304-1050 | Los Angeles, CA 90071-1560 |
| | (650) 493-9300 | (213) 683-9100 |

**Table of Contents**

- Ariel Emanuel, one of our directors, will be paid $1.5 million upon the consummation of the merger as compensation for consulting services provided to us in connection with the merger. Mr. Emanuel was not a director at the time we entered into this arrangement with him nor when the board approved the merger.

As a result of these interests, our directors and executive officers are or may have been more likely to vote to approve or recommend the approval of the merger agreement and the merger than if they did not have these interests. Our shareholders should consider whether these interests may have influenced these directors and executive officers to support or recommend the merger. You may read more about these interests as described under "The Merger — Interests of Source Interlink Directors, Officers and Affiliates in the Transaction" on page 50.

**There may be sales of a large number of shares of our common stock after the merger that could cause our stock price to fall.**

A large number of shares of our common stock may be sold into the public market within short periods of time at various dates following the closing of the merger. As a result, our stock price could fall. Of the approximately 26.7 million shares of our common stock to be issued in connection with the merger, approximately 18.8% of such shares will be immediately available for resale by former stockholders of Alliance and approximately 81.2% of such shares will be subject to "lock-up agreements" that restrict the timing of the resale of these shares. Under the lock-up agreements, shares will be released and available for sale in the public market as follows:

- up to 33 1/3% of the shares subject to lock-up agreements may be sold in the public market three months after the closing date of the merger;

- up to a further 33 1/3% of the shares subject to lock-up agreements may be sold in the public market six months after the closing date of the merger; and

- the remaining shares subject to lock-up agreements may be sold in the public market nine months after the closing date of the merger.

Any disposition of our common stock by former Alliance stockholders will also be subject to compliance with the Securities Act, including Rules 144 and 145 thereunder. While Rule 145 under the Securities Act may impose some limitations on the number of shares certain Alliance stockholders may sell, including AEC Associates, sales of a large number of newly released shares of our common stock could occur and that could result in a sharp decline in our stock price. In addition, the sale of these shares could impair the combined company's ability to raise capital through the sale of additional stock. See the sections entitled "Agreements Related to the Merger and Other Transactions — Stockholder's Agreement" beginning on page 75.

**During the pendency of the merger, we may not be able to enter into a merger or business combination with another party at a favorable price because of restrictions in the merger agreement.**

Covenants in the merger agreement may impede the ability of each of our company and Alliance to make acquisitions or complete other transactions that are not in the ordinary course of business but that could be favorable to them and their respective shareholders pending consummation of the merger. Any such transactions will require the consent of the other party. As a result, if the merger is not consummated, we may be at a disadvantage to our competitors. In addition, while the merger agreement is in effect and subject to very narrowly defined exceptions, we and Alliance are prohibited from soliciting, initiating, encouraging or entering into certain extraordinary transactions, such as a merger, sale of assets or other business combination outside the ordinary course of business, with any third party.

11

IB 00032

Table of Contents

# THE MERGER

*The following is a description of the material aspects of the proposed merger. The following discussion is a summary only and may not contain all of the information that is important to you. We encourage you to read carefully this entire proxy statement/prospectus, including th merger agreement included as Annex A to this proxy statement/prospectus, for a more complete understanding of the merger.*

### General

Each of Source Interlink's and Alliance's board of directors has approved the merger agreement. At the effective time of the merger, Alliance will merge with and into Alligator Acquisition, LLC, our wholly owned subsidiary.

In the merger, each share of Alliance common stock will be automatically converted into the right to receive that number of shares of our common stock based on the Exchange Ratio. The "Exchange Ratio" will be the quotient obtained by dividing (a) the aggregate number of shares of our common stock issued and outstanding (including shares issuable upon the exercise of all unexpired and unexercised options, warrants or other rights to acquire our common stock) immediately prior to the effective time of the merger by (b) the aggregate number of shares of Alliance common stock issued and outstanding (including shares directly or indirectly issuable upon the exercise of all unexpired and unexercised options, warrants or other rights to acquire Alliance capital stock) immediately prior to the effective time of the merger.

We will not issue fractional shares of our common stock in the merger. Instead, each Alliance stockholder otherwise entitled to a fractional share will receive cash, without interest, in lieu of a fraction of a share of our common stock. As of the effective time of the merger, we will deposit such amount with the exchange agent and will cause the exchange agent to forward payments to the owners of fractional interests.

At the effective time of the merger, each outstanding Alliance stock option, warrant and other right to acquire Alliance capital stock will cease to represent a right to acquire shares of Alliance capital stock and will be converted into an option, warrant or other right to acquire a number of shares of our common stock equal to the number of shares of Alliance common stock directly or indirectly issuable upon the exercise of such option, warrant or other right to acquire Alliance capital stock multiplied by the Exchange Ratio, at a per share exercise price equal to the existing per share exercise price of such option, warrant or other right to acquire Alliance capital stock divided by the Exchange Ratio.

### Background of the Merger

On a regular basis, both we and Alliance evaluate different strategies for improving our respective competitive positions and enhancing shareholder value, including opportunities for mergers with other companies, acquisitions of other companies and marketing and development alliances. In particular, we have for some time pursued a multi-faceted growth strategy that has included strategic alliances with, or acquisition of, businesses engaged in the fulfillment of products other than magazines for the purpose of complementing our existing fulfillment business.

On or about April 28, 2004, S. Leslie Flegel, our chairman and chief executive officer, John J. Ledecky, our largest shareholder, and Ariel Emanuel, our advisor and now one of our directors, held a conference call to discuss possible business opportunities for us involving the distribution of video and audio products.

On June 22, 2004, Mr. Emanuel introduced Messrs. Flegel and Gillis to Erika Paulson, a director of Alliance and a partner with The Yucaipa Companies, LLC, or Yucaipa, which is affiliated with Alliance's controlling stockholder, AEC Associates, L.L.C. After an informal, general discussion regarding their respective businesses, Ms. Paulson and Messrs. Flegel and Gillis agreed that they should meet again to discuss their mutual interests.

On July 7, 2004, Mr. Tony Schnug, acting chief executive officer and a director of Alliance and a partner with Yucaipa, joined Ms. Paulson and Messrs. Flegel and Gillis for a dinner during which the possibility of effecting a business combination between Source Interlink and Alliance was discussed. At the conclusion of

IB 00058