UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JONATHAN LEDECKY d/b/a IRONBOUND PARTNERS, 1400 34th Street NW Washington, DC 20007<br><br>Plaintiff,<br><br>v.<br><br>SOURCE INTERLINK COMPANIES, INC. 27500 Riverview Center Blvd., Suite 400 Bonita Springs, FL 34134<br><br>Defendant. | Civil Action No. 1:05CV01039(JGP) |

CERTIFIED COPY

DEPOSITION OF ARIEL ZEV EMANUEL

Beverly Hills, California

Thursday, May 18, 2006

Reported by:
Carmen R. Sanchez
CSR No. 5060




CORPORATION
Certified Court and Deposition Reporters
151 Kalmus Drive · Suite L-1 · Costa Mesa, CA 92626
800-660-3187 · Fax 714-662-1398
www.hahnbowersock.com email: hbdeposet@hahnbowersock.net

COSTA MESA · SAN BERNARDINO · LONG BEACH · LOS ANGELES · SAN DIEGO · SAN FRANCISCO

on the back by Mr. McGuire as The Endeavor Agency's general counsel?

A Yes.

Q Okay.

Does this appear to be a mutual nondisclosure agreement between your company, The Endeavor Agency, and Source Interlink Companies, Inc.?

A It looks like that. I haven't looked at the whole agreement, but it looks like that.

Q All right.

If you need some time to look through it, feel free.

A It looks like that.

Q Okay.

Did you know at the time whether your company was entering into a nondisclosure agreement with Source?

A I don't recall.

Q You might have known, but you don't recall?

A Yeah.

Q All right.

Again, this would be a common first step when your company was dealing with another company in a

business relationship?

MR. STERN: Objection to the form.

MR. McGUIRE: Can you ask the question in a different way, please.

MR. MILLER: Sure.

Q Would this be a common first step when your company, Endeavor, was entering into a business relationship with another company?

MR. STERN: Objection to the form.

MR. MILLER: You can answer the question.

MR. McGUIRE: Yes, you can.

THE WITNESS: Yes.

MR. MILLER: Okay.

Q Do you recall that the first introduction when Mr. Ledecky first made the introduction between you and some folks at Source, that it was over a telephone; that there was a telephone call initially?

A The first introduction was over a telephone?

Q Yeah. Let me see if I can jog your memory. Do you recall that you spoke with -- and if you don't remember, I'm not trying to put something in your mind. I'm just -- do you recall that your first conversation with anyone at Source was with Mr. Flegel

Q Okay.

Do you recall your company wanting to get this information from Mr. Ledecky regarding Source?

A No.

Q Okay.

Do you recall getting this E-mail?

A No.

Q Let's talk about the meeting, which either happened before or after the first telephone call. Where did the meeting take place?

A In New York at Source's headquarters.

Q And --

A I believe that's their headquarters, one of their locations.

Q And do you recall about how long after your first phone call to Mr. Ledecky asking for information or asking for an introduction to Source that this meeting occurred?

A Within a month, I believe.

Q Okay.

A You know, best of my recollection.

Q Who was at the meeting?

A From my side, it was myself and I believe Modi Wiczyk.

Q Could you spell that, please.

A W-i-c-z-y-k.

Q And who is Mr. Wiczyk?

A He's a partner at the firm.

Q At Endeavor?

A Yes.

Q Okay.

Anybody else from Endeavor's side?

A No.

Q Okay. What about from Source?

A I think it was Leslie.

Q Leslie Flegel?

A Yes.

Q Okay. Who else?

A I believe it was Jim Gillis, and then I believe there was a couple other people making presentations about the company, kind of just the information about the company; getting a download on the company.

Q Do you recall who they were?

A I think one of them was his son.

Q Leslie Flegel's son?

A Yes.

Q Okay.

A And then a bunch of other people rotated in and out. I don't remember. And I believe

Mr. Ledecky was there.

Q Okay.

About how long did the meeting last? Do you recall?

A Hour-and-a-half, about two hours, something like that.

Q Okay.

A Something like that.

Q Do you recall that at one point -- well, first of all, did Mr. Ledecky help set up this meeting?

