IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JONATHAN LEDECKY d/b/a IRONBOUND )
PARTNERS, )
)
Plaintiff, )
) Case No. 1:05CV01039 (JGP)
v. )
)
SOURCE INTERLINK COMPANIES, INC., )
)
Defendant. )

**DEFENDANT SOURCE INTERLINK COMPANIES, INC.'S
REPLY MEMORANDUM IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT**

Defendant Source Interlink Companies, Inc. ("Source") respectfully submits its Reply Memorandum in Support of its Motion for Summary Judgment.

Plaintiff does not deny the central premise of Source's summary judgment motion: that this case must be dismissed as a matter of law if there does not exist an executed written agreement between Source and Endeavor that manifests Source's acceptance of a business relationship between the parties. *See* Plaintiff's Opposition ("Opp.") at 12. Rather, Plaintiff incredulously argues that this unambiguous condition precedent is satisfied by the only written agreement that exists between Source and Endeavor, a Mutual Non-Disclosure Agreement ("NDA"), entered into *before* Source and Endeavor were ever introduced to each other. *See id.* at 12-14. Thus, if the Court correctly concludes that the NDA does not satisfy the Referral Agreement's condition precedent that there must exist an executed written agreement that establishes a business relationship between Source and Endeavor, then summary judgment must be granted in Source's favor. As discussed below, none of Plaintiff's mischaracterizations of the factual record and the agreements at issue can overcome the clear and unambiguous terms of the

Referral Agreement and the NDA, which establish that all of the parties -- including Plaintiff -- agreed and understood that no business relationship was established between the Source and Endeavor by virtue of execution of the NDA, and that no business relationship (regardless of its type or form) could be deemed to exist between these parties unless and until a *subsequent* definitive agreement establishing such business relationship was executed by them, which, it is undisputed, never occurred.

Plaintiff has also failed to demonstrate why his involvement in bringing Source and Endeavor together which, according to Plaintiff, directly resulted in a fulfilled business opportunity -- the Alliance merger -- did not constitute unlicensed brokerage services under Fla. Statutes, Chapter 475, where a "broker" is broadly defined under this statute to include "a person . . . who takes *any part* in the procuring . . . of business opportunities." (emphasis added) Plaintiff's arguments that his brokerage activities were not subject to the licensing requirements of Chapter 475 are similarly unavailing where (i) he agreed that Florida law governed his rights and obligations under the Referral Agreement, which necessarily included his obligation to obtain a proper brokerage license, and (ii) he alleges that his efforts resulted in a sale by merger of a controlling interest in a company located in Florida.

I. **The NDA Does Not Satisfy the Referral Agreement's Written Agreement Requirement**

In his Opposition, Plaintiff concedes that, in order for him to be entitled to compensation under the Referral Agreement, there must exist an executed written agreement between Source and Endeavor that establishes a business relationship between the parties. Because the NDA constitutes the only actual executed written agreement between Source and Endeavor, Plaintiff, as expected, valiantly attempts to demonstrate why this agreement should be found to satisfy this

unambiguous condition precedent. Plaintiff's arguments, however, are not supported by the undisputed factual record, the language of the agreements at issue, or relevant Florida law.

    A.    <u>The NDA Did Not Establish a Business Relationship, Nor Does it Govern an "Ongoing Business Relationship" Between Source and Endeavor</u>

Plaintiff argues that the NDA satisfies the Referral Agreement's written agreement requirement because "the Non-Disclosure Agreement was entered into for the purpose of governing Source and Endeavor's ongoing relationship . . . ." Opp. at 13. However, just because the NDA provides that confidential information exchanged between the parties can be used "for the purposes of the ongoing Relationship" (Summary Judgment Motion ("SJ Mot.") Ex. E. at ¶ 2) does not establish that the parties in fact entered into a business relationship by virtue of the NDA. Nor can it override the unambiguous terms of paragraph 6 of the NDA, wherein the parties "expressly understood and agreed that neither Party is bound by this Confidentiality Agreement to establish a Relationship (or any other transaction)" and that no business relationship could be deemed to exist between the parties "unless and until a definitive written agreement has been executed and delivered by the Parties." *Id.* at ¶ 6. It also cannot override clause 9(b) of the NDA, which provides that "This Agreement . . . shall not be construed to create any obligation on the part of either Party to retain the services or to compensate the other Party in any matter, *except as may be set forth by a separate written Agreement* duly executed and delivered by the parties. . . ." *Id.* at ¶ 9 (emphasis added). Because no such subsequent written agreement was ever entered into, under the terms of the NDA (and also the Referral Agreement) Source and Endeavor never had the "ongoing business relationship" that Plaintiff contends and the NDA does not constitute evidence of Source's acceptance of such a

