Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

_____
                                  )
JONATHAN LEDECKY d/b/a            )   Case No. 1:05CV01039
IRONBOUND PARTNERS,               )
                                  )
     Plaintiff,                   )
                                  )
vs.                               )
                                  )
SOURCE INTERLINK COMPANIES,       )
INC.,                             )
                                  )
     Defendant.                   )
_____)

VIDEOTAPED DEPOSITION OF

JONATHAN J. LEDECKY

Washington, D.C.

Wednesday, March 29, 2006

Job No.: 1-74746
Pages 1 through 278
Reported by:  John L. Harmonson, RPR

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410   (800) 292-4789   (301) 762-8282   (703) 288-0026   (410) 539-3664

7d71e894-5405-4672-90b9-8065d5fea538

VIDEOTAPED DEPOSITION OF JONATHAN J. LEDECKY
CONDUCTED ON WEDNESDAY, MARCH 29, 2006

Page 202

1  that information to them, whether it was the DVD,
2  CD, checkout, category killer, movie studios,
3  acquisitions, joint ventures, et cetera.
4      Q.  Okay.  So now I understand your
5  testimony that this agreement contemplates
6  multiple business relationships?
7      A.  I think any business relationship has
8  multiple parts to it, right, and you need
9  information about some parts.  You establish one
10 element of your relationship; you need more
11 information to make decisions about other elements
12 of it.
13     Q.  So again, you believe under this
14 agreement that it was contemplated by the parties
15 that there would be multiple relationships entered
16 into during the course of it?
17     A.  Well, and in fact, history bore that
18 out.
19     Q.  And we talked earlier about the term
20 "business venture" here, and you distinguished
21 that between the term "business venture" and
22 "business relationship," right?

Page 203

1      A.  Well, like I described to you, I was a
2  venture capitalist, I was an entrepreneur, so
3  there's all these different terminologies that you
4  use between, you know, discussions of business.
5      Q.  Okay.  But do you still make a
6  distinction between "business relationship" and
7  "business venture"?  Are you still trying to say
8  there is a difference between those two terms
9  under this agreement?
10     A.  I don't remember what I said initially.
11 We would have to go back and reread it.  I mean,
12 you know, we said a lot of things here in five or
13 six hours, so it's hard to remember everything I
14 said.
15     Q.  Okay.  Let me ask you again, then,
16 since you don't remember.  Is it your testimony
17 now that the term "business venture" and the
18 term --
19     A.  Kevin --
20     Q.  -- "business relationship" are
21 synonymous as used in this agreement?
22     A.  So help me out.

Page 204

1      MR. SCHWARTZ:  Objection; asked and
2  answered.
3      THE WITNESS:  So help me out.  Okay?
4  Tell me what the words "business venture" are
5  again, because I don't -- I have to be refreshed,
6  because we took a break.  Okay?
7  EXAMINATION BY MR. STERN:
8      Q.  It's in the same paragraph,
9  Paragraph 1.
10     A.  Okay, Paragraph 1.
11     Q.  Second sentence.
12     A.  Okay.  I think the way it's written
13 here it probably is the same.  Business ventures
14 and business relationships are probably the same,
15 yeah.  It looks like they're just using synonyms
16 or something.
17     Again, I didn't write the document, so
18 it wouldn't be possible for me to know what the
19 writer's interpretation was.  But any proposed
20 business venture, business relationship, it sounds
21 similar.  But again, I'm not an expert.  I'm not a
22 linguist.

