IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JONATHAN LEDECKY d/b/a<br>IRONBOUND PARTNERS,<br><br>*Plaintiff*,<br><br>v.<br><br>SOURCE INTERLINK COMPANIES, INC.,<br><br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:05CV01039 (JGP)<br>)<br>)<br>)<br>)<br>) |

PLAINTIFF'S SURREPLY IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In its Reply Memorandum in Support of its Motion for Summary Judgment, Source materially misstated the position taken by Mr. Ledecky in his Memorandum in Opposition to Defendant's Motion for Summary Judgment. Far from conceding that he would not be entitled to compensation had Source declined to enter into a written agreement with Endeavor, Mr. Ledecky has argued that, even if Source and Endeavor had never entered into a written agreement, which they did, he would still be entitled to compensation under Florida law because Source accepted the introduction and the ability to satisfy any condition precedent requiring a written agreement was within Source's own control. Moreover, Source's characterization of the written agreement provision would lead to an untenable result to the extent it would allow Source to enter into a business relationship with Endeavor, accept all the benefits thereof, and then avoid its obligation to compensate Mr. Ledecky merely by declining to put that relationship in writing. Rather, and as discussed below, the contract's requirement for a writing was essentially an anti-fraud provision that was intended to prevent Mr. Ledecky from claiming credit for introducing Source to a person or company that it already had a relationship with. The

interpretation of the Referral Agreement proffered by Source is not consistent with Florida law requiring that contracts not be interpreted in such a manner as would lead to an absurd result.

I.  Source Has Mischaracterized Mr. Ledecky's Position Regarding the Necessity of a Written Agreement.

In its Reply Memorandum, Source misstates the position taken by Mr. Ledecky in his Opposition to Defendant's Motion for Summary Judgment. Source asserts that Mr. Ledecky has conceded that he is not entitled to compensation under the Referral Agreement if there does not exist an executed written agreement between Source and Endeavor. On the contrary, and as Source is fully aware, Mr. Ledecky has unequivocally stated just the opposite. In his deposition, when asked whether he would be entitled to compensation even if Source and Endeavor had not entered into a written agreement, Mr. Ledecky testified that "the answer is yes. Obviously, I do believe I'm entitled to compensation under the terms of the agreement. Mr. Gillis [Source's President] indicated that I was entitled to enormous compensation under the agreement." (Ex. B, Ledecky Dep., 3/29/06, at 164:21-166:10). Moreover, in his opposition, Mr. Ledecky specifically argued that he would still be entitled to compensation under the Referral Agreement even if Source and Endeavor had not entered into a written agreement because, under Florida law, Source cannot rely on its failure to satisfy a condition precedent within its own control as justification for refusing to perform its obligation to compensate Mr. Ledecky.

II.  Source's Interpretation of the Meaning of the Written Agreement Provision is Unreasonable.

In its Reply, Source argues that the purpose of the written agreement provision is to prevent the relationship between Source and Endeavor from being characterized as a business relationship absent the existence of a written agreement. Such an interpretation leads to an absurd result and is untenable. If Source's position is extended to its logical conclusion, it would

- 3 -

mean that Source could accept the introduction provided by Mr. Ledecky (which it did), enter into a relationship with Endeavor (which it did), reap all the benefits of that relationship (which it did), and then avoid liability to Mr. Ledecky by simply declining to enter into a written agreement.  In fact, to take it one step further, in Source's view, the written agreement provision means that Source could enter into a business relationship with Endeavor, accept all the benefits therefrom, and enter into a written agreement with Endeavor, but escape liability to Mr. Ledecky by refusing to enter into a specific type of written agreement.  It is not reasonable to argue that the parties intended this result.  Under Florida law, a contract should not be interpreted in a manner that leads to an absurd result. *AeroJet-General Corp. v. Askew*, 511 F.2d 710, 722 (5th Cir. 1975) ("[i]t is elementary contract law . . . that a contract should not be construed to yield absurd results"); *Florida Power Corp. v. City of Tallahassee*, 154 Fla. 638, 644, 18 So.2d 671, 674 (1944) ("[i]f one interpretation would lead to an absurd conclusion, then such interpretation should be abandoned and the one adopted which would be in accord with reason and probability"); *Arthur Rutenberg Corp. v. Pasin*, 506 So.2d 33, 34-35 (Fla. Dist. App. 1987) (quoting *James v. Gulf Life Ins. Co.*, 66 So.2d 62, 63 (Fla. 1953) to hold that "[a]greements must receive a reasonable interpretation, according to the intention of the parties at the time of executing them" and "[a]n agreement will not be interpreted so as to render it oppressive or inequitable as to either party or so as to place one of the parties at the mercy of the other, unless it is clear that such was their intention at the time the agreement was made"). *See also Ritter v. Mutual Life Ins. Co. of New York*, 169 U.S. 139 (1898) ("[o]ne rule of interpretation is, that we must never attribute an absurd intent if a sensible one can be extracted from the writing").

