IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
JONATHAN LEDECKY d/b/a                )
IRONBOUND PARTNERS,                    )
                                                    )
              *Plaintiff*,                         )
                                                    )
v.                                                 )          Civil Action No. 1:05CV01039 (JGP)
                                                    )
SOURCE INTERLINK COMPANIES, INC.,   )
                                                    )
              *Defendant*.                        )
_____ )

PLAINTIFF'S PRETRIAL STATEMENT

I.      Jurisdiction:

        This Court has subject matter jurisdiction under 28 U.S.C. § 1332 in that the parties are

citizens of different states and the amount in controversy exceeds $75,000.

        The Court has jurisdiction over Defendant Source Interlink Companies, Inc. ("Source")

because Source transacted business in the District of Columbia and Mr. Ledecky's claims arose

from the business transacted in the District.  D.C. Code §§ 13-423(a)(1), (b) (2005).  *See also*

Mem. Order of Aug. 26, 2005.

II.     Facts:

        A.      The Following Facts Are Not Disputed:

        1.      In April of 2004, Mr. Ledecky contacted Mr. S. Leslie Flegel, Chairman and CEO

of Source, regarding a potential business opportunity.  (Flegel Dep., 5/4/06, at 39:25-40:4).  Mr.

Ledecky initially declined to reveal much about the opportunity because he wanted to enter into

an agreement with Source under which Source would compensate Mr. Ledecky for any deals that

resulted. (Flegel Dep., 5/4/06, at 44:8-19).  Mr. Flegel informed Mr. Ledecky that he would be

compensated if a deal took place.  (Flegel Dep., 5/4/06, at 48:23-49:3).  He proposed paying Mr. Ledecky an annual payment equal to five percent of the net income Source derived from any business relationship between Source and Mr. Ledecky's client.  (Flegel Dep., 5/4/06, at 54:8-25).

2.    On or about April 27, 2004, Source and Mr. Ledecky, acting under the name Ironbound Partners, LLC, entered into a Referral Agreement.  (Am. Compl. at ¶ 7; Answer to Am. Compl. at ¶ 7; Pl.'s Ex. 1, Referral Agreement; Bates Dep., 5/5/06, at 45:8-17; Joint Stipulations at ¶ 6, attached hereto as Ex. A).  Under that Referral Agreement, Mr. Ledecky agreed to introduce Source to his "Client."  (Pl.'s Ex. 1, Referral Agreement, Section 1).  The Referral Agreement provides, "Source shall pay to Ironbound, and Ironbound shall accept, compensation equal to 5% of the net income recorded by Source as a result of its relationship with Client during the five-year period following the date . . . on which the business relationship is established between Endeavor and Client."  (Pl.'s Ex. 1, Referral Agreement, Section 2; Joint Statement at ¶ 1).  The Referral Agreement does not define the term "business relationship." (Flegel Dep., 5/4/06, at 67:24-68:4).

3.    The "Client" referred to in the Referral Agreement is The Endeavor Agency, LLC ("Endeavor").  (Ex. A, Joint Stipulations, at ¶ 5; Bates Dep., 5/5/06, at 53:2-11).  According to Endeavor's Ariel Emanuel, Endeavor is a talent agency that represents "people and things." (Emanuel Dep., 5/18/06, at 12:19-13:10).  It also serves as a consultant in the entertainment business.  (Emanuel Dep., 5/18/06, at 13:10-18).  Mr. Emanuel described his business as "put[ting] people together and mak[ing] sure that things happen."  (Emanuel Dep., 5/18/06 at 57:14-21).

4.       At the time Mr. Ledecky and Source signed the Referral Agreement, the form that the business relationship between Source and Endeavor would take was not clear to the parties. (Bates Dep., 5/5/06, at 38:10-22).  Thus, the Referral Agreement placed no restriction on the form of that relationship.  (Bates Dep., 5/5/06, at 41:2-10).

5.       The Referral Agreement states that Source's acceptance of a business relationship with Endeavor would be "manifest only by execution of a written agreement between Source and [Endeavor]."  (Pl.'s Ex. 1, Referral Agreement at Section 1).  The Referral Agreement does not specify that the written agreement must be of any particular type.  Source's General Counsel admitted during his deposition that the Referral Agreement does not  define "written agreement." (Bates Dep., 5/5/06, at 44:1-9).  He testified that the written agreement contemplated by the Referral Agreement "only . . . has to be a written agreement, um, which would be an on paper, language agreement between the two parties."  (Bates Dep., 5/5/06, at 44:1-9).

6.       Pursuant to the Referral Agreement, Mr. Ledecky introduced Source to Endeavor in a conference call on April 27, 2004.  (Pl.'s Ex. 72, Def.'s Resp. to Pl.'s First Reqs. for Admis., No. 5; Am. Compl. at ¶ 20; Answer to Am. Compl. at ¶ 20).  Mr. Ledecky arranged the call, and Mr. Emanuel of Endeavor, Mr. Ledecky, Mr. Flegel, and James Gillis ("Mr. Gillis"), President of Source, participated.  (Pl.'s Ex. 72, Def.'s Resp. to Pl.'s First Reqs. for Admis., No. 7; Flegel Dep., 5/4/06, at 65:9-67:5; Gillis Dep., 5/3/06, at 91:17-25).  Source had no relationship with Endeavor or Mr. Emanuel prior to that introduction.  (Pl.'s Ex. 72, Def.'s Resp. to Pl.'s First Reqs. for Admis., Nos. 8, 12; Flegel Dep., 5/4/06, at 66:18-67:5).

7.       On the same day that Mr. Ledecky introduced Source to Endeavor, Source and Endeavor entered into a written Non-Disclosure Agreement dated as of April 26, 2004.  (Pl.'s Ex. 72, Def.'s Resp. to Pl.'s First Reqs. for Admis., No. 19; Pl.'s Ex. 2, Mutual Non-Disclosure

Agreement). That agreement states that it was entered into "in connection with exploring and evaluating a possible business relationship (the 'Relationship') and for the purposes of the ongoing Relationship." (Pl.'s Ex. 2, Mutual Non-Disclosure Agreement at 1).

8.      Pursuant to and as a direct result of Mr. Ledecky's introduction of Source to Endeavor and the execution of the Non-Disclosure Agreement, Endeavor and Source had a series of business meetings and discussions. (Flegel Dep., 5/4/06, at 65:9-67:5, 79:16-82:22, 91:1-93:10, 93:20-94:5, 123:1-23; Bates Dep., 5/5/06, at 61:17-62:2). For example, in May of 2004, Mr. Ledecky set up a meeting in New York attended by Endeavor's Mr. Emanuel and Modi Wiczyk and Source's Mr. Flegel, Mr. Gillis, and Jason Flegel. (Flegel Dep., 5/4/06, at 79:16-82:22). The representatives of the two companies discussed opportunities for Source to enter the home entertainment content market through the distribution of DVDs at checkout counters, as well as the possibility of taking the company private. (Flegel Dep. 5/4/06 at 82:16-22, 84:11-15; *see also* Am. Compl. at ¶ 21; Answer to Am. Compl. at ¶ 21).

9.      As a follow up to the meeting in New York, Messrs. Flegel and Gillis traveled to Los Angeles for a meeting at Endeavor's offices. During the meeting, Endeavor's Mr. Emanuel introduced Messrs. Flegel and Gillis to Ms. Erika Paulson, a director of Alliance Entertainment Corp. ("Alliance") and a partner with The Yucaipa Companies, LLC ("Yucaipa"). (Pl.'s Ex. 72, Def.'s Resp. to Pl.'s First Reqs. for Admis., No. 15; Flegel Dep., 5/4/06, at 91:1-92:2, 94:12-24; Gillis Dep., 5/3/06, at 127:1-14). Yucaipa is affiliated with Alliance's former controlling stockholder, AEC Associates, Inc., and is controlled by Ron Burkle. (Pl.'s Ex. 72, Def.'s Resp. to Pl.'s First Reqs. for Admis., No. 15; Bates Dep., 5/5/06 at 66:11-18). Alliance was a leading provider of home entertainment content products such as DVDs, CDs, video games and related merchandise. (Am. Compl. at ¶ 25; Answer to Am. Compl. at ¶ 25).

10.        At the meeting in Los Angeles, Ms. Paulson raised and the participants discussed the possibility of a merger between Source and Alliance.  (Flegel Dep., 5/4/06, at 91:1-93:10, 93:20-94:5).  A business combination or relationship with Alliance would advance Source's strategy of pursing strategic alliances with, or acquisitions of, businesses engaged in the distribution and fulfillment of products other than magazines.  (Am. Compl. at ¶ 25; Answer to Am. Compl. at ¶ 25).  It would enable Source to expand its existing product offerings beyond magazine fulfillment to include audio and video products.  (Am. Compl. at ¶ 25; Answer to Am. Compl. at ¶ 25).

11.        Prior to the meeting at which Endeavor's Mr. Emanuel introduced Source's Mr. Flegel and Mr. Gillis to Ms. Paulson, Source did not have any dealings with Alliance (Flegel Dep., 5/4/06, at 94:12-24), nor did it have any discussions with Alliance concerning any type of relationship.  (Pl.'s Ex. 72, Def.'s Resp. to Pl.'s First Reqs. for Admis., No. 17).

12.        Over the next several months, representatives of Source and Alliance visited each other's facilities, exchanged business and financial information, discussed basic terms and structure of a transaction and retained legal counsel and accountants to conduct due diligence.  (Am. Compl. at ¶ 27; Answer to Am. Compl. at ¶ 27; Gillis Dep., 5/3/06, at 141:11-23).  Endeavor's Mr. Emanuel participated in telephone calls and other meetings relating to the negotiation of the merger between Source and Alliance.  (Flegel Dep., 5/4/06, at 122:14-123:23, 126:17-127:7; Emanuel Dep., 5/18/06 at 68:4-69:3, 70:18-71:3).  On November 18, 2004, Source entered into a merger agreement with Alliance.  (Pl.'s Ex. 72, Def.'s Resp. to Pl.'s First Reqs. for Admis., No. 16; Pl.'s Ex. 3, Amendment No. 1 to Form S-4 Registration Statement Under the Securities Act of 1933 of Source Interlink Companies, Inc., at IB 00247 *et seq.*).

13.    Source's January 18, 2005, proxy statement for the merger with Alliance, filed with the SEC, informed shareholders that "Ariel Emanuel, one of our directors, will be paid $1.5 million upon consummation of the merger as compensation for consulting services provided to us in connection with the merger." (Pl.'s Ex. 3, Amendment No. 1 to Form S-4 Registration Statement Under the Securities Act of 1933 of Source Interlink Companies, Inc., at IB 00032; Gillis Dep., 5/3/06, at 156:18-157:23). In that document, Source refers to Mr. Emanuel as Source's "advisor." (Pl.'s Ex. 3, Amendment No. 1 to Form S-4 Registration Statement Under the Securities Act of 1933 of Source Interlink Companies, Inc., at IB 00058). Source's President, Mr. Gillis, testified that the proxy statement was accurate (Gillis Dep., 5/3/06, at 177:7-8).

