IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JONATHAN LEDECKY d/b/a IRONBOUND PARTNERS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SOURCE INTERLINK COMPANIES, INC., )<br>)<br>Defendant. )<br>_____ ) | Case No. 1:05CV01039 (JGP) |

**DEFENDANT SOURCE INTERLINK COMPANIES, INC.'S
PRETRIAL STATEMENT**

Defendant Source Interlink Companies, Inc. ("Source") respectfully submits its Pretrial Statement pursuant to the Court's Order for Pretrial Conference.

I.      Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

II.     Facts

Source sets forth the following undisputed facts:

1.      Source is a company headquartered in Bonita Springs, Florida. *See* Amendment No. 1 to Form S-4 Proxy Statement/Prospectus dated Jan. 19, 2005 ("S-4") at 100. Its business is primarily geared towards the management of magazine sales at front-end retail checkouts and distribution of magazines, DVDs and CDs to specialty retailers. S. Leslie Flegel Deposition ("Dep.") at 14(13)-(19); S-4 at 94.

2.      Pursuant to the Referral Agreement, Plaintiff Jonathan Ledecky agreed to introduce Source to a "Client" of Plaintiff and to assist Source in evaluating and

negotiating any proposed "business relationship" with the Client. *See* Referral Agmt. at ¶ 1.

3. The "Client" in the Referral Agreement is the Endeavor Agency, LLC ("Endeavor"), a Beverly Hills, California based talent agency. Plaintiff's Response to Source Interrogatory No. 1.

4. Under the terms of the Referral Agreement, Source had the unfettered discretion to accept or reject any proposed business relationship with Endeavor, and Source's acceptance of a business relationship with Endeavor could be manifest "only by execution of a written agreement between Source and [Endeavor]." Referral Agmt. at ¶ 1.

5. In the event Source and Endeavor entered into a business relationship and that relationship was documented by an executed written agreement between the parties, the Referral Agreement provides that:

> Source shall pay to Ironbound, and Ironbound shall accept, compensation equal to 5% of the net income recorded by Source as a result of its relationship with [Endeavor] during the five-year period following the date (the "Establishment Date") on which the business relationship is established between Source and [Endeavor].

Referral Agmt. at ¶ 2.

6. The rights and obligations of each of the parties to the Referral Agreement are to be governed by and interpreted and determined in accordance with Florida law. Referral Agmt. at ¶ 5(d). The Referral Agreement also contains an integration clause which provides that "[t]his is the entire and only Agreement between the parties respecting the subject matter hereof, and supercedes (sic) all prior agreements." *Id.* at ¶ 5(h).

7. From Plaintiff's perspective, the intention behind the Referral Agreement was for him to be compensated by Source if he made a "marriage of business opportunities and situations where . . . Source and Endeavor could do business together." Jonathan Ledecky Dep. at 54(15)-55(2); *see also* April 22, 2004 e-mail from Plaintiff to Source President Jim Gillis ("Furthermore, I need to be compensated for making the marriage, I will get you the fee arrangement on it."). According to Plaintiff, he was to "put the two parties on the playing field and see what would happen together. And if something came out of that relationship, I wanted to be compensated for it." Ledecky Dep. at 77(21)-78(2).

8. The Referral Agreement, which is "made and entered into as of April 26, 2004," was executed by both parties on April 27, 2004. Ledecky Dep. at 131(20)-133(9).

9. Also on April 27, 2004, after Source executed the Referral Agreement and before he introduced Source to Endeavor, Plaintiff arranged for Source and Endeavor to enter into a Mutual Non-Disclosure Agreement ("NDA") so the parties could exchange confidential information "in connection with exploring and evaluating a possible business relationship (the "Relationship")." NDA; Ledecky Dep. at 134(6)-136(7).

10. The NDA was executed before Source and Endeavor were introduced to each other by Plaintiff because, without an executed NDA, Endeavor was not willing to be introduced to Source by Plaintiff to discuss entering into a potential business relationship. *See* April 25, 2004 e-mail from Plaintiff to Source General Counsel Doug Bates) ("A leading company on the west coast wants to enter into an exciting business with Source Interlink but is unwilling to disclose certain information about the potential relationship without the protection of the enclosed [mutual non-disclosure] agreement.");

*see also* April 22, 2004 e-mail from Plaintiff to Source President Jim Gillis ("An opportunity dropped in my lap today that could literally be worth $100 million a year in PROFIT to [Source]. . . . It is tricky in that the group that brought it to me needs [Source] to sign a confidentiality agreement.").

