# EXHIBIT A

                                                                              1

              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
                  FT. MYERS DIVISION


JONATHAN LEDECKY d/b/a IRONBOUND
PARTNERS,

     Plaintiff,

     vs.                         CASE NO. 1:05 CV 01039

SOURCE INTERLINK COMPANIES, INC.,

     Defendant.
_____/

                    C O N F I D E N T I A L

     VIDEOTAPED DEPOSITION OF:   S. LESLIE FLEGEL

     DATE:                       May 4, 2006

     TIME:                       9:40 a.m. to 3:26 p.m.

     LOCATION:                   27200 Riverview Center
                                 Suite 309
                                 Bonita Springs, FL

     TAKEN BY:                   Plaintiff

     REPORTER:                   Betty G. Althoff, RPR

**14**

1  A. I am Chairman of the Board.
2  Q. What else?
3  A. Chief Executive Officer.
4  Q. Anything else?
5  A. No.
6  Q. How long have you been CEO of Source?
7  A. Um, since February 1st, 1995.
8  Q. And were you CEO of its predecessor companies?
9  A. I was the owner of the predecessor company of
10 one of the predecessor companies.
11 Q. How long have you been Chairman of the Board?
12 A. Since February 1st, 1995.
13 Q. How would you describe Sources' business, what
14 does it do?
15 A. Its business is primarily geared towards the
16 management of magazine sales, front end management,
17 meaning the manufacturing of it and placement of
18 products at the checkouts, and the distribution of
19 magazines, books, DVD's, and um, CD's music CD's.
20 Q. Give me one second, if you would. As CEO of
21 Source, I presume you are familiar with various public
22 documents that Source distributes, that it is required
23 to distribute under SEC rules?
24 A. Yes, I am.
25 Q. Let me show you -- let me show you Exhibit 1.

**15**

1     (Plaintiff's Exhibit No. 1, S-4, was marked
2  for identification.)
3     THE WITNESS: Okay.
4  BY MR. MILLER:
5  Q. Do you recognize that as an S-4 that was
6  issued by Source?
7  A. Yes.
8  Q. Okay. And what was the purpose of this S-4?
9  A. Well, it's not the only S-4 we have filed,
10 so --
11 Q. True. Why don't you take a look at the about
12 the second and third page or third and fourth page. Is
13 this the S-4 that Source issued to announce the special
14 shareholders meeting to be held on February 28th, 2005,
15 at which the shareholders would vote on the proposed
16 merger of Source and Alliance?
17 A. Correct, that is correct.
18 Q. And that merger was approved on February 28th,
19 2005, by the shareholder; correct?
20 A. That is correct.
21 Q. And therefore, as of February 28, 2005, Source
22 acquired Alliance; correct?
23 A. That is correct.
24 Q. Is everything in this S-4, that was issued by
25 Source under SEC Rules, accurate?

**16**

1  A. I would say materially so, yes.
2  Q. All right, how about nonmaterially so?
3  A. Well, any time you do a document of this size,
4  and I have seen it more often than not or as often as
5  not, there could be a terminology or a word that is
6  incorrect, but essentially, not materially incorrect.
7  Q. Okay. Are you aware of any words or phrases
8  that are incorrect in this S-4?
9  A. I am aware of a description of -- I don't
10 remember it specifically -- because I haven't read this
11 recently, but a description that I later read that I
12 felt incorrectly stated the manner in which Ari Emanuel
13 was paid.
14 Q. Okay. Tell me about that.
15 A. Well, I didn't agree to pay Ari Emanuel any
16 money, that was agreed to buy the Yucaipa people,
17 completely unrelated to me. And, um, when the payment
18 was made, it was made after the merger out of Alliance,
19 which we then owned.
20    And, um, I think that the way it is stated in
21 this, and it became an issue that I brought up with my
22 own internal people later. This is something I didn't
23 personally catch, because it is hard to read every word
24 in one of these things. That I felt that it gave the
25 impression, the way it was worded, that we had agreed

