# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JONATHAN LEDECKY d/b/a<br>IRONBOUND PARTNERS,<br><br>*Plaintiff*,<br><br>v.<br><br>SOURCE INTERLINK COMPANIES, INC.,<br><br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:05CV01039 (JGP)<br>)<br>)<br>)<br>)<br>) |

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Source moves for summary judgment on the ground that it did not have a "business relationship" with Endeavor. Source's assertions are belied by the record. As discussed more fully below, the record shows that:

- Mr. Ledecky introduced Source to The Endeavor Agency, LLC ("Endeavor"). (Ex. A, Def.'s Resp. to Pl.'s First Reqs. for Admis., No. 5).

- Source accepted that introduction and took part in business meetings and discussions with Endeavor, including business meetings and discussions facilitated by one of Endeavor's founding members, Ariel Emanuel ("Mr. Emanuel"). (Ex. B, Flegel Dep., 5/4/06, at 65:9-67:5, 79:16-80:12, 82:1-22, 91:1-94:5, 123:1-14, 126:17-127:7; Ex. C, Bates Dep., 5/5/06, at 61:17-62:24; Ex. D, Amendment No. 1 to Form S-4 Registration Statement filed by Source on January 18, 2005 ("S-4"), at IB 00058; Ex. E, Emanuel Dep., 5/18/06, at 35:8-37:1, 68:4-69:3, 70:18-71:8).

- Source and Endeavor entered into a written non-disclosure agreement which governs their exchange of confidential information, exploration of a business relationship, and their ongoing business relationship. (Ex. F, Mutual Non-Disclosure Agreement; Ex A, No. 19).

- Source's SEC filings expressly state that Mr. Emanuel, a principal of Endeavor, provided consulting services to Source in connection with its merger with Alliance Entertainment Corporation ("Alliance"). (Ex. D at IB 00032).

- Endeavor sent Source an invoice for $1.5 million for consulting services rendered in connection with the Alliance merger. (Ex. G, Invoice from Endeavor to Source; Ex. A, Nos. 25-28).

- Source paid Endeavor $1.5 million for consulting services. (Ex. A, Nos. 25-28).

- Source appointed Mr. Emanuel, Endeavor's founder, to its Board of Directors (Mr. Emanuel was Source's primary contact at Endeavor). (Ex. A, No. 29; Ex. H, Press Release (Nov. 18, 2004); Ex. B, Flegel Dep., 5/4/06, at 19:16-20:2; Ex. C, Bates Dep., 5/5/06, at 88:10-17).

- Source and Endeavor discussed other business dealings in addition to the consulting services rendered in connection with the Alliance merger. (Ex. B, Flegel Dep., 5/4/06, at 146:24-151:25, 153:13-24, 154:16-23; Ex. C, Bates Dep., 5/5/06, at 118:1-22, 124:9-125:5).

Notwithstanding these facts, Source seeks summary judgment on the ground that it did not have a business relationship with Endeavor. In support of its position, Source erroneously says it has no written agreement with Endeavor and, thus, the dealings between the companies should be characterized as something other than a "business relationship." Even if true, which it is not, this

- 2 -

would not enable Source to avoid its obligations under the Referral Agreement. As discussed more fully below, Source's motion is both factually and legally incorrect and should, therefore, be denied.

## STATEMENT OF MATERIAL FACTS

1. On or about April 27, 2006, Mr. Ledecky and Source entered into a Referral Agreement, pursuant to which Mr. Ledecky agreed to introduce Source to a Client, and Source agreed to pay Mr. Ledecky 5% of the net income earned by Source as a result of any business relationship with that Client for a five-year period. (Ex. I, Referral Agreement, Sections 1 and 2; Ex. J, Ledecky Dep., 3/29/06, at 131:20-133:20).

2. After the execution of the Referral Agreement, Mr. Ledecky introduced Source to the Client, Endeavor. (Ex. A, No. 5; Ex. J, Ledecky Dep., 3/29/06, at 135:17-136:7). The introduction took place during a conference call arranged by Mr. Ledecky and attended by Mr. Emanuel, Mr. Ledecky, S. Leslie Flegel ("Mr. Flegel"), the Chairman and CEO of Source, and James Gillis ("Mr. Gillis"), President of Source. (Ex. A, No. 7; Ex. D at IB 00058; Ex. B, Flegel Dep., 5/4/06, at 65:9-67:5; Ex. K, Gillis Dep., 5/3/06, at 91:17-25). Source had no relationship with Endeavor or Mr. Emanuel prior to that introduction. (Ex. A, Nos. 8, 12; Ex. B, Flegel Dep., 5/4/06, at 66:18-67:5).

