# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

_____
                              )
JONATHAN LEDECKY d/b/a        )    Case No. 1:05CV01039
IRONBOUND PARTNERS,           )
                              )
        Plaintiff,            )
                              )
vs.                           )
                              )
SOURCE INTERLINK COMPANIES,   )
INC.,                         )
                              )
        Defendant.            )
_____)

VIDEOTAPED DEPOSITION OF

JONATHAN J. LEDECKY

Washington, D.C.

Wednesday, March 29, 2006

Job No.:  1-74746
Pages 1 through 278
Reported by:  John L. Harmonson, RPR

Page 122

1      MR. SCHWARTZ: Objection.
2      THE WITNESS: I think I've answered the
3  question already.
4  EXAMINATION BY MR. STERN:
5      Q.  Okay.  Then explain to me one more
6  time, because I still don't understand.
7      A.  Okay.
8      Q.  Please explain how you can claim that
9  they have entered into a business relationship by
10  virtue of this document where it says in
11  Paragraph 6 here: "It is expressly understood and
12  agreed that neither party is bound by this
13  confidentiality agreement to establish a
14  relationship."
15      MR. SCHWARTZ: Objection; asked and
16  answered.
17      MR. STERN: I'm asking him again.
18  EXAMINATION BY MR. STERN:
19      Q.  Please answer the question.
20      THE WITNESS: Can you read the question
21  again, I'm sorry.  Can you read it back to me,
22  sir?

Page 123

1  (Whereupon, the record was read back by the
2  Reporter as follows:
3      QUESTION: Okay.  Then explain to me one
4  more time, because I still don't understand.
5      ANSWER: Okay.
6      QUESTION: Please explain how you can
7  claim that they have entered into a business
8  relationship by virtue of this document where
9  it says in Paragraph 6 here: "It is expressly
10  understood and agreed that neither party is
11  bound by this confidentiality agreement to
12  establish a relationship.")
13      THE WITNESS: So they sign this
14  document, and then they enter into a business
15  relationship.  A business relationship is having
16  meetings, exploring opportunities, and then doing
17  a transaction with each other or with third
18  parties.
19  EXAMINATION BY MR. STERN:
20      Q.  Okay.  But it says also in Paragraph 6:
21  "No contract or agreement with respect to the
22  relationship or any other transaction shall be

Page 124

1  deemed to exist between them unless and until a
2  definitive agreement has been executed and
3  delivered by the parties."
4      So you're still saying that even though
5  they don't have a definitive written agreement
6  between them, that they still, by virtue of this
7  contract, have a business relationship?
8      A.  Yes.
9      MR. SCHWARTZ: Objection.  Let me
10  object before you answer.
11      THE WITNESS: My answer would be yes.
12  EXAMINATION BY MR. STERN:
13      Q.  So it's your testimony that in the
14  context of this deal that we're talking about
15  here, by virtue of the fact that they were
16  introduced to each other, that they had a business
17  relationship?  Is that your testimony?
18      A.  In the world of commerce --
19      Q.  I'm not asking that.  I'm asking in the
20  context of this deal right here.
21      MR. SCHWARTZ: Answer the question how
22  you want to answer the question.

Page 125

1      THE WITNESS: Okay.  In the world of
2  commerce, when two parties get together and start
3  to have meetings and have sessions with each
4  other, they are, by nature, in a business
5  relationship.
6  EXAMINATION BY MR. STERN:
7      Q.  I'm asking in the context of this deal
8  here.
9      A.  I'm not an attorney.
10      Q.  I'm not asking as an attorney.  I'm
11  talking about your layman's understanding.
12      A.  And I've just given it to you, which my
13  layman's understanding is documents like this are
14  executed all the time and people enter into
15  business relationships off of these documents.
16  You wouldn't go through the problem of having this
17  document between parties unless you were going to
18  enter into a business relationship.  If you
19  weren't going to have a business relationship, why
20  would you sit down and take the time and effort
21  and spend the legal money to execute a
22  relationship between each other, which is what

32 (Pages 122 to 125)

Page 154

1  acquisition of Alliance, it probably wasn't
2  prudent to be putting a lot of things in e-mails
3  by the parties, so telephone calls were made.
4     Q.   Say that again. I'm sorry.
5     A.   Okay. So because Endeavor's activity
6  which I had referred to Source on ultimately
7  resulted in the acquisition of Alliance, during
8  that period of conversation that was going on,
9  those obviously were confidential conversations,
10  and Leslie Flegel made me a part of those
11  conversations. He directly engaged me and
12  included me in the fact that they were negotiating
13  with Alliance on an acquisition. He would ask my
14  advice on what I thought of the acquisition and
15  whether the acquisition was proper for Source, et
16  cetera. So I continued to do the job of my
17  referral agreement.
18     Q.   Okay. And I was just focusing on
19  whether those communications were by telephone or
20  by e-mail.
21     A.   Yes. Most of them were by telephone,
22  correct.

Page 155

1     Q.   All right. Let's look at the fourth
2  sentence.
3     A.   Which page, Kevin?
4     Q.   Page 1 of the agreement. "Source shall
5  have the unfettered discretion to accept or reject
6  any proposed business relationship with client
7  without liability to Ironbound." It says:
8  "Acceptance shall be manifest only by execution of
9  a written agreement between Source and the
10  client."
11        What is your understanding of that
12  first sentence, "unfettered discretion to accept
13  or reject any proposed business relationship with
14  client without liability to Ironbound"?
15     A.   That would be normally that a client --
16  that Source would be looking at opportunities and
17  would have the ability to say, "We want to do it,"
18  or "We don't want to do it," without liability to
19  Ironbound.
20     Q.   Okay. So you're talking about
21  opportunities that may have resulted from the
22  introduction, right?

