# EXHIBIT C

Case 1:05-cv-01039-JGP    Document 92-5    Filed 09/29/2006    Page 1 of 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---

JONATHAN LEDECKY d/b/a ) Case No. 1:05CV01039
IRONBOUND PARTNERS, )
)
    Plaintiff, )
)
vs. )
)
SOURCE INTERLINK COMPANIES, )
INC., )
)
    Defendant. )

---

VIDEOTAPED DEPOSITION OF

JONATHAN J. LEDECKY

Washington, D.C.

Wednesday, March 29, 2006

Job No.: 1-74746
Pages 1 through 278
Reported by: John L. Harmonson, RPR

Page 262

1  Q. Okay. And what's his relationship to
2  Source?
3  A. He was one of the investment bankers
4  for Source. And I believe Jefferies & Company may
5  have provided the fairness opinion on the deal.
6  Q. And he said -- he related to you a
7  conversation or discussion he had with Leslie
8  Flegel about you getting compensated?
9  A. Yes.
10  Q. And did he say that he -- Strike that.
11      Was there ever any discussion in terms
12  of disclosing -- with you about disclosing this in
13  any public filings or any SEC filings in regard to
14  this transaction?
15  A. I felt -- again, very positive -- that
16  my name was in the SEC filings. So I felt that
17  since I was referenced as the person who made the
18  introduction in the proxy statement, that was
19  consistent with all the things I had been told.
20  So here I am in the proxy statement saying Jon
21  Ledecky introduced Ari Emanuel and Endeavor to the
22  company in the discussion that they have to have

Page 263

1  for a proxy statement for the acquisition.
2      That was very good to see that. I felt
3  very good about that. It was consistent with what
4  the investment banker had told me Leslie had said
5  to him. It was consistent with what Jim Gillis
6  had told me. So it came as quite a shock when
7  Leslie told me I was entitled to no compensation
8  after the deal had closed.
9  Q. When was the first conversation you had
10  with Leslie Flegel about being compensated under
11  the agreement?
12  A. I would say again, as I answered
13  earlier, somewhere around the time of the
14  transaction's announcement.
15  Q. In November of 2004?
16  A. Again, around that period. Was it
17  exactly November? Was it after Thanksgiving? I
18  mean, it was somewhere around there. I was happy
19  for him and I felt very good about it.
20      And it wasn't a question of having to
21  have a conversation because, again, I had in my
22  mind three data points that were very good data

Page 264

1  points. I had my mention in the proxy. I had Jim
2  Gillis telling me. I had the investment banker
3  telling me. I had the agreement. So I felt these
4  are guys I've dealt with for six years, they're
5  extremely honorable people, this is wonderful for
6  everybody.
7  Q. Okay. And what did Leslie Flegel tell
8  you when you had that conversation with him?
9  A. He told me that he owed me something.
10  I then tried to press him what the something was,
11  and he said, "I'll have to think about it." And
12  we went back and forth on that, and eventually he
13  said, "I couldn't possibly pay you millions of
14  dollars. How could I do that with my board of
15  directors? I couldn't possibly do that. Let me
16  think about what I can do with my board of
17  directors. There are things that I can and can't
18  do without my board approval. I'll get back to
19  you."
20  Q. All right. And did he get back to you?
21  A. He did.
22  Q. When was that?

Page 265

1  A. Again, that was in this whole period of
2  time between the time the deal was announced until
3  the time ultimately we had our final -- what I
4  call the last lunch in I believe April of '05.
5  That's the last time I talked to Mr. Flegel.
6  Q. So was it at that last lunch that you
7  just described when he told you he wasn't going to
8  pay you anything?
9  A. It was at the last lunch that he said
10  that he didn't feel he owed me any compensation
11  for the Alliance deal; that Ari Emanuel should get
12  the credit for the deal going through; that
13  without Ari's involvement, the deal would have
14  never happened; that Ari was critical to the deal
15  and that the payment that Ari received reflected
16  that; and Ari was on the board and he would be
17  doing other things with Ari.
18      He said he didn't owe me money for that
19  transaction. He felt he owed me money for future
20  work that Endeavor would be doing with Source.
21  And he reiterated the opportunity to give me some
22  stock options; some stock warrants I think he

Page 266

1  called it at the time, which were relatively di
2  minimus. I think it was 50,000 stock warrants at
3  $8 a share with the stock trading at 9 or 10.
4  That was his initial offer to me.
5       We had the luncheon in Baltimore,
6  Maryland, after I had introduced him to a large
7  mutual fund, T. Rowe Price, in which I supported
8  the firm even up to that time and introduced them
9  to Jack Laporte, the fund manager at T. Rowe Price
10 Horizon Fund. T. Rowe Price eventually bought
11 600,000 shares of the stock.
12      So we had the meeting in the morning
13 and then we had the lunch. Dean Hine was present
14 at the lunch, and Leslie laid out his position
15 that I could accept what he was offering me, which
16 was a future payment on some futures or I could
17 sue him, and if I sued him, he would never talk to
18 me again.
19    Q.   And has he talked to you since?
20    A.   He has not.
21    Q.   Now, prior to this April meeting in
22 Baltimore you just described, this lunch meeting,

Page 267

1  your counsel had sent a demand to Source about
2  getting paid under the agreement?
3     A.   I believe so, yes. But I don't have
4  direct recollection of it.
5       MR. SCHWARTZ: I'm not testifying. If
6  you remember --
7  EXAMINATION BY MR. STERN:
8     Q.   I can show it to you if you would
9  like --
10    A.   That would be great.
11    Q.   -- if that would refresh your
12 recollection.
13      MR. SCHWARTZ: I would urge you to
14 check the dates on that document.
15      (Exhibit 26 marked for identification and
16 attached hereto.)
17 EXAMINATION BY MR. STERN:
18    Q.   My question was: Prior to this
19 meeting -- the first page of Exhibit 26 --
20      MR. SCHWARTZ: One second. I'm just
21 going to object to any use of this letter, the top
22 one, Exhibit 26. And just note for the record --

