IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JONATHAN LEDECKY d/b/a IRONBOUND PARTNERS, </br></br>           Plaintiff, </br></br> v. </br></br> SOURCE INTERLINK COMPANIES, INC., </br></br>           Defendant. | ) </br> ) </br> ) </br> ) </br> )   Case No. 1:05CV01039 (JGP) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) |

**DEFENDANT SOURCE INTERLINK COMPANIES, INC.'S MOTION *IN LIMINE* TO PRECLUDE ANY ARGUMENTS RELATING TO THE EFFECT OF ANY MISSTATEMENTS OR INACCURACIES IN DEFENDANT'S PUBLIC FILINGS WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Defendant Source Interlink Companies, Inc. ("Source") hereby moves and respectfully requests that this Court enter an order *in limine* precluding Plaintiff Jonathan Ledecky from making any arguments at trial concerning the effect of any misstatements or inaccuracies in Source's SEC registration documents pertaining to the merger between Source and non-party Alliance Entertainment Corporation ("Alliance"). Any argument or suggestion to the jury that Source violated federal securities laws or misled investors as a result of any misstatments or inaccuracies in its publicly-filed documents concerning the Source-Alliance merger would be impermissible under the District of Columbia's Model Rules of Professional Conduct.

## BACKGROUND

In this case Plaintiff is seeking to recover a commission from Source under a Referral Agreement for Source's merger with Alliance. Pursuant to the Referral Agreement, Plaintiff agreed to introduce Source to the Endeavor Agency, LLC ("Endeavor") and to assist Source in evaluating and negotiating any proposed "business relationship" with Endeavor. Under the

terms of the Referral Agreement, Source had the unfettered discretion to accept or reject any proposed business relationship with Endeavor, and Source's acceptance of a business relationship with Endeavor could be manifest "only by execution of a written agreement between Source and [Endeavor]." In the event Source and Endeavor entered into a business relationship that was documented by an executed written agreement between the parties, the Referral Agreement provides that:

> Source shall pay to [Plaintiff], and [Plaintiff] shall accept, compensation equal to 5% of the net income recorded by Source as a result of its relationship with [Endeavor] during the five-year period following the date (the "Establishment Date") on which the business relationship is established between Source and [Endeavor].

Plaintiff introduced Source to Endeavor in April 2004. Subsequent to the introduction, in June 2004, Ari Emanuel, a member of Endeavor, introduced Source to Erika Paulson, a director of Alliance and a partner with The Yucaipa Companies, LLC, an entity affiliated with Alliance's controlling stockholder, AEC Associates, L.L.C. A few weeks after they were introduced, Source and Alliance entered into merger discussions. On November 18, 2004, Source and Alliance entered into a merger agreement and announced that Mr. Emanuel had been appointed to Source's Board of Directors.

In connection with the Alliance merger -- after Source's Board approved a written plan of merger -- Source prepared and filed an SEC Form S-4 proxy statement for the purpose of soliciting votes of its shareholders on whether to approve the proposal in the merger agreement to issue common stock to Alliance shareholders. Source is a publicly held company whose shares are traded on the NASDAQ National Market under the trading symbol "SORC."

Amendment No. 1 to the Form S-4 dated January 19, 2005 ("S-4") (Exhibit A) describes the proposed Source-Alliance business combination and announced the special meeting of

shareholders that occurred on February 28, 2005, which resulted in the approval of the merger. Among other issues, the S-4 contains the SEC-mandated background description of the events leading to the merger with Alliance. (S-4 at 36-39.) It also discloses a $1.5 million payment that would be made to Mr. Emanuel in connection with the merger as follows:

> Ariel Emanuel, one of our directors, will be paid $1.5 million upon the consummation of the merger as compensation for consulting services provided to us in connection with the merger. Mr. Emanuel was not a director at the time we entered into this arrangement with him nor when the board approved the merger.

(*Id.* at 50.)

