# EXHIBIT B

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION


JONATHAN LEDECKY d/b/a IRONBOUND
PARTNERS,

    Plaintiff,

    vs.                              CASE NO. 1:05 CV 01039

SOURCE INTERLINK COMPANIES, INC.,

    Defendant.
_____/

C O N F I D E N T I A L

| | |
|---|---|
| VIDEOTAPED DEPOSITION OF: | S. LESLIE FLEGEL |
| DATE: | May 4, 2006 |
| TIME: | 9:40 a.m. to 3:26 p.m. |
| LOCATION: | 27200 Riverview Center<br>Suite 309<br>Bonita Springs, FL |
| TAKEN BY: | Plaintiff |
| REPORTER: | Betty G. Althoff, RPR |

**14**

1   A. I am Chairman of the Board.
2   Q. What else?
3   A. Chief Executive Officer.
4   Q. Anything else?
5   A. No.
6   Q. How long have you been CEO of Source?
7   A. Um, since February 1st, 1995.
8   Q. And were you CEO of its predecessor companies?
9   A. I was the owner of the predecessor company of
10  one of the predecessor companies.
11  Q. How long have you been Chairman of the Board?
12  A. Since February 1st, 1995.
13  Q. How would you describe Sources' business, what
14  does it do?
15  A. Its business is primarily geared towards the
16  management of magazine sales, front end management,
17  meaning the manufacturing of it and placement of
18  products at the checkouts, and the distribution of
19  magazines, books, DVD's, and um, CD's music CD's.
20  Q. Give me one second, if you would. As CEO of
21  Source, I presume you are familiar with various public
22  documents that Source distributes, that it is required
23  to distribute under SEC rules?
24  A. Yes, I am.
25  Q. Let me show you -- let me show you Exhibit 1.

**15**

1        (Plaintiff's Exhibit No. 1, S-4, was marked
2   for identification.)
3        THE WITNESS: Okay.
4   BY MR. MILLER:
5   Q. Do you recognize that as an S-4 that was
6   issued by Source?
7   A. Yes.
8   Q. Okay. And what was the purpose of this S-4?
9   A. Well, it's not the only S-4 we have filed,
10  so --
11  Q. True. Why don't you take a look at the about
12  the second and third page or third and fourth page. Is
13  this the S-4 that Source issued to announce the special
14  shareholders meeting to be held on February 28th, 2005,
15  at which the shareholders would vote on the proposed
16  merger of Source and Alliance?
17  A. Correct, that is correct.
18  Q. And that merger was approved on February 28th,
19  2005, by the shareholder; correct?
20  A. That is correct.
21  Q. And therefore, as of February 28, 2005, Source
22  acquired Alliance; correct?
23  A. That is correct.
24  Q. Is everything in this S-4, that was issued by
25  Source under SEC Rules, accurate?

**16**

1   A. I would say materially so, yes.
2   Q. All right, how about nonmaterially so?
3   A. Well, any time you do a document of this size,
4   and I have seen it more often than not or as often as
5   not, there could be a terminology or a word that is
6   incorrect, but essentially, not materially incorrect.
7   Q. Okay. Are you aware of any words or phrases
8   that are incorrect in this S-4?
9   A. I am aware of a description of -- I don't
10  remember it specifically -- because I haven't read this
11  recently, but a description that I later read that I
12  felt incorrectly stated the manner in which Ari Emanuel
13  was paid.
14  Q. Okay. Tell me about that.
15  A. Well, I didn't agree to pay Ari Emanuel any
16  money, that was agreed to buy the Yucaipa people,
17  completely unrelated to me. And, um, when the payment
18  was made, it was made after the merger out of Alliance,
19  which we then owned.
20       And, um, I think that the way it is stated in
21  this, and it became an issue that I brought up with my
22  own internal people later. This is something I didn't
23  personally catch, because it is hard to read every word
24  in one of these things. That I felt that it gave the
25  impression, the way it was worded, that we had agreed

**17**

1   to pay that money, when we hadn't.
2   Q. "We" who?
3   A. That Source.
4   Q. Well, in fact, Source did pay the money,
5   didn't it?
6   A. Source, Source -- Alliance paid the money, and
7   Source owned Alliance at the time -- but it had nothing
8   to do with the fact that we had agreed to any portion
9   of that. That was preagreed upon by Ron Burkle and
10  Yucaipa with Ari Emanuel, which I was not privy to any
11  of those discussions.
12  Q. You knew he was going to get a million and a
13  half dollars; correct, did you not, Mr. Flegel?
14  A. I knew at some point time the Yucaipa people
15  informed me that they were paying, that they had agreed
16  to pay Ari Emanuel a million and a half dollars.
17  Q. In fact, that fact is listed in this S-4,
18  isn't it? The fact that he is going to be paid a
19  million and a half dollars.
20  A. It is listed did in the S-4.
21  Q. And are you saying that, tell me again what
22  the discrepancy is?
23  A. I am saying I didn't agree to pay that money,
24  and it was paid by Alliance. Frankly, I wasn't
25  surprised that it wasn't paid prior to the merger, but

