1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

COPY

JONATHAN LEDECKY d/b/a IRONBOUND PARTNERS,

    Plaintiff,

vs.                    CASE NO. 1:05 CV 01039

SOURCE INTERLINK COMPANIES, INC.,

    Defendant.
_____/


C O N F I D E N T I A L


| | |
|---|---|
| VIDEOTAPED DEPOSITION OF: | DOUG BATES |
| DATE: | May 5, 2006 |
| TIME: | 10:30 a.m. to 1:25 p.m. |
| LOCATION: | 27200 Riverview Center<br>Suite 309<br>Bonita Springs, FL |
| TAKEN BY: | Plaintiff |
| REPORTER: | Betty G. Althoff, RPR |

Ledecky -vs- Source Interlink                                Doug Bates

37

 1           agreement other than Mr. Flegel.
 2   BY MR. MILLER:
 3       Q.    Okay.  Do you recall having any
 4   discussions with Mr. Ledecky regarding the meaning of
 5   any particular terminology in Exhibit 5?
 6       A.    The only thing I remember is there was
 7   some discussions, when we were drafting this,
 8   regarding the specificity of -- of the language in
 9   here.
10       Q.    All right, what do you mean?
11       A.    I remember I sort of, I don't remember the
12   specific language used, but I remember conversations
13   in which we talked about how it was not entirely
14   clear what form the business relationship with the --
15   I will use the defined term here "client" that is in
16   this agreement, Exhibit 5 --
17       Q.    Uh-huh.
18       A.    -- would take.  Um, it was clear that the
19   business relationship involved a direct, um, I am
20   trying not use the word defining, but a direct
21   relationship, if you will.  I hate to use the word
22   relationship right here, but with the client.
23       Q.    What do you mean by that?
24       A.    There was never, to my knowledge, in fact,
25   the context that I remember this in, there was never

38

1  any discussion that the client was an intermediary.
2  In other words, that what we were talking about here
3  was a business venture, specifically, with whoever
4  this client was.
5       Q.   Was there ever any discussion that the
6  client could not act as an intermediary?
7       A.   Um, not that I recall.
8       Q.   Okay.
9       A.   It just wasn't something we contemplated.
10      Q.   But there was discussion about the fact
11 that the business relationship, I think what you said
12 was it was not entirely clear what form the business
13 relationship with the client would take.
14      A.   That is correct.  In other words, it could
15 have -- it might have been a joint venture.  It might
16 have been an, um, independent sales agency type of
17 agreement.  It might have been a principal
18 transaction.  Um, it just wasn't, it wasn't clear
19 from anybody's context the discussions, because the
20 discussions hadn't taken place, what type of
21 relationship would evolve between Source and the
22 client.
23      Q.   Okay.  And you did not know at the time
24 this was being discussed or this -- who the client
25 was; correct?

1        A.    I did not, no.

2        Q.    Okay. And following up on what you just

3   said regarding your discussions with Mr. Ledecky, the

4   term business relationship is used in this Exhibit

5   No. 5; correct?

6        A.    The term business relationship is used.

7        Q.    Okay.

8        A.    Right.

9        Q.    And, in fact, the term business venture is

10  used as well; correct?

11       A.    That is correct.

12       Q.    And business relationship, the term

13  business relationship is not defined in this

14  agreement anywhere, is it?

15       A.    Not specifically defined, no.

16       Q.    Well, it's not generally defined either,

17  is it?

18       A.    Well, in the sense that there is not like

19  sale was defined in the prior exhibit to draft.

20       Q.    Correct. Well I guess I won't beat around

21  the bush; is there any definition of the term

22  business relationship in this agreement, Exhibit 5?

23       A.    I think that the term business

24  relationship can be defined from the context in which

25  it is used, if that is what you mean. I don't want

1  to, I am not saying that there is no definition in
2  here.  I think if you read the context it is clear in
3  which -- what business relationship means.
4      Q.   All right, tell me where you see that.
5      A.   I think when you look at the concept of,
6  in paragraph one, where you talk about the
7  "evaluation of a proposed business venture, that the
8  um, Source has the unfettered discretion to accept or
9  reject any proposed business relationship with the
10 client."  And particularly with the respect to the
11 next sentence, which talks about it being manifested
12 by a written agreement between the parties.
13     Q.   Uh-huh.
14     A.   It is clear that we are talking about a
15 relationship here that is, um, a commercial
16 relationship, where each party is benefiting.
17     Q.   Okay.  Is there a difference between a
18 commercial relationship and a business relationship?
19     A.   No.
20     Q.   Okay.  So it is, all right.  So you
21 believe that in context, it means any type of
22 business relationship in which there is a benefit to
23 each side?
24     A.   Monetary benefit, yeah.  It is, it was, it
25 is designed to be, as I intended it, that is what it

