


1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

JONATHAN LEDECKY d/b/a IRONBOUND PARTNERS,

    Plaintiff,

vs.                              CASE NO. 1:05 CV 01039

SOURCE INTERLINK COMPANIES, INC.,

    Defendant.
_____/

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF:   S. LESLIE FLEGEL

DATE:                       May 4, 2006

TIME:                       9:40 a.m. to 3:26 p.m.

LOCATION:                   27200 Riverview Center
                            Suite 309
                            Bonita Springs, FL

TAKEN BY:                   Plaintiff

REPORTER:                   Betty G. Althoff, RPR



1      A.  I would say materially so, yes.

2      Q.  All right, how about nonmaterially so?

3      A.  Well, any time you do a document of this size,
4  and I have seen it more often than not or as often as
5  not, there could be a terminology or a word that is
6  incorrect, but essentially, not materially incorrect.

7      Q.  Okay.  Are you aware of any words or phrases
8  that are incorrect in this S-4?

9      A.  I am aware of a description of -- I don't
10 remember it specifically -- because I haven't read this
11 recently, but a description that I later read that I
12 felt incorrectly stated the manner in which Ari Emanuel
13 was paid.

14     Q.  Okay.  Tell me about that.

15     A.  Well, I didn't agree to pay Ari Emanuel any
16 money, that was agreed to buy the Yucaipa people,
17 completely unrelated to me.  And, um, when the payment
18 was made, it was made after the merger out of Alliance,
19 which we then owned.

20     And, um, I think that the way it is stated in
21 this, and it became an issue that I brought up with my
22 own internal people later.  This is something I didn't
23 personally catch, because it is hard to read every word
24 in one of these things.  That I felt that it gave the
25 impression, the way it was worded, that we had agreed

17

1  to pay that money, when we hadn't.
2      Q.  "We" who?
3      A.  That Source.
4      Q.  Well, in fact, Source did pay the money,
5  didn't it?
6      A.  Source, Source -- Alliance paid the money, and
7  Source owned Alliance at the time -- but it had nothing
8  to do with the fact that we had agreed to any portion
9  of that.  That was preagreed upon by Ron Burkle and
10 Yucaipa with Ari Emanuel, which I was not privy to any
11 of those discussions.
12     Q.  You knew he was going to get a million and a
13 half dollars; correct, did you not, Mr. Flegel?
14     A.  I knew at some point time the Yucaipa people
15 informed me that they were paying, that they had agreed
16 to pay Ari Emanuel a million and a half dollars.
17     Q.  In fact, that fact is listed in this S-4,
18 isn't it?  The fact that he is going to be paid a
19 million and a half dollars.
20     A.  It is listed did in the S-4.
21     Q.  And are you saying that, tell me again what
22 the discrepancy is?
23     A.  I am saying I didn't agree to pay that money,
24 and it was paid by Alliance.  Frankly, I wasn't
25 surprised that it wasn't paid prior to the merger, but

1  I was told for technical reasons it had to be paid
2  after the merger, because it was only due upon the
3  conclusion of the merger. And therefore, was --
4      Q. Who told you that?
5      A. Sorry?
6      Q. Who told you that?
7          MR. STERN: Object to the form of the
8      question. I would advise you not to reveal any
9      attorney-client communications.
10 BY MR. MILLER:
11     Q. All right, go ahead and continue with your
12 answer.
13     A. And so, in effect, um, it was paid by
14 Alliance, which at the time, as a result of the merger,
15 we then owned, but it had nothing to do with anything I
16 had agreed to do.
17     Q. And you don't -- and Mr. Emanuel was a member
18 of the Board of Directors of Source at the time he was
19 paid the million and a half dollars; correct?
20     A. He -- I am not sure I remember precisely when
21 the sequence of events was. I don't know if that
22 happened before or after.
23     Q. Well, the Board of Source approved the merger
24 in November of 2004; correct?
25     A. The board, yeah, and I do not believe that he

44

1  anyway.  And secondly, it wasn't the most opportune
2  place to talk about that kind of stuff.
3      Q.  Was it just you on the phone at your end, was
4  Mr. Gillis on the phone as well?
5      A.  We only had one phone.  I think that I was on
6  the phone, and I think that maybe Jim had talked, but I
7  don't remember specifically.
8      Q.  Do you recall anything else about the business
9  opportunity that Mr. Ledecky was telling you in this
10 phone call?
11     A.  He didn't reveal, I don't believe in that
12 call, the initial call, that he revealed much about the
13 business opportunity.
14     Q.  Did he say why he wasn't revealing much in
15 that initial phone call?
16     A.  Yes.  He said he wanted to enter into an
17 agreement with the company that, um, it would
18 compensate him for putting this deal together, if in
19 fact, it happened.
20     Q.  What was your response to that?
21     A.  That is basically the same response I give to
22 anyone who ever calls me about something like that.
23     Q.  Which is what?
24     A.  That is if you bring me a deal that I don't
25 know about or that I haven't been involved in, and it

BY MR. MILLER:

Q. Let me show you Exhibit No. 4, and ask you to take a look at that. Is that two e-mails, the bottom e-mail being an e-mail from Mr. Ledecky to Mr. Bates with a cc to you and Mr. Gillis.

