UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JONATHAN LEDECKY** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 05-1039 (JGP) |
| | ) |
| **SOURCE INTERLINK** | ) |
| **COMPANIES, INC.,** | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## MEMORANDUM OPINION

Presently before the Court is **Defendant Source Interlink Companies, Inc.'s Motion for Summary Judgment [#58]** ("Def.'s Mot.")[1], which moves for dismissal of plaintiff's Amended Complaint ("Amend. Compl.") on the ground that no genuine issue of material fact remains in dispute which merits this case proceeding to trial. Def.'s Mot. (citing Fed. R. Civ. P. 56). Plaintiff takes issue with defendant's Motion, arguing that there are material disputes worthy of review by a jury which find ample support within the record. Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment [#61] ("Pl.'s Opp."), at 1 ("Source's assertions are belied by the record.").

As explained more fully below, the Court concludes that plaintiff has raised genuine issues of material fact and, as a consequence, defendant's Motion will be denied.

---

[1] The Court will hereafter use the abbreviation "Def.'s Memo" when citing Defendant Source Interlink Companies, Inc.'s Statement of Material Undisputed Facts and Points and Authorities in Support of its Motion for Summary Judgment.

## BACKGROUND

Plaintiff has brought this action against defendant alleging breach of a Referral Agreement ("Ref. Agr."), which became effective on April 26, 2004.[2] Ref. Agr., at 1; *see* Amend. Compl., at ¶ 1. Defendant is a large retail magazine distribution and fulfillment company. Amend. Compl. at ¶ 6. It was the function of plaintiff, a sole proprietorship, to introduce business entities to each other for "new growth opportunities[.]"[3] Amend. Compl. at ¶¶ 5, 15.

In terms of compensation for services, the Referral Agreement provides the following:

> Source shall pay to Ironbound, and Ironbound shall accept, 5% of the net income recorded by Source as a result of its relationship with Client during the five-year period following the date . . . on which the business relationship is established between Source and Client.

Ref. Agr., at 1. Also effective as of April 26, 2004, defendant and Endeavor Agency, LLC ("Endeavor"), a talent agency based in California, entered into a Mutual Non-Disclosure Agreement.[4] The NDA states in pertinent part below:

> Whereas, in connection with exploring and evaluating a *possible*

---

[2] Although the parties both indicate that the Referral Agreement was signed on April 27, 2004, the document lists an effect date of April 26, 2004. Ref. Agr., at 1 ("This Referral Agreement is made and entered into as of April 26, 2004[.]"). Moreover, the parties' signatures on the document are undated. *But see* Holmes, *The Path of the Law*, 10 Harvard Law Review 457 (1897) ("The making of a contract depends not on the agreement of two minds in one intention, *but on the agreement of two sets of external signs* – not on the parties having meant the same thing but on their having said the same thing." (J. Oliver Wendell Holmes, Jr.) (emphasis added)).

[3] It is unclear from the pleadings if plaintiff functioned in any other capacity.

[4] When both citing and referencing the Mutual Non-Disclosure Agreement, the Court will use the abbreviation "NDA." Like the Referral Agreement, the parties indicate that the NDA was signed on April 27, 2004, yet the document lists an effective date of April 26, 2004. NDA, at 1 ("This Agreement . . . is made effective as of April 26, 2004[.]"). And also like the Referral Agreement, the signatures on the NDA are undated.

> *business relationship* . . . and for the purpose of the *ongoing relationship*, the Parties recognize the need to disclose to one another certain of their Confidential Information . . . .

NDA, at 1 (emphasis added).

Pursuant to the terms of the Referral Agreement, plaintiff's principal and sole representative, Jonathan Ledecky, introduced defendant's former Chairman and CEO, S. Leslie Flegel, to Ariel Emanuel, a representative for Endeavor. Pl.'s Opp., at 1 (citations omitted); Amend. Compl., at ¶¶ 9, 13; Def.'s Memo, at 5. The attendees at the meeting "discuss[ed] possible business opportunities involving the retail distribution of audio and video products." Amend. Compl. at ¶ 20; *see also* Pl.'s Opp., at 4 (citations omitted). The meeting occurred via telephone conference on April 28, 2004, and was followed by another meeting held in New York City on May 12, 2004. Def.'s Memo, at 5; Amend. Compl., at ¶ 20.