A We just talked about this, that I called him to set the meeting.

Q Okay. I want to make sure we're talking about the same thing.

A Okay.

Q Do you recall that, while Mr. Ledecky was trying to set up the meeting, that there was initially -- from your end, there was a change as to who was going to be attending the meeting?

A I don't recall.

MR. MILLER: Okay.

Could you mark this Exhibit 5, please.

(Plaintiff's Exhibit 5 was marked for identification by the Certified Shorthand Reporter and attached hereto.)

they -- this might not be the right terminology, but they went -- the talks ended. They went sideways. They weren't talking for a while.

Q Did you take any steps to get them talking again?

A Well, I would be getting calls -- as I said, I would be getting -- I don't know how many calls they were. I'm trying to remember now if it was three calls, seven. I just don't remember.

Q Certainly more than one?

A Certainly more than one, yes.

Q Okay.

A I would be getting calls from Leslie and I'd be getting -- Leslie from Source, and I'd be getting calls from Erika, and it might have been Ron -- I don't remember -- about -- I think Ron was one time about the valuation issue, which then I think led to this board issue; and I was trying to get everybody to realize that, one, that they were good people, both parties; and from Leslie's side, that Ron was actually a really good guy. He could be somebody that could be trusted. He was -- you know, sounded like good business reasoning to do it. And in kind of most of these things what usually happens is, as in most businesses, ego gets ahead of good business judgment;

so I was just trying to -- I don't remember when -- calm everybody down; so that they could get back to the table and have a conversation.

Q Did you succeed in doing that?

A You have to ask the parties.

Q In these phone calls, where you're trying to calm everyone down and get them back to the table, were you acting on behalf of one side or the other or just as the go-between between them?

MR. STERN: Object to the form.

THE WITNESS: So, again, you're asking me kind of my intent at the time.

BY MR. MILLER:

Q Your role. Okay.

A Can I answer that question? Do I have to answer that question?

MR. McGUIRE: To the best of your ability. If you don't understand the question, have him rephrase it.

THE WITNESS: Well, not to sound, you know -- I was trying to get paid here; okay?

MR. MILLER: Okay.

THE WITNESS: And I was talking to Ron about my money, because I wanted to get paid if this -- as this thing progressed, I wanted to get paid; and I was

talking to Erika and Ron. And, finally, I think I had one or two conversations with Ron and one or two conversations with Erika about securing a payment for myself if something transpired.

BY MR. MILLER:

Q Okay. So it was in your interest to make sure it kept on track?

A Well, I wanted to get paid.

Q Did you learn at some point that it did get back to track; that is, the merger talks got back on track?

A Yeah -- yes.

Q How did you find out?

A I think -- I think Ron called me and said that he had a good meeting with them.

Q Do you recall --

A Yeah, Ron had called me.

Q Do you recall -- before you got that call from Mr. Burkle, do you recall calling Mr. Flegel and urging him to get back on the phone and start up talks with Mr. Burkle again?

A As I said to you, there was a couple -- I mean, I don't know if there was one call, three calls, five calls. I don't remember. I had been talking -- Leslie had talked to me. Erika talked to

me. I think Ron talked to me a couple times. So I had talked to him, and I was doing what I do on Leslie's side; doing what I do on Ron's side.

Q Okay.

At some point, after the talks got back on track, you learned that they wanted you to be on the board of directors of the new Source?

A Yeah.

Q Okay.

How did you find that out?

A I'm not sure -- I think both Ron and Leslie called me separately to tell me that.

Q Okay.

Did they tell you why?

A If I remember, Leslie's conversation is that he thought I was very helpful in the process of getting them back to the table; that he trusted me and that -- that made it -- I don't remember his exact words. That he trusted me, and he wanted me to be on the board. I think Ron said something in the same context.

Q Okay.

A I think in that conversation with Ron, I think I said to him, "Where does it say that I get paid?"

No. 11, please.

(Plaintiff's Exhibit 11 was marked for identification by the Certified Shorthand Reporter and attached hereto.)

BY MR. MILLER:

Q Showing you Exhibit No. 11, which is a one-page letter, dated January 7, 2005, from Mr. McGuire to Mr. Bates with a cc to you and Joel Mandel.