relationship.[1]  At most, Source and Endeavor had a *possible* or *potential* business relationship by virtue of entering into the NDA.  *See* SJ Mot. Ex. L, Emanuel Dep. at 59(2)-(4), 59(7)-(12), 59(24)-60(6).  This potential relationship was governed by the NDA, and continued as such unless and until the parties executed a subsequent definitive written agreement, which never occurred.

Plaintiff further disingenuously suggests that the Court should disregard paragraph 6 and, presumably, clause 9(b) of the NDA because such language was "conveniently inserted" by Source into the NDA to avoid its obligations to Plaintiff under the Referral Agreement.  *See* Opp. at 13.  The Court, however, cannot rewrite or excuse these provisions to make an otherwise valid contract more reasonable or favorable for Plaintiff.  *See N. Am. Van Lines v. Collyer,* 616 So.2d 177, 179 (Fla. Dist. Ct. App. 1993).  Moreover, in arguing that this condition should be excused, Plaintiff conveniently fails to mention that, in his role as intermediary between Source and Endeavor during the negotiation of the NDA, he was provided with this proposed language to the NDA by Source before the NDA was executed by the parties.  *See* SJ Mot. Ex. N.   Plaintiff never complained or raised a protest about this provision, which is hardly surprising because paragraph 6 of the NDA (and also clause 9(b)) essentially mirrors the written agreement requirement contained in the Referral Agreement, a provision to which Plaintiff also readily agreed.  Both of these provisions state that no business relationship will be deemed to exist

---

[1] Of course, had a subsequent definitive written agreement establishing a business relationship been executed by Source and Endeavor, then the NDA would have governed the confidentiality and non-disclosure obligations of that "ongoing business relationship."  That is precisely why the NDA provides that it is being executed both for the purpose of "exploring and evaluating a possible business relationship" and "for the purpose of the ongoing [r]elationship."

4

between Source and Endeavor unless and until a relevant definitive written agreement was executed by the parties.[2]

      B.     <u>Plaintiff's Interpretation of the Referral Agreement Would Render Its Material Provisions Meaningless</u>

Plaintiff dismisses the timing and factual context in which the NDA was executed as "irrelevant" (Opp. at 15) to determining whether the NDA satisfies the written agreement requirement. But the NDA's timing and factual context demonstrate beyond peradventure that neither Plaintiff nor Source believed or intended that the execution of the NDA established a business relationship between Source and Endeavor. The NDA was executed before Source and Endeavor were introduced to each other by Plaintiff because, according to Plaintiff, without an executed NDA, Endeavor *was not willing to be introduced to Source* by Plaintiff to discuss entering into a potential business relationship. *See* **Exhibit O**, attached hereto (April 25, 2004 e-mail from Plaintiff to Source General Counsel Doug Bates) ("A leading company on the west coast wants to enter into an exciting business with Source Interlink but is unwilling to disclose certain information about the potential relationship without the protection of the enclosed [mutual non-disclosure] agreement."); *see also* **Exhibit P**, attached hereto (April 22, 2004 e-mail from Plaintiff to Source President Jim Gillis) ("An opportunity dropped in my lap today that could literally be worth $100 million a year in PROFIT to [Source]. . . . It is tricky in that the group that brought it to me needs [Source] to sign a confidentiality agreement.") Thus, far from representing that execution of the NDA would establish an "ongoing business relationship" between Source and Endeavor, Plaintiff represented to Source at the time that the NDA was a