Page 205

1      Q.  Well, you definitely understand the
2  term "business relationship," as you've testified
3  to today, right?
4      A.  Yes.
5      Q.  Okay.  And you understand the term
6  "business venture," don't you?
7      A.  Well, maybe in this context it's a
8  little vague to me.  Again, I'm not being
9  argumentative, it's just that the question is so
10 narrow, I don't really understand the nature of
11 the question.  So I'm trying to be cooperative
12 with you.  But business venture, business
13 relationship, maybe you can give me further
14 guidance.
15     Q.  Unfortunately, I'm asking you
16 questions.
17     Going up to the third recital in the
18 referral agreement, again here it says:  "Source
19 desires to arrange for Ironbound to introduce it
20 to the client --
21     A.  Right.
22     Q.  -- and to assist Source in evaluating

VIDEOTAPED DEPOSITION OF JONATHAN J. LEDECKY
CONDUCTED ON WEDNESDAY, MARCH 29, 2006

Page 206

1  and negotiating any proposed business relationship
2  with the client, and Ironbound is willing to so
3  introduce and assist Source upon the terms and
4  conditions set forth in this agreement."
5      So it appears in this provision here
6  the parties are talking about there is going to be
7  an introduction between the parties, and then
8  going forward they're going to discuss whether
9  they're going to enter into a business
10 relationship; isn't that right?
11     A.  I guess as I've testified many times, I
12 think they entered into a business relationship
13 with that nondisclosure, mutual nondisclosure
14 agreement, and then moving forward to do other
15 business relationships with each other.
16     As a layman, that's the best I can come
17 up with.
18     Q.  All right.  That's your testimony.
19     Let's look at "General Provisions,"
20 Section 5 of the agreement.  Do you see Item (i)
21 at the bottom of that page, 5(i)?
22     A.  Uh-huh (affirmative response).  Yes.

Page 207

1     Q.  It says: "This is the entire and only
2  agreement between the parties respecting the
3  subject matter hereof and supersedes all prior
4  agreements."
5     Are you familiar with the term
6  "integration clause" in contracts?
7     A.  No.
8     Q.  What's your understanding of that
9  statement there?
10    A.  It means that if you were doing drafts
11 back and forth, this one would be -- the one that
12 you're signing would be the one that would be the
13 one that would rule.
14    Q.  Okay.
15    A.  So when they have that provision about
16 the merger, they went into a merger, and
17 80 percent of the board wasn't the same, the deal
18 wouldn't -- you know, they wouldn't pay me any
19 compensation.  That was removed, so this is the
20 one that deals with it.
21    Q.  Okay.  But that provision, neither
22 side -- the parties never agreed on that

Page 208

1  provision, right?  It was proposed by Source but
2  you objected to it, right?
3     A.  Right.
4     Q.  So that wasn't a prior agreement?
5     A.  It was a draft of an agreement.  I'm
6  using it as an example for you of what you're
7  asking me here, which is if I had executed that
8  agreement, then perhaps I wouldn't be entitled to
9  compensation under the Alliance deal.  But since
10 the merger did take place, now I can get that
11 compensation.  So it was a good change.
12    Q.  Okay.  So it's your testimony that by
13 virtue of removal of that provision, that somehow
14 implicated whether you could get compensation for
15 the Alliance deal?
16    A.  I think it's quite helpful, yes,
17 because it shows that a merger was contemplated in
18 the minds of Source prior to the execution of the
19 agreement.
20    Q.  Wasn't that provision talking about in
21 the event that you're entitled to compensation
22 under the agreement, that compensation would not

Page 209

1  terminate if in fact Source was sold or acquired
2  by another company?
3     A.  Again, we would have to take it out.
4  We can take it out and look at it.
5     Q.  If you want to do that, that's fine.
6  What exhibit was that?  It's Exhibit 5.  It's
7  Paragraph 2 there, "Compensation."
8     Isn't this provision talking about --
9  it's not talking about whether you're entitled to
10 compensation under the agreement by virtue of a
11 business relationship.  It's talking about in the
12 event you are entitled to compensation under the
13 agreement, it says here that it would be
14 terminated upon the event of Source being acquired
15 by or merging with another entity, right?
16    A.  That's not my interpretation of it.
17 That's yours.
18    Q.  Okay.  What's your interpretation?
19    A.  I think you would have to go back to
20 the other exhibits where the memos are discussed,
21 which we can do if you would like to go back over
22 stuff, which is fine.

53 (Pages 206 to 209)