      The more reasonable interpretation of the written agreement provision is that it was intended by the parties as an anti-fraud provision.  By requiring a written agreement, Source

would have the opportunity to ensure that Mr. Ledecky could not take credit for introducing a client with which Source had an existing relationship. Hence, when Source was presented with the written non-disclosure agreement with the name of the "Client" filled in, it would have the opportunity to reject the introduction and refuse to sign the non-disclosure agreement if the company Mr. Ledecky was proposing to introduce was one with which Source had an existing relationship.

When placed in the context of the Referral Agreement, such a provision makes sense, as the main concern of the party receiving the introduction is to avoid becoming obligated to pay for a pre-existing relationship. For example, had Mr. Ledecky sought to introduce Source to Barnes & Noble, an existing client of Source, when Source was presented with the non-disclosure agreement containing Barnes & Noble's name, Source would have refused to sign the agreement on the ground that it already had a relationship with Barnes & Noble. By so doing, Source would have rejected the introduction with no risk of incurring an obligation to Mr. Ledecky for a relationship it already had. Unlike the interpretation proffered by Source, this interpretation does not lead to an absurd result that would permit one party to avoid liability after accepting the other party's performance.

In this case, however, the company Mr. Ledecky introduced did not have an existing relationship with Source. By signing the agreement, Source acknowledged this fact and accepted the introduction. In so doing, Source accepted a business relationship (the nature and scope of which would be defined by the parties) that placed legal obligations and liabilities on each party. Under either scenario, the entry of the non-disclosure agreement and discussions about business opportunities would have created a business relationship. Whether such relationship would be limited to initial meetings and exploratory discussions or develop into an ongoing relationship, as

it did, is of no moment, as the act of entering into the non-disclosure agreement, accepting the introduction, and pursuing discussions gave rise to a business relationship (whether or not such relationship ultimately matured).

Of course, the fact of the relationship alone would not have triggered any obligation on Source's part. Rather, the obligation would be triggered by the success of that relationship. Thus, to the extent Source chose not to pursue an ongoing relationship with Endeavor and earned no income, it would owe nothing to Mr. Ledecky. To the extent it entered into an ongoing relationship, which the undisputed facts show it did, and earned profit from that relationship, it is obligated to compensate Mr. Ledecky under the Referral Agreement. Thus, the question is not whether the non-disclosure agreement created a business relationship. It did. Rather, the issue is whether the relationship that was created matured to the point that Source profited and thus became liable to compensate Mr. Ledecky, which it did.

A non-disclosure agreement is by definition a written agreement. The parties to such an agreement have a relationship. Inasmuch as the purpose of the agreement is to facilitate both initial and ongoing business discussions, the relationship created by such an agreement is necessarily a business relationship. To avoid this conclusion, Source argues that a non-disclosure agreement was not the type of agreement contemplated by the Referral Agreement's requirement for a written agreement. This argument is not supported by the Referral Agreement, which merely requires a "written agreement" and does not limit the condition to a certain type of written agreement. Indeed, Source never says what type of written agreement would be sufficient to fulfill this provision, but only that the written agreement it executed is not the type that was contemplated.