14.    Consistent with Source's disclosure in the proxy statement, Endeavor sent Source an invoice dated March 2, 2005, for $1.5 million for Endeavor's "consultant fee" for the Alliance merger. (Pl.'s Ex. 72, Def.'s Resp. to Pl.'s First Reqs. for Admis., Nos. 25-28; Pl.'s Ex. 6, Invoice from Endeavor to Source; Bates Dep., 5/5/06, at 114:1-16). Source paid Endeavor the $1.5 million that same day by wire transfer. (Pl.'s Ex. 7, Wire Transfer Information; Ex. A, Joint Stipulations, at ¶ 4; *see also* Pl.'s Ex. 72, Def.'s Resp. to Pl.'s First Reqs. for Admis., Nos. 25-28).

15.    On November 18, 2004, over three months prior to paying Endeavor the $1.5 million fee, Source appointed Mr. Emanuel to its Board of Directors. (Pl.'s Ex. 72, Def.'s Resp. to Pl.'s First Reqs. for Admis., No. 29; Flegel Dep., 5/4/06, at 19:16-20:2; Bates Dep., 5/5/06, at 88:10-17). Thus, Mr. Emanuel was a member of Source's Board at the time Source paid his company, Endeavor, $1.5 million. (Flegel Dep., 5/4/06, at 20:3-7).

16.     In addition to discussions and meetings relating to the Alliance merger, Source and Endeavor also discussed the possibility of entering into other written agreements in addition to the Non-Disclosure Agreement, and they exchanged proposed drafts of at least one such agreement.  (Flegel Dep., 5/4/06, at 146:24-147:7, 150:22-151:13; Bates Dep., 5/5/06, at 117:12-118:17, 122:25-125:5).  Endeavor also set up meetings between Source and individuals in the entertainment industry.  (Flegel Dep., 5/4/06, at 153:13-24).

17.     Source earned net income as a result of its merger with Alliance.  (Flegel Dep., 5/4/06, at 193:12-194:4).   The merger has permitted Source to expand into new product areas, namely, CDs and DVDs.  (Am. Compl. at ¶ 25; Answer to Am. Compl. at ¶ 25; Gillis Dep., 5/3/06, at 195:19-196:9).

18.     According to Mr. Flegel, Mr. Ledecky "got [Source] started down the track of getting in the DVD business."  (Flegel Dep., 5/4/06, at 162:15-164:4, 165:17-24).  The proxy statement that Source issued prior to its merger with Alliance sets forth the initial conference call among Messrs. Ledecky, Flegel and Emanuel as the first event leading to that merger.  (Pl.'s Ex. 3, Amendment No. 1 to Form S-4 Registration Statement Under the Securities Act of 1933 of Source Interlink Companies, Inc., at IB 00058; Gillis Dep., 5/3/06, at 95:17-97:19, 98:16-99:1).

19.     In addition to the net income Source is earning as a result of its merger with Alliance, Mr. Flegel has stated that Source expects that the Alliance merger will, among other things, (i) substantially expand its direct-to-retail distribution and fulfillment services beyond its existing magazine and periodicals business, (ii) strengthen its role in the multi-billion dollar mainstream distribution market for magazines by utilizing Alliance's in-store merchandizing capabilities, and (iii) provide significant economies of scale through the consolidation of

operations and the reduction of redundancies.  (Am. Compl. at ¶ 30; Answer to Am. Compl. at ¶ 30).

     20.    Source has refused to make payment to Mr. Ledecky under the Agreement.  (Am. Compl. at ¶ 37; Answer to Am. Compl. at ¶ 37).

     B.    <u>The Following Are Additional Facts Relied on by Plaintiff to Support His Contentions</u>:

     1.    Endeavor is not in the distribution and fulfillment business.  Rather, as Mr. Emanuel testified, Endeavor's business involves "put[ting] people together and mak[ing] sure that things happen."  (Emanuel Dep., 5/18/06 at 57:14-21).   Endeavor has extensive relationships with movie studios and other key participants in the entertainment industry, and Mr. Ledecky believed these relationships could be leveraged to introduce Source to potential business opportunities relating to the distribution and fulfillment of audio and video products such as CDs and DVDs.  Endeavor did not make any products itself.  Accordingly, Mr. Ledecky and Source could not and did not anticipate that Endeavor would be producing any products, but, rather, that Endeavor would put Source together with product producers and providers.

     2.    Because Endeavor is in the business of putting people together, and because at the time Source and Mr. Ledecky signed the Referral Agreement they did not know the form that Source's relationship with Endeavor would take, the Referral Agreement does not limit Mr. Ledecky's right to compensation to a particular type of deal or transaction.  Rather, Mr. Ledecky is entitled to compensation under the Referral Agreement with respect to net income Source earns from any and all business dealings and transactions resulting from its relationship with Endeavor, including, without limitation, business combinations, strategic alliances, distribution agreements, sales agreements and fulfillment agreements.

3.      The Referral Agreement provides that Source's acceptance of a business relationship with Endeavor would be "manifest only by execution of a written agreement between Source and [Endeavor]."  (Pl.'s Ex. 1, Referral Agreement at Section 1). The written Non-Disclosure Agreement between Source and Endeavor satisfies that provision.

4.      In addition to the Non-Disclosure Agreement between Source and Endeavor, Source had the opportunity to enter into additional written agreements with Endeavor.   Shortly before this case was filed, Source's General Counsel, Mr. Bates, informed Mr. Ledecky's counsel, Matthew D. Schwartz, that Source and Endeavor were finalizing a written agreement to govern future services.  (Pl.'s Ex. 74, Schwartz Affidavit).  Source and Endeavor circulated drafts of such an agreement during the spring of 2005 (Flegel Dep., 5/4/06, at 146:24-147:7, 150:22-151:13; Bates Dep., 5/5/06, at 117:12-118:17, 122:25-125:5; Pl.'s Ex. 59, E-mail of 2/4/05 from T. McGuire to D. Bates re Source Interlink engagement letter and attached draft of engagement letter; Pl.'s Ex. 64, Draft Engagement Agreement between Source and Endeavor; Pl.'s Ex. 65, E-mail of 3/11/05 from D. Bates to T. McGuire re Form of Engagement Agreement and attached draft of Engagement Agreement), and, on April 4, 2005, Source's Board of Directors gave its Nominating and Corporate Governance Committee authority to enter into an agreement with Endeavor and "to direct its execution and delivery by the appropriate officers of the Company."  (Pl.'s Ex. 67, Minutes of the Quarterly Meeting of the Board of Directors of Source, at D-0436).

5.      In addition to introducing Source to Endeavor, Mr. Ledecky also provided assistance when the relationship between Source and Endeavor broke down.  For example, prior to the May 12th meeting in New York, Endeavor contemplated cancelling the meeting due to scheduling conflicts.  (Ledecky Dep., 3/29/06, at 220:22-221:7).  This led to frustration on the

part of Mr. Flegel, who was "very upset." (Ledecky Dep., 3/29/06, at 221:20-222:15). Mr.
Ledecky worked with his contacts at both Endeavor and Source to make sure that the meeting
took place as planned. (Ledecky Dep., 3/29/06, at 220:22-226:1, 227:19-233:10).

6.      Later, following the New York meeting, the relationship between Source and
Endeavor broke down a second time. Mr. Flegel called Mr. Ledecky and expressed frustration
that Mr. Emanuel would not return his phone calls. (Ledecky Dep., 3/29/06, at 245:4-17). Mr.
Flegel stated that he was no longer interested in doing business with someone like Mr. Emanuel,
suggesting to Mr. Ledecky that he had taken Mr. Emanuel's failure to return his calls as a slight.
(Ledecky Dep., 3/29/06, at 245:18-246:6).

7.      Convinced that Endeavor could assist Source in identifying viable business
opportunities in the home entertainment content market, Mr. Ledecky called Mr. Emanuel to
restore the relationship between Endeavor and Source. (Ledecky Dep., 3/29/06, at 246:7-
247:22). During their discussion, Mr. Ledecky explained Mr. Flegel's frustration and advised
Mr. Emanuel that Endeavor would be passing up a significant business opportunity if he did not
return Mr. Flegel's calls. Shortly after speaking with Mr. Ledecky, Mr. Emanuel took his advice
and called Mr. Flegel. (Ledecky Dep., 3/29/06, at 248:10-17).

8.      Not only did Source and Endeavor reach an impasse during their negotiations, but
the relationship between Source and Alliance broke down at one point as well. In September
2004, after several months of negotiations and due diligence, Source formally discontinued
merger discussions with Alliance. (Flegel Dep., 5/4/06, at 108:6-110:9, 112:9-113:18). Mr.
Emanuel communicated with both Mr. Flegel and representatives of Alliance in order to
convince the parties to resume discussions. (Emanuel Dep., 5/18/06 at 70:18-71:8). According

to Mr. Flegel, the merger would not have been consummated but for Mr. Emanuel's efforts. (Ledecky Dep., 3/29/06, at 265:6-17).

9.      Both before and after the merger between Source and Alliance, Source's officers admitted that Source owed Mr. Ledecky compensation in connection with the merger.  (Ledecky Dep., 3/29/06, at 259:2-262:9, 263:9-264:19; Flegel Dep., 5/4/06, at 165:6-166:4, 166:9-16). Prior to the merger, Mr. Gillis told Mr. Ledecky that  he could expect compensation "in the millions" when the transaction was completed.  (Ledecky Dep., 3/29/06, at 259:2-260:20). Source's Mr. Flegel told Source's financial advisor that Mr. Ledecky would be owed "millions of dollars" if the merger went through.  (Ledecky Dep., 3/29/06, at 261:8-262:9; *see also* Flegel Dep., 5/4/06, at 164:9-165:5).  The day after the Alliance merger closed, Mr. Flegel sent Mr. Ledecky an e-mail stating, "[Y]ou are the one who got this started."  (Pl.'s Ex. 63, E-mail of 3/1/05 from L. Flegel to J. Ledecky; Flegel Dep., 5/4/06, at 162:10-164:4).  Even after Mr. Ledecky demanded compensation under the Referral Agreement, Mr. Flegel told Mr. Ledecky that Source owed Mr. Ledecky "something" for his role in bringing about the merger.  (Ledecky Dep., 3/29/06, at 263:9-264:19; *see also* Flegel Dep., 5/4/06, at 165:6-166:4, 166:9-16).

III.    <u>Claims of Parties</u>:

Mr. Ledecky's case includes claims for breach of contract, declaratory relief, breach of the duty of good faith and fair dealing, estoppel, and reformation.

Mr. Ledecky's breach of contract claim is based on the following facts: (1) Source and Mr. Ledecky entered into a contract under which Ironbound agreed to introduce Source to Endeavor and Source agreed to pay Ironbound five percent of the net income recorded by Source as a result of its relationship with Endeavor over a five-year period, (2) Mr. Ledecky performed his obligations under the Referral Agreement by introducing Source to Endeavor, (3) because of

Mr. Ledecky's introduction and its relationship with Endeavor, Source merged with Alliance and recorded and is expected to continue to record substantial net income as a result, (4) Source breached the Referral Agreement by repudiating its obligations thereunder and refusing to pay Mr. Ledecky the agreed-upon compensation, and (5) by reason of Source's breach of contract, Mr. Ledecky has been damaged in an amount to be proven at trial.