11. In the NDA, the parties expressly acknowledged and agreed that they had not entered into a business relationship by virtue of entering into the NDA:

> Both parties understand and agree that no contract or agreement with respect to the Relationship (or any other transaction) shall be deemed to exist between them or their respective stockholders or other owners, unless and until a definitive agreement has been executed and delivered by the Parties. None of the Parties or their respective stockholders, or any other person will have any rights or obligations of any kind whatsoever with respect to any transaction by virtue of this Confidentiality Agreement or any other written or oral expression by either Party or their respective Representatives unless and until a definitive agreement between the Parties is executed and delivered, other than with respect to the matters specifically agreed to herein. For purposes of this Confidentiality Agreement, the term "definitive agreement" does not include an executed letter of intent or any other preliminary written agreement. The Parties acknowledge and agree that any Relationship is subject to the approval of their respective senior management and/or their Board of Directors, which approval may be denied, granted or conditionally granted in such management's or board's complete discretion. *It is expressly understood and agreed that neither Party is bound by this Confidentiality Agreement to establish a Relationship (or any other transaction).* Each Party preserves the right, in its sole and absolute discretion, at any time, to reject any and all proposals from, and to terminate all discussions with, the other Party.

NDA at ¶ 6 (emphasis added); *see also id.* at ¶ 9(b) ("This Agreement . . . shall not be construed to create any obligation on the part of either Party to retain the services or to compensate the other Party in any matter, *except as may be set forth by a separate written Agreement* duly executed and delivered by the parties. . . .") (emphasis added).

12. Other than the NDA, there does not exist any executed written agreement between Source and Endeavor. Ledecky Dep. at 158(2)-(11).

13. In connection with the execution of the NDA, Plaintiff disclosed to Source for the first time that the "Client" in the Referral Agreement was Endeavor. Plaintiff's Response to Source Interrogatory No. 3.

14. After the NDA and Referral Agreement were executed, Plaintiff arranged for an introductory phone call between Ari Emanuel ("Emanuel"), a member of Endeavor, and Source's Chairman and CEO, Leslie Flegel, on April 27, 2004, while Flegel and Source's President and COO, Jim Gillis, were vacationing on a boat in Greece. Ledecky Dep. at 135(17)-137(22).

15. Plaintiff subsequently helped arrange an introductory face-to-face meeting between Source and Endeavor representatives on May 12, 2004 in New York, where potential business opportunities between the parties involving the supply and distribution of DVDs at retail checkouts were discussed. Ledecky Dep. at 219(14)-220(17); 234(6)-235(14); Flegel Dep. at 84(11)-(25); Jim Gillis Dep. at 108(21)-109(14); Plaintiff's Response to Source Interrogatory No. 5.

16. At the time Plaintiff made these introductions, he was not licensed as a broker in the State of Florida pursuant to Chapter 475, Florida Statutes. *See* Plaintiff's Response to Defendant's First Requests for Admission.

17. On June 22, 2004, at a meeting in Los Angeles, Ari Emanuel introduced Messrs. Flegel and Gillis to Erika Paulson, a director of Alliance Entertainment Corp. ("Alliance") and a partner with The Yucaipa Companies, LLC, an entity affiliated with Alliance's controlling stockholder, AEC Associates, L.L.C. S-4 at 36. Alliance, a company headquartered in Coral Springs, Florida, was a major distributor of DVDs, CDs

and other home entertainment product to specialty retailers, mass merchandisers, supermarkets and e-commerce retailers. *Id.* at 124, 132.

18.     A few weeks after they were introduced, Source and Alliance entered into merger discussions. S-4 at 37. On November 18, 2004, Source and Alliance entered into a merger agreement and announced that Mr. Emanuel had been appointed to Source's Board of Directors. *See* S-4 at 39; Nov. 18, 2004 press release. The Alliance merger closed on February 28, 2005. Douglas J. Bates Dep. at 84(3)-(12).