**17**

1  to pay that money, when we hadn't.
2  Q. "We" who?
3  A. That Source.
4  Q. Well, in fact, Source did pay the money,
5  didn't it?
6  A. Source, Source -- Alliance paid the money, and
7  Source owned Alliance at the time -- but it had nothing
8  to do with the fact that we had agreed to any portion
9  of that. That was preagreed upon by Ron Burkle and
10 Yucaipa with Ari Emanuel, which I was not privy to any
11 of those discussions.
12 Q. You knew he was going to get a million and a
13 half dollars; correct, did you not, Mr. Flegel?
14 A. I knew at some point time the Yucaipa people
15 informed me that they were paying, that they had agreed
16 to pay Ari Emanuel a million and a half dollars.
17 Q. In fact, that fact is listed in this S-4,
18 isn't it? The fact that he is going to be paid a
19 million and a half dollars.
20 A. It is listed did in the S-4.
21 Q. And are you saying that, tell me again what
22 the discrepancy is?
23 A. I am saying I didn't agree to pay that money,
24 and it was paid by Alliance. Frankly, I wasn't
25 surprised that it wasn't paid prior to the merger, but

**18**

1  I was told for technical reasons it had to be paid
2  after the merger, because it was only due upon the
3  conclusion of the merger. And therefore, was --
4      Q. Who told you that?
5      A. Sorry?
6      Q. Who told you that?
7         MR. STERN: Object to the form of the
8      question. I would advise you not to reveal any
9      attorney-client communications.
10 BY MR. MILLER:
11     Q. All right, go ahead and continue with your
12 answer.
13     A. And so, in effect, um, it was paid by
14 Alliance, which at the time, as a result of the merger,
15 we then owned, but it had nothing to do with anything I
16 had agreed to do.
17     Q. And you don't -- and Mr. Emanuel was a member
18 of the Board of Directors of Source at the time he was
19 paid the million and a half dollars; correct?
20     A. He -- I am not sure I remember precisely when
21 the sequence of events was. I don't know if that
22 happened before or after.
23     Q. Well, the Board of Source approved the merger
24 in November of 2004; correct?
25     A. The board, yeah, and I do not believe that he

**19**

1  was on the board in 2004.
2      Q. Okay. Well, we can correct that.
3         It will take me a minute to track it down.
4         MR. STERN: Can we go off the record so he can
5      hand him his glasses.
6         MR. MILLER: Sure.
7         THE VIDEOGRAPHER: Off the record, time is
8      10:04 p.m.
9         (Whereupon, an off the record discussion was
10     had.)
11        THE VIDEOGRAPHER: Back on the record, the
12     time is 10:05 a.m.
13        (Plaintiff's Exhibit No. 2,
14 Press Release, was marked for identification.)
15 BY MR. MILLER:
16     Q. All right, Mr. Flegel, let me show you Exhibit
17 2, and ask you to take a look at that. That is an
18 announcement, a press release actually, by your
19 company, Source, dated November 18, 2004, announcing
20 Ari Emanuel had been made a member of the Board of
21 Source; is that correct?
22     A. That is correct. I didn't remember it that
23 way, but that is correct.
24     Q. Okay. So would you agree that he was made a
25 member of the Board of Directors of Source as of

**20**

1  November 18th, 2004?
2      A. Yes.
3      Q. Okay. So by the time he was paid the million
4  and a half dollars, at the beginning of March of 2005,
5  he had been a member of the Board of Directors of
6  Source for several months; correct?
7      A. Yes.
8         MR. STERN: Object to the form of the
9      question.
10        THE WITNESS: I am sorry? I didn't hear you.
11        MR. STERN: I was just making an objection to
12     form for the record.
13        THE WITNESS: Okay.
14 BY MR. MILLER:
15     Q. Is that correct?
16     A. It appears it is correct, yes.
17     Q. And he was paid a million and a half dollars
18 within a couple days after the closing, after the
19 merger actually occurred on February 28th, 2005;
20 correct?
21     A. That is correct.
22     Q. All right. Are you saying that it is not a
23 material fact that there was a statement in your S-4
24 that one of your Board Directors, one of your members
25 of your Board of Directors was going to be paid a