3. Source also entered into a written Non-Disclosure Agreement with Endeavor. (Ex. F; Ex. A, No. 19). That agreement was signed on April 27, 2004, the same day that Mr. Ledecky introduced Source to Mr. Emanuel. (Ex. J, Ledecky Dep., 3/29/06, at 134:6-136:12). The agreement states that it was entered into "in connection with exploring and evaluating a possible

business relationship (the 'Relationship') and for the purposes of the ongoing Relationship." (Ex. F at 1).

4. Following Mr. Ledecky's introduction of Source to Endeavor, Mr. Emanuel participated in a number of business meetings and discussions with Source. (Ex. B, Flegel Dep., 5/4/06, at 65:9-67:5, 91:1-94:5, 123:1-14; Ex. C, Bates Dep., 5/5/06, at 61:17-62:24; Ex. D at IB 00058; Ex. E, Emanuel Dep., 5/18/06 at 35:8-37:1, 68:4-69:3, 70:18-71:3). For example, in May of 2004, Mr. Emanuel and Modi Wiczyk, another representative of Endeavor, met with Mr. Flegel, Mr. Gillis, and Jason Flegel in New York City and discussed opportunities for Source to enter the home entertainment content market through the distribution of CDs and DVDs at checkout counters, as well as the possibility of taking the company private. (Ex. B, Flegel Dep. 5/4/06 at 79:16-80:12, 82:1-22, 84:11-21; Ex. E, Emanuel Dep., 5/18/06, at 35:8-37:1).

5. Subsequently, Messrs. Flegel and Gillis traveled to Los Angeles for a business meeting at Endeavor's offices. During the business meeting, Mr. Emanuel introduced Messrs. Flegel and Gillis to Ms. Erika Paulson, a director of Alliance and a partner with The Yucaipa Companies, LLC ("Yucaipa"), an affiliate of Alliance's controlling stockholder. (Ex. A, No. 15; Ex. D at IB 00058; Ex. B, Flegel Dep., 5/4/06, at 91:1-92:2, 94:12-24). After the introduction, Ms. Paulson discussed the possibility of a merger between Source and Alliance. (Ex. B, Flegel Dep., 5/4/06, at 91:1-94:5).

6. Following that meeting, Mr. Emanuel took part in telephone calls and other meetings relating to the negotiation of the merger between Source and Alliance. (Ex. B, Flegel Dep., 5/4/06, at 123:1-23, 126:17-127:7, Ex. E, Emanuel Dep., 5/18/06 at 68:4-69:3, 70:18-71:3). When merger discussions between Source and Alliance broke down, Mr. Emanuel

- 4 -

communicated with both Mr. Flegel and representatives of Alliance in order to convince the parties to resume discussions. (Ex. E, Emanuel Dep., 5/18/06 at 70:18-71:8).

7. In addition to discussions and meetings relating to the Alliance merger, Source and Endeavor also discussed the possibility of entering into other written agreements in addition to the Non-Disclosure Agreement, and they exchanged proposed drafts of such an agreement. (Ex. B, Flegel Dep., 5/4/06, at 146:24-151:25; Ex. C, Bates Dep., 5/5/06, at 118:1-22, 124:9-125:5). Endeavor also set up meetings between Source and individuals in the entertainment industry and the licensing business. (Ex. B, Flegel Dep., 5/4/06, at 153:13-24, 154:16-23).

8. Prior to the merger with Alliance, Source placed Mr. Emanuel on its Board of Directors. (Ex. A, No. 29; Ex. H, Press Release (Nov. 18, 2004); Ex. B, Flegel Dep., 5/4/06, at 19:16-20:2; Ex. C, Bates Dep., 5/5/06, at 88:10-17). When Source sent a proxy statement to its shareholders recommending that the merger be approved, it informed those shareholders that Mr. Emanuel would be paid $1.5 million for consulting services provided to Source in connection with the merger. (Ex. D at IB 00032). Source has admitted that the $1.5 million fee was paid by Source to Endeavor as a "consultant fee" for "services rendered by Emanuel on Endeavor's behalf in connection with the Alliance merger." (Ex. A, Nos. 25-28; *see also* Ex. G).