Page 156

1     A.   Correct. Like the Alliance
2  acquisition.
3     Q.   Okay. But it talks about proposed
4  business relationship with the client.
5     A.   Right.
6     Q.   So they have the discretion to reject
7  or accept a proposed business relationship. But
8  if I understand your prior testimony --
9     A.   They already were in a business
10  relationship with the client.
11     Q.   Okay. So --
12     A.   And that's what the next sentence says:
13  "Acceptance shall be manifest only by execution of
14  a written agreement between Source and the
15  client." And that nondisclosure agreement was the
16  written agreement.
17     Q.   Okay. So you're saying that by virtue
18  of entering into the nondisclosure agreement prior
19  to the introductory phone call -- right? -- a
20  nondisclosure agreement was executed prior to the
21  introductory phone call, right?
22     A.   Concurrent with it on the same day,

Page 157

1  yes.
2     Q.   Prior to the introductory phone call,
3  right?
4     A.   (No verbal response.)
5     Q.   Right?
6     A.   My answer is nearly concurrent with the
7  phone call.
8     Q.   That was prior, wasn't it?
9     A.   Yes.
10     Q.   Okay. In fact, you made sure it was
11  executed prior to the introductory phone call,
12  right?
13     A.   Correct.
14     Q.   And it's your testimony that by
15  entering into that agreement, prior to even
16  speaking to these guys, that they entered into a
17  business relationship pursuant to this agreement?
18     A.   Yes. Because as a practical matter in
19  business, that's what you have to do in terms of
20  the document flow, which I think you have very
21  expertly given us today. You have been helpful in
22  establishing that document flow to show how

Page 158

1 business is done in America.
2    Q.   Other than that nondisclosure
3 agreement, are you aware of any other written
4 agreement between the parties?
5    A.   That was executed or that was in place?
6 Because I certainly have seen documents that were
7 not executed or didn't have a signature on them
8 that were produced during discovery.
9    Q.   I'm talking about executed agreements.
10    A.   Not that I've seen through discovery,
11 no.
12    Q.   So let's assume for the sake of
13 argument, based on your interpretation of the
14 agreement, if it's determined that that agreement,
15 this nondisclosure agreement, does not satisfy the
16 written agreement requirement here in this
17 contract, am I correct in saying that you would
18 not be entitled to any compensation under this
19 agreement?
20         MR. SCHWARTZ: Objection. That calls
21 for a legal conclusion.
22         MR. STERN: I'm asking for his

Page 159

1 understanding.
2         MR. SCHWARTZ: Objection.
3         If you can answer it, answer it. That
4 calls for a legal conclusion. If you think you
5 can answer it, go ahead.
6         THE WITNESS: I don't even know what
7 the question is now.
8 EXAMINATION BY MR. STERN:
9    Q.   Assume for me that this nondisclosure
10 agreement does not satisfy this written agreement
11 requirement here in the agreement, in the referral
12 agreement.
13    A.   That's a big assumption.
14    Q.   Okay. Well, I'm asking you to assume
15 that.
16    A.   Okay.
17    Q.   If that agreement does not satisfy that
18 requirement, would you agree you are not entitled
19 to any compensation under this agreement?
20         MR. SCHWARTZ: Objection. That calls
21 for a legal conclusion.
22         If you can answer it, answer it.

Page 160

1         THE WITNESS: The answer is yes, I
2 would be entitled to compensation regardless of
3 that.
4 EXAMINATION BY MR. STERN:
5    Q.   Okay. So you're saying it doesn't have
6 to exist in a written agreement between the
7 parties for you to get compensation under this
8 agreement?
9         MR. SCHWARTZ: Objection; asked and
10 answered.
11         MR. STERN: No, it's not.
12         THE WITNESS: I think I did answer the
13 question just previously.
14 EXAMINATION BY MR. STERN:
15    Q.   Then the answer is yes?
16         MR. SCHWARTZ: Read the question back,
17 please.
18         MR. STERN: My question is -- I'll ask
19 it again.
20 EXAMINATION BY MR. STERN:
21    Q.   Is it your testimony that you can
22 recover compensation under this agreement even if

Page 161

1 there does not exist a written agreement between
2 Source and Endeavor?
3         MR. SCHWARTZ: Objection; asked and
4 answered.
5         THE WITNESS: I would say given the
6 conversations that I had with Mr. Flegel and
7 Mr. Gillis, that certainly was my understanding,
8 yes.
9 EXAMINATION BY MR. STERN:
10    Q.   Okay. And I'm not talking about
11 conversations here. Based on your reading of the
12 document here, as a party to the agreement, who
13 read the agreement, agreed with the terms and
14 understood it as a sophisticated businessman, is
15 it your understanding based on reading the
16 document that you can recover under the agreement
17 compensation even if there does not exist a
18 written agreement between the parties?
19         MR. SCHWARTZ: Objection. It calls for
20 a legal conclusion, and it's been asked and
21 answered.
22         If you can answer it, answer it.