Page 268

1  we can deal with this in court -- that there is a
2  statement across the top of this letter that's on
3  Ironbound Partners LLC letterhead, Exhibit 26,
4  dated May 3, 2005. It says: "This letter is for
5  the purpose of settlement and compromise only."
6  That legend is repeated on the second page of the
7  letter. Therefore, under the Federal Rules of
8  Evidence, this would be inadmissible, and we're
9  objecting to its use.
10      Go ahead with that caveat.
11 EXAMINATION BY MR. STERN:
12    Q.   So the first page of this letter is
13 dated May 3, 2005, right?
14    A.   Yes. And you're saying the first
15 letter behind it is the March 29th letter?
16    Q.   Right. And I was asking you before I
17 showed you this if you recalled that your counsel,
18 prior to this meeting with Leslie Flegel in
19 Baltimore, had sent a demand.
20    A.   Right. Because we had been going back
21 and forth, as I indicated in my earlier testimony,
22 between late November and this period of time back

Page 269

1  and forth orally. And so I think finally my
2  counsel decided it was time to put it in writing.
3  And subsequently, as you indicated, we had the
4  lunch.
5     Q.   All right. And so you had this --
6  After Source got this, you then arranged to have
7  this meeting with Leslie to sort of talk about it?
8     A.   We put it together. Again, because we
9  were on very amicable terms, we put it together
10 with this meeting in front of T. Rowe Price that
11 had been a long-term investor in my other
12 transactions. I felt good enough about the
13 company and the merger to try to introduce them so
14 they would become a stockholder.
15    Q.   So you had the introduction to T. Rowe
16 Price, and then you subsequently had this meeting
17 to discuss --
18    A.   We went from there to have lunch
19 together to have a discussion about this letter.
20    Q.   Okay. And so essentially the purpose
21 of this lunch was sort of to see if you could
22 resolve your dispute without having to go to

Page 270

1  litigation, right?
2     A.  Yes.  Because again, as we said at
3  lunch, we both considered each other very good
4  friends and colleagues and we had had a
5  longstanding relationship with each other.  At
6  that point the relationship was six years old, and
7  I had continually backed Leslie from the
8  beginning.  I had given him my proxy when I first
9  got my shares which he could vote for two years,
10 and I had never sold any stock in the company
11 without his permission.  So we had a very close
12 relationship.
13    Q.  And you were hoping you could reach a
14 settlement of your dispute without having to file
15 a lawsuit, right?
16    A.  Yes.  Because it would eventually be
17 extremely costly to Source, which I was a
18 stockholder of, and when Source lost, it would owe
19 millions of dollars to me, and it was probably in
20 the better interest of the company to try to come
21 to a settlement than to go through this pain.
22    Q.  And, obviously, you weren't able to

Page 271

1  reach a settlement during the meeting and even
2  subsequent when you sent this May 3rd letter,
3  right?
4     A.  Well, Leslie became more intransient in
5  his position, perhaps, than he was in the
6  beginning in terms of backing off of some things
7  he had offered previously, which led to our
8  initial discussions.  Then when we had the lunch,
9  he took an even more hard-line position.
10       So I think in an attempt to go on
11 record, again to avoid litigation, I put this
12 letter that Matt's objected to.  For the purpose
13 of settlement and compromise only, we put an offer
14 on the table.  And that was really based on some
15 conversations behind the scenes with Jim Gillis,
16 who indicated although he didn't want to be
17 involved in it, that he thought it would be good
18 last try to put something out there and see how
19 Leslie reacted to it.  Because I think no one
20 wanted to go through what has become this process.
21 It's time-consuming and not very tasteful.
22    MR. STERN:  Why don't we take about

Page 272

1  five, and I might be close to being done here.
2     THE WITNESS:  Great.  Thank you.
3     THE VIDEOGRAPHER:  We are going off the
4  record.  The time is 4:33 p.m.
5     (A recess was then taken.)
6     THE VIDEOGRAPHER:  We are back on the
7  record.  The time is 4:49 p.m.
8  EXAMINATION BY MR. STERN:
9     Q.  Briefly, other than this conversation
10 you had with Jim Gillis in October or November
11 time frame about the compensation and everything,
12 have you had any subsequent conversations with him
13 about that?
14    A.  About --
15    Q.  About getting paid under the agreement.
16    A.  I would say the only conversations I
17 had with Jim would have been conversations between
18 that period of time and the time I had the lunch
19 with Leslie.  Since the time I had the lunch with
20 Leslie, I've had no communication with anybody at
21 Source.
22       I did get a nice Christmas card from

Page 273

1  Jim, which I appreciated.
2     Q.  But no communications --
3     A.  But I have not had any phone calls or
4  any other conversation with him.  During that
5  period of time between November and April, I think
6  Jim was trying to facilitate some sort of
7  agreement.
8        And, of course, as I indicated to you
9  earlier, you know, Leslie said he did owe me
10 something, he just didn't know what it was.  And
11 we tried to resolve that, but it didn't work out.
12    MR. STERN:  Nothing further.
13    MR. SCHWARTZ:  I have no questions.
14    THE VIDEOGRAPHER:  This marks the end
15 of the deposition of Mr. Ledecky.  The total
16 number of tapes used today was three.  We are
17 going off the record.  The time is 4:50 p.m.
18    (Whereupon, the deposition was concluded.)