During depositions, Plaintiff adduced testimony from the Chairman and CEO of Source, Leslie Flegel, that the basis for the $1.5 million payment to Mr. Emanuel was not correctly stated in Source's S-4:

```
 7     Q. Okay. Are you aware of any words or phrases
 8  that are incorrect in this S-4?
 9     A. I am aware of a description of -- I don't
10  remember it specifically -- because I haven't read this
11  recently, but a description that I later read that I
12  felt incorrectly stated the manner in which Ari Emanuel
13  was paid.
14     Q. Okay. Tell me about that.
15     A. Well, I didn't agree to pay Ari Emanuel any
16  money, that was agreed to buy the Yucaipa people,
17  completely unrelated to me. And, um, when the payment
18  was made, it was made after the merger out of Alliance,
19  which we then owned.
20         And, um, I think that the way it is stated in
21  this, and it became an issue that I brought up with my
22  own internal people later. This is something I didn't
23  personally catch, because it is hard to read every word
24  in one of these things. That I felt that it gave the
25  impression, the way it was worded, that we had agreed
 1  to pay that money, when we hadn't.
 2     Q. "We" who?
 3     A. That Source.
 4     Q. Well, in fact, Source did pay the money,
 5  didn't it?
 6     A. Source, Source -- Alliance paid the money, and
```

> 7  Source owned Alliance at the time -- but it had nothing
> 8  to do with the fact that we had agreed to any portion
> 9  of that. That was preagreed upon by Ron Burkle and
> 10 Yucaipa with Ari Emanuel, which I was not privy to any
> 11 of those discussions.
> 12     Q. You knew he was going to get a million and a
> 13 half dollars; correct, did you not, Mr. Flegel?
> 14     A. I knew at some point time the Yucaipa people
> 15 informed me that they were paying, that they had agreed
> 16 to pay Ari Emanuel a million and a half dollars.
> 17     Q. In fact, that fact is listed in this S-4,
> 18 isn't it? The fact that he is going to be paid a
> 19 million and a half dollars.
> 20     A. It is listed did in the S-4.
> 21     Q. And are you saying that, tell me again what
> 22 the discrepancy is?
> 23     A. I am saying I didn't agree to pay that money,
> 24 and it was paid by Alliance. Frankly, I wasn't
> 25 surprised that it wasn't paid prior to the merger, but
> 1  I was told for technical reasons it had to be paid
> 2  after the merger, because it was only due upon the
> 3  conclusion of the merger.

Leslie Flegel Dep. at 16(7)-18(3) (Exhibit B).

Source's General Counsel, Doug Bates, has also testified that the S-4's description of Mr. Emanuel's role in the Alliance transaction was inaccurate:

> 15     Q. And if we go to page, if we look at
> 16 Exhibit 9, and we go to page -- let me find it
> 17 again -- 50 at the bottom, 71 at the top right.
> 18     A. Okay.
> 19     Q. Second to the last paragraph says:
> 20       "Ariel Emanuel, one of our Directors, will
> 21 be paid a million and a half dollars upon the
> 22 consummation of the merger, as compensation for
> 23 consulting services provided to us in connection with
> 24 the merger;" is that what it says?
> 25     A. That is what it says, but it is wrong.
>
> 1      Q. And that information came from this
> 2  questionnaire?
> 3      A. I don't know that.
> 4      Q. Okay. Where did it come from?
> 5      A. I don't remember, I can't, I mean we had a

```
 6   lot of discussions in the working group, and I can't
 7   tell you exactly where that information would have
 8   come from, except that I can tell you for certain we
 9   knew that there was a million and a half being paid,
10   and um, I knew then, I know now, that he never
11   provided any consulting services or any other
12   services except in his individual capacity as a
13   Director of the Company to Source Interlink Companies
14   or any of its subsidiaries other than Alliance.
```

       *   *   *

```
 5       Q.  And as to these two documents, you're
 6   telling me this public filing from the company, the
 7   F-4 (sic), Exhibit 9, is wrong; is that right?
 8       A.  I am telling you that.
```