**18**

1  I was told for technical reasons it had to be paid
2  after the merger, because it was only due upon the
3  conclusion of the merger. And therefore, was --
4      Q. Who told you that?
5      A. Sorry?
6      Q. Who told you that?
7         MR. STERN: Object to the form of the
8      question. I would advise you not to reveal any
9      attorney-client communications.
10 BY MR. MILLER:
11     Q. All right, go ahead and continue with your
12 answer.
13     A. And so, in effect, um, it was paid by
14 Alliance, which at the time, as a result of the merger,
15 we then owned, but it had nothing to do with anything I
16 had agreed to do.
17     Q. And you don't -- and Mr. Emanuel was a member
18 of the Board of Directors of Source at the time he was
19 paid the million and a half dollars; correct?
20     A. He -- I am not sure I remember precisely when
21 the sequence of events was. I don't know if that
22 happened before or after.
23     Q. Well, the Board of Source approved the merger
24 in November of 2004; correct?
25     A. The board, yeah, and I do not believe that he

**19**

1  was on the board in 2004.
2      Q. Okay. Well, we can correct that.
3         It will take me a minute to track it down.
4         MR. STERN: Can we go off the record so he can
5      hand him his glasses.
6         MR. MILLER: Sure.
7         THE VIDEOGRAPHER: Off the record, time is
8      10:04 p.m.
9         (Whereupon, an off the record discussion was
10     had.)
11        THE VIDEOGRAPHER: Back on the record, the
12     time is 10:05 a.m.
13        (Plaintiff's Exhibit No. 2,
14 Press Release, was marked for identification.)
15 BY MR. MILLER:
16     Q. All right, Mr. Flegel, let me show you Exhibit
17 2, and ask you to take a look at that. That is an
18 announcement, a press release actually, by your
19 company, Source, dated November 18, 2004, announcing
20 Ari Emanuel had been made a member of the Board of
21 Source; is that correct?
22     A. That is correct. I didn't remember it that
23 way, but that is correct.
24     Q. Okay. So would you agree that he was made a
25 member of the Board of Directors of Source as of

**20**

1  November 18th, 2004?
2      A. Yes.
3      Q. Okay. So by the time he was paid the million
4  and a half dollars, at the beginning of March of 2005,
5  he had been a member of the Board of Directors of
6  Source for several months; correct?
7      A. Yes.
8         MR. STERN: Object to the form of the
9      question.
10        THE WITNESS: I am sorry? I didn't hear you.
11        MR. STERN: I was just making an objection to
12     form for the record.
13        THE WITNESS: Okay.
14 BY MR. MILLER:
15     Q. Is that correct?
16     A. It appears it is correct, yes.
17     Q. And he was paid a million and a half dollars
18 within a couple days after the closing, after the
19 merger actually occurred on February 28th, 2005;
20 correct?
21     A. That is correct.
22     Q. All right. Are you saying that it is not a
23 material fact that there was a statement in your S-4
24 that one of your Board Directors, one of your members
25 of your Board of Directors was going to be paid a

**21**

1  million and a half dollars by your company?
2         MR. STERN: Object to the form of the
3      question.
4         THE WITNESS: No, I didn't say that was
5      immaterial, I didn't say that.
6  BY MR. MILLER:
7      Q. Okay. What is immaterial then?
8      A. I didn't say anything was immaterial. I
9  didn't say that was -- I said from time to time -- I
10 said that this is materially correct.
11     Q. Right?
12     A. And from time to times, in filings of S-4's
13 there are misstatements that are not material, that is
14 what I said.
15     Q. And I asked you if there were any nonmaterial
16 misstatements in the S-4, and we talked about that.
17     A. But I said -- no one denies that he was paid
18 the million and a half dollars. What I think is not
19 material -- what I think is incorrect -- I am not a
20 Judge whether it is material or not, and I don't
21 believe it is material -- was the specific wording of
22 it.
23     Q. Uh-huh, Okay. Um, and the S-4 that we have
24 been looking at Exhibit Number 1, as we said before,
25 that was to announce the special shareholders meeting