41

1   was, yeah.
2       Q.    Okay.  And beyond that, however, there is
3   no limitation in here as to what type of
4   relationship, business relationship that would be,
5   because as you said before, no one knew what form it
6   was going to take.
7       A.    The concept was it was a relationship
8   between Source and the client, and we didn't know
9   what -- there was no restriction on, um, particularly
10  on the form that that would take.
11      Q.    Uh-huh, okay.  And so, just so I am
12  understanding, am I understanding that one of the
13  reasons it was left vague in here is because of just
14  that, because nobody knew what form it was going to
15  take?
16      A.    I didn't know what form it was going to
17  take, and my discussions with Mr. Ledecky, led me to
18  believe he didn't know what form it would take.
19      Q.    Okay, that is fair enough.
20            Um, it then talks about in paragraph two,
21  and again, I am referring to Exhibit 5.  In paragraph
22  two, entitled Compensation, it talks about what
23  compensation Ironbound would receive if it is due
24  compensation under this contract; correct?
25      A.    Yes.

106

1    Q.   And eventually, this was to alert the
2 reader, which would be the public, which was reading
3 the 10-K, what happened?
4    A.   No.  They would never see this.  It would
5 never be worded this way.  This is not a filed
6 document that goes to the reader.  The information
7 that is in here will be used by us to prepare a
8 public document, and to make a judgment on what needs
9 to be included in where.
10   Q.   And that is exactly what happened with
11 this S-4, Exhibit No. 9; isn't it?
12   A.   The information contained in here was
13 ultimately used, in part, for the preparation of this
14 document.
15   Q.   And if we go to page, if we look at
16 Exhibit 9, and we go to page -- let me find it
17 again -- 50 at the bottom, 71 at the top right.
18   A.   Okay.
19   Q.   Second to the last paragraph says:
20        "Ariel Emanuel, one of our Directors, will
21 be paid a million and a half dollars upon the
22 consummation of the merger, as compensation for
23 consulting services provided to us in connection with
24 the merger;" is that what it says?
25   A.   That is what it says, but it is wrong.

107

1    Q.    And that information came from this
2 questionnaire?
3    A.    I don't know that.
4    Q.    Okay. Where did it come from?
5    A.    I don't remember, I can't, I mean we had a
6 lot of discussions in the working group, and I can't
7 tell you exactly where that information would have
8 come from, except that I can tell you for certain we
9 knew that there was a million and a half being paid,
10 and um, I knew then, I know now, that he never
11 provided any consulting services or any other
12 services except in his individual capacity as a
13 Director of the Company to Source Interlink Companies
14 or any of its subsidiaries other than Alliance.
15   Q.    Okay. You have got to help me through
16 this, Mr. Bates. These are the only two documents we
17 have seen, at least during these depositions, that
18 refer to this million and a half dollars that is
19 being paid to Mr. Emanuel; correct?
20   A.    I don't know what you have seen.
21   Q.    Okay. Well, they are the only two we have
22 looked at today; is that right?
23   A.    Yes.
24   Q.    Are there any other documents that you're
25 aware of that talk about why Mr. Emanuel is being

1        But as far as I know, my understanding is
2   that Endeavor decided that it was not worth their
3   time and didn't want to pursue it any more.
4        Q.   Okay.  During this period of time, that is
5   March, April of 2005, were you being contacted or did
6   you have any contact with Mr. Ledecky's counsel,
7   Mr. Schwartz?
8        A.   Yes.
9        Q.   Okay.  And those contacts were regarding
10  Mr. Ledecky's desire to be paid under this referral
11  agreement, as a result of the acquisition of Alliance
12  by Source?
13       A.   Um, I think it was starting in early March
14  I guess I had a couple of conversations with
15  Mr. Schwartz about, about John's claim that he was
16  due money under the referral agreement.
17       Q.   Okay.  Do you recall during those
18  conversations telling Mr. Schwartz that, um, Source
19  was in negotiations with Mr. Emanuel regarding
20  entering into a -- some sort of sales rep or some
21  sort of agreement, written agreement with
22  Mr. Emanuel?
23       A.   Um, I don't remember that, no.
24       Q.   Do you remember telling Mr. Schwartz that
25  it was actually close to being signed?

1      A.    I don't remember that, no.

2      Q.    Are you saying you might have said that

3  or you --

4      A.    I might have said that, because at the

5  time, I will tell you that this is the agreement we

6  were working on, and what was eventually presented to

7  the board who rejected it.

8      Q.    Okay.  But you don't recall one way or the

9  other whether you said that?

10     A.    I don't recall one way or the other

11 whether I said it.

12     Q.    All right.

13         MR. MILLER:  Can we take a five minute break

14    and let me check my notes, and see what else I

15    need to go through and we will wrap up shortly.

16         THE VIDEOGRAPHER:  Off the record.  The time

17    is 1:05 p.m.

18         (A short break was held.)

19         THE VIDEOGRAPHER:  Back on the record.  The

20    time is 1:14 p.m.

21 BY MR. MILLER:

22     Q.    Mr. Bates, you were here yesterday when

23 Mr. Flegel gave his deposition; correct?

24     A.    I was.

25     Q.    Okay.  And he discussed various investment