A. I have seen this document, yes. Is that what you're asking me?

Q. That is one of the things I am asking you. Have you seen it before?

A. I have seen this document.

Q. Is this an e-mail, at least the bottom half of it is an e-mail you received from Mr. Ledecky?

A. All I can tell you is that it is not unfamiliar to me. I don't remember when or how I saw it.

Q. Okay. Well, you see in the bottom e-mail, which is dated April 25th, 2004, that Mr. Ledecky says, after saying hello to Mr. Bates, "I talked with Leslie today from Greece about the attached document." Do you see that.

A. I talked to him, I am sorry, say that again. I talked to -- yes, go ahead.

Q. Okay. If you go down a couple paragraphs under that, it says Leslie also indicated that he is willing to compensate me for making a deal happen

1  between Source and this company; was that an accurate
2  statement?
3      A.  Absolutely, yes.
4      Q.  He left that potential compensation vague; was
5  that true at the time?
6      A.  Is that what now?
7      Q.  He is saying in here, "he" meaning you, "left
8  that potential compensation vague."  Was that true, in
9  your conversation with Mr. Ledecky, that initially --
10     A.  It would be hard for me to agree to
11 compensation -- that is his terminology not mine -- it
12 would be hard for me to agree to compensation for
13 something that I have no clue what it was.  Would you
14 do that?
15     Q.  First of all, I ask the questions, Mr. Flegel,
16 not you.  I am not asking for your justification, I'm
17 simply asking you, in your conversation with
18 Mr. Ledecky, was the compensation you said you would be
19 willing to give vague at the time or was it specific?
20     A.  I would say that it wasn't specific, because
21 there was no way it could be.
22     Q.  All right, so is this categorization
23 Mr. Ledecky made in his e-mail accurate or not?
24     A.  I am not trying to be clever, I just don't
25 know what "vague" means.  It has all kinds of

1    The States while you were in Greece; correct?
2        A.  That is correct.
3        Q.  Would you take a look at that document in
4    front of you, Exhibit No. 4.  You will see that the top
5    e-mail is an e-mail from Mr. Bates to Mr. Ledecky; do
6    you see that?
7        A.  Yes.
8        Q.  Okay.  And in the second, well, what
9    Mr. Bates says in his e-mail is:  "I spoke to Leslie
10   this morning and he outlined your discussion with me.
11   Leslie informed me that Source could not compensate you
12   on the basis described in your message to me.  Leslie
13   would propose that you receive an annual payment equal
14   to five percent of the net income derived by Source
15   from the business relationship, as determined in
16   accordance with GAAP, applied on a basis consistent
17   with Source's financial statements, and assuming
18   allocation of all costs and expenses."
19       Do you see all that?
20       A.  Yes.
21       Q.  Is that accurate?
22       A.  Yes.
23       Q.  That is what you told Mr. Bates to relay to
24   Mr. Ledecky?
25       A.  Yes.

67

1  before that phone call?
2     A.   No.
3     Q.   Had Source had any dealings with Ari Emanuel
4  before that phone call?
5     A.   No.
6     Q.   Go back to paragraph one of the referral
7  agreement, it says:
8         "Thereafter, upon the reasonable request of
9  Source, Ironbound shall assist Source with its
10 evaluation and negotiation of any proposed business
11 venture between client and Source;" do you see that?
12    A.   Yes.
13    Q.   Okay.  If we continue on, a couple sentences
14 down, it says:
15        "Source shall have the unfettered discretion
16 to accept or eject any proposed business relationship
17 with client without liability to Ironbound;" do you see
18 that?
19    A.   Yes.
20    Q.   Okay.  Is there any sort of definition in here
21 anywhere as to the term "business relationship"?
22    A.   You would have to repeat that, because I am
23 not sure exactly what you mean by that.
24    Q.   Does the agreement define the term "business
25 relationship"?

1   A.   Does this agreement define it?

2   Q.   Yes, sir?

3   A.   Um, this agreement does not specify, does not
4   specifically define it, no.

5   Q.   Okay. And in fact, it uses terms like any
6   proposed business relationship or any proposed business
7   venture; correct?

8   A.   I am reading. What is the question?

9   Q.   Some of the terms used in this, in referring
10  to business relationship or business venture are
11  prefaced by the word "any," it refers to any proposed
12  business relationship, any proposed business venture.

13  A.   It says of any, yes.

14  Q.   And again, you have been a businessman for how
15  many years now?

16  A.   Take your pick, 40.

17  Q.   Okay. And I presume that in your 40 plus
18  years as a businessman, you have had many different
19  types of business relationships with individuals and
20  companies?