On June 22, 2004, after becoming an advisor to defendant, Emanuel arranged for defendant to meet with representatives of Alliance Entertainment Corp. ("Alliance"), a large distributor of home entertainment content products. Amend. Compl., at ¶¶ 25, 26; Def.'s Memo, at 5. Following a series of involved negotiations, defendant and Alliance merged on November 18, 2004. Def.'s Memo, at 5-6; Amend. Compl., at ¶ 29. Principally, plaintiff asserts that as a result of the introduction and subsequent merger of the two companies, Endeavor received $1.5 million and Emanuel, its representative, was appointed director of the newly merged entity. Amend. Compl., at ¶¶ 19, 31. After the merger, on this information and belief, plaintiff demanded that defendant remit payment pursuant to the terms of the Referral Agreement, which defendant refused. *Id*. at ¶¶ 33-35. Defendant stated as grounds for its refusal that the Referral Agreement, by its terms, does not cover the Alliance merger. *See* Def.'s Memo, at 6; Amend.

Compl., at ¶ 35.

On February 22, 2006, plaintiff filed an Amended Complaint[5] seeking compensation from defendant under the Referral Agreement, moving that defendant be ordered to produce its books and records for an annual accounting to determine amounts owed to plaintiff, and seeking damages in an amount to be proven at trial. Amend. Compl., at ¶ 1. These issues are ripe for the Court's consideration.

## LEGAL STANDARD

A court should only grant a motion for summary judgment if it finds there to be no genuine issues of material fact in dispute between the parties after the close of the pleadings. *Paquin v. Fannie Mae*, 20 F. Supp. 2d 94, 95 (D.D.C. 1998) (citing Fed. R. Civ. P. 56(c)). All reasonable inferences should be drawn in the light most favorable to the nonmoving party because upon review of a motion for summary judgment, it is the moving party that bears the burden of demonstrating the absence of material issues in dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). If successful in establishing its case at the summary judgment stage, the moving party has the right to judgment as a matter of law. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986). Despite the favorable inferences drawn for the nonmoving party, however, "the mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient; there must be evidence on which the jury could reasonably find for the plaintiff to defeat a motion for summary judgment." *Paquin*, 20 F. Supp. 2d at 95 (citation and internal quotation marks

---

[5] This suit was filed on May 23, 2005.

omitted) (brackets in original). When considering a motion for summary judgment, unlike a motion for judgment on the pleadings, the Court is not limited to reviewing evidence within the scope of the complaint. *Terry v. Reno*, 322 U.S. App. D.C. 124, 135, 101 F.3d 1412, 1423 (D.C. Cir. 1996).

## ANALYSIS

I.     **Choice-of-Law**

As an initial matter, the Court will apply Florida law when interpreting the terms of the Referral Agreement, and California law when interpreting the terms of the NDA. *See* Ref. Agr. at 1 ("The rights and obligations of each of the parties to this Agreement shall be governed by and interpreted and determined in accordance with the internal laws of the State of Florida . . . ."); NDA, at 3 ("This Agreement . . . shall be governed and construed in accordance with the laws of the State of California . . . ."). "[C]ontractual choice-of-law provisions are *usually* honored." *Milanovich v. Costa Crociere, S.P.A.*, 293 U.S. App. D.C. 332, 336, 954 F.2d 763, 767 (D.C. Cir. 1992) (citation omitted) (emphasis added); *see Commerce Consultants Internatonal, Inc. v. Vetrerie Riunite, S.P.A.*, 276 U.S. App. D.C. 81, 83, 867 F.2d 697, 699 (D.C. Cir. 1989) (extending this rule to forum-selection clauses, which not only specify the particular jurisdiction, but also the particular court to adjudicate contractual disputes). Notwithstanding, choice of law provisions are "neither absolutely binding nor absolutely void, but rather" are viewed "as factors which help a court to exercise its discretion on a *reasonable* basis . . . ." *E.g.*, *Colonial Leasing Co. v. Best*, 552 F. Supp. 605, 607 (D. Or. 1982) (citation omitted) (emphasis added).[6]

---

[6] As explained *infra*, the Court will not honor the Referral Agreement's choice of law provision when addressing the Florida brokerage licensing statute because to do so would

5

**II.     Whether There Was a "Business Relationship"**

In this case, regarding the threshold question of whether defendant and Endeavor were in a "business relationship" by virtue of their actions, because of the NDA or pursuant to some other written instrument, the Referral Agreement states in relevant part that

> Source shall have the unfettered discretion to accept or reject any *proposed business relationship* with Client without liability to Ironbound. *Acceptance shall be manifest only by execution of a written agreement between Source and Client.*

Ref. Agr., at 1 (emphasis added). However, there remains a question as to what exactly the term "business relationship" means in this context.