A Right.

Q And attaching a nine-page document entitled, "Questionnaire for Directors and Executive Officers of Source Interlink Companies, Inc."; is that correct?

A That looks like it is.

Q If you go to the next to the last page --

A Okay.

Q -- which has a page No. 8 at the bottom. Is that your signature on the page?

A Yes, it is.

Q Okay. And the preamble above your signature states that you understand when you sign that, that your answers were going to be used in preparation of one or more documents to be filed by our

company with the Securities and Exchange Commission; correct?

A That's what it says.

Q All right. And you understood that when you signed this?

A I don't recall if I understood it, but I believe I did.

Q Okay. And when it says, "our company," since this is a Source Interlink Companies form, I presume that means Source?

A I believe so.

Q Okay.

If you go to the page before, page 7, the Question 7.a says, "Please describe any standard cash or non-cash compensation ...," et cetera. Do you see the question?

A 7.a?

Q Yes.

A Yes.

Q Okay. And do you see your answer there below it, which says (as read):

"$1.5 million will be paid to Mr. Emanuel upon consummation of the merger of Alliance Entertainment Corp. with and into a wholly owned subsidiary of the Company ...."

Correct?

A Correct. That's what it says.

Q And "the Company" is Source; is that correct?

A I believe so, yes.

Q "... for consulting services provided to the Company in connection with the merger."

Correct?

A Correct.

Q And "the Company" is Source?

A I'm not sure that that's true.

Q Why not?

A I'm -- okay. I'll say yes.

Q Okay. And it says, "Mr. Emanuel was not a director at the time he entered into this arrangement with the Company."

A Correct.

Q Again, "the Company" was referring to Source; correct?

A I believe so, yes.

Q And so you were not a director of Source at the time --

A I had nothing to do with Source at the time.

Q Okay. Let me just finish my question.

A I'm sorry.

Q You were not a director of Source at the time you entered into the arrangement with Source to get the million-and-a-half dollars; correct?

A I was not a director of Source when I got the million-and-a-half dollars from Ron, no.

Q Well, you didn't get the million-and-a-half dollars from Ron, did you? It was paid from Source; wasn't it?

A I had no idea where it was paid from.

Q It says, "nor when the Company's board of directors approved the merger"; correct?

A That's what it says.

Q Okay.

If you read the first sentence here, it says that you were providing consulting services to Source; is that right?

A Yeah, that's what it says.

Q Okay. And you signed this document; correct?

A Correct.

Q When you signed this, did you believe that -- when you signed the document, did you believe that all the answers in this document were accurate?

A Yes.

Q Okay. And you knew that this information was going to be going to the SEC in one form or another; correct?

A Yeah.

Q And you would stand behind this information today; correct?

MR. STERN: Object to the form.

THE WITNESS: What does that mean?

BY MR. MILLER:

Q Well, did you give incorrect information to the SEC?

A Not to my --

MR. STERN: Object to the form.

MR. MILLER: Go ahead. You can answer.

THE WITNESS: Can I --

MR. McGUIRE: Can we go off the record for a minute?

MR. MILLER: Sure.

MR. McGUIRE: Thank you.

(A discussion was held off the record.)

MR. MILLER: Back on the record.

Q Did you give incorrect information to the SEC?

A No.

Q Why not?

A I gave accurate information to Source. What they did with the document -- they could go to the SEC. They could do whatever.

Q Okay. But the information you gave to Source was accurate? That's what you just said; correct?

A Yeah, I believe so.

Q Okay.

Now, the fee, are you aware that the fee ended up being a million-and-a-half dollars; correct?

A Correct.

Q And the fee was paid to Endeavor rather than to you personally; correct?

A Correct.

MR. MILLER: Can I have this marked, please, as Exhibit No. 12.

(Plaintiff's Exhibit 12 was marked for identification by the Certified Shorthand Reporter and attached hereto.)

BY MR. MILLER:

Q Showing you what's been marked as Exhibit No. 12, which is a one-page E-mail from Doug Bates to you with a copy to Mr. Flegel; is that correct?

A Yes, that's correct.