---

[2] Moreover, Plaintiff offers no evidence to support his assertion that Source added paragraph 6 of the NDA to avoid paying Plaintiff under the Referral Agreement. The fact of the matter is that the written agreement requirement was included in the NDA to protect Source against precisely the situation it finds itself in today -- where a party is unjustifiably trying to claim legal rights against and compensation from Source by virtue of the fact that Source was required to enter into a standard form non-disclosure agreement with a third party prior to being introduced to the party.

necessary pre-cursor that Source had to execute before Endeavor would allow Plaintiff to make the introduction between the parties.

Most importantly, Plaintiff's argument that the NDA satisfies the Referral Agreement's written agreement requirement is unavailing because it would result in an interpretation of the Referral Agreement that would be completely illogical and render other material provisions of this agreement meaningless or superfluous. "An interpretation of a contract which gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect." *Herian v. Southeast Bank, N.A.*, 564 So.2d 213, 214 (Fla. Dist. Ct. App. 1990); *Belen School, Inc. v. Higgins*, 462 So.2d 1151, 1153 (Fla. Dist. Ct. App. 1984). In particular, Plaintiff does not explain how his interpretation can be reconciled with the other provisions of paragraph 1 of the Referral Agreement:

> 1. <u>Introduction by Ironbound</u>. Promptly after execution of this Agreement, [Plaintiff] shall arrange a preliminary telephone conference between Source and representatives of [Endeavor]. Thereafter, upon the reasonable request of Source, [Plaintiff] shall assist Source with its evaluation and negotiation of any proposed business venture between [Endeavor] and Source. [Plaintiff] shall not make any representations or warranties to [Endeavor] or its business. Source shall have the unfettered discretion to accept or reject any proposed business relationship with [Endeavor] without liability to [Plaintiff]. *Acceptance shall be manifest only by execution of a written agreement between Source and [Endeavor].* [Plaintiff] shall use [his] best efforts to furnish to Source any information in [his] possession or control that a reasonable person would consider important in reaching a decision to establish a business relationship with [Endeavor].

(SJ Mot. Ex. A) (emphasis added).

As set forth in paragraph 1, the Referral Agreement specifically contemplates that, *after* the introduction by Plaintiff (and, therefore, after the execution of the NDA), Source would endeavor to, with Plaintiff's assistance, evaluate and/or negotiate a proposed business relationship with Endeavor. But if the parties had intended (and Plaintiff had believed) that Source and Endeavor entered into a business relationship by virtue of their execution of the NDA

6

(or even by virtue of Plaintiff's introduction), then there would have been no need for the Referral Agreement to provide that Source would have to "evaluate" or "negotiate" a "proposed business venture"[3] with Endeavor after their introduction, or to require that Plaintiff use "[his] best efforts to furnish to Source any information in [his] possession or control that a reasonable person would consider important in reaching a decision to establish a business relationship." Indeed, according to Plaintiff's argument, there would have been no decision for Source to make once the NDA was executed. Furthermore, if, as Plaintiff contends, the NDA manifests acceptance of business relationship between Source and Endeavor, then the provision in paragraph 1 giving Source "the unfettered discretion to accept or reject any proposed business relationship with [Endeavor] without liability to [Plaintiff]" is utterly meaningless, because, under Plaintiff's interpretation, Source had no discretion -- it accepted a business relationship with Endeavor before it was even introduced to Endeavor.

Finally, under Plaintiff's interpretation there would not be any need in the compensation provision of the Referral Agreement (paragraph 2) to provide that plaintiff's compensation would be measured based upon the date (called the "Establishment Date") on which the business relationship is established between Source and Endeavor. If, as Plaintiff would have it, the parties intended and believed that a business relationship was established between Source and Endeavor when the NDA was executed (April 27, 2004), then why did they provide for a separate "Establishment Date" of such relationship in the Referral Agreement? Not surprisingly, Plaintiff offers no answer to this fundamental question.