Of course, the fact that the agreement is silent on this point makes sense when taking into account the fact that Mr. Ledecky was not introducing a specific opportunity or transaction. Rather, as Mr. Bates testified, the meaning of the term "business relationship," as used in the Referral Agreement, was left vague by the parties because they did not know what form the relationship between Source and Endeavor would take, and "there was no restriction on, um, particularly on the form that that would take." (Ex. C, Bates Dep., 5/5/06, at 40:20-41:18). Because Mr. Ledecky was not a broker and was not introducing a specific transaction, the written agreement he provided to Source, and which Source had the opportunity to accept or reject, was the non-disclosure agreement, which enabled the parties to have broad-based business discussions consistent with the entire purpose of the introduction. It would not have made sense to provide Source with any other type of written agreement to accept or reject, because it was not known at that time what form Source's relationship with Endeavor would take. Indeed, given the broad-based business discussions that were contemplated, a non-disclosure agreement was exactly the type of written agreement that the parties would have expected to execute. As Mr. Emanuel of Endeavor testified, a non-disclosure agreement was a common first step taken by Endeavor when it was entering into a business relationship with another company. (Ex. D, Emanuel Dep., 5/18/06, at 27:16-28:12).

III.  <u>There is Evidence That Source Breached Its Duty of Good Faith and Fair Dealing By Refusing to Enter Into Another Written Agreement With Endeavor</u>.

Contrary to Source's argument in its Reply, the fact that Mr. Bates told Mr. Schwartz that Source and Endeavor were close to finalizing a written agreement is not inadmissible merely because it was mentioned while Mr. Schwartz and Mr. Bates were discussing Mr. Ledecky's claim for compensation. Rule 408 of the Federal Rules of Evidence provides that "[t]his rule does not require the exclusion of any evidence otherwise discoverable merely because it is

presented in the course of compromise negotiations." In this case, not only was the evidence that Endeavor and Source were in the process of entering into a written commission agreement otherwise discoverable, it has actually been discovered, through written drafts of agreements between Source and Endeavor (Exs. E and F). Moreover, there is evidence, in the form of Source's own meeting minutes, that, on April 4, 2005, Source's Board of Directors authorized its Nominating and Corporate Governance Committee to approve an agreement with Endeavor and "to direct its execution and delivery by the appropriate officers of the Company." (Ex. G, Minutes of the Quarterly Meeting of the Board of Directors of Source, at D-0436). The interpretation of this evidence is an issue of fact for the jury. A reasonably jury could conclude that the reason Source did not proceed on that agreement was to avoid liability to Mr. Ledecky. *See N. Am. Van Lines v. Collyer*, 616 So.2d 177, 179 (Fla. Dist. Ct. App. 1993) ("a party who, by his own acts, prevents performance of a contract provision cannot take advantage of his own wrong").

<u>Conclusion</u>

For these reasons, and for the reasons set forth in Mr. Ledecky's Opposition, Source's Motion for Summary Judgment should be denied.

Respectfully submitted,

    /s/ Allison Sinoski
Jan Paul Miller
 THOMPSON COBURN LLP
 One U.S. Bank Plaza
 St. Louis, Missouri  63101-1611
 (314) 552-6365 (telephone)
 (314) 552-7365 (facsimile)

Allison Sinoski (D.C. Bar No. 482593)
THOMPSON COBURN LLP
1909 K. Street, N.W. Ste. 600
Washington, D.C.  20006-1167
(202) 585-6900 (telephone)
(202) 585-6969 (facsimile)

*Attorneys for Plaintiff Jonathan Ledecky d/b/a Ironbound Partners*

- 8 -

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of July, 2006, a true and correct copy of the foregoing Surreply in Opposition to Defendant's Motion for Summary Judgment, was mailed electronically through CM/ECF to:

>Kevin E. Stern
>C. Allen Foster
>Maria Hallas
>GREENBERG TAURIG, LLP
>800 Connecticut Ave., N.W.
>Suite 500
>Washington, D.C.  20006


        /s/ Allison Sinoski