With respect to Mr. Ledecky's claim for declaratory relief, a real, present, actual and justiciable controversy exists between the parties regarding their respective rights and obligations under the Referral Agreement as it concerns Mr. Ledecky's claim for payment. Hence, Mr. Ledecky requests a declaration from the Court that:

   a.    Mr. Ledecky's compensation under the Referral Agreement is not limited to specific types of transactions;

   b.    the Referral Agreement covers all types of business transactions including, without limitation, mergers, acquisitions, joint ventures, strategic alliances, distribution agreements, reseller agreements, sales agreements, finder's agreements, or any other type of transaction or business dealing, regardless of the form or structure of the transaction (collectively "Transactions");

   c.    Mr. Ledecky is entitled to five percent of the net income recorded by Source as a result of its merger with Alliance for a period of five years following the Establishment Date, as that term is defined in the Referral Agreement.

   d.    Mr. Ledecky is entitled to five percent of the net income earned by Source from any and all Transactions resulting from Source's relationship with Endeavor for a period of five years following the Establishment Date including, without limitation, net

income recorded from Transactions with third parties that are facilitated, or introduced to Source, by Endeavor.

Mr. Ledecky's claim for breach of duty of good faith and fair dealing is based on the fact that Source breached its duty of good faith and fair dealing by failing to fulfill contractual conditions. Specifically, although Source had the opportunity to sign written agreements with Endeavor in addition to the Non-Disclosure Agreement, it did not do so. Instead, Source declined to put its consulting arrangement with Endeavor in writing and then refused to compensate Mr. Ledecky on the basis that Source never had a written agreement with Endeavor. As a result of Source's breach of its duty of good faith and fair dealing, Mr. Ledecky has been damaged by an amount to be proven at trial.

The basis for Mr. Ledecky's estoppel claim is that Source accepted Ironbound's introduction to Endeavor, retained Endeavor as a consultant, accepted Endeavor's services in connection with the Alliance merger, and paid Endeavor $1.5 million. Having accepted Mr. Ledecky's introduction to Endeavor and having entered into an ongoing business relationship that resulted, and will continue to result, in net income to Source, Source is estopped from claiming that Mr. Ledecky is not entitled to compensation under the Referral Agreement.

Finally, Mr. Ledecky makes a claim for reformation of contract. That claim is based on the following facts:

a.     At the time the Referral Agreement was entered into, the parties intended that Source would compensate Mr. Ledecky for his introduction of Endeavor if Source earned net income as a result of that relationship.

b.     The name Ironbound Partners, LLC was used in the Referral Agreement in the mistaken belief that it was an existing limited liability company when in fact it had been merged

out of existence several years earlier. Accordingly, Mr. Ledecky was using a fictitious name, as permitted under the laws of the District of Columbia. The parties have stipulated that the term Ironbound Partners, LLC, as used in the Referral Agreement, refers to Mr. Ledecky. (Ex. A, Joint Stipulations, at ¶ 6).

    c.      Mr. Ledecky performed all of Ironbound's obligations under the Referral Agreement, and Source has received the benefit of its bargain, namely, an introduction to and business relationship with Endeavor. The error in the name through which Mr. Ledecky contracted has had no effect on Source.[1]

    d.      Plaintiff does not seek to alter, modify or otherwise amend the terms or conditions of the Referral Agreement but simply to correct a mistake in the name by reforming the Referral Agreement to read "Ironbound Partners" rather than "Ironbound Partners, LLC" and deleting the related reference to Ironbound's status as a Delaware limited liability company.

    e.      It would be inequitable for Source to retain the benefit of the bargain while avoiding its obligations under the Referral Agreement.

IV.    Damages and/or Liability:

        Plaintiff seeks the following relief:

    a.      a declaration concerning the parties' rights and obligations under the Referral Agreement;

---

[1] Mr. Flegel testified that it made no difference to him that Mr. Ledecky signed the Agreement using the name Ironbound Partners. (Flegel Dep., 5/4/06, at 64:14-21). Mr. Bates testified that there was no suggestion from anybody at Source that it would only sign the agreement if Mr. Ledecky was working through an LLC, nor was there any suggestion that Source would only sign the agreement if Mr. Ledecky used the name Ironbound. (Bates Dep., 5/5/06, at 46:15-24).

b.      reformation of the Referral Agreement to replace the term "Ironbound Partners, LLC" with "Ironbound Partners" and to remove the reference to Ironbound as a Delaware limited liability company;

c.      an order directing Source to establish an accounting system to track all net income recorded as a result of the Alliance merger or other Transactions resulting from Source's relationship with Endeavor for a period of five years from the Establishment Date, as defined in the Referral Agreement;

d.      an order directing Source to produce its books and records for an annual accounting by an expert to determine amounts owed to Mr. Ledecky under the Referral Agreement for a period of five years from the Establishment Date;

e.      actual damages in an amount to be proven at trial;

f.      costs and attorneys' fees; and

g.      such further relief as the Court deems just and proper.

V.    <u>Legal Issues</u>:

A.      <u>Breach of Contract Claim</u>

Under Florida law, which applies to the interpretation of the Referral Agreement, the elements of a breach of contract claim are (1) a valid contract, (2) a material breach, and (3) damages. *Behrman v. Allstate Life Ins. Co.*, 2005 U.S. Dist. LEXIS 7262, *12 (S.D. Fla. 2005). The parties do not dispute that a valid contract was made. (Am. Compl. at ¶ 1; Answer to Am. Compl. at ¶ 1; Source's Statement of Material Undisputed Facts and P. & A. in Supp. of its Mot. for Summ. J. at 19). The issue of damages has been reserved for the second phase of this trial. Thus, the only element at issue during the liability phase is whether Source materially breached the agreement.

Source's obligation under the Referral Agreement is to pay Mr. Ledecky 5% of all net income earned as a result of its relationship with Endeavor during a 5-year period. There is no dispute that Source has not paid Mr. Ledecky. The issue, then, is whether Source is obligated to compensate Mr. Ledecky under the Agreement. Source has argued that it is not liable to Mr. Ledecky because, it claims, it does not have a "business relationship" with Endeavor, as that term is used in the Agreement. The undisputed facts clearly show that Source and Endeavor had a business relationship, which is an issue of fact for the jury. Source also argues that it is not liable to Mr. Ledecky under the Agreement because, it claims, it does not have a "written agreement" with Endeavor, as that term is used in the Agreement. The undisputed facts show that Source and Endeavor had a written agreement, which is an issue of fact for the jury.

Source argues that the written Non-Disclosure Agreement between Source and Endeavor is not evidence of a business relationship between these parties because of certain language inserted into that Non-Disclosure Agreement disclaiming that the parties were entering into a business relationship. That is a circular argument. This language itself exists and has meaning only because it is part of the business relationship established in the Non-Disclosure Agreement. Furthermore, under Florida law, the parties' characterization of their relationship is not dispositive. In *Parker v. Domino's Pizza, Inc.*, 629 So.2d 1026 (Fla. Dist. Ct. App. 1994), the court considered the question of whether the defendant pizza company was liable for the acts of its franchisee. *Id.* 1026-27. Although the franchise agreement between the parties stated that the franchisee was an independent contractor, the court held that this characterization of the parties' relationship did not establish the status of the parties' relationship as a matter of law. *Id.* at 1026-27, 1029. The court stated, "It is clear that the nature and extent of the relationship of parties said to occupy the status of principal and agent presents a question of fact . . . and is not

- 16 -

controlled by descriptive labels employed by the parties themselves." *Id.* at 1027 (citing *Holiday Inns, Inc. v. Shelburne*, 576 So.2d 322 (Fla. Dist. Ct. App. 1991); *Nazworth v. Swire Florida, Inc.*, 486 So.2d 637 (Fla. Dist. Ct. App. 1986)). *See also Singer v. Star*, 510 So.2d 637, 640 (Fla. Dist. Ct. App. 1987) (holding, "[A] statement in an agreement between parties that one is an independent contractor . . . is not dispositive of that issue" and "[a] jury may infer the existence of an agency even when both the principal and the agent deny it").

Moreover, Source's insertion of disclaimer language into the written Non-Disclosure Agreement cannot be used to excuse its obligations to Mr. Ledecky. Under Florida law, "a party who, by his own acts, prevents performance of a contract provision cannot take advantage of his own wrong." *N. Am. Van Lines v. Collyer*, 616 So.2d 177, 179 (Fla. Dist. Ct. App. 1993) (holding that the plaintiffs' professed inability to pay arbitration fees did not relieve them of the duty to submit to arbitration under the contract). *See also Hart v. Pierce*, 125 So. 243, 243 (Fla. 1929) (holding, "One who prevents happening of condition precedent cannot avail himself of his own wrong to relieve himself of liability on contract"); *Walker v. Chancey*, 117 So. 705, 707 (Fla. 1928) (holding, "[H]e who himself prevents the happening or performance of a condition precedent, upon which his liability, by the terms of the contract, is made to depend, cannot avail himself of his own wrong and relieve himself from his responsibility to the obligee") (internal quotation marks and citation omitted); *Ne. Drilling Inc. v. Inner Space Servs., Inc.*, 243 F.3d 25, 40 (1st Cir. 2001) (citing *Restatement (Second) of Contracts* § 245 (1981)) ("[A] contractual condition precedent is deemed excused when a promisor hinders or precludes fulfillment of a condition and that hindrance or preclusion contributes materially to the nonoccurrence of the condition").

In this case, there is a written agreement that governs the business relationship between Source and Endeavor. Under Florida law, Source cannot use disclaimer language that it inserted into the Non-Disclosure Agreement to prevent the happening of a condition precedent upon which Source's liability under the Referral Agreement depends. Indeed, even if the Non-Disclosure Agreement did not qualify as a written agreement under Section 1 of the Referral Agreement under Florida law, Source cannot use its failure to satisfy a condition precedent entirely within its control to avoid compensating Mr. Ledecky.

Additionally, Source's characterization of the written agreement provision is unreasonable and would lead to an absurd result. If Source's position is extended to its logical conclusion, it would mean that Source could enter into a business relationship with Endeavor, reap all the benefits of that relationship and then escape liability to Mr. Ledecky under the Referral Agreement by refusing to put its relationship with Endeavor in writing. To take it one step further, in Source's view, the written agreement provision means that Source could enter into a business relationship with Endeavor, accept all the resulting benefits, and enter into a written agreement with Endeavor, but escape liability to Mr. Ledecky by refusing to enter into a specific type of written agreement. It is not reasonable to argue that the parties intended this result. Under Florida law, a contract should not be interpreted in a manner that leads to an absurd result. *AeroJet-General Corp. v. Askew*, 511 F.2d 710 (5th Cir. 1975) ("It is elementary contract law . . . that a contract should not be construed to yield absurd results"); *Florida Power Corp. v. City of Tallahassee*, 18 So.2d 671, 674 (1944) ("If one interpretation would lead to an absurd conclusion, then such interpretation should be abandoned and the one adopted which would be in accord with reason and probability"); *Arthur Rutenberg Corp. v. Pasin*, 506 So.2d 33 (Fla. Dist. App. 1987) (quoting *James v. Gulf Life Ins. Co.*, 66 So.2d 62, 63 (Fla. 1953), to

hold, "Agreements must receive a reasonable interpretation, according to the intention of the parties at the time of executing them" and "[a]n agreement will not be interpreted so as to render it oppressive or inequitable as to either party or so as to place one of the parties at the mercy of the other, unless it is clear that such was their intention at the time the agreement was made"). *See also Ritter v. Mut. Life Ins. Co. of New York*, 169 U.S. 139 (1898) ("One rule of interpretation is, that we must never attribute an absurd intent if a sensible one can be extracted from the writing").