19.     Throughout 2004, Source and Endeavor engaged in sporadic discussions and negotiations with each other regarding entering into a proposed business venture involving the supply and distribution of DVDs and other home entertainment media at retail checkouts. *See* Gillis Dep. at 116(2)-(20); 120(4)-(15); 123(12)-124(2). In February and March 2005, the parties exchanged draft agreements. *See* Feb. 4, 2005 e-mail from Endeavor to Source attaching proposed engagement letter; March 11, 2005 e-mail from Source to Endeavor attaching proposed engagement agreement.

20.     No written or oral agreement, however, was ever reached between Source and Endeavor due to unresolved financial terms and potential conflict of interest issues arising from Mr. Emanuel's membership on Source's Board of Directors. *See* Bates Dep. at 122(25)-129(3); Flegel Dep. at 146(24)-148(10); Gillis Dep. at 165(8)-166(14); Ariel Emanuel Dep. at 118(25)-120(7).

21.     Mr. Emanuel, acting on Endeavor's behalf, provided consulting services in connection with the merger between Source and Alliance. Defendant's Response to Plaintiff's Request to Admit No. 24.

22.     Mr. Emanuel, however, was never retained as a consultant to Source and he did not participate in the negotiations between Source and Alliance or do anything to facilitate the merger between the companies. *See* Flegel Dep. at 125(1)-127(7); 139(6)-140(4); Erika Paulson Dep. at 113(17)-115(7); Emanuel Dep. at 95(3)-(19); 97(13)-98(8).

23.     Mr. Emanuel was always working on the Alliance-Yucaipa side of the merger, not the Source side. Emanuel Dep. at 95(3)-(19), 97(13)-98(8).

24.     Endeavor was paid $1.5 million by Source in connection with the Alliance merger in fulfillment of an Alliance obligation to Endeavor that Source inherited from Alliance upon consummation of the merger. *See* Flegel Dep. at 16(7)-18(16); Emanuel Dep. at 72(14)-(19); 83(9)-84(15); Paulson Dep. at 107(10)-110(16).

25.     Source had no input or involvement in the agreement to pay $1.5 million to Endeavor. This agreement was exclusively negotiated between Mr. Emanuel of Endeavor and Alliance's controlling shareholder, Ron Burkle. *See* Flegel Dep. at 16(7)-18(16); Emanuel Dep. at 72(14)-(19); 83(9)-84(15); Paulson Dep. at 107(10)-110(16).

III.    Claims of Parties - Defendant's Defenses

Plaintiff claims he is entitled to compensation under the terms of the Referral Agreement because the Alliance merger resulted from Source's alleged business relationship with Endeavor. Source denies that Plaintiff is entitled to any compensation under the Referral Agreement for the Alliance merger because an express contractual condition was never satisfied, namely, the requirement that Source and Endeavor enter into a "business relationship" as that term is used and limited in the Referral Agreement, and defined under Florida law. Source did not enter into any business relationship with Endeavor because the Referral Agreement specifically provides that no business

relationship will be deemed to exist between Source and Endeavor unless there exists an executed written agreement between the parties that manifests Source's acceptance of such relationship, and no such written agreement exists in this case.

The only executed written agreement that exists between Source and Endeavor is the NDA. Plaintiff contends that the NDA manifests Source's acceptance of a business relationship with Endeavor because the NDA provides that confidential information exchanged between the parties can be used "for the purposes of the ongoing Relationship." NDA at ¶2. But the NDA was executed before Source and Endeavor were even introduced to each other, and in that agreement the parties specifically acknowledged and agreed that they had *not entered* into a business relationship by virtue of its execution. *See* NDA at ¶¶ 6, 9(b). Accordingly, the NDA does not manifest Source's acceptance of a business relationship with Endeavor. In fact, it states the exact opposite.

Plaintiff also cannot establish that Source and Endeavor's dealings qualify as a "business relationship" under Florida law. Florida law holds that a legally enforceable business relationship exists only if the parties have existing or prospective legal or contractual rights against each other. *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla. 1995). Because Source and Endeavor's meetings, discussions and negotiations never resulted in the execution of a written agreement, they never had any existing or prospective legal rights against each other and, therefore, they did not enter into a business relationship under Florida law.