**21**

1  million and a half dollars by your company?
2         MR. STERN: Object to the form of the
3      question.
4         THE WITNESS: No, I didn't say that was
5      immaterial, I didn't say that.
6  BY MR. MILLER:
7      Q. Okay. What is immaterial then?
8      A. I didn't say anything was immaterial. I
9  didn't say that was -- I said from time to time -- I
10 said that this is materially correct.
11     Q. Right?
12     A. And from time to times, in filings of S-4's
13 there are misstatements that are not material, that is
14 what I said.
15     Q. And I asked you if there were any nonmaterial
16 misstatements in the S-4, and we talked about that.
17     A. But I said -- no one denies that he was paid
18 the million and a half dollars. What I think is not
19 material -- what I think is incorrect -- I am not a
20 Judge whether it is material or not, and I don't
21 believe it is material -- was the specific wording of
22 it.
23     Q. Uh-huh, Okay. Um, and the S-4 that we have
24 been looking at Exhibit Number 1, as we said before,
25 that was to announce the special shareholders meeting

166

1  for Alliance, but I didn't fell that John was entitled
2  to millions of dollars. I don't remember what I said
3  reference my board, but I don't believe that he was --
4  and I don't believe that anybody was.
5      Because I don't think anybody -- unless maybe
6  Len Rizzio, who never has asked for anything, because
7  Len Rizzio was the guy who made that deal happen. That
8  deal was dead, and he is the one that made it happen.
9      Q. My question is: Did you tell Mr. Ledecky
10 during one of these conversations that you do owe him
11 something, but that the board would not allow you to
12 pay him millions?
13     A. I was trying to appease John, and I might have
14 said that to him, because I didn't want to lose him as
15 an ally or as a friend, so I might have said that to
16 him.
17     MR. MILLER: Okay. I think it would be a good
18 time to take five minutes.
19     THE VIDEOGRAPHER: Off the record. The time
20 is 2:30 p.m.
21     (A discussion was held off the record.)
22     THE VIDEOGRAPHER: Back on the record. The
23 time is 2:44 p.m.
24 BY MR. MILLER:
25     Q. Mr. Flegel, what are your duties and

167

1  responsibilities as Chairman of the Board and CEO for
2  Source?
3      A. I ask myself that every day, by the way.
4      Q. Have you come up with an answer?
5      A. Yeah. Well, I am really responsible for, um,
6  performance of the company overall.
7      Q. Um-hmn.
8      A. And my specific duties, handle most of the
9  capital market elements of the company, and also the,
10 um, you know, any kind of banking relationships or
11 financial transactions, acquisitions, that kind of
12 thing.
13     Q. Is it part of your job to try to enhance the
14 value of the company?
15     A. Sure.
16     Q. And to try to enhance the business of the
17 company?
18     A. Sure.
19     Q. And that was obviously one of the reasons that
20 you went ahead with this purchase of Alliance?
21     A. It is.
22     Q. Okay. Part of your job is to seek out
23 profitable ventures for the company?
24     A. Sure.
25     Q. All right. Um, what did you do regarding --

168

1  how would you characterize your work on the Alliance
2  merger? What did you do?
3      A. Um, well, I mean, I was principally the one
4  that negotiated the deal with Yucaipa. And to some
5  degree, got involved in whatever company presentations
6  were required to do the deal; but that is principally
7  what I did.
8      Q. Okay. And was that in your role as CEO and
9  Chairman of the Board?
10     A. Yes.
11     Q. Part of your responsibilities in those roles?
12     A. That is true.
13     Q. I presume when acting as CEO and Chairman of
14 the Board, you're acting on behalf of the shareholders?
15     A. Yeah, I do.
16     Q. Okay. And you have a fiduciary responsibility
17 to them regarding trying to promote the value of the
18 company and the business of the company?
19     A. Correct.
20     Q. Excuse me. During the time that you were
21 negotiating the Alliance merger, were you at any time
22 during that period of time planning on leaving the
23 company?
24     A. Um, no, not really.
25     Q. Were you threatening to leave the company at