9. Both before and after the merger, Source's officers admitted that Source owed Mr. Ledecky compensation in connection with the merger. (Ex. J, Ledecky Dep., 3/29/06, at 259:2-262:9, 263:9-264:19; Ex. B, Flegel Dep., 5/4/06, at 165:6-166:16). Prior to the merger, Mr. Gillis, Source's President, told Mr. Ledecky that, when the transaction was completed, Mr. Ledecky could expect compensation "in the millions," and Mr. Flegel, Source's Chairman and CEO, admitted to Source's financial advisor, that, if the merger went through, Mr. Ledecky would be owed "millions of dollars." (Ex. J, Ledecky Dep., 3/29/06, at 259:2-262:9; *see also*

Ex. B, Flegel Dep., 5/4/06, at 164:9-165:5). The day after the Alliance merger closed, Mr. Flegel sent Mr. Ledecky an e-mail stating that Mr. Ledecky was "the one who got this started." (Ex. L, E-mail of 3/1/05 from L. Flegel to J. Ledecky; Ex. B, Flegel Dep., 5/4/06, at 162:10-164:4). Even after Mr. Ledecky demanded compensation under the Agreement, Mr. Flegel admitted to Mr. Ledecky that Source owed him "something" for his role in bringing about the merger, although he disagreed as to how much. (Ex. J, Ledecky Dep., 3/29/06, at 263:9-264:19; *see also* Ex. B, Flegel Dep., 5/4/06, at 165:6-166:16).

## ARGUMENT

I.   Summary Judgment Standard

Summary judgment is proper only when "there is no genuine issue as to any material fact and . . . the moving party is entered is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *White v. Fraternal Order of Police*, 909 F.2d 512, 516 (D.C. Cir. 1990); *Alyeska Pipeline Serv. Co. v. U.S. Envtl. Prot. Agency*, 856 F.2d 309, 313 (D.C. Cir. 1988). Summary judgment will not lie "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *See also Gilvin v. Fire*, 259 F.3d 749, 756 (D.C. Cir. 2001) ("[a] dispute about a material fact is 'genuine' if a reasonable jury, drawing all reasonable inferences in [the nonmovant's] favor, could return a verdict against the [movant]"). Furthermore, the nonmoving party is not required to resolve issues of fact conclusively in his favor to avoid summary judgment. "'[A]ll that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Anderson*, 477 U.S. at 248-49 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

Finally, a court should not make credibility determinations or weigh the evidence when ruling on a motion for summary judgment. Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *Robinson-Smith v. Gov't Employees Ins. Co.*, 323 F. Supp. 2d 12, 17 (D.D.C. 2004) (quoting *Anderson*, 477 U.S. at 255).

In this case, discovery has produced more than sufficient evidence to permit a reasonable jury to return a verdict for Mr. Ledecky. Both documentary evidence and deposition testimony have revealed that, following Mr. Ledecky's introduction, Source and Endeavor entered into a business relationship, evidenced by a written Non-Disclosure Agreement and confirmed by Source's own public filings. (Statement of Material Facts ("SMF"), *supra*, at ¶¶ 2-8). The business relationship resulted in the introduction of Source to Alliance and led to a merger that produced substantial net income to Source and a $1.5 million fee for Endeavor. (SMF at ¶¶ 5, 8; Ex. B, Flegel Dep., 5/4/06, at 193:12-194:4). Although Mr. Ledecky believes that these facts firmly establish that he is entitled to compensation under the Referral Agreement, at the very least, there is a genuine dispute over these material facts which renders summary judgment inappropriate.

II.     Contrary to Source's Assertions, the Conditions Precedent to
        Plaintiff's Recovery Under the Referral Agreement Have Been Satisfied.