       *   *   *

```
 6       Q.  Okay, I guess, all right.  Is your
 7   understanding that someone, is your explanation
 8   somebody reading this Exhibit 15 should be able to
 9   gather all that from this document?
10       A.  This is not designed to be read by a lay
11   person.
12       Q.  Right, but the S-4 is -- and you are
13   telling me that is wrong.
14       A.  Yes, I am telling you it is -- there is an
15   immaterial error in that, in that discussion -- that
16   is not relevant to a person who is reaching an
17   investment decision in respect to this transaction.
```

Douglas Bates Dep. at 106(15)-107(14), 108(5)-(8), 109(6)-(17) (Exhibit C); *see also* Ari Emanuel Dep. at 92(2)-(14), 95(3)-(19) (Exhibit D) (disagreeing with the S-4's statement that he was acting as a consultant for Source in connection with the Alliance merger; "My understanding is I was a consultant for [Alliance's controlling shareholder] Yucaipa.").

## **DISCUSSION**

Plaintiff's counsel has indicated through his pointed deposition questioning of Source's witnesses and Mr. Emanuel that he may insinuate or argue to the jury that Source committed securities law violations and misled investors by misstating the basis for Mr. Emanuel's $1.5 million payment in the S-4. *See, e.g.,* Bates Dep. at 110(3)-(22) (Exhibit C); Emanuel Dep. at 95(21)-97(12) (Exhibit D). However, Plaintiff never disclosed in discovery any expert witness he intends to call to opine on whether any inaccuracies contained in Source's S-4 constituted material misstatements under the proper legal standard. Moreover, even if he did, the question of whether any misstatement contained in Source's S-4 constitutes a violation of federal securities law or may have misled investors is wholly irrelevant to the only legal issue in this case, which is whether Plaintiff is entitled to compensation under the terms and conditions of the Referral Agreement. *See* Fed. R. Evid. 402. Thus, any insinuations through questioning or argument by Plaintiff's counsel that Source may have violated any securities laws or misled any investors would not only lack any foundation, but it would also serve to mislead and confuse the jury into considering wholly irrelevant issues. *See* Fed. R. Evid. 403.

Furthermore, any such questioning from Plaintiff's counsel would amount to nothing more than counsel providing his own personal opinion of Source's guilt to the jury, which is blatantly impermissible under the Model Rules of Professional Conduct.

The District of Columbia follows the ABA Model Rules. According to Rule 3.4(e) of the Model Rules, "In appearing in his professional capacity before a tribunal, a lawyer shall not in trial:

(3) Allude to any matter that the lawyer does not reasonably believe is relevant . . . or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused."

Accordingly, the Court should prohibit Plaintiff from insinuating or arguing to the jury that any inaccuracies or misstatements in Source's S-4 amounted to violations of any securities laws or misled investors.

## CONCLUSION

For the foregoing reasons, Source's Motion *in Limine* to Preclude Any Arguments Relating to The Effect of Any Misstatements or Inaccuracies in Defendant's Public Filings With The United States Securities And Exchange Commission should be granted.

Respectfully submitted,

/s/ Kevin E. Stern                    .
Kevin E. Stern (Bar No. 459214)
Geoffrey J. Greeves (Bar No. 463035)
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
Tel: (202) 331-3100
Fax: (202) 331-3101

*Counsel for Defendant Source Interlink Companies, Inc.*

Dated: September 29, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of September, 2006, I caused a true and correct copy of the foregoing to be served by electronic mail through CM/ECF on the following persons:

Jan Paul Miller, Esq.
THOMPSON COBURN, LLP
One U.S. Bank Plaza
St. Louis, MO 63101

Allison Manger, Esq.
THOMPSON COBURN, LLP
1909 K Street, NW
Suite 600
Washington, DC 20006

/s/ Tanya Caudell            .
Tanya Caudell