21  A.   Um, that is a fair assumption.

22  Q.   Okay. You have had business relationships
23  that were buyer-seller relationships; correct?

24  A.   That were what?

25  Q.   Buyer-seller relationships?

1    A.   Yes.
2    Q.   You have had business relationships that were
3    franchise relationships; do you have any of those?
4    A.   None that I can recall.
5    Q.   Okay.  Do you have business relationships that
6    were consulting relationships?
7    A.   Um, from whose perspective?
8    Q.   Either?
9    A.   I mean hiring a consult or being a consultant?
10   Q.   Either way.
11   A.   I have hired consultants.
12   Q.   Okay.  And is that a type of business
13   relationship?
14   A.   Um, well, I consider hiring a consultant more
15   of an employer/employee relationship than I do a
16   business relationship.
17   Q.   Isn't an employer/employee a business
18   relationship?
19   A.   I think you're talking about semantics.  I
20   consider a business relationship, um, one that I would
21   have with a company I did business with.  Um, I don't
22   know that I consider a business relationship between
23   myself -- I don't know that I consider Doug Bates and
24   me having a business relationship.  In my own context
25   of the word, I would say he is an employee.

70

```
 1        Q.  Okay.  How about people who are not employees,
 2   they consult?
 3        A.  I think of consultants as a form of an
 4   employee.
 5        Q.  Well, you don't pay W-2's. You don't give them
 6   W-2's, do you?
 7        A.  I did, but that is not necessarily, that might
 8   be a criteria used.
 9        Q.  You don't withhold tax from their pay, do you?
10        A.  No, but it's services they are performing for
11   my company.
12        Q.  Uh-huh.
13        A.  And I don't know that I -- it is just an
14   interpretation of a business relationship.  I am not
15   sure I agree that a consultant is, hiring a consultant
16   is what I would call a business relationship, but it is
17   in the context of business, so you know.
18        Q.  Was -- you assume my next question.  You
19   certainly, if you're hiring a consultant in the context
20   of the business, it is a business matter?
21        A.  No, I didn't say that.  I said I do believe
22   that a consultant is also an employee in this context
23   of business.  I just don't know that I consider any
24   relationship I had with an employee or a consultant a
25   business relationship.  I would consider a partner a
```

1  business relationship.
2      Q.  Why do you make that distinction?
3      A.  Just because I do.
4      Q.  Okay.
5      A.  You're talking about a subjective subject, and
6  that is the way I feel about it.
7      Q.  Okay.  Objectively speaking, is there any
8  limitation in this agreement regarding what types of
9  relationships can fall under the term "business
10 relationship"?
11         MR. STERN:  Object to the form of the
12         question, calls for a legal conclusion.  You can
13         answer the question.
14         THE WITNESS:  Right.  Well, my answer is, I
15         just wouldn't offer an opinion on that, because I
16         am not a lawyer.
17 BY MR. MILLER:
18     Q.  Okay.  Did you have any discussions with
19 anyone about what the term business -- at the time this
20 was signed -- did you have any discussions with anyone
21 about what the term "business relationship" meant in
22 this contract?
23     A.  Not that I can recall.
24     Q.  And when I say this contract, for the record,
25 I am referring to Exhibit 6; do you understand that?

165

1  remember?
2      A.  I don't remember.
3      Q.  You don't know of any reason why Mr. Chiles
4  would lie about that?
5      A.  I don't think Mr. Chiles is a liar.
6      Q.  Okay.  Do you recall having a discussion with
7  Mr. Ledecky before your April lunch in Baltimore, some
8  time in March -- or actually, strike that -- let me get
9  the time frame right.  Excuse me a second.
10         After the merger was closed, and before your
11 lunch meeting in April in Baltimore with Mr. Ledecky,
12 do you recall having another conversation with
13 Mr. Ledecky regarding his desire to be paid as a result
14 of the Source-Alliance merger?
15     A.  I had discussions with Mr. Ledecky about that,
16 yes.
17     Q.  Okay.  Do you recall that during one of those
18 discussions, prior to your lunch in Baltimore in April,
19 that you told Mr. Ledecky that you do owe him something
20 as a result of the Source-Alliance merger, but that the
21 board would not allow you to pay him millions of
22 dollars?
23     A.  You know, I will tell you that I felt that
24 John did get us started in the DVD business.  I don't
25 know that I, per se, said that we owed him something

166

1  for Alliance, but I didn't fell that John was entitled
2  to millions of dollars.  I don't remember what I said
3  reference my board, but I don't believe that he was --
4  and I don't believe that anybody was.
5         Because I don't think anybody -- unless maybe
6  Len Rizzio, who never has asked for anything, because
7  Len Rizzio was the guy who made that deal happen.  That
8  deal was dead, and he is the one that made it happen.
9         Q.  My question is:  Did you tell Mr. Ledecky
10 during one of these conversations that you do owe him
11 something, but that the board would not allow you to
12 pay him millions?
13        A.  I was trying to appease John, and I might have
14 said that to him, because I didn't want to lose him as
15 an ally or as a friend, so I might have said that to
16 him.
17            MR. MILLER:  Okay.  I think it would be a good
18       time to take five minutes.
19            THE VIDEOGRAPHER:  Off the record.  The time
20       is 2:30 p.m.
21            (A discussion was held off the record.)
22            THE VIDEOGRAPHER:  Back on the record.  The
23       time is 2:44 p.m.
24 BY MR. MILLER:
25        Q.  Mr. Flegel, what are your duties and