The legal compendium Florida Jurisprudence 2d, in its volume entitled "Business Relationships," does not specifically define the term. Rather, the volume describes "business relationships and organizations" as "*including* domestic and foreign corporations generally, nonprofit corporations, associations, limited liability companies and professional service corporations, business trusts, joint-stock companies, partnerships, limited partnerships and joint ventures." 8A Fla. Jur. 2d Business Relationships § Summary (2005) (emphasis added). This description does not aid the Court in answering the instant question.

Florida case law is also not particularly instructive in this regard as the courts vary widely in their use of the term "business relationship" without defining it. *Compare Fla. Bar v. Berman*, 659 So. 2d 1049, 1050 (Fla. 1995) (discussing "a business relationship" between an attorney and a non-attorney); *In re Code of Judicial Conduct*, 643 So. 2d 1037, 1052 (Fla. 1994) (warning against a judge entering into "business relationships with those lawyers or other persons likely to

---

produce an unreasonable result. *See infra*, ANALYSIS, III.

come before the court on which the judge serves."); *Greyhound Rent-A-Car, Inc. v. Austin*, 298 So. 2d 345, 347 (Fla. 1974) (discussing "a business relationship" between an automobile dealer and a creditor); *Chaachou v. Chaachou*, 73 So. 2d 830, 832 (Fla. 1954) (discussing a "business relationship" between a married couple); *De Lage Landen Fin. Servs. v. Cricket's Termite Control*, 942 So. 2d 1001 (Fla. Dist. Ct. App. 5th Dist. 2006) (discussing "business relationships" as concern the Florida code on sales and secure transactions), *with Horne v. Vic Potamkin Chevrolet, Inc.*, 533 So. 2d 261, 262 (Fla. 1988) (holding that "[a] basic function of the law is to foster *certainty in business relationships, not to create uncertainty by establishing ambivalent criteria for the construction of those relationships*." (citation and internal quotation marks omitted) (emphasis added)).

     Where Florida cases define the term "business relationship," the definition is not applicable toward resolving the present contract dispute because the term is used in a completely different legal context – *tort law*. To be sure, in addressing the "tortious interference with a business relationship" cause of action, the Supreme Court of Florida reiterated its long-standing rule that "a business relationship" is one that is "evidenced by an *actual and identifiable understanding or agreement* . . . ." *Gossard v. Adia Servs.*, 723 So. 2d 182, 184 (Fla. 1998) (emphasis added); *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994) (same); *see also Ferguson Transp. v. North Am. Van Lines*, 687 So. 2d 821, 821 (Fla. 1996) (holding that to prove "a business relationship" within the meaning of the tort, "the plaintiff must [also] prove a business relationship with identifiable customers."). Notwithstanding, even by analogy, the preceding line of tort cases offer no conclusive answer to the question of what constitutes a "business relationship" in cases such as this one. The Court therefore looks to the

7

Referral Agreement itself for guidance in defining the term.

The Referral Agreement sets forth just *one condition* to establish a "business relationship" – there must be "a written agreement" as a result of plaintiff's introduction of defendant to a third party. Ref. Agr., at 1; *see also Kislak v. Kreedian*, 95 So. 2d 510, 515 (Fla. 1957) (holding that where an agreement governing a "business relationship" "is *not reduced to writing*," this "is *evidence . . . that no such agreement actually existed*." (emphasis added)). Both parties agree that the Referral Agreement is unambiguous and that this is the correct interpretation. *See* Def.'s Memo, at 8 ("In order for Plaintiff receive [sic] a commission or finder's fee under the Referral Agreement, Source and Endeavor had to agree to enter into a 'business relationship' *after* Plaintiff's introduction." (emphasis added)); Pl.'s Opp., at 7 (similar).  Moreover, both parties agree that the Referral Agreement and the NDA were executed on the *same day*. *See* Def.'s Memo, at 5; Pl.'s Opp., at 1.  The parties disagree, however, regarding whether the NDA qualifies as the "written agreement" that resulted from plaintiff's introduction of defendant to Endeavor, and established a "business relationship" between the two business entities. *See* Def.'s Memo, at 10 ("[T]he NDA . . . does not satisfy the Referral Agreement's unambiguous conditions precedent . . . ."); Pl.'s Opp., at 7 ("Source and Endeavor entered into a business relationship, evidenced by a written Non-Disclosure Agreement. . . .  The business relationship resulted in the introduction of Source to Alliance and led to [their] merger[.]").