In contrast to Plaintiff's flawed argument, a finding that the NDA does not satisfy the written agreement requirement and that a subsequent executed written agreement establishing a

---

[3] Plaintiff testified that he considered the terms "business relationship" and "business venture" as used in the Referral Agreement to be synonymous. *See* Ledecky Dep. at 203(15)-204(16) (**Exhibit Q**, attached hereto).

business relationship between Source and Endeavor was required for Plaintiff to be entitled to compensation (and not satisfied here) would be completely consistent with and give effect to all of the material terms of the Referral Agreement. *See Herian, supra.* As the Referral Agreement provides, after Plaintiff introduced Endeavor to Source (and, therefore, after the NDA was executed), it was contemplated that Source would proceed, with Plaintiff's assistance, to engage in discussions and negotiations with Endeavor regarding a proposed business relationship (or business venture). SJ Mot. Ex. A at ¶ 2. Source would have the unfettered discretion to accept or reject any proposed business relationship with Endeavor. *Id.* But Source's acceptance of a business relationship could only be manifest by execution of a written agreement between Source and Endeavor. *Id.* Thus, if Source and Endeavor were unable to successfully negotiate a business relationship and execute a written agreement establishing such, then no compensation would be due Plaintiff under the terms of the Referral Agreement. This is precisely what happened in this case. If, however, the parties had executed a written agreement establishing a business relationship, then Plaintiff's compensation under the Referral Agreement would have been measured from the date of such agreement, *i.e.*, the "Establishment Date." *See id.* at ¶ 2.

In sum, Plaintiff's argument that the NDA satisfies the Referral Agreement's written agreement requirement is not supported by the terms of the agreements, or the relevant facts and applicable law. Because there exists no executed written agreement that manifests Source's acceptance of a business relationship with Endeavor, summary judgment must be granted in Source's favor.[4]

---

[4] Plaintiff also contends that "under any reasonable interpretation of the term 'business relationship,' a business relationship was established between Source and Endeavor." Opp. at 8. But Plaintiff does nothing to substantively explain how Source and Endeavor's dealings qualify as a "business relationship" under well-established Florida law. While Plaintiff correctly points out that each of the Florida "business relationship" cases cited by Source concern a claim for tortious interference with a business relationship, one of the elements of proving this tort is that there must exist an actual business relationship. *See Thunderwave, Inc. v. Carnival Corp.*, 954 F. Supp. 1562, 1566-67 (S.D. Fla. 1997) ("in order to state a claim for tortious interference, a Plaintiff must prove a business relationship with an

II. **Plaintiff Has Not Put Forward Any Admissible Evidence That Source Hindered or Prevented Fulfillment of the Written Agreement Requirement in Order to Avoid Liability to Plaintiff**

As a fallback argument, Plaintiff insists that, even if the NDA does not qualify as an applicable written agreement under paragraph 1 of the Referral Agreement, this condition precedent to Plaintiff's recovery should be excused here because Source allegedly purposefully prevented fulfillment of this condition to avoid liability to Plaintiff. In support of this argument, the only "evidence" Plaintiff offers is a declaration from his former lead counsel, Mr. Schwartz, wherein he describes a purported conversation he had with Source's General Counsel, Doug Bates, shortly prior to the filing of this lawsuit, where Mr. Bates reportedly informed Mr. Schwartz that Source and Endeavor were close to finalizing a written agreement.[5] *See* Opp. Ex. N. Based upon Mr. Bates's alleged statement and the fact that Source and Endeavor never entered into an applicable written agreement,[6] Plaintiff argues that a "reasonable jury could infer" that Source chose not enter into an agreement with Endeavor so that it could avoid liability to Plaintiff. Opp. at 18. However, by Mr. Schwartz's own admission, Mr. Bates made this statement to him in the context of settlement discussions between the parties. *See* Opp. Ex. N at ¶ 3 ("In or about

---

identifiable person") (internal quotations omitted). And Florida law holds that a legally enforceable business relationship only exists if the parties have existing or prospective legal or contractual rights against each other. *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla. 1995). Accordingly, contrary to Plaintiff's assertion, under Florida law, parties do not enter into a legally-recognized business relationship by virtue of being introduced to each other, having "business meetings," discussing "business opportunities" and/or engaging in "business negotiations." *See* Opp. at 8-9. They do not have a business relationship unless and until such activities result in the establishment of existing or prospective legal rights against each other. Because Source and Endeavor's meetings and discussions never resulted in the execution of a written agreement, they never had any existing or prospective legal rights against each other and, therefore, they did not enter into a business relationship under Florida law. *See* SJ Mem. at 9-12.