Indeed, the very language of the Referral Agreement shows that the parties did not intend to provide that Source and Endeavor could not establish a business relationship absent a written agreement. The Referral Agreement states that Source's acceptance of a business relationship with Endeavor would be "manifest only by execution of a written agreement between Source and [Endeavor]." (Pl.'s Ex. 1, Referral Agreement at Section 1). The Referral Agreement's use of the term "manifest," which means "[t]o show or demonstrate plainly" or "[t]o be evidence of," indicates that the parties intended the written agreement to serve as *evidence* of a business relationship between Source and Endeavor, not to prevent the *creation* of a business relationship absent such a written agreement. *Webster's II New College Dictionary* (2001).

Source also erroneously claims that Mr. Ledecky was acting as a broker under Florida law and that because he does not hold a Florida brokerage license, he is not entitled to compensation.[2] Although Florida law governs the parties' rights and obligations under the Referral Agreement, it does not govern whether Mr. Ledecky was required to hold a brokerage license in order to be compensated for introducing Source to Endeavor. Whether Mr. Ledecky

---

[2] Although Source claimed in its Motion for Summary Judgment that Mr. Ledecky acted as a broker, Mr. Flegel, Source's Chairman and CEO, admitted during his deposition that Mr. Ledecky did not serve as a broker to Source. (Flegel Dep. at 156:8-22, 158:9-11).

was required to be licensed is not a matter of contract interpretation but an issue of compliance with the appropriate regulatory scheme. No District of Columbia court has directly addressed this issue. In *Prudential Secs., Inc. v. Norcom Dev., Inc.*, Case No. 97-CIV-6308, 1999 WL 294806 (S.D.N.Y. May 11, 1999), however, the United States District Court for the Southern District of New York addressed a case involving a contract in which the defendant agreed that the plaintiff would act as exclusive agent for identifying potential opportunities for business transactions. *Id.* at *1. The plaintiff's efforts on behalf of the defendant resulted in the sale of real estate in North Carolina. *Id.* at *2. Although the parties' agreement contained a provision that New York law would apply, the court held that while New York law applied to contractual issues, North Carolina law would apply to the issue of whether the plaintiff brokered real estate without a license. *Id. See also Weatherby Assocs., Inc. v. Ballack*, 783 So.2d 1138, 1143 (Fla. Dist. Ct. App. 2001) (holding that although the parties' agreement contained a Connecticut choice-of-law provision, the trial court appropriately applied the law of the forum state in awarding attorney's fees because these fees were awarded pursuant to a state statute, not under the agreement). Thus, the fact that the Referral Agreement contains a Florida choice-of-law provision does not govern the question of whether Mr. Ledecky was required to hold a broker's license under a state statute.

Moreover, it would be inappropriate to apply Florida brokerage licensing law where, as here, the effect would be to invalidate the Referral Agreement between Source and Mr. Ledecky. *See* Restatement (Second) Conflicts of Laws: "A choice of law which invalidates the contract may be disregarded on the ground that the parties can be assumed to have intended that the contract would be binding, and if they chose a law which invalidates the contract, it can be

assumed that they did so by mistake."[3]  Section 187, cmt. e.  Here, Source argues that the parties chose Florida law not only to govern the interpretation of the Referral Agreement, but also to impose the Florida statutory scheme for the licensing of brokers of business relationships and opportunities.  To argue that the Source and Mr. Ledecky intended to invalidate their own agreement by choosing a statutory scheme that would void the contract is untenable.

Because the choice-of-law provision in the Referral Agreement does not apply to whether Mr. Ledecky was required to hold a Florida broker's license, the Court should look to the District of Columbia's choice-of-law rules to determine which law to apply.  In the District of Columbia, to determine which jurisdiction's law applies to substantive issues, the courts apply a governmental interest analysis.  *Dennis v. Edwards*, 831 A.2d 1006, 1012 (D.C. 2003).  Under this analysis, courts evaluate the governmental policies underlying the applicable conflicting laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case.  *Id.*  (citing *In re Estate of Delaney*, 819 A.2d 968, 988 (D.C. 2003)).  "[W]hen both states have an interest in applying their own laws to the facts of the case, . . . the law of the forum 'will be applied unless the foreign state has a greater interest in the controversy.'"  *Herbert v. Dist. of Columbia*, 808 A.2d 776, 779 (D.C. 2002) (quoting *Kaiser-Georgetown Cmty. v. Stutsman*, 491 A.2d 502, 509 (D.C. 1985)).

In *Dorothy K. Winston & Co. v. Town Heights Dev., Inc.*, 376 F. Supp. 1214 (D.D.C. 1974), a case strikingly similar to the instant case, this Court considered whether a real estate agent in the District of Columbia who was approached by a Florida company to sell Florida real

---

[3] While the District of Columbia has not addressed this particular comment to the Restatement, District of Columbia courts have applied the Restatement (Second) Conflict of Laws to analyze the proper choice of law.  *See, e.g.*, *Samra v. Shaheen Bus. and Inv. Group, Inc.*, 355 F. Supp. 2d 483, 495 n.8, 496 (D.D.C. 2005) (applying sections 187 and 188 of the Restatement); *Vaughan v. Nationwide Mut. Ins. Co.*, 702 A.2d 198, 200-201 (D.C. App. 1997).

estate would be subject to the Florida broker licensing laws. *Id.* at 1215, 1217-18. Noting that the performance of the contract (*i.e.*, soliciting potential buyers) occurred in any number of jurisdictions, the court focused on the respective interests of Florida and the District of Columbia in having their own laws apply. *Id.* at 1219. The court stated, "'Objections to application of foreign law would be justified if this analysis were to disclose that important interests of the forum would be sacrificed to advance equal or lesser interests of another jurisdiction.'" *Id.* (quoting *Mazza v. Mazza*, 475 F.2d 385, 391 (D.C. Cir. 1973)). Applying this standard, the court found that Florida's interest in registering real estate brokers in order to protect Florida consumers from disreputable real estate brokers did not outweigh the District of Columbia's interest in insuring that contracts entered into in the District are faithfully performed. *Id.* Rather, "D.C.'s interest in insuring performance of this contract would be unduly hampered by the application of Florida law while not significantly advancing Florida's public policy." *Id.* Thus, the court held that District of Columbia law would govern. *Id.*

As in *Dorothy K. Winston & Co.,* in the instant case, the District of Columbia has an interest in ensuring that a contract entered into by a District resident is faithfully performed, and that interest is not outweighed by Florida's interest in the application of its broker licensing statute to a District resident. Mr. Ledecky is a resident of the District of Columbia (Ledecky Dep., 3/29/06, at 14:4-7; Pl.'s Ex. 73, J. Ledecky Aff. at ¶ 1), he conducts business in the District of Columbia (Ledecky Dep., 3/29/06, at 15:8-18; Pl.'s Ex. 73, J. Ledecky Aff. at ¶ 1), the Referral Agreement between Source and Mr. Ledecky was negotiated by Mr. Ledecky from the District of Columbia (Pl.'s Ex. 73, J. Ledecky Aff. at ¶ 2), the Referral Agreement was executed by Mr. Ledecky in the District of Columbia (Ledecky Dep., 3/29/06, at 129:15-130:14, 131:20-136:12), Mr. Ledecky performed the introduction of Source to Endeavor from the District of

Columbia (Ledecky Dep., 3/29/06, at 129:15-130:14; Pl.'s Ex. 73, J. Ledecky Aff. at ¶ 7) and

Mr. Ledecky assisted Source in facilitating a business relationship with Endeavor through

telephone and e-mail communications from the District of Columbia.  (Pl.'s Ex. 73, J. Ledecky

Aff. at ¶ 7).  Furthermore, this Court rejected Source's attempts to deny the substantial

relationship that the Referral Agreement has to this forum when the Court denied Source's

Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue or, Alternatively, to

Transfer Venue.  (Mem. Order of Aug. 26, 2005).  The District of Columbia  has a substantial

interest in this case.

Furthermore, Endeavor, the company that Mr. Ledecky introduced to Source, is located

in California (Ledecky Dep., 3/29/06, at 50:4-12), Mr. Ledecky did not perform any actions in

the state of Florida with respect to the introduction of Source to Endeavor, and Mr. Ledecky did

not broker real estate, a business enterprise, or a business opportunity in Florida.  In fact, when

Mr. Ledecky introduced Mr. Emanuel to Source's officers through a conference call, Source's

officers were not even located in the United States.  They were sailing off the coast of Greece.

(Flegel Dep., 5/4/06, at 73:3-8; Gillis Dep., 5/3/06, at 53:8-15).

Even if Florida law applied to this issue, Mr. Ledecky did not act as a broker under

Florida law.  In order to prove that Mr. Ledecky acted as a broker under Florida law, Source

would need to prove that he negotiated the sale, exchange, or purchase of a business enterprise or

business opportunity or that he took part in the procuring of a seller or purchaser of a business

enterprise or business opportunity.  Fla. Stat. § 475.01(1)(a).  Mr. Ledecky did not perform any

of these functions.  Rather, he introduced Source to a company, Endeavor, that had substantial

connections in the entertainment industry, and it was Endeavor, through Mr. Emanuel, that

- 23 -

procured a merger partner for Source. To the extent that anyone acted as a broker under Florida law, it was Endeavor and Mr. Emanuel, not Mr. Ledecky.

      B.     <u>Declaratory Judgment</u>

In the case of actual controversy within its jurisdiction, a court of the United States may declare the rights and other legal relations of any interested party seeking such declaration. 28 U.S.C. § 2201(a). In this case, there is an actual controversy as to the parties' rights and liabilities under the Referral Agreement, and, thus, the Court has the discretion to grant declaratory judgment.

      C.     <u>Breach of Duty of Good Faith and Fair Dealing</u>

Florida recognizes a cause of action for breach of the duty of good faith and fair dealing. *Anthony Distribs., Inc. v. Miller Brewing Co.*, 882 F. Supp. 1024, 1031 (M.D. Fla. 1995) (citing *Scheck v. Burger King Corp.*, 798 F. Supp. 692, 693-94 (S.D. Fla. 1992)). An implied covenant of good faith and fair dealing attaches to the performance of each specific contractual obligation. *Kraft Co. v. J & H Mash & McLennan of Florida, Inc.*, 2006 WL 1876995, *2 (M.D. Fla. 2006). Thus, Source had a duty to perform each obligation under its agreement with Mr. Ledecky in good faith. Source failed to act in good faith in performing the written agreement provision of the Referral Agreement, both by attempting to avoid liability by relying on a disclaimer inserted into the Non-Disclosure Agreement and by failing to reduce its consulting arrangement with Endeavor to writing. Because Source has breached its duty of good faith and fair dealing, it has breached its contract with Mr. Ledecky and is liable for any damages caused by its breach.