In the alternative, Plaintiff has argued that, to the extent that the NDA does not satisfy the Referral Agreement's written agreement requirement, this express condition

precedent should be excused even though Source had the "unfettered discretion" to accept or reject any proposed business relationship with Endeavor, because Source, in breach of its implied contractual duty of good faith and fair dealing, wrongfully refused to enter into any written agreements with Endeavor for the purpose of avoiding liability to Plaintiff under the Referral Agreement. However, the Florida Supreme Court has held (en banc) that where, as is the case here, a broker expressly agrees that execution of a written agreement between the parties he brought together is a condition precedent to his right to a commission, the broker is not entitled to a commission even if the failure to consummate the transaction was due entirely to arbitrary refusal on the part of the principal. *Hanover Realty Corp. v. Codomo,* 95 So.2d 420, 423 (Fla. 1957) (en banc). Plaintiff therefore cannot use the implied duty of good faith and fair dealing to override or excuse a specific contract term or condition to the contrary. *Id.*

Moreover, even if Plaintiff could properly maintain a good faith and fair dealing claim, Plaintiff has not offered any admissible evidence to support this claim. The unrebutted testimony of each of the persons with direct knowledge of the Source-Endeavor discussions and negotiations -- Doug Bates, Leslie Flegel and Ari Emanuel -- is (1) that Source and Endeavor were ultimately unable to reach an agreement (either written or oral) due to unresolved financial terms and potential conflict of interest issues arising from Mr. Emanuel's membership on Source's Board of Directors, and (2) that potential compensation or liability to Plaintiff under the Referral Agreement had nothing to do with the breakdown in their negotiations.

Source also contends that the Referral Agreement is unenforceable by Plaintiff because he was not licensed as a broker under Florida law at the time he performed his

services under the Referral Agreement. Chapter 475 broadly defines a "broker" to cover not only persons who perform traditional brokerage services, but also "a person . . . who takes *any part* in the procuring . . . of business opportunities." (emphasis added) Thus, assuming *arguendo* that Plaintiff is entitled to recover for the Alliance merger under the terms of the Referral Agreement, he would clearly be recovering for taking a "part" in "the procuring of" this business opportunity. Accordingly, his alleged activities would constitute unlicensed brokerage services under Chapter 475, which bars him from enforcing or recovering a commission under the Referral Agreement.

IV.   Damages and/or Liability

Not applicable. No damages claims will be tried in this phase, as this case has been bifurcated into two phases, a liability and a damages phase.

V.   Legal Issues

(a)   The following legal authority is applicable to and supports Source's defenses:

- A legally enforceable business relationship only exists if the parties have existing or prospective legal or contractual rights against each other. *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla. 1995); *see also St. Johns Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*, 784 So.2d 500, 505 (Fla. Dist. Ct. App. 2001); *Thunderwave Inc. v. Carnival Corp.*, 954 F. Supp. 1562, 1566-67 (S.D. Fla. 1997).

- "Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused." Restatement (Second) of Contracts § 225(1) (1981); *Meruelo v. Robles,* 329 B.R. 350, 355 (S.D. Fla. 2005).

- "Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur." Restatement (Second) of Contracts § 225(3) (1981); *In re Gencor Indus., Inc.*, 298 B.R. 902, 911 (Bankr. M.D. Fla. 2003).

- A party is bound by, and a court is powerless to rewrite, the clear and unambiguous terms of a voluntary contract. A contractual provision cannot be rewritten or excused to make an otherwise valid contract more reasonable or

favorable from the standpoint of one contracting party. *Med. Ctr. Health Plan v. Brick,* 572 So.2d 548, 551 (Fla. Dist. Ct. App. 1990); *N. Am. Van Lines v. Collyer,* 616 So.2d 177, 179 (Fla. Dist. Ct. App. 1993).

- "An interpretation of a contract which gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect." *Herian v. Southeast Bank, N.A.,* 564 So.2d 213, 214 (Fla. Dist. Ct. App. 1990); *Belen School, Inc. v. Higgins,* 462 So.2d 1151, 1153 (Fla. Dist. Ct. App. 1984).

- "Generally the intentions of the parties to a contract govern its construction and interpretation. When determining intent, the best evidence is the plain language of the contract. The language being construed is to be read in common with other provisions of the contract." *Royal Oak Landing Homeowner's Ass'n, Inc. v. Pelletier,* 620 So.2d 786, 788 (Fla. Dist. Ct. App. 1993) (internal citations omitted).