169

1  all during that period of time?
2      A. Not that I can recall.
3      Q. Okay. And from your testimony earlier today,
4  in fact, you said the only way you were going to stay
5  on with the Alliance-Source merger was if you remained
6  as CEO of the company; correct?
7      A. What I said was that if my board wanted to do
8  the deal in spite of what I thought, they had a right
9  to do that, because I basically am an employee of the
10 company. I didn't see myself working for, um, a
11 successor.
12     Q. Okay. So you had no plans at that time of
13 leaving?
14     A. I had no plans of leaving the company.
15     Q. Did you receive a bonus from the company as a
16 result of this merger?
17     A. I received a portion of an allocation of a
18 bonus, an allocation of a bonus that was given to the
19 management team.
20     Q. How much did you get?
21     A. Um, six or seven hundred thousand dollars, if
22 I recall.
23     Q. $750,000 sound right?
24     A. Seven hundred fifty thousand, yeah.
25     Q. And in fact, you had to get a new employment

**170**

1  contract in order to be given that seven hundred fifty
2  thousand dollar bonus, didn't you?
3      A. I got a new employment contract.
4      Q. Under the employment contract that you had
5  that was in place during the negotiations of the
6  Alliance-Source merger, you couldn't have gotten a
7  seven hundred fifty thousand dollar bonus, could you?
8      A. I am sorry -- ask that again.
9      Q. During the -- when you were working under the
10 employment contract that you had that was in place
11 prior to the merger closing, you couldn't get a seven
12 hundred fifty thousand dollar bonus, could you?
13         MR. STERN: Object to the form. It calls for
14     a legal conclusion.
15 BY MR. MILLER:
16     Q. Well, we can just read what it says in the S-4
17 then or the 10-K.
18         THE WITNESS: Should I answer that question?
19         MR. MILLER: If you can.
20         THE WITNESS: Is that what you are saying?
21         MR. STERN: To the extent you can answer the
22     question, you can.
23         THE WITNESS: I don't know what would have
24     prevented me from getting a seven hundred fifty
25     thousand dollar bonus.

**171**

1  BY MR. MILLER:
2      Q. For your work on the Alliance merger?
3      A. I could have gotten a seven hundred fifty
4  thousand dollar bonus just -- it is up to the
5  discretion of the compensation committee.
6      Q. Really? Okay.
7         Could you look at -- what is the 10-K? Could
8  you look at -- pull out Exhibit 3, please, which is the
9  10-K.
10     A. Where is it? Yeah.
11     Q. And could you turn -- if you look at the
12 numbers in the upper right-hand corner -- could you
13 turn to page 56.
14     A. Okay.
15     Q. Okay. Down at the bottom there is a heading
16 that says --
17     A. Sorry about that.
18     Q. That is all right.
19        Says "employment contracts," correct?
20     A. Yep.
21     Q. And it starts with you, right?
22     A. Yes.
23     Q. It says, "In May of 2003 we are entering into
24 an employment and noncompetition agreement with our
25 Chairman and Chief Executive Officer, S. Leslie Flegel,

**172**

1  providing for his continued service in that position
2  until January 31, 2006"; correct?
3      A. Yep.
4      Q. So at the time the merger closed, you were
5  still under contract with the company until January,
6  31st, 2006, almost a full year later; right?
7      A. Yep.
8      Q. Under that contract it goes on to say:
9         "Mr. Flegel, received base compensation of
10 $535,000 subject to annual adjustment at the discretion
11 of the compensation committee of the board"; correct?
12     A. Correct.
13     Q. The agreement also provides for, "The award of
14 two cash incentives. The first entitles Mr. Flegel to
15 receive a bonus of up to 50 percent of his base
16 compensation, depending on the degree to which we
17 achieve our projected consolidated net income"; right?
18     A. Right.
19     Q. And so that is a bonus for if you meet your
20 projections?
21     A. Correct.
22     Q. Okay. The second permits, "The compensation
23 committee to award to Mr. Flegel a discretionary bonus
24 of up to 50 percent of his base compensation, depending
25 on such factors as the committee determines to be

**173**

1  relevant"; right?
2      A. Yes.
3      Q. So under that one, under your old contract,
4  which was in place while you were negotiating this
5  deal, the maximum bonus you could get from the
6  compensation committee for this other factors they
7  would deem relevant was $267,500, right, half of your
8  base salary?
9      A. No. I could have gotten five hundred
10 thirty-five thousand, 50 percent of the salary, on the
11 basis of meeting compliance of the objectives, and 50
12 percent -- another 50 percent on discretionary bonus.
13     Q. Right. But the bonus you got for doing the
14 merger, as you just said, doing the deal, that wasn't
15 based on meeting projections of income, was it?
16     A. No. That was based on bringing the deal to
17 conclusion --
18     Q. Right.
19     A. -- and for signing a new, long-term commitment
20 to the company unrelated to this.
21        But they could have exceeded. All this means
22 is that I was entitled to by contract, they could have
23 exceeded that at their own discretion.
24     Q. They could have just gone over what you had in
25 your contract?