As discussed above, Mr. Ledecky fulfilled his obligations under the Referral Agreement by introducing Source to Endeavor. (SMF at ¶¶ 1-2). Following that introduction, Source and Endeavor entered into a business relationship (SMF at ¶¶ 2-8), evidenced by a written Non-Disclosure Agreement (SMF at ¶ 3), that has resulted in substantial net income to Source. (Ex.

- 7 -

B, Flegel Dep., 5/4/06, at 193:12-194:4). Thus, every condition precedent to Mr. Ledecky's recovery under the Referral Agreement has been fulfilled and he is entitled to compensation.

  A. There Is Substantial Evidence That Source and Endeavor Entered Into a Business Relationship.

The material facts show that, under any reasonable interpretation of the term "business relationship," a business relationship was established between Source and Endeavor. As discussed above, Source and Endeavor entered into a written Non-Disclosure Agreement (SMF at ¶ 3), following which Mr. Emanuel introduced Source to Alliance. (SMF at ¶ 5). Business meetings and discussions took place between Source and Endeavor's representatives regarding both the Alliance merger and other business opportunities. (SMF at ¶¶ 4-7). Ultimately, Mr. Emanuel, a founding member of Endeavor, was appointed to Source's Board of Directors, and Endeavor was paid $1.5 million by Source for consulting services rendered in connection with the merger. (SMF at ¶ 8). There can be no reasonable dispute that these facts establish the existence of a business relationship between Source and Endeavor. At the very least, they are substantial evidence of a business relationship, creating a genuine issue of material fact that precludes summary judgment.

Source attempts to ignore the facts in claiming that its relationship with Endeavor was something other than a business relationship. Never mind that Source was introduced to Endeavor's Emanuel during a conference call set up by Mr. Ledecky, the purpose of which was to discuss *business* opportunities for Source; never mind that Source entered into a Non-Disclosure Agreement with Endeavor to govern their *business* relationship; never mind that Source attended *business* meetings with Endeavor's representatives, including Mr. Emanuel; never mind that Source's representatives corresponded with Mr. Emanuel and others at Endeavor regarding *business* matters; never mind that Source was introduced to Alliance by Mr. Emanuel

- 8 -

during a *business* meeting at Endeavor's offices; never mind that Mr. Emanuel continued to correspond with Source and with Alliance regarding the merger negotiations; never mind that Mr. Emanuel was placed on Source's Board of Directors prior to the merger with Alliance; and never mind that Source's own SEC filings state that Endeavor was paid $1.5 million by Source for services rendered to Source by Mr. Emanuel in connection with the merger. Notwithstanding all these uncontested facts, Source now makes the incredible claim that it did not have a business relationship with Endeavor. (Source Mem. of P. & A. at 8).

In an attempt to narrow the meaning of the term "business relationship" in order to justify its denial that such a relationship existed between it and Endeavor, Source cites a handful of inapposite cases involving actions for tortious interference with business relationships. (Source Mem. of P. & A. at 9). Those cases dealt with the question of whether the plaintiffs could recover damages based on alleged future business that was lost due to the defendants' interference. *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 815 (Fla. 1995); *St. Johns River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*, 784 So.2d 500, 505-06 (Fla. Dist. Ct. App. 2001); *Thunderwave Inc. v. Carnival Corp.*, 954 F.Supp. 1562, 1566-67 (S.D. Fla. 1997). The plaintiffs in those cases were denied recovery because they had failed to prove, beyond mere speculation, that future business would have resulted absent the defendants' interference. *Ethan Allen, Inc.*, 647 So. 2d at 815 (holding that the plaintiff could not recover damages, in a tortious interference with business relationship case, where the relationship was based on speculation regarding future sales to past customers); *St. Johns River Water Mgmt. Dist.*, 784 So.2d at 505-06 (holding that the defendant was entitled to a directed verdict where there was no evidence that the plaintiff's contract with the city of Daytona Beach would have gone forward absent the defendant's interference); *Thunderwave Inc.*, 954 F. Supp. at 1566-67

(holding that the plaintiff could not recover in a tortious interference with business relationship action where it had not alleged any identifiable agreement with any identifiable customer, instead relying on mere "hopeful projections").