To resolve this dispute, the Court turns to the NDA, which states that its purpose is to "explor[e] and evaluat[e] a *possible* business relationship" and to further "*the ongoing relationship*" between defendant and Endeavor. NDA, at 1 (emphasis added).  Defendant insists

that the NDA's inclusion of the word "possible" defeats plaintiff's assertion that the document created a "business relationship" between defendant and Endeavor. Def.'s Memo, at 10. Nonetheless, for the two reasons which follow, the Court is unconvinced.

First, despite the NDA's disclaimer that it is intended solely to establish a "possible" business relationship, the document is *unclear* as to the nature of the resultant "ongoing relationship" between defendant and Endeavor and, again, the parties offer competing accounts. Interpretation of the terms of the NDA is subject to California law, which provides that disclaimers such as the word "possible" do not always control in defining the nature and parameters of an agreement between business entities. *See Estate of Goshen*, 167 Cal. App. 3d 97, 100 (Cal. Ct. App. 1985) (holding that "the validity of [a] disclaimer . . . *is fully reviewable*[.]" (citing 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 209, p. 4200)).[7]

And second, under both Florida and California law, where, as here, "each side argues that the contract is clear and unambiguous, but ascribes a different meaning to the 'unambiguous' language, the contract is rendered ambiguous and summary judgment is improper." *Campaniello v. Amici P'Ship*, 832 So. 2d 870, 872 (Fla. Dist. Ct. App. 4th Dist. 2002) (citation omitted); *accord Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (Cal. Ct. App. 2004). This principle extends to *both* the NDA and the Referral Agreement.

In sum, because the Referral Agreement only requires that there be "a written agreement" to establish a "business relationship," and because there remains a dispute as to if the NDA, by its terms, establishes such a relationship, plaintiff has raised a genuine issue for trial.

---

[7] This is true under Florida law as well. *Breed Techs. v. AlliedSignal Inc.*, 861 So. 2d 1227, 1232 (Fla. Dist. Ct. App. 2nd Dist. 2003) ("[D]escriptive labels employed in agreements are not determinative as to the actual legal relationship between the parties." (citation omitted)).

Accordingly, defendant's argument fails.[8]

**III.    Whether Absence of Florida Brokerage License Precludes Recovery**

Defendant argues that plaintiff's "involvement in bringing Source and Endeavor together . . . constitute[s] unlicenced brokerage services under Fla. Statutes, Chapter 475." Defendant Source Interlink Companies, Inc.'s Reply Memorandum in Support of its Motion for Summary Judgment [#65[ ("Def.'s Reply"), at 2 (referencing Fla. Stat. § 475.01(1)(a)).[9]   In response,

---

[8] As there is an issue of material fact regarding the NDA, the Court expresses no opinion on plaintiff's claim that defendant attempted to avoid liability by refusing to enter into an additional written agreement with Endeavor. *See* Pl.'s Opp., at 18 ("[T]here is a material factual dispute as to the reason Source and Endeavor failed to sign a second written agreement to govern their relationship[.]").

[9] The Florida brokerage licensing statute provides in relevant part:

> "Broker" means a person who . . . appraises, auctions, sells, exchanges, buys, rents, or offers, attempts or agrees to appraise, auction, or negotiate the sale, exchange, purchase, or rental of business enterprises or business opportunities or any real property or any interest in or concerning the same, including mineral rights or leases, or who advertises or holds out to the public by any oral or printed solicitation or representation that she or he is engaged in the business of appraising, auctioning, buying, selling, exchanging, leasing, or renting business enterprises or business opportunities or real property of others or interests therein, including mineral rights, or who takes any part in the procuring of sellers, purchasers, lessors, or lessees of business enterprises or business opportunities or the real property of another, or leases, or interest therein, including mineral rights, or who directs or assists in the procuring of prospects or in the negotiation or closing of any transaction which does, or is calculated to, result in a sale, exchange, or leasing thereof, and who receives, expects, or is promised any compensation or valuable consideration, directly or indirectly therefor; and all persons who advertise rental property information or lists. . . .