[5] Mr. Bates does not recall ever making this statement to Mr. Schwartz. *See* Opp. Ex. C, Bates Dep. at 129(4)-130(11).

[6] As demonstrated in Source's summary judgment memorandum (at 12-13), the undisputed actual facts are that Source and Endeavor were unsuccessful in entering into a written agreement establishing a business relationship due to unresolved financial terms and potential conflict of interest issues arising from Ari Emanuel's membership on Source's Board of Directors.

9

April or May of 2005, I advised Mr. Bates that it was my understanding that, *in an effort to compromise Mr. Ledecky's claim under the Referral Agreement,* Source's CEO, Mr. S. Leslie Flegel, had proposed entering into a new agreement with Mr. Ledecky similar to an agreement it had with The Endeavor Agency, LLC.") (emphasis added). Thus, any purported statements made by Mr. Bates to Mr. Schwartz during their conversation would be inadmissible under the Federal Rules of Evidence. *See* Fed. R. Evid. 408 ("statements made in compromise negotiations is . . . not admissible."). Because Plaintiff cannot use this inadmissible statement to concoct a genuine dispute of material fact on his claim of breach of the duty of good faith and fair dealing, summary judgment must be granted in Source's favor on this claim.

### III. Plaintiff was Required to Hold a Florida Broker's License to Recover Under the Referral Agreement

Plaintiff contends that he was not required to hold a Florida broker's license because he did not act as a broker within the meaning of Fla. Statutes, Chapter 475. In particular, he argues that his activities under the Referral Agreement did not fall within the statute's definition of a "broker" because he only introduced Source to Endeavor and it was Endeavor, not he, who introduced Source to Alliance. Opp. at 25. However, contrary to Plaintiff's assertion, the type of activities covered by the licensing requirements of Chapter 475 are not so limited. A "broker" is broadly defined under the statute to cover not only persons who perform traditional brokerage services, but also "a person . . . who takes *any part* in the procuring . . . of business opportunities." Fla. Stat. § 475.01(1)(a) (emphasis added). Here, Plaintiff has characterized his role under the Referral Agreement as someone who made a "marriage of *business opportunities and situations where* . . . Source and Endeavor could do business together." SJ Mot. Ex. D, Ledecky Dep. at 54(15)-55(2) (emphasis added). And it is undisputed that Plaintiff is seeking to recover here for his role in bringing Source and Endeavor together, which, according to Plaintiff,

directly resulted in a fulfilled business opportunity -- the Alliance merger. Thus, assuming *arguendo* that Plaintiff is entitled to recover for the Alliance merger under the terms of the Referral Agreement, he would clearly be recovering for taking a "part" in the procuring of this business opportunity. Accordingly, his alleged activities would constitute unlicensed brokerage services under Chapter 475, which bar him from enforcing or recovering a commission under the Referral Agreement.[7]

Plaintiff next asserts that he was not required to hold a Florida brokerage license because his activities were not subject to Chapter 475, notwithstanding the fact that (i) Florida law governs his rights and obligations under the Referral Agreement, which necessarily included his obligation to obtain a proper Florida brokerage license, and (ii) he is seeking to recover under such agreement for a merger transaction that took place between Florida companies exclusively within the State of Florida. Plaintiff's argument that the Referral Agreement's Florida choice-of-law provision does not dictate whether he was required to comply with the Florida brokerage license requirements rests entirely upon an unpublished decision from the Southern District of New York that applied New York law, *Prudential Securities, Inc. v. Norcom Dev., Inc.*, 1999 WL 294806 (S.D.N.Y. May 11, 1999). However, that non-binding case supports Source's position, not Plaintiff's. In *Prudential,* the court held that, even though the agreement at issue contained a New York choice-of-law provision, North Carolina law applied to the question of whether the plaintiff was required to comply with that state's real estate broker license requirement, because the efforts of the plaintiff on behalf of the defendant resulted, in part, in the