      D.     <u>Estoppel</u>

Under the doctrine of equitable estoppel, "'a party with full knowledge of the facts, which accepts the benefits of a transaction, contract, statute, regulation, or order may not

subsequently take an inconsistent position to avoid the corresponding obligations or effects.'"
*First Am. Discount Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008, 1016 (D.C. Cir. 2000) (quoting *Kaneb Servs., Inc. v. FSLIC*, 650 F.2d 78, 81 (5th Cir. 1981)).  *See also Mick's at Pennsylvania Ave., Inc. v. BOD, Inc.*, 389 F.3d 1284, 1289 (D.C. Cir. 2004); *DeShong v. Seaboard Coast Line R.R. Co.*, 737 F.2d 1520, 1522 (11th Cir. 1984).  Source had full knowledge that Mr. Ledecky expected to be compensated for net income earned by Source as a result of its relationship with Endeavor.  Source accepted Mr. Ledecky's introduction and accepted all the resulting benefits, including the Alliance merger.  Having accepted the benefits of its contract with Mr. Ledecky, and having acknowledged in its public filings that Mr. Ledecky's introduction to Endeavor was the first event leading to the Alliance merger, Source is estopped from denying its obligations under that contract.

   E. <u>Reformation</u>

   Reformation is an appropriate remedy where there is an error in reducing the agreement of the parties to a writing.  *Isaac v. First Nat'l Bank of Maryland*, 647 A.2d 1159, 1163 n.10 (D.C. 1994).  *See also Cafritz v. Cafritz*, 347 A.2d 267 (D.C. 1975) ("Reformation is appropriate where a mistake is made in the drafting of an instrument so that the written contract fails to express the true agreement between the parties").  In this case, the parties intended to enter into an agreement by and between Source and a Ledecky-owned Ironbound entity.  The parties have stipulated that the term Ironbound Partners, LLC, as used in the Referral Agreement, refers to Mr. Ledecky.  The parties mistakenly named the wrong Ironbound entity when reducing their agreement to writing.  Reformation is appropriate to correct that mistake.

F.    Evidentiary Issues

Contrary to Source's argument in its reply memorandum in support of its Motion for Summary Judgment, the fact that Mr. Bates told Mr. Schwartz that Source and Endeavor were close to finalizing a written agreement is not inadmissible merely because it was mentioned while Mr. Schwartz and Mr. Bates were discussing Mr. Ledecky's claim for compensation. Rule 408 of the Federal Rules of Evidence provides, "This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations." The evidence that Endeavor and Source were in the process of entering into a written commission agreement was discoverable, and has been discovered, through written drafts of agreements between Source and Endeavor (Pl.'s Exs. 59, 64, and 65). Moreover, Source's own meeting minutes provide evidence that on April 4, 2005, Source's Board of Directors authorized its Nominating and Corporate Governance Committee to approve an agreement with Endeavor and "to direct its execution and delivery by the appropriate officers of the Company." (Pl.'s Ex. 67, Minutes of the Quarterly Meeting of the Board of Directors of Source, at D-0436). The mere fact that the proposed agreement between Source and Endeavor was mentioned to Mr. Schwartz at the same time he and Mr. Bates were discussing Mr. Ledecky's compensation does not preclude Mr. Schwartz from testifying on this issue.

VI.    Motions

There are three outstanding motions: Plaintiff's Motion to Compel Production of Documents, Defendant's Motion to Compel Production of Documents, and Defendant's Motion for Summary Judgment. At this time, Plaintiff believes the first two motions are moot and only Defendant's Motion for Summary Judgment need be addressed by the Court.

At this time, Plaintiff does not anticipate any motions to amend his complaint to conform with the evidence.

VII.    <u>Discovery</u>

Plaintiff does not believe that further discovery is required in the liability phase of this bifurcated case.  Although two discovery motions remain outstanding, Plaintiff believes they are moot and does not plan to seek sanctions against Defendant relating to discovery issues.

VIII.    <u>Witnesses</u>

Plaintiff may call the following witnesses during his case in chief:

Jonathan Ledecky
Ironbound Partners
1400 34th Street N.W.
Washington, D.C.  20007

S. Leslie Flegel
Source Interlink Companies, Inc.
17500 Riverview Center Blvd., Suite 400
Bonita Springs, Florida  34134

James R. Gillis
Source Interlink Companies, Inc.
17500 Riverview Center Blvd., Suite 400
Bonita Springs, Florida  34134

Doug Bates, Esq.
Source Interlink Companies, Inc.
17500 Riverview Center Blvd., Suite 400
Bonita Springs, Florida  34134

John Chiles
Jeffries & Company, Inc.
650 California Street, 29th Floor
San Francisco, California  94108

Ariel Emanuel
The Endeavor Agency, LLC
9601 Wilshire Blvd., Third Floor
Beverly Hills, California  90210

Matthew D. Schwartz, Esq.
Marcus & Millichap Real Estate Investment Brokerage Company
1620 L Street, N.W., Suite 600
Washington, D.C.  20036

Plaintiff does not expect to call any expert witnesses in the liability phase of this case.

Plaintiff expects to use depositions in lieu of live testimony for Mr. Emanuel.  The portions of Mr. Emanuel's deposition that Plaintiff may offer include: Emanuel Dep., 5/18/06, at 9:18-24, 12:2-13:25, 18:17-21:15, 24:10-26:4, 26:19-28:12, 35:8-37:15, 44:15-45:1, 45:20-47:21, 50:14-51:13, 52:5-20, 53:3-16, 54:5-57:21, 58:16-58:18, 58:21, 58:23-60:6, 62:8-63:2, 63:18-69:9, 69:20-71:20, 73:11-20, 77:6-82:7, 82:9-82:14, 86:4-86:5, 86:12-87:7, 88:16-91:12, 92:2-92:10, 93:23-94:3, 96:4-13, 110:8-21.

Plaintiff also may introduce portions of the depositions of Messrs. Flegel, Bates, and Gillis.  The portions of Mr. Flegel's deposition that Plaintiff may offer include: Flegel Dep., 5/4/06, at 13:17-14:19, 14:25-15:23, 19:16-20:7, 20:17-21, 21:23-22:3, 23:2-4, 33:14-15, 34:11-37:16, 38:5-8, 39:25-40:10, 42:25-45:3, 48:2-49:3, 51:20-25, 53:15-24, 54:3-55:10, 56:20-25, 57:24-59:12, 61:2-62:13, 64:14-21, 65:9-67:5, 67:24-68:4, 71:18-23, 72:5-21, 73:3-74:9; 75:22-76:1, 77:2-5, 79:16-82:22, 84:11-15, 91:1-93:10, 93:20-94:5, 94:12-24, 97:25-98:6, 98:13-99:13, 103:4-104:17, 105:20-106:23, 107:3-5, 108:6-110:15, 112:9-113:18, 114:9-115:7, 122:14-123:23, 126:7-127:7, 131:3-8, 133:7-10, 137:9-18, 138:20-139:13, 146:24-147:7, 150:22-151:13, 152:8-153:24, 156:8-25, 157:19-22, 158:9-11, 158:15-159:10, 162:10-166:4, 166:9-16, 169:15-170:3, 176:12-177:11, 180:17-183:19, 187:3-23, 193:12-194:4.

The portions of Mr. Bates' deposition that Plaintiff may offer include: Bates Dep., 5/5/06, at 7:5-20, 9:2-7, 13:14-14:5, 24:2-27:10, 30:1-33:22, 34:15-24, 38:5-7, 38:10-22, 39:12-15, 41:2-42:12, 42:15-25, 43:21-44:9, 44:25-46:24, 50:23-51:1, 53:2-11, 53:16-54:11, 56:20-22, 57:2-6, 61:17-62:2, 64:1-65:1, 66:11-18, 68:15-73:21, 74:17-75:7, 76:5-14, 79:12-15, 82:5-15, 83:12-

84:12, 86:8-88:1, 88:10-89:3, 91:14-22, 101:9-102:25, 104:4-20, 106:10-14, 107:15-108:8, 112:20-114:20, 115:12-14, 117:12-118:17, 122:25-125:5, 129:4-130:11.

The portions of Mr. Gillis' deposition that Plaintiff may offer include: Gillis Dep., 5/3/06, at 27:1-29:14, 29:23-30:18, 33:20-34:13, 35:15-37:16, 38:6-39:15, 40:5-7, 41:22-43:9, 48:6-19, 49:24-50:5, 52:17-53:15, 55:16-24, 56:21-57:10, 66:8-69:18, 79:11-16, 80:10-16, 81:2-9, 81:10-82:13, 83:23-84:22, 89:21-90:16, 90:18-22, 91:17-25, 92:22-93:4, 94:12-16, 94:22-25, 95:17-97:19, 98:16-99:1, 99:15-103:5, 108:13-20, 114:1-9, 120:16-24, 126:10-127:14, 132:1-8, 137:18-138:1, 138:19-140:8, 141:11-23, 142:11-144:18, 145:18-146:2, 146:5-147:5, 147:14-150:11, 153:7-16, 153:23-154:2, 154:13-16, 156:18-157:23, 158:10-14, 166:15-167:6, 169:20-170:22, 171:11-172:6, 176:13-177:8, 183:13-19, 186:5-23, 186:25, 187:2-8, 189:18-19, 189:21-190:21, 195:19-200:5.

With regard to the deposition testimony designated by Defendant, Plaintiff objects to portions of that testimony as follows:

- Emanuel Dep., 5/18/06 at 14:10-14:19—Plaintiff objects to this testimony on the ground that it is irrelevant. Fed. R. Evid. 402.

- Emanuel Dep., 5/18/06 at 15:1-15:18—Plaintiff objects to this testimony on the ground that it is irrelevant. Fed. R. Evid. 402.

- Emanuel Dep., 5/18/06 at 16:10-18:9—Plaintiff objects to this testimony on the ground that it is irrelevant. Fed. R. Evid. 402.

- Emanuel Dep., 5/18/06 at 53:3-55:17—Plaintiff objects to the designation of page 53, line 17 through page 54, line 4 on the ground that this testimony is irrelevant and contains hearsay. Fed. R. Evid. 402 and 802.

- Emanuel Dep., 5/18/06 at 118:25-120:7—Plaintiff objects to the designation of page 119, line 12 through page 120, line 7 on the ground that this testimony is hearsay.  Fed. R. Evid. 802.

- Paulson Dep., 5/17/06, at 11:1-15:7—Plaintiff objects to the designation of page 11, lines 11 through 22 on the ground that this testimony is irrelevant.  Fed. R. Evid. 402.

- Paulson Dep., 5/17/06, at 15:21-16:3—Plaintiff objects to this testimony on the ground that it is irrelevant.  Fed. R. Evid. 402.

- Paulson Dep., 5/17/06, at 16:7-21:7—Plaintiff objects to the designation of page 16, line 7 through page 18, line 21 on the ground that this testimony is irrelevant.  Fed. R. Evid. 402.

- Paulson Dep., 5/17/06, at 22:22-24:9—Plaintiff objects to the designation of page 23, line 21 through page 24, line 9 on the ground that this testimony is irrelevant.  Fed. R. Evid. 402.

- Paulson Dep., 5/17/06, at 27:10-30:25—Plaintiff objects to the designation of page 30, lines 10 through 12 on the ground that this testimony is irrelevant.  Fed. R. Evid. 402.

- Paulson Dep., 5/17/06, at 60:2-60:8—Plaintiff objects to this testimony on the ground that it is hearsay.  Fed. R. Evid. 802.