- "In construing a contract a court must consider the objects to be accomplished, and to this end should place itself in the position of the parties when the contract was entered into. A corollary to this is that the court should arrive at an interpretation consistent with reason, probability, and the practical aspect of the transaction between the parties." *Wright & Seaton, Inc. v. Prescott,* 420 So.2d 623, 629 (Fla. Dist. Ct. App. 1982) (quoting *Bay Mgmt., Inc. v. Beau Monde, Inc.,* 366 So.2d 788, 791 (Fla. Dist. Ct. App. 1978) (internal quotations omitted).

- A contract should be considered as a whole in determining the intention of the parties to the instrument. The conditions and circumstances surrounding the parties to the instrument and the object or objects to be obtained when the contract was executed should be considered. *Triple E Dev. Co. v. Floridagold Citrus Corp.,* 51 So.2d 435, 438 (Fla. 1951).

- Where a broker expressly agrees that execution of a written agreement between the parties he brought together is a condition precedent to his right to a commission, the broker is not entitled to a commission even if the failure to consummate the transaction was due entirely to arbitrary refusal on the part of the principal. *Hanover Realty Corp. v. Codomo,* 95 So.2d 420, 423 (Fla. 1957) (en banc).

(b)   Source has filed concurrently with its Pretrial Statement the following Motions *in Limine,* which address and set forth Source's position on several evidentiary matters that Source knows will be or expects to become an issue at trial:

    (1) Motion *in Limine* to Exclude Evidence of and Statements Made in Settlement Discussions;

    (2) Motion *in Limine* to Exclude Matthew D. Schwartz and Any Other Trial Witness Not Listed in Plaintiff's Initial Disclosures or Supplements Thereto;

    (3) Motion *in Limine* to Exclude Lay Opinion Testimony;

    (4) Motion *in Limine* to Exclude Evidence and/or Arguments Regarding Payments of Bonuses, Fees and/or Awarding of Employment Contracts in Connection With the Alliance Merger;

    (5) Motion *in Limine* to Preclude Any Arguments Relating to The Effect of Any Misstatements or Inaccuracies in Defendant's Public Filings With The United States Securities And Exchange Commission;

    (6) Motion *in Limine* to Exclude Evidence and/or Arguments Concerning Plaintiff's Now-Dismissed Equitable Claims;

    (7) Motion *in Limine* to Preclude Plaintiff From Testifying About Any Out-of-Court Statements From John Chiles;

    (8) Motion *in Limine* to Preclude Plaintiff From Asserting an Estoppel Claim

VI. <u>Motions</u>

  (a) The following motions remain outstanding:

    (1) Defendant's Motion for Summary Judgment [Doc. #58]

  (b) <u>Additional Motions</u>:  Source has filed concurrently with this Pretrial Statement the Motions *in Limine* listed above in Section V(b).

VII.  Discovery

While all discovery has been completed, there may be a potential discovery issue due to the fact that Plaintiff has indicated that he intends to call as a witness in his case in chief his former lead counsel in this case, Matthew Schwartz. As set forth in Source's Motions *in Limine* filed concurrently with this Pretrial Statement, Source believes that Mr. Schwartz should be precluded from testifying in this case for the principal reasons that (i) he was never previously disclosed by Plaintiff as a potential witness in this case, in violation of the mandatory witness disclosure obligations under Fed. R. Civ. P. 26(a)(1) and 26(e)(1); and (ii) any purported statements made by Source to Mr. Schwartz were made in the context of a settlement discussion between counsel, and, therefore, are inadmissible under Fed. R. Evid. 408. However, in the event the Court denies Source's Motions *in Limine* and Mr. Schwartz is allowed to testify, then Source would respectfully request that it be granted leave to depose Mr. Schwartz before trial.

VIII.  Witnesses

(a)  Source may call the following witnesses in its case in chief:

(1)  S. Leslie Flegel, Source Interlink Companies, Inc., 27500 Riverview Center Blvd., Suite 400, Bonita Springs, FL  34134

(2)  Douglas J. Bates, Source Interlink Companies, Inc., 27500 Riverview Center Blvd., Suite 400, Bonita Springs, FL  34134

(3)  James Gillis, Source Interlink Companies, Inc., 27500 Riverview Center Blvd., Suite 400, Bonita Springs, FL  34134

Source also reserves the right to call in its case in chief any witness listed by Plaintiff.