**174**

1    A. Absolutely, they could do it.
2    Q. So why did you bother signing a new employment
3 contract?
4    A. Why did I?
5    Q. Yeah.
6    A. Because this contract was coming to an end.
7    Q. Well, it wasn't coming to an end for another
8 year.
9    A. Yeah, but that is coming to an end, when
10 you're 68 years old -- 67 years old.
11   Q. Well, isn't it a fact, isn't it a fact that
12 the employment contract, the new employment contract
13 was signed so that you could get a variety of
14 additional incentives and bonuses and monies because of
15 this merger?
16   A. Listen, okay, I am 67 -- as of now -- I am 68
17 and a half years old. I was going to have to commit
18 another five years of my life to making all of this
19 happen and consolidating all that.
20       I negotiated a deal with my company for
21 purposes of having spent probably the last five good
22 years of my life doing this, which is what they asked
23 me to do. So that's why I negotiated this contract.
24 Because for another year, I wasn't going to do this and
25 then be out in the cold. There were other things I

**175**

1 could do, other things I would do now.
2       If somebody in the current situation comes in
3 and buys this company, and it is not to my liking who
4 it is, I can't stop it -- but if they do that, it
5 doesn't mean I have to go with it.
6       So, therefore, I wanted the protection of, if
7 they wanted me to stay another five years, which
8 everyone included wanted me to stay. Then I did it the
9 good, old-fashioned American way, I negotiated a new
10 deal. That is what I did. If that is a crime, I am
11 sorry.
12   Q. I thought you negotiated this Alliance merger,
13 because under your duty as CEO, you were supposed to do
14 what was best for the company and the shareholders.
15   A. I did.
16       MR. STERN: Object to the form of the
17   question.
18       THE WITNESS: I did negotiate on what was the
19   best for the shareholders. That doesn't mean I
20   have to stay with the company.
21 BY MR. MILLER:
22   Q. True. But the bonus you got, the seven
23 hundred fifty thousand dollar bonus, wasn't for staying
24 with the company, that was for doing the merger. That
25 is what the 10-K and the F-4 said.

**176**

1    A. That was for doing the merger, because we
2 didn't hire an investment banker. Despite what the
3 thing about Jefferies says, we negotiated the deal. We
4 did all the due diligence on the deal. We did all the
5 work, and worked around the clock to do the deal. And
6 my board -- and we saved the company millions.
7       We paid Jefferies $600,000 for their opinion
8 letter. That is unheard of in a deal like this. And
9 that's because I felt we saved the company millions of
10 dollars and the board did, by our doing all the work
11 ourselves, and that was what that money was paid for.
12   Q. And the new employment contract that you got
13 also provides for a variety of other, additional monies
14 to you or potential monies to you; correct?
15   A. It was a new contract, yes.
16   Q. So your salary went up from a $535,000 base
17 salary to $915,000 base salary; is that right?
18   A. That is correct.
19   Q. And you have got a short-term incentive that
20 could be worth $1.8 million per year for five years;
21 correct?
22   A. Only if I hit extraordinary goals.
23   Q. And you could get up to 35 percent of the
24 challenge, um, grant, which could total over half a
25 million dollars; correct, to you?