The holdings of those cases do not apply to the instant case, which is not an action for tortious interference with a prospective business relationship, and in which there is no need to speculate as to whether Source and Endeavor would have entered into a business relationship in the future that would have yielded income to Source. Those events have already occurred, and the facts show that Source and Endeavor entered into a business relationship that led to the largest merger in Source's history. To the extent, then, that Source attempts to use cases involving tortious interference with prospective business relationships to narrow the definition of "business relationship," as that term is used in the Referral Agreement, its reliance on those cases is misplaced.

Moreover, in contrast with Source's position that the term "business relationship" was meant to be narrow, Source's General Counsel, Doug Bates, testified in his deposition that the meaning of the term "business relationship," as used in the Referral Agreement, was left vague by the parties because they did not know what form the relationship between Source and Endeavor would take and "there was no restriction on, um, particularly on the form that that would take." (Ex. C, Bates Dep., 5/5/06, at 40:20-41:18). Mr. Ledecky also testified that his intention was to be compensated regardless of the type of enterprise that resulted from the relationship between Source and Endeavor, stating that "[b]ecause it was such a broad-based discussion with Endeavor, I wanted to try to maintain fluidity in the agreement," and "I was trying to protect myself by having a somewhat global agreement so that whatever came out of those relationships, I would be compensated." (Ex. J, Ledecky Dep., 3/29/06, at 57:1-12, 79:12-

80:7). In light of the fact that the parties intended the term "business relationship" to cover any possible relationship between Source and Endeavor, Source's argument that the term should be narrowly defined for the purposes of summary judgment is unfounded.

In a footnote to its opening brief, Source cites a portion of Mr. Emanuel's deposition in which he stated that he had a business relationship with Ron Burkle, Yucaipa's principal and Alliance's controlling shareholder. (Source Mem. of P. & A. at 11 n.6). In a later footnote, Source claims that Mr. Emanuel was paid $1.5 million for consulting services rendered to Alliance, not Source. (Source Mem. of P. & A. at 12 n.7). However, the fact that Mr. Emanuel had a business relationship with Mr. Burkle does not preclude Endeavor and Mr. Emanuel from having a business relationship with Source as well. Moreover, during his deposition, Mr. Emanuel admitted that he signed a questionnaire sent to him by Source's General Counsel for the purpose of preparing documents to be filed by Source with the SEC. (Ex. E, Emanuel Dep., 5/18/06, at 77:6-81:4). That questionnaire stated that Mr. Emanuel served as a consultant to *Source*, and Mr. Emanuel admitted that the questionnaire was accurate. (Ex. E, Emanuel Dep., 5/18/06, at 77:6-82:7). Indeed, in one of Source's own SEC filings, Source itself stated that Mr. Emanuel was paid for consulting services rendered to *Source*, (Ex. D at IB 00032), and that Mr. Emanuel served as Source's advisor. (Ex. D at IB 00058). Source's President, Mr. Gillis, testified that Source's SEC filing was accurate (Ex. K, Gillis Dep., 5/3/06, at 177:7-8). In short, there is ample evidence, including documents signed by Mr. Emanuel and issued by Source, establishing that Source and Endeavor had a business relationship.

B.   Source and Endeavor Entered Into a Written Agreement.

Having accepted the benefit of Mr. Ledecky's introduction and having proceeded with a business relationship with Endeavor, Source now attempts to seize on any technicality it can find

- 11 -

to avoid its liability to Mr. Ledecky. Unable to deny the basic facts giving rise to an ongoing business relationship, Source seeks to avoid liability by arguing that it had no written agreement with Endeavor and, for that reason, it is not liable to Mr. Ledecky under the Referral Agreement. This argument is both factually and legally inaccurate.

The Referral Agreement states that Source's acceptance of its business relationship with Endeavor was to be "manifest only by execution of a written agreement between Source and [Endeavor]." (Ex. I at Section 1). As an initial matter, and regardless of how Source seeks to characterize that agreement, whether in its papers or in the agreement itself, the Non-Disclosure Agreement between Source and Endeavor is by definition a written agreement between the parties. This is evidenced by the fact that the agreement confers specific rights and liabilities on each party that are legally enforceable.