Fla. Stat. § 475.01(1)(a).

10

plaintiff argues that "the Florida broker licensing statute does not govern this case" because "[w]hether Mr. Ledecky was required to be licensed is not a matter of contract interpretation, but, rather, an issue of compliance with the appropriate regulatory scheme." Pl.'s Opp., at 20-21. Plaintiff also points to deposition testimony of Flegel which appears to contradict defendant's assertion that Ledecky acted as a broker in facilitating the meeting between defendant and Endeavor, and is thus required to have had a brokerage license under Florida law to recover under the Referral Agreement. *Id.* at 19-20. The particular language plaintiff identifies is as follows:

> Q. All right. Did Mr. Ledecky provide assistance to you in Source's purchasing of the Alliance business?
>
> A. None that I can recall.
>
> Q. Okay. Did Mr. Ledecky act as a facilitator in the Source purchase of Alliance?
>
> A. No.
>
> Q. Did he act as a negotiator in the Source purchase of Alliance?
>
> A. None that I can recall.
>
> Q. *Did he act as a broker in the Source purchase of Alliance?*
>
> A. *None that I can recall.*
>
> Q. Did he act as a go-between in the Source purchase of Alliance?
>
> A. None that I can recall.
>
> Q. Did he act as a broker in any culminated business deals for Source in 2004-2005?
>
> A. None that I can think of.

*Id.* (emphasis added).  Setting aside the testimony of Flegel, it seems clear as a matter of law that the absence of a brokerage license should not preclude recovery under the Referral Agreement.

In support of its argument, defendant chiefly relies on *Meteor Motors, Inc. v. Thompson Halbach & Assocs.*, 914 So. 2d 479 (Fla. Dist. Ct. App. 4th Dist. 2005), where Florida's fourth district court of appeal broadly construed the Florida brokerage licensing statute "to include business brokers" such as plaintiff. 914 So. 2d 479, 482 (Fla. Dist. Ct. App. 4th Dist. 2005).  The *Meteor Motors* court then held that an Arizona party's telephone calls, faxes and emails to individuals in Florida made the Arizona party a "broker" under the Florida brokerage licensing statute. *Id.* at 483.

This Court is not bound by the holding in *Meteor Motors*, nor is it persuaded by its rationale.  Were that ruling to be rigidly applied in this case, plaintiff's introduction of Source to Endeavor would constitute illegal brokerage under Florida law and the entire Referral Agreement would be rendered void *ab initio*.  The Court views this as an odd result as it would frustrate the parties' clear intent in this case to be bound by the terms of the Referral Agreement. *See*, *e.g.*, *Kipin Indus. v. Van Deilen Int'l, Inc.*, 182 F.3d 490, 495 (6th Cir. 1999) ("'If the parties have chosen a law that would invalidate the contract, it can be assumed that they did so by mistake.'" (quoting Restatement (Second) of Conflict of Laws § 187, Comment e (1989)); *see also United States v. Winstar Corp.*, 518 U.S. 839, 911, 116 S. Ct. 2432, 2472 (1996) ("Under ordinary principles of contract law, one would construe the contract in terms of *the parties' intent*, as revealed by language and circumstance." (citation omitted) (emphasis added)).

As the parties have indicated their shared belief that the Referral Agreement controls by

its execution and in subsequent filings with the Court[10], the absence of a Florida brokerage license does not preclude plaintiff's recovery as a matter of law.

## CONCLUSION

For the reasons set forth above, Defendant Source Interlink Companies, Inc.'s Motion for Summary Judgment [#58] will be denied. An appropriate Order accompanies this Memorandum Opinion.

**Date: February 1, 2007**                                              **JOHN GARRETT PENN**
                                                                        **United States District Judge**

---

[10] *See* Defendant Source Interlink Companies, Inc.'s Statement of Points and Authorities in Support of its Motion to Dismiss Plaintiff's Implied Contract Claims [#28], at 2 ("[H]ere, an express contract between the parties is alleged, and Plaintiff has not alleged . . . that he lacks an adequate remedy at law."); Plaintiff's Opposition to Defendant's Motion to Dismiss [#38], at 1 ("[T]he Court or a jury will have no difficulty finding that the Agreement *is* applicable to both Source's relationship with Endeavor and the Alliance merger . . . . " (emphasis in original)).