---

[7] The fact that Source's Chairman and CEO does not believe that Plaintiff served as a broker is irrelevant, as what matters is whether Plaintiff's alleged activities fall within the Chapter 475 statutory definition of a "broker," which is broader than the term's traditional definition. *See Meteor Motors, Inc. v. Thompson Halbach & Assocs.*, 914 So.2d 479, 483 (Fla. Dist. Ct. App. 2005). Nor does it matter that Plaintiff did not participate in the Source-Alliance negotiations, as one does not have to be a participant in the subject transaction's negotiations to qualify as a broker under Chapter 475. *See id.*

sale of real property in North Carolina. 1999 WL 294806, at *2. Similarly, here Plaintiff contends that his efforts on Source's behalf ultimately resulted in the Alliance merger, which was a sale by merger of property located in Florida, *i.e.*, a sale of controlling interest in a company located in Florida. Thus, *Prudential* demonstrates that Florida law would apply to the issue of whether Plaintiff was required to hold a Florida brokerage license under Chapter 475.

Plaintiff further contends that District of Columbia law instead of Florida law should apply under a "governmental interest" analysis. But a "governmental interest" analysis is only utilized in the absence of an effective choice of law by the parties, which is not the case here. *See* Restatement (Second) Conflict of Laws § 188(2). Thus, *Dorothy K. Winston & Co. v. Town Heights Dev., Inc.*, 376 F. Supp. 1214 (D.D.C. 1974), upon which Plaintiff relies, is inapposite. In that case, the court employed a governmental interest analysis to determine whether to apply District of Columbia or Florida law, including its statutory broker licensing requirement, to a real estate broker's sales commission contract only because there did not exist a choice-of-law provision in the contract.[8]

Finally, Plaintiff's argues that it would be inappropriate to apply the Florida brokerage licensing statute against Plaintiff because the effect would be to invalidate the Referral Agreement, which would be contrary to the parties' intent to enter into a binding agreement. But if that were the case then no commission agreement involving unlicensed brokerage services could ever be invalidated on these grounds, a result which would be directly contrary to the strict dictates of Chapter 475. In any event, it is not the parties' choice of Florida law that has served to invalidate the Referral Agreement. Rather, the contract's invalidation is the result of

---

[8] Thus, in contrast to the court in *Prudential, supra*, the court in *Dorothy K. Winston* did not draw an analytical distinction between choice of law regarding contractual issues and choice of law regarding the applicable state licensing scheme that governs the contract.

Plaintiff's failure to understand and comply with his obligation under Florida law to obtain a broker's license when he performed his services under the Referral Agreement.

## CONCLUSION

For the foregoing reasons and reasons stated in its Statement of Points and Authorities, Source respectfully requests that the Court grant its Motion for Summary Judgment.

Respectfully submitted,

/s/ Kevin E. Stern
C. Allen Foster (Bar No. 411662)
Kevin E. Stern (Bar No. 459214)
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, DC  20006
Tel: (202) 331-3100
Fax: (202) 331-3101

*Counsel for Defendant Source Interlink Companies, Inc.*

Dated: July 14, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July, 2006, I caused a true and correct copy of the foregoing to be served by electronic mail through CM/ECF on the following persons:

Jan Paul Miller, Esq.
THOMPSON COBURN LLP
One U.S. Bank Plaza
St. Louis, MO 63101

Allison Sinoski, Esq.
THOMPSON COBURN, LLP
1909 K Street, NW
Suite 600
Washington, DC 20006

/s/ Jozef Przygrodzki      .
Jozef Przygrodzki