- Paulson Dep., 5/17/06, at 106:14-110:16—Plaintiff objects to the designation of page 109, lines 1 through 11 on the ground that this testimony is hearsay.  Fed. R. Evid. 802.

- Paulson Dep., 5/17/06, at 115:8-116:20—Plaintiff objects to this testimony on the ground that it is irrelevant.  Fed. R. Evid. 402.

- Paulson Dep., 5/17/06, at 125:4-126:4—Plaintiff objects this testimony on the ground that it is irrelevant, hearsay, and the witness lacked personal knowledge to testify as to these matters.  Fed. R. Evid. 402, 602, and 802.

- Flegel Dep., 5/4/06, at 17:4-11—Plaintiff objects to the designation of page 17, lines 9 through 11 of this testimony on the grounds that the witness lacked personal knowledge to testify as to these matters.  Fed. R. Evid. 602.

- Flegel Dep., 5/4/06, at 45:4-17—Plaintiff objects to this testimony on the ground that it is irrelevant.  Fed. R. Evid. 402.

- Flegel Dep., 5/4/06, at 45:19-25—Plaintiff objects to this testimony on the ground that it is irrelevant.  Fed. R. Evid. 402.

- Flegel Dep., 5/4/06, at 46:1-5—Plaintiff objects to this testimony on the ground that it is irrelevant.  Fed. R. Evid. 402.

- Flegel Dep., 5/4/06, at 160:25-161:8—Plaintiff objects to the designation of page 161, lines 2 through 8 of this testimony on the ground that it is irrelevant and the witness lacked personal knowledge to testify as to these matters.  Fed. R. Evid. 402, 602.

- Flegel Dep., 5/4/06, at 189:1-4—Plaintiff objects to this testimony on the ground that it is hearsay.  Fed. R. Evid. 802.

- Bates Dep., 5/5/06, at 49:2-25—Plaintiff objects to the designation of page 49, lines 13 through 25 of this testimony on the ground that the witness lacked personal knowledge to testify as to these matters.  Fed. R. Evid. 602.

- Bates Dep., 5/5/06, at 93:9-18—Plaintiff objects to the designation of page 93, lines 14 through 18 of this testimony on the ground that the witness lacked personal knowledge to testify as to these matters.  Fed. R. Evid. 602.

- Bates Dep., 5/5/06, at 118:18-119:24—Plaintiff objects to the designation of page 119, lines 19 through 24 of this testimony on the ground that it is hearsay.  Fed. R. Evid. 802.

- Bates Dep., 5/5/06, at 125:6-126:10—Plaintiff objects to the designation of page 126, lines 7 through 10 of this testimony on the ground that it is hearsay.  Fed. R. Evid. 802.

- Bates Dep., 5/5/06, at 126:12-127:4—Plaintiff objects to this testimony on the ground that it is hearsay.  Fed. R. Evid. 802.

- Bates Dep., 5/5/06, at 127:6-8—Plaintiff objects to this testimony on the ground that it is hearsay.  Fed. R. Evid. 802.

- Bates Dep., 5/5/06, at 127:10-128:5—Plaintiff objects to this testimony on the ground that it is hearsay.  Fed. R. Evid. 802.

- Bates Dep., 5/5/06, at 128:9-129:3—Plaintiff objects to the designation of page 128, lines 9 through 16 of this testimony on the ground that it is hearsay and the witness lacked personal knowledge to testify as to these matters.  Fed. R. Evid. 602, 802.  Plaintiff objects to the designation of page 128, lines 17 through 25 of this testimony on the ground that it is hearsay.  Fed. R. Evid. 802.  Plaintiff objects to the designation of page 129, lines 1 through 3 of this testimony on the ground that the witness lacked personal knowledge to testify as to these matters.  Fed. R. Evid. 602.

- Gillis Dep., 5/3/06 at 128:21-129:11—Plaintiff objects to the designation of page 129, lines 1 through 11 of this testimony on the ground that it is irrelevant and hearsay.  Fed. R. Evid. 402, 802.

- Gillis Dep., 5/3/06 at 155:17-156:5—Plaintiff objects to the designation of page 155, line 22 through page 156, line 5 of this testimony on the ground that the witness lacked personal knowledge to testify as to these matters.  Fed. R. Evid. 602.

- Gillis Dep., 5/3/06 at 170:23-171:10—Plaintiff objects to the designation of page 171, lines 3 through 10 of this testimony on the ground that the witness lacked personal knowledge to testify as to these matters.  Fed. R. Evid. 602.

- Gillis Dep., 5/3/06 at 172:7-174:13—Plaintiff objects to the designation of page 173, line 11 through page 174, line 14 of this testimony on the ground that it is hearsay.  Fed. R. Evid. 802.

- Gillis Dep., 5/3/06 at 174:23-175:12—Plaintiff objects to this testimony on the ground that it is hearsay.  Fed. R. Evid. 802.

- Gillis Dep., 5/3/06 at 179:12-180:7—Plaintiff objects to this testimony on the ground that it is hearsay.  Fed. R. Evid. 802.

- Gillis Dep., 5/3/06 at 182:6-14—Plaintiff objects to this testimony on the ground that it is hearsay and the witness lacked personal knowledge to testify as to these matters.  Fed. R. Evid. 602, 802.

In the event the Court overrules Plaintiff's objections to Ms. Paulson's testimony, Plaintiff may offer the following counter-designations in addition to the designations listed by

Defendant:  Paulson Dep., 5/17/06, at 24:21-25:21, 31:1-4, 47:13-48:17, 94:2-96:10, 99:22-100:21.

Plaintiff opposes Source's objections to the deposition testimony Plaintiff has designated for potential use at trial.  Because Source has indicated that it will not be providing specific responses to Plaintiff's objections to Source's designated deposition testimony at this time, and because Source has objected to a large portion of Plaintiff's proffered testimony, Plaintiff reserves the right to review Source's objections in detail and make specific arguments in opposition to those objections.

IX.   <u>Exhibits</u>:

Plaintiff may introduce the following exhibits during trial:

<u>Plaintiff's Exhibit 1</u>—Referral Agreement between Source and Mr. Ledecky (Bate Nos. D-0351 through D-0353).

<u>Plaintiff's Exhibit 2</u>—Mutual Non-Disclosure Agreement between Endeavor and Source (Bate Nos. IB 00536 through IB 00538).

<u>Plaintiff's Exhibit 3</u>—Amendment No. 1 to Form S-4 Registration Statement Under the Securities Act of 1933 of Source Interlink Companies, Inc. (Bate Nos. IB 00005 through IB 00504).

<u>Plaintiff's Exhibit 4</u>—Form 10-K of Source Interlink Companies, Inc. for the fiscal year ended January 31, 2006.

<u>Plaintiff's Exhibit 5</u>—E-mail of 3/1/05 from D. Bates to A. Emanuel re Wire Transfer (Bate No. D-0556).

<u>Plaintiff's Exhibit 6</u>—Invoice from Endeavor to Source for $1.5 million "consultant fee." (Bate No. D-0439).

Plaintiff's Exhibit 7—Wire transfer information for $1.5 million payment to Endeavor (Bate Nos. D-0440 through D-0441).

Plaintiff's Exhibit 8—E-mail of 4/22/04 from J. Ledecky to J. Gillis re HUGE business opportunity (Bate No. D-0475).

Plaintiff's Exhibit 9—E-mail of 4/22/04 from J. Ledecky to T. McGuire re Called you back.

Plaintiff's Exhibit 10—E-mail of 4/25/04 from J. Ledecky to T. McGuire re Update on Source Interlink (includes attached draft of letter agreement between Endeavor and Ironbound).

Plaintiff's Exhibit 11—E-mail of 4/25/04 from J. Gillis to J. Ledecky re Conversation with Leslie from Greece on Sunday at noon EST (includes e-mail of 4/25/04 from J. Ledecky to D. Bates, copies to J. Gillis and L. Flegel) (Bate No. D-0477).

Plaintiff's Exhibit 12—E-mail of 4/25/04 from J. Gillis to J. Ledecky re Conversation with Leslie from Greece on Sunday at noon EST (includes E-mail of 4/2/505 from J. Ledecky to J. Gillis) (Bate No. D-0476).

Plaintiff's Exhibit 13—E-mail of 4/25/04 from J. Ledecky to D. Bates re Conversation with Leslie from Greece on Sunday at noon EST (includes response of 4/26/04 from D. Bates to J. Ledecky) (Bate No. IB 00504).

Plaintiff's Exhibit 14—E-mail of 4/26/04 from D. Bates to J. Ledecky re Proposed Engagement Agreement (includes attached Referral Agreement) (Bate Nos. IB 00505 through IB 00509).

Plaintiff's Exhibit 15—E-mail of 4/26/04 from J. Ledecky to D. Bates re Proposed Engagement Agreement (includes response of 4/26/04 from D. Bates to J. Ledecky) (Bate No. IB 00510).

Plaintiff's Exhibit 16—E-mail of 4/26/04 from D. Bates to J. Ledecky re sourcenondisclosure1.doc (includes red-lined draft of Mutual Non-Disclosure Agreement) (Bate Nos. IB 00511 through IB 00515).

Plaintiff's Exhibit 17—E-mail of 4/26/04 from D. Bates to J. Ledecky re Ledecky.DOC (Bate No. IB 00516).

Plaintiff's Exhibit 18—E-mail of 4/26/04 from J. Ledecky to D. Everett, copy to D. Bates, re Confirming Conference Call (includes response of 4/27/04 from D. Bates to J. Ledecky) (Bate No. IB 00574).

Plaintiff's Exhibit 19—E-mail of 4/27/04 from T. McGuire to J. Ledecky re FW: J.Ledecky.nda4.16.04 (includes E-mail of 4/27/04 from J. Ledecky to T. McGuire).

Plaintiff's Exhibit 20—E-mail of 4/28/04 from T. McGuire to J. Ledecky re DVD Proposal/Source Business Plan (Bate No. IB 00539).

Plaintiff's Exhibit 21—E-mail of 5/2/04 from J. Ledecky to J. Gillis re Wednesday May 12th in New York City (includes response of 5/2/04 from J. Gillis to J. Ledecky) (Bate No. D-0478).

Plaintiff's Exhibit 22—E-mail of 5/3/04 from J. Gillis to J. Ledecky re 5/12 Mtg. (includes e-mail of 5/3/04 from D. Everett to J. Gillis re 5/12 Mtg.) (Bate No. D-0480).

Plaintiff's Exhibit 23—E-mail of 5/11/04 from J. Ledecky to J. Gillis and L. Flegel re Wednesday Meeting with Endeavor (Bate No. D-0481).

Plaintiff's Exhibit 24—E-mail of 5/11/04 from J. Gillis to J. Ledecky re Wednesday Meeting with Endeavor (includes e-mail of 5/11/04 from J. Ledecky to J. Gillis and L. Flegel) (Bate No. D-0482).

Plaintiff's Exhibit 25—E-mail of 5/11/04 from J. Gillis to J. Ledecky re Wednesday Meeting with Endeavor (includes e-mail of 5/11/04 from J. Ledecky to J. Gillis) (Bate No. D-0483).