(b)     Source intends to use the depositions of the following third party witnesses in its case in chief in lieu of live testimony:

(1)     <u>Ariel Z. Emanuel</u>, deposition taken on May 18, 2006

(2)     <u>Erika Paulson</u>, deposition taken on May 17, 2006.

Source intends to use the deposition testimony of these persons at trial because they are third parties who are beyond the subpoena power of this Court. The portions of Mr. Emanuel's and Ms. Paulson's respective depositions that Source may introduce at trial are set forth in Appendix A. Source opposes any and all objections by Plaintiff to any deposition designation offered by Source, and is prepared to address any such objections at the pretrial conference or any other time designated by the Court.

Attached as Appendix B are Source's objections and counter-designations to Plaintiff's proposed deposition designations, and its objections to Plaintiff's proposed counter-designations to Source's deposition designations.

(c)     Source may introduce the following interrogatory responses and responses to requests for admission at trial: Plaintiff's Responses to Source Interrogatory Nos. 1, 3 and 6; and Plaintiff's Responses to Defendant's First Requests for Admission Nos. 1 and 2.

IX.     <u>Exhibits</u>

Source's trial exhibit list is attached as Appendix C.

X.     <u>Stipulations</u>

The parties have agreed to the following fact stipulations:

1.     Mr. Ariel Emanuel became a member of the Board of Directors of Defendant Source Interlink Companies, Inc. ("Source") on November 18, 2004.

2.      The merger between Source and Alliance Entertainment Corporation closed on February 28, 2005.

3.      Plaintiff's Exhibit 3 (Amendment No. 1 to Form S-4 Registration Statement Under the Securities Act of 1933 of Source Interlink Companies, Inc.) and Plaintiff's Exhibit 4 (Form 10-K of Source Interlink Companies, Inc. for the fiscal year ended January 31, 2006) were filed with the United States Securities and Exchange Commission.

4.      Plaintiff's Exhibit 7 documents the payment of $1.5 million to the Endeavor Agency, LLC ("Endeavor") in satisfaction of the invoice that Source received from Endeavor on or around March 2, 2005, after Alliance was merged into Source. (Plaintiff's Exhibit 6).

5.      The term "Client," as used in the Referral Agreement , refers to Endeavor.

6.      The term Ironbound Partners, LLC, as used in the Referral Agreement, refers to Plaintiff Jonathan Ledecky.

In addition, the parties have agreed to stipulate to the authenticity of the exhibits that each party has indicated that it may introduce at trial, except for the following exhibits: Plaintiff's Exhibits 53, 55, 61, 73 and 74.  With respect to Plaintiff's Exhibits 53, 55, and 61, the parties stipulate to their authenticity in all respects except for the authenticity of Ariel Emanuel's signature.

A copy of the stipulation, signed by counsel for both parties, is attached as Appendix D.

XI.     Unusual Issues or Problems

None.

XII.   Voir Dire

Source's proposed questions to be asked during voir dire examination of potential jurors are set forth in Appendix E.

XIII.   Instructions, Interrogatories, Special Verdicts

Source's proposed jury instructions are set forth in Appendix F. Source does not presently believe that juror interrogatories or a special verdict form is appropriate for this case. Source reserves the right to propose a special verdict form depending on the evidence, issues and claims ultimately presented at trial.

XIV.   Settlement

The parties conducted an unsuccessful mediation on September 13, 2006. No further settlement discussions have taken place since.

XV.   Time for Trial

Counsel for both parties estimate that trial will take no more than four (4) days.

Respectfully submitted,

/s/ Kevin E. Stern            .
Kevin E. Stern (Bar No. 459214)
Geoffrey J. Greeves (Bar No. 463035)
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC  20006
Tel:  (202) 331-3100
Fax:  (202) 331-3101

*Counsel for Defendant Source Interlink Companies, Inc.*

Dated:  September 29, 2006

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of September, 2006, I caused a true and correct copy of the foregoing to be served by electronic mail through CM/ECF on the following persons:

Jan Paul Miller, Esq.
THOMPSON COBURN, LLP
One U.S. Bank Plaza
St. Louis, MO 63101

Allison Manger, Esq.
THOMPSON COBURN, LLP
1909 K Street, NW
Suite 600
Washington, DC 20006


/s/ Tanya Caudell              .
Tanya Caudell