**177**

1    A. Um, yes.
2       MR. STERN: Object to the form of the
3   question.
4 BY MR. MILLER:
5    Q. And you also got a consulting agreement for
6 after you leave the company, for five years, at over
7 $400,000 a year; correct?
8    A. Yep.
9    Q. All right. So that all adds up to a potential
10 of $20 million to you, correct?
11   A. All in, I guess that's about right.
12   Q. All right.
13   A. If we hit the challenge grant, which is a huge
14 if -- because it's unlikely, I think, that we will --
15 but if we do, yes.
16   Q. And did I understand you to say a few minutes
17 ago that one of the reasons that you feel that you were
18 entitled to the seven hundred fifty thousand dollar
19 bonus for the merger, was because you acted as the
20 investment banker instead of the Jefferies Company?
21       MR. STERN: Object to the form of the
22   question.
23       THE WITNESS: We -- from our perspective --
24   first of all, my board awarded that to us, because
25   they were delighted, and they thought I did a good

**Page 178**

1  job, because of the fact that we got a company
2  that made substantially more EBITDA than we did
3  for an equal number of shares, and so they
4  rewarded me for that.
5  BY MR. MILLER:
6  Q. Just for the record, what is EBITDA?
7  A. Earnings before interest, taxes, depreciation,
8  and amortization.
9  Q. Okay, go ahead.
10  A. And they thought I did a very good job in
11  negotiating and bringing this deal to fruition. Made
12  us a much bigger company, gave us much more wherewithal
13  financially; and it was in a way a reward for bringing
14  a company through some tough times that we had, and
15  turning around another company -- which I never really
16  got rewarded for doing.
17  And so my board came to me and said that they
18  felt that I was entitled to this, and that the company,
19  and that I wanted more to, in fact, even suggested that
20  more go to the other management team. And my board
21  wanted me to get that particular portion of it, and so
22  that is what happened.
23  And I am not ashamed of it. I think it was a
24  good job, and a great deal for the company and my
25  shareholders, and it's going to result in tremendous, I

**Page 179**

1  hope, in great advancement on behalf of my shareholders
2  in terms of what they ultimately get out of this deal.
3  Q. So did the board come to you with these
4  figures and this offer?
5  A. I don't remember exactly. I think it was a
6  combination of events that took place and the
7  discussions, and I don't remember exactly who came to
8  who. I don't remember.
9  Q. Okay. It is not a situation where they just
10  simply offered you the numbers and you --
11  A. I just don't remember.
12  Q. Let me finish my question, and I didn't pause
13  that time.
14  A. Okay.
15  Q. It's not a situation where they just came to
16  you with the numbers, and you said okay?
17  A. I don't think anything is quite that defined
18  or that clear, but they did feel we did a great job,
19  and we talked about it.
20  And, by the way, in terms of the compensation
21  plan, we hired a very, very respected outside company
22  that dictated, um, all terms of this, including the
23  million and a half dollar payment, a company called
24  Clark Consulting, a New York Stock Exchange Company,
25  it's one of the most respected firms that does this

**Page 180**

1  kind of compensation planning. They did an exhaustive
2  study of what people make who run companies of this
3  magnitude, what founders make, what kind of deals
4  founders get.
5  And I did not have a retirement plan. And
6  this, in effect, was a kind of a way -- the deal we
7  made -- was kind of a way of getting me a retirement
8  plan, because at my age, it would have been way too
9  expensive to fund one.
10  THE VIDEOGRAPHER: We are down to four
11  minutes. Going off the record. The time is 3:00
12  p.m.
13  (A short break was held.)
14  THE VIDEOGRAPHER: Back on the record. The
15  time is 3:04 p.m.
16  BY MR. MILLER:
17  Q. Mr. Flegel, did other people at Source receive
18  bonuses as a result of this merger?
19  A. Um, yes, other people, I don't know that we
20  refer to them as bonuses, but they received a fee for
21  it. And, again, it was all in reference to, um, hiring
22  this very reputable firm, who agreed it was a proper
23  thing to do.
24  Q. Okay. Could you -- I think you said it might
25  not be referred to as bonuses. Can you look at page

**Page 181**

1  53, if you look in the upper right-hand corner of
2  Exhibit 3. If you look at page 53 of 21, or 200 and
3  whatever.
4  A. I don't want to screw this up. Exhibit 3,
5  what do you want me to look for?
6  Q. Page 53, if you look in the upper right-hand
7  corner, the number, page 53.
8  A. Okay, yeah.
9  Q. Okay. There is a chart there at the top;
10  correct?
11  A. Right.
12  Q. And that shows salaries and bonuses for fiscal
13  years 2006, 2005, and 2004; correct?
14  A. Right.
15  Q. All right. And yours is listed there;
16  correct?
17  A. I am saying --
18  Q. Your numbers are listed there?
19  A. Yeah, they are.
20  Q. And Mr. Gillis; correct?
21  A. Right.
22  Q. Mr. Tuchman?
23  A. Yes.
24  Q. Mr. Flegel, well, Mr. Jason Flegel?
25  A. Yes.