Moreover, the Referral Agreement does not specify that the written agreement contemplated by Section 1 must be of any particular type. In fact, Source's General Counsel admitted that there is no definition of "written agreement" in the Referral Agreement, and stated it "only . . . has to be a written agreement, um, which would be an on paper, language agreement between the two parties." (Ex. C, Bates Dep., 5/5/06, at 44:1-9). The evidence developed by Mr. Ledecky shows that Source and Endeavor entered into a written agreement evidencing their business relationship, thus satisfying the provision in the Referral Agreement. Nonetheless, Source attempts to explain this fact away.

Source and Endeavor executed the written Non-Disclosure Agreement "in connection with exploring and evaluating a possible business relationship (the 'Relationship') and for the purposes of the ongoing Relationship." (Ex. F at 1; SMF at ¶ 3). The Non-Disclosure Agreement delineates the rules under which Source and Endeavor could exchange business

information. (Ex. F). Mr. Emanuel himself testified that a Non-Disclosure Agreement was a common first step taken by Endeavor when it was entering into a business relationship with another company. (Ex. E, Emanuel Dep., 5/18/06, at 27:16-28:12. *See also* Ex. M, Paulson Dep., 5/17/06, at 48:8-17) (testifying that a confidentiality agreement is a "common agreement that's entered into between two companies that are entering into a business relationship"). The fact that the Non-Disclosure Agreement was entered into for the purpose of governing Source and Endeavor's ongoing relationship satisfies the Referral Agreement's written agreement provision.

Source argues that language inserted by Source into the Non-Disclosure Agreement disclaiming that a relationship had been established between Source and Endeavor precludes the Non-Disclosure Agreement from qualifying as the type of written agreement that was contemplated in the Referral Agreement. (Source Mem. of P. & A. at 10-11). In an attempt to place form over substance, Source is asking the Court to ignore the fact of the business relationship between Source and Endeavor, and instead rely solely on a disclaimer conveniently inserted into the Non-Disclosure Agreement in order to excuse Source from its obligations to Mr. Ledecky.

Source's argument that the Non-Disclosure Agreement is not a written agreement governing a business relationship is contrary to the terms of the agreement itself. By its terms, the Non-Disclosure Agreement not only governed the parties' initial business discussions, but their ongoing relationship as well. In so doing, the agreement confers specific legally enforceable rights and liabilities on each party, which relate to their continuing business relationship. In this respect, the Non-Disclosure Agreement serves as an executory contract governing the rights and obligations of Source and Endeavor with respect to future business

dealings. Source's effort to characterize the Non-Disclosure Agreement as something other than a written agreement governing a business relationship is an exercise of form over substance. Once Source accepted the introduction and decided to enter into discussions with Endeavor, this agreement governed their business relationship. To the extent Source and Endeavor discussed transactions, exchanged confidential information, and took part in meetings in which introductions were made, Source and Endeavor have a business relationship, and the Non-Disclosure Agreement governs that relationship.

Of course, Source's characterization of the Non-Disclosure Agreement is not dispositive in addressing the true nature of the relationship created thereunder. Indeed, Florida courts have specifically held that, where two parties have a relationship with each other, those parties' characterization of the nature of their relationship is not dispositive. In *Parker v. Domino's Pizza, Inc.*, 629 So.2d 1026 (Fla. Dist. Ct. App. 1994), the court considered the question of whether the defendant pizza company was liable for the acts of its franchisee. *Id.* 1026-27. It held that, although the franchise agreement between the parties stated that the franchisee was an independent contractor, *id.* at 1027, this did not establish the status of the parties' relationship as a matter of law. *Id.* at 1029. The court stated that "[i]t is clear that the nature and extent of the relationship of parties said to occupy the status of principal and agent presents a question of fact . . . and is not controlled by descriptive labels employed by the parties themselves." *Id.* at 1027 (citing *Holiday Inns, Inc. v. Shelburne*, 576 So.2d 322 (Fla. Dist. Ct. App. 1991); *Nazworth v. Swire Florida, Inc.*, 486 So.2d 637 (Fla. Dist. Ct. App. 1986)). *See also Singer v. Star*, 510 So.2d 637, 640 (Fla. Dist. Ct. App. 1987) (holding that "a statement in an agreement between parties that one is an independent contractor . . . is not dispositive of that issue" and "[a] jury may infer the existence of an agency even when both the principal and the agent deny it").