Plaintiff's Exhibit 26—E-mail of 5/11/04 from J. Ledecky to A. Emanuel re Source Interlink—YOU NEED TO COME TO NYC AFTER ALL (Bate No. IB 00004).

Plaintiff's Exhibit 27—Letter of 5/13/04 from A. Emanuel to R. Burkle re Source Interlink.

Plaintiff's Exhibit 28—E-mail of 5/14/04 from J. Ledecky to L. Flegel re Update (Bate No. D-0484).

Plaintiff's Exhibit 29—E-mail of 6/7/04 from J. Gillis to J. Ledecky re Ari phone (Bate No. D-0485).

Plaintiff's Exhibit 30—E-mail of 6/8/04 from J. Ledecky to R. Rosen re Radio silence

Plaintiff's Exhibit 31—E-mail of 6/13/04 from J. Ledecky to A. Emanuel re Update and Thoughts

Plaintiff's Exhibit 32—E-mail of 6/15/04 from J. Gillis to K. Glover re Ari Emanuel called (Bate No. D-0486).

Plaintiff's Exhibit 33—E-mail of 6/21/04 from K. Glover to J. Gillis re calls (Bate No. D-0490).

Plaintiff's Exhibit 34—E-mail of 6/23/04 from J. Ledecky to L. Flegel, copy to J. Gillis, re how did LA go? (Bate No. D-0488).

Plaintiff's Exhibit 35—Minutes of a Special Meeting of the Board of Directors of Source Interlink Companies, Inc. (July 27, 2004) (Bate No. D-0364).

Plaintiff's Exhibit 36—Minutes of a Special Meeting of the Board of Directors of Source Interlink Companies, Inc. (Aug. 2, 2004) (Bate No. D-0363).

Plaintiff's Exhibit 37—E-mail of 9/15/04 from K. Glover to J. Gillis re call (Bate No. D-0491).

Plaintiff's Exhibit 38—E-mail of 9/15/04 from J. Gillis to K. Glover re call (Bate No. D-0492).

Plaintiff's Exhibit 39—E-mail of 9/16/04 from L. Flegel to J. Ledecky re Happy New Year.

Plaintiff's Exhibit 40—E-mail of 9/22/04 from L. Flegel to J. Ledecky re Congratulations.

Plaintiff's Exhibit 41—Minutes of a Special Meeting of the Board of Directors of Source Interlink Companies, Inc. (Sept. 23, 2004) (Bate No. D-0558).

Plaintiff's Exhibit 42—Minutes of a Special Meeting of the Board of Directors of Source Interlink Companies, Inc. (Oct. 5, 2004) (Bate Nos. D-0559 through D-0560).

Plaintiff's Exhibit 43—Minutes Governance Committee Special Meeting (Oct. 29, 2004) (Bate Nos. D-0493 through D-0496).

Plaintiff's Exhibit 44—E-mail of 11/1/04 from T. Matchett to T. Franc et al. re Background check Ari Emanuel (includes attached background check) (Bate Nos. D-0497 through D-0507).

Plaintiff's Exhibit 45—E-mail of 11/9/04 from S. Liu to D. Bates re Merger Agreement Open Issues (Bate No. D-0508).

Plaintiff's Exhibit 46—E-mail of 11/15/04 from D. Bates to A. Emanuel re Consent to Board Appointment (includes attached Consent) (Bate Nos. D-0509 through D-0510).

Plaintiff's Exhibit 47—E-mail of 11/15/04 from D. Everett to D. Bates re Resume/Biography (includes attached Biography of Ariel Emanuel) (Bate Nos. D-0512 through D-0514).

Plaintiff's Exhibit 48—E-mail of 11/17/04 from T. McGuire to T. McGuire Assistant re Source Form (includes E-mail of 11/17/04 from M. Donkis to A. Emanuel Assistants Group et al. re Source Form).

Plaintiff's Exhibit 49—E-mail of 11/17/04 from D. Cullingham to J. Gillis re Message—Michael Donkis—Form needed? (includes E-mail of 11/17/04 from J. Gillis to D. Cullingham and E-mail of 11/17/04 from D. Cullingham to J. Gillis) (Bate No. D-0519).

Plaintiff's Exhibit 50—Minutes of a Special Meeting of the Board of Directors of Source Interlink Companies, Inc. (Nov. 17, 2004) (Bate Nos. D-0373 through D-0377).

Plaintiff's Exhibit 51—Minutes of a Special Meeting of the Board of Directors of Source Interlink Companies, Inc. (Nov. 18, 2004) (Bate Nos. D-0380 through D-0392) (includes Resolutions of the Board of Directors Source Interlink Companies, Inc.)

Plaintiff's Exhibit 52—Press Release, "Source Interlink Elects Founding Partner of Endeavor, Top Talent Agency, to Board of Directors" (Nov. 18, 2004) (Bate Nos. D-0378 through D-0379).

Plaintiff's Exhibit 53—Source Interlink Voting Agreement between Source, Alliance, and Emanuel (Nov. 18, 2004).

Plaintiff's Exhibit 54—E-mail of 12/7/04 from T. McGuire to T. McGuire Assistant re Ariel Emanuel (includes E-mail of 11/29/04 from T. McGuire to B. Kahan re Ariel Emanuel and E-mail of 11/29/04 from D. Bates to T. McGuire re Ariel Emanuel).

Plaintiff's Exhibit 55—Letter of 12/7/04 from T. McGuire to D. Bates re Source Interlink/Power of Attorney (includes attached Power of Attorney).

Plaintiff's Exhibit 56—Memo of 1/05 from D. Bates to A. Emanuel re General Director and Officer Questionnaire (includes attached Questionnaire).

Plaintiff's Exhibit 57—E-mail of 1/7/05 from D. Bates to T. McGuire re Registration Statement.

Plaintiff's Exhibit 58—Letter of 1/7/05 from T. McGuire to D. Bates re Officer Questionnaire (includes signed copy of Officer Questionnaire).

Plaintiff's Exhibit 59—E-mail of 2/4/05 from T. McGuire to D. Bates re Source Interlink engagement letter (includes draft of Engagement Letter between Source and Endeavor and e-mail of 2/24/05 from D. Bates to L. Flegel) (Bate Nos. D-0553 through D-0555).

Plaintiff's Exhibit 60—E-mail of 2/22/05 from T. McGuire to T. McGuire Assistant re Director Action by Consent (includes E-mail of 2/18/05 from D. Bates to A. Emanuel et al. re Director Action by Consent).

Plaintiff's Exhibit 61—Letter of 2/22/05 from T. McGuire to D. Bates re Action by Consent (includes attached Action of the Board of Directors by Unanimous Written Consent (Feb. 25, 2005)).

Plaintiff's Exhibit 62—E-mail of 2/23/05 from D. Bates to T. McGuire re Director Action by Consent (includes E-mail of 2/23/05 from T. McGuire to D. Bates re Director Action by Consent) (Bate No. D-0558).

Plaintiff's Exhibit 63—E-mail of 3/1/05 from L. Flegel to J. Ledecky re Congratulations on your great success.

Plaintiff's Exhibit 64—Draft of Engagement Agreement Between Source and Endeavor (Mar. 2, 2005) (Bate Nos. D-0411 through D-0420).

Plaintiff's Exhibit 65—E-mail of 3/11/05 from D. Bates to T. McGuire re Form of Engagement Agreement (includes draft of Engagement Agreement dated 3/21/05).

Plaintiff's Exhibit 66—Director's Non-Qualified Stock Option Agreement between Source and Emanuel (Mar. 31, 2005) (Bate Nos. D-0422 through D-0425).

Plaintiff's Exhibit 67—Minutes of the Quarterly Meeting of the Board of Directors of Source Interlink Companies, Inc. (Apr. 4, 2005) (Bate Nos. D-0433 through D-0438).

Plaintiff's Exhibit 68—E-mail of 6/29/05 from W. Curry to L. Flegel re Ari called looking for him (Bate No. D-0557).

Plaintiff's Exhibit 69—Letter of 7/19/05 from D. Bates to A. Emanuel re FY 2006 Stock Options.

Plaintiff's Exhibit 70—Letter of 7/21/05 from T. McGuire to D. Bates re FY 2006 Stock Options.

Plaintiff's Exhibit 71—Letter of 9/7/05 from D. Bates to J. Ledecky re Referral Agreement (Bate No. D-0354).

Plaintiff's Exhibit 72—Defendant's Response to Plaintiff's First Requests for Admission.

Plaintiff's Exhibit 73—Declaration of J. Ledecky.

Plaintiff's Exhibit 74—Declaration of M. Schwartz.

Plaintiff's Exhibit 75—Defendant's Response to Plaintiff's First Set of Interrogatories.

X.     Stipulations

The parties' stipulations are attached hereto as Exhibit A.  For the sake of convenience, they are listed below:

1.    Mr. Ariel Emanuel became a member of the Board of Directors of Defendant Source Interlink Companies, Inc. ("Source") on November 18, 2004.

2.    The merger between Source and Alliance Entertainment Corporation closed on February 28, 2005.

3.    Plaintiff's Exhibit 3 (Amendment No. 1 to Form S-4 Registration Statement Under the Securities Act of 1933 of Source Interlink Companies, Inc.) and Plaintiff's Exhibit 4 (Form 10-K of Source Interlink Companies, Inc. for the fiscal year ended January 31, 2006) were filed with the United States Securities and Exchange Commission.

4.    Plaintiff's Exhibit 7 documents the payment of $1.5 million to the Endeavor Agency, LLC ("Endeavor") in satisfaction of the invoice that Source received from Endeavor on or around March 2, 2005, after Alliance was merged into Source. (Plaintiff's Exhibit 6).

5.    The term "Client," as used in the Referral Agreement , refers to Endeavor.

6.    The term Ironbound Partners, LLC, as used in the Referral Agreement, refers to Plaintiff Jonathan Ledecky.

In addition, the parties have agreed to stipulate to the authenticity of the exhibits that each party has indicated that it may introduce at trial, except for the following exhibits: Plaintiff's Exhibits 53, 55, 61, 73 and 74.  With respect to Plaintiff's Exhibits 53, 55, and 61, the parties stipulate to their authenticity in all respects except for the authenticity of Ariel Emanuel's signature.

XI.    <u>Unusual Issues or Problems</u>:

Plaintiff does not anticipate any unusual issues or problems.

XII.    <u>Voir Dire</u>:

Plaintiff is filing proposed voir dire questions with the Court and has attached a copy of those questions hereto as Exhibit B. For the sake of convenience, those questions are also set forth below:

1.      Plaintiff Jonathan Ledecky d/b/a Ironbound Partners is represented by Mr. Jan Paul Miller, Mr. Harvey Levin, and Mrs. Allison Manger of Thompson Coburn LLP. Have any of the members of the jury, members of their family or close friends, known or ever been represented by Mr. Miller, Mr. Levin, Mrs. Manger, their law firm, or have any knowledge of any kind about them or their firm?

2.      Plaintiff Jonathan Ledecky d/b/a Ironbound Partners was previously represented by Mr. Matthew Schwartz of Thompson Coburn LLP and Marcus & Millichap Real Estate Investment Brokerage Company. Have any of the members of the jury, members of their family or close friends, known or ever been represented by Mr. Schwartz or have any knowledge of any kind about him?