Page 182

1    Q. And Mr. Fierman; correct?
2    A. Right.
3    Q. All right. And you will notice that in the
4    bonus column there is a smaller B in parentheses;
5    correct?
6    A. Yes.
7    Q. All right. And that refers down to the
8    paragraph below that starts with the small letter B;
9    correct?
10   A. Right.
11   Q. And that says -- that paragraph says, "Bonus
12   compensation is paid by the company in the year
13   subsequent to the executive performance to which it
14   relates"; correct?
15   A. Right.
16   Q. And then it says:
17      "Amounts reported reflect amounts actually
18   paid by the company in the year indicated, and include
19   special bonuses of $750,000 for Mr. S. Leslie Flegel,
20   $300,000 for Mr. Gillis, one million three hundred
21   thousand dollars for Mr. Tuchman, $125,000 for Mr.
22   Jason Flegel and $135,000 for Mr. Fierman, associated
23   with the consummation of the merger with Alliance;
24   correct?
25   A. Correct.

Page 183

1    Q. So these are bonuses we are talking about;
2    right?
3    A. They are classified as bonuses, I guess.
4    Q. And they deal with -- as they say, they are
5    associated with the consummation of the merger with
6    Alliance; correct?
7    A. Not all that bonus was, a portion of it was.
8    Q. Well, why doesn't it say that in your 10-K?
9    A. I don't know why it doesn't say that; but
10   obviously, if I got a -- if I received one point --
11   what does it say I received?
12   Q. Seven hundred fifty thousand.
13   A. Oh, the seven hundred fifty was relevant.
14   Q. That is what I am talking about.
15   A. I thought you were talking about -- look, it
16   says up there one million four twenty-five.
17   Q. I am only talking about the seven hundred
18   fifty thousand.
19   A. Oh, then I agree with you.
20   Q. All right. And why did Mr. Gillis earn a
21   three hundred thousand dollar bonus as a result of the
22   merger?
23   A. Because of his participation in the, um,
24   events.
25   Q. Such as what?

Page 184

1    A. He attended meetings, he was present during
2    the presentations to Yucaipa. He played a role. He
3    was president and chief operating officer of the
4    company.
5    Q. How many meetings did he attend?
6    A. I don't remember.
7    Q. How many presentations -- did he make any
8    presentations?
9    A. Yeah, he was always, he was there for
10   presentations. He was there at the original dinner
11   with Erika and Tony. He played a role.
12   Q. How many other meetings was he at?
13   A. I don't know.
14   Q. That is not many meetings for $300,000.
15   A. I don't know how many meetings.
16      MR. STERN: Object to the form of the
17   question.
18   BY MR. MILLER:
19   Q. What about Mr. Tuchman? What did he do to get
20   the 1.3 million?
21   A. I didn't determine that. That was determined
22   on the Yucaipa portion of the deal.
23   Q. He came over from Yucaipa?
24   A. He didn't worked for Yucaipa, he ran Alliance.
25   He didn't work for me until the merger was closed.

Page 185

1    Q. What about Mr. Jason Flegel, what did he do to
2    the merger to earn a one hundred twenty-five thousand
3    dollar bonus?
4    A. He did a degree of the modeling, and he also
5    did a very involved analysis on the synergies involved
6    in the deal.
7    Q. A degree of demodeling -- is that what you
8    said?
9    A. He did the modeling --
10   Q. Oh, the modeling.
11   A. -- to determine the synergies in the deal. He
12   is very adept at that.
13   Q. What does that mean, determine the synergies
14   in the deal?
15   A. In the process of a deal like this, and every
16   deal we do, we do an analysis of what kind of
17   cost-saving synergies there are by bringing these
18   companies together.
19   Q. Uh-hmn. Mr. Jason Flegel reports to, his
20   direct report is to Mr. Gillis; correct?
21   A. That is correct.
22   Q. Are you aware that Mr. Gillis said he was not
23   aware of Mr. Jason Flegel doing anything regarding the
24   merger?
25   A. No, I don't -- I cannot imagine that he said