3.      Defendant Source Interlink Companies, Inc. is represented by Mr. Kevin Stern, Mr. C. Allen Foster, Mr. Geoffrey Greeves, and Ms. Maria Hallas of Greenburg Traurig, LLP. Have any of the members of the jury, members of their family or close friends, known or ever been represented by Mr. Stern, Mr. Foster, Mr. Greeves, Ms. Hallas, or have any knowledge of any kind about them or their firm?

4.      Does anyone on the jury panel know each other?

5.      Have any of you, or members of your family, been a party to a lawsuit?

        a.      What were the circumstances of the suit?

        b.      What was the result?

6.      Have any of you ever had an experience with a referral or finder's fee agreement before?

a.      What was that experience?

7.      Have any of you ever been involved in the breach of a contract?

8.      Have any of you ever been in a situation where you believed someone had breached a contract?

9.      Have any of you ever been employed by or known anyone that has been employed by any party to this case?

10.     Do any of you have any knowledge about this case or what the facts purport to be other than what you have heard in this courtroom today?

11.     Have any of the members of the jury, members of their family or close friends, ever known or conducted business with Mr. S. Leslie Flegel, Mr. Doug Bates, Mr. James R. Gillis, Source Interlink Companies, Inc., or have any knowledge of any kind about Messrs. Flegel, Bates and Gillis or Source?

12.     Have any of the members of the jury, members of their family or close friends, ever known or conducted business with Mr. Jonathan Ledecky, Ironbound Partners, or have any knowledge of any kind about Mr. Ledecky or Ironbound?

13.     Have any of the members of the jury, members of their family or close friends, ever known or conducted business with Mr. Ariel Emanuel or The Endeavor Agency, LLC, or have any knowledge of any kind about Mr. Emanuel or Endeavor?

14.     Have any of the members of the jury, members of their family or close friends, ever known or conducted business with Ms. Erika Paulson, Mr. Ron Burkle, The Yucaipa

Companies, LLC, or have any knowledge of any kind about Ms. Paulson, Mr. Burkle, or Yucaipa?

15.     Have any of the members of the jury, members of their family or close friends, ever known or conducted business with Alliance Entertainment Corp., or have any knowledge of any kind about that company?

16.     Have any of you ever taken any law courses or had any legal training?

17.     Have any of you worked in the field of law?

18.     Have any of you ever served on a jury before?

     a.     Were you the Foreman?

     b.     What was the case about?

     c.     Were you able to reach a verdict?

     d.     Is there anything about your previous experience as a juror that would prevent you from rendering a fair and impartial verdict in this case?

14.     Do any of you know any of the parties to this case or have you ever heard about them before today?  How?  When?  Where?

15.     Please briefly describe your job or profession, and that of your spouse where applicable.

16.     Briefly describe your prior work experience.

17.     Do any of you have any reason to believe that you should not serve on this jury based on what you have heard thus far?

18.     Some of you may know a reason why you should not sit as a juror on this case, and I simply have not asked a question that brings forth that information.  If any of you feel that you know of such a reason, please tell me.

XIII.   <u>Instructions, Interrogatories, Special Verdicts</u>:

Plaintiff is filing proposed jury instructions with the Court and has attached a copy hereto as Exhibit C.  For the sake of convenience, Plaintiff's proposed instructions are also set forth below:

§1.01 (Function of the Court), §1.02 (Function of the Jury), §1.04 (Juror's Duty to Deliberate), §1.09 (Jury Not to Take Cue from Judge), §1.10 (Rulings on Objections), §2.01 (Evidence in the Case), §2.03 (Inferences), §2.05 (Statements of Counsel), § 2.06 (Jury's Recollection Controls), §2.08 (Burden of Proof), §2.10 (Direct and Circumstantial Evidence), §3.01 (Jury to Determine Credibility of Witnesses), §3.02 (Number of Witnesses), §3.05 (Depositions as Evidence), §3.08 (Impeachment by Prior Inconsistent Statements), §4.05 (Consideration of the Evidence—Corporate Party's Agents and Employees), §11.01 (Contract—Defined), §11.02 (Contract Formation—Elements), §11.12 (Contract to be Construed as a Whole), §11.13 (Terms of a Contract—Evidence).

Plaintiff also proposes the following instructions from the Standardized Jury Instructions for the District of Columbia, with modifications:

§11.20 (Prevention of a Condition)—Plaintiff proposes modifying the first two sentences of §11.20 as follows "If you find, under the contract in this case, that Source had no duty to perform unless it entered into a written agreement with Endeavor, and that condition was in Source's control and that Source wrongfully failed to perform that condition but accepted the benefits of the contract, then you must find that Source breached the contract and is liable to Mr. Ledecky." *See N. Am. Van Lines v. Collyer*, 616 So.2d 177, 179 (Fla. Dist. Ct. App. 1993); *Hart v. Pierce*, 125 So. 243, 243 (Fla. 1929); *Walker v. Chancey*, 117 So. 705, 707 (Fla. 1928). *See*

*also Ne. Drilling Inc. v. Inner Space Servs., Inc.*, 243 F.3d 25, 40 (1st Cir. 2001) (citing

*Restatement (Second) of Contracts* § 245 (1981)).

§11.17 (Breach of Contract—Defined), but ending with the sentence "If you find that

Source breached the contract with Mr. Ledecky, then Source is liable to Mr. Ledecky for

damages."

In addition, Plaintiff proposes the following instructions:

"In interpreting a contract, you should look first at the express words. The words should

be interpreted by what a reasonable person in the parties' position would have thought the words

meant." *See* Comment 2 to § 11.14 of the Standardized Jury Instructions for the District of

Columbia (citing *District of Columbia v. Langenfelder & Son*, 558 A.2d 1155, 1159 (D.C. 1989);

*1901 Wyoming Ave. Coop. Assoc. v. Lee*, 345 A.2d 456, 461-62 (D.C. 1975)).

"The nature of the relationship between Source and The Endeavor Agency, LLC is an

issue in this case. When considering whether Source and Endeavor entered into a business

relationship, you should not rely on the descriptive labels used by either Source or Endeavor to

characterize that relationship. Rather, you should consider all the facts and make your own

determination as to whether Source and Endeavor entered into a business relationship." *See*

*Parker v. Domino's Pizza, Inc.*, 629 So.2d 1026, 1026-29 (Fla. Dist. Ct. App. 1994); *Nazworth*

*v. Swire Florida, Inc.*, 486 So.2d 637 (Fla. Dist. Ct. App. 1986); *Singer v. Star*, 510 So.2d 637,

640 (Fla. Dist. Ct. App. 1987).

"When determining the meaning of the terms in the contract, you should keep in mind

that a contract should not be interpreted in a manner that leads to an absurd result. If one

interpretation would lead to an absurd conclusion, that interpretation should be rejected in favor

of an interpretation that is reasonable. Additionally, the contract should not be interpreted in a

manner that would place one party at the mercy of the other, unless it is clear that this was the parties' intention at the time they entered into the contract." *See AeroJet-General Corp. v. Askew*, 511 F.2d 710 (5th Cir. 1975); *Florida Power Corp. v. City of Tallahassee*, 154 Fla. 638, 644, 18 So.2d 671, 674 (1944); *Arthur Rutenberg Corp. v. Pasin*, 506 So.2d 33 (Fla. Dist. App. 1987) (quoting *James v. Gulf Life Ins. Co.*, 66 So.2d 62, 63 (Fla. 1953). *See also Ritter v. Mut. Life Ins. Co. of New York*, 169 U.S. 139 (1898).

"In every contract, the law implies a duty on each party to the contract to deal with each other fairly and in good faith. Mr. Ledecky has alleged that Source breached that duty. If you find that Source failed to act fairly and in good faith in performing its obligations under the contract, you must find that it has breached the contract." *See Anthony Distribs., Inc. v. Miller Brewing Co.*, 882 F. Supp. 1024, 1031 (M.D. Fla. 1995) (citing *Scheck v. Burger King Corp.*, 798 F. Supp. 692, 693-94 (S.D. Fla. 1992)); *Kraft Co. v. J & H Mash & McLennan of Florida, Inc.*, 2006 WL 1876995, *2 (M.D. Fla. 2006).

"If you find that Source accepted the benefits of the contract with full knowledge that Mr. Ledecky expected to be compensated for his services, you must find that Source is prevented from denying that it has a duty to compensate Mr. Ledecky under the contract." *See First Am. Discount Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008, 1016 (D.C. Cir. 2000) (quoting *Kaneb Servs., Inc. v. FSLIC*, 650 F.2d 78, 81 (5th Cir. 1981)). *See also Mick's at Pennsylvania Ave., Inc. v. BOD, Inc.*, 389 F.3d 1284, 1289 (D.C. Cir. 2004); *DeShong v. Seaboard Coast Line R.R. Co.*, 737 F.2d 1520, 1522 (11th Cir. 1984).

If the Court rules that Florida law applies to the issue of whether Mr. Ledecky was required to hold a broker's license in making the introduction of Source to Endeavor, Plaintiff proposes the following instruction: "If Mr. Ledecky acted as a broker in introducing Source to

Endeavor, the contract between Mr. Ledecky and Source is unenforceable.  Source has the

burden of proving that Mr. Ledecky acted as a broker.  In order to find that Mr. Ledecky acted as

a broker under the applicable Florida statute, you must find that he negotiated the sale, exchange,

or purchase of a business enterprise or business opportunity, or that he took part in the procuring

of a seller or purchaser of a business enterprise or business opportunity.  If you do not find that

Mr. Ledecky negotiated the sale, exchange, or purchase of a business enterprise or business

opportunity, and if you find that Mr. Ledecky did not take part in the procuring of a seller or

purchaser of a business enterprise or business opportunity, you must find that he did not act as a

broker." *See* Fla. Stat. § 475.01(1)(a).

If the Court rules that D.C. law applies to the brokerage issue, no such instruction is

necessary.

XIV.    <u>Settlement</u>:

The parties have engaged in mediation in an attempt to settle this dispute.  No settlement

has been reached at this time, but Plaintiff remains open to settlement discussions.

XV.    <u>Time for Trial</u>:

Plaintiff estimates that trial will take four days.

XVI.    <u>Miscellaneous</u>:

None.

Respectfully submitted,


    /s/ Harvey A. Levin
Jan Paul Miller
 THOMPSON COBURN LLP
 One U.S. Bank Plaza
 St. Louis, Missouri  63101-1611

- 49 -

(314) 552-6365 (telephone)
(314) 552-7365 (facsimile)

Harvey A. Levin (D.C. Bar No. 203869)
Allison Manger (D.C. Bar No. 482593)
THOMPSON COBURN LLP
1909 K. Street, N.W. Ste. 600
Washington, D.C.  20006-1167
(202) 585-6900 (telephone)
(202) 585-6969 (facsimile)

*Attorneys for Plaintiff Jonathan Ledecky d/b/a
Ironbound Partners*

CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of September, 2006, a true and correct copy of the

foregoing Plaintiff's Pretrial Statement, was mailed electronically through CM/ECF to:

>  Kevin E. Stern
>  C. Allen Foster
>  Geoffrey Greeves
>  Maria Hallas
>  GREENBERG TRAURIG, LLP
>  800 Connecticut Ave., N.W.
>  Suite 500
>  Washington, D.C.  20006

>  /s/ Allison Manger