**186**

1  that. But if he said that, he said it. I have no
2  reason -- that's just not true that he didn't do
3  anything.
4      Q. What did Mr. Fierman do to earn a thirty-five
5  thousand bonus in association with the Alliance deal?
6      A. Mr. Fierman is the Chief Financial Officer of
7  the company.
8      Q. Yeah.
9      A. And he did a lot of due diligence on
10 accounting procedures, 404 compliance procedures,
11 examination of the books, the things that a good old
12 CFO does.
13     Q. Part of his job as CFO, isn't it?
14     A. Yeah.
15     Q. Okay. But he gets over a hundred thousand
16 dollar bonus for doing something that is his job?
17     A. He got a hundred --
18        MR. STERN: Object to the form of the
19 question.
20        THE WITNESS: Should I answer that question?
21        MR. STERN: Yes.
22        THE WITNESS: I can't hear what you are
23 saying. So that is why I ask that question.
24        He got the bonus for his participation in
25 making this deal, in helping make this deal

**187**

1  happen.
2  BY MR. MILLER:
3      Q. Did any other individuals, other than the ones
4  who are listed in this K 10, Exhibit 4 -- Exhibit 3,
5  any other individuals at Source earn or receive bonuses
6  as a result of the Alliance merger?
7      A. Yes. Some of the other, um, due diligence
8  people did.
9      Q. Such as who?
10     A. John Bode received a bonus.
11     Q. How much did he get?
12     A. I don't recall exactly.
13     Q. How do you spell his last name?
14     A. B-O-D-E.
15     Q. Who else?
16     A. Doug Bates.
17     Q. How much did he get?
18     A. I think a hundred some odd thousand dollars.
19 I don't remember, I just don't. It's a couple years
20 ago. I don't remember exactly who got what.
21     Q. Who else?
22     A. I think Mark Humphries (Phonetic spelling) got
23 some money. He is a comptroller of the company.
24        These guys worked day and night.
25     Q. Who else?

**188**

1      A. I don't know that anyone else did on the
2  Source side.
3      Q. Okay. Have you discussed this lawsuit with
4  Mr. Emanuel?
5      A. Um, Mr. Emanuel is aware of this lawsuit.
6      Q. How do you know that?
7      A. Because we have talked about it.
8      Q. All right. When did you talk with him about
9  it?
10     A. I don't remember -- I haven't talked to him
11 recently about it.
12     Q. How many times have you talked to him about
13 it?
14     A. I don't remember, I don't know.
15     Q. What did you talk with him about?
16     A. Just the fact that it was -- that John had
17 filed a lawsuit, and um, saying that he was entitled to
18 whatever his claims were in the agreement.
19     Q. What else did you tell Mr. Emanuel?
20     A. I don't remember. I haven't talked to him for
21 quite a while about it.
22     Q. About how long?
23     A. Months.
24     Q. What did Mr. Emanuel tell you?
25     A. Sorry?

**189**

1      Q. What did Mr. Emanuel tell you in this
2  conversation?
3      A. He didn't believe that Mr. Ledecky played any
4  role in this deal.
5      Q. Which deal is that?
6      A. The Alliance deal.
7      Q. What else did he say?
8      A. I don't recall. We did not have an extensive
9  discussion about it.
10     Q. Okay. Have you talked with anybody else at
11 Endeavor regarding this lawsuit?
12     A. I, personally, have not.
13     Q. Is that, by the way, as far as your
14 conversations with Mr. Emanuel regarding this lawsuit,
15 is that the only conversation you have any recollection
16 of, the one you just referred to?
17     A. I have talked to him on a couple of occasions
18 about it, going back months ago. But I couldn't tell
19 you, specifically, what we talked about. It was very
20 brief, and he might have asked me about it one time
21 and -- but I must have talked to him 25 times since
22 then without the subject ever coming up.
23     Q. Okay. Have you talked with anyone from the
24 former Alliance company about this lawsuit?
25     A. I, personally, have not, other than the people